**EXHIBIT A**

**TO AFFIDAVIT OF MICHAEL N. EDELMAN IN
SUPPORT OF ADVANCEME, INC.'S OPPOSITION TO MOTION
FOR LEAVE TO AMEND INVALIDITY CONTENTIONS**

Dockets.Justia.com

**Gerould, Elaine**

**From:**    David Goldin [dgoldin@amerimerchant.com]
**Sent:**    Wednesday, April 26, 2006 2:15 PM
**To:**    Litle, Tim
**Subject:** my contact info

David Goldin
AmeriMerchant
475 Park Avenue South
15th Floor
New York, NY 10016
Tel: 212-779-2100 x102
Fax: 646-349-3272

**EXHIBIT B**

**TO AFFIDAVIT OF MICHAEL N. EDELMAN IN
SUPPORT OF ADVANCEME, INC.'S OPPOSITION TO MOTION
FOR LEAVE TO AMEND INVALIDITY CONTENTIONS**

eFax

## Gerould, Elaine

| | |
|---|---|
| **From:** | David Goldin [dgoldin@amerimerchant.com] |
| **Sent:** | Thursday, April 27, 2006 4:20 PM |
| **To:** | Litle, Tim |
| **Subject:** | Forbes article |

got your message – I will try you back shortly.  I did find the Forbes article (see attached)

Business & Company Resource Center -- News/Magazine Display Page                    Page 1 of 3



Gale Databases from NYSL from LSTA funds and Back to NYPL

**Business & Company** RESOURCE CENTER

Help · Search Tips · Gale Resources · List of Sources

Home | Company | Industry | Articles | Advanced Search

Enter your search term(s): [                    ] [Company Search ▾]   SEARCH   Search History

Print  Email

☐ Mark this document

Revise Search
< Results List

Company Profile | News/ Magazines | Histories | Investment Reports | Financials | Rankings | Suits and Claims | Products | Industry Overview

_____ Article 1 of 1 _____

All Articles in this issue

**Related Subjects**
Direct marketing
New business
enterprises

Forbes, June 8, 1992 v149 n12 p120(2)

# "People thought I was nuts."

(Randall Bourne starts his own business, Exposures Inc.)
*Manjeet Kripalani, Tatiana Pouschine*

**Abstract:** Randall Bourne started his direct-mail photograph-frame business on $400,000 after his first child was born. His company, Exposures, will gross $15 million in 1992. Bourne's marketing strategy is discussed.

**Full Text:** COPYRIGHT 1992 Forbes, Inc.
What drives a man to start a business? In this case, becoming a father, but not for the reason you think.

RANDALL BOURNE got the idea for his business when he became a father. Like most proud papas, he accumulated dozens of snapshots of his new daughter. But why just shove them off in a drawer somewhere? Shopping around for frames and albums, he was disappointed in what he found. Other people, he reasoned, must have similar experiences. Thus was born Exposures Inc., a $15-million-a-year business selling photo frames and albums via mail-order catalog.

Like every entrepreneur we've ever met, Bourne drew on his past experiences. An amateur photographer and dedicated surfer, he started his business life with a little photo studio one block from California's Manhattan Beach in 1973, after he graduated from the University of Southern California. It was a serious effort, but, he confess, he "spent a lot of time surfing." Closing the shop, he drifted down to Costa Rica to think things over and be near good surfing. His self-analysis led him to decide to go to business school. When he graduated from USC in 1979 with a master's in business administration, he headed to New York City and a job with Scali, McCabe, Sloves, an advertising agency. One of his tasks was helping to create a direct marketing program for Nikon Camera.

Though he liked advertising, Bourne missed the excitement of decision making. "In the advertising business, you can make neat campaigns you recommended to your clients, but they make the decision," he explains. "I wanted to be on the other side of the table."

In 1982 little Kirsten was born. "Your pile of pictures for the first child is probably

six times as big as the one for your second," says Bourne, recognizing that the zeal for kid-snapping fades with the realization that the photos are rarely looked at.

Yet Americans were taking 40 million photographs a day--and in most cases they didn't know what to do with the results. Such photo frames as were widely available were cheap-looking commodity items, sold mainly on price.

While still at Scali, Bourne spent two years researching the photo frame market. His research showed that people would take their snapshots out of drawers if they had an attractive way to display them. Bourne decided to go into the photo frame business. "Should I become a manufacturer, or have a store or become a national player?" he asked himself.

Manufacturing or developing a chain of specialty stores would cost a fortune, and take time. Direct marketing, he realized, would enable him to establish a national presence in a few months. Direct marketing it was to be. "At the time [1986] cataloging was hot and romantic," he says. It was growing 15% a year, twice the rate of U.S. retail overall.

Bourne knew full well that most new ventures fail, but what the heck. He was just 34, and he figured he could always go back to an advertising job. His kids--there were now two of them--would never knew he'd failed.

In February of 1986 he quit Scali. For his new business he raised nearly $400,000; he had $40,000 himself, his family threw in $300,000, and a shopkeeper whose photo frames he liked put in $20,000.

Exposures Inc. began life in the Bournes' living room in Old Greenwich, Conn. The only employee was a secretary installed in the spare bedroom. Bourne began his search for products. He attended trade shows, pored over magazines and walked the streets to find suppliers. Good-looking frames existed, but they had never had a proper marketing exposure. Suppliers, he recalls, were quite skeptical. "I was walking around with this roughed-up kind of catalog dummy," recounts Bourne. Half of the manufacturers he approached wouldn't sell to him; the other half, only if he paid in advance of shipment. But Bourne lined up suppliers and designed some albums himself, selecting materials and approaching bookbinders to make up orders.

Bourne then paid a list broker $10,000 to rent 20 lists of 5,000 subscribers each. Those lists broke down into four or five market categories, such as young families, highpriced gift buyers and photographers.

Preparing the catalog seemed to eat money. Bourne spent $25,000 on design and photos, $15,000 for color separation, $25,000 on printing. And, of course, he had to buy inventory and warehouse it.

By July he was ready. "I gambled $100,000 on that first mailing (excluding overhead and warehousing). People thought I was nuts," Bourne says. "Photo frames, yes, but in a catalogu?" Then there was price. Frames in the Exposures catalog ranged from $25 to $165, compared with the average $19 frames sold in the stores.

Within six months, Bourne knew he had a business. The first mailing produced revenues of $100,000, and he learned that proud parents were better prospects as a group than photo buffs. The second and third mailing brought in $400,000 of sales each, reflecting improvements in product lines and mailings as a result

of feedback from the first mailing.

Finding capital remained a problem, but Bourne was innovative. Postage was his largest expense, and in 1989, when he needed money, he turned to his credit card processor, a New Hampshire-based company called litle & Co. Litle agreed to finance his postage by discounting his credit card receivables. It was such a good idea, other catalogers have followed suit.

