# EXHIBIT 1

Dockets.Justia.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ADVANCEME, INC. | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | CAUSE NO. 6:05-CV-424 (LED) |
| RAPIDPAY, LLC, BUSINESS CAPITAL | § | |
| CORPORATION, FIRST FUNDS LLC, | § | |
| MERCHANT MONEY TREE, INC., | § | |
| REACH FINANCIAL, LLC and | § | |
| FAST TRANSACT, INC. d/b/a | § | |
| SIMPLE CASH | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

**DEFENDANTS FIRST FUNDS, LLC's, MERCHANT MONEY TREE, INC.'s,
AND REACH FINANCIAL, LLC's REPLY IN SUPPORT OF THEIR
MOTION FOR LEAVE TO AMEND PRELIMINARY INVALIDITY CONTENTIONS**

Defendants First Funds, LLC, Merchant Money Tree, Inc., and Reach Financial, LLC ("Defendants") hereby file their Reply in Support of their Motion for Leave to Amend Preliminary Invalidity Contentions and, in support hereof, would respectfully show the Court as follows:

**I.**

**BACKGROUND**

As described in Defendants' Motion for Leave to Amend Preliminary Invalidity Contentions ("Motion"), Defendants have gone to great lengths to diligently pursue and collect evidence supporting invalidating prior art in this matter, including undertaking the daunting task of convincing their direct competitors to cooperate and to search for documents over a decade old. *See* Timeline of Facts Relevant to Defendants' Motion to Amend Invalidity Contentions ("Timeline"), attached hereto as Ex. F; Motion at 2-4. As soon as evidence and documents were

752,540

located, Defendants have both (a) promptly provided the documents to Plaintiff AdvanceMe, Inc. ("AdvanceMe"), and (b) promptly incorporated the evidence and documents into, and served on AdvanceMe, invalidity charts identifying where each element of each claim may be found in the prior art systems. *Id.* Upon being told by AdvanceMe that it would object to the updated invalidity contentions, Defendants realized they had omitted to obtain leave and immediately filed the motion for leave to amend.

Rather than explain how Defendants could have possibly been more diligent in their efforts to discover and disclose the Litle & Company prior art systems and supporting documentation, AdvanceMe, in its Opposition to Defendants' Motion for Leave to Amend Invalidity Contentions ("Opposition"), disregards the documented timeline of relevant facts set forth in Defendants' Motion and instead responds with assertions regarding when it *thinks* Defendants may have gained knowledge of the Litle & Company prior art. Further, AdvanceMe makes specious claims of hypothetical prejudice, all of which are either wholly unsupported or inapplicable to the instant case, as described herein.

Having shown good cause for the proposed amendments of their Preliminary Invalidity Contentions ("Original Contentions"), Defendants respectfully request that the Court grant their Motion.[1]

## II.

## ARGUMENT

### A.    Defendants Have Shown Good Cause for the Proposed Amendments

As the parties agree, the Court may grant Defendants' Motion if Defendants show good cause for the proposed amendments. *See STMicroelectronics, Inc. v. Motorola, Inc.*, 307 F.

---

[1] As explained in their Motion, Defendants seek leave to amend their Original Contentions to include the Litle & Company prior art systems. *See* Ex. G, Proposed Litle & Company Invalidity Claim Chart.

Supp. 2d 845, 849 (E.D. Tex. 2004) (Davis, J.); Opposition at 9. Four considerations are relevant to the Court's determination: (1) Defendants' <u>reasons</u> for not including the proposed amendments by the scheduling order deadline; (2) the <u>importance</u> of the Litle & Company prior art systems; (3) potential <u>prejudice</u> in allowing the addition of the Litle & Company prior art systems; and (4) the availability of a continuance to cure such prejudice. *See Alt v. Medtronic*, 2006 U.S. Dist. LEXIS 4435 (E.D. Tex. Feb. 1, 2006) (Davis, J.). As explained in their Motion and below, each of these four factors weighs strongly in favor of permitting Defendants' requested amendments. AdvanceMe's only arguments in opposition are either contrary to the documented facts or unsupported assertions of prejudice.

> ### 1. <u>Defendants Received the Litle & Co. Information & Documents *After* Their Preliminary Invalidity Contentions Were Due</u>

As demonstrated in the Motion and reiterated herein, the first factor – the explanation for the delay – weighs heavily in favor of granting Defendants' proposed amendments. Defendants did not receive sufficient Litle & Co. information and documents to assert this prior art in good faith until July 14, 2006.[2] *See* Motion at 2-4; Ex. F. Defendants promptly provided the documents and their First Amended Preliminary Invalidity Contentions (including the initial Litle & Company disclosures) to AdvanceMe on July 20, 2006. Defendants brought this motion as soon as it was brought to Defendants' attention that such a motion for leave to amend was necessary to amend their Original Contentions. *See* Ex. H (Letter from Robert Matz to Hilary Preston dated September 1, 2006). AdvanceMe's attempt to attribute a lack of good faith or gamesmanship to the delay in bringing the motion is thus misplaced. Defendants have promptly provided all relevant information to AdvanceMe as it has become available to Defendants, as

---

[2] As explained in Defendants' Motion, the proposed amendment further supplements the disclosures regarding Litle & Company made in Defendants' First Amended Invalidity Contentions served July 20, 2006. See Ex. G; Motion, Ex. C to Gray Decl.

described in their Motion and herein.  *Id.*  Upon receiving additional Litle & Company documents on July 25, 2006, Defendants promptly provided those documents to AdvanceMe on July 28, 2006 and provided AdvanceMe with their Second Amended Preliminary Invalidity Contentions (the amendments on which their Motion is based) on August 31, 2006.  *See* Motion at 2-4; Ex. F.  This documented timeline demonstrates that Defendants could not have reasonably met the scheduling order deadline of July 7, 2006 for the Litle & Company prior art systems and documents, despite their diligence.  AdvanceMe's Opposition does nothing to undercut that demonstration.  Instead, it responds by making bald and unsupported assertions about Defendants' knowledge, all of which are contradicted by the objective facts.

AdvanceMe argues that Defendants received "the Litle documents" in June, *see* Opposition at 11, although it fails to recognize that the *only* Litle documents received in June were fragments of a single postage advance agreement.  *See* Ex. F; Ex. B to the Declaration of Joseph Gray in Support of Defendant's Motion ("Gray Declaration").  At that time, Defendants had not obtained enough information about Litle & Company (which was sold in 1995) to determine whether and to what extent Litle & Company practiced the claimed invention in the early 1990s.  It was not until Defendants received additional information and additional documentation on July 14, 2006 that Defendants were able to assert in good faith that Litle & Company publicly and commercially practiced U.S. Patent No. 6,942,281's (the "281 Patent") claimed invention.  *See* Ex. F; Ex. C to Gray Declaration.  Seven days later, on July 21, 2006, Defendants served their First Amended Preliminary Invalidity Contentions, which included the Litle & Company prior art systems and citations to the relevant documents that Defendants had received as of that date.  *See* Ex. F.

4

Relevant information has been difficult to obtain.  Defendants had only limited access to Mr. Litle.  Many relevant documents were in the possession of Paymentech (a multi-billion dollar processing company and competitor of Defendants, which evolved from First USA years after First USA bought Litle & Co. in 1995).  Additionally, Mr. Litle is the CEO of a large processing company (also a competitor of Defendants') and has no immediate interest in the outcome of this litigation.  *See* Ex. I.  Defendants have painstakingly gained only limited access to Mr. Litle and have had an extremely difficult time convincing Paymentech to search for decade-old documents and provide them to Defendants.

Defendants have exerted incredible efforts in their search for documentation regarding the Litle & Company prior art and have provided to AdvanceMe all relevant information they have obtained every step of the way.[3]  *See* Ex. F; Motion at 2-4.  Indeed, Defendants now seek to supplement their contentions to include the Litle & Co. prior art systems and the documentary evidence that they received after July 7, 2006, and had promptly produced to AdvanceMe on July 21 and July 28, 2006.  AdvanceMe's statement that "[t]he alleged prior that the Defendants now seek to add was known to the defendants weeks before they served their Preliminary Invalidity Contentions" Opposition at 1, is simply inaccurate, as it is directly contradicted by AmeriMerchant's documented correspondence with Tim Litle and Paymentech.

**2.**    **The Litle & Company Prior Art Systems Anticipate All Relevant Claims of the '281 Patent**

As explained in Defendants' Motion, the Litle & Co. prior art systems and documents and the accompanying analyses in Defendants' proposed amendments, are critically important to

---

[3] Defendants brought this motion as soon as it was brought to their attention that they had failed to file a motion for leave to amend their Original Contentions.  *See* Ex. H (letter from Robert Matz).  AdvanceMe's attempt to attribute a lack of good faith or gamesmanship to the delay in bringing the motion is thus misplaced.  Defendants have promptly provided all relevant information to AdvanceMe as it has become available, as described in their Motion and herein.

their defense of AdvanceMe's claims, as they establish invalidity of all relevant asserted claims. *See* Motion at 7; Ex. G.  AdvanceMe, in its Opposition, does not explain any basis for contending that Litle & Company does not constitute invalidating prior art, but rather states that Defendants "rely only on lawyer's argument."  Opposition at 15.  But Defendants do no such thing.  The detailed facts demonstrating how Litle & Company's systems anticipated the relevant asserted claims are found in the July 21, 2006 amended Invalidity Contentions, as supplemented by the Litle & Company documents (produced to AdvanceMe on or before July 28, 2006) and in Defendants' further Amended Preliminary Invalidity Contentions (served August 30, 2006).

AdvanceMe fails to mention that Mr. Litle testified at his deposition on September 6, 2006, that Defendants' proposed Amended Invalidity Contentions accurately describe the manner in which the Litle & Company systems anticipate all relevant claims of the patent-in-suit.  *See* Ex. J, Tim Litle Deposition Transcript at 123-158.  AdvanceMe also fails to mention that it cross-examined Mr. Litle for about three hours and was unable to raise even one single basis for contending that any relevant asserted claims could somehow avoid anticipation by the Litle & Co. systems.  As this Court has agreed that an amendment to include invalidating prior art weighs in favor of permitting the amendment, Defendants have satisfied this second prong of the analysis.[4]  *See Alt*, 2006 U.S. Dist. LEXIS 4435, *12-13.

### 3.     AdvanceMe Will Suffer No Relevant Prejudice if the Court Permits the Amendment

As explained in Defendants' Motion and confirmed by AdvanceMe's Opposition, AdvanceMe will suffer no relevant prejudice if the Court permits the proposed amendments. Defendants included the initial framework for the Litle & Company prior art in their First

---

[4] Defendants again note that their second proposed amendment is proposing to *supplement* their first amended Preliminary Invalidity Contentions of July 21, 2006 to include *further* support found in documents obtained *after* those Contentions were served.

Amended Preliminary Infringement Contentions, which were served on AdvanceMe on July 21, 2006. *See* Ex. F. AdvanceMe was thus on notice of this prior art system two weeks after the scheduling order deadline. On July 28, 2006, eight days after serving their First Amended Preliminary Infringement Contentions, Defendants produced the additional documentation to AdvanceMe on which the entirety of Defendants' proposed amendments are based. *See* Ex. F. Further, trial is set for March 26, 2007, and discovery does not close until February 15, 2007. Both parties thus have ample time to conduct all necessary discovery.

But, instead of addressing these facts directly, AdvanceMe ignores the precedent of this Court that permitted an amendment seven months after the original deadline for submission of preliminary invalidity contentions (and after the *Markman* hearing)[5] and proffers several stock claims of prejudice that are wholly disconnected from the facts of this case. AdvanceMe claims that Defendants' proposed amendments threaten "to throw the discovery process into chaos" because AdvanceMe has "prepared discovery requests, responded to discovery, conducted depositions, and prepared for claims construction on the assumption that the Defendants' original Preliminary Invalidity Contentions would govern Defendants' invalidity arguments in this case." Opposition at 17. AdvanceMe also inexplicably claims that it would have to propound "new requests for admission and new requests for production." *Id.* AdvanceMe's specious claims of prejudice may appear credible in a vacuum, but they are wholly inapplicable to this case.

First, as the parties in this action are to produce all documents relevant to any claim or defense without discovery requests, pursuant to the patent rules and Discovery Order, and as AdvanceMe has not served a single request for admission on Defendants, AdvanceMe's claim of prejudice based on propounding "new requests for admission and new requests for production"

---

[5] *See Alt v. Medtronic, Inc.,* 2006 U.S. Dist. LEXIS 4435, *13-14 (E.D. Tex. Feb. 1, 2006).

are questionable at best.  Regarding "respond[ing] to discovery," AdvanceMe has not produced a single non-publicly available document in this action,[6] but instead has only produced several thousand pages of publicly available prosecution histories, and the articles and patents cited therein.  Nor has AdvanceMe responded to the single interrogatory propounded by any Defendant.  AdvanceMe does not explain how its *lack* of discovery response has in any way been affected by the proposed amendments.

Second, AdvanceMe argues that it has "prepared for claims construction on the assumption that Defendants' Preliminary Invalidity Contentions would govern Defendants' arguments in this case."  Opposition at 11.  While it is clear from AdvanceMe's proposed constructions that it is attempting to exclude prior art through erroneous claim construction, as explained in Defendants' Responsive Claim Construction Brief at 5-12 and 16-21, invalidity contentions and prior art are *wholly irrelevant* to claim construction analysis and thus provide no basis for AdvanceMe's claims of prejudice.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1327 (Fed. Cir. 2005) (en banc).

Third, only two depositions have been taken in this case, *both of which were noticed by Defendants*: Mr. Litle and the alleged inventor, Barbara Johnson.[7]  At Mr. Litle's deposition on September 6, 2006, all parties examined Mr. Litle on the documents that AmeriMerchant received by July 25, 2006 and that Defendants produced to AdvanceMe on or before July 28, 2006.  In other words, AdvanceMe received all Litle & Company documents on which Defendants' proposed amendments are based, and on which Defendants' questioning at Mr.

---

[6] However, yesterday, Plaintiff, for the first time produced some discovery, in the form of excerpts from three depositions in another case, where Defendants had been requesting the entire deposition transcripts for some time.