Bourne's catalogs are innovative too. He works hard to make them chatty. For example, he introduces a "grandma locket" like this: "Grandmothers today are a bread apart from the rocker-bound knitters of yesteryear, but...they still love to brag about grandchildren." The photo frames in the catalog always contain pictures of customers instead of glamourous models.

This year Exposures expects to sell $15 million worth of merchandise and net $450,000.

End of story? Alas. Starting a business isn't that easy. Bourne had a success, but he ran out of money. The three mailings had left his finances depleted and the fourth exhausted them in 1987. His bank was in trouble itself and unwilling to lend him money. He could have chosen to sell out to a public cataloger, but he scorned the offering price: The $1 million he was offered was not even tempting. Reluctantly, Bourne approached venture capitalists--vulture capitalists, entrepreneurs sometimes call them. He got a $1.2 million capital infusion from two venture firms, New York's First Boston and Connecticut's Consumer Venture Partners.

It was a harsh deal. Bourne had to give up 80% of the equity. "So I gave up majority control, but I am still chief executive officer and entrepreneur," he says.

His remaining 20% is now worth a great deal of money--and his backers are very happy. Bourne is too busy with plans for expanding his business to spend much time regretting having to give up most of his company to backers. Two possibilities: starting a second catalog that would include collectibles and home furnishings or acquiring complementary companies. Meanwhile, he now surfs twice a year instead of twice a day.
**Bus. Coll.:** 65U1997
**Mag. Coll.:** 64J1545

Article A12268981

_____ Article 1 of 1 _____

Top of Page

THOMSON
——————※——————
GALE

Copyright and Terms of Use

Fax

## Gerould, Elaine

**From:**    Litle, Tim
**Sent:**    Thursday, April 27, 2006 5:24 PM
**To:**    Carroll, Marcus
**Subject:** FW: Forbes article

Top of page 3.


Tim Litle
Litle & Co.
900 Chelmsford Street
Lowell, MA 01851
Tim@Litle.com
(o) 978-275-6520
(m) 978-807-8807

**From:** David Goldin [mailto:dgoldin@amerimerchant.com]
**Sent:** Thursday, April 27, 2006 4:20 PM
**To:** Litle, Tim
**Subject:** Forbes article

I got your message – I will try you back shortly.  I did find the Forbes article (see attached)


8/29/2006

Business & Company Resource Center -- News/Magazine Display Page                    Page 1 of 3



Article 1 of 1

All Articles in this Issue

**Related Subjects**
Direct marketing
New business
enterprises

*Forbes*, June 8, 1992 v149 n12 p120(2)

# "People thought I was nuts."

(Randall Bourne starts his own business, Exposures Inc.)
*Manjeet Kripalani, Tatiana Pouschine*

**Abstract:** Randall Bourne started his direct-mail photograph-frame business on $400,000 after his first child was born. His company, Exposures, will gross $15 million in 1992. Bourne's marketing strategy is discussed.

**Full Text:** COPYRIGHT 1992 Forbes, Inc.
What drives a man to start a business? In this case, becoming a father, but not for the reason you think.

RANDALL BOURNE got the idea for his business when he became a father. Like most proud papas, he accumulated dozens of snapshots of his new daughter. But why just shove them off in a drawer somewhere? Shopping around for frames and albums, he was disappointed in what he found. Other people, he reasoned, must have similar experiences. Thus was born Exposures Inc., a $15-million-a-year business selling photo frames and albums via mail-order catalog.

Like every entrepreneur we've ever met, Bourne drew on his past experiences. An amateur photographer and dedicated surfer, he started his business life with a little photo studio one block from California's Manhattan Beach in 1973, after he graduated from the University of Southern California. It was a serious effort, but, he confess, he "spent a lot of time surfing." Closing the shop, he drifted down to Costa Rica to think things over and be near good surfing. His self-analysis led him to decide to go to business school. When he graduated from USC in 1979 with a master's in business administration, he headed to New York City and a job with Scali, McCabe, Sloves, an advertising agency. One of his tasks was helping to create a direct marketing program for Nikon Camera.

Though he liked advertising, Bourne missed the excitement of decision making. "In the advertising business, you can make neat campaigns you recommended to your clients, but they make the decision," he explains. "I wanted to be on the other side of the table."

In 1982 little Kirsten was born. "Your pile of pictures for the first child is probably

six times as big as the one for your second," says Bourne, recognizing that the zeal for kid-snapping fades with the realization that the photos are rarely looked at.

Yet Americans were taking 40 million photographs a day--and in most cases they didn't know what to do with the results. Such photo frames as were widely available were cheap-looking commodity items, sold mainly on price.

While still at Scali, Bourne spent two years researching the photo frame market. His research showed that people would take their snapshots out of drawers if they had an attractive way to display them. Bourne decided to go into the photo frame business. "Should I become a manufacturer, or have a store or become a national player?" he asked himself.

Manufacturing or developing a chain of specialty stores would cost a fortune, and take time. Direct marketing, he realized, would enable him to establish a national presence in a few months. Direct marketing it was to be. "At the time [1986] cataloging was hot and romantic," he says. It was growing 15% a year, twice the rate of U.S. retail overall.

Bourne knew full well that most new ventures fail, but what the heck. He was just 34, and he figured he could always go back to an advertising job. His kids-- there were now two of them--would never knew he'd failed.

In February of 1986 he quit Scali. For his new business he raised nearly $400,000; he had $40,000 himself, his family threw in $300,000, and a shopkeeper whose photo frames he liked put in $20,000.

Exposures Inc. began life in the Bournes' living room in Old Greenwich, Conn. The only employee was a secretary installed in the spare bedroom. Bourne began his search for products. He attended trade shows, pored over magazines and walked the streets to find suppliers. Good-looking frames existed, but they had never had a proper marketing exposure. Suppliers, he recalls, were quite skeptical. "I was walking around with this roughed-up kind of catalog dummy," recounts Bourne. Half of the manufacturers he approached wouldn't sell to him; the other half, only if he paid in advance of shipment. But Bourne lined up suppliers and designed some albums himself, selecting materials and approaching bookbinders to make up orders.

Bourne then paid a list broker $10,000 to rent 20 lists of 5,000 subscribers each. Those lists broke down into four or five market categories, such as young families, highpriced gift buyers and photographers.

Preparing the catalog seemed to eat money. Bourne spent $25,000 on design and photos, $15,000 for color separation, $25,000 on printing. And, of course, he had to buy inventory and warehouse it.

By July he was ready. "I gambled $100,000 on that first mailing (excluding overhead and warehousing). People thought I was nuts," Bourne says. "Photo frames, yes, but in a catalog?" Then there was price. Frames in the Exposures catalog ranged from $25 to $165, compared with the average $19 frames sold in the stores.