[7] Barbara Johnson was deposed on June 28, 2006 at the location of AdvanceMe's choice, well before the July 20, 2006 scheduling order deadline for submitting preliminary invalidity contentions.

Litle's deposition was largely based, over a *month prior* to Mr. Litle's deposition, and AdvanceMe had the opportunity to question Mr. Litle based on all of those documents. Further, AdvanceMe served a subpoena requesting *additional* documents on Mr. Litle, and Mr. Litle produced all relevant documents pursuant to that subpoena in advance of the deposition. AdvanceMe thus had every opportunity to examine Mr. Litle based on all relevant documents at his deposition on September 6th, which it did for roughly three hours. AdvanceMe also fails to mention that upon receiving Defendant's updated invalidity contentions on August 31, 2006, AdvanceMe contacted Mr. Litle, asked him questions, and told him that his deposition would be taken on September 6, 2006. How can AdvanceMe now pretend it was not ready for the deposition on the date it chose for the deposition?

As shown above, AdvanceMe's stock claims of prejudice are untenable under the facts of this case. The reality is that, despite AdvanceMe's rhetoric of "enough [is] enough," Opposition at 2, the trial in this case is about six months away and discovery does not close for over four months, and AdvanceMe will suffer no actual prejudice from the Court's granting Defendants' Motion. This factor thus also weighs in favor of permitting Defendants' proposed amendments.

### 4. Availability of a Continuance

As explained in Defendants' Motion, any prejudice suffered by AdvanceMe could be cured by a continuance of the pre-trial deadlines. Motion at 9. AdvanceMe does not argue that such a continuance would not cure any prejudice suffered; instead, AdvanceMe claims that its "planning for [certain unrelated] discovery would have to be modified," including the claim construction hearing and 30(b)(6) depositions. Opposition at 17. AdvanceMe, however, fails to explain how its "planning" for this discovery would "have to be modified," or why a continuance would not resolve any such "planning" issues. This factor thus weighs heavily in favor of permitting Defendants' proposed amendments.

**B.**    **The Court Should Deny AdvanceMe's Premature Request**

In what appears to be AdvanceMe's true motivation in opposing Defendants' meritorious Motion, AdvanceMe argues that it would have been willing to agree to the amended Invalidity Contentions provided that this should "be the last set of amended contentions that Defendants are permitted to serve in this case."    Opposition at 17.    AdvanceMe's novel suggestion of a preemptive approach to *future* amendments, even if based on good cause, is not only unsupported, but contrary to the interests of justice.    Indeed, such an argument reveals the lack of a credible argument in opposition to the *current* Motion.    The Court should not permit AdvanceMe to cower behind stock claims of prejudice in an attempt to avoid introduction or development of invalidating prior art.    Third party depositions to provide additional evidence to support the disclosed prior art are still being scheduled,[8] and additional facts regarding prior art systems which were used commercially more than 10 years ago by various companies, many of whom no longer exist, are still being investigated on an urgent basis.    Defendants thus respectfully request that AdvanceMe's request for an arbitrary, preemptive exclusion of any future proposed amendments to Defendants' Preliminary Invalidity Contentions be disregarded.

## III.

## CONCLUSION

Defendants therefore respectfully request that the Court grant their motion for leave to amend, and that any future motions for leave to amend be considered on their own merits.

---

[8] For example, the deposition of Lee Suckow (the CEO of Clever Ideas-LeCard, Inc., another invalidating prior art system) is scheduled for Wednesday, October 4, 2006.

10

October 3, 2006

Respectfully submitted,

By: /s/ Willem G. Schuurman

Willem G. Schuurman
Texas State Bar No. 17855200
bschuurman@velaw.com
Joseph D. Gray
Texas State Bar No. 24045970
jgray@velaw.com
**VINSON & ELKINS L.L.P.**
2801 Via Fortuna, Suite 100
Austin, Texas 78746
Telephone: 512.542.8400
Facsimile: 512.236.3476

-and-

Hilary L. Preston
hpreston@velaw.com
**VINSON & ELKINS L.L.P.**
666 Fifth Avenue – 26th Floor
New York, NY 10103
Telephone: 212.237.0000
Facsimile: 212.237.0100

-and-

Douglas R. McSwane, Jr.
State Bar No. 13861300
**POTTER MINTON**
A Professional Corporation
110 N. College
500 Plaza Tower (75702)
P.O. Box 359
Tyler, Texas 75710
Telephone: 903.597.8311
Facsimile: 903.593.0846
E-mail: dougmcswane@potterminton.com

*Counsel for Defendants First Funds, LLC,
Merchant Money Tree, Inc., and Reach
Financial, LLC*

11

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ADVANCEME, INC. | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | CAUSE NO. 6:05-CV-424 (LED) |
| RAPIDPAY, LLC, BUSINESS CAPITAL | § | |
| CORPORATION, FIRST FUNDS LLC, | § | |
| MERCHANT MONEY TREE, INC., | § | |
| REACH FINANCIAL, LLC and | § | |
| FAST TRANSACT, INC. d/b/a | § | |
| SIMPLE CASH | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that all counsel of record who have consented to electronic service are being served a copy of this document via the court's CM/ECF system per Local Rule CV-5(a)(3) on this the 3rd day of October, 2006.  Any other counsel of record will be served by first class mail on this same date.

/s/ Willem G. Schuurman
Willem G. Schuurman

# EXHIBIT F

**EXHIBIT F**
**Timeline of Facts Relevant to Defendants'**
**Motion to Amend Invalidity Contentions**

- <u>February 27, 2006</u>: AdvanceMe adds Defendants (the "*Rapidpay* Defendants") as defendants in the instant action and files an action against AmeriMerchant, LLC ("AmeriMerchant") (together with the *Rapidpay* Defendants, "Defendants") similarly claiming infringement of the '281 Patent.

- <u>April 20, 2006</u>: Defendants retain Vinson & Elkins L.L.P. ("V&E") as national counsel.

- <u>April 26, 2006</u>: David Goldin (of AmeriMerchant) sends an email to Tim Litle containing David Goldin's contact information. *See* Ex. A to Gray Declaration.

- <u>June 19, 2006</u>: Paymentech provides to AmeriMerchant (which, in turn, provides to the *Rapidpay* Defendants) fragments of supporting documentation for a Litle & Company "postage advance" agreement with a merchant. *See* Ex. B to Gray Declaration.[1] This documentation, alone, does not provide the Defendants with sufficient information to include Litle & Company as a prior art reference in their Preliminary Invalidity Contentions. Defendants' efforts to discover additional documentation continue.

- <u>June 28, 2006</u>: Deposition of the alleged inventor, Barbara Johnson. Examination did not involve Litle & Company.

- <u>July 7, 2006</u>: The *Rapidpay* Defendants serve their Preliminary Invalidity Contentions.

- <u>July 14, 2006</u>: Paymentech provides to AmeriMerchant (which, in turn, provides to the *Rapidpay* Defendants) additional fragments of supporting documentation evidencing Litle & Company's public and commercial use of its "postage advance" product. *See* Motion, Ex. C to Gray Declaration. At this point, based on *both* sets of documents they have received and factual investigations to date, Defendants have a good faith basis for including Litle & Company as a prior art reference in their Preliminary Invalidity Contentions.

- <u>July 20 and 21, 2006</u>: AmeriMerchant serves its Preliminary Invalidity Contentions in the *AmeriMerchant* action; the *Rapidpay* Defendants serve their Amended Preliminary Invalidity Contentions (amended to include Litle & Company prior art reference); and Defendants provide to AdvanceMe all Litle & Company supporting documentation they have received to date.

---

[1] AmeriMerchant received these first fragments of documentation on June 19, 2006. The fax header accompanying the documents reveals this date, although the fax cover sheet improperly states "March 3, 2006." *See* Motion, Ex. B to Gray Declaration. These documents were first received by AmeriMerchant on June 19, 2006, as correctly revealed by the fax header.

1

- <u>July 25, 2006</u>: Defendants finally receive from Paymentech a *complete* "postage advance" agreement and additional supporting documentation regarding the systems and methods practiced by Litle & Company prior to the filing of the '281 Patent. *See* Motion, Ex. D to Gray Declaration.

- <u>July 28, 2006</u>: Defendants produce all Litle & Company documentation received since July 20, 2006 to AdvanceMe.

- <u>August 30 and 31, 2006</u>: Defendants served on AdvanceMe amended preliminary invalidity contentions in both actions reflecting the additional information in the documents that were produced by July 28, 2006. These amended preliminary invalidity contentions added no new prior art references; they simply further explained the Litle & Company systems and methods that were disclosed in AmeriMerchant's Preliminary Invalidity Contentions and the *Rapidpay* Defendants' First Amended Preliminary Invalidity Contentions, served July 20, 2006.

- <u>September 6, 2006</u>: Deposition of Tim Litle. All parties, including AdvanceMe, examined Tim Litle based on Litle & Company documents *available to all parties over one month earlier*.

2

# EXHIBIT G

**Litle & Co.**
**Invalidity Claim Chart**
**United States Patent No. 6,941,281**

| Claims | Prior Publication References |
|---|---|
| 1. A method for automated payment, comprising: | Litle & Co. ("Litle") utilized a method for automated payments to Litle as repayment of obligations owed by merchants either for postage or cash advances. *See, e.g.,* Litle & Co. Member Agreement, LI_00017-29 (hereafter "Member Agreement"); *see, e.g.,* Demand Promissory Note for Postage Advances between Museum Publications of America and Litle & Co., dated September 27, 1993, LI_00033-35 (hereafter "Promissory Note"); *see, e.g.,* February 17, 1994 Letter from Robert George to Michael Duffy, LI_00030-31; *see* M. Kripalani, T. Pouschine, "People thought I was nuts", Forbes, June 8, 1992, v.149, n12, p120(2), LI_00001-03 (hereafter "Forbes Article"). |
| at a merchant, | The merchant, either directly or via its agent, would accept a customer identifier, *e.g.,* a card, as payment from the customer. *See* Member Agreement, LI_00017-29. |
| accepting a customer identifier as payment from the customer, | "WHEREAS, LITLE and NPC are engaged in the business of processing paper-based and electronic data representing transactions conducted through the use of CHARGE CARDS, and

WHEREAS, MEMBER desires to honor CHARGE CARDS in connection with the retail sale of PRODUCTS to MEMBER's customers, to submit SALES RECORDs and REFUNDs representing such transactions to LITLE for processing and to sell to FNBL the SALES RECORDs generated with BANK CARDs and the indebtednesses represented thereby."

Member Agreement at LI_00018.

"CHARGE CARD is the plastic BANK CARD or T&E CARD issued by a CARD ORGANIZATION to the CARDHOLDER and the charge account number designated on the card, either of which MEMBER accepts from customers as payment for their purchases from MEMBER." *Id.* |

United States Patent No. 6,941,281

| Claims | Specification References |
|---|---|
| | "BANK CARD means a valid and unexpired CHARGE CARD issued by an ISSUING MEMBER of MCI or VISA which contains the MasterCard service mark or Visa's Blue, White and Gold Bands Design service mark. A BANK CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.*<br><br>"CARD ORGANIZATION is VISA, MCI or the issuer of a T&E CARD." *Id.*<br><br>"T&E CARD is a valid and unexpired Travel and Entertainment CHARGE CARD issued by American Express, Carte Blanche, Diner's Club or Discover. A T&E CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.* at LL_00019. |
| and electronically forwarding information related to the payment to a computerized merchant processor; | The merchant, either directly or via its agent, electronically forwarded information related to the payment to Litle, the computerized merchant processor.<br><br>"WHEREAS, LITLE and NPC are engaged in the business of processing paper-based and electronic data representing transactions conducted through the use of CHARGE CARDS, and<br><br>WHEREAS, MEMBER desires to honor CHARGE CARDS in connection with the retail sale of PRODUCTS to MEMBER's customers, to submit SALES RECORDs and REFUNDs representing such transactions to LITLE for processing and to sell to FNBL the SALES RECORDs generated with BANK CARDs and the indebtednesses represented thereby."<br><br>Member Agreement at LL_00018 (showing that the merchant electronically forwarded information related to the payment to Litle, a computerized merchant processor).<br><br>"SALES RECORD means all documents or data presented to LITLE as evidence of a CARD SALE." *Id.* at LL_00019 (showing that the merchant electronically accepts the customer identifier). |

UNITED STATES PATENT NO. 6,941,281

| CLAIMS | SPECIFICATION REFERENCES |
|---|---|
|  | "c. MEMBER shall complete each SALES RECORD to include a notation in the space provided for the CARDHOLDER's signature that the sale was initiated by mail order (MO), telephone order (TO) or pre-authorized order (PO) (except for sales made in person, for which the CARDHOLDER's signature shall be obtained) . . . ." *Id.* at LI_00019 (showing that the merchant electronically forwarded information related to the payment to Litle, a computerized merchant processor). |
|  | "SALES RECORD means all documents or data presented to LITLE as evidence of a CARD SALE." *Id.* at LI_00019. |
|  | "Litle & Co. continues to be your credit card processor and will continue to work directly with you to provide a high level of customer and technical service." February 28, 1992 letter from Tim Litle to Robert George, LI_00016. |
| at the computerized merchant processor, | "Litle & Co. continues to be your credit card processor and will continue to work directly with you to provide a high level of customer and technical service." February 28, 1992 letter from Tim Litle to Robert George, LI_00016. |
| acquiring the information related to the payment from the merchant, authorizing and settling the payment, | "WHEREAS, LITLE and NPC are engaged in the business of processing paper-based and electronic data representing transactions conducted through the use of CHARGE CARDS . . . ." Member Agreement at LI_00018. |
| and forwarding at least a portion of the payment to a computerized payment receiver as payment of at least a portion of an obligation made by the merchant; | "In consideration of Litle & Co. making advances for the account of [Museum Publications of America] to United States Postal Service, [Museum Publications of America] agrees to pay on demand the Principal Amount of Advance plus management fee to Litle & Co., or order. MEMBER further agrees that all CHARGE CARD transactions from all divisions and subsidiaries will be processed by Litle & Co. while any amount owed under this note is still outstanding. Notwithstanding that such amounts are otherwise payable on demand, MEMBER agrees that . . . (ii) the Daily Repayments shall be deducted from daily NET PROCEEDS. . . ." |