Within six months, Bourne knew he had a business. The first mailing produced revenues of $100,000, and he learned that proud parents were better prospects as a group than photo buffs. The second and third mailing brought in $400,000 of sales each, reflecting improvements in product lines and mailings as a result

of feedback from the first mailing.

Finding capital remained a problem, but Bourne was innovative. Postage was his largest expense, and in 1989, when he needed money, he turned to his credit card processor, a New Hampshire-based company called litle & Co. Litle agreed to finance his postage by discounting his credit card receivables. It was such a good idea, other catalogers have followed suit.

Bourne's catalogs are innovative too. He works hard to make them chatty. For example, he introduces a "grandma locket" like this: "Grandmothers today are a bread apart from the rocker-bound knitters of yesteryear, but...they still love to brag about grandchildren." The photo frames in the catalog always contain pictures of customers instead of glamourous models.

This year Exposures expects to sell $15 million worth of merchandise and net $450,000.

End of story? Alas. Starting a business isn't that easy. Bourne had a success, but he ran out of money. The three mailings had left his finances depleted and the fourth exhausted them in 1987. His bank was in trouble itself and unwilling to lend him money. He could have chosen to sell out to a public cataloger, but he scorned the offering price: The $1 million he was offered was not even tempting. Reluctantly, Bourne approached venture capitalists--vulture capitalists, entrepreneurs sometimes call them. He got a $1.2 million capital infusion from two venture firms, New York's First Boston and Connecticut's Consumer Venture Partners.

It was a harsh deal. Bourne had to give up 80% of the equity. "So I gave up majority control, but I am still chief executive officer and entrepreneur," he says.

His remaining 20% is now worth a great deal of money--and his backers are very happy. Bourne is too busy with plans for expanding his business to spend much time regretting having to give up most of his company to backers. Two possibilities: starting a second catalog that would include collectibles and home furnishings or acquiring complementary companies. Meanwhile, he now surfs twice a year instead of twice a day.
**Bus. Coll.: 65U1997**
**Mag. Coll.: 64J1545**

Article A12268981

_____ Article 1 of 1 _____

Top of Page

THOMSON
━━━━━✳━━━━━       Copyright and Terms of Use
GALE

## EXHIBIT C

### TO AFFIDAVIT OF MICHAEL N. EDELMAN IN SUPPORT OF ADVANCEME, INC.'S OPPOSITION TO MOTION FOR LEAVE TO AMEND INVALIDITY CONTENTIONS

**CHASE ⬡** ™
**Paymentech**

# Facsimile

1601 Elm Street, 9th Floor
Dallas, Texas 75201
www.chasepaymentech.com

March 3, 2006

To:      David Golden

Fax:     646 - 3 49 - 3272
From:    Paul Hankins

Phone:   214 - 849 - 2072        Fax: (214) 849-2067

Number of pages including cover 12

The pages comprising this facsimile contain confidential information of Paymentech, Inc.  This information is intended for use solely by the individual or entity named as the recipient. Any disclosure, copying, distribution, or use of the contents of this transmission is prohibited.  If you have received this transmission in error, please notify us by telephone at (214) 849-2083 immediately so that we may arrange to retrieve this transmission at no cost to you.

6/19/00

Schedule E - 1

## Promissory Note for Postage Advances

| | |
|---|---|
| Principal Amount of Advance is: | $170,210.30 |
| Advance is Payable to: | Postmaster, Atlanta, GA |
| Advance will be made on: | 6/25/90 |
| First repayment will be made on | 7/16/90 |
| Daily Repayment amount is | $4311.47 |
| Last repayment will be made on: | 9/7/90 |

In consideration of Litle & Co. making advances for the account of MEMBER to Postmaster, Atlanta, GA., MEMBER agrees to pay on demand the Principal Amount of Advance plus accrued interest at 10% to Litle & Co., or order. Notwithstanding that such amounts are otherwise payable on demand, MEMBER agrees that (i) the Principal Amount of Advance, plus accrued interest at 10% less prior payments shall be paid in full on or before Sept. 10, 1990 and (ii) the Daily Repayments shall be deducted from daily NET PROCEEDS.

Upon a default in payment of any obligation of MEMBER under this Schedule, Litle & Co., may, upon 48 hours notice, at its option, declare all obligations of MEMBER to Litle & Co. immediately due and payable and exercise all rights and remedies available under applicable law. The rights and remedies of Litle & Co. under this Schedule are cumulative of, in addition to, and not in limitation of, any rights or remedies otherwise available to Secured Party including without limitation such other rights and remedies as may be available under the OPERATING GUIDE or MASTER MEMBERSHIP AGREEMENT. MEMBER shall pay reasonable costs of collection incurred by Secured Party, including reasonable fees of attorney.

No delay or omission on the part of Secured Party in exercising any right hereunder shall operate as a waiver of such right or of any other right. MEMBER waives presentment, demand, protest and notices of every kind and assents to any one or more extensions of time or other indulgences, to any substitutions, exchanges or releases of collateral (if any), and to the addition or release of any person primarily or secondarily liable.

Exposures, Inc.
MEMBER

ALLEN ABBOTT - VP. MARKETING
By (Type or Print Name & Title)

Signature

6/22/90
Date



**"ENVIRONMENT, Inc. OPERATING GUIDE**

June 18, 1990 - Page 11 of 11
M-003-11M

TOTAL P.03

06/19/06  MON 14:18 FAX 214 849 2067          PAYMENTECH          ____ ___ ____      HERE FES          ☒004

## Security Agreement

To secure the prompt and full payment of any and all obligations, whether due or to become due, now existing or hereafter arising, of MEMBER to Litle & Co., Inc. ("Secured Party"), including without limitation those obligations arising under Schedule E - 1 of the OPERATING GUIDE for Postage Advances, MEMBER grants Secured Party a continuing security interest in all accounts, inventory, equipment, customer lists, furniture, fixtures, CARD SALES and all other tangible and intangible property of MEMBER, wherever located, now owned or hereafter acquired or arising and any and all additions, substitutions, proceeds and products thereto and thereof. All cash, deposits, instruments, sums due MEMBER from Secured Party, or other property of MEMBER in possession of Secured Party (whether for safekeeping or otherwise) shall constitute security for the obligations and may be applied or set off by Secured Party against the obligations at any time and whether or not any of the obligations are then due or other collateral is available to Secured Party.

MEMBER agrees that a copy of this security agreement may be filed as a financing statement and MEMBER agrees to take such additional acts and deliver such additional statements as Secured Party may reasonably request in order to protect, preserve and perfect the rights of Secured Party.