3

UNITED STATES PATENT NO. 6,941,281

| CLAIMS | SPECIFICATION REFERENCES |
|---|---|
| | Promissory Note at LI_00033 (showing that a portion of the card payments were forwarded to Litle, as a computerized payment receiver, as payment of at least a portion of an obligation that arose when Litle advanced postage costs ("Principal Amount of Advance") to merchant). |
| | "NET PROCEEDS is an amount equal to: The GROSS PROCEEDS, Less LITTLE FEES, Less RELEASED CHARGEBACKS (if no RESERVE exists), Less any other amounts due from MEMBER to LITTLE, Less any PREPAYMENTS." |
| | Member Agreement at LI_00018. |
| | "Litle agreed to finance [Exposures, Inc.'s ("Exposures")] postage by discounting his [Exposures'] credit card receivables."  *See* Forbes Article at LI_00003 (describing how a portion of the payment from credit card companies was forwarded as payment on Exposures' obligation to Litle, as a computerized payment receiver, for financing postage costs, with the remainder, the discounted credit card receivables, being forwarded to Exposures). |
| | "As security for the obligations of Boston Publishing (the Borrower) under such financing agreements, Hanover Finance is being granted a security interest in our inventory, certain accounts and substantially all of the tangible and intangible personal property of Boston Publishing, including, without limitation, all rights of the Borrower to receive payments in respect of Card Sales from Litle & Co. . . . 1. Upon written instruction from Hanover Finance or assignees of Hanover Finance, designated in writing by Hanover Finance, without further action by Boston Publishing, you will make all payments of Net Proceeds or any other credits, reserves, deposits, balances, refunds or other amounts now or hereafter due to Boston Publishing under the Member Agreement in respect of Card Sales directly by wire transfer, to such account or accounts as Hanover Finance may designate in writing (the "Accounts")." |
| | February 17, 1994 Letter from Robert George to Michael Duffy at LI_00030-31 (showing that Litle forwarded a portion of the payment to the loan payment |

4

UNITED STATES PATENT NO. 6,941,281

| CLAIMS | SPECIFICATION REFERENCES |
|---|---|
| | receiver, *e.g.*, Hanover Finance, as payment of at least a portion of an obligation made by the merchant, *e.g.*, Boston Publishing). |
| and at the computerized payment receiver,<br><br>receiving the portion of the payment forwarded by the computerized merchant processor and applying that portion to the outstanding obligation made by the merchant to reduce such obligation. | "In consideration of Litle & Co. making advances for the account of [Museum Publications of America] to United States Postal Service, [Museum Publications of America] agrees to pay on demand the Principal Amount of Advance plus management fee to Litle & Co., or order. MEMBER further agrees that all CHARGE CARD transactions from all divisions and subsidiaries will be processed by Litle & Co. while any amount owed under this note is still outstanding. Notwithstanding that such amounts are otherwise payable on demand, MEMBER agrees that . . . (ii) the Daily Repayments shall be deducted from daily NET PROCEEDS. . . ."<br><br>Promissory Note at LI_00033 (showing that a portion of the payment is received by Litle as repayment of an obligation that arose when Litle advanced postage costs ("Principal Amount of Advance") to merchant); *see* Promissory Note Repayment Schedule at LI_00035 (showing that Litle received and applied the forwarded portion of the payment to Museum Publication of America's outstanding obligation to Litle).<br><br>"NET PROCEEDS is an amount equal to: The GROSS PROCEEDS, Less LITLE FEES, Less RELEASED CHARGEBACKS (if no RESERVE exists), Less any other amounts due from MEMBER to LITLE, Less any PREPAYMENTS."<br><br>Member Agreement at LI_00018. |
| 2. The method of claim 1 wherein the accepting step comprises accepting a credit card number as the customer identifier. | "WHEREAS, LITLE and NPC are engaged in the business of processing paper-based and electronic data representing transactions conducted through the use of CHARGE CARDS, and<br><br>WHEREAS, MEMBER desires to honor CHARGE CARDS in connection with the retail sale of PRODUCTS to MEMBER's customers, to submit SALES RECORDs and REFUNDs representing such transactions to LITLE for processing and to sell to FNBL the SALES RECORDs generated with BANK |

UNITED STATES PATENT NO. 6,941,281

| CLAIMS | SPECIFICATION REFERENCES |
|---|---|
| | CARDs and the indebtednesses represented thereby." Member Agreement at LI_00018. |
| | "CHARGE CARD is the plastic BANK CARD or T&E CARD issued by a CARD ORGANIZATION to the CARDHOLDER and the charge account number designated on the card, either of which MEMBER accepts from customers as payment for their purchases from MEMBER." *Id.* |
| | "BANK CARD means a valid and unexpired CHARGE CARD issued by an ISSUING MEMBER of MCI or VISA which contains the MasterCard service mark or Visa's Blue, White and Gold Bands Design service mark. A BANK CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.* |
| | "CARD ORGANIZATION is VISA, MCI or the issuer of a T&E CARD." *Id.* |
| | "T&E CARD is a valid and unexpired Travel and Entertainment CHARGE CARD issued by American Express, Carte Blanche, Diner's Club or Discover. A T&E CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.* at LI_00019. |
| 3. The method of claim 1 wherein the accepting step comprises accepting a debit card number as the customer identifier. | It would have been obvious to a person of ordinary skill in the art at the time of the alleged invention of Plaintiff's asserted claims to apply mechanisms and methods in use for one type of customer identifier to another type of customer identifier, *e.g.* for debit cards as well as credit cards. And the statements by the alleged inventor and by the examiner, and the language of the patent itself makes clear that a person of ordinary skill in the art would be motivated to make the method or system work in the same way for any customer identifier, including debit cards. |
| | "WHEREAS, LITLE and NPC are engaged in the business of processing paper-based and electronic data representing transactions conducted through the use of |

6

UNITED STATES PATENT NO. 6,941,281

| CLAIMS | SPECIFICATION REFERENCES |
|---|---|
| | CHARGE CARDS, and WHEREAS, MEMBER desires to honor CHARGE CARDS in connection with the retail sale of PRODUCTS to MEMBER's customers, to submit SALES RECORDs and REFUNDs representing such transactions to LITTLE for processing and to sell to FNBL the SALES RECORDs generated with BANK CARDs and the indebtednesses represented thereby." |
| | Member Agreement at LI_00018. |
| | "CHARGE CARD is the plastic BANK CARD or T&E CARD issued by a CARD ORGANIZATION to the CARDHOLDER and the charge account number designated on the card, either of which MEMBER accepts from customers as payment for their purchases from MEMBER." *Id.* |
| | "BANK CARD means a valid and unexpired CHARGE CARD issued by an ISSUING MEMBER of MCI or VISA which contains the MasterCard service mark or Visa's Blue, White and Gold Bands Design service mark. A BANK CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.* |
| | "CARD ORGANIZATION is VISA, MCI or the issuer of a T&E CARD." *Id.* |
| | "T&E CARD is a valid and unexpired Travel and Entertainment CHARGE CARD issued by American Express, Carte Blanche, Diner's Club or Discover. A T&E CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.* at LI_00019. |
| 4. The method of claim 1 wherein the accepting step comprises accepting a smart card number as the customer identifier. | It would have been obvious to a person of ordinary skill in the art at the time of the alleged invention of Plaintiff's asserted claims to apply mechanisms and methods in use for one type of customer identifier to another type of customer identifier, *e.g.* for smart cards as well as credit cards. And the statements by the alleged inventor and by the examiner, and the language of the patent itself makes clear that a person of ordinary skill in the art would be motivated to make the |

7

UNITED STATES PATENT NO. 6,941,281

| CLAIMS | SPECIFICATION REFERENCES |
|---|---|
| | method or system work in the same way for any customer identifier, including smart cards. |
| | "WHEREAS, LITLE and NPC are engaged in the business of processing paper-based and electronic data representing transactions conducted through the use of CHARGE CARDS, and |
| | WHEREAS, MEMBER desires to honor CHARGE CARDS in connection with the retail sale of PRODUCTS to MEMBER's customers, to submit SALES RECORDs and REFUNDs representing such transactions to LITLE for processing and to sell to FNBL the SALES RECORDs generated with BANK CARDs and the indebtednesses represented thereby." |
| | Member Agreement at LI_00018. |
| | "CHARGE CARD is the plastic BANK CARD or T&E CARD issued by a CARD ORGANIZATION to the CARDHOLDER and the charge account number designated on the card, either of which MEMBER accepts from customers as payment for their purchases from MEMBER." *Id.* |
| | "BANK CARD means a valid and unexpired CHARGE CARD issued by an ISSUING MEMBER of MCI or VISA which contains the MasterCard service mark or Visa's Blue, White and Gold Bands Design service mark. A BANK CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.* |
| | "CARD ORGANIZATION is VISA, MCI or the issuer of a T&E CARD." *Id.* |
| | "T&E CARD is a valid and unexpired Travel and Entertainment CHARGE CARD issued by American Express, Carte Blanche, Diner's Club or Discover. A T&E CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.* at LI_00019. |
| 5. The method of claim 1 wherein the accepting | "WHEREAS, LITLE and NPC are engaged in the business of processing paper- |

8

**UNITED STATES PATENT NO. 6,941,281**

| CLAIMS | SPECIFICATION REFERENCES |
|---|---|
| step comprises accepting a charge card number as the customer identifier. | based and electronic data representing transactions conducted through the use of CHARGE CARDS in connection with the retail sale of PRODUCTS to MEMBER's customers, to submit SALES RECORDs and REFUNDs representing such transactions to LITLE for processing and to sell to FNBL the SALES RECORDs generated with BANK CARDs and the indebtednesses represented thereby."<br><br>Member Agreement at LI_00018.<br><br>"CHARGE CARD is the plastic BANK CARD or T&E CARD issued by a CARD ORGANIZATION to the CARDHOLDER and the charge account number designated on the card, either of which MEMBER accepts from customers as payment for their purchases from MEMBER." *Id.*<br><br>"BANK CARD means a valid and unexpired CHARGE CARD issued by an ISSUING MEMBER of MCI or VISA which contains the MasterCard service mark or Visa's Blue, White and Gold Bands Design service mark. A BANK CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.*<br><br>"CARD ORGANIZATION is VISA, MCI or the issuer of a T&E CARD." *Id.*<br><br>"T&E CARD is a valid and unexpired Travel and Entertainment CHARGE CARD issued by American Express, Carte Blanche, Diner's Club or Discover. A T&E CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.* at LI_00019. |
| 6. The method of claim 1 wherein the accepting step comprises accepting the customer identifier at a merchant location. | "c. MEMBER shall complete each SALES RECORD to include a notation in the space provided for the CARDHOLDER's signature that the sale was initiated by mail order (MO), telephone order (TO) or pre-authorized order (PO) (except for sales made in person, for which the CARDHOLDER's signature shall be |

9

UNITED STATES PATENT NO. 6,941,281

| CLAIMS | SPECIFICATION REFERENCES |
|---|---|
| | obtained) . . . ." Member Agreement at LI_00019. |
| 7. The method of claim 1 wherein the accepting step comprises electronically accepting the customer identifier. | "c. MEMBER shall complete each SALES RECORD to include a notation in the space provided for the CARDHOLDER's signature that the sale was initiated by mail order (MO), telephone order (TO) or pre-authorized order (PO) (except for sales made in person, for which the CARDHOLDER's signature shall be obtained) . . . ." Member Agreement at LI_00019. |
| | "WHEREAS, LITLE and NPC are engaged in the business of processing paper-based and electronic data representing transactions conducted through the use of CHARGE CARDS . . . ." Member Agreement at LI_00018 (showing that the merchant electronically accepts the customer identifier). |
| | "SALES RECORD means all documents or data presented to LITLE as evidence of a CARD SALE." *Id.* at LI_00019 (showing that the merchant electronically accepts the customer identifier). |
| 8. The method of claim 1 wherein the steps performed at the merchant processor further comprise accumulating the payments until a predetermined amount is reached and then forwarding at least a portion of the accumulated payments to the payment receiver. | Litle would accumulate the payments until a predetermined amount was reached and then forward at least a portion of the accumulated payments to the payment receiver. *See, e.g.,* Promissory Note Repayment Schedule at LI_00035 (outlining specified daily and weekly payment amount). |
| 9. The method of claim 1 wherein the steps performed at the merchant processor comprise periodically forwarding at least a portion of the payment to the payment receiver. | Litle would periodically forward at least a portion of the payment to the payment receiver. *See, e.g.,* Promissory Note Repayment Schedule at LI_00035 (outlining daily and weekly payment schedules). |
| | "In consideration of Litle & Co. making advances for the account of [Museum Publications of America] to United States Postal Service, [Museum Publications of America] agrees to pay on demand the Principal Amount of Advance plus management fee to Litle & Co., or order. MEMBER further agrees that all CHARGE CARD transactions from all divisions and subsidiaries will be |