Upon a default in payment of any of the obligations secured hereby or performance of any obligation of MEMBER under this Schedule, Secured Party may, upon 48 hours notice, at its option, declare all obligations immediately due and payable and exercise all rights and remedies available to a secured party under applicable law. All rights and remedies of Secured Party under this Schedule are cumulative of, in addition to, and not in limitation of, any rights or remedies otherwise available to Secured Party including without limitation such other rights and remedies as may be available under the OPERATING GUIDE or MASTER MEMBERSHIP AGREEMENT. MEMBER shall pay reasonable costs of collection incurred by Secured Party, including reasonable fees of attorney.

No delay or omission on the part of Secured Party in exercising any right hereunder shall operate as a waiver of such right or of any other rights. MEMBER waives presentment, demand, protest and notices of every kind and assents to one or more extensions of time or other indulgences, to any substitutions, exchanges or releases of collateral (if any), and to the addition or release of any other person, primarily or secondarily liable.

Exposures, Inc.
MEMBER

ALLEN ABBOTT VP MARKETING
By (Type or Print Name & Title)

_Signature_

70 South Main St.

South Norwalk, CT 06854
Mailing Address

June 15, 1990
Date

Litle & Co., Inc.

By  JOHN E. SHIREY

_Signature_

54 Stiles Road

Salem, NH 03079
Mailing Address

6/25/90
Date

Schedule F - 4

## Security Agreement

To secure the prompt and full payment of any and all obligations, whether due or to become due, now existing or hereafter arising, of MEMBER to Litle & Co., Inc. ("Secured Party"), including without limitation those obligations arising under Schedule E - 4 of the OPERATING GUIDE for Postage Advances, MEMBER grants Secured Party a continuing security interest in all accounts, inventory, equipment, customer lists, furniture, fixtures, CARD SALES and all other tangible and intangible property of MEMBER, wherever located, now owned or hereafter acquired or arising and any and all additions, substitutions, proceeds and products thereto and thereof. All cash, deposits, instruments, sums due MEMBER from Secured Party, or other property of MEMBER in possession of Secured Party (whether for safekeeping or otherwise) shall constitute security for the obligations and may be applied or set off by Secured Party against the obligations at any time and whether or not any of the obligations are then due or other collateral is available to Secured Party.

MEMBER agrees that a copy of this security agreement may be filed as a financing statement and MEMBER agrees to take such additional acts and deliver such additional documents as Secured Party may reasonably request in order to protect, preserve and perfect the rights of Secured Party.

Upon a default in payment of any of the obligations secured hereby or performance of any obligation of MEMBER under this Schedule, Secured Party may, upon 48 hours notice, at its option, declare all obligations immediately due and payable and exercise all rights and remedies available to a secured party under applicable law. All rights and remedies of Secured Party under this Schedule are cumulative of, in addition to, and not in limitation of, any rights or remedies otherwise available to Secured Party including without limitation such other rights and remedies as may be available under the OPERATING GUIDE or MASTER MEMBERSHIP AGREEMENT. MEMBER shall pay reasonable costs of collection incurred by Secured Party, including reasonable fees of attorney.

No delay or omission on the part of Secured Party in exercising any right hereunder shall operate as a waiver of such right or of any other rights. MEMBER waives presentment, demand, protest and notices of every kind and assents to one or more extensions of time or other indulgences, to any substitutions, exchanges or releases of collateral (if any), and to the addition or release of any other person, primarily or secondarily liable.

Exposures, Inc.
MEMBER

J. Randall Bourne
By (Type or Print Name & Title)

Signature

70 South Main St.

South Norwalk, CT 06854
Mailing Address

June 19, 1991
Date

06/19/06    MON 14:20 FAX 214 849 2067        PAYMENTECH

Schedule E - 4

## Demand Promissory Note for Postage Advances

| | |
|---|---|
| Principal Amount of Advance is: | $168,000.00 |
| Advance is Payable to: | Postmaster, Atlanta, GA |
| Advance will be made on: | 06/26/91 |
| First repayment will be made on | 07/08/91 |
| Daily Repayment and Management Fee is: | $4412.50 |
| Last repayment will be made on: | 08/30/91 |

In consideration of Litle & Co. making advances for the account of MEMBER to Postmaster, Atlanta, GA, MEMBER agrees to pay on demand the Principal Amount of Advance plus accrued interest at 10% and $6720.00 Management Fee to Litle & Co. or order. MEMBER further agrees that all CHARGE CARD transactions from all divisions and subsidiaries will be processed by Litle & Co. while any amount owed under this note is still outstanding. Notwithstanding that such amounts are otherwise payable on demand, MEMBER agrees that (i) the Principal Amount of Advance, plus accrued interest at 10% and non-interest bearing Management Fee, less prior payments shall be paid in full on or before September 2, 1991 and (ii) the Daily Repayments shall be deducted from daily NET PROCEEDS.

Until such time as demand is made MEMBER shall make payments in accordance with the schedule above. The rights and remedies of Litle & Co. under this Schedule are cumulative of, in addition to, and not in limitation of, any rights or remedies otherwise available to Secured Party including without limitation such other rights and remedies as may be available under the OPERATING GUIDE or MASTER MEMBERSHIP AGREEMENT. MEMBER shall pay reasonable costs of collection incurred by Secured Party, including reasonable fees of attorney.

No delay or omission on the part of Secured Party in exercising any right hereunder shall operate as a waiver of such right or of any other right. MEMBER waives presentment, demand, protest and notices of every kind and assents to any one or more extensions of time or other indulgences, to any substitutions, exchanges or releases of collateral (if any), and to the addition or release of any person primarily or secondarily liable.

Exposures, Inc.
MEMBER

J. Randall Bourne

(Type or Print Name & Title)

Signature

Date                  6/19/91

06/19/06   MON 14:20 FAX 214 849 2067....   PAYMENTECH   WAL BANKY HOWARD   ☒007
JUN 21 '90 15:59 CONSUMER VENTURE 203-629-2819   ☒002
P.2

## SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT, dated as of June 22, 1990 by and among EXPOSURES INC., a Delaware corporation ("Exposures"), THE CONNECTICUT BANK AND TRUST COMPANY, N.A., a national banking association (the "Bank"), CONSUMER VENTURE PARTNERS I, L.P., a Delaware limited partnership ("Consumer Venture Partnership") and FIRST BOSTON INVESTMENT LIMITED PARTNERSHIP NO. 6, a New York limited partnership ("First Boston Partnership" and together with Consumer Venture Partnership, the "Guarantors").