10

UNITED STATES PATENT NO. 6,941,281

| CLAIMS | SPECIFICATION REFERENCES |
|---|---|
| | processed by Litle & Co. while any amount owed under this note is still outstanding. Notwithstanding that such amounts are otherwise payable on demand, MEMBER agrees that . . . (ii) the Daily Repayments shall be deducted from daily NET PROCEEDS. . . ." Promissory Note at LI_00033 (showing that payments were periodically forwarded). |
| 10. A system for automated payment of an obligation made by a merchant, comprising: | Litle utilized a system for automated payments to Litle as repayment of obligations owed by merchants either for postage or cash advances. *See* Member Agreement; Promissory Note; February 17, 1994 Letter from Robert George to Michael Duffy; Forbes Article. |
| at a merchant, | The merchant, either directly or via its agent, would accept a customer identifier as payment from the customer. Means for accepting a customer identifier as payment existed, including, on information and belief, a magnetic card reader, keyboard input and/or telephone. |
| means for accepting a customer identifier as payment from the customer and | "WHEREAS, LITLE and NPC are engaged in the business of processing paper-based and electronic data representing transactions conducted through the use of CHARGE CARDS, and |
| | WHEREAS, MEMBER desires to honor CHARGE CARDS in connection with the retail sale of PRODUCTS to MEMBER's customers, to submit SALES RECORDs and REFUNDs representing such transactions to LITLE for processing and to sell to FNBL the SALES RECORDs generated with BANK CARDs and the indebtednesses represented thereby." |
| for electronically forwarding information related to the payment to a computerized merchant processor, | Member Agreement at LI_00018 (showing that the merchant maintained a magnetic card reader and/or keyboard input and/or telephone for accepting a customer identifier and electronically forwarded information related to the payment to Litle, a computerized merchant processor). |
| wherein the merchant associated with the payment has an outstanding obligation to a third party; | "c. MEMBER shall complete each SALES RECORD to include a notation in the space provided for the CARDHOLDERS's signature that the sale was initiated by mail order (MO), telephone order (TO) or pre-authorized order (PO) (except for |

11

UNITED STATES PATENT NO. 6,941,281

| CLAIMS | SPECIFICATION REFERENCES |
|---|---|
| | sales made in person, for which the CARDHOLDER's signature shall be obtained). . . ." *Id.* at LI_00019 (showing that the merchant maintained a magnetic card reader and/or keyboard input and/or telephone for accepting a customer identifier and electronically forwarded information related to the payment to Litle, a computerized merchant processor). |
| | "CHARGE CARD is the plastic BANK CARD or T&E CARD issued by a CARD ORGANIZATION to the CARDHOLDER and the charge account number designated on the card, either of which MEMBER accepts from customers as payment for their purchases from MEMBER." *Id.* |
| | "BANK CARD means a valid and unexpired CHARGE CARD issued by an ISSUING MEMBER of MCI or VISA which contains the MasterCard service mark or Visa's Blue, White and Gold Bands Design service mark. A BANK CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.* at LI_00018. |
| | "CARD ORGANIZATION is VISA, MCI or the issuer of a T&E CARD." *Id.* |
| | "T&E CARD is a valid and unexpired Travel and Entertainment CHARGE CARD issued by American Express, Carte Blanche, Diner's Club or Discover. A T&E CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.* at LI_00019. |
| | "In consideration of Litle & Co. making advances for the account of [Museum Publications of America] to United States Postal Service, [Museum Publications of America] agrees to pay on demand the Principal Amount of Advance plus management fee to Litle & Co., or order.  MEMBER further agrees that all CHARGE CARD transactions from all divisions and subsidiaries will be processed by Litle & Co. while any amount owed under this note is still outstanding.   Notwithstanding that such amounts are otherwise payable on demand, MEMBER agrees that . . . (i) the Daily Repayments shall be deducted |

12

UNITED STATES PATENT NO. 6,941,281

| CLAIMS | SPECIFICATION REFERENCES |
|---|---|
| | from daily NET PROCEEDS. . . ." |
| | Promissory Note at LI_00033 (showing that Litle acted as the merchant processor and that the merchant had an outstanding obligation that arose when Litle advanced postage costs ("Principal Amount of Advance") to merchant). |
| | "As security for the obligations of Boston Publishing (the Borrower) under such financing agreements, Hanover Finance is being granted a security interest in our inventory, certain accounts and substantially all of the tangible and intangible personal property of Boston Publishing, including, without limitation, all rights of the Borrower to receive payments in respect of Card Sales from Litle & Co. . . . 1. Upon written instruction from Hanover Finance or assignees of Hanover Finance, designated in writing by Hanover Finance, without further action by Boston Publishing, you will make all payments of Net Proceeds or any other credits, reserves, deposits, balances, refunds or other amounts now or hereafter due to Boston Publishing under the Member Agreement in respect of Card Sales directly by wire transfer, to such account or accounts as Hanover Finance may designate in writing (the "Accounts")." |
| | February 17, 1994 Letter from Robert George to Michael Duffy at LI_00030-31 (showing that the merchant, *e.g.*, Boston Publishing, had an outstanding obligation to a third party, *e.g.*, Hanover Finance). |
| and at the computerized merchant processor, means for receiving the information related to the payment from the merchant, means for authorizing and settling the payment, | The language of the patent makes clear that a merchant processor acquires payment information and authorizes and settles the payment. On information and belief, the means for performing these functions and for forwarding a portion of the payment to the third party to reduce the obligation is a modem and computer running appropriate software. |
| | "Litle & Co. continues to be your credit card processor and will continue to work directly with you to provide a high level of customer and technical service." February 28, 1992 letter from Tim Litle to Robert George at LI_00016. |

13

| United States Patent No. 6,941,281 | |
| --- | --- |
| **Claims** | **Specification References** |
| and means for forwarding a portion of the payment to the third party to reduce the obligation. | "WHEREAS, LITLE and NPC are engaged in the business of processing paper-based and electronic data representing transactions conducted through the use of CHARGE CARDS, and<br><br>WHEREAS, MEMBER desires to honor CHARGE CARDS in connection with the retail sale of PRODUCTS to MEMBER's customers, to submit SALES RECORDs and REFUNDs representing such transactions to LITLE for processing and to sell to FNBL the SALES RECORDs generated with BANK CARDs and the indebtednesses represented thereby."<br><br>Member Agreement at LL_00018. |
| | "In consideration of Litle & Co. making advances for the account of [Museum Publications of America] to United States Postal Service, [Museum Publications of America] agrees to pay on demand the Principal Amount of Advance plus management fee to Litle & Co., or order. MEMBER further agrees that all CHARGE CARD transactions from all divisions and subsidiaries will be processed by Litle & Co. while any amount owed under this note is still outstanding. Notwithstanding that such amounts are otherwise payable on demand, MEMBER agrees that . . . (ii) the Daily Repayments shall be deducted from daily NET PROCEEDS. . . ." Promissory Note at LL_00033 and Promissory Note Repayment Schedule at LL_00035 (showing that a portion of card payments are forwarded to Litle, as a computerized payment receiver, to reduce the obligation that arose when Litle advanced postage costs ("Principal Amount of Advance") to merchant).<br><br>"NET PROCEEDS is an amount equal to: The GROSS PROCEEDS, Less LITLE FEES, Less RELEASED CHARGEBACKS (if no RESERVE exists), Less any other amounts due from MEMBER to LITLE, Less any PREPAYMENTS."<br><br>Member Agreement at LL_00018.<br><br>"As security for the obligations of Boston Publishing (the Borrower) under such financing agreements, Hanover Finance is being granted a security interest in our |

14

**UNITED STATES PATENT NO. 6,941,281**

| CLAIMS | SPECIFICATION REFERENCES |
|---|---|
| | inventory, certain accounts and substantially all of the tangible and intangible personal property of Boston Publishing, including, without limitation, all rights of the Borrower to receive payments in respect of Card Sales from Litle & Co. . . . 1. Upon written instruction from Hanover Finance or assignees of Hanover Finance, designated in writing by Hanover Finance, without further action by Boston Publishing, you will make all payments of Net Proceeds or any other credits, reserves, deposits, balances, refunds or other amounts now or hereafter due to Boston Publishing under the Member Agreement in respect of Card Sales directly by wire transfer, to such account or accounts as Hanover Finance may designate in writing (the "Accounts")." |
| | February 17, 1994 Letter from Robert George to Michael Duffy at LL_00030-31 (showing that Litle could forward a portion of the payment to the loan payment receiver, *e.g.*, Hanover Finance, to reduce the merchant's, *e.g.*, Boston Publishing obligation). |
| 11. The system of claim 10 wherein the accepting means comprises means for accepting a credit card number as the customer identifier. | The merchant, *e.g.*, Museum Publications of America, accepted credit cards from customers for payment. Means for accepting a credit card number as the customer identifier included, on information and belief, a magnetic card reader, keyboard input and/or telephone. |
| | "WHEREAS, LITLE and NPC are engaged in the business of processing paper-based and electronic data representing transactions conducted through the use of CHARGE CARDS, and WHEREAS, MEMBER desires to honor CHARGE CARDS in connection with the retail sale of PRODUCTS to MEMBER's customers, to submit SALES RECORDs and REFUNDs representing such transactions to LITLE for processing and to sell to FNBL the SALES RECORDs generated with BANK CARDs and the indebtednesses represented thereby." |
| | Member Agreement at LL_00018. |
| | "CHARGE CARD is the plastic BANK CARD or T&E CARD issued by a |

UNITED STATES PATENT No. 6,941,281

| CLAIMS | SPECIFICATION REFERENCES |
|---|---|
| | CARD ORGANIZATION to the CARDHOLDER and the charge account number designated on the card, either of which MEMBER accepts from customers as payment for their purchases from MEMBER." *Id.* |
| | "BANK CARD means a valid and unexpired CHARGE CARD issued by an ISSUING MEMBER of MCI or VISA which contains the MasterCard service mark or Visa's Blue, White and Gold Bands Design service mark. A BANK CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.* |
| | "CARD ORGANIZATION is VISA, MCI or the issuer of a T&E CARD." *Id.* |
| | "T&E CARD is a valid and unexpired Travel and Entertainment CHARGE CARD issued by American Express, Carte Blanche, Diner's Club or Discover. A T&E CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.* at LI_00019. |
| 12. The system of claim 10 wherein the accepting means comprises means for accepting a debit card number as the customer identifier. | It would have been obvious to a person of ordinary skill in the art at the time of the alleged invention of Plaintiff's asserted claims to apply systems and means in use for one type of customer identifier to another type of customer identifier, *e.g.* for debit cards as well as credit cards. And the statements by the alleged inventor and by the examiner, and the language of the patent itself makes clear that a person of ordinary skill in the art would be motivated to make the method or system work in the same way for any customer identifier, including debit cards. Debit card numbers may be accepted, for example, using the merchant's magnetic card reader, keyboard input and/or telephone. |
| | "WHEREAS, LITLE and NPC are engaged in the business of processing paper-based and electronic data representing transactions conducted through the use of CHARGE CARDS, and |
| | WHEREAS, MEMBER desires to honor CHARGE CARDS in connection with the retail sale of PRODUCTS to MEMBER's customers, to submit SALES |

16

UNITED STATES PATENT NO. 6,941,281

| CLAIMS | SPECIFICATION REFERENCES |
|---|---|
| | RECORDs and REFUNDs representing such transactions to LITLE for processing and to sell to FNBL the SALES RECORDs generated with BANK CARDs and the indebtednesses represented thereby." |
| | Member Agreement at LL_00018. |
| | "CHARGE CARD is the plastic BANK CARD or T&E CARD issued by a CARD ORGANIZATION to the CARDHOLDER and the charge account number designated on the card, either of which MEMBER accepts from customers as payment for their purchases from MEMBER." *Id.* |
| | "BANK CARD means a valid and unexpired CHARGE CARD issued by an ISSUING MEMBER of MCI or VISA which contains the MasterCard service mark or Visa's Blue, White and Gold Bands Design service mark. A BANK CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.* |
| | "CARD ORGANIZATION is VISA, MCI or the issuer of a T&E CARD." *Id.* |
| | "T&E CARD is a valid and unexpired Travel and Entertainment CHARGE CARD issued by American Express, Carte Blanche, Diner's Club or Discover. A T&E CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.* at LL_00019. |
| 13. The system of claim 10 wherein the accepting means comprises means for accepting a smart card number as the customer identifier. | It would have been obvious to a person of ordinary skill in the art at the time of the alleged invention of Plaintiff's asserted claims to apply systems and means in use for one type of customer identifier to another type of customer identifier, *e.g.*, for smart cards as well as credit cards. And the statements by the alleged inventor and by the examiner, and the language of the patent itself makes clear that a person of ordinary skill in the art would be motivated to make the method or system work in the same way for any customer identifier, including smart cards. Smart card numbers may be accepted, for example, using the merchant's |

17

UNITED STATES PATENT NO. 6,941,281

| CLAIMS | SPECIFICATION REFERENCES |
|---|---|
| | magnetic card reader, keyboard input and/or telephone. |
| | "WHEREAS, LITLE and NPC are engaged in the business of processing paper-based and electronic data representing transactions conducted through the use of CHARGE CARDS, and |
| | WHEREAS, MEMBER desires to honor CHARGE CARDS in connection with the retail sale of PRODUCTS to MEMBER's customers, to submit SALES RECORDs and REFUNDs representing such transactions to LITLE for processing and to sell to FNBL the SALES RECORDs generated with BANK CARDs and the indebtednesses represented thereby." |
| | Member Agreement at LL_00018. |
| | "CHARGE CARD is the plastic BANK CARD or T&E CARD issued by a CARD ORGANIZATION to the CARDHOLDER and the charge account number designated on the card, either of which MEMBER accepts from customers as payment for their purchases from MEMBER." *Id.* |
| | "BANK CARD means a valid and unexpired CHARGE CARD issued by an ISSUING MEMBER of MCI or VISA which contains the MasterCard service mark or Visa's Blue, White and Gold Bands Design service mark. A BANK CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.* |
| | "CARD ORGANIZATION is VISA, MCI or the issuer of a T&E CARD." *Id.* |
| | "T&E CARD is a valid and unexpired Travel and Entertainment CHARGE CARD issued by American Express, Carte Blanche, Diner's Club or Discover. A T&E CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.* at LL_00019. |
| 14.  The system of claim 10 wherein the accepting means comprises means for accepting | The merchant, *e.g.*, Museum Publications of America, accepted charge cards from customers for payment.  Means for accepting a charge card number as the |

18

UNITED STATES PATENT No. 6,941,281

| CLAIMS | SPECIFICATION REFERENCES |
|---|---|
| a charge card number as the customer identifier. | customer identifier included, on information and belief, a magnetic card reader, keyboard input and/or telephone.

"WHEREAS, LITLE and NPC are engaged in the business of processing paper-based and electronic data representing transactions conducted through the use of CHARGE CARDS, and

WHEREAS, MEMBER desires to honor CHARGE CARDS in connection with the retail sale of PRODUCTS to MEMBER's customers, to submit SALES RECORDs and REFUNDs representing such transactions to LITLE for processing and to sell to FNBL the SALES RECORDs generated with BANK CARDs and the indebtednesses represented thereby."