WHEREAS, on August 30, 1989, Exposures and the Bank entered into a Line of Credit/Grid Agreement (the "Line of Credit") and a Security Agreement (the "CBT Security Agreement");

WHEREAS, pursuant to the CBT Security Agreement, Exposures has granted to the Bank a continuing security interest (the "CBT Security Interest") in certain of its properties, including all of Exposures' accounts receivable and customer lists (Exposures' accounts receivable and customer lists, together with the proceeds thereof, but no other collateral subject to the CBT Security Interest or the Guarantors' Security Interest (defined below), are hereinafter called the "Priority Collateral");

WHEREAS, on August 30, 1989, Exposures, Consumer Venture Partners, L.P., a Delaware limited partnership ("CVP Partnership"), Consumer Venture Parallel Fund, L.P., a Delaware limited partnership ("CVPF Partnership") and First Boston Partnership entered into a Security Agreement (the "Guarantors' Security Agreement") with respect to the guarantee of the Line of Credit by CVP Partnership, CVPF Partnership and First Boston Partnership;

WHEREAS, pursuant to the Guarantors' Security Agreement, Exposures has granted to CVP Partnership, CVPF Partnership and First Boston Partnership a continuing security interest in certain of its assets (the "Guarantors' Security Interest");

WHEREAS, Consumer Venture Partnership has succeeded to all of the rights and obligations of CVP Partnership and CVPF Partnership under the Guarantors' Security Agreement;

WHEREAS, Litle & Co., Inc., a Delaware corporation ("Litle"), has agreed to make certain advances in the aggregate amount not to exceed $175,000 for the account of Exposures to Postmaster, Atlanta, Georgia and in connection therewith

-2-

Exposures has executed a security agreement dated as of the date hereof (the "Litle Security Agreement");

WHEREAS, the Bank has deemed the aforesaid advances for the account of Exposures to be in its interest as a creditor of Exposures and has entered into an amendment to the CBT Security Agreement in order to consent to the security interest granted pursuant to the Litle Security Agreement;

WHEREAS, the Guarantors have deemed the aforesaid advances for the account of Exposures to be in their respective interests as guarantors of the Line of Credit and have consented in writing to said advances; and

WHEREAS, in connection with the Litle Security Agreement, Exposures has agreed to obtain subordination of the CBT Security Interest and the Guarantors' Security Interest to Litle's security interest with respect to the Priority Collateral, but no other collateral subject to the CBT Security Interest or the Guarantors' Security Interest (as so limited, the "Litle Security Interest"), and the Bank has agreed to subordinate the CBT Security Interest and the Guarantors have agreed to subordinate the Guarantors' Security Interest to the Litle Security Interest.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein contained, it is hereby agreed:

1.  The Litle Security Interest shall take precedence over and have priority with respect to the CBT Security Interest and the Guarantors' Security Interest in the Priority Collateral.

2.  The Bank hereby subordinates the CBT Security Interest, and the Guarantors hereby subordinate the Guarantors' Security Interest, in the Priority Collateral to and in favor of the Litle Security Interest, and any proceeds of the Priority Collateral shall be applied against amounts owing under the Litle Security Agreement, and paid over to Litle to the extent of the amount of Exposures' then-outstanding obligations to Litle secured by the Priority Collateral, prior to any application thereof against amounts owing to the Bank or to the Guarantors.

3.  Neither the Bank nor the Guarantors shall institute any action or take any steps or use any means to realize upon the Priority Collateral as long as any claim made in respect to the Litle Security Interest remains unsatisfied and so long as Litle is diligently pursuing the satisfaction of its claims by, among other

-3-

things, realizing or attempting to realize upon the
Priority Collateral.

4.   Upon distribution of any assets of Exposures, whether
     by reason of sale, reorganization, liquidation,
     dissolution, arrangement, bankruptcy, receivership,
     assignment for the benefit of creditors, foreclosure or
     otherwise, Litle shall be entitled to receive the
     proceeds from the sale, collection or other disposition
     of the Priority Collateral until all amounts owing with
     respect to the Litle Security Agreement have been paid
     in full.

5.   Neither the Bank nor the Guarantors shall sell,
     assign, transfer, pledge or hypothecate at any time
     while this Subordination Agreement remains in effect
     any right, claim or interest of any kind in or to any
     of the Priority Collateral without making such sale,
     assignment, transfer, pledge or hypothecation expressly
     subject to the terms of this Subordination Agreement.

6.   The Bank, the Guarantors and Exposures will execute
     such further instruments and do such further acts as
     any party may reasonably request to effectively carry
     out the terms and purposes of this Subordination
     Agreement.

7.   Nothing in this Agreement shall be deemed to affect
     the validity or priority of the CBT Security Interest
     or the Guarantors' Security Interest, except to the
     extent that the respective security interests of the
     Bank and the Guarantors in the Priority Collateral are
     subordinated to the Litle Security Interest hereunder.
     The Guarantors acknowledge that the CBT Security
     Interest shall take precedence over and have priority
     with respect to the Guarantors' Security Interest.  No
     third party shall have any rights under this Agreement.
     Any failure of Litle to duly perfect its security
     interest under the Litle Security Agreement shall
     render this Subordination Agreement null and void.

8.   This Subordination Agreement may be amended only by a
     writing signed by the parties and, if its interest is
     affected, by Litle.  For so long as this Subordination
     Agreement is in effect, Exposures shall not increase
     the amount of the advances from Litle beyond $175,000
     without the prior consent of the Bank and the
     Guarantors.

06/19/06  MON 14:22 FAX 214 849 2067          PAYMENTECH                      ☒010
. 06/21/90   15:55   ☎203 077 7301          DAY BERRY HOWARD                   ☒005

-4-

9.  Any notice or demand required or made hereunder shall
    be by hand, by a nationally recognized overnight
    courier service or by express or certified mail, return
    receipt requested, to the following addresses:

        If to Exposures:

        Exposures, Inc.
        70 South Main Street
        South Norwalk, Connecticut  06854
        Attention: Mr. J. Randall Bourne

        If to the Bank:

        The Connecticut Bank and Trust Company, N.A.
        Norwalk Commercial CTLF 015N
        Four Stamford Forum
        Stamford, CT 06901
        Attention: Mr. John Stanley
                   Vice President

        If to the Guarantors:

        Consumer Venture Partners I, L.P.
        Three Pickwick Plaza
        Greenwich, Connecticut  06830
        Attention:  Mr. Pearson C. Cummin, III

        and

        First Boston Investment Partnership No. 6
        The First Boston Corporation
        Tower Forty-Nine ~~Park Avenue Plaza~~
        ~~12 East 49th Street~~ 55 East 52nd St.
        New York, New York ~~10017~~ 10055
        Attention:  Mr. John F. Kenny, Jr.
                    Vice President

10. This Subordination Agreement may be executed in
    counterparts, each of which shall be deemed an
    original but all of which together shall constitute one
    and the same instrument.  This Subordination Agreement
    shall be binding upon, and inure to the benefit of, the
    parties hereto and Litle, as third party beneficiary,
    and their respective successors and assigns.

06/19/06  MON 14:22 FAX 214 849 2067      PAYMENTECH                              ☒011
                                                                                  ☒008

-5-

11.  This Subordination Agreement shall be governed by, and
     construed and interpreted according to, the laws of the
     State of Connecticut.

     IN WITNESS WHEREOF, the parties hereto have caused this
Subordination Agreement to be executed as of the date first above
written.