Member Agreement at LI_00018.

"CHARGE CARD is the plastic BANK CARD or T&E CARD issued by a CARD ORGANIZATION to the CARDHOLDER and the charge account number designated on the card, either of which MEMBER accepts from customers as payment for their purchases from MEMBER." *Id.*

"BANK CARD means a valid and unexpired CHARGE CARD issued by an ISSUING MEMBER of MCI or VISA which contains the MasterCard service mark or Visa's Blue, White and Gold Bands Design service mark. A BANK CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.*

"CARD ORGANIZATION is VISA, MCI or the issuer of a T&E CARD." *Id.*

"T&E CARD is a valid and unexpired Travel and Entertainment CHARGE CARD issued by American Express, Carte Blanche, Diner's Club or Discover. A T&E CARD shall be deemed valid on and after the effective date, if shown, and through and including the expiration date embossed thereon." *Id.* at LI_00019. |
| 15. The system of claim 10 wherein the | On information and belief, means for accepting the customer identifier existed at |

19

United States Patent No. 6,941,281

| Claims | Specification References |
|---|---|
| accepting means comprises means for accepting the customer identifier at a merchant location. | a location of a merchant or merchant's agent, including, on information and belief, a magnetic card reader, keyboard input and/or telephone.<br><br>"c. MEMBER shall complete each SALES RECORD to include a notation in the space provided for the CARDHOLDERS's signature that the sale was initiated by mail order (MO), telephone order (TO) or pre-authorized order (PO) (except for sales made in person, for which the CARDHOLDER's signature shall be obtained). . . ." Member Agreement at LI_00019. |
| 16. The system of claim 10 wherein the accepting means comprises means for electronically accepting the customer identifier. | On information and belief, means for a merchant's electronically accepting a customer identifier existed in the Litle system, including, on information and belief, a magnetic card reader, keyboard and/or telephone.<br><br>"c. MEMBER shall complete each SALES RECORD to include a notation in the space provided for the CARDHOLDERS's signature that the sale was initiated by mail order (MO), telephone order (TO) or pre-authorized order (PO) (except for sales made in person, for which the CARDHOLDER's signature shall be obtained). . . ." Member Agreement at LI_00019.<br><br>"WHEREAS, LITLE and NPC are engaged in the business of processing paper-based and electronic data representing transactions conducted through the use of CHARGE CARDS . . . ." Member Agreement at LI_00018 (showing that the merchant electronically accepts the customer identifier).<br><br>"SALES RECORD means all documents or data presented to LITLE as evidence of a CARD SALE." *Id.* at LI_00019 (showing that the merchant electronically accepts the customer identifier). |
| 17. The system of claim 10 wherein the merchant processor further comprise means for accumulating the payments until a predetermined amount is reached and means for forwarding at least a portion of the accumulated | Litle would accumulate the payments until a predetermined amount was reached and then forward at least a portion of the accumulated payments. *See* Promissory Note Repayment Schedule at LI_00035 (outlining specified daily and weekly payment amount). |

20

| United States Patent No. 6,941,281 | |
| --- | --- |
| **Claims** | **Specification References** |
| payments to the third party. | On information and belief, the means for accumulating the payments until a predetermined amount was reached and means for forwarding at least a portion of the accumulated payments was a modem and computer running appropriate software. |
| 18. The system of claim 10 wherein the forwarding means at the merchant processor comprises means for periodically forwarding at least a portion of the payment to the third party. | Litle would periodically forward at least a portion of the payment. *See* Promissory Note Repayment Schedule at LL_00035 (outlining daily and weekly payment schedules). On information and belief, the means for performing this function was a modem and computer running appropriate software. |
| | "In consideration of Litle & Co. making advances for the account of [Museum Publications of America] to United States Postal Service, [Museum Publications of America] agrees to pay on demand the Principal Amount of Advance plus management fee to Litle & Co., or order. MEMBER further agrees that all CHARGE CARD transactions from all divisions and subsidiaries will be processed by Litle & Co. while any amount owed under this note is still outstanding. Notwithstanding that such amounts are otherwise payable on demand, MEMBER agrees that . . . (ii) the Daily Repayments shall be deducted from daily NET PROCEEDS. . . ." Promissory Note at LL_00033 (showing that payments were periodically forwarded). |
| 19. The system of claim 10 wherein the forwarding means at the merchant processor comprises means for forwarding to the third party an amount that is a percentage of the obligation. | Litle forwarded an amount that is a percentage of the obligation. On information and belief, the means for performing this function was a computer running appropriate software. |
| | "In consideration of Litle & Co. making advances for the account of [Museum Publications of America] to United States Postal Service, [Museum Publications of America] agrees to pay on demand the Principal Amount of Advance plus management fee to Litle & Co., or order. MEMBER further agrees that all CHARGE CARD transactions from all divisions and subsidiaries will be processed by Litle & Co. while any amount owed under this note is still outstanding. Notwithstanding that such amounts are otherwise payable on |

United States Patent No. 6,941,281

| Claims | Specification References |
|---|---|
| | demand, MEMBER agrees that . . . (ii) the Daily Repayments shall be deducted from daily NET PROCEEDS. . . ."

Promissory Note at LI_00033 (showing that payments forwarded were in an amount that was a percentage of the obligation); *see also* Promissory Note Repayment Schedule at LI_00035 (outlining daily and weekly payment amount, all of which individually and collectively constituted a percentage of the merchant's total obligation). |

22

# EXHIBIT H

**Paul**Hastings

ATTORNEYS

Paul, Hastings, Janofsky & Walker LLP
Five Palo Alto Square • Sixth Floor • Palo Alto, CA 94306-2155
telephone 650 320 1800 • facsimile 650 320 1900 • www.paulhastings.com

Atlanta
Beijing
Brussels
Hong Kong
London
Los Angeles
Milan
New York
Orange County
Palo Alto
Paris
San Diego
San Francisco
Shanghai
Stamford
Tokyo
Washington, DC

650-320-1823
robertmatz@paulhastings.com

September 1, 2006

<u>Via E-Mail</u>

Hilary Preston, Esq.
Vinson & Elkins LLP
666 Fifth Avenue, 26th Floor
New York, New York 10103

Re:    *AdvanceMe, Inc. v. RapidPay LLC, et al.* (No. 6:05-cv-00424) (E.D. Tex.);
       *AdvanceMe, Inc. v. AmeriMerchant, LLC* (No. 6:06 CV 82)(E.D. Tex.).
       Defendants' Amended and Second Amended Invalidity Contentions

Dear Hilary:

I write to inform you that Defendants in the above-referenced matters have violated the Patent Rules of the Eastern District of Texas by purporting to amend their Preliminary Invalidity Contentions without an order of the Court.

P.R. 3-7 provides:

> Amendment or modification of the....Preliminary or Final Invalidity Contentions, other than as expressly provided in P.R. 3-6, may be made only by order of the Court, which shall be entered only upon a showing of good cause.

In the *RapidPay* matter, Defendants have twice purported to amend their Preliminary Invalidity Contentions without an order of the Court. On July 21, 2006, Defendants attempted to amend their Preliminary Invalidity Contentions by adding a number of alleged prior publication references to their Preliminary Infringement Contentions: (1) a credit card processing agreement among Electronic Data Systems Corporation, Reno Air, and First USA Merchant Services, (2) an article from *Forbes* magazine, and (3) a Promissory Note between Litle & Co. and Exposures, Inc. On August 30, 2006, the *RapidPay* Defendants purported to amend their Preliminary Invalidity Contentions to include additional prior publication references with respect to Litle & Co., including (1) a Litle & Co. Member Agreement, (2) a Demand Promissory Note for Postage Advances between Museum Publications of America and Litle & Co., (3) a February 17, 1994 Letter from Robert George to Michael Duffy. Since amendment of Defendants' Preliminary Invalidity Contentions can be made only by order of the Court, and since there is no order of the Court granting Defendants permission to amend their Preliminary Invalidity Contentions, these purported Amended and Second Amended Invalidity Contentions are of no legal effect.

Hilary Preston, Esq.
September 1, 2006
Page 2

In the *AmeriMerchant* matter, on August 30, 2006, Defendant purported to amend its Preliminary Invalidity Contentions to include prior publication references with respect to Litle & Co., including (1) a Litle & Co. Member Agreement, (2) a Demand Promissory Note for Postage Advances between Museum Publications of America and Litle & Co., (3) a February 17, 1994 Letter from Robert George to Michael Duffy. Again, since amendment of Defendant's Preliminary Invalidity Contentions can be made only by order of the Court, and since there is no order of the Court granting Defendant permission to amend its Preliminary Invalidity Contentions, its Amended Preliminary Invalidity Contentions are of no legal effect.

In light of the foregoing, please be advised that AdvanceMe will only be considering those contentions set forth in Merchant Money Tree, Inc., First Funds LLC, and Reach Financial, LLC's Preliminary Invalidity Contentions, dated July 7, 2006, and AmeriMerchant, LLC's Preliminary Invalidity Contentions, dated July 20, 2006.

Sincerely,

Robert C. Matz
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

LEGAL_US_W # 54528782.1

# EXHIBIT I



How I Did It
CEOs Share
Their Secrets
of Explosive
Growth

*25th Anniversary*
# SPECIAL ISSUE

# Inc.

AMERICA'S
FASTEST
GROWING
PRIVATE
COMPANIES





## | 500 **PROFILES OF SUCCESS** |

#### INCLUDING

The new No. 1 company (5,629% three-year growth),
the biggest job creator (6,591 employees), and
the flat-out biggest company ever to appear on this list,
with annual revenue of $3.4 billion

#### PLUS

What the CEOs think about compensation,
benefits, politics, and cashing out

September 2003
$8.99 US $8.99 Canada





0  71486 02758  3

## How I Did It



# "To succeed we have to know four things"

**Three-Year Growth**
# 5,629%

**Ted Little**
Chairman, Little & Co. Financial Services

*More than 40 years of direct marketing and financial services history is packed into the genial, unassuming person of Tim Little. An engineer to the core, Little, 66, is responsible for some of the commercial world's least sexy innovations, including those three-digit numbers on the backs of credit cards that discourage fraud, credit card rules that let consumers buy on installment plans, and the system by which mass mailers receive discounts from the U.S. Postal Service for presorting by carrier route. These ideas and others have made or saved billions of dollars for Little's clients, as well as thousands of direct marketers who have never heard his name. Little & Co. is No. 1 on this year's Inc. 500 list with $34.8 million in 2005 revenue and three-year growth of 5,629.1 percent.*

**I grew up in Grosse Pointe,** Michigan. My grandfather was the chief engineer for Lincoln; my dad ran the Detroit office for Time magazine. The engineering gene must have skipped a generation: I got it and went to Cal Tech. My freshman physics professor was Richard Feynman and my freshman chemistry professor was Linus Pauling.

**At Harvard Business School** I took all the entrepreneurial courses I could. I wanted to be a technical entrepreneur, although at the time it wasn't clear what that meant. After business school I worked on cold-war intelligence technologies at Litton Industries. I was there for less than a year when I got appendicitis, and while I was having my appendix out someone stole my project from the lab. The Feds were all

over the place. I left Litton in 1965. That was the last time I worked for a company that wasn't mine.

**A politician friend** wanted to be able to mass-mail letters to specific groups of voters. I thought we could use computers to create targeted letters based on information about groups of people. The politician and I and two other guys started a company to do that for large marketers.

**We got into list management,** which means segmenting a marketer's mailing list according to demographics and buying patterns. We also saw a big opportunity in subscription fulfillment—making sure the right people get the publications they subscribe to. One of our clients was *The Christian*



Where Credit is Due
Tim Lide, unsung (but well rewarded) hero. If you sell directly to customers, he's been a sort of partner to you.

Photograph by Dirk Anschutz



*Think big.*

EVEN A GROWING BUSINESS should feel like the most important company in its town,

on helping businesses of all sizes, well, grow. Whether it's retirement planning

solutions that fit your exact needs. And the needs of the company you'll be tomorrow.

*To learn more, contact your financial*

©2005 Principal Financial Services, Inc. "The Principal," "Principal Financial Group" and the Edge Design logo/design are trademarks of the illustration companies and "well disclaimer (800) 247-4123, member SIPC and/or independent broker-dealers. Securities offered through Princor Registered Representatives offered through Princor Corporation, distributed through Des Moines, IA 50392. Insurance issued by insurance company. FDIC insured, not obligations or deposits of Principal Bank, not guaranteed by Principal Bank, and subject to investment risk.



state, country, world. At least that's how we see it. For over 125 years, we've focused

and investments, medical coverage or life insurance, we can easily customize

Because no matter how big you are, truth is, we'd like to help you get bigger.



Retirement
Investments
Insurance
Banking

**Principal**
**Financial Group**

WE'LL GIVE YOU AN EDGE℠

...ssional or visit principal com_____

Edge are service marks of Principal Financial Services Inc. Insurance issued by Principal Life Insurance Company. Securities offered through Princor Financial Services Corporation,
Principal Bank member FDIC, Equal Housing Lender. Principal Life, Princor® Principal Bank and Principal Financial Services Inc. are members of the Principal Financial Group®
...org pass to bes chit companies. AH #4854-072009



*Science Monitor.* Only 79 percent of the next day subscribers get it on the day they expected it. I went into one of the printing huts and watched people take the *Monitors* off the belt and stuff them in mail sacks. There was a thick manual about how to put stuff in the sack and the maximum weight and the minimum number of pieces. These were minimum-wage people—a lot of them didn't speak English. And they were writing out the tags that went on the mail sacks by hand and then taking them to the post office where more people would dump them on a table and then put them in other sacks. We came up with a system to computerize that. Labels would be printed according to Zip codes and the newspapers would then be sorted based on their destinations. We got it working, and I'll be damned if they didn't get 92 percent on time delivery.