                              EXPOSURES INC.

                              By: _____
                                 Its           President

                              CONSUMER VENTURE
                              PARTNERS I, L.P.

                              By: CONSUMER VENTURE
                                  ASSOCIATES, L.P.

                              By: _____
                                 General Partner

                              FIRST BOSTON INVESTMENT
                              PARTNERSHIP NO. 6

                              By: FBGB, INC.

                              By: _____
                                 Its

                              THE CONNECTICUT BANK AND
                              TRUST COMPANY, N.A.

                              By: _____
                                 Its VICE PRESIDENT

06/19/06  MON 14:23 FAX 214 849 2067        PAYMENTECH
                                          DAY BERRY HOWARD                          ☒012
                                                                                   ☒007

-5-

11.    This Subordination Agreement shall be governed by, and
       construed and interpreted according to, the laws of the
       State of Connecticut.

    IN WITNESS WHEREOF, the parties hereto have caused this
Subordination Agreement to be executed as of the date first above
written.

                              EXPOSURES INC.

                              By: _____
                                   Its

                              CONSUMER VENTURE
                              PARTNERS I, L.P.

                              By: CONSUMER VENTURE
                                  ASSOCIATES, L.P.

                              By: _____
                                   General Partner

                              FIRST BOSTON INVESTMENT
                              PARTNERSHIP NO. 6

                              By: FBGB, INC.

                              By: _____
                                   Its

                              THE CONNECTICUT BANK AND
                              TRUST COMPANY, N.A.

                              By: _____
                                   Its

06/19/06  MON 14:23 FAX 214 849 2067___    PAYMENTECH           ☒013
       06/21/90   15:55   ☎203 877 7301      DAY BERRY HOWARD       ☒008
                                                                    ☒008

--5--

11.  This Subordination Agreement shall be governed by, and
     construed and interpreted according to, the laws of the
     State of Connecticut.

     IN WITNESS WHEREOF, the parties hereto have caused this
Subordination Agreement to be executed as of the date first above
written.

                              EXPOSURES INC.

                              By:_____
                                 Its

                              CONSUMER VENTURE
                              PARTNERS I, L.P.

                              By: CONSUMER VENTURE
                                  ASSOCIATES, L.P.

                              By:_____
                                 General Partner

                              FIRST BOSTON INVESTMENT
                              PARTNERSHIP NO. 6

                              By: FBGP, INC.

                              By:_____
                                 Its  President

                              THE CONNECTICUT BANK AND
                              TRUST COMPANY, N.A.

                              By:_____
                                 Its

## EXHIBIT D

### TO AFFIDAVIT OF MICHAEL N. EDELMAN IN SUPPORT OF ADVANCEME, INC.'S OPPOSITION TO MOTION FOR LEAVE TO AMEND INVALIDITY CONTENTIONS

eFax                                                                      Page 1 of 1

## Gerould, Elaine

| | |
|---|---|
| **From:** | David Goldin [dgoldin@amerimerchant.com] |
| **Sent:** | Tuesday, June 20, 2006 3:00 PM |
| **To:** | Litle, Tim |
| **Subject:** | Postage Financing Agreement |

Tim --

wanted to bring you up to date, attached you will find a copy of the schedule / security agreement of the postage financing agreement w/ Exposures. The entire document couldn't be located, this was all that was apparently in the folder. The patent attorneys think it's enough to "start" and we may ask for testimony from you, etc. that further details how the program worked if needed.

just wanted to keep you in the loop and again I appreciate your help in this matter. I hope you are enjoying your summer (not sure if you left for Martha's Vineyard or not) and I will touch base soon.

David


David Goldin
AmeriMerchant
175 Park Avenue South
15th Floor
New York, NY 10016
Tel: 212-779-2100 x102
Fax: 646-349-3272

## EXHIBIT E

### TO AFFIDAVIT OF MICHAEL N. EDELMAN IN
### SUPPORT OF ADVANCEME, INC.'S OPPOSITION TO MOTION
### FOR LEAVE TO AMEND INVALIDITY CONTENTIONS



Page 1 of 2

## Gerould, Elaine

| | |
|---|---|
| **From:** | David Goldin [dgoldin@amerimerchant.com] |
| **Sent:** | Tuesday, June 27, 2006 7:31 PM |
| **To:** | Litle, Tim |
| **Subject:** | RE: Postage Financing Agreement |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Paymentech's attorney is claiming that the Hearthsong documents are not there and all they have from the Exposures agreement was a schedule A (where definitions are defined in another agreement that they don't have). With your testimony, it will definitely help "put the pieces of the puzzle together."

As part of the district we are in, we need to do "automatic disclosures" -- will Randy from Exposures be ok w/ us listing him as someone we are going to use in our case? If so, do you have a contact address for him we can put down (work or home)?

The patent attorney's know about your willingness to testify and I will keep you posted well ahead in advance of the progress of what's going on. Again, I appreciate all your efforts thus far. Enjoy your summer and I will be in touch.

-David

---

**From:** Litle, Tim [mailto:tim@litle.com]
**Sent:** Tuesday, June 27, 2006 10:18 AM
**To:** David Goldin
**Subject:** RE: Postage Financing Agreement

This is great that they found something in the file. Perhaps they have some operating documentation that shows that proceeds were deducted each day.

Looking at these documents reminds me that Allen Abbott also signed the documents as treasurer of Exposures. I have continued to keep in touch with him and saw him within the last couple of months. I'm sure that he will provide affidavits and even testify if needed as will I. Allen's contact information is:

Sr. VP of Marketing
Paul Fredrick
223 West Poplar Street
Fleetwood, PA 19522

aabbott@paulfredrick.com
(610) 944-0909 (0)
(610) 395-5590 (h)
(610) 360-9904 (m)

Exposures was the first of these agreements (after the original group we did in the early to mid eighties). Hearthsong came later as well as others that I don't remember. Perhaps Paymentech could locate such information. As we continued the program, it became more defined. I suspect that the Hearthsong paperwork would have explicitly specified a 25% deduction from Hearthsong's proceeds until the amount was paid off and those after that would have been even better defined.

I noticed that John Shirey also signed the Exposures documents. He is still with Paymentech and could shed light on the situation as well. However, I have heard that he now works for Paymentech in Ireland.

Tim Litle
Litle & Co.
900 Chelmsford Street
Lowell, MA 01851
Tim@Litle.com
(o) 978-275-6520
(m) 978-807-8807

8/29/2006

eborx

**From:** David Goldin [mailto:dgoldin@amerimerchant.com]
**Sent:** Tuesday, June 20, 2006 3:00 PM
**To:** Litle, Tim
**Subject:** Postage Financing Agreement

Tim –

wanted to bring you up to date, attached you will find a copy of the schedule / security agreement of the postage financing agreement w/ Exposures.  The entire document couldn't be located, this was all that was apparently in the folder.  The patent attorneys think it's enough to "start" and we may ask for testimony from you, etc. that further details how the program worked if needed.

just wanted to keep you in the loop and again I appreciate your  help in this matter.   I hope you are enjoying your summer (not sure if you left for Martha's Vineyard or not) and I will touch base soon.