One of my business school friends was high up at the U.S. Postal Service, and they'd been studying the *Monitor* thing. He said, "We save so much money with this, do you think you could get your buddies in the direct marketing business to do it if we give them a discount?" It cost 9.6 cents to mail a catalog, so I said, "How about four cents?" Eight months later the post office announced its first Carrier Route Presort discount, and it was four cents. Now about half of all mail is delivered that way. I think they paid me $500 for introducing the idea.

Around 1977, I had sold my company and my wife, Joan, and I bought a catalog company. It was called Clymer's of Bucks County and it sold American handicrafts. We also began to handle warehousing and fulfillment for other catalogs. All the catalogs were losing 3 percent of sales because of inefficiencies in the payment-processing system—the networks were set up for retailers and not for situations where the buyer isn't present to hand over his card. So in 1982 I put together a system to address the requirements of catalogs and the card-not-present world. We eventually brought that 3 percent down to about .1 percent.

I started the first Litle & Co. in 1986, with $1.6 million of unsecured credit.

from the bank. The total amount Joan and I put in was $1,000. It was another payments-processing company for catalogers. We had customers like AOL, Land's End, most of the guys on late-night television selling Chinese woks.

We did some significant things. We worked with Visa to introduce address verification, where a cataloger asks for the customer's billing address as a way to check his identity. With American Express we introduced the identification number on credit cards. Another thing we got through was installment billing. Visa had rules against that because the interest would be paid to the seller and not the credit card issuer. We explained that companies like NordicTrack don't want the interest; they want to increase their sales. We suggested a rule that would prohibit the seller from collecting interest on installment payments. Six weeks later, the rules changed, and Visa ended up selling installment payments as a feature. Like those other things it was a dumb idea of mine, and then it was an interesting idea of mine, and then it was Visa's idea.

In 1995 I sold the company to First USA for about $80 million. I didn't sell them my name so they renamed it Paymentech.

In 2001 I started this company. It does the same thing as the first Litle & Co., but it's a different entity. More than half of our clients are Internet marketers.

To succeed, we have to know four things. First, we have to be good systems guys. Our competitors are very nontechnical, whereas systems are our core competence. Second, we have to know our market. Our competitors are populated by bankers and go to banking conferences; we go to direct

marketing or Internet conferences. Third, we have to know Visa and MasterCard regulations. And fourth, we have to know how to manage risk. We are the ones who make sure the card issuers get their money from our customers' sales. So if one of our customers goes out of business we take it on the chin pretty hard.

This is the engineer in me talking, but I want to build the perfect payment processing system. The software environment has changed a lot since my old company. There's not a whole lot of stuff in

> ## "Like those other things, installment billing was a dumb idea of mine, then it was an interesting idea of mine, then it was Visa's idea."

our computer room. The undepreciated value of all our computer hardware is around $65,000. There was probably $20 million in the old Litle & Co., and we had twice the number of employees.

My son Tom has an art history degree and a fine arts degree. He also ran a successful venture capital firm for six years. But he worked at my other companies during the '90s, and last year he joined this one as vice president of business development. He's done such a terrific job that the members of our executive committee have come to me individually and said, "It's time to make Tom CEO." So we did that.

One of my personal goals for this year is not to be in the critical path of anything going on at the company. I think I'm doing a good job at staying out of these guys' way. I'm in the meeting every month where we plan the next month's software. And I explain how to deal with Visa and MasterCard, and with our partner bank, Wells Fargo. But I don't roll up my sleeves and do things like I used to.

People think I'm crazy, but I love this business.

*As told to Leigh Buchanan*

**Inc.com** For a full archive of past HOW I DID IT features, visit www.inc.com/keyword/hidi.



**HUMMER**
LIKE NOTHING ELSE.™

Pictured: The 2007 H2. © General Motors Corporation. 2006. HUMMER.COM

# EXHIBIT J

1

1          VOLUME:   I
           PAGES:   1 - 306
2          EXHIBITS:  Per index
3
       UNITED STATES DISTRICT COURT
4     FOR THE EASTERN DISTRICT OF TEXAS
            TYLER DIVISION
5
6          C.A. No. 6:05-cv-424-LED-JDL
7   ADVANCEME, INC.,                    )
            Plaintiff                   )
8                                       )
                                        )
9   vs.                                 )
                                        )
                                        )
10  RAPIDPAY LLC, BUSINESS CAPITAL      )
    CORPORATION, FIRST FUNDS LLC,       )
11  MERCHANT MONEY TREE, INC.,          )
    REACH FINANCIAL, LLC and            )
12  FAST TRANSACT, INC.                 )
    d/b/a SIMPLE CASH,                  )
13          Defendants                  )

14  _____
15          C.A. No. 6:06-cv-82-LED
16  ADVANCEME, INC.,                    )
            Plaintiff                   )
17                                      )
                                        )
18  vs.                                 )
                                        )
19  AMERIMERCHANT, LLC,                 )
            Defendant.                  )
20  _____
21
22        VIDEOTAPED DEPOSITION
23               OF
24        THOMAS J. LITLE, IV
25   WEDNESDAY, SEPTEMBER 6, 2006

122

1  it, and the performance obligation was
2  something that the fulfillment company is
3  legally required to do anyway, and that is,
4  don't charge the customer until the goods
5  are shipped.
6  Q. What are the obligations of the catalog
7     company?
8  A. In what sense?
9  Q. In the three-party agreement, did the
10    merchant have any obligations to the
11    fulfillment company?
12 A. The merchant had to pay the fulfillment
13    company for their services.
14 Q. And the obligations of Litle & Company?
15 A. We had to pay the fulfillment company on
16    behalf of the merchant and we had our normal
17    obligations as -- for routine payment
18    processing, as well.
19 Q. That were outlined in the Member Agreement?
20 A. Yes.
21      (One-page document entitled "US
22      6,941,281 B1" is marked Exhibit
23      Number 11 for Identification.)
24 Q. I'm handing you what has been marked Litle
25    Exhibit 11, which are the claims of United

123

1  States Patent 6941281. It shows   it's
2  just the last page of the Patent Column 7
3  and 8.
4      MR. EDELMAN: I'll object to the
5  extent that you're excerpting a page from an
6  entire patent and also not showing Mr. Litle
7  the proposed construction of the terms of
8  the patent, and also not show him the
9  arguments the parties have made with the
10 file list of the patent.
11 Q. Okay, could you please read Claims 1 and 10
12    to yourself?
13      MR. SMITH: Just 1 and 10?
14 Q. Just 1 and 10.
15 A. All right.
16 Q. Do you understand those two claims?
17      MR. EDELMAN: Same objections.
18 A. I think so.
19      (Document entitled "Litle & Co.,
20      Invalidity Claim Chart, United
21      States Patent No. 6,941,281" is
22      marked Exhibit Number 12 for
23      Identification.)
24 Q. I'm handing you what has been marked Litle
25    Exhibit 12, which is a chart that we have

124

1  prepared with two columns. The left column
2  lists the claims of the patent, which is the
3  claims on Litle Exhibit 11 that you just
4  read, 1 and 10, as well as all the other
5  claims which are printed in the left column,
6  and in the right column, we've cited to
7  portions of the Litle documents that you've
8  testified here today that refer to the
9  elements of the claim that are listed in the
10 left-hand column, and what I'd like to ask
11 you to do is -- we'll go through this row by
12 row and I'd like you to read the right-hand
13 column, I'll read the left-hand column to
14 you, and ask you to tell us if what we've
15 cited in the right-hand column is accurate.
16      MR. EDELMAN: Excuse me. Before
17 you read that, can I have a representation
18 as to whether this was provided --
19      MR. GRAY: Yes, it was.
20      MR. EDELMAN: It was provided when?
21      MR. GRAY: Last week sometime.
22      MR. EDELMAN: Okay.
23      MR. SMITH: I'd like to note, we're
24 not going to object to the line of
25 questioning, certainly, but Mr. Litle is

125

1  here as a fact witness. He is not rendering
2  a conclusion on patent validity. He is here
3  simply to testify as a factual witness. I
4  just wanted to make that clear before --
5      MR. EDELMAN: And again, I want to
6  object to the extent that this is being
7  shown to Mr. Litle without the discussion of
8  what the terms are construed to mean, or the
9  parties' construction. It's misleading,
10 putting the witness in an impossible
11 situation. If you want to do it, go ahead.
12 Q. You testified that you understand the terms
13    that are used in the patent; is that
14    correct?
15      MR. EDELMAN: Same objections.
16 A. Yeah, I think so, but if we get to some I
17 don't understand, then I'll say that.
18 Q. Please do. So on Page 1 of Litle Exhibit
19    12, in the first row, the claim recites,
20    "A method for automated payment,
21    comprising."
22 A. That's not exactly a complete sentence.
23 Q. No, and what we've done, and the reason I
24    had you read Claims 1 through 10, is because
25    we have broken down the claims --

32 (Pages 122 to 125)

126

1  A. Okay.
2  Q. -- and if you would like to refer back to
3     Litle Exhibit 11, right there, you can read
4     the full claim in context.
5  A. Okay.
6  Q. So "A method for automated payment," and
7     what we've listed here are all the documents
8     you've testified about today and stated
9     "Litle & Company utilized a method for
10    automated payments as repayment of
11    obligations owed by merchants either for
12    postage or cash advances." Is that correct?
13 A. Yeah, and also, the reserves and something
14    like the Hanover Direct obligation. The
15    other kinds of obligations that we've talked
16    about. So it isn't just for postage or cash
17    advances.
18 Q. Was the fulfillment center operation that
19    you just testified about, was that a method
20    of automated payment?
21 A. To the fulfillment center?
22 Q. Yes.
23 A. Yes.
24 Q. What about for the wire fee you discussed?
25 A. For the what?

127

1  Q. For the wire fee: was that a method for
2     automated payment?
3  A. Yes.
4  Q. And was equipment — payments for equipment
5     rental and purchase, was that a method for
6     automated payment?
7  A. Yes.
8  Q. Looking now at the second row of the first
9     page of Litle 12, the claim says "At a
10    merchant, accepting a customer identifier as
11    payment from the customer." Can you look at
12    the right-hand column and tell me whether or
13    not those citations from the Litle documents
14    show that a merchant accepted the customer
15    identifier as payment from the customer?
16    MR. EDELMAN: Objection. Calls for
17    claim construction, beyond the scope of the
18    testimony, misleading, lack of foundation.
19 Q. I absolutely do not want you to try to
20    construe the claims.
21    MR. EDELMAN: He has to construe
22    the claim to answer the question.
23    MR. SCHUURMAN: Why don't you ask
24    him during your cross and stop interfering.
25    Go ahead.

128

1     MR. EDELMAN: I can put my
2  objections on the record.
3     MR. SCHUURMAN: Well, make them
4  short.
5     MR. EDELMAN: I will make them as
6  long as I want to make them.
7  Q. Based on your understanding after being in
8     the card processing industry for about 25
9     years --
10 A. More than that.
11 Q. I'm sorry? Longer than that?
12    MR. SMITH: 25-plus.
13 Q. 25-plus years.
14    MR. EDELMAN: Don't make him a
15 patent attorney.
16 Q. Do the —
17    MR. GRAY: I'm sorry. Is that an
18 objection?
19    MR. EDELMAN: Yes, it is.
20    MR. GRAY: I didn't hear
21 "objection."
22    MR. EDELMAN: Objection. It
23 doesn't make him a patent attorney. Go
24 ahead.
25    MR. GRAY: Please limit your

129

1  objections to objections as to form.
2     MR. EDELMAN: It was a beautiful
3  objection as to form.
4  Q. Okay. Does the right-hand column, does that
5     recite citations to the documents you've
6     testified about today that show a merchant
7     accepts a customer identifier as payment
8     from a customer?
9     MR. EDELMAN: Same objection.
10 Q. Please take as much time as you need.
11 A. And the question is, at that time, did we
12    accept the customer identifier as a payment
13    for transaction, and the answer is we did.
14 Q. The merchants did or Litle & Company did?
15 A. The merchants accepted it.
16 Q. As described in the quotes in this chart
17    that you're reading?
18    MR. EDELMAN: Same objection.
19 A. Right.
20 Q. Okay. Looking at the bottom row on Page 2
21    of Litle Exhibit 12, the claim states "and
22    electronically forwarding information
23    related to the payment to a computerized
24    merchant processor." Could you please tell
25    me whether the cites in the right-hand

33 (Pages 126 to 129)

130

```
1    column illustrate that Litle & Company
2    electronically -- or that the merchant
3    electronically forwarded information related
4    to the payment to Litle & Company?
5         MR. EDELMAN:  Objection.  Calls for
6    claim construction, beyond beyond the scope
7    of the deposition, lack of foundation.
8  A.  Yes.
9  Q.  And to clarify, you said that using --
10   pursuant to the Member Agreement, which is
11   Litle Exhibit 4, the merchant would accept
12   credit cards, debit cards, and charge cards,
13   such as an American Express card?
14 A.  That's correct.
15 Q.  And did you also testify that the merchant
16   would accept those cards using a telephone
17   and inputting the credit card number into a
18   computer?
19 A.  That's one way, yes.
20        MR. EDELMAN:  I just want to put an
21   objection on the record.  It wasn't clear to
22   me    vague and ambiguous as to which
23   merchants you're referring to.
24 Q.  Which merchants would accept a credit card
25   via telephone?
```

131

```
1  A.  That's how the card-not-present merchants
2    received most of their transactions.  When
3    they didn't receive them by telephone was
4    when they -- or by an order blank sent
5    through the mail.  It was typically at a
6    warehouse sale or something like that.  Then
7    they were operating just like a normal
8    retailer operating.
9  Q.  And was the process by which those merchants
10   forwarded information, such as the card,
11   information and payment amount, to Litle &
12   Company in the authorization step in Litle
13   10, was that process different for
14   card-not-present or card-present
15   transactions?
16 A.  How they actually forwarded the information
17   to us?  Yeah.  Actually, sometimes we got
18   the settlement information -- well, the
19   authorization process might not -- I can't
20   remember.  It depended on the situation.
21   Might not have actually gone through us, but
22   we were responsible for it.  It might have
23   gone directly to NDC, and then that
24   information would have come to us through
25   NDC, the authorization information, which we
```