-David


David Goldin
AmeriMerchant
475 Park Avenue South
15th Floor
New York, NY 10016
Tel: 212-779-2100 x102
Fax: 646-349-3272


NOTICE: This message, including all attachments transmitted with it, is for the use of the addressee only. It may contain proprietary, confidential and/or legally privileged information belonging to Litle & Co. No confidentiality or privilege is waived or lost by any mistransmission. If you are not the intended recipient, you must not, directly or indirectly, use, disclose, distribute, print or copy any part of this message. If you believe you have received this message in error, please delete it and all copies of it from your system and notify the sender immediately by reply e-mail. Thank you.

## EXHIBIT F

**TO AFFIDAVIT OF MICHAEL N. EDELMAN IN
SUPPORT OF ADVANCEME, INC.'S OPPOSITION TO MOTION
FOR LEAVE TO AMEND INVALIDITY CONTENTIONS**

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| ADVANCEME, INC.,<br><br>Plaintiff<br><br>v.<br><br>RAPIDPAY LLC, BUSINESS CAPITAL CORPORATION, FIRST FUNDS LLC, MERCHANT MONEY TREE, INC., REACH FINANCIAL LLC, and FAST TRANSACT, INC. dba SIMPLE CASH,<br><br>Defendants | CASE NO. 6:05-CV-424 LED |

## DEFENDANTS' P.R. 3-3 PRELIMINARY INVALIDITY CONTENTIONS

Pursuant to the Court's Amended Docket Control Order and Patent Rules ("P.R.") 3-3 and 3-4 of the Rules of Practice for Patent Cases before the Eastern District of Texas, Defendants First Funds LLC, Merchant Money Tree, Inc., and Reach Financial LLC ("Defendants") submit the following preliminary invalidity contentions and accompanying document production.

These contentions pertain to Claims 1-19 of U.S. Patent No. 6,941,281 (the '281 Patent). Defendants submit, however, that AdvanceMe has not fully complied with its obligation to submit specific Preliminary Infringement Contentions relating to the means-plus-function claims of the '281 patent, in that AdvanceMe's Contentions for Claims 10-19, relating to means-plus-function claim elements, provide only conclusory accusations of Accused Instrumentalities and do not identify structure with specificity. *See* AdvanceMe's Preliminary Infringement Contentions; P.R. 3-1. Further, Defendants submit that AdvanceMe has not fully complied with its obligation to submit specific Preliminary Infringement Contentions relating to Claims 8 and

17, in that AdvanceMe's Contentions do not identify any ability of the Accused Instrumentalities to "accumulate payments until a predetermined amount is reached." *See* AdvanceMe's Preliminary Infringement Contentions; P.R. 3-1.

Defendants have based these Preliminary Invalidity Contentions in part on AdvanceMe's proffered claim interpretations, as best understood by Defendants. Defendants do not accept AdvanceMe's proffered claim interpretation, and Defendants' application of AdvanceMe's claim interpretations for purposes of these Preliminary Invalidity Contentions shall not be deemed an acceptance of AdvanceMe's constructions or a waiver of Defendants' right to proffer alternative constructions.

Because AdvanceMe has not yet provided Defendants with reasonably specific Preliminary Infringement Contentions, the Court has not yet ruled on claim construction, and discovery and fact investigations are ongoing, Defendants reserve the right to supplement these Preliminary Invalidity Contentions.

1.    **PRIOR ART – 35 U.S.C. § 102(B)**

Attached as Exhibits 1-4 are claim charts respectively indicating how prior art items 1-4 anticipate every limitation of at least certain of Claims 1-19 of the '281 Patent, based on Defendants' present understanding of how AdvanceMe is construing those claims. To the extent any limitation is deemed not to be exactly met by an item of prior art, Defendants submit that the difference would have been obvious to one skilled in the art at the time of the alleged invention in view of the state of the art and knowledge of those skilled in the art, and that the item of prior art therefore renders the claims invalid for obviousness.

| | **Publication Title** | **Item offered for sale or publicly used or known** |
|---|---|---|
| 1. | Clever Ideas – LeCard dining program documents (1992-1996) | Clever Ideas - LeCard, Inc. offered a product known as LeCard that utilized a system and method of automated payment wherein LeCard would advance a sum of money or an amount of advertising to restaurants in exchange for the restaurant providing food and beverage credit for LeCard cardholders.  The restaurant's contractual obligation to repay the credit amount would be reduced as customers used LeCard to pay for food and beverages.  Diners Club, the merchant processor, would acquire, authorize and settle the LeCard transaction and would electronically forward some portion of the payment to LeCard in satisfaction of the restaurant's obligation to LeCard.  LeCard thus publicly used the method and system as claimed in the '281 patent, and LeCard's method and system were described in a printed publication, more than one year prior to the date of the application for a patent in the United States and constitutes 35 U.S.C. § 102(b) prior art.  A chart identifying where specifically in this item of prior art each element of each asserted claim is found is attached hereto as Exhibit 1.[1] |
| 2. | SEC Form 10-K for Transmedia Network, Inc. (December 29, 1995) | Transmedia Network Inc. ("Transmedia") offered a product known as the Transmedia card that utilized a system and method of automated payment wherein Transmedia advanced a sum of money to a restaurant or other merchant, via a purchase at a discount of "Rights-to-Receive" (*i.e.*, the right to receive goods and services).  After acquiring, authorizing and settling the transaction, Transmedia would withhold or otherwise electronically forward some portion of the payment to a computerized payment receiver in satisfaction of the restaurant's (or other merchant's) contractual obligation to Transmedia.  Transmedia thus publicly used the method and system as claimed in the '281 patent, and Transmedia's method and system were described in a printed publication, more than one year prior to the date of the application for a patent in the United States and constitutes 35 U.S.C. § 102(b) prior art.  A chart identifying where specifically in this item of prior art each element of each asserted claim is found is attached hereto as Exhibit 2.[2] |
| 3. | First USA Merchant Services, Inc. Merchant Credit Card | First USA Merchant Services, Inc. ("First USA") offered to provide credit card processing services to merchants that incorporated a system and method of automated payment as |

---

[1] Clever Ideas-LeCard anticipates Claims 1, 5-10 and 14-19.  Clever Ideas-LeCard renders obvious Claims 2-4 and 11-13.  *See* Exhibit 1.