132

```
1    needed for our process, and then the
2    settlement information might have gone to
3    NDC first and then through NPC, but it was
4    part of our contract, and the settlement
5    information sometimes then went directly to
6    us.  Could go any one of those ways.
7  Q.  Whether the card was present or not present,
8    was the information related to the payment,
9    such as the card number and the payment
10   amount --
11 A.  Yes.
12 Q.  -- was that electronically forwarded?
13 A.  Yes.  If the card-not-present, it was always
14   directly forwarded to us.
15 Q.  Electronically?
16 A.  Yes.  When it was card-not-present, it was
17   always forwarded electronically, but the
18   route that it took could vary, depending on
19   the circumstances.
20 Q.  Okay.  Thank you.  On Page 3 of Litle
21   Exhibit 12, the next portion of the claim
22   states "at the computerized merchant
23   processor, acquiring the information related
24   to the payment from the merchant,
25   authorizing and settling the payment, and
```

133

```
1    forwarding at least a portion of the payment
2    to a computerized payment receiver as
3    payment of at least a portion of an
4    obligation made by the merchant."
5  A.  Uh-huh.
6  Q.  Could you please read the citations in the
7    right-hand column, and it flows over on to
8    Page 4 and 5, and tell me whether that
9    accurately recites the portions of the
10   agreements you've testified to today.
11        MR. EDELMAN:  I'm sorry.  Was your
12   question getting at whether it reflects the
13   language of the Claim 10?
14        MR. GRAY:  No.  I asked whether it
15   accurately reflects --
16        MR. EDELMAN:  Reflects the
17   agreements.
18 Q.  Do you understand my question?
19 A.  Yeah.  You are asking -- I'll read it back.
20   As I understand it, you're asking me to look
21   at the citations and without trying to
22   interpret whether they comply with the
23   patent or not, you're asking whether those
24   citations are accurate.  Is that true?
25 Q.  Right.
```

34 (Pages 130 to 133)

134

1      MR. EDELMAN: That's fine.
2  A.  I have a question. In the first sentence,
3      it says, at the end, "Management fee to
4      Litle & Company, or order." I'm not sure
5      that's either what it says or what it should
6      have said.
7  Q.  I believe that s what it says. That's
8      Litle Exhibit 7, I believe?
9      MR. EDELMAN: I'm sorry. Where is
10     the witness referring?
11     MR. GRAY: The bottom of Page 3,
12     the bottom paragraph in the right column,
13     the fourth line down.
14     MR. EDELMAN: Oh, I see it.
15     Thanks.
16 A.  Yeah, I think that was a typo and it should
17     have probably said -- it should have
18     probably referred to what we were thinking
19     of setting up or maybe had set up as a
20     separate operation to do postage financing.
21 Q.  Okay. Outside of Litle & Company?
22 A.  Right. Well, it would have been owned by
23     roughly the same people, but it would have
24     been a separate operation.
25 Q.  Do you have any other questions about the

135

1      citations in the right column?
2  A.  Yeah. I'd like to look at the definition of
3      "prepayments."
4  Q.  That's in the Member Agreement?
5  A.  Okay. Yes, that's accurate.
6  Q.  Do all these citations on Pages 3 through 5
7      accurately reflect your understanding of
8      what the language in the left column
9      requires?
10     MR. EDELMAN: Same objections.
11 A.  As I understand it, yes.
12 Q.  And do you have any questions about what
13     that -- do you understand what the claim
14     language in the left-hand column is on those
15     pages?
16     MR. EDELMAN: Same objection.
17     MR. SMITH: Objection. I think
18     "claim language" is misleading. He can
19     talk about what the words say, but "claim
20     language" is a big problem.
21 Q.  The language that's printed in the left-hand
22     column, do the right-hand citations
23     accurately reflect your understanding?
24 A.  As a layman's understanding because lawyers
25     always interpret stuff a little

136

1      differently.
2      MR. SMITH: He knows too well.
3      MR. EDELMAN: Objection.
4  A.  And then they charge you for it.
5  Q.  Your understanding, though, as someone who
6      has been in the payment processing
7      industry for 25-plus years.
8  A.  I would say I understand what the left-hand
9      column is getting at and the right-hand
10     column is a reflection of exactly that --
11 Q.  Okay.
12 A.  -- and matches what our documentation was.
13 Q.  And I'm going to be asking the same
14     questions about each row going throughout
15     this document. So beginning on Page 5,
16     would you please read the citations in the
17     right column?
18 A.  The question is the same; is this an
19     accurate representation?
20 Q.  Yes.
21 A.  Yes, it is.
22 Q.  Do those citations accurately reflect your
23     understanding of the description in the
24     left-hand column?
25     MR. EDELMAN: Same objections.

137

1  A.  Yes. I understand the computer payment
2      receiver as what I call the third party, and
3      if that's the case, yes, it does accurately
4      reflect it.
5  Q.  Looking at the next row, and the left-hand
6      column begins with the Number 2 --
7  A.  Uh-huh.
8  Q.  -- it says "The method of claim 1 wherein
9      the accepting step comprises accepting a
10     credit card number as the customer
11     identifier." Could you please look at
12     what's cited in the right-hand column and
13     tell me if that accurately reflects the
14     Litle documents and -- well, if it
15     accurately reflects that Litle accepted
16     credit card numbers? Sorry. Let me start
17     over. That the merchants who processed
18     through Litle accepted credit card numbers.
19     MR. EDELMAN: Same objections.
20     MR. SMITH: Do you understand that
21     question?
22     THE WITNESS: I think so.
23 Q.  Let me rephrase. Sorry. Could you look at
24     the citations in the right-hand column and
25     tell me whether those citations accurately

35 (Pages 134 to 137)

138

1  illustrate that Litle & Company processed
2  credit card transactions for merchants?
3      MR. EDELMAN: Same objections.
4  A. Yes. That was our service, processing
5  credit cards for merchants.
6  Q. And on Page 6 of Litle Exhibit 12, the
7  bottom row begins with the number 3, could
8  you please look at the right-hand column
9  and, disregarding the first paragraph,
10  please tell me whether those citations --
11  A. Disregarding the first paragraph?
12  Q. Right, disregarding, and was your testimony
13  earlier that Litle would process debit cards
14  on behalf of merchants?
15  A. Yes, but they weren't necessarily identified
16  as debit cards.
17  Q. Right.
18  A. In fact, they were necessarily by the
19  payment networks disguised as debit cards.
20  Q. Could you please read the citations to the
21  documents and tell me whether those
22  citations showed that Litle accepted debit
23  cards -- sorry -- that Litle processed
24  transactions where debit cards were used at
25  the merchant?

139

1      MR. EDELMAN: Same objections.
2  A. And the question again, is?
3  Q. Whether these citations in the right-hand
4  column illustrate that Litle would process
5  debit card transactions for merchants.
6  A. Yes.
7  Q. Do you know what a Smart Card is?
8  A. Yes.
9  Q. What is a Smart Card?
10  A. It's typically a card with a chip on it that
11  carries information about an individual. In
12  those days, they were talking about Smart
13  Cards carrying your medical history and all
14  kinds of stuff on it, and so they would have
15  represented a distributor database of a
16  hundred million nodes, which was in my view
17  ridiculous, and I said so on regular
18  occasions in front of a bunch of credit card
19  people. Now, it's really become a card that
20  carries personal identification
21  information. So a Smart Card is usually an
22  identification device. Prepaid phone cards
23  could be considered Smart Cards because they
24  stored information on them, but I always
25  looked at Smart Cards as those that had a

140

1  computer chip on them that did something.
2  There are cards now that carry changing
3  passwords on it, sort of like an RSA
4  password. There are cards that you can
5  stick your thumb over and it can identify
6  the fact that your thumb print is really
7  your thumb print and not somebody else's. A
8  Smart Card encompasses all kinds of stuff.
9  A Smart Card typically had to be used in
10  conjunction with some sort of terminal
11  device. So we didn't handle any Smart Cards
12  that I know, except that it's also my
13  understanding that some Smart Cards had Visa
14  or MasterCard identification numbers on
15  them, and if that case, if somebody gave
16  those Visa and MasterCard identification
17  numbers over the telephone as a
18  card-not-present card, we would handle it
19  like we'd handle any other credit card,
20  although we wouldn't necessarily know it was
21  a Smart Card.
22  Q. Could you look at Page 9 of Litle Exhibit
23  12, the very bottom line, and Page 9, and
24  tell me whether the citations to the Litle
25  documents in the right-hand column

141

1  illustrate that Litle processed charge card
2  transactions for its merchants.
3      MR. EDELMAN: Same objections as
4  before.
5  A. Yes.
6  Q. And on the row that's numbered 6, would you
7  please read the citations in the right-hand
8  column and tell me whether that accurately
9  illustrates that the merchants for whom
10  Litle would process transactions would
11  sometimes accept credit cards at their
12  warehouse sales or otherwise at the merchant
13  location?
14      MR. EDELMAN: Same objections.
15  A. Well, interestingly enough,
16  card-not-present, based on the Visa and
17  MasterCard regulations, the
18  card-not-presents were accepted at the
19  merchant location that was their office or
20  the place where they were accepting orders,
21  and that location, I think in those days, it
22  changed, had to be identified, by city and
23  state. So that was true with
24  card-not-present, but card present is more
25  obvious. Card-presents were done -- one of

36 (Pages 138 to 141)

142

1 the things that I actually got Visa and
2 MasterCard to do was to allow us, instead of
3 putting the city and state as an identifier
4 for where the card-not-present transactions
5 came from, allowing them -- or now, it's a
6 requirement -- to put the 800 number of the
7 customer service number on it. I don't
8 remember at this time whether the actual
9 city and state was still required, but this
10 was interestingly enough true for
11 card-not-present, as well as card-present
12 transactions.
13 Q. On Page 10, Row 7, would you please tell me
14 whether the right-hand column illustrates
15 how merchants for whom Litle would process
16 transactions would electronically accept
17 cards?
18      MR. EDELMAN: Same objections.
19      MR. SMITH: It looks like, on some
20 of this, there's some editorial, as well.
21 So whether the quotes is what came from the
22 documents; is that right?
23      MR. GRAY: Right.
24      MR. SMITH: Are you asking him to
25 verify what is in the parentheses?

143

1      MR. GRAY: No.
2      MR. SMITH: Okay. So just -- I
3 just want to be --
4      MR. GRAY: Well, actually, yes.
5 Q. If we say it shows something, I'd like you
6 to verify that the quote actually does
7 show.
8      MR. SMITH: Do you understand what
9 they're asking?
10      THE WITNESS: Yes.
11 A. This is certainly what was said. The idea
12 of actually identifying a sale as a mail
13 order or a telephone order was often done,
14 not necessarily always done. We'd identify
15 each merchant or each sub-merchant by our
16 internal merchant number that we had that
17 the merchant also used. So anything that
18 would come under one merchant number would
19 be a mail order. Another sub-merchant
20 number would be a telephone number. Another
21 sub-merchant number would be a card-present
22 transaction. We'd roll all that up and
23 account for it as one merchant, but we could
24 tell where the transactions came from,
25 typically, and the merchants sometimes did

144

1 it religiously and sometimes they didn't do
2 so well, but --
3 Q. And you earlier -- did you earlier testify
4 that some of Litle & Company's merchants
5 would have credit card terminals or card
6 terminals at the merchant location?
7 A. Yes, and we could always identify those
8 transactions, because we'd get a terminal
9 number and we knew which terminal it was
10 used, and so we'd always know that was a
11 card-present transaction. We didn't
12 necessarily always know that a
13 card-not-present transaction was a telephone
14 order or a mail order, and I frankly don't
15 think Visa and MasterCard cared about that.
16 Q. How would you receive that information from
17 the terminal?
18 A. Well, it could take several routes, but
19 electronically, the path that it took
20 would -- could take several different
21 routes. It could come right from the
22 terminal to us. It could go from the
23 terminal to NDC. It could go from the
24 terminal to NPC, and I don't really remember
25 all the ways, but we would change -- over

145

1 time, we would change the way we did that.
2 For efficiency reasons, for cost reasons,
3 for whatever reasons, we would change that,
4 but we always received it electronically.
5 We probably received some paper
6 transactions, but I can't imagine, during
7 the whole course of our company, we received
8 more than a handful.
9 Q. Looking at Row 8 on Page 10 of Litle Exhibit
10 12, did Litle & Company ever instruct FNBL
11 to accumulate payments until a certain
12 amount is reached before forwarding
13 payments?
14      MR. EDELMAN: Objection. Calls for
15 claim construction, mischaracterizes the
16 claim.
17 Q. Do you understand that language, Mr. Litle,
18 "accumulate the payments"?
19      MR. EDELMAN: Same objection.
20      MR. SMITH: Well, I think it's a
21 couple of questions. So do you want him to
22 answer your question or do you want him to
23 comment on the text that's written here next
24 to --
25      MR. GRAY: Comment on my question.