[2] Transmedia anticipates Claims 1, 5-10 and 14-19.  Transmedia renders obvious Claims 2-4 and 11-13.  *See* Exhibit 2.

| | | |
|---|---|---|
| | Agreement<br><br>(July 1, 1993) | claimed in the '281 patent. First USA, the merchant processor, would acquire, authorize and settle the transaction. First USA would withhold or otherwise electronically forward some portion of the payment to a computerized payment receivers as payment of at least a portion of an obligation made by the merchant. First USA thus publicly used the method and system as claimed in the '281 patent, and First USA's system and method were described in a printed publication, more than one year prior to the date of the application for a patent in the United States and constitutes 35 U.S.C. § 102(b) prior art. A chart identifying where specifically in this item of prior art each element of each asserted claim is found is attached hereto as Exhibit 3.[3] |
| 4. | Bank of America Merchant Services Card Processing Service Agreement Terms and Conditions<br><br>(November 1994 (Reprinted August 1995)) | Bank of America NT&SA offered to provide credit card processing services to merchants which incorporated a system and method of automated payment as claimed in the '281 patent. Bank of America, the merchant processor, would acquire, authorize and settle the transaction. Bank of America would withhold or otherwise electronically forward some portion of the payment to a computerized payment receiver as payment of at least a portion of an obligation made by the merchant. First USA thus publicly used the method and system as claimed in the '281 patent, and First USA's system and method were described in a printed publication, more than one year prior to the date of the application for a patent in the United States and constitutes 35 U.S.C. § 102(b) prior art. A chart identifying where specifically in this item of prior art each element of each asserted claim is found is attached hereto as Exhibit 4.[4] |

Defendants' investigation of these products and services is ongoing, and Defendants reserve the right to supplement these contentions to include additional details regarding these products and services as discovery in this case continues.

---

[3] First USA anticipates Claims 1-2, 6-11 and 15-19. First USA renders obvious Claims 3-5 and 12-14. *See* Exhibit 3.

[4] Bank of America anticipates Claims 1-2, 6-11 and 15-19. Bank of America renders obvious Claims 3-5 and 12-14. *See* Exhibit 4.

2.    INVENTORSHIP – 35 U.S.C. § 102(f)

The '281 patent is invalid because the alleged inventor did not herself invent the subject matter sought to be patented. As evidenced during the deposition of the alleged inventor, Barbara Johnson, she lacks knowledge of card processing and familiarity with, or knowledge of, the meaning of many, if not all, features of the '281 patent.

| Name of person from whom the invention or any part was derived | Circumstances |
|---|---|
| Gary Johnson | Gary Johnson is the husband of the inventor. On information and belief, he was knowledgeable of the card processing industry at the time of the alleged inventor's invention. Barbara Johnson testified that she did not directly correspond with the prosecuting attorneys, but instead indirectly corresponded with the prosecuting attorneys through Gary Johnson. On knowledge and belief, the invention or some part of the invention was derived from Gary Johnson. |
| Les Falk and/or other employees of Media Works Funding Corporation, Countrywide Business Alliance, Inc. and/or AdvanceMe, Inc. | On information and belief, Les Falk is the former CEO of the assignee of the '281 patent. On information and belief, the invention or some part of the invention was derived from Les Falk and/or other employees of the assignee (which underwent multiple name changes). |
| Paula Campbell, Robert Tosti, John Forcier and/or other attorneys of the law firm Testa, Hurwitz & Thiebeault LLP involved in the prosecution of U.S. Patent No. 6,941,281 and/or U.S. Patent No. 6,826,544. | Attorneys from Testa, Hurwitz & Thiebeault LLP were involved in the prosecution of U.S. Patent No. 6,941,281 and/or U.S. Patent No. 6,826,544. On information and belief, the invention or some part of the invention was derived from Paula Campbell, Robert Tosti, John Forcier and/or other attorneys of the law firm Testa, Hurwitz & Thiebeault LLP. |
| David Klein and/or other attorneys of the law firm Shearman & Sterling LLP involved in the prosecution of the U.S. Patent No. 6,941,281 and/or U.S. Patent No. 6,826,544. | Attorneys from Shearman & Sterling LLP were involved in the prosecution of U.S. Patent No. 6,941,281 and/or U.S. Patent No. 6,826,544. On information and belief, the invention or some part of the invention was derived from David Klein and/or other attorneys of the law firm Shearman & Sterling LLP. |

Defendants' investigation of these individuals and the circumstances surrounding their contribution to the alleged invention is ongoing, and Defendants reserve the right to supplement these contentions to include additional details regarding these individuals and circumstances as discovery in this case continues.

3.    **P.R. 3-4 DOCUMENT PRODUCTION**

Simultaneously with service of Defendants' Preliminary Invalidity Contentions, Defendants are producing a copy of each item of prior art identified pursuant to P.R. 3-3(a) which does not appear in the file history of the patent-in-suit. At the present time, Defendants have made every effort to produce all relevant, non-privileged documents in their possession, custody or control that may evidence the information required under P.R. 3-4(a). All such documents were produced on June 26, 2006 with Defendants' initial production of documents pursuant to the Court's Amended Docket Control Order and Local Rule CV-26. Defendants' search for documents is ongoing, and Defendants reserve the right to supplement its document production as additional relevant, non-privileged documents in their possession, custody or control are identified.

Respectfully submitted,

By: _____

Willem G. Schuurman
Texas State Bar No. 17855200
Joseph D. Gray
Texas State Bar No. 24045970
VINSON & ELKINS L.L.P.
2801 Via Fortuna, Suite 100
Austin, Texas 78746
Phone:  (512) 542-8400 –
Fax:  (512) 236-3476

- and -

Hilary L. Preston
VINSON & ELKINS L.L.P.
666 Fifth Avenue – 26th Floor
New York, New York 10103
Phone: (212) 237-0000
Fax: (212) 237-0100

- and -

Douglas McSwane
Texas State Bar No. 13861300
POTTER MINTON, P.C.
110 North College
500 Plaza Tower
Tyler, Texas 75702
Phone:  (903) 597-8311
Fax:  (903) 593-0846

*ATTORNEYS FOR DEFENDANTS
FIRST FUNDS LLC, MERCHANT
MONEY TREE, INC. AND REACH
FINANCIAL LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing instrument has been served upon all counsel of record, on this the 7th day of July, 2006 in the manner indicated:

*Via Federal Express*
Ronald S. Lemieux
PAUL, HASTINGS, JANOFSKY & WALKER LLP
Five Palo Alto Square, Sixth Floor
Palo Alto, CA 94306-2155

*Via Federal Express*
Otis Carroll
IRELAND, CARROLL & KELLEY, P.C.
6101 S. Broadway, Suite 500
Tyler, Texas 75703

*Via U.S. Mail*
Lawrence Morrison, General Counsel
Stephanie Nimberg, President
RAPIDPAY, LLC
17 Battery Place Suite 1330
New York, New York 10004

Amy a Reiley