146

1  Q. You can disregard the text on the right-hand
2     side.
3        MR. SMITH: Okay. Ignore what is
4     on the paper. Can you read the question
5     back, please.
6        (The following question was read
7        back by the court reporter:
8        "Looking at Row 8 on Page 10 of
9        Litle Exhibit 12, did Litle &
10       Company ever instruct FNBL to
11       accumulate payments until a certain
12       amount is reached before forwarding
13       payments?")
14 A. I'll answer that in two parts. The first
15    part is, we did accumulate transactions.
16    Some of our customers would send us --
17    they'd go through a cycle every day. Some
18    of them would go through a cycle every ten
19    minutes, and based on the way transactions
20    are settled, you know, they're all settled
21    in a batch, that's all batch is today, even,
22    and we would settle them through the Visa
23    and MasterCard network. Also, multiple
24    times during the day, but somebody like
25    Micro Warehouse would send us batches every

147

1     ten minutes, and we would accumulate those
2     until it was convenient or until the next
3     time we settled it through the Visa and
4     MasterCard networks. Now, that wasn't
5     necessarily accumulating it until a
6     pre-determined amount was reached. It was
7     accumulating it until either we wanted to
8     get them in under the day's fiscal cutoff or
9     for the next time we -- our next cycle we
10    had to settle through Visa and MasterCard.
11    We probably had three or four times a day,
12    we did that.
13 Q. Okay.
14 A. Now, as far as accumulating payments until a
15    pre-determined amount is reached, we really
16    didn't do that, as far as I can tell.
17 Q. Looking at Row 9 on Page 10, you just
18    described that Litle & Company would often
19    instruct FNBL to forward the payments -- or
20    to settle the payments and forward the
21    payments daily; is that correct?
22 A. What we did is we settled the payments --
23    when I said go to the Visa/MasterCard
24    networks, that, in those days I think was
25    through FNBL. They were operating as our

148

1     gateway into the networks, and so we would
2     settle with them multiple times. Maybe we'd
3     only settle with them once. I don't
4     remember. I know when we were settling
5     directly through Visa and MasterCard, we did
6     settle with them multiple times.
7        Now, we didn't -- the part of when
8     we would electronically transmit the data to
9     the merchants or the third parties, that was
10    kind of independent of that. The dollar
11    value would accumulate or the dollar value
12    would show up in the First National Bank of
13    Louisville account as a funds transfer in
14    bulk. They were just one big number that
15    came in from Visa, one number that came in
16    from MasterCard, and then we'd sort it out
17    according to our own accounting records.
18    Maybe I don't understand the question.
19 Q. Was there a particular event that would
20    trigger an electronic forwarding of money
21    from FNBL to a merchant or to a third
22    party?
23 A. Our instruction.
24 Q. And what was a typical instruction?
25 A. It would be, at this point in time -- "On

149

1     this day, transfer this amount to that
2     account, this account to that account," and
3     it was just a list of amounts and accounts
4     that we would transfer.
5  Q. Would it forward -- would it transfer those
6     amounts daily, for example?
7  A. Yes. That cycle was done every day.
8  Q. Okay. Looking at Line 9 on Page 10, the
9     quote that begins "In consideration of
10    Litle & Company making advances," if you
11    look at the second line from the bottom of
12    that quote on Page 11, it says, small Roman
13    Numeral ii, "The daily repayments shall be
14    deducted from daily net proceeds."
15 A. Uh-huh.
16 Q. Does that show that FNBL would forward
17    payments to the merchant daily and deduct --
18    well, does that show that FNBL would forward
19    payments, net proceeds, daily to the
20    merchant?
21 A. Based on our instruction, we would say
22    "Forward this amount of money, some amount
23    of money, to the merchant." FNBL did not
24    know what the components of that money was.
25    From our point of view, our instructions

38 (Pages 146 to 149)

150

1 would say "Forward the daily net proceeds,
2 less any of the other obligations of the
3 merchant." The other obligations could be
4 for chargebacks that had actually already
5 been withheld by the networks, it could be
6 for our fees, it could be for payment of
7 postage advances, it could be for payment of
8 terminals, it could be to increase increase
9 the reserve account. It could be all kinds
10 of stuff --
11       THE VIDEOGRAPHER: Five minutes
12 left on tape.
13 A. -- but when you say FNBL forwarded an
14 amount, they forwarded what we told them.
15 It was the sum of all those components.
16 Q. Would you instruct FNBL to forward those
17 payments to the third party?
18 A. Yes.
19 Q. Daily?
20 A. Yes.
21 Q. For example --
22 A. It depended. Actually, sometimes we did do
23 it weekly, so we would -- I guess we
24 would -- yeah, most of the time we did it
25 daily. Frankly, we tried to do everything

151

1 daily. We tried to deal with interchange
2 daily. We tried to deal with all this stuff
3 daily, because that was easiest for the
4 merchant if everything happened all at the
5 same time. We'd sort out the fact that Visa
6 actually charge dollars us for interchange
7 once a month. There were all kinds of
8 different timing arrangements that were in
9 there, and for a merchant to try and figure
10 that all out, it was difficult, so we tried
11 to do everything daily for the merchant. .
12 Q. But if not daily, was it typically on some
13 other periodic basis?
14 A. Yes.
15       MR. GRAY: We can go ahead and
16 change the tape.
17       THE VIDEOGRAPHER: The time is
18 2:08. This is the end of Cassette 2. We
19 are off the record.
20       MR. SMITH: We'll take five.
21       (Recess.)
22       THE VIDEOGRAPHER: The time is
23 2:17. This is the beginning of Cassette
24 Number 3 in the deposition of Thomas Litle.
25 We are on the record.

152

1 Q. (Cont'd. By Mr. Gray) Mr. Litle, I'd like
2 you to look back at Litle Exhibit 11, and
3 again, read Claim 10 to yourself slowly.
4 When the language -- when the claim recites
5 "means" for something, that means it's
6 reciting an apparatus or equipment that is
7 used for performing a particular function,
8 and what I'd like to ask you is, for each of
9 those portions of a claim, and I'll begin
10 with "means for accepting a customer
11 identifier as payment for the customer."
12 I'd like you to tell me whether there was a
13 standard equipment used in the industry for
14 performing a particular function. Do you
15 understand?
16 A. I think so.
17       MR. EDELMAN: I object. Also, it
18 calls for claim construction.
19 Q. Was there standard equipment used in the
20 industry for accepting a customer identifier
21 as payment from the customer?
22       MR. EDELMAN: Same objections.
23 A. There were standards. There were several
24 types of equipment. The one we dealt with
25 most was an order processing system that was

153

1 basically a terminal and an operator would
2 key in the order. The software that managed
3 that computerized order entry system was
4 often sold to the direct marketers by a
5 third party, and there are limited numbers.
6 Sometimes direct marketers wrote their own
7 software they used different equipment,
8 but it was all basically what one would
9 consider a relatively standard order entry
10 system.
11 Q. And to clarify, was that a computer keyboard
12 where someone would input a number -
13 A. Yes.
14 Q. -- into a computer?
15 A. Uh-huh. That was one way.
16 Q. What was another way?
17 A. Another way was to actually use terminals
18 and probably five years before the period of
19 time we're talking about, which I think is
20 1992, that range, the computerized order
21 entry systems really didn't accept credit
22 cards, so terminals were used in parallel
23 with the computerized order entry system,
24 but by 1992, it was generally order entry
25 systems that were built to accept credit

39 (Pages 150 to 153)

154

1  cards, to check the validity, the mechanical
2  validity. The Visa and MasterCard
3  transactions were 16 characters long and
4  started with a 4 and a 5 respectively, and
5  had a 10-check digit at the end, and that
6  kind of stuff, and that was most of the
7  card-not-present transactions.
8  Q. And Litle & Company processed -- did Litle &
9     Company process card transactions for
10    merchants who accepted credit cards or cards
11    via terminals or computer keyboard input?
12 A. Yes. The terminals was -- we certainly
13    did. That was a smaller part of our
14    business.
15 Q. What sort of hardware did merchants use to
16    electronically forward information related
17    to the payment to Litle?
18 A. They used -- on their computers, they had
19    connections to either -- in those days, they
20    had connections to either a frame relay
21    system, which was something supplied by the
22    telephone company, or a regular dial-up
23    telephone, and those transactions would get
24    conveyed to us via those kinds of
25    telephone-operated networks.

155

1  Q. Okay. How would Litle receive that
2     information from the merchant?
3  A. We would also be connected to either a plain
4     dial-up line, and the merchant would call
5     the number, our number, basically, make a
6     telephone call, and we'd have a modem
7     connected to that and we'd receive the
8     merchant's data, or we'd be connected to the
9     other end of a frame relay circuit and
10    accept the information from the merchant, or
11    in some cases, we actually had a lease line
12    between the merchant and us, and so it was
13    just like a -- the phone company provided
14    it, but it was like a wire between us and
15    the merchant.
16 Q. What hardware was used for authorizing and
17    settling the payment at each of the entities
18    involved in the process?
19       MR. EDELMAN: Objection. Calls for
20    claim construction.
21 A. The -- what hardware was --
22 Q. -- was used by each entity in the process
23    outlined in Litle Exhibit 10, and I'm just
24    asking generally.
25       MR. SMITH: You mean, each of

156

1     the --
2  Q. Right. For example, computers, network and
3     modem.
4  A. Well, that's it. It was the way the
5     transaction was captured, whether it was in
6     an order entry system or a terminal, the way
7     it was transmitted, whether it was connected
8     by modem or to a lease line -- a modem to a
9     dial-up line. It was actually modems to a
10    frame relay line or connected to a ease
11    line at the merchant's end. Basically, the
12    reverse of that at our end to receive the
13    information, and the information went back
14    and forth. When a merchant would send in a
15    settlement file, for example, then we had to
16    send back a confirmation that what they
17    thought they sent us, we actually got, and
18    that was the moment in time, when we sent
19    back that confirmation, when we owned the
20    transactions.
21 Q. And you testified earlier to this, but what
22    hardware was used -- sorry. Let me start
23    over. How was the money forwarded from FNBL
24    to the third party in your diagram in
25    Exhibit 10?

157

1  A. Either through a wire transfer, which was,
2     a wire transfer system is operated by the
3     Fed -- it's the way banks typically transfer
4     money between each other -- or by the ACH --
5     an ACH system, which means automated
6     clearinghouse, and I think that's operated
7     by the Fed -- no. It's operated by an
8     organization called NACHA, National
9     Automated Clearinghouse Association, or
10    something like that, and which really did
11    the same thing as a wire did, except it took
12    a day longer.
13 Q. In each of the examples that you've
14    testified to here today, is the equipment
15    that is used by each of the entities in
16    Litle Exhibit 10, is that -- is it the same
17    equipment?
18 A. Pretty much. Depending on the
19    circumstance. If it was the same type of
20    circumstance, it would be the same type of
21    equipment. I mean, we would have ten people
22    transmitting files at the same time, so
23    there were ten instances in the same
24    equipment, but --
25 Q. Okay. In other words, did the equipment

40 (Pages 154 to 157)

**158**

1  change between the Hanover finance situation
2  and the postage finance situation, for
3  example?
4  A. It could because it just depended on how
5  Hanover would receive payments. Maybe they
6  received an ACH. Maybe they received a
7  wire. I don't remember how they did that.
8  Q. Either way, it was an electronic transfer?
9  A. Yes.
10  MR. GRAY: I'll pass the witness.
11  (Discussion off the record.)
12  CROSS-EXAMINATION
13  by Mr. Edelman:
14  Q. Good afternoon.
15  A. Hi.
16  Q. I am Mike Edelman. I will be asking you
17  questions on behalf of Advanceme. Could you
18  put Little Exhibit 11 back in front of you?
19  Now, I believe you testified earlier that
20  you thought, at least from your perspective,
21  that you understood what Claims 1 and 10
22  encompassed?
23  A. Uh-huh.
24  Q. Is that correct?
25  A. Not from a lawyer's point of view, but

**159**

1  from --
2  Q. From your point of view?
3  A. -- from a layman's point of view, yeah.
4  Q. All right. Does your company perform the
5  inventions in Claims in 1 and 10?
6  MR. SMITH: I'm going to object and
7  I'm going to instruct the witness not to
8  answer to the extent that the answer would
9  reveal confidential proprietary information.
10  To the extent that it would not it, you may
11  answer. He's here in his personal capacity;
12  not as a representative of the current Little
13  & Company. So with that caveat, the
14  question again?
15  A. So I'm going to get sued if I say yes;
16  right?
17  Q. I'm asking --
18  A. No, we don't.
19  Q. You do not, and why do you not perform the
20  inventions in Claims 1 and 10 n your
21  current business?
22  A. Because our company is a relatively new
23  company and the process by which we build
24  our system is building it up sequentially to
25  serve the needs of our early customers, and

**160**

1  we haven't really gotten to that aspect of
2  what we -- what we think our service will
3  be. I don't know if we'll ever perform
4  that. We may. We may not.
5  Q. When you say "that," do you mean providing
6  payments to third parties?
7  A. Yes.
8  Q. Do you have an option that's advertised on
9  your website called Dynamic Settlement?
10  A. It's not active. Dynamic Settlement, no, we
11  don't -
12  Q. What is Dynamic Settlement?
13  A. Huh?
14  Q. What is Dynamic Settlement?
15  A. Actually, I don't remember what Dynamic
16  Settlement is.
17  Q. Doesn't Dynamic Settlement, as described on
18  your website, describe payments to third
19  parties?
20  MR. SMITH: Objection. Same
21  instruction. You're here in a personal
22  capacity; not as a representative of the new
23  Little & Co.
24  A. Okay. Providing payments to third parties.
25  We do that in the sense that we maintain

**161**

1  reserves, we maintain -- we do some of the
2  stuff we're talking about. We don't do
3  postage financing.
4  Q. Do you believe that maintaining reserves for
5  third parties is not performing Claims 1 and
6  10?
7  MR. SMITH: Objection.
8  A. I think that's -- I think that's an
9  interpretation of the patent and that's not
10  why I'm here.
11  Q. You didn't seem to have any problem with the
12  other side's questions.
13  MR. SMITH: Object to the
14  characterizations.
15  MR. GRAY: I never asked --
16  Q. Mr. Little, is there any way to perform
17  Claims 1 and 10, other than postage
18  financing?
19  MR. SMITH: Objection. You're
20  asking about his interpretation again.
21  Q. In your layman's perspective.
22  A. Is there any way to what?
23  Q. Perform Claims 1 and 10, other than by
24  postage financing.
25  A. Sure.

41 (Pages 158 to 161)

206

1    COMMONWEALTH OF MASSACHUSETTS

2    MIDDLESEX, SS.

3

4            I, Denise M. Rae, a Certified

5    Shorthand Reporter and Notary Public duly

6    commissioned and qualified within and for

7    the Commonwealth of Massachusetts, do hereby

8    certify:

9            That THOMAS J. LITLE, IV, the

10   witness whose deposition is hereinbefore set

11   forth, was duly sworn by me, and that such

12   deposition is a true record of the testimony

13   given by the witness to the best of my

14   skill, knowledge, and ability.

15            IN WITNESS WHEREOF, I have hereunto

16   set my hand and my affixed notarial seal

17   this 8th day of September, 2006.

18

19   _____

20            Denise M. Rae

21            Notary Public

22

23   My commission expires:

24   January 16, 2009

25