# EXHIBIT A

Dockets.Justia.com

```
                                                        Page 1
 1                    VOLUME:  I
                      PAGES:  1 - 306
 2                    EXHIBITS:  Per index

 3

           UNITED STATES DISTRICT COURT
 4        FOR THE EASTERN DISTRICT OF TEXAS
                  TYLER DIVISION
 5

 6              C.A. No. 6:05-cv-424-LED-JDL

 7  ADVANCEME, INC.,                   )
               Plaintiff               )
 8                                     )
    vs.                                )
 9                                     )
                                       )
10  RAPIDPAY LLC, BUSINESS CAPITAL     )
    CORPORATION, FIRST FUNDS LLC,      )
11  MERCHANT MONEY TREE, INC.,         )
    REACH FINANCIAL, LLC and           )
12  FAST TRANSACT, INC.                )
    d/b/a SIMPLE CASH,                 )
13             Defendants              )
    _____

14

15              C.A. No. 6:06-cv-82-LED

16  ADVANCEME, INC.,                   )
               Plaintiff               )
17                                     )
    vs.                                )
18                                     )
                                       )
19  AMERIMERCHANT, LLC,                )
               Defendant.              )
20  _____

21

22           VIDEOTAPED DEPOSITION

23                    OF

24           THOMAS J. LITLE, IV

25        WEDNESDAY, SEPTEMBER 6, 2006
```

Page 2

1  VIDEOTAPED DEPOSITION OF THOMAS J. LITLE, IV,
2  taken on behalf of the Defendant, AmeriMerchant,
3  LLC, pursuant to the applicable provisions of
4  the Federal Rules of Civil Procedure, before
5  Denise M. Rae, a Certified Shorthand Reporter
6  and Notary Public within and for the Commonwealth
7  of Massachusetts, at the DoubleTree Hotel,
8  50 Warren Street, Lowell, Massachusetts, on
9  Wednesday, September 6, 2006, commencing at
10  9:33 a.m.
11
12

                        - - - -

13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1  ALSO PRESENT:
2    Ralph Scopa, Legal Video Specialist
3    David Goldin
4    Parris Sanz.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1       APPEARANCES:
2
3  Representing the Plaintiff:
4    PAUL, HASTINGS, JANOFSKY & WALKER, LLP
     by MICHAEL N. EDELMAN, ESQ.
5    Five Palo Alto Square, Sixth floor
     Palo Alto, California  94306-2155
6    Telephone No. (650) 320-1822
     michaeledelman@paulhastings.com
7
8
   Representing the Defendants, Amerimerchant,
9  LLC, et als.:
10   VINSON & ELKINS, LLP
     by JOSEPH D. GRAY, ESQ.
11   and WILLIAM SCHUURMAN, ESQ.
     2801 Via Fortuna, Suite 100
12   Austin, Texas  78746-7568
     Telephone No. (512) 542-8420
13   jgray@velaw.com
     bschuurman@velaw.com
14
   and,
15
16   VINSON & ELKINS, LLP
     by ATTY. HILARY L. PRESTON
17   666 Fifth Avenue, 26th floor
     New York, New York  10103-0040
18   Telephone No. (212) 237-0066
     hpreston@velaw.com
19
20 Representing the Deponent:
21   GOODWIN PROCTER
     by NEIL T. SMITH, ESQ.
22   Exchange Place
     53 State Street
23   Boston, Massachusetts  02109
     Telephone No. (617) 570-1000
24   nsmith@goodwinprocter.com
25

Page 5

1         I N D E X
2  DEPONENT              PAGE
3
   THOMAS J. LITLE, IV
4
5    By Mr. Gray          8
                        287
6
     By Mr. Edelman      158
7                        299
8
9
10
11        E X H I B I T S
12
   No.                  Page
13
   1  Notice of Videotaped Oral Deposition
14     of Tim Litle.          9
15   2  Magazine entitled "Inc. 500,"
        September, 2006.        11
16
   3  Three-page Curriculum Vitae.    21
17
   4  Document entitled "Litle & Company,
18     Member Agreement."        29
19   5  Letter dated February 17, 1994.   67
20   6  Three-page photocopy of article
        entitled "People thought I was
21      nuts."                82
22   7  Three-page document entitled
        "Schedule E-1, Demand Promissory
23      Note For Postage Advances."    87
24   8  Five-page document beginning with
        Interoffice Memorandum dated
25      January 24, 1990.        100

2 (Pages 2 to 5)

Page 6

1    9   Five-page document entitled
2        "Schedule E-1 Promissory Note for
3        Postage Advances."                    111
     10  Diagram on white board.               114
4        (Available on videotape only.)

5    11  One-page document entitled
6        "US 6,941,281 B1."                    122
     12  Document entitled "Litle & Co.,
7        Invalidity Claim Chart, Unites
8        States Patent No. 6,941,281."         123
     13  Document entitled "Litle, Payment
9        Processing Services."                 193

10   14  One-page document.                    202

11   15  One-page e-mail dated April 26,
12       2006.                                 234
     16  Two-page document consisting of
13       e-mails beginning with e-mail dated
         June 27, 2006.                        243
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1          At the DoubleTree Hotel, Lowell,
2    Massachusetts:
3          THE VIDEOGRAPHER:  Good morning.
4    We are now recording and on the record.  My
5    name is Ralph Scopa.  I am a legal video
6    specialist working for Veritext New York.
7    Today's date is September 6, 2006.  The time
8    is 9:33 a.m.  This is the deposition of
9    Thomas Litle in the matter Advanceme,
10   Incorporated versus RapidPay, et als., and
11   also, Advanceme, Incorporated versus
12   AmeriMerchant, U.S. District Court, Eastern
13   District of Texas, Tyler Division, Civil
14   Action Numbers 6:05-cv-424-LED-JDL and
15   6:06-cv-82-LED.  This deposition is being
16   taken at the DoubleTree Hotel in Lowell,
17   Mass.  The Court Reporter is Denise Rae.
18         Counsel will state their
19   appearances and the Court Reporter will
20   administer the oath.
21         MR. SMITH:  Neil Smith of Goodwin
22   Procter for Mr. Litle.
23         MR. GRAY:  Joseph Gray, Vinson &
24   Elkins, on behalf of AmeriMerchant, Reach
25   Financial, First Funds, and Merchant Money

Page 8

1    Tree.
2          MS. PRESTON:  Hilary Preston, also
3    Vinson & Elkins, for the same defendants as
4    Mr. Gray.
5          MR. SCHUURMAN:  I'm Bill Schuurman,
6    also representing the same defendants as Mr.
7    Gray.
8          MR. EDELMAN:  Michael Edelman from
9    Paul, Hastings for Advanceme.  Also here
10   with me, Paris Sanz from Advanceme.
11               -  -  -  -
12         THOMAS J. LITLE, IV, having duly
13   sworn that his testimony would be the truth,
14   the whole truth, and nothing but the truth,
15   testified as follows:
16              DIRECT EXAMINATION
17   by Mr. Gray:
18   Q.  Good morning, Mr. Litle.
19   A.  Hello.
20   Q.  Would you please state your name and
21   address, for the record?
22   A.  Thomas Litle, 1182 Monument Street, Concord,
23   Massachusetts.
24   Q.  Okay, and as we go along today, if I ask a
25   question that you don't understand or if

Page 9

1    you'd like me to repeat a question, please
2    just ask and I'd be happy to do so.
3    A.  All right.
4    Q.  And to keep Denise -- to stay on Denise's
5    good side, we should both try not to talk
6    over each other.  I'll attempt to wait until
7    you finish your answers before I ask another
8    question, and also, if you need a break at
9    any point, just say so and we can stop the
10   deposition and take a break.
11         MR. GRAY:  Would you please mark
12   that.
13         (Notice of Videotaped Oral
14         Deposition of Tim Litle is marked
15         Exhibit Number 1 for
16         Identification.)
17   Q.  I'm handing you what has been marked
18   Litle 1, which is a Notice of Videotaped
19   Oral Deposition of Tim Litle.  Have you seen
20   this Notice of Deposition and the attached
21   subpoena?
22   A.  Yes, I have seen the subpoena.
23         MR. SMITH:  I don't know if he
24   received the notice.
25         MR. GRAY:  Okay.

Page 10

1    MR. SMITH: He didn't receive the
2    notice. He's seen the subpoena.
3    Q. And you understand that you're here today
4       being deposed pursuant to that subpoena?
5    A. Yes, I do.
6    Q. Have you ever been deposed before?
7    A. Yes.
8    Q. When was that?
9    A. A number of times in various things over the
10      past 30 years.
11   Q. Okay. About how many times?
12   A. Five.
13   Q. Okay, and I'd like to briefly run through
14      your background. Where did you get your
15      undergraduate degree?
16   A. California Institute of Technology.
17   Q. And what was your major?
18   A. Electric -- electronic engineering.
19   Q. Then did you do any graduate work?
20   A. Yes, I did.
21   Q. Where did you go?
22   A. Harvard Business School.
23   Q. And could you tell me where -- who your
24      current employer is?
25   A. Litle & Company.

Page 11

1    Q. When was Litle & Company formed?
2    A. 2001. June, I think. July, maybe.
3    Q. What is the business of Litle & Company?
4    A. We're in the payment processing business.
5       MR. GRAY: Could you mark this?
6       (Magazine entitled "Inc. 500,"
7       September, 2006 is marked Exhibit
8       Number 2 for Identification.)
9    Q. The card payment processing industry, you
10      said? You said the payment processing. Is
11      it card payment processing?
12   A. Yeah. Credit card and debit card and all
13      kinds of cards.
14   Q. Okay. I'm handing you what has been marked
15      Litle 2, which is the September, 2006 issue
16      of "Inc. 500." I've marked two pages. I
17      think it begins on Page 78.
18      MR. EDELMAN: Do you have a copy of
19      that?
20      MR. GRAY: I don't. I just have
21      the original.
22      MR. GOLDIN: It's on the
23      newsstand.
24   Q. The article -- it's an article about you and
25      your company and it ranks you number 1; is

Page 12

1    that correct?
2    A. That's right.
3    Q. Have you seen this article before?
4    A. Interestingly enough, these are very hard to
5       come by. This is only the second one I've
6       seen, so --
7    Q. Have you had a chance to read the article?
8    A. Yes.
9    Q. And does it accurately describe what your
10      company is and your background?
11   A. Yes.
12   Q. Okay. In that article, it mentions, on the
13      next page, it mentions Litle & Company --
14      sorry, the following page -- which page is
15      that? 92?
16   A. 82.
17   Q. 82. Page 82, it mentions Litle & Company --
18      another Litle & Company that was sold to
19      First USA in 1995; is that right?
20   A. That's right.
21   Q. And what is the relationship between the
22      Litle & Company that was sold in 1995 to the
23      current Litle & Company?
24   A. There is no relationship.
25   Q. Okay. Were they involved in similar

Page 13

1    business?
2    A. Yes.
3    Q. The card payment processing?
4    A. That's right.
5    Q. So for the rest of the deposition today, I'm
6       going to be asking you questions only about
7       the company that was sent to First USA in
8       1995.
9    A. Right. They did get some of the numbers
10      wrong there.
11   Q. Okay. Which numbers did they get wrong?
12   A. The sale amount.
13   Q. Okay, and so your testimony here today, at
14      least for my questions, will apply only to
15      the Litle & Company that was sold in 1995.
16      MR. SMITH: Okay. So just so the
17      record is clear and so Tim understands, if
18      Mr. Gray refers to Litle & Company, he is
19      referring to the old Litle & Co., which is
20      no longer a company you're affiliated with,
21      and if you need to refer to, either in your
22      answer or you think he's referring to in a
23      question, your current employer, we'll need
24      to designate that as the new Litle & Co. or
25      some other name to differentiate that from

4 (Pages 10 to 13)

Page 14

1    the company that was sold in 1995. Okay?
2    If at any point you're not clear, you can
3    ask me.
4            THE WITNESS: No. That's fine.
5    Q. Okay. When was the old Litle & Company
6    formed?
7    A. In 1986.
8    Q. 1986, and it was sold in 1995?
9    A. That's right.
10   Q. To First USA?
11   A. That's right.
12   Q. And then after that, Chase -- was it
13   Paymentech that bought First USA?
14   A. No. The old Litle & Company was sold to
15   First USA without the ability to use my
16   name. I did not sell my name, so they had
17   two years to change the name and they
18   changed it to Paymentech.
19   Q. Okay. When did you first become involved in
20   the card processing industry?
21           MR. EDELMAN: Objection. Vague and
22   ambiguous.
23           MR. SMITH: You can -- if someone
24   objects, you can answer, unless I instruct
25   you not to answer. So as long as you can

Page 15

1    understand the question as it was phrased,
2    you can answer it.
3    A. In -- around 1982. Within a year of 1982.
4    Q. What were you doing around 1982?
5    A. At that time, my wife and I were running a
6    mail order catalog and we were doing -- she
7    was doing the merchandising and the creative
8    part. I was doing the operations part.
9    Q. Okay. When did card processing become a
10   part of your business?
11   A. When we determined that we had a problem
12   with our card processing and there was
13   nobody to do it properly. There were other
14   reasons, as well.
15   Q. So what did you do first to become involved
16   in the card processing business?
17   A. I first -- basically, gave our current card
18   processor a hard time because they weren't
19   doing our work the way I thought they should
20   do it, and he basically said "If you're so
21   smart, why don't you do it yourself." That
22   was one of the reasons I got into the
23   business, because the card processors at the
24   time couldn't service direct marketers or
25   what I will call the card-not-present

Page 16

1    industry.
2    Q. What was the name of your catalog company?
3    A. It was called Clymer's of Bucks County.
4    Q. And when you became involved in the card
5    processing industry, did you form a new
6    company?
7    A. Yes.
8    Q. What was the name of that company?
9    A. It was called DMGT, Direct Marketing
10   Guaranty Trust.
11   Q. In what year did you form DMGT?
12   A. I don't really remember exactly. I think it
13   was 1982. Might have been 1983.
14   Q. What sorts of customers did you have for the
15   processing business, DMGT?
16   A. Other catalogs that we knew from being in
17   the industry with our catalog.
18   Q. Did catalog companies supply the products
19   themselves or did they use a fulfillment
20   company to supply the products to customers,
21   to ship the customers products to
22   customers?
23   A. There's several pieces to that question.
24   Did they supply the products. They usually
25   bought products from other people. Most

Page 17

1    catalogs at that time warehoused their own
2    products. Not all did. That was one of the
3    things we had done shortly before is
4    effectively started a full service
5    fulfillment company, which, as far as we
6    know, was the first one that serviced
7    catalogs.
8    Q. So what sorts of customers did you have --
9    did DMGT have at that time?
10   A. They weren't all catalogs, but mostly, they
11   were catalog companies, and they were all
12   card-not-present types of merchants.
13   Q. So for your catalog company customers, did
14   any of them use fulfillment centers to ship
15   products to customers?
16   A. Actually, the first customers we had used
17   us. That was one of the reasons we got into
18   the business, because we had -- we had, all
19   together, including our own catalog, we had
20   14 fulfillment customers and -- of various
21   sorts, but all in the card-not-present
22   business, all direct marketers, and they all
23   used our payment processing service.
24   Q. And what did you say the name of your
25   fulfillment company was?

5 (Pages 14 to 17)

Page 18

1  A.  It was called The Back Room.
2  Q.  And was The Back Room related to DMGT?
3  A.  Yes.  It had roughly the same ownership.
4     Not exactly the same ownership.
5  Q.  Was it organized separately?
6  A.  Yes.
7  Q.  How were they organized?
8  A.  I don't understand the question.
9  Q.  Limited partnership or LLC?
10  A.  Oh.  It was sub-chapter S.
11  Q.  Both of them were?
12  A.  Yeah.  LLC's weren't around at the time.
13  Q.  And they were separate sub-chapter S
14     companies?
15  A.  Yes, as I remember it.
16  Q.  Okay.  Would DMGT ever forward a portion of
17     card payments due catalog companies to a
18     fulfillment center?
19        MR. EDELMAN:  Objection.  Leading.
20  A.  DM --
21        MR. EDELMAN:  Sorry.  It's also
22     vague and ambiguous.  You can go ahead.
23        MR. SMITH:  Would you like to have
24     the question read back?
25        THE WITNESS:  No.

Page 19

1  A.  DMGT did forward the fulfillment -- yeah,
2     maybe you should read the question back.
3        MR. SMITH:  Can you read the
4     question back, please, or do you want to
5     restate it?
6  Q.  I can restate.  Did catalog companies have
7     any obligations to fulfillment companies for
8     providing the services you've mentioned?
9        MR. EDELMAN:  Objection.  Vague and
10     ambiguous, leading.
11        MR. SMITH:  Do you understand that
12     question.
13        THE WITNESS:  Yeah.
14  A.  Catalog companies that use fulfillment
15     centers, instead of doing their own
16     fulfillment, certainly in our case owed us
17     money for the services we rendered to them.
18     We rendered, as I said, services to, all
19     together, if I remember, 14 direct
20     marketers.  All, but one of them, was really
21     a catalog company, and those fulfillment
22     companies owed us money.
23  Q.  How would The Back Room be paid by those
24     catalog companies?
25  A.  What we did is, the fulfillment -- the DMGT,

Page 20

1     the credit card processing company processed
2     their credit cards and sent all of the money
3     that was owed to the merchants directly to
4     the merchants after deducting the cost of
5     the services that we charged to the
6     catalogs.
7  Q.  And where would DMGT forward that portion of
8     the money?
9  A.  To the bank account that was -- that
10     involved those kinds -- I guess, in that
11     case, it was to the bank account that the
12     fulfillment company operated.
13  Q.  Okay.  So in the situation where The Back
14     Room was a fulfillment company, DMGT would
15     forward a portion of the card payment to The
16     Back Room's bank account?
17  A.  That's correct.
18  Q.  And the remaining portion, DMGT would
19     forward to the catalog company?
20  A.  That's right.
21  Q.  And would this money be electronically
22     forwarded?
23        MR. EDELMAN:  Objection.  Vague and
24     ambiguous.
25  Q.  How would the money be forwarded?

Page 21

1  A.  Either by wire or by using an ACH transfer.
2     No.  At that time, it was all by wire.
3  Q.  What does "by wire" mean?
4  A.  It means using the wire service that the Fed
5     operates.  It's electronic transfer of
6     money.
7        MR. GRAY:  Please mark that.
8        (Three-page Curriculum Vitae of
9        Thomas J. (Tim) Litle is marked
10        Exhibit Number 3 for
11        Identification.)
12  Q.  About what time frame were you just giving
13     testimony about for DMGT in The Back Room?
14        MR. EDELMAN:  Objection.  Vague and
15     ambiguous.
16  A.  It was in the 1982-1983 time frame because
17     our first customers were our own fulfillment
18     customers, so it was in that time frame.
19  Q.  And how did the catalog companies accept
20     credit cards during that time?
21        MR. EDELMAN:  Objection.  Leading.
22  A.  When people called in or sent in orders
23     through the mail, the fulfillment operation
24     would convert the orders, including the
25     credit card information, into an order entry

Page 22

1  system and they would convert the orders
2  from the -- that were received by mail into
3  the order entry system, as well.
4  Q.  So they would input the card number using a
5  keyboard into a computer?
6  A.  Yeah, along with rest of the order.
7  Q.  I'm handing you what has been marked
8     Litle 3, which appears to be your CV.
9         MR. SMITH:  Did we skip Litle 2?
10        MR. GRAY:  No.  Litle 2 was the
11     article.
12        MR. SMITH:  Oh, I apologize.
13  Q.  Is that an accurate CV?
14  A.  Yes.  It doesn't say the "Inc. 500."
15  Q.  Right, and could you describe -- do you sit
16     on any boards or have you sat on any boards
17     in the recent past?
18  A.  Yes.
19  Q.  Which boards have those been?
20  A.  Can I look at this to remember them?
21  Q.  Sure.
22  A.  There's a fairly long list of them on the
23     second page.  I was on some public boards.
24     I've celebrated getting off my last public
25     board recently.

Page 23

1  Q.  Which board was that?
2  A.  J. Jill.
3  Q.  I see on here a lot of DMA activities and
4     awards.  What is the DMA?
5  A.  The Direct Marketing Association.
6  Q.  What is the DMA Hall of Fame Award?
7  A.  That, I was recognized as having contributed
8     to the direct marketing industry in a
9     variety of ways, and that was an award for
10     that.
11  Q.  In what ways did you contribute or were you
12     recognized for contributing?
13  A.  Well, there was a whole series of them.  I
14     did a whole lot of work in the privacy area,
15     did a lot of self-regulation work.  I was on
16     the Ethics Operating Committee, including
17     Chairman of the Ethics Operating Commit, in
18     which we attempted to make sure that the
19     direct marketing industry had a good image
20     relative to how the direct marketers
21     conducted themselves ethically.  I was on
22     the DMA's Board of Directors, which
23     basically ran the Direct Marketing
24     Association.  I'm currently on the Direct
25     Marketing Education Foundation.  I'm a

Page 24

1  trustee.  I'm also the -- their secretary,
2  and that attempts to foster education in
3  colleges to help students learn direct
4  marketing, so there are more people that can
5  come in and work for the companies in the
6  direct marketing industry, that know what
7  they're doing.
8  Q.  I also see on your resume, on Page 2, one of
9     the boards you sit on is the Payment
10     Processors Association?
11  A.  Yes, that's true.
12  Q.  What is the Payment Processors Association?
13  A.  Well, I guess it's not true any more because
14     it's basically defunct, but I was involved
15     with that, and it was a group of payment
16     processors that were trying to figure out
17     how to get an association, so that they
18     would have a little more clout with Visa and
19     MasterCard.
20  Q.  So they were all -- all the members of the
21     Payment Processors Association, they were
22     payment processors?
23  A.  Yes.
24  Q.  Have you ever heard of the CIO 100 award?
25  A.  Yes.

Page 25

1  Q.  Have you been awarded that?
2  A.  Recently, yes.
3  Q.  When were you awarded that?
4  A.  Within the last couple of months.  I guess
5     that's not on here either.  Maybe it is.
6  Q.  What is the CIO 100 award?
7  A.  It recognizes companies that have
8     outstanding IT infrastructures and
9     understanding of how to build systems.  It's
10     normally larger companies, but we were -- we
11     won the award with Intel and Dell and a lot
12     of large companies this year.  I don't know
13     if we were the smallest, but we were
14     probably close to the smallest company.
15  Q.  That's impressive.  Okay, for the remainder
16     of the deposition, I'm just going to be
17     asking questions about the old Litle &
18     Company, which you said was formed in 1987;
19     is that correct?
20  A.  '86.
21  Q.  '86, and was sold in 1995?
22  A.  That's right.
23  Q.  Okay.  So that time frame is where my
24     questions are directed.  So again, could you
25     describe, generally, the business of Litle &

7 (Pages 22 to 25)

Page 26

1 Company in the early 1990's?
2 A. Litle & Company was the second payment
3 processor that I started; the first one
4 being DMGT. My partner in DMGT and I
5 basically had a falling out, so I had to
6 start over again. That involved, frankly,
7 the ethics of using -- mis-using the data,
8 or at least in my opinion, his desire to
9 misuse the data. So I started Litle &
10 Company over again, which was a payment
11 processor just like DMGT was, except at that
12 point, we didn't have the catalog or the
13 fulfillment operation any more. So it was a
14 pure payment processor. We went out and
15 sold card-not-present companies and did
16 their payment processing, which meant we
17 purchased the transactions from the
18 merchants and we, in exchange, gave them
19 the money for the transactions, less a
20 discount, and that discount was shared
21 between us, Visa, MasterCard, or other card
22 company.
23 Q. And so the discount is what the customer
24 would pay for having the card transactions
25 processed by Litle & Company?

Page 27

1       MR. EDELMAN: Objection. Leading.
2 Q. The discount that I was referring to was
3 what the merchants would pay in order to
4 participate in the credit card system, and
5 the merchants were our customers. We
6 generally refer to our customers as the
7 customers of the merchant.
8 Q. Did Litle & Company provide any other
9 services, other than card processing
10 services?
11 A. We-- not in the sense of -- we didn't
12 provide fulfillment services, or we didn't
13 -- we weren't a catalog, but we did assist
14 payment processors -- excuse me. We did
15 assist merchants with various other kinds of
16 requirements that they had, and those kinds
17 of requirements were everything from kind of
18 special services, we did installment billing
19 for them, we did consulting services to show
20 them how to operate their businesses more
21 efficiently. We did the third party payment
22 services. We advanced them money for
23 postage. We were advocates for them when
24 they got in trouble with Visa and
25 MasterCard. We helped them with some of

Page 28

1 their technical requirements in order to
2 interface with us. I probably forgot a half
3 a dozen things that we did, but --
4 Q. Did you provide any services for credit
5 arrangements with the merchants?
6       MR. EDELMAN: Objection.
7       MR. SMITH: Objection.
8       MR. EDELMAN: Vague and ambiguous.
9 A. I don't understand the question.
10       MR. SMITH: Could you restate the
11 question?
12       MR. GRAY: Sure.
13 Q. If a merchant had an obligation such as --
14 let me restate. If a company was going to
15 provide a credit line to a merchant and
16 required a percentage of the future credit
17 card transactions, would Litle & Company
18 ever forward a portion of the payments due
19 the merchant to that third party?
20       MR. EDELMAN: Objection. Vague and
21 ambiguous, leading, calls for a conclusion.
22 A. I refer to the fact that we did third-party
23 payments for our merchants and those
24 third-party payments took various forms.
25 Typically, the third-party payment that we

Page 29

1 made for -- on behalf of a merchant was to
2 fulfill a merchant's obligations to one of
3 their suppliers in one form or another. The
4 supplier could be either a fulfillment
5 company, it could be a credit facility that
6 they had, or it could be a postage advance
7 that we made.
8 Q. Okay, and we'll go into those each in more
9 detail, but first --
10       (Document entitled "Litle &
11       Company, Member Agreement" is
12       marked Exhibit Number 4 for
13       Identification.)
14 Q. I'm handing you what has been marked Litle
15 4, which is a Litle & Company Member
16 Agreement entered into between or among
17 Litle & Company, National Processing
18 Company, First National Bank of Louisville
19 and the undersigned merchant, which is
20 Museum Publications of America. Have you
21 seen this Member Agreement before?
22 A. I wrote most of it.
23 Q. So you actually drafted this document?
24 A. That's right.
25 Q. Could you describe what this document -- the

8 (Pages 26 to 29)

Page 30

1     agreement that's embodied in this document?
2 A. Yes. The relationship of a merchant to a
3     payment processor is quite complicated
4     because the payment processor has to
5     underwrite credit for the merchant, it has
6     to provide the merchant funds, it has to
7     deal with disputes or help the merchant with
8     disputes. It's a complicated relationship,
9     and this agreement describes that
10     relationship.
11 Q. If you look at the first page, which is
12     Bates labeled LI00018 -- second page --
13     sorry.
14 A. Yeah.
15 Q. In the left column, third paragraph down it
16     says, "Whereas, Litle and NPC are engaged in
17     the business of processing paper-based and
18     electronic data representing transactions
19     conducted through the use of charge cards,"
20     do you see that?
21 A. Yes.
22 Q. Could you describe Litle and NPC's
23     relationship?
24 A. NPC was at the time the world's largest
25     payment processing company that was owned a

Page 31

1     hundred percent by First National Bank of
2     Louisville and did no card-not-present
3     transactions at all. In order for us to
4     participate in the Visa and MasterCard
5     networks, we needed a sponsor bank, which
6     the technical term for it is an acquirer, an
7     acquiring bank, which would be a member of
8     Visa and MasterCard. First National Bank of
9     Louisville was our sponsor bank. First
10     National -- or NPC, National Processing
11     Company, that they owned, was where all
12     their knowledge of payment processing was
13     embodied, and so the people at National
14     Processing Company were the ones that
15     administrated our contracts and our
16     relationship, and in fact, they were also
17     officers of First National Bank of
18     Louisville.
19 Q. So when the document says you're both --
20     Litle and NPC are engaged in the business of
21     processing paper-based transaction, in
22     electronic data representing transactions,
23     did each company, Litle and NPC, have a
24     network that was used to process the
25     transactions?

Page 32

1       MR. EDELMAN: Objection. Vague and
2     ambiguous.
3 A. They were each capable of processing
4     payments for merchants. NPC was not
5     particularly good, although they could do
6     it, of processing card-not-present
7     merchants, because it's quite different than
8     processing cards where the -- processing
9     transactions where the card was present in
10     the transaction, and we processed
11     card-not-present. They processed
12     card-present transactions. The systems are
13     different, the rules are different, the
14     exposure to fraud is different. So it's two
15     quite different businesses. At the time,
16     this was just after or shortly after Visa
17     and MasterCard changed their rules, such
18     that our sponsoring -- our sponsor had to be
19     on our contract, or. That was the way that
20     it was interpreted at the time. So this was
21     a three-party contract when we -- and our
22     sponsor had to be a signatory to our
23     contract. That was different before this
24     time and it's kind of changed since, but
25     that's how it worked then.

Page 33

1 Q. If you look at the same page, LI00018, in
2     the left column, under "Definitions,"
3     there's a term "bank card."
4 A. Right.
5 Q. Do you see that? Could you describe what a
6     bank card was?
7 A. Yeah. It's a card that is issued by either
8     Visa or MasterCard.
9 Q. And how does a customer -- a customer
10     holding a bank card pay for the transaction?
11 A. In the card-not-present environment?
12 Q. Right.
13 A. Typically, at that time, they would call up
14     a catalog merchant, a merchant of ours, they
15     would say "I want to order something," and
16     they would give their credit card number
17     over the telephone, their expiration date,
18     their name and address, and all the order
19     information. At that point, the merchant
20     would get an authorization from us to see if
21     the credit card could be used for that
22     transaction, we'd reply, we'd give them an
23     answer, either yes or no. Assuming the
24     answer was yes, the merchant would then ship
25     the merchandise to the consumer, and at the

Page 34

1  same time, they would send us a record of
2  the transaction, which was basically an
3  electronic record sent to us over the
4  telephone network or frame relay or
5  something, and we would then provide them
6  with the face value of the amount of the
7  transaction, less a discount, less any other
8  charges that were appropriate.
9  Q. At that time, how often did Visa and
10  MasterCard bill their clients?
11  A. Visa and MasterCard doesn't actually bill
12  their clients. The card-issuing banks in
13  the Visa and MasterCard network bill the
14  clients, and those are -- different banks
15  have different policies. At the time, I
16  think they all billed once a month, but now,
17  some of them bill every 22 days or
18  something. All of them do things that are
19  different.
20  Q. And were those all revolving credit, those
21  cards?
22       MR. SMITH: Objection.
23  A. We would actually have no way of knowing.
24  At the time, all we knew was a Visa and a
25  MasterCard. There were a lot of debit

Page 35

1  cards. I suppose some of them were
2  corporate cards. Just all the products that
3  Visa and MasterCard had, we could process,
4  and we didn't know the difference. In fact,
5  Visa and MasterCard, by policy, didn't allow
6  people to know the difference, and that is
7  what the recent Wal-Mart suit was all about
8  because Wal-Mart wanted to know what kind of
9  cards their consumers were using, and Visa
10  and MasterCard wouldn't tell them. Now, you
11  can tell what kind of card the consumer is
12  using, but at that time, you couldn't.
13  Q. So from 1987 through 1995, Litle & Company
14  accepted debit and credit cards?
15  A. Yes.
16  Q. Again, looking at Litle 4, If you go to the
17  page that's marked LI00027 --
18  A. Okay.
19  Q. -- it appears that each of those four
20  parties signed the agreement sometime in May
21  or June of 1992; is that correct?
22  A. That's right.
23  Q. And how many other agreements like this did
24  Litle & Company have?
25  A. In 1992? I don't know. When we sold the

Page 36

1  company, there were probably a thousand. So
2  in 1992, I guess there were 600, maybe,
3  700.
4  Q. So Litle & Company was practicing what's
5  described in this agreement commercially
6  throughout that time?
7  A. Yes.
8       MR. EDELMAN: Objection. Vague and
9  ambiguous as to "that time."
10  Q. About how many transactions did Litle &
11  Company process at the time it was sold --
12  or by the time it was sold in 1995?
13       MR. SMITH: Objection. That's a
14  vague question. Could you restate that?
15       MR. GRAY: Sure.
16  Q. How many transactions -- what is your
17  estimate of how many transactions Litle &
18  Company processed?
19  A. I would have to look that up, but it was in
20  the billions.
21  Q. Again, looking at Litle 4, on Page LI00018,
22  in the right-hand column, the very top
23  says "charge card." Could you describe what
24  a charge card is?
25  A. Well, we use "charge card" as the generic

Page 37

1  term for all kinds of credit cards or debit
2  cards or any kind of card that we process,
3  because there were T & E cards that were
4  like American Express and Discover. There
5  were debit cards, there were credit cards,
6  there's JCB, which is a Japanese card. So
7  the term for all kinds of cards, regardless
8  of what they were, was what we call charge
9  cards.
10  Q. How did American Express and Discover differ
11  from Visa and MasterCard?
12  A. Visa and MasterCard, we actually purchased
13  the transactions from the merchant and paid
14  them a discount. We were also responsible
15  for any of the liabilities of the merchants
16  to the credit card networks as a result of
17  that purchase. American Express and
18  Discover are single companies. They are not
19  a bunch of organizations trying to work
20  together the way with Visa and MasterCard
21  were with all the banks that participate in
22  the networks, and as a result, one of the
23  by-products of that is we did not purchase
24  the cards. We just conveyed the cards back
25  and forth or conveyed the transactions back

10 (Pages 34 to 37)

Page 38

1  and forth to American Express or Discover or
2  Diners at that time, and so we didn't have
3  any liability.  We weren't in the cash
4  stream.  We didn't actually pay the
5  merchants for those transactions.
6  Q.  Okay.
7  A.  In fact, the merchants were paid directly by
8  American Express, Discover, JCB, Diners.
9  Q.  So you mentioned that when Litle & Company
10  was sold in 1995, there were roughly a
11  thousand or so merchants who had signed a
12  similar agreement to this; is that correct?
13  A.  Yeah, as it evolved over time.
14  Q.  And at that time, were these agreements
15  identical or did you alter them for an
16  individual merchant?
17  A.  We would have addendums on them if we did
18  services, different kinds of services.
19  There are optional services that we would do
20  for merchants.
21  Q.  But the card processing portion of the
22  agreement was identical among all the
23  merchants?
24  A.  Yes.  The bulk of it was identical.  Well,
25  it wasn't identical.  It would evolve as we

Page 39

1  discovered that we should have put something
2  else in, like any agreement does, and one of
3  the ways it did evolve is, I notice on this
4  one it's got National Processing
5  Company and National Bank of Louisville.
6  You notice the same guy signed in both
7  places, and it was a little confusing
8  because the relationships with Visa and
9  MasterCard were changing at that time, or
10  their rules were changing.  Sorry.
11  Q.  Was Litle & Company an authorized ISO for
12  MasterCard and Visa prior to its sale to
13  First USA in 1995?
14         MR. EDELMAN:  Objection.  Leading.
15  A.  That's a complicated answer.  When we first
16  got involved in the payment processing
17  business, the term  "ISO" wasn't a
18  recognized term.  After a while,
19  organizations started selling payment
20  processing on behalf of third-party payment
21  processors.  We were basically a third-party
22  payment processor, and the ISO
23  organizations, Independent Sale
24  Organizations, their primary responsibility
25  was selling.  They sold -- they typically

Page 40

1  sell a terminal to a dry cleaner, for
2  example, for an exorbitant price, and that
3  would be their payment and then they would
4  turn the payment over to a payment
5  processor.  That kind of payment evolved
6  over time and it was difficult for Visa and
7  MasterCard to figure out how to deal with
8  them.  In fact, they kind of wished they'd
9  all go away, and so what they did is kind of
10  re-defined ISO's and an ISO now is any
11  company that signs up a merchant and goes
12  and signs merchants for payment processing
13  contracts like this.  So at sometime, that
14  definition of an ISO was developed, and if
15  it was developed before I sold the company,
16  yes, we would have been a registered ISO,
17  and if it was developed after I sold the
18  company, no, we wouldn't have been a
19  registered ISO.  On the other hand, we're
20  primarily a third-party processor, and
21  that's the way the networks look at it.
22  Most ISO's don't do all the payment
23  processing.  Some ISO's don't take the
24  liability of the merchant.  There's all
25  kinds of different relationships, but to

Page 41

1  answer the question, if the regulations said
2  that, because we signed merchants, we should
3  be an ISO, then we would have registered as
4  an ISO.  As far as I was concerned, that
5  would be fairly routine.
6  Q.  Did Litle & Company ever sign up a merchant
7  under a Member Agreement and turn the
8  transactions over to NPC?
9  A.  No.  NPC -- what we did is, originally, we
10  sent the transactions, after we did the
11  processing, we used NPC as a gateway into
12  the payment processing system.  They didn't
13  perform as a payment processor.  They only
14  performed as a gateway for us.  After time
15  went on, we put our transactions directly
16  into the networks without any participation
17  of NPC, other than their sponsorship.
18  Q.  Okay.  Leaving the registration and
19  regulations about ISO's aside, at the time,
20  Litle & Company was an authorized ISO for
21  Visa and MasterCard; right?
22  A.  If it was required, we were.  If anybody --
23  let me put it this way.  If anybody in the
24  country was a registered ISO, then we would
25  have been a registered ISO, as well.

11 (Pages 38 to 41)

1  Q. Referring again to Litle 4 at LI00024, the
2     last paragraph of that page begins "If via
3     Point of Sale Data Capture Terminal."  Could
4     you describe what a Point of Sale Data
5     Capture Terminal is?
6  A. That is a device that is used for
7     card-present transactions, where somebody
8     swipes the card and the transaction is
9     captured that way.  Most of our transactions
10    were a result of a card-not-present merchant
11    keying the order into their system and
12    taking the order over the telephone if the
13    card wasn't present in the transaction.  As
14    I said earlier, we did not do card-present
15    transactions, typically.  On the other hand,
16    if we had a customer -- virtually all of our
17    merchants had warehouse sales to get rid of
18    their inventory, or maybe they had an outlet
19    store or something like that or -- for
20    example, Orvis was one of our customers, and
21    they had a whole chain of stores.  Hammacher
22    Schlemmer did, too.  As an accomodation, we
23    would handle the terminal work.  We could do
24    a good job of it.  We couldn't do it -- I
25    mean, we didn't have any special expertise

1     at it, the way we did card-not-present
2     transactions, but this paragraph was to
3     identify the fact that we would have
4     transactions that we captured in the
5     traditional way in a retail store where
6     somebody swiped the card.
7  Q. So is the swipe machine a magnetic card
8     reader?
9  A. A physical credit card has a magnetic stripe
10    on the back of it.  It was a machine that
11    would read that magnetic stripe.
12 Q. And that's the machine that is referred to
13    on LI-24?
14 A. Yeah.  It's a typical machine in a retail
15    environment.  If you ever watched the clerk
16    swipe the card, that's the machine.
17 Q. Okay.  Do you know if Museum Publications of
18    America had a retail outlet?
19 A. I don't know for sure.  Actually, most of
20    our customers had some way -- some need for
21    terminals.  The retail outlet was one way.
22    Another reason they would have a terminal is
23    because they would -- lots of our merchants
24    at that time would provide refunds through a
25    facility -- well, let's see.  Particularly,

1     if a refund was asked by a customer and the
2     customer had to use a different credit card
3     than the original credit card they charged
4     the merchandise to, typically, that would go
5     through a clerk that was trusted by the
6     company, because there was a great deal
7     of -- there's a possibility of fraud in the
8     case that I'm talking about, so they would
9     have a special clerk enter those kinds of
10    transactions through a terminal.
11 Q. And you said that was the majority or most
12    of the merchants that you signed up under
13    this agreement?
14 A. Most of the merchants we signed up had at
15    least one terminal, yes.  As far as I know,
16    they all had at least one terminal, but
17    usually, they had one or two.
18 Q. Okay.  At this point, I'd like you to walk
19    us through Litle & Company's method of
20    processing a card transaction, and you can
21    talk us through, you can draw a diagram,
22    whatever you prefer, that would help you
23    explain to us how a card transaction is
24    processed --
25       MR. EDELMAN:  Objection.  Leading.

1  Q. -- from purchase to --
2       MR. EDELMAN:  Vague and ambiguous,
3     calls for a narrative.
4  Q. -- from purchase through payment.
5  A. Okay.  I would be most comfortable in
6     drawing a diagram, actually.  Does that --
7       MR. SMITH:  It is.  So let's just
8     be clear what you're asking him to do then.
9     So you want him to outline Litle & Co's. --
10    basically, the entire process from purchase
11    through --
12      MR. GRAY:  Right.
13      MR. SMITH:  You want him to do it
14    in a narrative form, but also using a
15    diagram that will then be entered into the
16    record.
17      MR. GRAY:  Right, that identifies
18    the parties involved.
19      THE WITNESS:  That does identify
20    the parties involved?  Okay.
21      MR. EDELMAN:  Vague and ambiguous.
22      MR. SMITH:  Okay.  So we're
23    speaking in generalities.
24 A. What I'm going to do is draw a diagram of--
25    I think you're asking me, just generically,

1   how payment processing works.
2  Q.  How payment processing worked under Litle 4,
3      under the Member Agreement.
4  A.  What do I do with my microphone?
5          MR. SMITH:  You'll put it on the
6      table.
7  A.  I should say I often do this when I'm
8      teaching classes or explaining this to
9      somebody, and the diagram always comes out
10     different, so I don't guaranty -- but in any
11     case, it all starts with the consumer and
12     what the consumer does is makes his calls,
13     the merchant -- I'll call it a CNP merchant,
14     card-not-present merchant -- and orders the
15     goods or services.  The card-not-present
16     merchant then wants to find out whether or
17     not that card is a good transaction.
18 Q.  Mr. Litle, could you do a card-present
19     transaction, if that differs at all from a
20     card-not-present transaction?
21 A.  Okay.  Why don't I say where it's different
22     because, from the diagram point of view,
23     it's very similar.  Most of the differences
24     in a card-not-present transaction are in how
25     one protects themselves from liability, how

1      one resolves disputes between the cardholder
2      and the merchant, those kinds of things, and
3      those wouldn't show up in a diagram, but if
4      I think of something that's different, I'll
5      explain it when I'm doing it.
6  Q.  Thank you.
7  A.  So the card -- but in this case, the
8      card-not-present merchant, one place where
9      it is different is when the consumer orders
10     and the card is not present, they typically
11     call up on the phone.  These days, they fill
12     in their own order on the internet, or they
13     send in an order form through the mail.  So
14     there is no card there.  They can't swipe a
15     terminal.  In a card-present environment,
16     the merchant -- the person would be there
17     at the cash register, they'd have their
18     stuff -- they'd have their card, and it
19     would all happen together.  Okay.  So the
20     card-not-present -- the merchant then, in
21     all cases, would go and get an
22     authorization, typically hooked up with the
23     payment processor.  Now, a payment
24     processor, which would be us, in this case.
25     So they have an authorization request, which

1      I'll represent with a question mark, and
2      then the payment processor returns an answer
3      and it says either yes or no and all kinds
4      of flavors of no, but it says yes or no,
5      this is a card that's going to be good and
6      the merchant is likely to be paid, and I'll
7      explain that later.
8  Q.  Does the payment processor make that
9      determination?
10 A.  No.  Where the payment processor gets that
11     information is going to be this side of the
12     diagram.  But the payment processor goes and
13     gets an authorization through the networks,
14     eventually back to the card-issuing bank,
15     but I'll draw that in a second.  But as soon
16     as the merchant gets an authorization to go
17     ahead and make the sale -- and you know what
18     that is in a retail environment.  You wait
19     for a minute and then the code comes back,
20     and that tells the merchant they can make
21     the sale, and then what the merchant then
22     does is it ships the order to the consumer.
23     I won't get into back orders and partial
24     orders and all that kind of stuff.  That can
25     make it pretty complicated.  Okay.  Then

1      what the merchant does is, simultaneously
2      with shipping the orders, the merchant then
3      sends a settlement transaction and there's
4      still a bunch of flavors of that, but
5      typically, they send in a settlement
6      transaction to the payment processor.
7  Q.  And what is the settlement transaction?
8  A.  The settlement transaction is the merchant's
9      notification that it's fulfilled the
10     consumer requirement and that they want the
11     money for this sale.  So the settlement
12     transaction is the one we buy.
13 Q.  And that includes the dollar amount of the
14     purchase?
15 A.  That's true.
16         MR. EDELMAN:  Objection.  Leading.
17     I just want a standing objection that I
18     object -- my initial objections stated when
19     the question came to lead to this
20     presentation and I don't want to interrupt
21     the flow of the presentation, but I do have
22     a standing objection to the entire
23     presentation.  As long as we understand
24     that, we can go ahead.
25 A.  So the payment processor interfaces to the

Page 50

1 networks, as I call them, and I'm talking
2 about Visa and MasterCard transactions now.
3 The payment processor, when it gets asked
4 for an authorization -- we don't know how to
5 determine whether a consumer has a good card
6 or not, so we send it to the Visa and
7 MasterCard networks. I'll just say "Visa,"
8 but it means Visa and MasterCard, and Visa
9 switches the authorization request back to
10 the card-issuing bank. So again, this is
11 this path, the authorization request, we go
12 to Visa and MasterCard, they switch it to
13 the card-issuing bank, and the card-issuing
14 bank is the one that generates the yes or
15 no. That comes back to us and then that
16 goes to the merchant that's asking for the
17 authorization. This whole process of going
18 through here to the card-issuing bank and
19 back again is between one and two seconds,
20 typically.
21 Q. And the box labeled "PP" is Litle & Company?
22 A. That's right, or a payment processor like
23 us. Everybody basically does it the same
24 way, although they may use different ways,
25 they may use different suppliers. For

Page 51

1 example, at this point if time, we really
2 went to an authorization supplier called NDC
3 and NDC went into the Visa and MasterCard
4 network. NDC is now called Global Payments,
5 and the answer came back through here.
6 Q. So are you saying that the authorization
7 request was -- it was always routed through
8 Litle & Company?
9 A. Yes, because one of the services that we
10 offered and still do is the interface with
11 the merchant because the merchants typically
12 have order entry systems that they wrote
13 themselves or they bought from somebody and
14 it's been modified over time, and there are
15 all kinds of interfaces, there are all kinds
16 of networks, ways of doing authorizations
17 through the networks. We do most of it now,
18 for example, through the internet, but at
19 that time, it was done on dial-up modems or
20 through frame relay systems. That's -- we
21 communicated with the merchants. This is
22 virtually all electronic. I don't think we
23 ever -- we didn't process much paper. We
24 had the capability, but -- out of a couple
25 of billing transactions a year, we might

Page 52

1 have processed a dozen paper transactions.
2        So anyway, this is how the
3 authorization works. Then the settlement
4 comes to the payment processor. The
5 settlement at this point in time then went
6 to NPC, which entered the settlement
7 transactions into Visa. This was an
8 electronic transaction that just specified
9 how many dollars this merchant was trying to
10 collect. Okay. So when it went through
11 here back to the card-issuing bank, it was
12 the card issuing bank's job to pay off the
13 merchant. So the card-issuing bank -- I'll
14 use another color. Now, this is really
15 money that comes from the card-issuing bank
16 back through the Visa networks. Visa has a
17 big clearinghouse and interestingly enough,
18 in this case, the dollars go to the
19 acquirer, which is our sponsor bank, and
20 so -- NPC and first of Louisville were the
21 same thing -- but the dollars would go to
22 the First of Louisville, and at this time,
23 one of the reasons there was a three-party
24 agreement is because the First of Louisville
25 would pay off the merchant. They would

Page 53

1 actually wire or, by ACH, transfer the money
2 to the merchant, and how did they know what
3 to transfer to the merchant? They
4 transferred whatever we told them to. We
5 issued instructions. This is kind of a
6 mess, but we issued instructions to NPC and
7 First of Louisville and said "Wire so much
8 money to the merchant," and that's what they
9 did. That's a typical transaction. That
10 would be true of the card-present or
11 card-not-present transaction, except for the
12 actual swipe of the cards.
13        Now, the dollars that actually got
14 transferred is, the card-issuing bank would
15 transfer -- let's say it was a hundred
16 dollars that was originally charged. The
17 card-issuing bank would keep part of that
18 hundred dollars called interchange. It's an
19 amount of money that the card-issuing banks
20 just get in the transaction. That's
21 probably -- these days, it's one and a half
22 to two percent. So let's say the
23 card-issuing bank, when they got a request
24 for a hundred dollars, this amount that they
25 actually sent, let's say it was $98.50,

Page 54

1  because they kept their, say, one and a
2  half. There are about 200 different
3  interchange rates, depending on different
4  situations. So I'm just saying it's about
5  one and a half percent. It's higher for
6  card-not-present transactions. It's lower
7  for run-of-the-mill straight retail
8  transactions. Okay. This money would then
9  go to -- they deducted their interchange and
10 then when it came to Visa, Visa would then
11 deduct what they called their assessments.
12 So right here, this amount of money was more
13 like, say, $98.35. Right here. Our
14 acquiring bank or First of Louisville would
15 get the $98.35. We would tell First of
16 Louisville in bulk -- we didn't tell them
17 transaction-by-transaction -- we would tell
18 them to transfer $98 to the card-not-present
19 merchant, and then we would tell them to
20 transfer 35 cents to us for our fee.
21 Q. Will you label the $98 step from First of
22   Louisville to the merchant as Step Z with
23   the red marker? I'm going to ask --
24 A. Label it as Step Z?
25 Q. Yes, sir. Thank you.

Page 55

1  A. Okay.
2  Q. Okay. What type of equipment would Litle &
3    Company use in this process?
4        MR. EDELMAN: Objection. Vague and
5    ambiguous. Step Z doesn't have Litle &
6    Company.
7        MR. GRAY: I didn't refer to Step
8    Z.
9  A. I'm sorry. What kind of equipment we use
10   where?
11 Q. For each of the arrows that go into and out
12   of PP, the box labeled PP.
13 A. We used various kinds of computers. We used
14   communications equipment. We used, you
15   know, terminals and stuff, so that our
16   operators can control the process. I'm not
17   quite clear what you mean.
18 Q. No. That's what I was looking for; and what
19   type of software would those computers use?
20 A. It was all software we wrote ourselves, and
21   it was -- at that time, we used C. C is a
22   programming language. We used Stratus
23   computers by brand. We used the Stratus
24   operating system. We had other kinds of
25   computers. We had a Pyramid -- no -- an

Page 56

1  Encore computer. We had all kinds of
2  stuff. We had UPS systems, generators, to
3  keep everything going, in case we lost
4  power, all kinds of backup equipment. All
5  together, I don't know how far it was, ten
6  or 20 million dollars worth of equipment.
7  Q. And you said in Step Z, the method of
8    transferring those funds was via ACH or wire
9    transfer?
10 A. Yes. It depended on the merchant and how
11   fast our deal was and they would get their
12   money because ACH took an extra day,
13   compared to wire, but it was less expensive
14   and more automatable.
15 Q. And both of those are electronic transfers?
16 A. Yes.
17 Q. You can have your seat back. Thank you very
18   much. You mentioned a few of these examples
19   earlier.
20       MR. SMITH: Sorry.
21 Q. You mentioned a few of these examples
22   earlier, but for Step Z in the diagram
23   you've drawn, was there ever a time when
24   First of Louisville, which I'll call FNBL,
25   when FNBL did not forward the entire, in

Page 57

1  your example, $98 to the merchant in Step
2  Z?
3  A. Yes.
4        MR. EDELMAN: Objection. Leading.
5        MR. SCHUURMAN: How is that
6    leading? "Were there any instances."
7        MR. EDELMAN: We can have a
8    discussion, if you'd like to.
9  Q. Could you list those examples?
10 A. Well, there was a period of time, as I said,
11   Visa and MasterCard changed the rules
12   around, and before that was changed, we got
13   the money in our bank accounts, but there
14   were instances of payment processors that
15   basically ran off with merchants' money. So
16   Visa and MasterCard changed that. So the
17   third-party payment processors, which we
18   are, or which we were, didn't actually ever
19   see the cash. That was one instance.
20   Another instance was where we wired money to
21   a third party because that was the deal we
22   had with the merchant or the merchant had
23   with the third-party and we were instructed
24   to do that, so we did.
25 Q. What types of third parties were you

15 (Pages 54 to 57)

Page 58

1   instructed to wire funds to?
2   A.  Well, there were several.  One of them was
3       to us or to organization we controlled, if
4       we had advanced postage money to the
5       catalog, then we had pre-arranged schedule
6       in which they'd pay that back after the
7       catalog was mailed and they began to get
8       orders, and we would collect -- we would
9       keep some of the proceeds of that in
10      addition to our fees, and that was a -- it
11      was kind of a separate operation where we
12      basically advanced money then collected
13      it as part of the merchant stream.  That was
14      one example.
15              Another example was very similar to
16      what we did when we started DMGT, and that
17      was, we made a three-way deal with the
18      merchant, where the merchant, for various
19      reasons, would want us to work with the
20      fulfillment company, and whenever the
21      merchant had a customer that they had a
22      fulfillment company fulfill for them, the
23      fulfillment company, just like we did in
24      1982, but this is an independent fulfillment
25      company, would want to be paid right after

Page 59

1       they shipped the goods.  Typically, in this
2       case, it was an info-mercial type of
3       company, and the one I remember the best is
4       the woman that invented the mop that you
5       could ring out without getting your hands
6       wet.  Anyway, she was not a business
7       person.  The fulfillment company wanted her
8       business, but didn't really trust that they
9       were going to get paid, and we wanted to do
10      her payment processing, but really didn't
11      trust that she would ship her orders before
12      she sent the transaction to us, and of
13      course, if somebody hasn't shipped the
14      orders and we get transactions from them, we
15      give them the money for orders they haven't
16      shipped and they never ship the orders, we
17      are in deep trouble.  So we want to do
18      everything we can to make sure that the
19      order is shipped.  So there was a three-way
20      deal.  We would pay on behalf of the
21      merchant the fulfillment company, generally
22      on a daily basis, and the fulfillment
23      company wouldn't have to guaranty the
24      financial viability of the merchant, but
25      they would have to guaranty that they

Page 60

1       wouldn't send us any transactions, unless
2       the goods were actually shipped.  All of our
3       interests were served and this lady that
4       invented the mop made millions of dollars;
5       whereas, otherwise, nobody would have done
6       her work.
7   Q.  When was this when you processed the mop
8       transactions?
9   A.  I don't know.  It was probably in the early
10      nineties sometime.  It was certainly before
11      I sold the company.
12  Q.  Were there other examples of when you paid a
13      third party?
14  A.  Yeah.  We did that in the info-mercial
15      industry quite regularly.  That was -- that
16      was sort of a normal course of action.
17  Q.  Were there other examples, outside the
18      fulfillment industry or info-mercial
19      situation?
20  A.  Yeah.  There was sort of a third kind of way
21      we paid people, and that was, if one of our
22      merchants had a line of credit with a
23      financial institution or a financial funding
24      source of some sort, very often, we would
25      participate in a deal such that that funding

Page 61

1       credit could call us up and say "Now,
2       instead of sending the money to the
3       merchant, you've got to send it to us."
4       They looked at that as security on their
5       loan, and sometimes, actually, we didn't
6       know about those deals.  The lending
7       institution just made the deal with the
8       merchant and didn't include us, but would
9       call us up and say "Now, you should send us
10      all the money," and we would say "Who are
11      you," and then we'd get the merchant on the
12      phone and we'd figure out that the merchant
13      had made the deal with the funding source,
14      and so we obviously don't want to send money
15      to somebody that isn't authorized to get
16      it.  You know, there were those two kinds of
17      situations where we would forward money to a
18      funding source.  In some of those
19      situations, or in the kind of situation, if
20      a company was going out of business and
21      going out of business hard, the funding
22      source might want to get all the funds, a
23      hundred percent.  Usually, what happened was
24      the funding source wanted to keep the
25      company alive enough so that it could sell

Page 62

1  its inventory to the people that were
2  ordering from the catalog at full price,
3  because they could get more money back than
4  if they put the company out of business and
5  had to sell it all to some sort of jobber.
6  So the result was that it was usually a
7  percentage of the proceeds would go to the
8  funding source.
9  Q.  And where would the remaining percentage
10  go?
11  A.  That would go to the merchant.
12  Q.  Did Litle & Company require reserve accounts
13  for its merchants?
14  A.  Depended on the merchant.  Depended on the
15  creditworthiness of the merchant, because
16  one of the important things that a payment
17  processor does is take the liability for the
18  merchant performing for the customers.  If
19  it doesn't, it gets chargebacks and the
20  chargebacks come to Litle & Company and it's
21  up to us to collect it.
22       Now, if a merchant was out of
23  business or disappeared, we needed some
24  funds to draw on to be able to collect those
25  kinds of chargebacks.  So if there was any

Page 63

1  likelihood that a merchant would go out of
2  business, we kept a reserve.
3  Q.  Did the merchants ever rent or purchase
4  equipment, such as terminals, from a third
5  party?
6  A.  In our case, usually, they didn't, but
7  that's not an unusual thing to happen,
8  because we didn't have enough terminals
9  around -- I mean, a big payment processor
10  like Global probably has five million
11  terminals outstanding.  We might -- if we
12  had 500, I would have been surprised.
13  Well, maybe we did, because of Hammacher
14  Schlemmer -- but it was in the low thousands
15  that we would have had.  So generally, we
16  just bought them and we had ownership of
17  them and we would provide them to the
18  merchants in one of three ways.  We'd either
19  give them to the merchant, we'd sell them to
20  the merchant, or we would charge them a
21  monthly fee for that equipment.
22  Q.  How would the merchant pay the monthly fee,
23  for example?
24  A.  We deducted that from their payment stream
25  that we would have otherwise sent to the

Page 64

1  merchant.
2  Q.  So where would that money go, instead of to
3  the merchant?
4  A.  It would go to us.
5  Q.  From First National Bank of Louisville?
6  A.  Right.  That would be part of the transfer
7  that we instructed First National Bank of
8  Louisville to do.
9  Q.  And that equipment rental fee or purchase
10  fee would be in addition to the processing
11  fees Litle typically charges its merchants?
12  A.  That's true, and there are other kinds of
13  charges.  Obviously, chargebacks -- unfunded
14  chargebacks -- well, that's more
15  complicated.  Then there are fines and there
16  are all kinds of various charges that
17  merchants pay, depending on what happens.
18  Q.  What is an example of one of those fines or
19  fees?
20  A.  It wasn't done as much then, but it was --
21  it's done more now -- if a merchant deposits
22  or tries to settle a transaction that wasn't
23  properly authorized and does it a lot, Visa
24  and MasterCard are likely to impose a fine.
25  That fine is on us, as a payment processor,

Page 65

1  and then again, it's up to us to collect it
2  from the merchant.
3  Q.  Did Litle & Company, charge, for example, a
4  wire fee?
5  A.  Yes.  I think we charged -- I don't really
6  remember -- ten bucks a wire and $2.50 for
7  an ACH.
8  Q.  Could you explain what the wire is?  If the
9  merchant requested that, how does this
10  process change?
11  A.  It didn't change at all.  The Z up there
12  from First of Louisville, if it was a wire,
13  it generally meant that the wire amount was
14  determined on a given day, and that same
15  day, the money was transferred from First
16  National Bank of Louisville to the
17  merchant's account.  An ACH -- if it was
18  determined on the same day that an ACH of so
19  much money should be transferred, the actual
20  transfer didn't take place until the
21  following day.
22  Q.  And how would the merchant pay the wire fee
23  or the ACH fee?
24  A.  It would be deducted from the -- as a fee
25  from the amount of money that is represented

17 (Pages 62 to 65)

Page 66

1   by the Z step.
2  Q.  In addition to the standard Litle & Company
3     processing fees?
4  A.  That's true.
5  Q.  And First National Bank of Louisville would
6     then forward that fee to Litle & Company?
7  A.  Yes.  In the -- where it said 35 cents, in
8     that step, that would be part of our
9     instructions to First National Louisville
10    and how to transfer money.
11        MR. GRAY:  I think now would be a
12    good time for a break, if you would like
13    one.
14        THE VIDEOGRAPHER:  The time is
15    10:52.  This is the end of Cassette 1.  We
16    are off the record.
17        (Recess.)
18        THE VIDEOGRAPHER:  The time is
19    11:06.  This is the beginning of Cassette
20    Number 2 in the deposition of Thomas Litle.
21    We are on the record.
22  Q.  (Cont'd. By Mr. Gray)  Mr. Litle, you've
23     spoken, generally, about six different
24     examples of when FNBL paid a third party out
25     of credit card receivables out to the

Page 67

1   merchant, and I'd like to go through each
2    one of those in detail at this point, all
3    right, beginning with the example you gave
4    involving a line of credit a merchant
5    received.
6  A.  All right.
7        MR. GRAY:  I'd like to mark this.
8    (Letter dated February 17, 1994 is
9    marked Exhibit Number 5 for
10    Identification.)
11  Q.  I'm handing you what has been marked Litle
12    5, which is a letter from Robert George, the
13    President of Boston Publishing Company, what
14    appears to be the President of Boston
15    Publishing Company, to Michael Duffy,
16    Vice-president of Litle & Company, dated
17    February 17, 1994.  Could you describe the
18    agreement that this letter speaks about?
19        MR. SMITH:  Objection.  You skipped
20    a step there.
21  Q.  Have you seen this letter before?
22  A.  Yes.
23        MR. EDELMAN:  Objection.  Vague and
24    ambiguous.  Leading.
25  Q.  Could you describe the agreement this letter

Page 68

1   embodies?
2  A.  This letter describes an agreement between
3    Hanover Direct and Boston Publishing Company
4    in which Hanover Direct supplied a line of
5    credit of three million dollars to Boston
6    Publishing, and Hanover has -- has a
7    security interest in lots of Boston
8    Publishing's assets, maybe all of them,
9    including the right, and I'm quoting,
10    "rights of the borrower," meaning Hanover,
11    "to receive payments in respect of card
12    sales from Litle & Company.
13  Q.  What does that mean?
14  A.  That means, as I interpret this, that if
15    Hanover Direct called us up and said, in
16    Step Z there, "Instead of sending the money
17    to Boston Publishing, send some or all of it
18    to Hanover Direct."
19  Q.  In the situation where FNBL would send some
20    of the money to Hanover Direct, where would
21    the remaining portion be sent?
22  A.  Go to the merchant.
23  Q.  So FNBL would forward a percentage of the
24    credit card receipts to Hanover Direct --
25  A.  That's right.

Page 69

1  Q.  -- electronically --
2  A.  That's right.
3  Q.  -- and would electronically forward the
4    remainder of the credit card payments to the
5    merchant?
6  A.  That's right.
7  Q.  Are you aware of any relationship between
8    Boston Publishing Company and Museum
9    Publications of America?
10  A.  One of them was the name of the catalog and
11    one of them was the name of the company that
12    owned the catalog, as far as I can tell.
13  Q.  Did Litle 5 -- did this letter amend an
14    agreement similar to the Member Agreement
15    that was in Litle 4 between Museum
16    Publications of America and Litle &
17    Company?
18  A.  I suppose -- yes.  I suppose it did.
19  Q.  How would FNBL electronically forward a
20    portion of those credit card receivables to
21    Hanover Direct?
22  A.  Either wire or ACH.  I wouldn't know which
23    without looking at the agreement more
24    carefully.
25  Q.  Is there any relationship between Litle &

Page 70

1  Company and Boston Publishing?
2  A. Yes. They were a customer, they were a
3    merchant of ours.
4  Q. Beyond that, there is no other relationship?
5  A. No.
6  Q. Is Boston Publishing related to FNBL?
7  A. No.
8  Q. Is Boston Publishing related to NPC?
9  A. No.
10        MR. SMITH: I just want to note my
11    objection. We're talking about back in the
12    date of this agreement; right?
13        MR. GRAY: Right.
14  Q. On Litle 5, in the "Re" line," it says
15    "Boston Publishing Company, Inc., Litle
16    Agreement dated dated 6/8/90." Would that
17    Litle agreement be a Member Agreement like
18    the Member Agreement in Litle 4?
19  A. Yes, it would.
20  Q. About how many arrangements such as that
21    described in Litle 5 did Litle & Company
22    enter into?
23        MR. EDELMAN: Objection. Vague and
24    ambiguous.
25  A. Well, in this case, I'm not sure we really

Page 71

1    entered into it. We were just told that
2    there was this agreement between Boston
3    Publishing Company and Hanover, and they
4    were alerting us to it and they didn't have
5    to send us this letter. If they had that
6    agreement and we didn't see this letter and
7    Hanover Direct said "Send some or all of the
8    money to us," you know, we would have done
9    it on making sure that Hanover Direct had
10    that ability because of an agreement between
11    Hanover and Boston Publishing.
12        So I don't know how many of these
13    agreements actually existed. We probably
14    were aware of a dozen of them, and I know
15    there were others. I know there were
16    others, because every once in a while, we'd
17    get called up and somebody would say "Divert
18    these funds for this reason."
19  Q. And what would they mean by "Divert these
20    funds"?
21  A. That would mean they had a security interest
22    in the funds and we should pay them to
23    whoever had the security interest in the
24    funds. Obviously, we would want to make
25    sure they really did have a security

Page 72

1    interest in the funds.
2  Q. At that point, how would you go about
3    diverting the funds?
4  A. It would be our instructions to -- first to
5    Louisville in how they transferred the
6    funds. It would be an ACH or a wire to all
7    of the parties who were involved.
8  Q. What percentage was typically diverted?
9  A. Oh, boy, that varied all over the place.
10    Sometimes it was a hundred percent. Most of
11    the time, it was a percentage that ranged
12    from, I suppose, ten percent to 50 percent.
13  Q. Could I ask you to go back to the board and
14    just draw a picture for us, a picture of how
15    Step Z was changed in this situation, such
16    as the Hanover Direct that's in Litle
17    Exhibit 5?
18        MR. EDELMAN: Objection. Vague and
19    ambiguous. Just again, my objection to the
20    demonstration.
21  A. Okay. In that case, there was a third party
22    and the third party could take the form of
23    the varieties of third parties we've talked
24    about, but in the case you're asking about,
25    we would have some of the funds -- some or

Page 73

1    all of the funds sent to the third party
2    instead of Z, or in addition to Z, and so
3    there's just this extra step. So the total
4    of what I'll call X and Z was a hundred
5    percent of the funds we would normally send
6    out. We just send it out in two different
7    pieces, and the fees we would get was the
8    extra wire or ACH, so we really didn't --
9    it wasn't particularly profitable for us.
10  Q. And in order for Litle & Company to provide
11    those instructions to FNBL, you would verify
12    that the merchant has an outstanding
13    obligation to that third party?
14        MR. EDELMAN: Objection. Vague and
15    ambiguous. Leading.
16  Q. Yeah. If we didn't identify the fact that
17    that was a legitimate obligation to do that,
18    we would have been liable for sending money
19    to a third party that we shouldn't have
20    sent. So obviously, we didn't want to be
21    liable for that.
22  Q. So in the process where FNBL was forwarding
23    a portion of the payments to the third
24    party, in this case, Hanover Direct, from
25    beginning to end, could you walk us through

Page 74

1  from, assuming it's a card-present merchant,
2  the presentation of the card through
3  payment?  Just talk through.
4        MR. EDELMAN:  Same objections.
5  Vague and ambiguous.  Calls for a
6  narrative.  Leading.
7        MR. SMITH:  Could you clarify what
8  you're looking for?  You want him to do the
9  whole process again?
10  Q.  Yes.  Could you just talk through the steps
11     that are drawn on the board?
12  A.  Okay.  Everything would be identically the
13     same.  Hanover Direct, for sure, they had
14     outlet stores and so, assuming that it was a
15     sale from an outlet store, the consumer
16     would swipe the transaction through the
17     terminal.  All that -- everything would be
18     identically the same as is shown on that
19     diagram, and some of the money that would be
20     diverted to the third party in the X step
21     would have come from that sale at the outlet
22     store, and some of it in Z would have come
23     from the outlet store.  All that money, one
24     way or another, got funneled through one of
25     those two branches, assuming some of the

Page 75

1     money was going to a third party.
2  Q.  Okay.  So in this situation, the merchant
3     would have an obligation to pay some portion
4     of the receivables to Hanover Direct;
5     correct?
6        MR. EDELMAN:  Objection.  Vague and
7     ambiguous.  Leading.
8  A.  According to this agreement, the merchant
9     and Hanover Direct made, yes.
10  Q.  And a customer would go to a Hanover Direct
11     retail store or outlet?
12  A.  Actually, that's confusing.  Hanover Direct
13     happened to be a catalog.  It happened to be
14     a customer of ours.  So I'm getting that a
15     little confused.  If you look at them
16     strictly as providing a line of credit -- I
17     think that's the context you're looking at
18     now -- and this in that case, the consumer
19     would have bought something from Museum
20     Collections Outlet Store, and so the Museum
21     Collections money would go through that
22     process and Hanover Direct would be the
23     third party.  It happened by coincidence to
24     be a catalog, but that was not significant
25     in the scheme of things.

Page 76

1  Q.  And you're referring to Museum Publications
2     of America?
3  A.  Museum Publications was the merchant, yes.
4     Hanover, in this case, would be extending
5     the line of credit.
6  Q.  Okay.  When the customer then went to the
7     store and swiped the card through a credit
8     card terminal, then at that point, the
9     information related to the payment, such as
10     the payment amount -- the payment amount and
11     the card number, would be sent as an
12     authorization request to Litle & Company;
13     correct?
14  A.  Uh-huh.
15  Q.  And that was electronically sent to Litle &
16     Company?
17        MR. EDELMAN:  Objection.  Leading.
18     Vague and ambiguous.
19  A.  Yes.
20  Q.  Then the authorization process would proceed
21     as you described earlier, electronically
22     through Litle & Company's computers and
23     networks?
24  A.  Yeah, the authorization.  We would get it,
25     we would route it through the networks.

Page 77

1     We'd get the answer back.  We'd send the
2     answer back to the, in that case, the
3     terminal, and that would, as I said, took
4     between one and two seconds.  Then the
5     terminal would store up all those
6     transactions during the day.  This is
7     typically how it was done.  I don't remember
8     if Museum Collections did it exactly this
9     way, but it's typically how it's done.
10     They'd store up all those transactions, and
11     at the end of the day, the terminal itself
12     would send some settlement -- the settlement
13     money through basically the same route.
14     Actually, the settlement money, there would
15     be a little box between the merchant and us
16     because we didn't receive those settlements
17     directly.  We had somebody else manage our
18     terminals for us and then they took care of
19     all the individual terminals that settled
20     and then they sent the bulk settlements to
21     us.
22  Q.  As money was transferred from the
23     card-issuing bank -- or was money
24     transferred from the card-issuing bank to
25     the Visa/MasterCard network at that point?

20 (Pages 74 to 77)

Page 78

1  A. After the settlement went through the
2     system, as I described before, the
3     settlement would go to us as the payment
4     processor, to NPC, who was the Gateway and
5     actually, operating as a gateway, not a
6     payment processor, into Visa. That
7     transaction would go in there. It would be
8     re-routed to one of the 12,000 banks that
9     issues credit cards, and then that bank
10    would actually pay a clearinghouse operated
11    by Visa and that clearinghouse -- Visa then
12    instructs that clearinghouse to send an
13    amount of money in total that NPC or First
14    of Louisville would get for all of their
15    merchant -- all the merchants that First of
16    Louisville did, for us because we were using
17    them as a gateway. So that money could go
18    to First of Louisville in bulk, for all
19    kinds of people, for Wal-Mart, for the
20    airlines. We were just in there, but it
21    would have been one wire. Then First of
22    Louisville would have then wired, according
23    to our instructions. They would they would
24    know how much money was due to our merchants
25    total, and we would tell them how to split

Page 79

1     it up; and in the case you're showing, some
2     of it would be actually sent to the merchant
3     and some of it would be sent to the third
4     party.
5  Q. And that would be electronically sent to the
6     merchant?
7  A. Oh, yeah. All of it was electronic.
8  Q. Then once Hanover Direct received that
9     money, they would apply that to whatever
10    obligation the merchant had?
11  A. Yeah, presumeably. I mean, I don't know
12    what they did with it, but as long as we met
13    our obligation, we didn't pay much attention
14    what happened next.
15  Q. And this letter, which is Litle 5, is dated
16    February 17, 1994; correct?
17  A. Right.
18  Q. Are you aware of any agreements similar to
19    this or any instructions that you provided
20    to FNBL prior to 1994?
21  A. For Museum Collections?
22  Q. Or any merchant.
23  A. Yeah. We actually did postage financing for
24    these guys prior to this arrangement they
25    had, and there were -- yeah, we had

Page 80

1     arrangements to pay third parties, the
2     fulfillment people, the creditors, the
3     postage. We looked at ourselves as a third
4     party for the postage financing because it
5     was a separate account, so we could figure
6     it out. So whatever third party it was
7     would have had some sort of arrangement or
8     we would have been made aware of an
9     arrangement between the merchant and the
10    creditor before we actually did that or
11    before we actually sent any money to the
12    creditor.
13  Q. Was the sort of arrangement you're
14    describing with Hanover Direct and the
15    merchant, was this a confidential
16    arrangement?
17  A. No, I don't think so. No, it was not.
18  Q. Would you solicit creditors to ask you to
19    divert funds?
20  A. Well, typically we didn't solicit the
21    creditors. We certainly didn't keep it a
22    secret that we would do that. We believe
23    that was a service that we offered to our
24    merchants and usually, the merchants would
25    come to us because they needed some sort of

Page 81

1     financing and they heard that, you know, we
2     could help them out in this, particularly,
3     you know, in the postage financing. We got
4     a lot of requests for that.
5  Q. So how would the merchant learn that you
6     were able to divert funds?
7  A. Well, the people that we did it for were
8     exceedingly pleased. One guy even got an
9     article in Forbes Magazine, I think, about
10    how he thought this was -- among other
11    things, talked about how this was an
12    innovative way he did his financing. A lot
13    of the consultants in the industry -- the
14    catalog industry is fairly close-knit and
15    there are a lot of consultants that run
16    around. They're sort of like honey bees
17    pollinating all the plants, and they tell
18    everybody all this stuff, and so a company
19    called Hearthsong, for example --
20    Hearthsong, H-e-a-r-t-h-s-o-n-g -- and it
21    was a kids' catalog and they were trying to
22    sell their catalog and they didn't have
23    enough money to publish the last catalog,
24    and so we did postage financing. They were
25    able to publish the last catalog and they

Page 82

1  successfuly sold the company, and that
2  was -- that kind of stuff was pretty
3  well-known.
4  Q.  Okay.  I'd like to talk to the postage
5  advance arrangement in detail, but as far as
6  the financing arrangement, the payments to
7  creditors, like you just described on the
8  board, how would the merchants learn about
9  that situation?
10     MR. EDELMAN:  Objection.  Calls for
11  speculation, lack of foundation.
12  A.  They'd ask us.  I mean, they heard about us
13  from the consultant -- typically, the
14  consultants.  I can think of one who
15  probably got four or five people to come to
16  us because he was working with the company
17  and providing value in his consulting and he
18  found this information to help him provide
19  values to his clients.
20  Q.  Do you remember his name?
21  A.  Yes, I do.
22  Q.  What is that?
23  A.  Jim Alexander.
24     (Three-page photocopy of article
25     entitled "People thought I was

Page 83

1     nuts" is marked Exhibit Number 6
2     for Identification.)
3  A.  I don't remember if Jim was the --
4     MR. SMITH:  There's no question
5  before you --
6  A.  -- consultant with Boston Publishing.
7  Q.  Do you remember any of the merchants he was
8  a consultant for?
9  A.  Not that actually used the service.  I just
10  remember he was aware of what we were doing.
11  Q.  So Litle & Company's ability to perform this
12  service was commonly known among
13  consultants?
14     MR. EDELMAN:  Objection.  Vague and
15  ambiguous.
16  A.  I believe it was.  You know, I certainly
17  talked about it a lot.  It was a value-added
18  service that we offered that nobody else --
19  no other payment processor seemed to offer
20  on a regular basis and it made us look
21  better to prospects.
22  Q.  I'm handing you what has been marked Litle
23  6, which is an article from Forbes June 8,
24  1992 issue, Volume 149, Note 12, Page 120,
25  entitled "People thought I was nuts."  Is

Page 84

1  this the article you referred to just a
2  minute ago?
3  A.  I think so.  Let me take a look at it.  Yes,
4  it is.
5  Q.  If you look at Page 3 of Litle 6 marked
6  LI00003 --
7  A.  Yeah.
8  Q.  -- the first full paragraph on the page says
9  "Finding capital remained a problem, but
10  Bourne was innovative.  Postage was his
11  largest expense and in 1989, when he needed
12  money, he turned to his credit card
13  processor, a New Hampshire-based company
14  called Litle & Co.  Litle agreed to finance
15  his postage by discounting his credit card
16  receivables.  It was such a good idea, other
17  catalogers have followed suit."
18     Can you describe, generally, the
19  process of postage financing?
20  A.  Yeah.  By discounting his credit card
21  receivables wasn't quite it.  It was -- his
22  credit card receive abilities, we paid some
23  of them to a third party.  It wasn't exactly
24  discounted, but other than that, this is
25  exactly what I've described, except that

Page 85

1  paying the money to a third party was paying
2  it to us because we advanced them the
3  postage.  What we did -- and in order to
4  advance him the postage, the process we
5  would go through is, we would determine
6  approximately what his Visa and MasterCard
7  receivables or proceeds were going to be
8  during the period immediately after he
9  mailed the catalog, and then we would
10  actually pay his postage bill.  We wouldn't
11  pay him.  We'd actually pay the post
12  office.  We made sure the check went from us
13  into the post office's hands.  So he'd never
14  see the check.  He knew how much it was.
15  Then we would -- we changed it around for a
16  while, as we were getting used to it, but
17  effectively, we would add a fee to the
18  amount of the postage, and then we'd
19  collect -- we'd collect a portion or we'd
20  keep a portion of the proceeds that we would
21  otherwise send him until we recovered our
22  initial postage amount, plus our fee.
23  Q.  You said you would keep a portion of the
24  credit card receivables?
25  A.  Yes.

22 (Pages 82 to 85)

Page 86

1   Q.  Would you instruct FNBL to forward that
2        portion to Litle & Company?
3   A.  Yes.  Then that was typically forwarded, it
4        is my recollection, to a separate account,
5        so that was a separate.
6   Q.  A separate account from the processing fees?
7   A.  Right.
8   Q.  Would the payment itself be separate from
9        the processing fee payment?
10  A.  I'm sorry.
11  Q.  Because you said it was forwarded to two
12       separate accounts.
13  A.  Right.
14  Q.  That implies that FNBL made two separate
15       payments to Litle & Company?
16  A.  That's true.
17  Q.  One of those payments being payments for
18       processing fees?
19  A.  All the routine stuff that they always did.
20  Q.  And then the other payment to the separate
21       account being the payment to Litle in
22       satisfaction of the merchants' postage
23       advance obligation to Litle?
24  A.  That's my recollection.  Yeah, because we
25       wanted to keep it straight.

Page 87

1              (Three-page document entitled
2        "Schedule E-1, Demand Promissory
3        Note for Postage Advances" is
4        marked Exhibit Number 7 for
5        Identification.)
6   Q.  I'm handing you what has been marked Litle
7        7, which is Schedule E-1, Demand Promissory
8        Note for Postage Advances.  The parties who
9        signed were Robert George from Litle &
10       Company --
11  A.  No.  Robert George was from --
12  Q.  -- from Museum Publications of America.  At
13       the top of Litle 7, it says "Schedule E-1."
14       Is this a schedule E-1 to the Member
15       Agreement?
16  A.  Yeah.  It's basically an addendum to the
17       Member Agreement.
18  Q.  Okay.  So it's an addendum agreement to the
19       Member Agreement in Litle 4?
20  A.  Right.  I think so.  Litle 4 or a subsequent
21       agreement.  I don't know.
22  Q.  But a similar agreement with Museum
23       Publications --
24  A.  Right.
25  Q.  -- of America.  At the top of this page, it

Page 88

1        says "Principle Amount of Advance is
2        $204,224.48"?
3   A.  Right.
4   Q.  And then directly underneath that, it says
5        "Management Fee: $9,190.52."
6   A.  Right.
7   Q.  Could you describe what the management fee
8        is?
9   A.  That was our fee.  We advanced $204,224.48
10       worth of postage and we collected that
11       amount, plus $9,190.52, which I think was
12       about five percent.
13  Q.  So -- and directly under that, it says
14       "Advance is payable to United States
15       Postmaster, Saratoga Springs, New York"?
16  A.  That's right.
17  Q.  So Litle & Company would advance the
18       principal amount of advance to the
19       Postmaster --
20  A.  That's correct.
21  Q.  -- and in return, Museum Publications of
22       America would repay Litle & Company the sum
23       of principal amount of advance and
24       management fee?
25              MR. EDELMAN:  Objection.  Leading.

Page 89

1   A.  Yes, that's correct.
2   Q.  The first paragraph of Litle 7, it says "In
3        consideration of Litle & Company making
4        advances for the account of member to the
5        United States Postal Service, member agrees
6        to pay on demand the principle amount of
7        advance, plus management fee, to Litle &
8        Company or order," which is what you just
9        testified to; correct?
10  A.  I think so, yeah.  Yes.
11  Q.  "Member further agrees that all charge card
12       transactions from all divisions and
13       subsidiaries will be processed by Litle &
14       Company while any amount owed under this
15       note is still outstanding."  Could you
16       explain why member agrees --
17  A.  If we forward or if we advance them that
18       money and then he didn't process through us,
19       we have no way of collecting it.  So
20       obviously, we wanted to preserve our way of
21       collecting the money.
22  Q.  So if you advanced money to a merchant -- a
23       postage advance to a merchant, you would
24       process all of their card transactions?
25  A.  That's correct.

Page 90

1  Q. The next sentence says "Notwithstanding that
2    such amounts are otherwise payable on
3    demand, member agrees that" -- and I'm
4    skipping down to small ii,"the daily
5    repayments shall be deducted from daily net
6    proceeds." What does that mean?
7  A. It means that we collected our advance daily
8    against the proceeds that we otherwise would
9    have paid them. The net proceeds would be
10   Z, under normal circumstances in that
11   diagram, and what they paid us was X. So
12   that said, we deducted from Z.
13 Q. Does "net proceeds" have the same meaning in
14   Litle 7, Schedule E-1, as defined in the
15   Member Agreement, Litle 4?
16 A. Yes, it would.
17 Q. Litle 7 is dated September 27, 1993;
18   correct?
19 A. Is dated what?
20 Q. September 27, 1993.
21 A. Yes.
22 Q. The bottom by the signatures.
23 A. No. That's when the advance will be made.
24 Q. The advance will be made on September 17;
25   right? It says that on the top of the page,

Page 91

1    but it was signed on September 27, 1993;
2    correct?
3  A. Yes, it was.
4  Q. Are you aware of any postage advances Litle
5    & Company made prior to that time?
6  A. I think we had a regular program with these
7    guys. This wasn't the only one. I don't
8    remember whether this was the first one or
9    not the first one.
10 Q. About how many postage advances did Litle &
11   Company make?
12 A. Somewhere between three and six, probably.
13 Q. Three and six postage advances or
14   between three and six customers?
15 A. To these guys, we did postage advances
16   something like three to six times. I'm
17   guessing. I really don't remember, but they
18   published catalogs and they published them
19   multiple times of the year, so --
20 Q. So three to six to Museum Publications of
21   America?
22 A. Yeah.
23 Q. How many other merchants did Litle & Company
24   advance postage for?
25 A. I don't really remember. It must have been

Page 92

1    at least a dozen.
2  Q. How did you deduct the payments to Litle &
3    Company -- how did you instruct FNBL to
4    deduct the payments from Litle & Company?
5      MR. SMITH: Objection. Do you
6    understand the question?
7      THE WITNESS: I think so.
8  A. We didn't really instruct them to deduct
9    it. It was just an instruction of where
10   they wired the money to.
11 Q. And you would instruct them to wire it to
12   Litle & Company's bank account?
13 A. That's right.
14 Q. And that bank account is separate from the
15   bank account that you instructed FNBL to
16   wire the processing fees; correct?
17 A. It was, but I don't know if it always was.
18 Q. At some point, it was, though, prior to its
19   sale in 1995?
20 A. Yes.
21 Q. So again, going through the entire process
22   of a customer swiping a card at Museum
23   Publications of America, as the diagram is
24   drawn on the board, can you talk us through
25   the steps that you've outlined on the board?

Page 93

1      MR. EDELMAN: Objection. Vague and
2    ambiguous. Leading.
3  Q. Could you explain the steps, as you've drawn
4    them on the board and as they apply to this
5    agreement, for a card transaction at Museum
6    Publications of America?
7  A. Well, the steps, excluding the part about
8    the third party, were the same for Museum
9    Collections as for every one of our other
10   steps. That was a generic explanation,
11   excluding the third party.
12 Q. So the authorization and settlement steps,
13   up to the point of Step Z, are identical in
14   the Hanover finance situation, which you've
15   just described --
16 A. Uh-huh.
17 Q. -- and the postage advance situation?
18 A. Uh-huh, and the only difference is, in this
19   example of the postage advance, is the X
20   step was more than zero. It was whatever
21   the schedule called for.
22 Q. If you look at Page 3 of Litle 7, which is
23   marked LI00035, at the top, it says
24   "Repayment Schedule."
25 A. Yeah.

Page 94

1   Q.  Is this the schedule you were just referring
2       to?
3   A.  Yes.
4   Q.  Or similar schedule?
5   A.  Right.
6   Q.  Could you describe what this schedule
7       provides?
8   A.  Yeah.  Before we did the postage financing,
9       as I think I said earlier, we figured out
10      about what the Visa/MasterCard volume of net
11      proceeds would be to the merchant, or in
12      this case, Museum Publications, and that was
13      obviously based on their experience with
14      mailing the catalog, what they expected
15      their sales would be, et cetera, and so this
16      schedule is a result of that expectation of
17      Visa/MasterCard net proceeds that they would
18      get and it described the weekly and daily
19      payments that would come to us in
20      satisfaction of our postage financing, in
21      satisfaction of our advance.
22  Q.  Would you instruct FNBL to pay Museum
23      Publications of America weekly, as it
24      appears on this chart?
25  A.  Well, this has both weekly and daily, and

Page 95

1       this varied.  I don't remember exactly how
2       this was implemented, but it was normally
3       implemented as a percentage of the net
4       proceeds, which this prediction -- which
5       would approximate this prediction.  It
6       wouldn't be -- necessarily be exactly this.
7       There were some occasions when we figured
8       out what the schedule was and we took
9       exactly this out.  When I say we took it
10      out, we instructed First of Louisville to --
11      or that was part of our instructions to
12      First of Louisville.  First of Louisville,
13      as I think is clear, had no idea what was
14      going on.  If they didn't trust us, this
15      wouldn't have worked, because they didn't
16      have any idea whether the funds were going
17      to the right place.  So we always looked at
18      it as though we really controlled the whole
19      process.
20  Q.  So you would instruct FNBL to forward a
21      percentage of the credit card receipts due
22      the merchant -- the net proceeds due the
23      merchant?
24  A.  I think, in most cases, that was true.
25      Sometimes we would instruct them to pay a

Page 96

1       fixed amount based on the original
2       projection.
3   Q.  Would FNBL pay Litle & Company daily?
4   A.  Yes.  All this process worked every day.
5       Did they pay on any other basis,
6       periodically or otherwise?
7   A.  No.  As far as they were concerned, they
8       sent out wires every day.  Now, some of the
9       wires paying off third parties might not go
10      every day, but our instructions to them went
11      every day, and they followed our
12      instructions every day, bank day.
13  Q.  What are examples of other instructions you
14      would give to pay third parties?
15  A.  The fulfillment companies that we were
16      talking about.  Depending on how many
17      shipments -- well, what we would do is, that
18      would typically be an approximation of the
19      fulfillment costs, and for every sale
20      transaction that we got, we would do a
21      calculation that was something like four
22      dollars plus four percent of sales or
23      something like that.  We'd figure that out
24      and that would be part of our instructions
25      to First of Louisville, and we would pay the

Page 97

1       fulfillment guys every single day.  So the
2       shipments they made on Monday, they would be
3       paid for on Tuesday or Wednesday.  Sometimes
4       the money was delayed.
5   Q.  Would you ever instruct FNBL to pay, you
6       know, every other day or multiple times per
7       day?
8   A.  Well, no.  FNBL only really sent -- FNBL,
9       they would always pay, according to our
10      instructions every day.  Sometimes our
11      instructions didn't include a merchant --
12      maybe the merchant didn't send us a
13      settlement file that day or maybe the
14      merchant sent us more refunds than sales.
15      So we would instruct -- that would be ACH
16      debit to the account where we'd actually
17      take money out of the merchant's account,
18      but we did give instructions every day.
19      Whether those instructions involved an
20      individual merchant or any of these programs
21      every single day or not, just depended on
22      the circumstances.
23  Q.  So if a merchant is included in those
24      instructions to FNBL, FNBL would make daily
25      payments to those merchants?

Page 98

1  A.  Yeah.
2  Q.  Did you ever instruct FNBL to pay on a
3     per-transaction basis?
4  A.  They had no facility to do that.  Oh, I
5     suppose we did.  If somebody sent us one
6     transaction, the wire for that day would be
7     for one transaction, but the instructions
8     were always for the, you know, total amounts
9     for a given event.
10  Q.  When Litle & Company received these payments
11     from FNBL, similar to the schedule that's
12     reflected on Page 3 of Litle 7, did Litle &
13     Company apply those payments to the postage
14     advance obligation of the merchant?
15  A.  Yes, in the sense that we determined what
16     the total amount, the postage advance, plus
17     our fee, and we -- as the program developed,
18     we made it clear that our fee was the first
19     thing paid, and then they -- the transfers
20     kept coming until the total advance, plus
21     fee, was paid off, and then the payments,
22     the X payments to the third party, in this
23     case, us, stopped.
24  Q.  So as those payments came in, Litle &
25     Company reduced the outstanding obligation

Page 99

1     of the merchant?
2          MR. EDELMAN:  Objection.  Leading.
3  A.  Yes.  That's true.
4  Q.  How would FNBL forward those payments to
5     Litle & Company?  I'm sorry.  Forward the
6     payments pursuant to the schedule and the
7     Demand Promissory Note in Litle 7?
8  A.  It would either be by wire or by ACH.  The
9     bulk payments -- the wires to us, I don't
10     remember whether they were wire or ACH, but
11     they were some form of electronic payment.
12  Q.  What was a typical percentage of credit card
13     receivables that you would instruct FNBL to
14     forward to Litle & Company?
15          MR. EDELMAN:  Objection.  Vague and
16     ambiguous.  Lack of foundation.
17  A.  I don't think there was a typical.  It
18     varied a lot.  I don't think it would have
19     ever been less than five percent and ever,
20     obviously, more than a hundred percent, but
21     that was the range.
22  Q.  Somewhere between five and a hundred
23     percent; right?
24  A.  Right, and it might have been less than
25     that, too.  I can't imagine we would have

Page 100

1     done it for less than five percent.
2          (Five-page document beginning with
3     Interoffice Memorandum dated
4     January 24, 1990 is marked Exhibit
5     Number 8 for Identification.)
6  Q.  I'm handing you what has been marked Litle
7     8, which appears to be an Interoffice
8     Memorandum from you to John Shirey and
9     copied, Steve Tritman, dated January 24,
10     1990, and the subject is "New Product -
11     Postage Advance."  Is that right?
12  A.  Yeah.
13  Q.  Have you seen this letter before?
14  A.  Yes.  I wrote it.
15  Q.  Could you tell me what this letter relates
16     to?
17  A.  I guess this -- this was an internal memo
18     talking about a Postage Advance Program that
19     I had been thinking about and talking to
20     Exposures, actually, about.
21  Q.  And it appears that you attached a letter
22     from you to Allen Abbott on Page 3, which is
23     LI00065 --
24  A.  That's right.
25  Q.  -- dated December 27, 1989?

Page 101

1  A.  Yeah.  Wow, it went back quite a way, didn't
2     it.
3  Q.  Had you engaged in any postage advances
4     prior to this letter to Exposures?
5  A.  No.
6  Q.  If you look at the last page of the exhibit,
7     which is LI00067, it has an Excel
8     spreadsheet or a spreadsheet?
9  A.  Yeah.
10  Q.  Could you describe what the spreadsheet
11     contains?
12  A.  Yeah.  I'll have to study it, but in
13     general, what it did is, it outlined my then
14     concept of how the postage financing would
15     work, including what the fees would be and
16     how we would collect our fee -- or for
17     example advance, what the example advance
18     would be, how we would collect our fee, how
19     we would get paid back for the advance.
20  Q.  Does this show how, as Litle & Company
21     received payments -- or would receive
22     payments from FNBL, the merchant's
23     outstanding balance would be paid down?  If
24     you look at Column E.
25  A.  Yes.  In fact, Column E is what the

Page 102

1    principal balance outstanding is, and there
2    are actually two examples here, I guess.
3    Q.  What are the different examples?
4    A.  I'm trying to review this quickly, but one
5       looks like it's a postage advance of
6       $90,000, and the other looks like a postage
7       advance of $150,000.  There may be different
8       repayment schedules.  I'm not sure.  It
9       looks like it's trying to figure out how
10      long the money would be outstanding in a
11      typical -- for a catalog or with these
12      parameters in the collection.  I notice that
13      we were collecting our fee here as we
14      collect our principal, but that was too
15      complicated and we eventually just added it
16      to the principal as a fixed amount.
17   Q.  Was there a typical length of time a
18      merchant had to repay the cash advance?
19   A.  I think this was an analysis of how long we
20      thought it would be, and I remember coming
21      to the conclusion it would be about a six or
22      eight-week payback, and I suspect that this
23      had something to do with that analysis.
24   Q.  Does that apply to all postage advances that
25      Litle & Company made?

Page 103

1    A.  Yes, because the -- when a catalog is
2       mailed, the response curve for virtually all
3       catalogs are similar, and of course, we had
4       the experience because we had been in the
5       catalog business for ten years.
6    Q.  And the response curve, what is that?
7    A.  The response curve is, if you mail on day
8       one, how much business do you get on each
9       day subsequent to that, going out 90 days,
10      and after that, there's some residual amount
11      remaining, but if you plot that on a graph,
12      all the graphs for every catalog look about
13      the same.
14   Q.  I'd like to refer you back to Litle Exhibit
15      4, which is the Member Agreement --
16   A.  Yeah.
17   Q.  -- dated or signed in May or June of 1992,
18      as shown on LI00029.  Could you please turn
19      to page that's marked LI00020?
20   A.  Yeah.
21   Q.  In the left column, at the top, it says "4.
22      Reserve"?
23   A.  Yes.
24   Q.  You briefly described what a reserve account
25      is earlier, and I'd like you to walk us

Page 104

1    through -- well, how does the process you've
2       drawn on the board change for a reserve
3       account, if at all?
4    A.  A reserve account is a separate account that
5       we kept at First National Bank of
6       Louisville.  At some point prior to that
7       point, we kept it in our own bank account.
8       Again, that was because of Visa regulations
9       that it changed, but that was a separate
10      account in which we held our merchants'
11      money against possible losses or against
12      chargeback liability, and the reserve was
13      another way, which I didn't mention before,
14      but another way that money was transferred
15      from the First National Bank of Louisville,
16      general account, to the reserve, if we were
17      increasing the reserve, or it was
18      transferred from the reserve account back to
19      the First of Louisville distribution
20      account, and then distributed to the
21      merchant.  So that was -- so we instructed
22      First of Louisville to transfer money
23      between those two accounts and the reserve
24      account was held on behalf of the merchant.
25      No.  It was an account -- I don't know when

Page 105

1    this changed, but it was an account for the
2       benefit of Litle.  The money in the merchant
3       account at sometime was considered merchant
4       money.  These days, it's considered not
5       merchant money, a merchant receivable, but
6       it's held there to -- as a reserve against
7       potential chargeback liability.
8    Q.  Is it the same account to which FNBL would
9       forward credit card payments to the
10      merchant?
11   A.  No.
12   Q.  Is it the same account to which FNBL would
13      forward processing fees to Litle & Company?
14   A.  No.
15   Q.  What types of reserve accounts are there?
16      Let me rephrase.  Sorry.  What type of
17      reserve agreement -- what are the different
18      types of reserve agreements?
19   A.  Well, one of the things a payment processor
20      has is total control over that.  So you
21      know, on the fly, after the merchant signs
22      this, if we deem ourselves insecure, we can
23      invent any kind of reserve requirement
24      that's necessary.  Merchants often complain
25      loudly about that, but there are different

27 (Pages 102 to 105)

Page 106

1   kinds. Sometimes we take an amount of money
2   or we have transferred to the reserve
3   account, and the only transfers really are
4   between the distribution account and the
5   reserve account and the reserve account back
6   to the distribution account.
7   Q.  What is the distribution account?
8   A.  That is the First of Louisville account
9      that's involved in Z there, but the
10     different kinds of reserves is really how
11     it's paid and how it's returned to the
12     merchant. Sometimes it's paid in lump sum
13     and it just sits there. Sometimes it's a
14     percentage of the prior day's -- the prior
15     day's gross sales, typically not net
16     sales -- gross sales, and it builds up to
17     some number and then stops building up.
18     Sometimes it's something we call a rolling
19     reserve, which is a percentage of every
20     day's gross sales, and then let's say it's a
21     six-month rolling reserve, 180 days later,
22     the merchant gets back the money they put in
23     originally, but on the same day, they pay
24     the percentage of that day's sales. So the
25     rolling reserve tends to go up and down with

Page 107

1   the volume of the merchant's business.
2   There are all kinds of -- sometimes it's a
3   reserve that the merchant discovers that
4   they didn't get any money that day because
5   their chargebacks, based on our measurements
6   and our risk analysis, says that we're going
7   to get a hit. Sometimes we find out the
8   merchant isn't paying their merchandise
9   bills because they don't have enough cash
10  and then we have to protect ourselves.
11  Q.  Did Litle & Company ever require a merchant
12     to maintain a rolling reserve account?
13  A.  Yeah, I think so. I can't remember when the
14     first -- yeah, sure. That's not an unusual.
15  Q.  If you look at page LI00026 of Litle 4, the
16     bottom section of the page, it says "Net
17     chargeback reserve: Minimum net chargeback
18     reserve, $75,000." Could you explain what
19     that means?
20  A.  Oh, in this case, we had -- it looked like
21     we had a reserve of $75,000 in our
22     reserve -- in the First of Louisville
23     reserve account at all times, and I don't
24     remember what -- how we put it in there, but
25     obviously, this says it wouldn't go below

Page 108

1   $75,000.
2   Q.  And you said withdrawals from the reserve
3      account might be made by FNBL, in the case
4      of chargebacks, for example?
5   A.  No. What happened is, the reserve account
6      just sat there. The only time it changed
7      was if we said "Put some more money in the
8      reserve account from the distribution
9      account" or "Put some money from the reserve
10     account into the distribution account."
11     Chargebacks were actually netted against the
12     proceeds we would send to the merchant in
13     Step Z. So chargebacks were deducted from
14     the normal distribution account, unless
15     there was nothing there, and then we'd go to
16     the reserve account.
17  Q.  Okay. In the situation where net proceeds
18     was zero or too small to cover the
19     chargebacks --
20  A.  That's right.
21  Q.  -- FNBL would withdraw money from the
22     reserve account?
23  A.  Based on our instruction. They didn't know
24     that somebody had net proceeds of less than
25     zero. They didn't know any of that stuff.

Page 109

1   Q.  If you instructed FNBL to deposit money into
2      the reserve account, where would that money
3      come from?
4   A.  It would come from the -- typically, from
5      the distribution account because we
6      typically had a deal where the merchant
7      could build up the reserve account; and so
8      we would take it out of their net proceeds
9      to build it up in the reserve account.
10     Sometimes, if we took on a new merchant that
11     we required a reserve right away, they would
12     wire the money to the reserve account -- no,
13     they wouldn't wire the money to the reserve
14     account. They typically wired it to the
15     distribution account, and then we'd put it
16     in the reserve account. Maybe they -- in
17     that case, that would be one of the few
18     places that I could imagine a check would be
19     used in this whole process, but --
20  Q.  Only in the beginning, though, to create a
21     balance?
22  A.  Yeah. It wasn't a routine thing. The
23     reason they didn't wire directly in and out
24     of the reserve, to my recollection, is we
25     didn't want them to know what the reserve

28 (Pages 106 to 109)

1     account was. We didn't want them to see
2     what the routing numbers or have any idea to
3     you to find that money, if they decided they
4     wanted to get their reserve out without
5     letting us know.
6  Q. So am I correct saying that, if the reserve
7     account balance in the Museum Publications
8     of America, Exhibit 4, example, if that
9     account fell below $75,000, Litle & Company
10     would instruct FNBL to forward a portion
11     of the net proceeds to the reserve account?
12         MR. EDELMAN: Objection.
13  A. Absolutely.
14  Q. FNBL would forward a portion of the reserve
15     proceeds to the reserve account and the
16     remaining portion to Museum Publications of
17     America?
18  A. That's right, unless we deducted some more
19     for postage financing or something like
20     that.
21  Q. And were each of those transfers electronic
22     transfers?
23  A. Yes.
24  Q. By wire or ACH?
25  A. Right. Even within First of Louisville, it

1     was an electronic transfer. I should add,
2     though, that when you say "Did they process
3     that from Museum Collections," it was,
4     again, all done in bulk. We had the
5     details. We said "This is how much it adds
6     up. Today, transfer this much out of the
7     distribution account into the reserve
8     account."
9  Q. Did you account internally for the balance
10     in that reserve account for each individual
11     merchant?
12  A. Yes.
13         MR. GRAY: One last thing before
14     the lunch break.
15         (Five-page document entitled
16         "Schedule E-1, Promissory Note for
17         Postage Advances" is marked Exhibit
18         Number 9 for Identification.)
19  Q. I'm handing you what has been marked Litle
20     Exhibit 9, which says "Schedule E-1,
21     Promissory Note for Postage Advances,"
22     signed by Allen Abbott of Exposures; is that
23     correct?
24  A. That's right.
25  Q. And is this the same Exposures that's

1     referenced in the Interoffice Memorandum,
2     Litle Exhibit 8?
3  A. Yes.
4  Q. And this agreement reflects the
5     negotiations -- or does this agreement
6     reflect the negotiations between you and
7     Allen Abbott?
8  A. Yes.
9  Q. Are there any differences between Litle
10     Exhibit 7 and Litle Exhibit 9, the two
11     promissory notes? Let me rephrase. Any
12     differences in the way the system worked or
13     the process.
14  A. Not really. There probably were slight
15     improvements between when we first did the
16     Exposures in the way the agreement was
17     written. I think, by that time, by
18     Exhibit 7, we made it clear we were
19     collecting our fee first, for example, and
20     there probably were mostly contractual
21     differences, but the way the system actually
22     worked was identical.
23  Q. Is the Member Agreement referred to in Litle
24     Exhibit 9 substantially similar to the
25     Member Agreement in Litle Exhibit 4?

1  A. Yes.
2  Q. And Litle Exhibit 9, does it describe the
3     process for postage advancing that you've
4     been testifying about today?
5  A. I don't know if it describes the whole
6     thing, but it certainly covers what I was
7     talking about. It doesn't describe the
8     whole thing, but it is the agreement that
9     goes with what I was describing.
10  Q. Okay.
11         MR. EDELMAN: We can discuss how to
12     proceed. It seems to me we should finish
13     questioning before lunch.
14         MR. SMITH: Do you want to go off
15     the record for a second?
16         (Discussion off the record.)
17         THE VIDEOGRAPHER: Off the record
18     at 12:07.
19         (Lunch recess.)
20         AFTERNOON SESSION
21         THE VIDEOGRAPHER: On the record at
22     1:15.
23         MR. GRAY: Before we get started,
24     I'll put this on the record, that I've asked
25     Denise to copy Pages 78 through 82 of the

Page 114

1 September issue of "Inc., 500," which is
2 marked Litle Exhibit 2.
3        I'd also like to mark the board as
4 a Litle Exhibit.
5        MR. EDELMAN:  I assume we got a
6 good shot on the video of the board.
7        MR. SMITH:  I'd just like to note
8 for the record that the diagram changed
9 during different points of the testimony.
10 So this is the final, today, version.
11        (Diagram on white board marked
12        Exhibit Number 10 for
13        Identification.)
14        (Discussion off the record.)
15        MR. GRAY:  Everyone approves.
16 Q.  (Cont'd. By Mr. Gray)  One final question
17 about reserve accounts, which we were
18 talking about just before the break.  As
19 described in Litle Exhibit 4, the Member
20 Agreement, the reserve account -- was the
21 reserve account a pre-existing obligation
22 for the merchant?
23        MR. SMITH:  Objection.
24 A.  It was an obligation for the merchant to
25 fund it, yes, if that's your question.

Page 115

1 Q.  It is the question, and is that pursuant to
2 the Member Agreement, Exhibit 4?
3 A.  Yes.  Yes, it is.
4 Q.  Also, to clarify, Litle Exhibit 10, the
5 chart on the board, in a transaction where
6 the card is present, could you explain one
7 more time what changes about the diagram?
8 A.  About the diagram itself, nothing changes.
9 How the authorizations are obtained and how
10 the settlement is made for a card-present is
11 generally done through a terminal that is a
12 card swipe terminal.
13 Q.  For the card-present transactions?
14 A.  For the card-present transactions.
15 Sometimes it's done through a cash register
16 that's connected to a central computer.
17 There are all kinds of ways of doing it, but
18 at some point in time, the card is present
19 in the transaction, where most of the
20 transactions that we did, but certainly not
21 all, the card wasn't present in the
22 transaction, so the information, instead of
23 being obtained by a card swipe, was obtained
24 because somebody keyed it into a port or
25 entry terminal.

Page 116

1 Q.  Earlier, you mentioned that FNBL will
2 sometimes pay fulfillment centers; is that
3 correct?
4 A.  Yes.  The Z leg of that diagram, instead of
5 going to a merchant, we'd instruct them to
6 wire money to fulfillment centers.
7 Q.  Would you instruct them to wire the entire
8 amount or a portion of it?
9 A.  It depended -- no.  In that case, it was
10 virtually always.  I don't remember any
11 exceptions, but it was a portion of the
12 amount that was an approximation for the
13 per-order value of their fulfillment
14 services.  They would true it up at the end
15 of the month, typically.
16 Q.  In that situation, would FNBL electronically
17 forward a portion of the credit card
18 receivables, of the net proceeds, to the
19 fulfillment center?
20 A.  Based on our instruction, and all they knew
21 was that it was a bank account.  They didn't
22 know whether it was a fulfillment center or
23 who it was, but the answer is yes.
24 Q.  And the remaining portion, would FNBL
25 electronically forward that to the catalog

Page 117

1 company?
2 A.  Yes.
3 Q.  So the fulfillment center would be the third
4 party in Step X in your chart, Litle Exhibit
5 10?
6 A.  Yes.
7 Q.  And did you say you had about 12 catalog
8 companies?
9 A.  I don't really remember.  It was between ten
10 and 20, probably.  Something like that, that
11 actually used those services.  We certainly
12 talked about it to other companies that may
13 have decided not to use the service or
14 something.
15 Q.  But 12 of those companies used your services
16 of diverting a portion of the funds to the
17 fulfillment center --
18        MR. EDELMAN:  Objection.  Asked and
19 answered.
20 Q.  -- is that correct?
21 A.  I would say it's approximately 12.  I don't
22 know the number and have no way of figuring
23 that out, exactly.
24 Q.  We talked a little bit earlier about a
25 merchant renting or purchasing equipment.

Page 118

1  A. Right.
2  Q. And would the merchant sometimes purchase or
3     rent that equipment from a third party?
4  A. They may have. I don't remember that
5     happening very often, but it might have
6     happened. We use NPC as a third party to
7     manage the whole terminal process on our
8     behalf, and maybe I would consider them a
9     third party. It didn't have to be NPC. It
10    could have been anybody.
11 Q. So if the merchant would have rented or did
12    rent or purchase equipment, such as a credit
13    card terminal, then you could -- Litle &
14    Company could have instructed FNBL to divert
15    a portion of the credit card payments?
16 A. That's right.
17 Q. And would those payments have been sent
18    electronically?
19       MR. EDELMAN: Objection.
20    Incomplete, hypothetical, lack of
21    foundation.
22 A. The payments would have been deducted from
23    the Z leg there, and so the merchant would
24    have gotten the net amount after those
25    payments were deducted.

Page 119

1  Q. Can you think of any examples of a third
2     party who would have rented or sold that
3     equipment, such as a terminal, to the
4     merchant?
5  A. Yeah. NPC did that. That was one of the
6     things they did. NDC, which is on there,
7     too, did that. Today's Global Payments,
8     they did that. Virtually, every payment
9     processor that was in the card-present
10    world, which was virtually every payment
11    processor there was, other than us, had
12    terminal functions. There were separate
13    companies -- I don't remember their names --
14    but I know that there were separate
15    companies that that's all they did. They
16    rendered and serviced terminals, and the
17    major asset they had was somebody in every
18    metropolitan area that could go and replace
19    a broken terminal within 20 minutes.
20 Q. In the situation where NDC provided the
21    terminal, would Litle & Company instruct
22    FNBL to pay a portion of the net proceeds to
23    NPC?
24 A. That was a little more complicated. NDC was
25    actually -- their bills came through NPC to

Page 120

1     us. So you're really getting convoluted,
2     but -- yeah. Actually, what we would have
3     done was had First of Louisville transfer
4     money to NPC's account, which would have
5     been another account in First of Louisville
6     that NPC owned.
7  Q. Okay. Would that money have been
8     electronically forwarded?
9  A. Yeah. It's all part of the ACH system, and
10    the ACH system was so automated, and it is
11    even more so now, that that's the way you
12    make transfers between two accounts in the
13    same bank on a regular basis.
14 Q. And taking one step back to the fulfillment
15    part that you described, the fulfillment
16    situation with a catalog company --
17 A. Yeah.
18 Q. -- did Litle & Company instruct FNBL to
19    forward a portion of the payment to the
20    fulfillment center to satisfy an obligation
21    of the merchant to the fulfillment center?
22 A. Yeah. The merchant owed the fulfillment
23    center, on a per-shipment basis, a fee, and
24    so that's what we forwarded on the
25    merchant's behalf to the fulfillment

Page 121

1     center.
2  Q. And how did you know what portion that
3     should be?
4  A. We didn't know exactly. What we did is we
5     made an approximation that usually was some
6     fixed amount, plus a percentage of the
7     transaction. So any transactions we'd
8     settle, we would send four dollars, plus
9     four percent of the face value to the
10    fulfillment center. Obviously, that wasn't
11    the exact amount, and at the end of a month,
12    say -- I think that's typically how they did
13    it -- the merchant and the fulfillment
14    company would true up whatever differential
15    there was at the end of the month.
16 Q. Were those fees outlined in the three-party
17    agreement you mentioned earlier?
18 A. Yeah, and they could change -- and they
19    changed as people discovered that the
20    approximation was a little higher or a
21    little low.
22 Q. What else was included in the three-party
23    agreement?
24 A. The obligation for the fulfillment company,
25    a performance obligation, as we talked about

Page 122

1    it, and the performance obligation was
2    something that the fulfillment company is
3    legally required to do anyway, and that is,
4    don't charge the customer until the goods
5    are shipped.
6    Q. What are the obligations of the catalog
7       company?
8    A. In what sense?
9    Q. In the three-party agreement, did the
10      merchant have any obligations to the
11      fulfillment company?
12   A. The merchant had to pay the fulfillment
13      company for their services.
14   Q. And the obligations of Litle & Company?
15   A. We had to pay the fulfillment company on
16      behalf of the merchant and we had our normal
17      obligations as -- for routine payment
18      processing, as well.
19   Q. That were outlined in the Member Agreement?
20   A. Yes.
21           (One-page document entitled "US
22           6,941,281 B1" is marked Exhibit
23           Number 11 for Identification.)
24   Q. I'm handing you what has been marked Litle
25      Exhibit 11, which are the claims of United

Page 123

1    States Patent 6941281. It shows -- it's
2    just the last page of the Patent Column 7
3    and 8.
4           MR. EDELMAN: I'll object to the
5    extent that you're excerpting a page from an
6    entire patent and also not showing Mr. Litle
7    the proposed construction of the terms of
8    the patent, and also not show him the
9    arguments the parties have made with the
10   file list of the patent.
11   Q. Okay, could you please read Claims 1 and 10
12      to yourself?
13          MR. SMITH: Just 1 and 10?
14   Q. Just 1 and 10.
15   A. All right.
16   Q. Do you understand those two claims?
17          MR. EDELMAN: Same objections.
18   A. I think so.
19          (Document entitled "Little & Co.,
20          Invalidity Claim Chart, United
21          States Patent No. 6,941,281" is
22          marked Exhibit Number 12 for
23          Identification.)
24   Q. I'm handing you what has been marked Litle
25      Exhibit 12, which is a chart that we have

Page 124

1    prepared with two columns. The left column
2    lists the claims of the patent, which is the
3    claims on Litle Exhibit 11 that you just
4    read, 1 and 10, as well as all the other
5    claims which are printed in the left column,
6    and in the right column, we've cited to
7    portions of the Litle documents that you've
8    testified here today that refer to the
9    elements of the claim that are listed in the
10   left-hand column, and what I'd like to ask
11   you to do is -- we'll go through this row by
12   row and I'd like you to read the right-hand
13   column, I'll read the left-hand column to
14   you, and ask you to tell us if what we've
15   cited in the right-hand column is accurate.
16          MR. EDELMAN: Excuse me. Before
17   you read that, can I have a representation
18   as to whether this was provided --
19          MR. GRAY: Yes, it was.
20          MR. EDELMAN: It was provided when?
21          MR. GRAY: Last week sometime.
22          MR. EDELMAN: Okay.
23          MR. SMITH: I'd like to note, we're
24   not going to object to the line of
25   questioning, certainly, but Mr. Litle is

Page 125

1    here as a fact witness. He is not rendering
2    a conclusion on patent validity. He is here
3    simply to testify as a factual witness. I
4    just wanted to make that clear before --
5          MR. EDELMAN: And again, I want to
6    object to the extent that this is being
7    shown to Mr. Litle without the discussion of
8    what the terms are construed to mean, or the
9    parties' construction. It's misleading,
10   putting the witness in an impossible
11   situation. If you want to do it, go ahead.
12   Q. You testified that you understand the terms
13      that are used in the patent; is that
14      correct?
15          MR. EDELMAN: Same objections.
16   A. Yeah, I think so, but if we get to some I
17      don't understand, then I'll say that.
18   Q. Please do. So on Page 1 of Litle Exhibit
19      12, in the first row, the claim recites,
20      "A method for automated payment,
21      comprising."
22   A. That's not exactly a complete sentence.
23   Q. No, and what we've done, and the reason I
24      had you read Claims 1 through 10, is because
25      we have broken down the claims --

32 (Pages 122 to 125)

Page 126

1  A. Okay.
2  Q. -- and if you would like to refer back to
3     Litle Exhibit 11, right there, you can read
4     the full claim in context.
5  A. Okay.
6  Q. So "A method for automated payment," and
7     what we've listed here are all the documents
8     you've testified about today and stated
9     "Litle & Company utilized a method for
10    automated payments as repayment of
11    obligations owed by merchants either for
12    postage or cash advances." Is that correct?
13 A. Yeah, and also, the reserves and something
14    like the Hanover Direct obligation. The
15    other kinds of obligations that we've talked
16    about. So it isn't just for postage or cash
17    advances.
18 Q. Was the fulfillment center operation that
19    you just testified about, was that a method
20    of automated payment?
21 A. To the fulfillment center?
22 Q. Yes.
23 A. Yes.
24 Q. What about for the wire fee you discussed?
25 A. For the what?

Page 127

1  Q. For the wire fee; was that a method for
2     automated payment?
3  A. Yes.
4  Q. And was equipment -- payments for equipment
5     rental and purchase, was that a method for
6     automated payment?
7  A. Yes.
8  Q. Looking now at the second row of the first
9     page of Litle 12, the claim says "At a
10    merchant, accepting a customer identifier as
11    payment from the customer." Can you look at
12    the right-hand column and tell me whether or
13    not those citations from the Litle documents
14    show that a merchant accepted the customer
15    identifier as payment from the customer?
16       MR. EDELMAN: Objection. Calls for
17    claim construction, beyond the scope of the
18    testimony, misleading, lack of foundation.
19 Q. I absolutely do not want you to try to
20    construe the claims.
21       MR. EDELMAN: He has to construe
22    the claim to answer the question.
23       MR. SCHUURMAN: Why don't you ask
24    him during your cross and stop interfering.
25    Go ahead.

Page 128

1        MR. EDELMAN: I can put my
2  objections on the record.
3        MR. SCHUURMAN: Well, make them
4  short.
5        MR. EDELMAN: I will make them as
6  long as I want to make them.
7  Q. Based on your understanding after being in
8     the card processing industry for about 25
9     years --
10 A. More than that.
11 Q. I'm sorry? Longer than that?
12       MR. SMITH: 25-plus.
13 Q. 25-plus years.
14       MR. EDELMAN: Don't make him a
15 patent attorney.
16 Q. Do the --
17       MR. GRAY: I'm sorry. Is that an
18 objection?
19       MR. EDELMAN: Yes, it is.
20       MR. GRAY: I didn't hear
21 "objection."
22       MR. EDELMAN: Objection. It
23 doesn't make him a patent attorney. Go
24 ahead.
25       MR. GRAY: Please limit your

Page 129

1  objections to objections as to form.
2        MR. EDELMAN: It was a beautiful
3  objection as to form.
4  Q. Okay. Does the right-hand column, does that
5     recite citations to the documents you've
6     testified about today that show a merchant
7     accepts a customer identifier as payment
8     from a customer?
9        MR. EDELMAN: Same objection.
10 Q. Please take as much time as you need.
11 A. And the question is, at that time, did we
12    accept the customer identifier as a payment
13    for transaction, and the answer is we did.
14 Q. The merchants did or Litle & Company did?
15 A. The merchants accepted it.
16 Q. As described in the quotes in this chart
17    that you're reading?
18       MR. EDELMAN: Same objection.
19 A. Right.
20 Q. Okay. Looking at the bottom row on Page 2
21    of Litle Exhibit 12, the claim states "and
22    electronically forwarding information
23    related to the payment to a computerized
24    merchant processor." Could you please tell
25    me whether the cites in the right-hand

33 (Pages 126 to 129)

Page 130

1 column illustrate that Litle & Company
2 electronically -- or that the merchant
3 electronically forwarded information related
4 to the payment to Litle & Company?
5     MR. EDELMAN:  Objection.  Calls for
6 claim construction, beyond beyond the scope
7 of the deposition, lack of foundation.
8 A.  Yes.
9 Q.  And to clarify, you said that using --
10 pursuant to the Member Agreement, which is
11 Litle Exhibit 4, the merchant would accept
12 credit cards, debit cards, and charge cards,
13 such as an American Express card?
14 A.  That's correct.
15 Q.  And did you also testify that the merchant
16 would accept those cards using a telephone
17 and inputting the credit card number into a
18 computer?
19 A.  That's one way, yes.
20     MR. EDELMAN:  I just want to put an
21 objection on the record.  It wasn't clear to
22 me -- vague and ambiguous as to which
23 merchants you're referring to.
24 Q.  Which merchants would accept a credit card
25 via telephone?

Page 131

1 A.  That's how the card-not-present merchants
2 received most of their transactions.  When
3 they didn't receive them by telephone was
4 when they -- or by an order blank sent
5 through the mail.  It was typically at a
6 warehouse sale or something like that.  Then
7 they were operating just like a normal
8 retailer operating.
9 Q.  And was the process by which those merchants
10 forwarded information, such as the card,
11 information and payment amount, to Litle &
12 Company in the authorization step in Litle
13 10, was that process different for
14 card-not-present or card-present
15 transactions?
16 A.  How they actually forwarded the information
17 to us?  Yeah.  Actually, sometimes we got
18 the settlement information -- well, the
19 authorization process might not -- I can't
20 remember.  It depended on the situation.
21 Might not have actually gone through us, but
22 we were responsible for it.  It might have
23 gone directly to NDC, and then that
24 information would have come to us through
25 NDC, the authorization information, which we

Page 132

1 needed for our process, and then the
2 settlement information might have gone to
3 NDC first and then through NPC, but it was
4 part of our contract, and the settlement
5 information sometimes then went directly to
6 us.  Could go any one of those ways.
7 Q.  Whether the card was present or not present,
8 was the information related to the payment,
9 such as the card number and the payment
10 amount --
11 A.  Yes.
12 Q.  -- was that electronically forwarded?
13 A.  Yes.  In the card-not-present, it was always
14 directly forwarded to us.
15 Q.  Electronically?
16 A.  Yes.  When it was card-not-present, it was
17 always forwarded electronically, but the
18 route that it took could vary, depending on
19 the circumstances.
20 Q.  Okay.  Thank you.  On Page 3 of Litle
21 Exhibit 12, the next portion of the claim
22 states "at the computerized merchant
23 processor, acquiring the information related
24 to the payment from the merchant,
25 authorizing and settling the payment, and

Page 133

1 forwarding at least a portion of the payment
2 to a computerized payment receiver as
3 payment of at least a portion of an
4 obligation made by the merchant."
5 A.  Uh-huh.
6 Q.  Could you please read the citations in the
7 right-hand column, and it flows over on to
8 Page 4 and 5, and tell me whether that
9 accurately recites the portions of the
10 agreements you've testified to today.
11     MR. EDELMAN:  I'm sorry.  Was your
12 question getting at whether it reflects the
13 language of the Claim 10?
14     MR. GRAY:  No.  I asked whether it
15 accurately reflects --
16     MR. EDELMAN:  Reflects the
17 agreements.
18 Q.  Do you understand my question?
19 A.  Yeah.  You are asking -- I'll read it back.
20 As I understand it, you're asking me to look
21 at the citations and without trying to
22 interpret whether they comply with the
23 patent or not, you're asking whether those
24 citations are accurate.  Is that true?
25 Q.  Right.

34 (Pages 130 to 133)

1        MR. EDELMAN:  That's fine.
2  A.  I have a question.  In the first sentence,
3       it says, at the end, "Management fee to
4       Litle & Company, or order."  I'm not sure
5       that's either what it says or what it should
6       have said.
7  Q.  I believe that is what it says.  That's
8       Litle Exhibit 7, I believe?
9        MR. EDELMAN:  I'm sorry.  Where is
10      the witness referring?
11       MR. GRAY:  The bottom of Page 3,
12      the bottom paragraph in the right column,
13      the fourth line down.
14       MR. EDELMAN:  Oh, I see it.
15      Thanks.
16  A.  Yeah, I think that was a typo and it should
17      have probably said -- it should have
18      probably referred to what we were thinking
19      of setting up or maybe had set up as a
20      separate operation to do postage financing.
21  Q.  Okay.  Outside of Litle & Company?
22  A.  Right.  Well, it would have been owned by
23      roughly the same people, but it would have
24      been a separate operation.
25  Q.  Do you have any other questions about the

1       citations in the right column?
2  A.  Yeah.  I'd like to look at the definition of
3       "prepayments."
4  Q.  That's in the Member Agreement?
5  A.  Okay.  Yes, that's accurate.
6  Q.  Do all these citations on Pages 3 through 5
7       accurately reflect your understanding of
8       what the language in the left column
9       requires?
10       MR. EDELMAN:  Same objections.
11  A.  As I understand it, yes.
12  Q.  And do you have any questions about what
13      that -- do you understand what the claim
14      language in the left-hand column is on those
15      pages?
16       MR. EDELMAN:  Same objection.
17       MR. SMITH:  Objection.  I think
18      "claim language" is misleading.  He can
19      talk about what the words say, but "claim
20      language" is a big problem.
21  Q.  The language that's printed in the left-hand
22      column, do the right-hand citations
23      accurately reflect your understanding?
24  A.  As a layman's understanding because lawyers
25      always interpret stuff a little

1       differently.
2        MR. SMITH:  He knows too well.
3        MR. EDELMAN:  Objection.
4  A.  And then they charge you for it.
5  Q.  Your understanding, though, as someone who
6       has been in the payment processing
7       industry for 25-plus years.
8  A.  I would say I understand what the left-hand
9       column is getting at and the right-hand
10      column is a reflection of exactly that --
11  Q.  Okay.
12  A.  -- and matches what our documentation was.
13  Q.  And I'm going to be asking the same
14      questions about each row going throughout
15      this document.  So beginning on Page 5,
16      would you please read the citations in the
17      right column?
18  A.  The question is the same; is this an
19      accurate representation?
20  Q.  Yes.
21  A.  Yes, it is.
22  Q.  Do those citations accurately reflect your
23      understanding of the description in the
24      left-hand column?
25       MR. EDELMAN:  Same objections.

1  A.  Yes.  I understand the computer payment
2       receiver as what I call the third party, and
3       if that's the case, yes, it does accurately
4       reflect it.
5  Q.  Looking at the next row, and the left-hand
6       column begins with the Number 2 --
7  A.  Uh-huh.
8  Q.  -- it says "The method of claim 1 wherein
9       the accepting step comprises accepting a
10      credit card number as the customer
11      identifier."  Could you please look at
12      what's cited in the right-hand column and
13      tell me if that accurately reflects the
14      Litle documents and -- well, if it
15      accurately reflects that Litle accepted
16      credit card numbers?  Sorry.  Let me start
17      over.  That the merchants who processed
18      through Litle accepted credit card numbers.
19       MR. EDELMAN:  Same objections.
20       MR. SMITH:  Do you understand that
21      question?
22       THE WITNESS:  I think so.
23  Q.  Let me rephrase.  Sorry.  Could you look at
24      the citations in the right-hand column and
25      tell me whether those citations accurately

35 (Pages 134 to 137)

Page 138

1    illustrate that Litle & Company processed
2    credit card transactions for merchants?
3         MR. EDELMAN:  Same objections.
4    A.  Yes.  That was our service, processing
5    credit cards for merchants.
6    Q.  And on Page 6 of Litle Exhibit 12, the
7    bottom row begins with the number 3, could
8    you please look at the right-hand column
9    and, disregarding the first paragraph,
10    please tell me whether those citations --
11    A.  Disregarding the first paragraph?
12    Q.  Right, disregarding, and was your testimony
13    earlier that Litle would process debit cards
14    on behalf of merchants?
15    A.  Yes, but they weren't necessarily identified
16    as debit cards.
17    Q.  Right.
18    A.  In fact, they were necessarily by the
19    payment networks disguised as debit cards.
20    Q.  Could you please read the citations to the
21    documents and tell me whether these
22    citations showed that Litle accepted debit
23    cards -- sorry -- that Litle processed
24    transactions where debit cards were used at
25    the merchant?

Page 139

1         MR. EDELMAN:  Same objections.
2    A.  And the question again, is?
3    Q.  Whether these citations in the right-hand
4    column illustrate that Litle would process
5    debit card transactions for merchants.
6    A.  Yes.
7    Q.  Do you know what a Smart Card is?
8    A.  Yes.
9    Q.  What is a Smart Card?
10    A.  It's typically a card with a chip on it that
11    carries information about an individual.  In
12    those days, they were talking about Smart
13    Cards carrying your medical history and all
14    kinds of stuff on it, and so they would have
15    represented a distributor database of a
16    hundred million nodes, which was in my view
17    ridiculous, and I said so on regular
18    occasions in front of a bunch of credit card
19    people.  Now, it's really become a card that
20    carries personal identification
21    information.  So a Smart Card is usually an
22    identification device.  Prepaid phone cards
23    could be considered Smart Cards because they
24    stored information on them, but I always
25    looked at Smart Cards as those that had a

Page 140

1    computer chip on them that did something.
2    There are cards now that carry changing
3    passwords on it, sort of like an RSA
4    password.  There are cards that you can
5    stick your thumb over and it can identify
6    the fact that your thumb print is really
7    your thumb print and not somebody else's.  A
8    Smart Card encompasses all kinds of stuff.
9    A Smart Card typically had to be used in
10    conjunction with some sort of terminal
11    device.  So we didn't handle any Smart Cards
12    that I know, except that it's also my
13    understanding that some Smart Cards had Visa
14    or MasterCard identification numbers on
15    them, and if that case, if somebody gave
16    those Visa and MasterCard identification
17    numbers over the telephone as a
18    card-not-present card, we would handle it
19    like we'd handle any other credit card,
20    although we wouldn't necessarily know it was
21    a Smart Card.
22    Q.  Could you look at Page 8 of Litle Exhibit
23    12, the very bottom line, and Page 9, and
24    tell me whether the citations to the Litle
25    documents in the right-hand column

Page 141

1    illustrate that Litle processed charge card
2    transactions for its merchants.
3         MR. EDELMAN:  Same objections as
4    before.
5    A.  Yes.
6    Q.  And on the row that's numbered 6, would you
7    please read the citations in the right-hand
8    column and tell me whether that accurately
9    illustrates that the merchants for whom
10    Litle would process transactions would
11    sometimes accept credit cards at their
12    warehouse sales or otherwise at the merchant
13    location?
14         MR. EDELMAN:  Same objections.
15    A.  Well, interestingly enough,
16    card-not-present, based on the Visa and
17    MasterCard regulations, the
18    card-not-presents were accepted at the
19    merchant location that was their office or
20    the place where they were accepting orders,
21    and that location, I think in those days, it
22    changed, had to be identified, by city and
23    state.  So that was true with
24    card-not-present, but card present is more
25    obvious.  Card-presents were done -- one of

36 (Pages 138 to 141)

Page 142

1  the things that I actually got Visa and
2  MasterCard to do was to allow us, instead of
3  putting the city and state as an identifier
4  for where the card-not-present transactions
5  came from, allowing them -- or now, it's a
6  requirement -- to put the 800 number of the
7  customer service number on it.  I don't
8  remember at this time whether the actual
9  city and state was still required, but this
10  was interestingly enough true for
11  card-not-present, as well as card-present
12  transactions.
13 Q.  On Page 10, Row 7, would you please tell me
14  whether the right-hand column illustrates
15  how merchants for whom Litle would process
16  transactions would electronically accept
17  cards?
18         MR. EDELMAN:  Same objections.
19         MR. SMITH:  It looks like, on some
20  of this, there's some editorial, as well.
21  So within the quotes is what came from the
22  documents; is that right?
23         MR. GRAY:  Right.
24         MR. SMITH:  Are you asking him to
25  verify what is in the parentheses?

Page 143

1         MR. GRAY:  No.
2         MR. SMITH:  Okay.  So just -- I
3  just want to be --
4         MR. GRAY:  Well, actually, yes.
5  Q.  If we say it shows something, I'd like you
6  to verify that the quote actually does
7  show.
8         MR. SMITH:  Do you understand what
9  they're asking?
10         THE WITNESS:  Yes.
11 A.  This is certainly what was said.  The idea
12  of actually identifying a sale as a mail
13  order or a telephone order was often done,
14  not necessarily always done.  We'd identify
15  each merchant or each sub-merchant by our
16  internal merchant number that we had that
17  the merchant also used.  So anything that
18  would come under one merchant number would
19  be a mail order.  Another sub-merchant
20  number would be a telephone number.  Another
21  sub-merchant number would be a card-present
22  transaction.  We'd roll all that up and
23  account for it as one merchant, but we could
24  tell where the transactions came from,
25  typically, and the merchants sometimes did

Page 144

1  it religiously and sometimes they didn't do
2  so well, but --
3 Q.  And you earlier -- did you earlier testify
4  that some of Litle & Company's merchants
5  would have credit card terminals or card
6  terminals at the merchant location?
7 A.  Yes, and we could always identify those
8  transactions, because we'd get a terminal
9  number and we knew which terminal it was
10  used, and so we'd always know that was a
11  card-present transaction.  We didn't
12  necessarily always know that a
13  card-not-present transaction was a telephone
14  order or a mail order, and I frankly don't
15  think Visa and MasterCard cared about that.
16 Q.  How would you receive that information from
17  the terminal?
18 A.  Well, it could take several routes, but
19  electronically, the path that it took
20  would -- could take several different
21  routes.  It could come right from the
22  terminal to us.  It could go from the
23  terminal to NDC.  It could go from the
24  terminal to NPC, and I don't really remember
25  all the ways, but we would change -- over

Page 145

1  time, we would change the way we did that.
2  For efficiency reasons, for cost reasons,
3  for whatever reasons, we would change that,
4  but we always received it electronically.
5  We probably received some paper
6  transactions, but I can't imagine, during
7  the whole course of our company, we received
8  more than a handful.
9 Q.  Looking at Row 8 on Page 10 of Litle Exhibit
10  12, did Litle & Company ever instruct FNBL
11  to accumulate payments until a certain
12  amount is reached before forwarding
13  payments?
14         MR. EDELMAN:  Objection.  Calls for
15  claim construction, mischaracterizes the
16  claim.
17 Q.  Do you understand that language, Mr. Litle,
18  "accumulate the payments"?
19         MR. EDELMAN:  Same objection.
20         MR. SMITH:  Well, I think it's a
21  couple of questions.  So do you want him to
22  answer your question or do you want him to
23  comment on the text that's written here next
24  to --
25         MR. GRAY:  Comment on my question.

Page 146

1  Q.  You can disregard the text on the right-hand
2     side.
3          MR. SMITH:  Okay.  Ignore what is
4     on the paper.  Can you read the question
5     back, please.
6          (The following question was read
7          back by the court reporter:
8          "Looking at Row 8 on Page 10 of
9          Litle Exhibit 12, did Litle &
10         Company ever instruct FNBL to
11         accumulate payments until a certain
12         amount is reached before forwarding
13         payments?")
14  A.  I'll answer that in two parts.  The first
15     part is, we did accumulate transactions.
16     Some of our customers would send us --
17     they'd go through a cycle every day.  Some
18     of them would go through a cycle every ten
19     minutes, and based on the way transactions
20     are settled, you know, they're all settled
21     in a batch, that's all batch is today, even,
22     and we would settle them through the Visa
23     and MasterCard network.  Also, multiple
24     times during the day, but somebody like
25     Micro Warehouse would send us batches every

Page 147

1     ten minutes, and we would accumulate those
2     until it was convenient or until the next
3     time we settled it through the Visa and
4     MasterCard networks.  Now, that wasn't
5     necessarily accumulating it until a
6     pre-determined amount was reached.  It was
7     accumulating it until either we wanted to
8     get them in under the day's fiscal cutoff or
9     for the next time we -- our next cycle we
10     had to settle through Visa and MasterCard.
11     We probably had three or four times a day,
12     we did that.
13  Q.  Okay.
14  A.  Now, as far as accumulating payments until a
15     pre-determined amount is reached, we really
16     didn't do that, as far as I can tell.
17  Q.  Looking at Row 9 on Page 10, you just
18     described that Litle & Company would often
19     instruct FNBL to forward the payments -- or
20     to settle the payments and forward the
21     payments daily; is that correct?
22  A.  What we did is we settled the payments --
23     when I said go to the Visa/MasterCard
24     networks, that, in those days I think was
25     through FNBL.  They were operating as our

Page 148

1     gateway into the networks, and so we would
2     settle with them multiple times.  Maybe we'd
3     only settle with them once.  I don't
4     remember.  I know when we were settling
5     directly through Visa and MasterCard, we did
6     settle with them multiple times.
7          Now, we didn't -- the part of when
8     we would electronically transmit the data to
9     the merchants or the third parties, that was
10     kind of independent of that.  The dollar
11     value would accumulate or the dollar value
12     would show up in the First National Bank of
13     Louisville account as a funds transfer in
14     bulk.  They were just one big number that
15     came in from Visa, one number that came in
16     from MasterCard, and then we'd sort it out
17     according to our own accounting records.
18     Maybe I don't understand the question.
19  Q.  Was there a particular event that would
20     trigger an electronic forwarding of money
21     from FNBL to a merchant or to a third
22     party?
23  A.  Our instruction.
24  Q.  And what was a typical instruction?
25  A.  It would be, at this point in time -- "On

Page 149

1     this day, transfer this amount to that
2     account, this account to that account," and
3     it was just a list of amounts and accounts
4     that we would transfer.
5  Q.  Would it forward -- would it transfer those
6     amounts daily, for example?
7  A.  Yes.  That cycle was done every day.
8  Q.  Okay.  Looking at Line 9 on Page 10, the
9     quote that begins "In consideration of
10     Litle & Company making advances," if you
11     look at the second line from the bottom of
12     that quote on Page 11, it says, small Roman
13     Numeral ii, "The daily repayments shall be
14     deducted from daily net proceeds."
15  A.  Uh-huh.
16  Q.  Does that show that FNBL would forward
17     payments to the merchant daily and deduct --
18     well, does that show that FNBL would forward
19     payments, net proceeds, daily to the
20     merchant?
21  A.  Based on our instruction, we would say
22     "Forward this amount of money, some amount
23     of money, to the merchant."  FNBL did not
24     know what the components of that money was.
25     From our point of view, our instructions

Page 150

1     would say "Forward the daily net proceeds,
2     less any of the other obligations of the
3     merchant." The other obligations could be
4     for chargebacks that had actually already
5     been withheld by the networks, it could be
6     for our fees, it could be for payment of
7     postage advances, it could be for payment of
8     terminals, it could be to increase increase
9     the reserve account. It could be all kinds
10    of stuff --
11         THE VIDEOGRAPHER: Five minutes
12    left on tape.
13 A.  -- but when you say FNBL forwarded an
14     amount, they forwarded what we told them.
15     It was the sum of all those components.
16 Q. Would you instruct FNBL to forward those
17     payments to the third party?
18 A. Yes.
19 Q. Daily?
20 A. Yes.
21 Q. For example --
22 A. It depended. Actually, sometimes we did do
23     it weekly, so we would -- I guess we
24     would -- yeah, most of the time we did it
25     daily. Frankly, we tried to do everything

Page 151

1     daily. We tried to deal with interchange
2     daily. We tried to deal with all this stuff
3     daily, because that was easiest for the
4     merchant if everything happened all at the
5     same time. We'd sort out the fact that Visa
6     actually charge dollars us for interchange
7     once a month. There were all kinds of
8     different timing arrangements that were in
9     there, and for a merchant to try and figure
10    that all out, it was difficult, so we tried
11    to do everything daily for the merchant. .
12 Q. But if not daily, was it typically on some
13     other periodic basis?
14 A. Yes.
15         MR. GRAY: We can go ahead and
16    change the tape.
17         THE VIDEOGRAPHER: The time is
18    2:08. This is the end of Cassette 2. We
19    are off the record.
20         MR. SMITH: We'll take five.
21         (Recess.)
22         THE VIDEOGRAPHER: The time is
23    2:17. This is the beginning of Cassette
24    Number 3 in the deposition of Thomas Litle.
25    We are on the record.

Page 152

1 Q. (Cont'd. By Mr. Gray) Mr. Litle, I'd like
2     you to look back at Litle Exhibit 11, and
3     again, read Claim 10 to yourself slowly.
4     When the language -- when the claim recites
5     "means" for something, that means it's
6     reciting an apparatus or equipment that is
7     used for performing a particular function,
8     and what I'd like to ask you is, for each of
9     those portions of a claim, and I'll begin
10    with "means for accepting a customer
11    identifier as payment for the customer."
12    I'd like you to tell me whether there was
13    standard equipment used in the industry for
14    performing a particular function. Do you
15    understand?
16 A. I think so.
17         MR. EDELMAN: I object. Also, it
18    calls for claim construction.
19 Q. Was there standard equipment used in the
20    industry for accepting a customer identifier
21    as payment from the customer?
22         MR. EDELMAN: Same objections.
23 A. There were standards. There were several
24    types of equipment. The one we dealt with
25    most was an order processing system that was

Page 153

1     basically a terminal and an operator would
2     key in the order. The software that managed
3     that computerized order entry system was
4     often sold to the direct marketers by a
5     third party, and there are limited numbers.
6     Sometimes direct marketers wrote their own
7     software. They used different equipment,
8     but it was all basically what one would
9     consider a relatively standard order entry
10    system.
11 Q. And to clarify, was that a computer keyboard
12    where someone would input a number --
13 A. Yes.
14 Q. -- into a computer?
15 A. Uh-huh. That was one way.
16 Q. What was another way?
17 A. Another way was to actually use terminals
18    and probably five years before the period of
19    time we're talking about, which I think is
20    1992, that range, the computerized order
21    entry systems really didn't accept credit
22    cards, so terminals were used in parallel
23    with the computerized order entry system,
24    but by 1992, it was generally order entry
25    systems that were built to accept credit

39 (Pages 150 to 153)

Page 154

1    cards, to check the validity, the mechanical
2    validity. The Visa and MasterCard
3    transactions were 16 characters long and
4    started with a 4 and a 5 respectively, and
5    had a 10-check digit at the end, and that
6    kind of stuff, and that was most of the
7    card-not-present transactions.
8  Q. And Litle & Company processed -- did Litle &
9    Company process card transactions for
10   merchants who accepted credit cards or cards
11   via terminals or computer keyboard input?
12 A. Yes. The terminals was -- we certainly
13   did. That was a smaller part of our
14   business.
15 Q. What sort of hardware did merchants use to
16   electronically forward information related
17   to the payment to Litle?
18 A. They used -- on their computers, they had
19   connections to either -- in those days, they
20   had connections to either a frame relay
21   system, which was something supplied by the
22   telephone company, or a regular dial-up
23   telephone, and those transactions would get
24   conveyed to us via those kinds of
25   telephone-operated networks.

Page 155

1  Q. Okay. How would Litle receive that
2    information from the merchant?
3  A. We would also be connected to either a plain
4    dial-up line, and the merchant would call
5    the number, our number, basically, make a
6    telephone call, and we'd have a modem
7    connected to that and we'd receive the
8    merchant's data, or we'd be connected to the
9    other end of a frame relay circuit and
10   accept the information from the merchant, or
11   in some cases, we actually had a lease line
12   between the merchant and us, and so it was
13   just like a -- the phone company provided
14   it, but it was like a wire between us and
15   the merchant.
16 Q. What hardware was used for authorizing and
17   settling the payment at each of the entities
18   involved in the process?
19        MR. EDELMAN: Objection. Calls for
20   claim construction.
21 A. The -- what hardware was --
22 Q. -- was used by each entity in the process
23   outlined in Litle Exhibit 10, and I'm just
24   asking generally.
25        MR. SMITH: You mean, each of

Page 156

1    the --
2  Q. Right. For example, computers, network and
3    modem.
4  A. Well, that's it. It was the way the
5    transaction was captured, whether it was in
6    an order entry system or a terminal, the way
7    it was transmitted, whether it was connected
8    by modem or to a lease line -- a modem to a
9    dial-up line. It was actually modems to a
10   frame relay line or connected to a lease
11   line at the merchant's end. Basically, the
12   reverse of that at our end to receive the
13   information, and the information went back
14   and forth. When a merchant would send in a
15   settlement file, for example, then we had to
16   send back a confirmation that what they
17   thought they sent us, we actually got, and
18   that was the moment in time, when we sent
19   back that confirmation, when we owned the
20   transactions.
21 Q. And you testified earlier to this, but what
22   hardware was used -- sorry. Let me start
23   over. How was the money forwarded from FNBL
24   to the third party in your diagram in
25   Exhibit 10?

Page 157

1  A. Either through a wire transfer, which was,
2    a wire transfer system is operated by the
3    Fed -- it's the way banks typically transfer
4    money between each other -- or by the ACH --
5    an ACH system, which means automated
6    clearinghouse, and I think that's operated
7    by the Fed -- no. It's operated by an
8    organization called NACHA, National
9    Automated Clearinghouse Association, or
10   something like that, and which really did
11   the same thing as a wire did, except it took
12   a day longer.
13 Q. In each of the examples that you've
14   testified to here today, is the equipment
15   that is used by each of the entities in
16   Litle Exhibit 10, is that -- is it the same
17   equipment?
18 A. Pretty much. Depending on the
19   circumstance. If it was the same
20   circumstance, it would be the same type of
21   equipment. I mean, we would have ten people
22   transmitting files at the same time, so
23   there were ten instances in the same
24   equipment, but --
25 Q. Okay. In other words, did the equipment

40 (Pages 154 to 157)

1    change between the Hanover finance situation
2    and the postage finance situation, for
3    example?
4    A. It could because it just depended on how
5    Hanover would receive payments. Maybe they
6    received an ACH. Maybe they received a
7    wire. I don't remember how they did that.
8    Q. Either way, it was an electronic transfer?
9    A. Yes.
10        MR. GRAY: I'll pass the witness.
11        (Discussion off the record.)
12        CROSS-EXAMINATION
13    by Mr. Edelman:
14    Q. Good afternoon.
15    A. Hi.
16    Q. I am Mike Edelman. I will be asking you
17    questions on behalf of Advanceme. Could you
18    put Litle Exhibit 11 back in front of you?
19    Now, I believe you testified earlier that
20    you thought, at least from your perspective,
21    that you understood what Claims 1 and 10
22    encompassed?
23    A. Uh-huh.
24    Q. Is that correct?
25    A. Not from a lawyer's point of view, but

1    from --
2    Q. From your point of view?
3    A. -- from a layman's point of view, yeah.
4    Q. All right. Does your company perform the
5    inventions in Claims in 1 and 10?
6        MR. SMITH: I'm going to object and
7    I'm going to instruct the witness not to
8    answer to the extent that the answer would
9    reveal confidential proprietary information.
10    To the extent that it would not it, you may
11    answer. He's here in his personal capacity;
12    not as a representative of the current Litle
13    & Company. So with that caveat, the
14    question again?
15    A. So I'm going to get sued if I say yes;
16    right?
17    Q. I'm asking --
18    A. No, we don't.
19    Q. You do not, and why do you not perform the
20    inventions in Claims 1 and 10 in your
21    current business?
22    A. Because our company is a relatively new
23    company and the process by which we build
24    our system is building it up sequentially to
25    serve the needs of our early customers, and

1    we haven't really gotten to that aspect of
2    what we -- what we think our service will
3    be. I don't know if we'll ever perform
4    that. We may. We may not.
5    Q. When you say "that," do you mean providing
6    payments to third parties?
7    A. Yes.
8    Q. Do you have an option that's advertised on
9    your website called Dynamic Settlement?
10    A. It's not active. Dynamic Settlement, no, we
11    don't --
12    Q. What is Dynamic Settlement?
13    A. Huh?
14    Q. What is Dynamic Settlement?
15    A. Actually, I don't remember what Dynamic
16    Settlement is.
17    Q. Doesn't Dynamic Settlement, as described on
18    your website, describe payments to third
19    parties?
20        MR. SMITH: Objection. Same
21    instruction. You're here in a personal
22    capacity; not as a representative of the new
23    Litle & Co. Providing payments to third parties.
24    A. Okay. Providing payments to third parties.
25    We do that in the sense that we maintain

1    reserves, we maintain -- we do some of the
2    stuff we're talking about. We don't do
3    postage financing.
4    Q. Do you believe that maintaining reserves for
5    third parties is not performing Claims 1 and
6    10?
7        MR. SMITH: Objection.
8    A. I think that's -- I think that's an
9    interpretation of the patent and that's not
10    why I'm here.
11    Q. You didn't seem to have any problem with the
12    other side's questions.
13        MR. SMITH: Object to the
14    characterizations.
15        MR. GRAY: I never asked --
16    Q. Mr. Litle, is there any way to perform
17    Claims 1 and 10, other than postage
18    financing?
19        MR. SMITH: Objection. You're
20    asking about his interpretation again.
21    Q. In your layman's perspective.
22    A. Is there any way to what?
23    Q. Perform Claims 1 and 10, other than by
24    postage financing.
25    A. Sure.

Page 162

1  Q. And are there any ways that Claims 1 and 10
2     could be performed through setting up
3     reserve accounts through third parties?
4          MR. SMITH: Objection.
5  A. Is there any way -- repeat the question.
6          (The previous question was read
7          back by the court reporter.)
8          MR. SMITH: Objection, to the
9     extent you're asking him to interpret the
10    claims.
11  A. Setting up reserve accounts through third
12     parties.
13         MR. SMITH: Objection. Vague.
14  A. Could you define for me what you mean by
15     "reserve account through third parties"? I
16     know what a reserve account is. I know what
17     "through third parties" means, but I don't
18     know what a --
19  Q. Is the process of setting up a reserve
20     account for a third party something that can
21     result in a performance of Claims 1 and 10?
22         MR. SMITH: Objection, to the
23     performance of Claims 1 and 10.
24  A. A reserve account for a third party?
25  Q. Yes.

Page 163

1         THE WITNESS: I don't know what
2     he's talking about.
3         MR. SMITH: Okay. Can you phrase a
4     new question? I think it's a confusing
5     question. He can't answer the question,
6     so --
7  Q. Let me ask him another one. Under the
8     Dynamic Settlement process that is
9     advertised on your website, what benefits
10    does Litle & Company currently provide to
11    third parties?
12  A. An example -- what do we currently
13     provide --
14  Q. Yes.
15         MR. SMITH: I'll instruct you not
16    to answer anything that's not publicly
17    available.
18  Q. Can you answer the question?
19  A. Yes.
20  Q. Okay. Go ahead.
21         MR. SMITH: Do you need to talk or
22    do you understand what he's saying? My
23    instruction is to answer the question to the
24    extent that you're not revealing
25    confidential proprietary current Litle & Co.

Page 164

1     information.
2  A. Okay. The question -- repeat the question,
3     please?
4         MR. EDELMAN: Could you read it
5    back?
6         (The pending question was read back
7         by the court reporter.)
8         MR. SMITH: Do you need to talk
9    about it?
10        THE WITNESS: Yeah, but it's -- you
11    know, it's basically a trick question.
12        MR. SMITH: Well, then if you can't
13    answer the question as phrased, you can't
14    answer the question as phrased.
15  A. Because it isn't a question of what does
16    Dynamic Settlement provide separate from
17    what do we currently provide. It's
18    basically two questions.
19  Q. I'm just asking you what -- does -- okay.
20    I'll try to ask it a different way. . Does
21    Litle & Company currently provide any
22    benefits to third parties as part of the
23    payment processing services?
24        MR. SMITH: I object to the form of
25    the question, but if that's clear to you,

Page 165

1     with my previous caveats, please answer.
2  A. Provide third parties, meaning, not the
3     merchant?
4  Q. Right.
5  A. I'm trying to think. Do we provide any
6     benefits to third parties? Yes.
7  Q. Okay, and what benefits are those?
8  A. Well, we work with --
9         MR. SMITH: Same caveat before you
10    answer. My same instruction. You're not
11    going to reveal any proprietary or
12    confidential information.
13  A. Okay. As a general, we work with a lot of
14    third parties, like third-party fulfillers,
15    people like that. We provide a lot of
16    benefits to fulfillers, including various
17    kind of consulting roles, setting up
18    networks for them, helping them be able to
19    service card-not-present merchants better.
20    I am not currently aware that we pay third
21    parties directly for obligations of
22    merchants.
23  Q. What do you mean by "directly"?
24  A. That we forward obligations of merchants,
25    like what they owe to a fulfillment

42 (Pages 162 to 165)

Page 166

1    company -- I am not aware that we forward
2    those kinds of payments to fulfillment
3    companies today. We may, but I don't --
4    Q. Is there any company, other than Litle &
5    Company, that might forward such payments on
6    Litle's behalf?
7         MR. SMITH: Same caveat. Same
8    instruction applies.
9    A. Yeah. I don't -- I don't think so.
10   Q. Is providing the benefits to fulfillment
11   companies what is meant on the website by
12   the term "Dynamic Settlement"?
13        MR. SMITH: I'm going to instruct
14   you not to answer that question. He is here
15   in his personal capacity. If you want to
16   subpoena Litle & Co., by all means, but he's
17   not going to --
18        MR. EDELMAN: He is the founder of
19   Litle & Company. He can answer the
20   question.
21        MR. SMITH: Well, I'm instructing
22   him not to answer the question.
23        MR. EDELMAN: On what basis?
24        MR. SMITH: On the basis that he's
25   here in his personal capacity. He's here to

Page 167

1    testify about stuff that happened years ago,
2    and you're asking him about stuff with his
3    current company. He's not prepared to
4    testify. He's not going to testify on Litle
5    & Co.'s behalf today. If you want to
6    subpoena the company, do so.
7         MR. EDELMAN: You know that's not a
8    relevant objection -- a valid objection.
9         MR. SMITH: I disagree.
10        MR. EDELMAN: You know and I know
11   that.
12        MR. SMITH: I disagree.
13        MR. EDELMAN: There's no objection
14   in the Federal Rules of Evidence --
15        MR. SMITH: Certainly, there are.
16   He's not going to reveal confidential
17   information. He's a third party to this
18   lawsuit and he's not going to do it.
19   Q. Is the process or the details of the process
20   by which you work with third-party
21   fulfillers confidential or proprietary to
22   Litle?
23        MR. SMITH: Objection, to the
24   extent that calls for a legal conclusion.
25   If you want to talk about what confidential

Page 168

1    and proprietary means -- if you want to talk
2    about what confidential and proprietary
3    means, we can do that off the record.
4    A. We have non-disclosure agreements with
5    virtually every fulfillment company we work
6    with.
7    Q. So would it be permitted pursuant to those
8    non-disclosure agreements for you to
9    publicly talk about the details of how you
10   process payments with those third-party
11   fulfillment companies?
12        MR. SMITH: Objection. Calls for a
13   legal conclusion. I don't think you should
14   answer that. If you understand his
15   question, go ahead, but I instruct you not
16   to answer.
17   A. I'll try and answer the question for you,
18   with the expectation that this makes sense
19   and we can move on. Dynamic Settlement on
20   our website does -- is something that a
21   marketing guy in our company put up on the
22   website that theoretically means that we
23   will do third-party payments. We have not
24   to this date done third-party payments, as
25   we've been describing that the old Litle &

Page 169

1    Company did, because we haven't -- we don't
2    have the accounting capacity to deal with
3    it.
4    Q. Your website states that Litle & Company
5    offers Dynamic Settlement; correct, and
6    you're telling me now that, in fact, the
7    company can't provide the services it
8    advertises?
9         MR. SMITH: Objection. Compound
10   question. Object to the form. Object to to
11   the extent that he's here in his personal
12   capacity --
13   A. We --
14        MR. SMITH: I would say don't
15   answer that question.
16   A. Okay.
17        MR. SMITH: Are you instructing him
18   not to answer?
19        MR. SMITH: I do. Rephrase it. I
20   object to the question.
21   Q. Okay. You just referred to the fact that
22   there was non-disclosure agreements in place
23   with fulfillment companies. Do I have that
24   right?
25   A. That's true.

43 (Pages 166 to 169)

Page 170

1   Q.  What sort of information is protected by
2       those non-disclosure agreements?
3           MR. SMITH:  Objection.  It calls
4       for legal conclusions.  He's not here to
5       testify to that.
6           MR. EDELMAN:  He's here to testify
7       in his individual capacity and whatever I
8       ask him.  That's the rules.  You can't
9       instruct him not to answer my questions.
10          MR. SMITH:  Don't state the rules
11      to me.  I can instruct him to do whatever I
12      want, so --
13          MR. EDELMAN:  And I can haul you to
14      the Eastern District of Texas and get
15      sanctions for both him, personally, and
16      you.
17          MR. SMITH:  If you want to try to
18      get me to Texas, good luck.
19          MR. EDELMAN:  Okay.  I will get you
20      to Texas because you cannot instruct him not
21      to answer that question.
22          MR. SMITH:  Good luck, but the
23      subpoena is issued out of the District of
24      Massachusetts.  Let's not forget that.  Now,
25      look, he can't testify to the contents of

Page 171

1       these agreements and the legal basis for
2       that.
3           MR. EDELMAN:  Why not?
4           MR. SMITH:  Because he's not a
5       lawyer.  He's a fact witness.  Ask him stuff
6       about the facts.
7           MR. EDELMAN:  So if he can't
8       answer -- I'm not asking him a legal
9       question.  My question is --
10          MR. GRAY:  I'll object to
11      relevance, too.
12          MR. EDELMAN:  Thank you.
13  Q.  My question was:  What sort of information
14      was -- is protected under your third-party
15      non-disclosure agreements?
16          MR. SMITH:  As a general matter.
17  Q.  Yes.  What sort of information do these
18      agreements protect?
19          MR. GRAY:  Objection.  Relevance.
20          MR. SMITH:  I'm going to also
21      object to relevance.  I'll say that, if you
22      understand his question, to the extent you
23      know in your capacity as a lay witness, you
24      can answer.
25  A.  It would be information that the -- that

Page 172

1       either the fulfillment company or that we
2       would not want discussed publicly or that
3       isn't already in the public domain.
4   Q.  And do you consider the manner by which you
5       provide services or benefits to a
6       fulfillment company to be the type of
7       information that is not public?
8   A.  Generally, no, but sometimes, yes.  There
9       are often protocols and there are often
10      methods of operation that a third-party
11      fulfillment company considers proprietary.
12      There's often special ways to hook up
13      networks.  There's often things that they do
14      that, from their point of view -- they are
15      proprietary skills that even their customers
16      don't know.  It helps them do their job
17      better.  Under those circumstances, no, we
18      don't reveal it to their competitors.  Just
19      like when we have a lot of merchants and a
20      lot of merchants compete with each other.
21      We don't tell a competing merchant what the
22      other guy's financial situation is.  We --
23      there's stuff that is obviously proprietary
24      that we don't tell competitors or we don't
25      give to the general public.

Page 173

1           Now, we have some of those things
2       ourselves.  Some of the ways we do our
3       processing, some of the techniques we use to
4       make sure we don't process duplicate files,
5       for example.  There's a whole lot of stuff
6       like that, that, as far as I'm concerned,
7       are proprietary.
8           Now, I'll go back to your question
9       about Dynamic Settlement because you
10      probably don't understand why I'm having
11      trouble with this.  Dynamic Settlement is
12      basically a term that a marketing guy in our
13      place came up with third-party
14      payments.  Yes, it is advertised on the
15      website.  One of the unique characteristics
16      about our company is we can turn on a dime.
17      If we find somebody that really wants to
18      have Dynamic Settlement, and we elect to
19      offer Dynamic Settlement, by the time we get
20      the contract signed, we'll be able to offer
21      Dynamic Settlement, and so -- so whether or
22      not we can -- whether or not we can perform
23      a certain service today doesn't necessarily
24      preclude us from selling it because, by the
25      time we get the contracts and the customer

44 (Pages 170 to 173)

Page 174

1    all in place, we'll have it available.
2    We're really good at that. That's one of
3    the reasons we won the CIO 100 Award, is
4    because we are one of the best IT
5    departments in the country, according to
6    them.
7        MR. SMITH: Wait for another
8    question.
9    Q. Okay. So let's go back to the old Litle &
10   Company for a moment. All right? When the
11   old Litle & Company dealt with fulfillment
12   companies, did it also have non-disclosure
13   agreements with the companies during that
14   time period?
15   A. I wouldn't be at all surprised if they did.
16   I don't remember, specifically.
17   Q. Would you have any reason, as you sit here,
18   to believe that there wouldn't be
19   non-disclosure agreements in the old Litle &
20   Company?
21   A. No.
22   Q. And were the type of things that those
23   agreements protected similar to the type of
24   things that would be protected under the
25   non-disclosure agreements that the new

Page 175

1    Litle & Company has?
2    A. Oh, come on.
3        MR. SMITH: Objection.
4    Irrelevant. Lack of foundation. Outside of
5    the scope of this witness's knowledge.
6        MR. EDELMAN: Are you instructing
7    him not the answer?
8        MR. SMITH: No. Your answer was
9    "Oh, come on."
10   A. In a deposition, you're not supposed to
11   speculate.
12   Q. Okay. Can you identify, as you sit here,
13   any difference between the type of
14   information that would be protected under
15   the old Litle & Company non-disclosure
16   agreements and the type of information that
17   would be protected under the new
18   non-disclosure agreements?
19       MR. SMITH: Objection.
20   A. No.
21   Q. So sometimes the old Litle & Company would
22   enter into non-disclosure agreements that
23   would encompass certain ways that Litle &
24   Company would perform its processing.
25   A. Is that a question?

Page 176

1    Q. Yeah.
2    A. I wouldn't be surprised, but it wasn't
3    necessarily something we did all the time
4    because, very often, we didn't tell our
5    merchants what we were doing when we were
6    processing --
7    Q. Okay.
8    A. -- but to the extent that we had to and we
9    felt it was proprietary, we would have
10   protected it by a non-disclosure.
11   Q. In -- now, again, I'm going to refer back to
12   the old Litle & Company. Okay? When
13   Litle & Company signed up merchants or
14   customers for its business, was it typical
15   that there would be a merchant agreement
16   signed?
17   A. It was typical then. It's mandatory now.
18   Q. Okay, and in those merchant agreements, was
19   it typical for a confidentiality clause to
20   be included?
21   A. Yes, but the confidentiality clause dealt
22   with proprietary data, primarily. That was
23   the standard piece of the agreement, is
24   because we would see customer lists,
25   et cetera, from our merchants and we were

Page 177

1    not to disclose that or misuse that data.
2    Q. If you could turn to Exhibit Litle 4, and I
3    want to direct your attention to the
4    document Bate-stamped LI00021.
5        MR. SMITH: What's the number?
6    Q. It's Page 21.
7    A. Yeah.
8    Q. Okay, and do you see Section 17 of this
9    agreement has a confidentiality provision?
10   A. Yeah.
11   Q. Okay, and it goes on to the next page?
12   A. Yeah.
13   Q. Okay. Is this a portion of the Member
14   Agreement that you drafted yourself?
15   A. Yes.
16   Q. Okay. Was this language about
17   confidentiality typical of the type of
18   confidentiality language you would put in
19   your member agreements?
20   A. Yes, and it's completely different from
21   the kind of confidentiality agreement you
22   were talking -- confidentiality information
23   you were talking about a while ago.
24   Q. Earlier in your testimony, you made a
25   reference to the old Litle & Company

Page 178

1  purchasing transactions. Do you recall
2  that?
3  A. That's true.
4  Q. What do you mean by "purchasing
5  transactions"?
6  A. Well, I can explain it or you can read it in
7  the same Exhibit 4, because it's a defined
8  term.
9  Q. Okay. Are you referring to the definition
10  of "purchased"?
11  A. Yeah.
12  Q. Okay.
13       MR. SMITH: Do you want to explain
14  it or do you want him to read that in the
15  record?
16  Q. Why don't you go ahead and explain to me
17  what you mean by "purchased."
18  A. When we receive settlement transactions from
19  the merchant and we confirm that we received
20  the settlement transactions, the number and
21  the dollar amounts of it, at that point,
22  that's the point where we actually purchase
23  the transaction from the merchant and we
24  purchase the transactions for their face
25  value, less the discount and various kinds

Page 179

1  of fees.
2  Q. Is there any other party involved in the
3  normal payment processing cycle that you
4  described earlier that would acquire member
5  transactions, other than Litle & Company?
6       MR. SMITH: Objection. Acquire or
7  purchase? I'm sorry.
8  Q. Start with purchase.
9  A. The party that purchases the transaction is
10  the party that has the agreement with the
11  merchant, and no, there aren't other parties
12  that are involved with the actual purchase
13  of the transaction.
14  Q. Okay. When would you, during a typical
15  processing transaction, pay the merchant for
16  this purchase of the transaction?
17       MR. SMITH: Objection.
18  A. I assume you mean, pay the merchant for the
19  net -- basically, the net proceeds --
20  Q. Yes.
21  A. -- as may be adjusted by other means.
22  Q. Fine.
23  A. That's generally a negotiated item, but if
24  we purchase transactions on Monday, it's
25  typically, they have the money wired to them

Page 180

1  or ACH to them on Wednesday. If it's wired,
2  they get the money on Wednesday. If it's
3  ACH'd to them, they get the money on
4  Thursday.
5  Q. All right, and pursuant to this standard
6  Member Agreement, Litle & Company was
7  acquired to be the sole company that
8  processed the credit card transactions for
9  those companies involved in the postage
10  financing program; correct?
11  A. That's right.
12  Q. So with respect to those companies involved
13  in the postage financing program, is it fair
14  to say take Litle & Company was the only
15  company that purchased or processed the
16  credit card transactions?
17  A. By agreement, that was supposed to happen.
18  Sometimes merchants didn't do what they were
19  supposed to do.
20  Q. Can you identify any instance in the postage
21  financing program where a merchant didn't do
22  what they were supposed to do?
23  A. No.
24  Q. Okay, and in the payment process that you
25  described earlier, you indicated that

Page 181

1  Litle & Company would provide instructions
2  on what should happen with funds; correct?
3       MR. SMITH: Objection. Vague. Can
4  you restate the question? I'm sorry.
5  Q. Well, I'm just trying to restate what you
6  said earlier about the instructions that
7  Litle provided, that in the normal payment
8  processing service that you provided,
9  Litle & Company was the company that
10  provided instructions to a bank --
11  A. Oh, you're talking about the instructions to
12  First of Louisville?
13  Q. Yes.
14  A. Okay. Now, what was the question?
15  Q. The question was: Litle & Company was the
16  company that provided instructions to the
17  bank?
18  A. That's true.
19  Q. It was the bank that actually then forwarded
20  the actual payments?
21  A. They executed the instructions, yes.
22  Q. Okay. Did Litle & Company forward the
23  payments itself or did the bank forward the
24  payments?
25  A. Originally, when we started, Litle & Company

46 (Pages 178 to 181)

Page 182

1  forwarded the payments because we held the
2  bank accounts.  There were other payment
3  processors, third-party payment processors,
4  around that, instead of forwarding the money
5  the way they were supposed to, they
6  basically used the money for working
7  capital, kept the money, and the merchants
8  didn't get their money, and Visa had to step
9  up and pay for that.  They changed the rules
10 to limit their liability and make sure there
11 was an acquiring bank to watch over the
12 third-party payment processors and be
13 responsible for any lack of performance by
14 the third-party payment processors.  That --
15 under those circumstances -- under those
16 circumstances, it currently is Visa
17 regulations where third-party payment
18 processors cannot actually execute the
19 forwarding of the money to the bank.
20 Q.  Well, in a standard Member Agreement that is
21    marked as Litle 4, it would be the bank that
22    would actually forward the payment;
23    correct?
24 A.  I believe that that change in Visa
25    regulations and requirements was in place at

Page 183

1  that time, yes.
2  Q.  Do you know when those regulations came into
3    place?
4  A.  Yeah.  It was right around that time, in the
5    early nineties, and whenever Visa proclaims
6    a new regulation, it usually takes several
7    years to get everybody to comply.  So some
8    of our contracts would have complied.  Some
9    of them wouldn't have.
10 Q.  Do you know, for the Exposures Member
11    Agreement, whether that agreement was
12    similar in its content to the Museum
13    Agreement?
14 A.  It would have been similar.  The method of
15    who transferred the money may have been
16    different then.  I just don't -- do we have
17    an Exposures agreement?  I could tell by
18    looking at the Agreement.
19 Q.  Did you conduct any search to try to find
20    the Exposures agreement in response to the
21    subpoena served by Advanceme?
22        MR. SMITH:  Well, he conducted a
23    search in response to the subpoena.  I don't
24    think there was a specific request for
25    Exposures.

Page 184

1        MR. EDELMAN:  There was.
2  A.  You'll of to remember that all that
3    documentation is held at Paymentech, the
4    company, my old company, a company with whom
5    I compete, and they're not going to make
6    their records easily available to me.  On
7    the other hand, they did --
8        MR. SMITH:  Just answer his
9    question.  His question was:  Did you
10   conduct a search?
11 A.  Yeah, I did.
12 Q.  Did you work with Paymentech to conduct a
13   search for documentation relating to
14   Exposures?
15       MR. SMITH:  Objection.  "To work
16   with."
17 A.  I was going to ask, what do you mean
18   by "work with"?
19 Q.  Did you communicate with Paymentech?
20 A.  I communicated with Paymentech.
21 Q.  And what did you say to Paymentech?
22 A.  I delivered a voicemail saying we're
23   interested in -- or I had been asked to
24   provide documentation and I'd be interested,
25   and "Do you have any of that documentation

Page 185

1  available?"
2  Q.  What documentation did you specify?
3  A.  It was anything that had anything to do with
4    postage financing.
5  Q.  Okay.  Did you communicate to Paymentech
6    that you were looking for information
7    specifically pertaining to Exposures?
8  A.  I don't remember.
9  Q.  When did you --
10 A.  I might have.
11 Q.  I'm sorry.
12 A.  I probably did because I remembered that
13   Exposures was one of the companies.
14 Q.  And who did you forward the request to at
15   Paymentech?
16 A.  Mike Duffy.
17 Q.  Did Mr. Duffy work with you at the old Litle
18   & Company?
19 A.  Yes.  I hired him.
20 Q.  What was his position?
21 A.  Vice-president of finance and
22   administration.
23 Q.  And when Litle & Company was sold, did Mr.
24   Duffy stay on at Paymentech?
25 A.  Yes, he did.

Page 186

1  Q. Okay. What is his position now at
2     Paymentech?
3  A. He is everything, except vice-president of
4     finance and administration. He runs the
5     place.
6  Q. Did you actually talk to him personally
7     about the request for information?
8  A. No. I left a voicemail.
9  Q. And Mr. Duffy then provided information to
10    you in response to your request?
11 A. Either he did or one of the people that
12    worked for him did.
13 Q. Okay.
14 A. But I don't think they provided it to me. I
15    think they provided it to --
16 Q. Did anyone assist you in attempting to
17    gather information from Paymentech?
18       MS. PRESTON: In response to your
19    subpoena?
20       MR. EDELMAN: Yes.
21       MR. SMITH: To the extent you were
22    assisted by counsel or anyone working at the
23    behest of counsel, I would instruct you not
24    to answer, but otherwise --
25 A. The answer is no.

Page 187

1  Q. Did you have any discussion with Mr. Goldin
2     about obtaining information from Paymentech?
3        MS. PRESTON: In response to the
4     subpoena?
5        MR. SMITH: Can you identify who
6     you're talking about?
7  Q. David Goldin.
8  A. Yes.
9  Q. I hope we all know who he is.
10 A. Yes.
11 Q. And what discussion did you have with Mr.
12    Goldin on that subject?
13 A. Well, I got this call from somebody I never
14    heard of and he said "I'm in a patent
15    litigation and I heard that you knew
16    something about third-party payments from
17    payment processors. What can you tell me
18    about it? I hear you did some of that."
19    That's about the -- about the way the
20    conversation went, and I said "Yeah, we did
21    that. We did postage financing and we did
22    some other stuff," and he said "Do you have
23    any documentation about that?" As a result
24    of that question, I left a voicemail for
25    Mike Duffy.

Page 188

1  Q. Now, when was this initial communication?
2  A. Geez, I don't remember. Two months ago.
3     Maybe more. I don't know.
4  Q. So the initial communication came from Mr.
5     Goldin to you?
6  A. Yes.
7  Q. And at the time that that communication
8     occurred, were you already aware of
9     Advanceme?
10 A. No, never heard of them.
11 Q. Okay. Now, I'm going to go back to the time
12    period of the old Litle & Company and again
13    focus on the 1986 to 1995 time period.
14    During that time period, did Litle & Company
15    regularly advertise in magazines or
16    periodicals?
17 A. Uh-huh.
18 Q. What were the names of the magazines or
19    periodicals it would advertise in?
20 A. They were typically the trade press for the
21    direct marketing industry. DM News, Direct
22    Catalog Age. There may have been one or two
23    others.
24 Q. Okay, and why did Litle & Company want to
25    advertise in those sort of magazines?

Page 189

1  A. To just keep our name in front of people.
2  Q. Was one of the purposes of those
3     advertisements to tell potential customers
4     of the type of services that Litle & Company
5     could offer?
6  A. Yeah, to some degree, but most people knew
7     what we did.
8  Q. Okay. How much money, on a yearly basis,
9     would Litle & Company spend to place these
10    advertisements?
11 A. A hundred thousand dollars.
12 Q. I'm sorry. A hundred thousand? Was there
13    somebody at Litle & Company that was in
14    charge of advertising?
15 A. For short periods of time. They didn't last
16    long.
17 Q. Who was that person?
18 A. Huh?
19 Q. Who was that person?
20       MR. SMITH: Objection. I think it
21    was people.
22 Q. Oh, more than one person. Can you name any
23    individuals?
24 A. No.
25 Q. But there were periods of time when you were

48 (Pages 186 to 189)

Page 190

1  personally in charge of advertising for the
2  company?
3  A. When I personally was in charge?
4  Q. Yes.
5  A. Well, there was a period of time when I was
6  personally in charge of everything.
7  Q. So you would often make personal decisions
8  on what advertisements would be placed and
9  how often they would be placed and that sort
10 of thing?
11         MR. SMITH: Objection.
12 A. Not really.
13 Q. Who would make those decisions?
14 A. Whoever our marketing person du jour was.
15 Q. Okay, and did Litle & Company continuously
16 place advertisements from the 1986 to 1995
17 period?
18         MR. SMITH: Objection.
19 Continuously?
20 A. "Continuously" sounds like some sort of
21 program, and that wasn't the case.
22 Q. But was there a time when it ceased
23 advertising all together? Was there a time
24 when Litle & Company just stopped placing
25 ads all together, decided that it wasn't a

Page 191

1  good thing for Litle & Company to do?
2         MR. SMITH: In the time period
3  you're talking about?
4         MR. EDELMAN: Yeah.
5  A. Not that I remember.
6  Q. Did any of the advertisements that Litle &
7  Company placed from 1986 to 1995 make any
8  mention of postage financing?
9  A. I doubt it, because that wasn't the kind of
10 advertising we did.
11 Q. Okay. Did any of the advertisements that
12 Litle & Company placed from 1986 to 1995
13 make any mention of Exposures or Museum
14 Publications of America?
15 A. I doubt it. That's not the kind of
16 advertising we did.
17 Q. Now, in addition to advertisements, did
18 Litle & Company also create brochures or
19 other sorts of marketing material for
20 handing out to customers or potential
21 customers?
22 A. Yeah.
23 Q. Okay, and did Litle & Company often hand out
24 those sort of materials at trade shows?
25 A. Yeah.

Page 192

1  Q. Okay. How much would Litle & Company spend
2  on a yearly basis in creating marketing
3  materials to hand out?
4  A. Fifty thousand dollars. It wasn't much.
5  Q. Okay. What aspects of Litle & Company's
6  business were discussed in these marketing
7  materials that were handed out?
8         MR. SMITH: Objection. To the
9  extent that you remember. It's a broad
10 question.
11 A. I do. The fact that we were a payment
12 processor that understood the direct
13 marketing business and we had lots of good
14 references, and "Call us."
15 Q. Were there any marketing materials that got
16 into some more detail about the type of
17 services that Litle & Company could perform?
18 A. I'm sure there were. You're asking me to go
19 back 20 -- you know, years.
20         MR. EDELMAN: Let me mark as next
21 in order Exhibit Number 12 -- excuse me.
22 What number?
23         MS. PRESTON: 13.
24         MR. EDELMAN: -- a document that
25 has a title "Litle Payment Processing

Page 193

1  Services."
2         (Document entitled "Litle, Payment
3         Processing Services" is marked
4         Exhibit Number 13 for
5         Identification.)
6  Q. Was the document marked as Exhibit 13 one of
7  the pieces of marked --
8  A. Do I get the --
9         MR. SMITH: We don't have a copy
10 yet.
11 A. -- advantage of being able to look at it?
12 Q. You're so greedy.
13         MR. SMITH: Do you want him to look
14 it over?
15         MR. EDELMAN: Yeah, sure.
16 A. Yeah, I haven't seen this for ten years.
17         MR. SMITH: All set?
18 A. I guess so, sure.
19 Q. Was the document marked as Exhibit 13 one of
20 the pieces of marketing material that
21 Litle & Company created?
22 A. It appears to be. I don't know when.
23 Q. Okay. Do you have a recollection of this
24 particular piece of marketing material?
25 A. Not specifically. In general, yes.

Page 194

1    Q.  Does this marketing material marked as
2         Exhibit 13 make any mention of postage
3         financing?
4    A.  I didn't see it.  I assume that it doesn't.
5              MR. SMITH:  Objection.
6    A.  That it does not.
7    Q.  Does the document marked as Exhibit 13 make
8         any mention of Litle & Company's ability to
9         provide payments to third parties to help
10        pay off obligations the merchants have?
11   A.  I didn't see it.
12   Q.  Okay.  Are you aware of any marketing
13        material that Litle & Company ever created
14        from 1986 to 1995 that made any mention of
15        postage financing?
16   A.  Am I aware of it?  No.
17   Q.  Are you aware of any marketing material that
18        Litle & Company created at any point from
19        1986 to 1995 that made any mention of
20        Exposures or Museum Publications of
21        America?
22   A.  I'm not aware of any that was.  I'm not
23        aware of whether it was or not.  I just
24        can't answer that question.
25   Q.  Okay.  Now, during this time period from

Page 195

1         1986 to 1995, were there any newspaper
2         articles that would be written about the
3         Litle & Company business?
4    A.  Yes.
5    Q.  Okay.  Do you recall approximately how many
6         different newspaper articles?
7    A.  A hundred.  Lots.
8    Q.  Were there any newspaper articles written
9         about a Litle business that made any mention
10        about the postage financing program, other
11        than the Forbes article that was discussed
12        today?
13   A.  There could have been.
14   Q.  Do you recall any others?
15   A.  No.
16   Q.  Did you give any interviews to any reporters
17        before any of those articles were
18        published?
19             MR. SMITH:  Objection.  Which
20        articles?
21   Q.  Well, you talked about that there was maybe
22        about a hundred or so newspaper articles?
23   A.  Uh-huh.
24   Q.  Did any of those articles contain any
25        interviews that a reporter had with you?

Page 196

1    A.  Probably.
2    Q.  Do you recall any newspaper article that
3         talked about any interview with you in which
4         postage financing was discussed?
5    A.  Do I recall?  No.  Is it likely that there
6         was?  Probably.
7    Q.  You are unable to identify any; correct?
8    A.  No.
9    Q.  Did you author any articles from 1986 to
10        1995?
11   A.  Yes.
12   Q.  How many?
13   A.  Dozens.
14   Q.  Did any articles that you authored from 1986
15        to 1995 make any mention of postage
16        financing?
17   A.  Not that I remember, but it's certainly
18        probable.
19   Q.  You cannot remember a specific article?
20   A.  No.  I can't remember any of the articles
21        you're talking about now.
22   Q.  Okay.  That's not my problem.  That's
23        theirs.  Did you ever author any articles,
24        from 1986 to 1995, that made any mention of
25        Exposures or Museum Publications of

Page 197

1         America?
2    A.  Specifically, I doubt it.
3    Q.  Why do you doubt it?
4    A.  Because we don't talk about our customers
5         like that.
6    Q.  Why not?
7    A.  That's just a policy.  We didn't -- we
8         didn't talk about our customers, unless we
9         were part of something that they were
10        talking about.
11   Q.  Are you aware of any newspaper articles,
12        from 1986 to 1995, that made any mention of
13        Litle & Company paying off an obligation
14        that a merchant owed to a third party?
15   A.  No.  That's not the kind of thing that our
16        articles were about.
17   Q.  Now, you stated that, at the time you sold
18        Litle & Company, you thought you had about a
19        thousand different Member Agreements?
20   A.  Yeah.
21   Q.  Okay.  What happened to those agreements
22        when you sold the company?  Did they stay in
23        the possession of Paymentech?
24   A.  Yes.
25   Q.  Was it Litle & Company's practice to

50 (Pages 194 to 197)

Page 198

1  maintain copies of the Member Agreements
2  during the time that the relationship with
3  the merchant continued?
4  A. Yes.
5      MR. GRAY: I'm sorry. Did you ask
6  whether it was Paymentech's regular
7  practice?
8      MR. EDELMAN: No. Whether it was
9  Litle & Company's.
10 Q. Did Litle & Company create any sort of
11 internal newsletter or bulletin to
12 distribute to its employees?
13 A. I believe so.
14 Q. And what was the purpose of distributing an
15 internal bulletin and newsletter?
16 A. I'm not sure I can answer that, other than
17 to say it's a typical thing to employees.
18 Talking about employee benefits, how the
19 company was doing, et cetera.
20 Q. Did those internal bulletins ever talk
21 about new programs that Litle & Company
22 would offer?
23 A. I stayed as far away from that kind of stuff
24 as possible.
25 Q. Who was the person?

Page 199

1  A. Somebody in our HR department.
2  Q. Okay. Can you identify a name?
3  A. No.
4  Q. Are you aware of any internal bulletins or
5  newsletters that made any mention, from 1986
6  to 1995, of postage financing, Exposures --
7  A. No.
8  Q. -- or Museum Publications of America? No?
9  You conducted a search in response to the
10 Advanceme subpoena for documents relating to
11 postage financing; correct?
12 A. Relating to?
13 Q. To postage financing.
14 A. Yes.
15 Q. And where did you search, other than asking
16 for information from Paymentech?
17 A. I only had one other place, other than
18 asking for Paymentech, and that is, we have
19 a barn and we have a lot of old documents in
20 it, and so searched -- I didn't do that
21 initially. I did that fairly recently.
22 Q. Okay. Did you locate in your search any
23 documents in your possession relating to
24 postage financing?
25 A. Yes.

Page 200

1  Q. Okay, and what documents were those?
2      MR. SMITH: I'll state that any
3  documents that were located relating to
4  postage financing were produced in response
5  to the subpoena.
6  Q. I'm trying to figure out where they were
7  located.
8      MR. SMITH: I guess that's not the
9  question. So if you want to ask a different
10 question, that's fine.
11 Q. Did you locate documents relating to postage
12 financing in response to this subpoena?
13     MR. SMITH: He already answered
14 that, that he did.
15 Q. Okay, and where did you find them?
16     MR. SMITH: And I'll state that we
17 produced all those documents.
18     MR. EDELMAN: I'm asking him a
19 question, where he found them.
20 A. It wasn't "them." It was one document.
21 Q. Okay. Which document was that?
22     MR. SMITH: And that's my
23 statement. If he doesn't remember the
24 document, fine. We produced it to you. I'm
25 not trying to be obstructive. If he doesn't

Page 201

1  remember what he turned over to me, you
2  know, you were given -- we didn't hold
3  anything back.
4      MR. EDELMAN: I'm not accusing
5  anybody of anything. I'm just trying to
6  figure out where he found the documents.
7  A. I did find one document in the barn. My
8  assistant and I did an exhaustive search.
9  It was in a pile of unrelated stuff. I
10 don't know how the hell it got there, and
11 I -- but there is one document, and I think
12 it's been labeled.
13 Q. Could you identify that document?
14 A. It was Exhibit 8.
15 Q. The Interoffice Memorandum. Exhibit 8.
16 Okay. At the time that Litle & Company was
17 sold in 1995, did you maintain any files,
18 personally, from Litle & Company in your
19 possession?
20 A. Yes.
21 Q. Okay, and what sort of files did you keep?
22 A. There were things like the articles and PR
23 stuff, just to keep as souvenirs.
24 Q. Okay. So the other documents that were
25 produced in response to the Advanceme

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

Page 202

1 subpoena relating to postage financing were
2 obtained from other sources?
3         MR. SMITH: I'm not sure --
4 objection. Do you have a specific document
5 in mind?
6         MR. EDELMAN: Let me just mark as
7 next in order -- what are we on?
8         (One-page document is marked
9         Exhibit Number Number 14 for
10        Identification.)
11 Q. I'm just going to hand you a copy of a file
12    folder that we got that has the name
13    "Postage Advance" on it. Could you just
14    review that for a moment and just tell me if
15    this is a copy of a folder or a tab that was
16    in your possession or is it something that
17    was given to you?
18 A. I have not a clue what this is. I don't
19    know where it came from. Maybe it was
20    something that was in the souvenirs by
21    mistake. This stuff was a big mish-mash.
22        MR. SMITH: I'll represent that we
23 produced this document in response to the
24 subpoena.
25 Q. What I'm trying to figure out is where this

Page 203

1    file called "Postage Advance" was located.
2         MR. SMITH: Well, if you know.
3 A. I have no idea.
4 Q. Okay. You recall not finding any sort of
5    files or areas set aside for Postage
6    Advance-related documentation; correct?
7 A. I recall that there was no such thing. All
8    this stuff was homogenized. You put me
9    through a great deal of effort. We tried to
10   be serious about finding everything and the
11   only thing I remember we found was one
12   document that came from our barn, which
13   you're free to look through -- I would --
14        MR. SMITH: Okay.
15 A. All the rest of the stuff came from
16    Paymentech.
17 Q. You're giving your attorney a heart attack.
18    You did not locate a copy of the Exposures
19    or Museum Publications Member Agreements;
20    correct?
21 A. I did not.
22 Q. Okay. Did you locate copies of Member
23    Agreements that the old Litle & Company had
24    with other merchants?
25 A. No, I don't remember that I did.

Page 204

1 Q. Okay. Do you know whether or not you have
2    copies of any other Member Agreements?
3 A. No, I don't. I don't remember.
4 Q. Were there any documents that you located in
5    advance to the subpoena that you thought
6    contained confidential information of
7    Litle & Company, and therefore, had concerns
8    about producing?
9 A. The old Litle & Company?
10 Q. Yes.
11        MR. SMITH: I'll object to the term
12 "confidential" as a legal term, but
13 otherwise, you can answer.
14 A. Were there any documents from the old
15    Litle & Company? Yes.
16 Q. Which documents are those?
17 A. It was a list of customers that I should
18    have left there, but somehow, got in the
19    pile of stuff, and it was used to send out
20    notice that Litle & Company had been sold.
21 Q. And you considered that list of customers to
22    be confidential information?
23 A. I recognized I shouldn't have had it, so I
24    figured it was confidential information.
25 Q. Was Exposures and Museum Publications of

Page 205

1    America members of Litle & Company at the
2    time the company was sold?
3         MR. SMITH: Objection. To the
4    extent you are using the term "Member" as
5    in" Member Agreement"?
6         MR. EDELMAN: Yes.
7         MR. SMITH: If you know.
8 A. I don't remember if Museum Collections was
9    because it may have either gone out of
10   business or become part of Hanover Direct.
11   I don't remember exactly what happened.
12   Exposures became part of another company and
13   that other company was a member of Litle &
14   Company or was a merchant of Litle &
15   Company, and so Exposures, from that point
16   of view, as a subsidiary or whatever it was
17   of the company that bought it, was still
18   operating with Litle & Company, but not as
19   an independent organization.
20 Q. I think you testified earlier that the
21    members of Litle & Company would accept
22    debit card transactions?
23 A. Yes.
24 Q. Okay. Did Litle & Company know, when it
25    received the information about a

52 (Pages 202 to 205)

1    transaction, whether it was a debit card
2    transaction or a credit card transaction?
3    A.  No.
4    Q.  Did Exposures accept debit card
5    transactions?
6    A.  Yes.
7    Q.  Okay, and how do you know that?  Do you
8    independently recall that, or is there a
9    document that refreshes your recollection?
10   A.  No.  I independently know that.
11   Q.  Okay.  You could not have found out that
12   information from the transaction information
13   received from Exposures; correct?
14   A.  That's correct.
15   Q.  Okay.  So how else could you learn whether
16   Exposures was accepting debit cards?
17   A.  Through the trade newsletters that talked
18   about what percentage of Visa and MasterCard
19   transactions were actually debit cards, or
20   were actually debit cards, rather than
21   credit cards.
22   Q.  Okay, and how did that tell you that
23   Exposures itself was accepting debit cards?
24   A.  The environment is very statistical.  If
25   anybody got ten percent debit cards, then

1    everybody got ten percent debit cards, plus
2    or minus half a percent.
3    Q.  So you would have the same testimony with
4    respect to Museum Publications of America?
5    A.  Yes.
6    Q.  Okay.  Did you ever have any communications
7    with either Exposures or Museum Publications
8    of America in which it was disclosed to you
9    specifically that those companies accepted
10   debit cards?
11   A.  No.
12   Q.  Are you aware of any documentation that
13   would reflect that, in fact, Exposures or
14   Museum Publications of America would accept
15   debit cards?
16   A.  Not other than the statistical data
17   published by the industry press.
18   Q.  And do you know whether Exposures or Museum
19   Publications of America accepted Smart
20   Cards?
21   A.  Same answer as for debit cards.  We would
22   have received -- if a debit card had
23   something that was used that looked like a
24   MasterCard number or a Visa number, we
25   would have known it as a MasterCard or a

1    Visa; not as specifically what card type it
2    was.
3    Q.  Okay.  Well, were catalogers widely
4    accepting Smart Cards in the early 1990's?
5    A.  It was accepting -- catalogs were accepting
6    any card that had a valid Visa identifier or
7    a MasterCard identifier.  Those identifiers
8    were -- did not identify what type of Visa
9    or MasterCard product it was.  So if -- and
10   I don't know what the statistics were for
11   Smart Cards that were used that way, so --
12   if they were one percent -- I'm speculating
13   now -- then one percent of Exposures' card
14   transactions would have been Smart Cards.
15   It was eerily statistical, how those things
16   worked.
17   Q.  Okay.  Did Smart Cards ever contain separate
18   identifying numbers, other than a Visa or
19   MasterCard number?
20   A.  I don't know.
21   Q.  Now, during the normal processing that the
22   old Litle & Company did, as you described in
23   Litle 10, what direct interactions did
24   Litle & Company have with a card issuer,
25   such as Visa or MasterCard?

1    A.  First of all, Visa and MasterCard are not
2    card issuers.  The member banks of Visa and
3    MasterCard are card issuers, and they're
4    separated from the payment processors by the
5    Visa and MasterCard network, so our
6    communications was through the Visa and
7    MasterCard network, and the closest
8    communications we had directly with them was
9    when we got a chargeback and there was some
10   sort of dispute, so we'd call up the bank
11   and try to work it out, but as a general
12   matter, of course, other than stuff like
13   that, we had no conversation with them.
14   Although, for independent reasons, I knew a
15   lot of people and was friendly with them,
16   but we didn't have any contracts with them,
17   if that's your question.
18   Q.  And would what you just described about the
19   degree of interaction with the card issuers
20   apply also to the process in which postage
21   financing would be involved?
22   A.  I think I understand your question, but
23   could you ask it again?
24              MR. GRAY:  Objection.
25   Q.  Okay.  The addition of postage financing, as

Page 210

1   part of the process, would not change the
2   amount of interaction you would have with
3   the card issuers; correct?
4   A.  That's true.
5   Q.  Now, before, you made a reference to the
6       fact that transactions were processed in
7       bulk.  What did you mean by that?
8   A.  I have to ask him a question.
9           MR. SMITH:  Do you recall?
10  A.  I believe the reference is when we
11      instructed First of Louisville to make the
12      funds transfer, I said that funds transfer
13      was basically in bulk or the -- when Visa's
14      network paid off the transactions that we
15      processed to First Bank of Louisville, it
16      was a single-funds transfer --
17  Q.  Okay.
18  A.  -- and First National Bank of Louisville had
19      to separate themselves, which of those funds
20      were associated with our merchants and which
21      ones were associated with other merchants,
22      and then, within that group, we had to
23      figure out, of those funds, which were
24      associated with our -- which of our specific
25      merchants got what funds, and I think that's

Page 211

1       what I meant, "in bulk."  Visa and
2       MasterCard, when they wired the money to
3       First of Louisville, they didn't have a
4       clue, other than what the total amount was.
5   Q.  Okay, and First of Louisville didn't know --
6       have a clue about the amounts either, other
7       than what you told them?
8   A.  That's true.
9   Q.  And it was the First of Louisville that
10      would go ahead and forward amounts, whether
11      to the members' bank accounts or to some
12      other location?
13  A.  Yes, based on our instructions.
14  Q.  Now, you make a reference to instructions.
15      Did the Member Agreement specifically
16      require Litle & Company to provide
17      instructions to the First National Bank of
18      Louisville?
19  A.  I don't think the Member Agreements called
20      that out, but if we didn't give them the
21      instructions, the merchants wouldn't get
22      their money.
23  Q.  The Member Agreements in fact make reference
24      to the Litle & Company providing
25      calculations.

Page 212

1   A.  I don't remember that.
2   Q.  Okay.  If you could refer back to Litle 4.
3   A.  Yeah.
4   Q.  Okay, and I want to refer you to Page 19,
5       and this is Section 3, Sub-section d, and it
6       states "Daily, Litle shall calculate the
7       gross proceeds, processing fees, pass
8       through fees, released chargebacks, net
9       proceeds, and prepayment with respect to all
10      sales records and refunds properly presented
11      by Litle to NPC on the preceding business
12      day."
13  A.  Yeah.
14  Q.  Okay.  Are those calculations what you were
15      referring to as instructions?
16  A.  No.
17  Q.  Okay.  So were there calculations that were
18      provided, separate and apart from
19      instructions?
20  A.  Yes.
21  Q.  And when would Litle & Company provide the
22      calculations during this process?
23  A.  This was -- the calculations were the
24      reporting to the merchants, so the merchants
25      themselves could figure out what -- you

Page 213

1       know, what their net proceeds were and --
2   Q.  Well, under the agreement, weren't the
3       calculations supposed to be provided only to
4       NPC?
5   A.  No.
6   Q.  Could you go to Section 3, Sub-section e?
7   A.  Yeah.
8   Q.  Okay.  The first sentence states "Litle
9       shall promptly provide to NPC the results of
10      the calculations described in Paragraph 3.d
11      above in sufficient time for NPC and FNBL
12      reasonably to meet the processing cycle set
13      forth on Schedule C of the agreement."  Does
14      that indicate that the calculations were
15      supposed to be provided to NPC?
16  A.  You're confused.  I'm not sure how I should
17      help you.
18  Q.  Well, explain to me how I'm confused.
19          MR. SMITH:  Objection.
20  Q.  Limited only to this provision in the
21      contract.
22          MR. GRAY:  Objection.
23  A.  There are basically two audiences for our
24      calculations.
25  Q.  Correct.

54 (Pages 210 to 213)

Page 214

1  A.  One was for the merchant to give them their
2      reporting, so they would understand what
3      their daily fees were and all the
4      information they needed in order to conduct
5      their business properly, and we generally
6      refer to that as "reporting," and after we
7      figured out what we were going to report to
8      the merchant, there was -- part of that was
9      the amount of money that was going to be
10     transferred to them --
11  Q.  And that's the --
12  A.  -- and that's the instruction we gave to
13      NPC. We said, "Fundamentally, based on our
14      calculations, this means that you should
15      wire this amount of money from our
16      distribution account to the merchant."
17  Q.  Okay. Well, I'm going to refer back again
18      to Section e here, and it's talking about
19      Litle promptly providing to NPC results of
20      the calculations.
21  A.  The results of the calculation meant the
22      amount to be transferred.
23  Q.  The instructions?
24  A.  Yes.
25  Q.  Okay. So Paragraph e is describing the

Page 215

1      instructions you've been testifying to
2      today?
3  A.  Yes.
4  Q.  All right, and those instructions would be
5      provided after the sales records for the
6      transactions had previously been provided to
7      NPC?
8          MR. SMITH: Objection.
9  A.  It was in conjunction with the sales
10     transactions. When we provided the sales --
11     the records, the sales and refunds to NPC --
12  Q.  Uh-huh.
13  A.  -- we added them up and that was part of the
14     calculation to give to the merchant, but the
15     instructions of how much to wire wasn't
16     necessarily and usually wasn't the sum of
17     the sales minus the refunds because there's
18     other stuff in there. There were
19     chargebacks, there were fees, there were
20     changes to the reserve account, there were
21     payments to third parties, which is what
22     you're interested in. Anyway, the net
23     result of all of that stuff was what we told
24     NPC to wire from the distribution account to
25     the merchant.

Page 216

1  Q.  Okay, and when you provided the instructions
2      to NPC, at that time, it was NPC's
3      obligation to obtain actual amount from the
4      card issuers?
5  A.  No.
6  Q.  Okay. Who would actually go and get the
7      money from the card issuers?
8  A.  Nobody would go and get the money from the
9      card issuer. Oh, Visa would. Visa had a
10     clearinghouse operation where, every day,
11     Visa presented a bill to the card issuers
12     for all the money they owed to all the
13     merchants that charged any credit cards to
14     the cards they had issued, and they put all
15     of that money into the clearinghouse. The
16     clearinghouse then figured out how much of
17     that money should go to First National Bank
18     of Louisville, CitiCorp, and everybody
19     else. First National got theirs. They
20     separated it between us and everybody else.
21     We got ours. We split it up among the
22     merchants.
23  Q.  Okay. What was the purpose of providing the
24     calculations to NPC, as opposed to First
25     National Bank of Louisville?

Page 217

1  A.  NPC and the First National Bank of
2      Louisville, remember, there was that
3      transition time, as far as we were
4      concerned, that was synonymous. They were
5      the same people. It was the same thing, as
6      far as we were concerned. That really was
7      to the First of Louisville.
8  Q.  What was the relationship between NPC and
9      the First National Bank?
10  A.  NPC was wholly-owned by First National Bank
11     of Louisville.
12  Q.  And what was NPC's function in this
13     process?
14  A.  NPC was the group that knew about credit
15     card processing, so First National Bank of
16     Louisville had the -- they delegated their
17     responsibility, according to the Visa and
18     MasterCard regulations, to the people that
19     would have considered themselves working for
20     NPC. However, if you noticed, NPC and First
21     of Louisville both signed one of the
22     agreements and it was the same guy.
23  Q.  Did NPC itself have any responsibility for
24     supervising or managing the manner in which
25     First of Louisville would distribute funds?

55 (Pages 214 to 217)

Page 218

1	MR. SMITH: Objection.
2	A. Any instructions for First of Louisville to
3	distribute funds probably would have been
4	executed -- I don't know, actually, but it
5	very well could have been executed by NPC
6	personnel. It was fundamentally the same
7	thing.
8	Q. So you don't know -- when you sent the
9	instructions, you wouldn't know exactly
10	which personnel, as between NPC personnel or
11	First National personnel, would actually be
12	involved in executing the instructions?
13	A. The personnel were generally personnel of
14	both companies.
15	Q. All right. Which one of the companies had
16	the contractual obligation to make sure
17	that the funds were distributed
18	appropriately?
19	A. Based on Visa and MasterCard regulations,
20	First of Louisville, but again, it was
21	really unclear at the time. People were
22	sort of thrashing around trying to figure
23	all that out, and I probably didn't know for
24	sure and I didn't care, either, just as long
25	as it got done.

Page 219

1	Q. Let me go back to Exhibit 8.
2	A. Yeah.
3	MR. EDELMAN: Before I proceed, I
4	know this was marked "Outside counsel eyes
5	only." Is this a concern of you, in terms
6	of asking questions on that?
7	MR. SMITH: Not by us.
8	MS. PRESTON: It was designated by
9	us. I think that you produced it, as well.
10	MR. EDELMAN: Do you have any
11	objection to us asking questions about this
12	while Mr. Sanz is present?
13	MR. SMITH: Do I have any
14	questions? No, but I'm not a party to the
15	protective order, so that's between you
16	guys.
17	MR. EDELMAN: Okay. It's marked
18	"outside counsel eyes." I --
19	MR. GRAY: Yeah. Right. We don't
20	have a problem with that. We did that to
21	protect his confidentiality. We'll remove
22	the designation of Exhibit 8 and designate
23	it "Confidential."
24	Q. You say the memo was sent to John Shirey?
25	A. Shirey, yes.

Page 220

1	Q. Shirey. I'm sorry. What was his title at
2	the time of Litle & Company?
3	A. He might have been our CFO then.
4	Q. Was he CFO at the time that Litle & Company
5	was sold, 1995?
6	A. No.
7	Q. Did he leave the company before that time?
8	A. Yes.
9	Q. Okay.
10	A. Then he came back.
11	Q. Did he come back before 1995?
12	A. Uh-huh.
13	Q. Okay. So when he came back to Litle &
14	Company, what was his position at that
15	time?
16	A. It wasn't CFO. I don't remember what it
17	was.
18	Q. Where is Mr. Shirey employed now, if you
19	know?
20	A. Paymentech.
21	Q. Have you contacted Mr. Shirey about this
22	litigation?
23	A. No.
24	Q. And who is Steve Tritman?
25	A. He is the guy that was working with us at

Page 221

1	that point in time who didn't work with us
2	very long.
3	Q. Was he an employee of Litle & Company?
4	A. Yes.
5	Q. And what was his position?
6	A. I don't remember. It might have been chief
7	operating officer. Something like that.
8	Q. Do you know whether this memorandum was ever
9	forwarded to anyone, other than Mr. Shirey
10	or Mr. Tritman?
11	A. No, I don't.
12	Q. Okay. I want to go down to the fourth
13	paragraph on the first page.
14	A. Numbered paragraph?
15	Q. It starts with the words "I suggest."
16	A. Yeah.
17	Q. The third sentence states "We already have
18	the requirement that we be paid in one day
19	if the account balance goes negative so we
20	are protected contractually on negative
21	balances." What did you mean when you said
22	you were protected contractually against
23	negative balances?
24	A. If we received a settlement file that had
25	more refunds, in terms of dollars, than

56 (Pages 218 to 221)

Page 222

1  sales, in terms of dollars, that meant we
2  owed the merchant money -- no. That meant
3  the merchant owed us money, rather than the
4  other way around, and under those
5  circumstances, we could do an ACH debit and
6  take money out of their account.
7  Q. When you say "take money out of their
8  account," you're referring to the merchant's
9  account?
10  A. Right.
11  Q. Okay, and did Litle & Company have the
12  ability to go into the bank account of the
13  member and debit that account?
14  A. Yes.
15  Q. Okay. Did it do that through First of
16  Louisville or did it do that directly?
17  A. No. It was an instruction to First of
18  Louisville.
19  Q. Okay. So the company that would actually
20  debit the account would be First of
21  Louisville?
22  A. That's right.
23  Q. The next sentence states "I would assume
24  that the 'conditional' nature of our credit
25  card advances will protect us in a Chapter

Page 223

1  11 situation, but if it doesn't, we
2  obviously have to fix the contract so it
3  does." What did you mean by the conditional
4  nature of the credit card?
5  A. I think in the agreement, it says we
6  conditionally purchase -- the purchase of
7  the credit card transactions is conditional
8  on the fact that those are good transactions
9  and they don't have chargebacks against
10  them, et cetera, and I don't remember
11  exactly, but I think the conditional nature
12  meant that we felt we were protected in a
13  Chapter 11 situation of being -- of being in
14  the general creditor pool in a way that
15  would disadvantage us. I think we came
16  ahead of the general creditors. I don't
17  really remember the technical part, but we
18  had a pretty senior position, based on
19  the --
20  Q. When you say "conditional," was there a
21  particular type of conditions you were
22  thinking of that you were placing on the
23  credit card advances or did you just more
24  generally?
25  A. No. Generally, when we purchased a credit

Page 224

1  card, if it turned out that it was a bad
2  credit card or a fraud or it turned into a
3  chargeback, then we could unwind the
4  conditional purchase and get our money back
5  from the merchant. That had nothing to do
6  with the advances. It was just the way the
7  contract was set up.
8  Q. And did the Member Agreement with Exposures
9  ultimately implement this conditional nature
10  of the credit card advances?
11  A. You're asking me stuff I just don't remember
12  the specifics of.
13  Q. Now, if you could go to the numbered
14  Paragraph 3 at the bottom, it states "It
15  should be clear that all of the conditions
16  of our processing contract are still in
17  force." Is the processing contract you
18  refer to there the Member Agreement --
19  A. Yes.
20  Q. Other than a Member Agreement, were there
21  any other standard type of documents that a
22  member would sign?
23  A. Sometimes they'd sign a personal guaranty.
24  Sometimes they'd sign a cross-company
25  guaranty, where there were a number of

Page 225

1  commonly-owned companies, like the
2  info-mercial business, they had a company
3  for every product, and if a product went
4  south on a company like that, we expected
5  them to pay their obligations, anyway.
6  There are probably other ancillary kinds of
7  agreements.
8  Q. Do you recall the phrase "Master Membership
9  Agreement"?
10  A. Yeah.
11  Q. Was that just another name for the standard
12  Merchant Agreement?
13  A. No.
14  Q. Okay. What was the Master Membership
15  Agreement?
16  A. What I was trying to do was to set up a
17  one-page Master Membership Agreement, which
18  meant that every other type of product we
19  offer, under that, they would get an
20  addendum to the Master Agreement that didn't
21  have to be signed, but if they used the
22  product, they had one transaction that used
23  that product, and they used it in any way
24  that it was obvious they used the product,
25  then that piece of agreement was in force.

57 (Pages 222 to 225)

Page 226

1    We never did quite get that figured out, so
2    I don't think that applies here.
3  Q.  Okay.  You never actually completed a Master
4    Membership Agreement?
5  A.  I think we did with some people, but it
6    turned out to be cumbersome.
7  Q.  Do you know whether Exposures or Museum
8    Publications of America ever signed a Master
9    Membership Agreement?
10  A.  If they did, it was -- in my sense, it was
11    superceded by what you see as a Member
12    Agreement.
13  Q.  But you can't recall whether they originally
14    signed one or not at this point?
15  A.  No.
16  Q.  If you could go to the next page, Paragraph
17    4, it states "We should indicate what
18    percentage of the Visa/MasterCard sale
19    deposits will be deducted from each payment
20    to the member.  Note that this is not net
21    deposits."  Could you explain the difference
22    between sale deposits and net deposits?
23  A.  Yeah.  Sale deposit was for all the sales
24    that were made for which the merchant or
25    member was due payment.  The net deposit was

Page 227

1    less the refunds that the merchant wanted to
2    send back to the cardholder through the same
3    mechanism.  It was basically a negative
4    sale, as far as the mechanics were
5    concerned, and the reason we wanted to do it
6    on sale transactions is we never really had
7    any control over what membership refunds
8    were and it was easier to do it on the sale
9    transactions.
10  Q.  Okay.  Was there anything in the process
11    that you've described earlier in Litle 10
12    that would differ if it was percentage of a
13    sale deposit, as opposed to percentage of a
14    net deposit?
15  A.  Yeah.  The amount of money that we would
16    have gotten by multiplying the net deposits
17    by the percentage would have been less than
18    the amount of money we got by multiplying
19    sale deposits by the --
20  Q.  In both cases, First of Louisville would be
21    forwarding the amounts?
22  A.  Yeah.  They forwarded whatever we told them
23    and they wouldn't know how we calculated
24    them.
25  Q.  Okay.  The next paragraph -- well, let me

Page 228

1    read the first couple of sentences into the
2    record.  "We have to identify what the fee
3    should be.  My sense is that we do something
4    like deduct 21 percent from the
5    Visa/MasterCard proceeds, of which we keep
6    one percent and 20 percent goes back to the
7    member."  What did you mean when you said
8    "20 percent goes back to the member"?
9  A.  The original way we were trying to figure
10    out how to collect our fee would be a
11    percentage of what we withheld from the
12    member; i.e., if 20 percent was how much we
13    were withholding from the member and paying
14    to the third party, we would actually
15    withhold 21 percent and keep one percent.
16    That was the engineering in me talking.  It
17    was trying to be too precise and I don't
18    think we ever did it that way.  I think we
19    simply added the fee, our fee, to the total
20    amount they owed us and then took out our
21    fee first.
22  Q.  Well, why is there a reference to the 20
23    percent going back to the member?
24  A.  Oh, 20 percent going back to the member?  I
25    think that's a mistake.  I think it should

Page 229

1    be the 20 percent going to the third party.
2  Q.  Now, with respect to Exposures, was Litle &
3    Company responsible for obtaining
4    authorization for the credit card payments?
5  A.  Yes.
6  Q.  And Exposures did that through sending a
7    request that ultimately went to the card
8    issuers?
9  A.  Yes.
10  Q.  Okay, and the response to that authorization
11    request would come back from the card
12    issuers to you at Litle?
13  A.  Typically, from the card issuer to the
14    Visa/MasterCard card network, in those days,
15    from NDC, then back to us, and then back to
16    the merchant.
17  Q.  Did NPC have any involvement in
18    authorization requests?
19  A.  Yes, in the fact that they contract with
20    NDC, under which we operated.
21  Q.  But did NPC directly involve itself in the
22    authorization process?
23  A.  I do not believe so.
24  Q.  Okay.  Did First of Louisville?
25  A.  No.

58 (Pages 226 to 229)

1      MS. PRESTON:  Michael, would this
2  be a good time to take a short break?
3      MR. EDELMAN:  Yes.
4      THE VIDEOGRAPHER:  The time is
5  3:55.  This is the end of Cassette 3 and
6  we're off the record.
7      (Discussion off the record.)
8      (Recess.)
9      THE VIDEOGRAPHER:  The time is
10  4:11.  This is the beginning of Cassette
11  Number 4, the deposition of Thomas Litle.
12  We are on the record.
13  Q.  (Cont'd. By Mr. Edelman)  now, Before today,
14  had you had any previous communications with
15  counsel for any of the defendants?
16  A.  Before today?
17  Q.  Yeah.
18  A.  I talked to them yesterday.
19  Q.  Who did you talk to yesterday?
20  A.  I guess, the three lawyers that are here.
21  Q.  Okay, and before your discussion with them
22  yesterday, did you have any other
23  conversations with counsel for the
24  defendants?
25  A.  I think there was a telephone call, but I

1  don't remember the content of it and I don't
2  remember who was on it.
3  Q.  Do you recall there was a telephone
4  interview which was set up for you to
5  describe Litle & Company's process to the
6  defendants' attorneys?
7      MR. SMITH:  Objection.  Was the
8  question, "do you recall if"?
9  A.  If what?
10      MR. EDELMAN:  Go ahead and read it
11  back.
12      (The previous question was read
13      back by the court reporter.)
14      MR. SMITH:  Object.  I think, lack
15  of foundation.  "If" didn't make it on to
16  the record, so maybe you should restate the
17  question.
18  Q.  Was there a conversation in which you were
19  interviewed by the defendants' attorneys
20  about the processes used by Litle & Company?
21      MR. SMITH:  Object to the term
22  "interview," but otherwise, if you
23  understand the question.
24  A.  I don't know exactly what you mean by "the
25  processes used by Litle & Company."

1  Q.  This first telephone conversation that you
2  had with defendants' counsel, what counsel
3  did you talk to?
4  A.  I don't remember who was on it.  I could
5  tell you the basis of the conversation, if
6  that makes --
7      MR. SMITH:  Well --
8  Q.  Sure.  Go ahead.
9  A.  They were trying to figure out whether I was
10  a witness that would be able to -- that
11  understood the situation and could talk
12  about the patent issue and whether I had any
13  knowledge of any kind of funding for
14  merchants and whether we had been repaid
15  using the credit card processing mechanism,
16  and I think they were just trying to figure
17  out whether they should talk to me again or
18  not.
19  Q.  And was the patent issued to Advanceme
20  discussed during that conversation?
21  A.  Well, I knew it was a patent idea, but the
22  issue -- the things in the patent, I don't
23  remember any discussion about.  The first
24  time I ever saw the claims was today.
25  Q.  Okay.  You said you also had a meeting with

1  defendants' counsel yesterday?
2  A.  Yes.
3  Q.  Okay.  How long did that meeting take
4  place?
5  A.  Boy, I don't know.  A couple of hours.
6  Three hours, maybe.
7  Q.  And what did you discuss with defendants'
8  counsel during that meeting?
9  A.  Same kind of stuff.  They wanted to
10  understand what we did.  I don't think we
11  discussed anything that hasn't been
12  discussed today.
13  Q.  Okay.  Did you get up on a board and draw
14  the payment process, similar to what you did
15  today?
16  A.  Yes.
17  Q.  And did you draw a diagram that was similar
18  to Litle 10 for the attorneys yesterday?
19  A.  I suppose it was similar.  When I do that,
20  they never come out the same way.
21  Q.  And did counsel tell you that they would ask
22  you to make the same drawing during the
23  deposition?
24  A.  No.  They told me that I might have to
25  explain what the situation was.  I'm more

59 (Pages 230 to 233)

Page 234

1  comfortable doing the drawing.
2  Q. Did counsel yesterday give you a copy of the
3     patent?
4  A. I don't think so.
5  Q. Okay. Have you ever received a copy of the
6     patent?
7  A. I think I have received a copy of the
8     patent. I know I've never read it.
9  Q. Who sent you a copy of the patent?
10        MR. SMITH: If that was something
11  that I sent you or something that was
12  provided to you by counsel --
13  A. Yeah, probably.
14  Q. Other than your counsel, did anybody else
15     produce the patent to you?
16  A. It's possible. I don't remember. I've been
17     pretty busy these days. I don't answer much
18     of any e-mail or read anything.
19        MR. EDELMAN: Let me mark as next
20  in order Exhibit Number 15.
21        (One-page e-mail dated April 26,
22        2006 is marked Exhibit Number 15
23        for Identification.)
24  Q. I'm just trying to pin down the date of your
25     initial communication with anyone about this

Page 235

1  litigation. Could you look at document
2  marked as --
3        MR. SMITH: Is there a question?
4  Q. If you could review the document marked as
5     Exhibit Number 15.
6  A. Yeah.
7  Q. Is this e-mail sent about the time that you
8     initially had a communication with Mr.
9     Goldin?
10  A. I would suspect so, yes.
11  Q. Okay. So it was in about April of 2006 when
12     you first learned about this lawsuit?
13  A. That's right.
14  Q. Okay. During the initial conversation with
15     Mr. Goldin, did he ask whether you could
16     search for particular information about
17     postage financing?
18  A. I don't remember if it was the initial
19     conversation. At some point, he asked me if
20     we had any documentation about it, and I
21     said no, I didn't think so, but all that
22     kind of documentation would be at
23     Paymentech.
24  Q. And did you agree with Mr. Goldin that you
25     would make an effort to try to track down

Page 236

1  any documentation?
2  A. I believe so, and that resulted in my call
3     to Mike Duffy.
4  Q. Why did you agree to make that effort?
5        MR. SMITH: Objection.
6  A. Because he asked me to and I figured it was
7     what he was looking for, so I was going to
8     try and help him out.
9  Q. Why did you want to help him out?
10        MR. SMITH: Objection.
11  A. Why would I not want to help him out? I
12     don't know. It's the same question. I try
13     to help everybody out. That's one of the
14     reasons we do so well in the industry.
15     Everybody in the industry owes me a favor,
16     one way or another.
17  Q. At some point, did you reach a belief that
18     the inventions in the Advanceme patent had
19     been practiced by the old Litle & Company?
20  A. Yes.
21  Q. Okay, and when did you reach that belief?
22  A. When I understood what the basis of the
23     patent was.
24  Q. And how did you understand what the basis of
25     the patent was?

Page 237

1  A. Because David told me in a simplified form.
2  Q. So Mr. Goldin described to you what the
3     patent was, and based on Mr. Goldin's
4     description --
5  A. No. It was more he described what his
6     company did and that he was getting sued by
7     you guys because you thought that you held
8     the rights to do what he was doing, and it
9     sounded to me a hell of a lot like that's
10     something we had done as far back as 1982 or
11     '3.
12  Q. And Mr. Goldin also sent you the patent;
13     correct?
14  A. He may have. I may have received the
15     patent, and he probably -- if I did, he
16     probably expected me to read it, but I
17     didn't.
18  Q. So let me make get it straight. You
19     performed a belief on whether the old
20     Litle & Company was performing the patent
21     inventions, but you didn't bother to read
22     the patent that was sent to you?
23        MR. SMITH: Objection. Object to
24  the form. Compound question.
25  A. Ask it in two pieces and I'll answer it.

Page 238

1    MR. EDELMAN: That's a perfectly
2    appropriate question.
3    A.  Sort of like "When did you stop beating your
4    wife?" Right?
5    MR. EDELMAN: Read it back.
6    (The previous question was read
7    back by the court reporter.)
8    MR. SMITH: Objection.
9    Argumentative. Object to the form. If you
10   understand the question, you can answer it.
11   A.  I do understand it. It's two questions.
12   One is, did I form an opinion on what the
13   patent was all about based on conversations
14   with David and his description of what his
15   company was doing that, theoretically, was
16   in violation of the patent, and the answer
17   was yes, I got a sense of what the patent
18   was all about; and to the second question,
19   even though, you know, as a lawyer, you
20   probably wouldn't approve of this, I did not
21   read the patent.
22   Q.  Well, what I'm trying to understand from you
23   is why would you immediately believe what
24   Mr. Goldin had to say about the nature of
25   the patent inventions, instead of just

Page 239

1    reading the patent?
2    MR. SMITH: Objection.
3    Argumentative.
4    A.  I guess that's because you're a lawyer and
5    I'm an engineer. That's the way I --
6    Q.  You found Mr. Goldin's words to you about
7    what the patent inventions were was more
8    trustworthy than what the patent said?
9    MR. SMITH: Objection. Calls for
10   speculation. Object to the form.
11   Argumentative.
12   A.  If he was -- if he was being sued --
13   MR. GRAY: Objection. Lack of
14   foundation. Just answer his question.
15   A.  Am I stupid; is that the question?
16   MR. EDELMAN: I'm glad you think
17   it's funny. Could you read back the
18   question?
19   (The previous question was read
20   back by the court reporter.)
21   MR. SMITH: I object.
22   MR. GRAY: Object to the form.
23   MR. SMITH: It's argumentive. I
24   mean, you know, this isn't trial. If you
25   want to ask him to answer that question

Page 240

1    again, you can do it --
2    Q.  How long have you had the patent in your
3    possession?
4    A.  I don't know that I have it in my
5    possession, even now. If you show me a copy
6    of something that I got, I would believe
7    that I have it, but I have not read it.
8    Q.  Did you ever ask anyone for a copy of the
9    patent?
10   MR. SMITH: Apart from
11   conversations you might have had with me,
12   your counsel.
13   A.  I don't remember. I might have.
14   Q.  Now, during the first interview that -- I'm
15   sorry.
16   MR. EDELMAN: Strike that.
17   Q.  During the first discussion you had on the
18   telephone with defendants' counsel, was Mr.
19   Goldin present on that conversation?
20   MR. SMITH: If you know.
21   A.  I think so, yes.
22   Q.  Okay, and were there any other subjects
23   discussed during that conversation, other
24   than issues related to the patent?
25   MR. SMITH: Objection.

Page 241

1    A.  Not that I remember.
2    Q.  Did Mr. Goldin, during that conversation,
3    talk to you about AmeriMerchant's program
4    and whether it could be something Litle &
5    Company would be interested in?
6    MR. SMITH: Objection. Lack of
7    foundation. Assuming facts not in
8    evidence.
9    MS. PRESTON: Too vague.
10   MR. SMITH: If you understand the
11   question, you can answer. I don't
12   understand the question.
13   A.  I don't remember. I do remember a
14   discussion. I don't remember when it was,
15   that, would it -- is there any way that it
16   would make sense for us to do business
17   together, and I came to a conclusion that
18   there wasn't, and I told him so.
19   Q.  And how many discussions did you have with
20   Mr. Goldin on whether it made any sense for
21   the companies to do business together?
22   A.  I think, at most, one.
23   Q.  Okay, and what did you discuss on that
24   subject?
25   A.  Well, I didn't know how he was advancing, or

Page 242

1    I asked him how his business worked, and he
2    said he advanced mostly -- money to mostly
3    restaurants. We don't process restaurants.
4    Restaurants are a card-present kind of
5    transaction. We don't process restaurants,
6    and so it didn't make any sense for us to
7    pursue any business interest.
8  Q. Who brought up the idea that AmeriMerchant
9    and Litle & Company might be able to work
10   together?
11 A. I don't remember. Could have been me.
12   We're always interested in customers. If I
13   did, I didn't know he was not a
14   card-not-present.
15 Q. Could it have been Mr. Goldin who brought up
16   the idea?
17       MR. SMITH: Objection.
18 A. I don't remember.
19 Q. Did Mr. Goldin send you information about
20   AmeriMerchant?
21 A. I don't remember getting any real brochures,
22   but I might have.
23 Q. Okay. Was the discussion that you had with
24   Mr. Goldin about the possibility of
25   AmeriMerchant and Litle & Company doing

Page 243

1    business together part of the same
2    discussion that you had with defendants'
3    counsel about patent issues?
4        MR. SMITH: Objection.
5  A. I doubt it.
6  Q. You believe there was a separate
7    conversation?
8  A. I don't know. Could have been.
9  Q. Do you recall whether it was the same
10   conversation or a different conversation?
11 A. It was a very short conversation that
12   ended when I discovered that he was
13   advancing money to restaurants, business
14   which we would not have been interested. If
15   he was advancing money to card-not-present
16   people, we probably would have been
17   interested in it.
18       MR. EDELMAN: I will mark as next
19   in order Number 16.
20       (Two-page document consisting of
21       e-mails beginning with e-mail dated
22       June 27, 2006 is marked Exhibit
23       Number 16 for Identification.)
24 Q. First, could you tell me whether the
25   document marked as Exhibit Number 16 is a

Page 244

1    true and correct copy of an e-mail chain
2    between you and Mr. Goldin?
3  A. Looks like it.
4  Q. I first direct your attention to the e-mail
5    at the bottom of the document from Mr.
6    Goldin to yourself, and you see the first
7    sentence refers to a schedule/security
8    agreement --
9  A. Yeah.
10 Q. -- of the postage financing agreement. Is
11   that the schedule/security agreement
12   relating to Exposures that has been marked?
13 A. Yes.
14 Q. Okay, and the next sentence states "The
15   entire document couldn't be located. This
16   was all that was apparently in the folder."
17   Do you have any understanding of what folder
18   is being referenced here?
19 A. I would assume it's the contract folder.
20   Again, that would be --
21 Q. The contact folder in Paymentech?
22 A. Yeah, Paymentech. Yes.
23 Q. Okay. So this communication was happening
24   after you had discussed with Mr. Goldin the
25   possibility that there would be documents at

Page 245

1    Paymentech?
2  A. Yes.
3  Q. The next sentence states "The patent
4    attorneys think it's enough to start and we
5    may ask for testimony from you, et cetera,
6    that further details how the program worked
7    if needed." What did you understand Mr.
8    Goldin meant by the statement that "the
9    patent attorneys think it's enough to
10   start"?
11       MR. SMITH: Objection. Calls for
12   speculation. Outside of this witness's
13   knowledge.
14       MR. GRAY: Objection.
15       MR. SMITH: You can answer. I
16   mean, he's asking you --
17 A. They are basically trying to figure out
18   whether I would be helpful to their case, I
19   think.
20 Q. If you could go up to your response to the
21   e-mail to Mr. Goldin?
22 A. Uh-huh.
23 Q. First sentence states"This is great that
24   they found something in the file." Does
25   that indicate that, by this point, you had

62 (Pages 242 to 245)

1 already formed an opinion that Litle &
2 Company's process included the inventions in
3 the patent?
4       MR. SMITH:  Objection.
5 A.  Litle & Company's process included the
6 patent?
7 Q.  Well, why did you think it was great that
8 Mr. Goldin found something in the file?
9 A.  Because I thought it was unlikely Paymentech
10 could find anything, and they were also
11 competitors, so I thought it was unlikely
12 they'd even try.
13 Q.  Okay.  The next sentence states "Perhaps"
14 they have some operating documentation that
15 shows that proceeds were deducted each
16 day."
17 A.  Right.
18 Q.  Was any of that operating documentation ever
19 located to produce in response to the
20 Advanceme subpoena?
21       MR. SMITH:  To Advanceme subpoena
22 on who?
23       MR. EDELMAN:  Mr. Litle.
24 A.  I didn't have any of it.  I wouldn't expect
25 I would.

1 Q.  Okay.  What operating documentation did you
2 have in mind?
3 A.  It would be the calculations of the -- what
4 had been previously referred to as the
5 calculations from which the instructions
6 would be derived to -- that we gave to First
7 of Louisville.
8 Q.  Okay.  The e-mail also makes a reference to
9 an Allen Abbott?
10 A.  Uh-huh.
11 Q.  Mr. Abbott was the treasurer of Exposures in
12 the early 1990's?
13 A.  I believe he was the CFO.
14 Q.  Okay, and during your communication with Mr.
15 Abbott back in the 1990's, was Mr. Abbott
16 one of the people that worked with you in
17 formulating the postage finance program?
18 A.  Yes.
19 Q.  When was the last time you spoke to Mr.
20 Abbott?
21 A.  A couple of months ago.
22 Q.  And did you speak with him about this case?
23 A.  Yes.
24 Q.  Okay, and what did you talk about with Mr.
25 Abbott?

1 A.  I think it was before we found those
2 documents, actually, and I just asked him if
3 he remembered the postage financing, and he
4 should get in touch with David, if he did.
5 Q.  Okay.  Did you talk to Mr. Abbott before
6 this June e-mail was sent?
7 A.  Yes.  Not about this, necessarily, or --
8 yes, I think it was probably before this.
9 Q.  Okay.  Other than the communication you just
10 talked about with respect to the patent, are
11 you in regular communication with Mr.
12 Abbott?
13 A.  Yeah.  He's an active part of the catalog
14 and direct marketing community, and I see
15 him at trade shows, and I consider him a
16 friend and he considers me a friend, I
17 think.
18 Q.  Now, do you see, getting towards the middle
19 of the document, it says "Exposures was the
20 first of these agreements."
21 A.  Yeah.
22 Q.  Does that mean that Exposures was the first
23 company that entered into a postage finance
24 agreement with Litle & Company?
25 A.  Yes.

1 Q.  Okay.  Then in parentheses it makes a
2 reference to "the original group we did in
3 the early to mid eighties."  What is that a
4 reference to?
5 A.  Oh, that was not postage financing.  The
6 early to mid eighties was when we collected
7 the fulfillment fees from the clients way
8 back in DMGT days.
9 Q.  Okay.  So that was not done at Litle &
10 Company?
11 A.  That's right.
12 Q.  Okay.  Are you aware of any documentation
13 that would reflect the fulfillment fees
14 process that you're describing in the early
15 to mid 1980's?
16 A.  I am not aware of any, but DMGT was also
17 part of the sale to Paymentech, and so
18 Paymentech would have those, and that's sort
19 of documents once removed.  So I think
20 chances of finding any of that stuff is
21 pretty low.
22 Q.  The next sentence states "Hearthsong came
23 later, as well as others that I don't
24 remember."  So was Hearthsong another
25 company that entered into an agreement with

1    Litle & Company for postage financing?
2    A.  Yes.
3    Q.  And did Hearthsong sign a Member Agreement?
4    A.  Yes.
5    Q.  Okay, and was that a Member Agreement
6       similar to the Member Agreement attached --
7    A.  I obviously don't remember specifically, but
8       they were all similar, so I would assume
9       that's the case.
10   Q.  Do you know whether there was any effort to
11      ask Paymentech to search for any documents
12      relating to Hearthsong?
13   A.  I think so.  I think I would have -- I don't
14      remember specifically, but I would have
15      asked for the Exposures -- no.  I do
16      remember.  I asked for Exposures and
17      Hearthsong.  I did not ask for Museum
18      collections because I didn't remember them
19      at the time.
20   Q.  Other than Exposures, Hearthsong, and Museum
21      Publications of America, are there any other
22      merchants that you recall that entered into
23      postage finance agreements?
24   A.  Yeah, there were a number, but I can't
25      remember what their names were.

1    Q.  Okay.  I'm asking, was there any other names
2       that you can recall?
3    A.  Huh?
4    Q.  I was asking, were there any other names
5       that you can recall?
6    A.  No.
7    Q.  Now, in the fourth sentence in this
8       paragraph, it states "As we continued the
9       program, it became more defined."  What did
10      you mean by that?
11   A.  Well, the difference between the
12      documentation behind the Exposures agreement
13      and the Museum Collections agreement was
14      improved and changed and more descriptive
15      and our fees were defined on when we
16      collected them and the procedure was more
17      crisp, and it was just a result of
18      experience over doing this a number of
19      times.
20   Q.  And was one of the changes that the
21      repayments would be first taken out of
22      Litle's fees?
23   A.  The payment be taken out of Litle's fees?
24   Q.  I'm sorry.  That the repayment would first
25      be applied with respect to Litle's fees.

1         MR. SMITH:  Objection.
2    A.  I think so, yeah.
3    Q.  Are there any other specific changes that
4       you can identify in the postage financing
5       program between the Exposures agreement and
6       agreements that came later on?
7    A.  No.  Like the fee thing, they would have
8       been fairly minor in the scheme of things.
9       The general idea was --
10        MR. GRAY:  Objection.  Are you
11      referring to the Litle fees from Exhibit 4,
12      or are you referring to the management fee
13      from the promissory note?
14        MR. EDELMAN:  I'm referring to the
15      Litle fees from Exhibit 4.  Actually, I'm
16      not sure.  I don't understand your
17      question.  I object.
18        THE WITNESS:  It's catchy.
19        MR. GRAY:  I'm sorry to interrupt.
20      I feel like you guys are going back and
21      forth.  The Litle fees were defined as the
22      processing fees on Exhibit 4.  The
23      management fee is the fee Litle & Company
24      charged for the postage advance.
25        MR. EDELMAN:  Right.  What I'm

1       getting at is whether the repayment was
2       first applied to the management fee.
3         MR. GRAY:  The management fee.
4       Okay.
5         THE WITNESS:  Yes, I understood it
6       that way.
7         MR. SMITH:  You understood it that
8       way?
9    Q.  Now, this process that you diagrammed on
10      Litle 10, is it fair to say that that same
11      basic process applied to every merchant
12      under the postage financing program?
13   A.  Yes.
14   Q.  Was there a distinction in the Member
15      Agreements between purchase sales and
16      conveyed sales?
17   A.  Yes.
18   Q.  Okay.  What is that distinction?
19   A.  The purchase sales were Visa and MasterCard
20      sales in which we took liability for the
21      merchant's behavior.  Conveyed sales were
22      the merchants had agreements directly with,
23      say, American Express, and all we did was
24      facilitate the delivery of transactions to
25      American Express and facilitate

64 (Pages 250 to 253)

Page 254

1 authorizations. If the merchant went out
2 business and stuck all the consumers and the
3 consumer wanted their money back, they would
4 get it back from American Express, not from
5 us.
6 Q. Did the standard Member Agreement encompass
7 both purchase sales and conveyed sales?
8 A. Usually.
9 Q. And did the standard Member Agreements
10 encompass both debit card transactions, as
11 well as charge card transactions?
12 A. Well, as I testified earlier, the debit
13 cards and the credit cards were, by design,
14 not distinguishable. Visa and MasterCard,
15 by design, did not allow people to know
16 which were which.
17 Q. Okay. Now, under the standard Member
18 Agreement, Litle handled certain credit card
19 transactions differently than others;
20 correct? It was handled, Visa and
21 MasterCard, one way, and American Express, a
22 different way?
23 A. Relative to the purchase part and the
24 liability and where they were sent, yes.
25 Q. Okay. How did Litle & Company know from the

Page 255

1 information it received from the merchant
2 which type of card transaction it was?
3 A. American Express starts with a 37 and is 15
4 digits long -- I think it's 37. Visa starts
5 with 1 4. MasterCard starts with a 5.
6 Diners started with a 39 or something like
7 that. I might not have these right, but we
8 could tell the different brands based on
9 the, what you call the identifier, but the
10 credit card number and its construction.
11 Within the Visa brand, we could not and were
12 not allowed to have, and Visa did not
13 divulge, any way to determine whether it was
14 a credit card or a debit card until Wal-Mart
15 won their battle royal suit and got Visa to
16 pay them two billion dollars, or whatever
17 they got them to pay, and that is what that
18 suit was all about, because Visa and
19 MasterCard did not distinguish them. The
20 reason they didn't distinguish them is they
21 collected interchange on credit cards and
22 the interchange covered opportunity loss of
23 interest that though didn't collect between
24 the time they paid the merchant and the time
25 they got it from the consumer, if there was

Page 256

1 a grace period, and debit cards were
2 deducted directly from the consumer's
3 account. So they made a lot more money on
4 debit cards that they processed in the guise
5 of credit cards. So they didn't want to
6 give up on that profitability. That is what
7 the Wal-Mart suit was all about. Visa and
8 MasterCard both lost and it cost them a
9 total of three billion dollars.
10 Q. Were all the debit card transactions that
11 Litle & Company handled linked to MasterCard and Visa in some
12 that were linked to MasterCard and Visa in some
13 way? Do you understand my question?
14 A. That question makes no sense.
15 Q. All right. Were there debit cards that were
16 used at the time that were completely
17 unconnected to MasterCard and Visa?
18 A. Uh-huh. Like proprietary bank terminal
19 cards?
20 Q. Right. Let's take for example a Wells Fargo
21 debit card.
22 A. If it didn't have a Visa or a MasterCard
23 number on the front of it, we didn't process
24 it.
25 Q. Okay. So Litle & Company would process only

Page 257

1 those debit cards that had Visa or
2 MasterCard on them?
3 A. Only Visa or MasterCard debit cards, yes.
4 Q. Did Litle & Company create a document called
5 an Operating Guide?
6     MR. SMITH: Objection.
7 A. The Operating Guide was part of the Master
8 Member Agreement that never went anywhere,
9 and so I don't remember whether we created
10 the Operating Guide. I think there was an
11 attempt to, but I don't know that it was
12 used.
13 Q. What was going to be the purpose of the
14 operating guide?
15     MR. SMITH: Objection. Calls for
16 speculation.
17 A. Remember the Master Agreement that you were
18 talking about --
19 Q. Right.
20 A. -- was going to be one page and it was going
21 to refer to the operating guide as sort of a
22 giant appendix to the agreement, that these
23 are the guidelines that the merchant had to
24 follow. That was actually a fairly common
25 way that payment processors wrote their

65 (Pages 254 to 257)

Page 258

1    agreements at the time.  In fact, we were
2    basically copying what Chase did at the time
3    when Chase was our payment processor for our
4    catalog.  Interestingly enough, Chase didn't
5    have any operating guide either, but we had
6    to comply with all the regulations in this
7    non-existent operating guide.  I know just
8    by the look on your face you don't believe
9    that, but one of the wonderful regulations
10   that Visa/MasterCard have is you have to
11   comply with all the regulations of Visa and
12   MasterCard, and one of the first regulations
13   is merchants can't read or can't see the
14   regulations.  Nobody believes it, but it's
15   true.
16   Q.  Do you have a copy or maintain a copy of
17      Visa and MasterCard regulations?
18   A.  Yes.
19   Q.  And do you consult those regulations in your
20      business?
21          MR. SMITH:  Objection.
22   A.  Yes.
23   Q.  Okay, and how often do you consult those
24      regulations?
25   A.  We got a guy that knows them by heart.  It's

Page 259

1    a stack of stuff that is a foot high.
2    Q.  Okay, and at the old Litle & Company, did
3       you also maintain a copy of the
4       regulations?
5    A.  Yes, but as a third-party processor, that
6       was okay.  We just couldn't give them to our
7       merchants.
8    Q.  Right, and so throughout the time that you
9       were at the old Litle & Company, you had a
10      company of the Visa and MasterCard
11      regulations?
12   A.  As they were changed, which was with great
13      regularity.
14   Q.  How often would those regulations be
15      changed?
16   A.  At least once a year, and the way Visa
17      worked is -- the way the network worked is
18      they did the best job they could at figuring
19      out what the rules would be, and then when
20      they discovered things went wrong, they
21      changed the rules and came out with a new
22      set of regulations.  One of the rules
23      changes we've talked about, and that is how
24      the funds got distributed to the merchants.
25   Q.  How would you be informed of changes to the

Page 260

1    regulations?
2    A.  We would get bulletins on a regular basis
3       from Visa and MasterCard if it was something
4       we should be alerted to and then we would
5       get a copy of the regulations every time
6       they came out.
7    Q.  And who at the old Litle & Company was
8       responsible for insuring that Litle &
9       Company's operations were consistent with
10      the Visa and MasterCard regulations?
11   A.  We had -- I forget what we called it then,
12      but basically, a compliance department, and
13      the compliance department kept up with those
14      thing, informed the merchants about changes
15      they had to make in -- when they changed,
16      and informed our systems people about when
17      we had to do compliance -- or systems work
18      to maintain compliance with the
19      regulations.
20   Q.  Did you work with any attorneys at any point
21      at the old Litle & Company to review Visa
22      regulations and determine whether the
23      company was performing consistently with
24      them?
25   A.  No.  That was really our job and it seems to

Page 261

1    be beyond most attorneys to try and figure
2    that stuff out.
3    Q.  When Litle & Company would come out with a
4       new program or service, was it typical that
5       someone at Litle & Company would review the
6       Visa and MasterCard regulations to insure
7       that service was consistent with
8       regulations?
9          MR. GRAY:  Objection.
10         MR. SMITH:  Object to form.
11         THE WITNESS:  Shall I answer?
12         MR. SMITH:  If you understand the
13      question, you can answer.
14   A.  We knew whether that new product or service
15      was either consistent or inconsistent with
16      the regulations.  If it was consistent with
17      the regulations, that was fine.  If it was
18      inconsistent with the regulations, and we
19      believed Visa should change the regulations,
20      then we would go and lobby Visa and get them
21      to change the regulations.  In fact, I wrote
22      some of the Visa regulations on situations
23      like that where we got them to change the
24      regulations to accommodate the
25      card-not-present world, because the

66 (Pages 258 to 261)

Page 262

1    regulations were all set up without any
2    anticipation that there would be a
3    card-not-present world.  So the regulations
4    continue to change, continue to change based
5    on stuff -- big changes in the regulations
6    are because of all the credit card numbers
7    that have been compromised.  Visa has
8    clamped down on security issues.  That's the
9    kind of stuff.  It was a continuing evolving
10   process.
11   Q.  What sort of regulations did Visa or
12       MasterCard have concerning the
13       confidentiality of member information?
14           MR. SMITH:  Objection.
15           MS. PRESTON:  At some particular
16       point?
17           MR. SMITH:  What time frame are we
18       talking about?
19   Q.  This is during the early 1990's when you
20       were at the old Litle & Company.
21           MR. SMITH:  He's already testified
22       that the regulations changed quite
23       frequently.  I mean, if you want him to
24       answer as a broad generality, that's fine,
25       but it's --

Page 263

1    A.  That one, I can answer.  A lot, because a
2        spent a lot of time on the privacy issues
3        for both the DMA and Visa and MasterCard.
4        In those days, there really wasn't a whole
5        lot involved with what a payment processor
6        could do with the data, and because we had
7        direct marketing companies whose data was
8        one of their primary assets of their
9        company, the idea that Visa and MasterCard
10       didn't think much of regulating the
11       confidentiality of that data was something
12       that we objected to pretty strongly.  That's
13       one of the reasons that that confidentiality
14       section is in the Member Agreement.  That
15       was a benefit to the members, telling them
16       that, unlike CitiCorp and all the rest of
17       these guys who are abusing their
18       confidential information, we wouldn't do
19       that.  We understood the value of their
20       confidential information and we looked at
21       that as a sales feature of how we approached
22       the world.
23           In those days, I was on the Ethics
24       Committee of the DMA.  In fact, I was
25       chairman of the Ethics Committee and the

Page 264

1    lawyer that kept us honest and made sure we
2    remained ethical was a guy named Bob
3    Sherman, who works for your firm and you
4    probably know him, and I actually -- I was
5    involved in trying to get self-regulations
6    for the direct marketing industry to have
7    all of its transaction facilitators, of
8    which we were one type, to agree to keep
9    that data in confidence, and at that time, I
10   believe that allowing that data to float
11   around or not having any regulations around
12   that was bad.  I thought that the companies
13   and major league companies who were
14   mis-using the data was unethical, and at the
15   present time, Gramm-Leach & Bliley now say
16   it's illegal and I was hoping, really, we
17   could avoid something like Gramm-Leach &
18   Bliley by self-regulation.  So that's what
19   the confidential data was all about, and I
20   can go another three days on that subject,
21   but --
22   Q.  So the confidentiality provisions in the
23       Member Agreements at Litle & Company was
24       something that were different from
25       confidentiality provisions that might be in

Page 265

1    other processors' Member Agreements?
2            MR. GRAY:  Objection.
3            MR. SMITH:  Objection.  By "the
4        processors," the third-party processors?
5            MR. EDELMAN:  Yes.
6            MR. SMITH:  Objection.  Calls for
7        speculation.  I don't know how he would know
8        that.
9    A.  I do know that and they were different and
10       we sold it as a feature of our service.
11   Q.  That it was greater confidentiality?
12   A.  Yes.
13   Q.  During the early 1990's, who was Litle &
14       Company's primary competitor with respect to
15       processing for catalogers?
16            MR. SMITH:  Objection.
17   Q.  If it had one.
18   A.  My first company.
19   Q.  Which company that was?
20   A.  DMGT.
21   Q.  Do you know how DMGT handled confidentiality
22       of member information?
23   A.  They didn't address it.
24   Q.  Their Member Agreements were silent on that?
25   A.  I believe so, yeah.  It might have addressed

67 (Pages 262 to 265)

Page 266

1    it, but it didn't address it as strongly as
2    we did. Because they were our competition,
3    we managed to make them look bad by
4    explaining that.
5  Q. Were there times when you were able to sign
6    up members for Litle & Company based upon
7    the confidentiality provisions that you
8    could offer?
9  A. I can't say it was based on only the
10    confidentiality agreements, but the fact
11    that we were primarily direct marketers in
12    the payment processing world and understood
13    direct market issues, I would say, overall,
14    is why we signed up a lot of customers and
15    understanding that confidentiality that part
16    of it, and actually, I testified in
17    Washington, did all kinds of stuff about
18    this on that subject.
19  Q. You testified in Washington on
20    confidentiality of processing information?
21  A. Of confidentiality of information in the
22    hands of transaction facilitators, which
23    could be anybody with computers that had to
24    have information of the kind that we had in
25    our computers.

Page 267

1  Q. You made a reference to your former company,
2    DMGT?
3  A. Uh-huh.
4  Q. Okay. When did you leave DMGT?
5  A. 19 -- the end of 1985.
6  Q. And what were the circumstances of your
7    departure?
8  A. I basically had a falling out with my
9    partner. Primarily, interestingly enough,
10    from my point of view anyway, over the
11    confidentiality issue. He wasn't from the
12    direct marketing industry, very bright,
13    capable guy, but he thought a good revenue
14    stream for us would be to actually use the
15    data in our computers as if it were our own
16    and I, at the time, was the chairman of the
17    DMA's Ethics Operating Committee and
18    figured, you know, this was not something I
19    could sign up for, so we either had to do it
20    my way or his way and we had some other
21    issues, which in my view weren't all that
22    significant, but -- so eventually, he
23    decided he wanted to do it his way. He had
24    control of the situation and I left.
25  Q. Did you resign or were you fired?

Page 268

1  A. I was fired.
2  Q. What was your position when you were fired?
3  A. I was -- I don't really remember. I think I
4    was president and CEO.
5  Q. Did your disagreements with DMGT result in
6    any legal claims?
7  A. Yes.
8  Q. Did you sue DMGT?
9  A. Yes.
10  Q. What were the claims?
11  A. Oh, boy. I'm going to have to reconstruct
12    it. The claims were because we had
13    different entities involved in DMGT, and
14    they weren't exactly owned the same way,
15    what were my rights, et cetera. DMGT was a
16    sub-chapter S corporation. We had agreed
17    that any tax liability would be distributed
18    to the sub-chapter S holders. I didn't get
19    any distribution, so I had to pay taxes on
20    income that I never saw, and it was that
21    kind of stuff.
22      MR. SMITH: I'm just going to --
23    we're pretty far afield. So -- I mean, it's
24    your time, but you know, we're going to do a
25    hard stop if you're going to keep asking

Page 269

1    questions far afield like this. So I
2    suggest you use your time to focus on
3    stuff -- this is pretty far afield from
4    what's relevant here today. If you feel
5    otherwise, it's your time, but --
6  Q. Okay. And did DMGT make any claims against
7    you?
8      MR. SMITH: Objection.
9    Irrelevant. Calls for a legal conclusion,
10    speculative.
11  A. I don't remember. I didn't do anything
12    wrong. I don't think they did, no. Maybe
13    they did, but I don't remember.
14  Q. So the claims that you asserted against
15    DMGT, where did you assert those claims?
16  A. Huh?
17  Q. Where were those claims asserted that you
18    brought against DMGT?
19      MR. GRAY: Objection. Vague.
20      MR. SMITH: Objection.
21  Q. Where, is what I'm asking.
22      MR. SMITH: What court --
23  Q. What court?
24      MR. SMITH: -- is what you're
25    asking -- to the extent that you remember,

Page 270

1  and I object to this whole line of
2  questioning as irrelevant and beside the
3  point?
4  A. I was a resident of New Hampshire. DMGT was
5  a New Hampshire company. So it was in
6  New Hampshire.
7  Q. And what was the outcome of the litigation
8  with DMGT?
9        MR. SMITH: Same objection.
10  A. From whose point of view?
11  Q. That's a good question to ask a lawyer. I'm
12  just trying to find out what the outcome
13  was, meaning, financial outcome, settlement
14  terms, anything like that.
15        MR. SMITH: To the extent that you
16  recall a potential settlement agreement. I
17  don't know if there was or not, but if you
18  want to talk about it --
19  A. I don't really remember. It dragged on and
20  on and on and helped us get a foothold and
21  compete. So I didn't look at it as that
22  kind of lawsuit.
23  Q. Did anybody end up having to pay any money?
24        MR. SMITH: Objection.
25  A. Yeah.

Page 271

1  Q. Did DMGT pay any money to you?
2        MR. SMITH: Objection.
3  Irrelevant.
4  A. Yeah.
5  Q. And during this litigation, did you provide
6  any testimony?
7        MR. SMITH: Objection.
8  Irrelevant. What kind of testimony?
9        THE WITNESS: Do you want me to
10  answer this stuff?
11        MR. SMITH: You can answer stuff if
12  you remember, but --
13        THE WITNESS: I don't really care.
14  A. Yeah, I did provide testimony.
15  Q. Okay. Was that testimony by way or
16  deposition or declaration?
17  A. Name it it was everything.
18  Q. Did it get to trial?
19  A. Yeah.
20  Q. And you testified at trial?
21        MR. SMITH: Objection.
22  A. It was not really a trial. It was a master
23  arrangement which -- and I don't know what
24  I'm talking about -- but it wasn't a formal
25  trial.

Page 272

1  Q. Okay. Are you still -- do you still have
2  any copies of any of the transcripts of any
3  of your testimony in this case?
4        MR. SMITH: Objection. Irrelevant
5  and far from the scope of anything. If you
6  know, off the top of your head, you can
7  answer that. If it's something that might
8  be kept in your attorney's office, then you
9  shouldn't answer it.
10  A. It might have been all thrown out. At one
11  time, it was in this barn.
12  Q. What other sorts of documents were in this
13  barn?
14        MR. SMITH: Objection.
15  Q. Can you give me a general description --
16  A. My homework papers from college. You
17  know -- I go in it as little as possible,
18  averaging maybe once a year.
19  Q. Were you ever accused by DMGT of revealing
20  confidential information?
21        MR. SMITH: Objection.
22  Irrelevant. Calls for a legal conclusion.
23  A. I don't remember that being a part of
24  anything.
25  Q. Other than the litigation with DMGT, have

Page 273

1  you ever been involved in any other
2  litigation?
3        MR. SMITH: Objection. What do you
4  mean? I mean, him as a person,
5  individually?
6  Q. Let's start with you, individually. Have
7  you ever been a named party in any
8  litigation?
9        MR. SMITH: What is the relevance
10  of this stuff? What are you looking for?
11        MR. EDELMAN: You know what I'm
12  looking for. You know exactly what I'm
13  looking for.
14        MR. SMITH: I don't see how it's
15  relevant to what he's talking about today.
16        MR. EDELMAN: Your advisory opinion
17  is noted.
18  Q. Can you answer the question?
19  A. Can I answer the question? Yes.
20  Q. How many different pieces of litigation?
21        MR. SMITH: Objection. I object to
22  the form of that question. What is a "piece
23  of litigation"? I don't understand the term
24  "piece of litigation." I'd recommend you
25  seek clarification. I also don't understand

69 (Pages 270 to 273)

Page 274

1   the term "involved." As a party, as a
2   witness; as a what?
3   A. Yeah.
4        MR. SMITH: Maybe you could restate
5   the question. He obviously doesn't
6   understand it.
7   A. Well, I was sued by a guy I invested in
8   because he claimed that, because my partner
9   and I weren't going to invest any more money
10  in him, that it diminished the value of his
11  stock, and therefore, we should be forced to
12  invest more money in him with no contractual
13  expectation.
14  Q. Was that suit filed while you were at
15  Litle & Company?
16       MR. SMITH: Objection.
17  Irrelevant.
18  A. No. It was afterwards. It was a frivolous
19  lawsuit.
20       MR. SMITH: Just answer his
21  questions yes or no.
22  Q. Did you ever get named as a defendant in any
23  lawsuit while you were at Litle & Company?
24       MR. SMITH: Objection.
25  Irrelevant. Answer yes or no.

Page 275

1   A. As a defendant?
2        MR. SMITH: Him, in his personal
3   capacity?
4        MR. EDELMAN: Yes.
5        MR. SMITH: So he's not talking
6   about a lawsuit involving the company.
7   A. I don't think so. I might have been. I
8   mean, this is not something I have a
9   chronology that pops to mind.
10  Q. Did the old Litle & Company ever get sued?
11       MR. SMITH: Objection. Relevance.
12  A. I don't remember. It's not an uncommon
13  occurrence.
14  Q. Have you ever been criminally convicted?
15  A. No.
16  Q. Has the current Litle & Company been sued
17  for anything?
18       MR. SMITH: Objection.
19  Irrelevant.
20       MR. GRAY: Objection. Relevance.
21  A. I don't think so. Oh -- I don't know.
22       MR. EDELMAN: Let's take a break
23  for a few minutes. I'm going to see what I
24  need to wrap up. Okay?
25       THE VIDEOGRAPHER: Off the record

Page 276

1   at 5:04.
2        (Recess.)
3        THE VIDEOGRAPHER: On the record at
4   5:15.
5   Q. (Cont'd. By Mr. Edelman) Earlier, you made
6   reference to three-way agreements or
7   three-party agreements involving fulfillment
8   companies. Do you recall that?
9   A. Uh-huh.
10  Q. Do you still have possession of any of those
11  agreements?
12  A. I wouldn't. They would be in Paymentech's
13  hands.
14  Q. Okay. Do you know whether Paymentech was
15  asked to locate any of those three-party
16  agreements?
17       MR. SMITH: Objection. I object.
18  You can answer, if you know.
19  A. I don't think I asked them, so I don't know.
20  Q. Okay, and then you also had described
21  instances of which a bank could basically
22  direct Litle & Company to forward certain
23  payments to the bank. Does that sound
24  familiar to you? Hanover Direct, for
25  example.

Page 277

1        MR. SMITH: Objection.
2   A. Yeah.
3   Q. And there would be situations in which a
4   bank or institution such as Hanover would
5   tell you to forward certain payments to the
6   merchants bank?
7        MR. GRAY: Objection.
8        MR. SMITH: Objection to the form
9   of the question. If you understand, you can
10  answer it.
11  A. I understand the subject matter. I don't --
12  the construction of the question doesn't
13  make any sense.
14  Q. Are you in in possession of any
15  documentation to indicate that Litle &
16  Company ever paid a third-party bank or
17  institution to pay off a loan that that bank
18  had provided to a merchant?
19  A. Do I have any of that documentation? No.
20       MR. SMITH: Objection.
21  Q. Would that be located at Paymentech?
22  A. Right.
23  Q. You also made a reference to a consultant
24  named Jim Alexander.
25  A. Uh-huh.

70 (Pages 274 to 277)

Page 278

1   Q. And you think that is a consultant that may
2       have told merchants about postage
3       financing?
4   A. It could have been Jim. It could have been
5       his partner at the time. It could have been
6       another consultant of a similar ilk, but
7       most people knew what we did postage
8       financing, and they would -- and these were
9       guys that helped catalogs and financials in
10      other matters. So yes, Jim would have been
11      the kind of a person that would have told.
12  Q. Okay, and was this a consultant that had a
13      relationship with Litle & Company?
14  A. Not a formal relationship, but we were
15      friends.
16  Q. Okay. Would Jim Alexander have any sort of
17      contractual consulting relationship with the
18      merchants?
19          MR. SMITH: Objection.
20  A. Could be. I wouldn't know, but -- might be
21      an investment banking relationship.
22  Q. Have you talked to Randy Bourne about this
23      litigation?
24  A. Yes.
25  Q. Okay, and when did you talk to him?

Page 279

1   A. Probably not too long after I heard about
2       it, because Exposures was the situation I
3       remembered first.
4   Q. Okay, and did you call up Mr. Bourne to ask
5       him if he had any information?
6          MR. SMITH: Objection.
7   A. No. Actually, I called him up to suggest
8       that maybe David would want to talk to him,
9       and said "Hello, how are you doing?" I
10      mean, we were friends, too.
11  Q. Other than Mr. Bourne and Mr. Abbott, were
12      there others at Exposures with whom Litle &
13      Company communicated about the postage
14      financing?
15  A. I suppose they were, but that was the CEO
16      and the CFO, so --
17  Q. Okay, and was there one person at Litle &
18      Company that would have general
19      responsibility for the Exposures account?
20  A. We had an account manager assigned to every
21      account we had, and I don't remember who
22      their account manager was.
23  Q. So there would also --
24  A. So the answer is yes.
25  Q. And there also would have been an account

Page 280

1       manager assigned to the Museum Publications
2       account?
3   A. Yes.
4   Q. Can you recall the name of anyone at Museum
5       Publications that Litle & Company
6       communicated with about postage finance,
7       other than Mr. George?
8   A. Maybe Gil Kemp, but he was a merchant. He
9       wasn't a business type, so I'm sure if it
10      didn't have anything to do with merchandise,
11      he wouldn't remember it.
12  Q. What position did Mr. Kemp have?
13  A. He was the chief merchandiser.
14  Q. Chief merchandiser for Museum Publications?
15  A. Yes. It might not have been that title, but
16      that was the function.
17  Q. Okay, and was there any individual that you
18      can recall at Hearthsong that Litle &
19      Company communicated with about postage
20      financing?
21  A. Yes. Hearthsong was run by a husband and
22      wife, and I don't remember their names, and
23      I don't remember specifically which one of
24      them was the primary contact, but Hearthsong
25      was a catalog that was run by a husband and

Page 281

1       wife, which is not unusual in the catalog
2       business.
3   Q. Earlier today, you were talking about the
4       different accounts that Litle & Company may
5       have used in relation to this process. Is
6       it correct that the account to which the
7       Litle fees would be forwarded from First
8       National would be different than the general
9       account for a particular merchant?
10          MR. SMITH: Objection.
11          MR. GRAY: Objection.
12          MR. SMITH: Do you understand the
13      question?
14  A. Can you rephrase the question?
15  Q. Well, did -- was there sort of a general
16      account, electronic account, that was set up
17      for each merchant that Litle & Company did
18      business with?
19          MR. GRAY: Objection. Do you mean
20      an account at Litle & Company?
21          MR. EDELMAN: Yes.
22  A. No.
23  Q. When, typically, would you open an
24      electronic account for the merchants?
25  A. We wouldn't.

71 (Pages 278 to 281)

1  Q.  Who would open those accounts?
2  A.  The merchant.
3  Q.  Okay.  So it was up to a merchant to open an
4      account at a bank that the merchant wanted
5      to use?
6  A.  And their money was either credited or
7      debited to that account, as the case may be,
8      in their bank.  It was their money.
9  Q.  Okay, and would Litle & Company directly
10     communicate with the member bank to do the
11     crediting or debiting, or did it do that
12     through First National?
13 A.  It did it through First National.  When you
14     issue a wiring instruction, all you need to
15     know is the destination bank routing
16     numbers, either whether it's a wire or ACH,
17     and the money just shows up at the bank.
18     The receiving bank doesn't have to do
19     anything.  We, obviously, advise the
20     merchant through reporting that the money
21     was going to show up there, so they would
22     know they could spend it, I suppose.
23 Q.  Uh-huh, and when money came back to Litle &
24     Company from First National, where did
25     that -- what account did that money go to?

1      Talking about the money coming in for the
2      Litle fees.
3  A.  By account number, by account name.  Either
4      one, I wouldn't know.
5  Q.  Uh-huh.  Would that be an account -- were
6      the Litle fees for a merchant set up at a
7      bank that was used by Litle & Company?
8  A.  Yes.
9  Q.  And so First National would forward a
10     payment of the Litle fees to an account at
11     Litle & Company's bank?
12 A.  Right.
13 Q.  All right, and were those fees set into a
14     separate account only for a particular
15     merchant, or were Litle fees for lots of
16     different merchants put together on a single
17     account?
18 A.  The latter.
19 Q.  Okay.  Was there any segregation in the bank
20     account for the Litle fees relating to any
21     particular merchant?
22         MR. GRAY:  Objection.  Vague and
23     ambiguous.
24 A.  The fees for the normal payment processing
25     business and the normal stuff was all put in

1      a general Litle & Company bank account.  The
2      management fees for the postage financing, I
3      believe, was put into a different account.
4  Q.  Okay, and this different account for the
5      fees for the postage financing, would there
6      be a separate one of those accounts set up
7      for each merchant?
8  A.  No.
9  Q.  Okay.  So was there one account in which all
10     the fees relating to the postage advance
11     program were placed?
12 A.  I believe that was the case, and I don't
13     know if that started right from the
14     beginning or it evolved that way or what,
15     but it was -- we looked at that as a
16     separate product from our payment processing
17     product, and so we segregated the money that
18     way, is my memory.
19 Q.  Were fees from the general Litle bank
20     account ever transferred to the management
21     fees account relating to the postage
22     program?
23 A.  I doubt it.
24 Q.  How about the reverse; were fees ever
25     transferred or monies ever transferred from

1      the postage management fee account to the
2      general Litle bank account?
3  A.  It's possible.  I don't know for sure.
4  Q.  So was there any separate bank account that
5      would be designated as the Exposures postage
6      advance account or something like that?
7  A.  No.  It was looked at as a product and the
8      Exposures advance account and anybody else's
9      advance account would be run through that
10     bank account as a separate product from the
11     payment processing product.
12 Q.  Okay.  So Litle & Company would get its 20
13     percent, let's say, from First National
14     relating to postage financing, and it would
15     place that in its postage financing
16     account --
17 A.  Yes, because --
18 Q.  -- and once it was placed in that account,
19     it was co-mingled with all the other money
20     that came in under the postage finance
21     program?
22         MR. GRAY:  Objection.
23 A.  That's the way I remember it, yeah.
24 Q.  Okay.  Did Litle & Company ever outsource
25     any of its processing functions, other than

72 (Pages 282 to 285)

Page 286

1  with respect to the entities you already
2  described in Litle 10?
3        MR. SMITH: Objection.
4        MR. GRAY: Objection.
5        MR. SMITH: Do you understand the
6  question?
7        THE WITNESS: Yeah, I do, but I
8  don't --
9  A. Not that I can think of. Sometimes they
10  change, like NPC turned into First USA
11  later, but usually, we didn't have more than
12  one vendor for any specific task.
13  Q. Okay. So you think that the companies
14  listed in Litle 10 are the universe of those
15  companies with whom Litle & Company dealt in
16  the normal processing functions?
17  A. Or a substitute for those companies, as we
18  were able to negotiate better deals, or for
19  whatever reason.
20        MR. GRAY: Objection. Your
21  question wasn't limited in time, and he just
22  testified that the processors changed over
23  the course of time.
24        MR. EDELMAN: Okay. I'm going to
25  reserve my time. I think I'm done, unless

Page 287

1  something comes up in the last few minutes
2  of questioning.
3        REDIRECT EXAMINATION
4  by Mr. Gray:
5  Q. First, to follow up on some of these last
6  questions, the money that was deposited into
7  the postage financing account by FNBL, did
8  Litle & Company then apply that money to
9  reduce the merchant's outstanding
10  obligation?
11  A. Yes, and actually, the advance came from
12  that account, too.
13  Q. I'm sorry. The advance came --
14  A. The advance would have come from that
15  account.
16  Q. Right.
17  A. So --
18  Q. The account at Litle --
19  A. The advance -- the deficit from the advance
20  or the expense of the advance then got
21  reimbursed by the amount of money that came
22  back into that account --
23  Q. So --
24  A. -- plus our management fee.
25  Q. Did Litle & Company finance all of these

Page 288

1  postage advance agreements itself?
2  A. Yes, we did. We looked into the idea of
3  getting somebody else to do it, but that's
4  when all the banks in Boston at the same
5  time blew up together and there wasn't
6  much -- it wasn't easy to do anything with
7  any banks because everybody was looking for
8  a job.
9  Q. Earlier, Mr. Edelman asked about Litle &
10  Company's advertising and marketing
11  materials--
12  A. Uh-huh.
13  Q. -- in the time period 1985 to 1995, and you
14  testified, I believe, that you don't
15  remember whether the postage advance was
16  ever advertised in any of those materials;
17  is that correct?
18  A. Yeah.
19  Q. And why might Litle & Company not have
20  advertised the postage advancing
21  arrangement?
22  A. Well, all the people that would have been
23  dealing, or at least the major people that
24  would have been dealing with the catalogs
25  knew about it, and we were financing it out

Page 289

1  of our own pocket, and we just didn't have
2  enough capital to satisfy. We didn't need
3  to advertise. We had all the business we
4  could handle, and also, when the postage
5  financing was required, it was all
6  fundamentally acquired at the same time. So
7  if we could have gotten people to avail
8  themselves of the service in some more
9  evenly-distributed way, we could have done a
10  lot more, but we had to pick and choose
11  between the people that we would provide the
12  postage financing to, and we, frankly, did
13  it based on, you know, just judgment call on
14  my part.
15  Q. So did merchants approach Litle & Company
16  asking for postage financing arrangements
17  that Litle & Company denied?
18  A. Yes.
19  Q. Did you, during the time period '86 to '95,
20  the old Litle & Company, ever make any
21  effort to keep your general postage
22  financing procedures confidential?
23  A. No. In fact, we told the consultants and
24  the people that could provide us with that
25  business. We made it quite clear to them.

73 (Pages 286 to 289)

1  Q. Did Litle & Company ever attempt to keep its
2     third-party payment procedures
3     confidential?
4         MR. EDELMAN: Objection. Vague and
5     ambiguous.
6  A. No. During our sales process, when we found
7     a merchant that could be benefitted by that,
8     we talked about it.
9  Q. Were there any NDA's in place when you
10    talked to these merchants about the
11    arrangement?
12        MR. SMITH: Objection. Do you
13    understand "NDA," non-disclosure agreement?
14        THE WITNESS: Sure.
15 A. Not that covered that, no.
16 Q. There was a lot of talk about
17    confidentiality and how Litle & Company
18    provided enhanced confidentiality for
19    particular pieces of information for its
20    merchants.
21 A. Right.
22 Q. And could you just describe the scope of
23    confidentiality you were discussing, if you
24    understand that question?
25 A. Yes. Mail order -- catalogs, in particular,

1     have two major assets. One is their mailing
2     list, which are the people that buy from
3     them regularly, and the other is the history
4     of how the mailing list and products and
5     everything else worked. We had the mailing
6     list information on our computer. We had
7     that information, so if we wanted to, we
8     could take that information and rent it to
9     competing catalogs. Now, catalogs normally
10    render or exchange their list to people they
11    control and they get the revenue from that.
12    If we rendered and exchanged their mailing
13    list and we took the revenue from that, in
14    my view, that was tantamount to stealing
15    from our customers. So we didn't do it.
16    There were companies that definitely did,
17    CitiCorp being the primary example.
18 Q. The confidentiality provisions in Exhibit 4
19    of the Member Agreement, did those
20    confidentiality provisions apply only to
21    those customers lists and the customer
22    information that you've just described?
23        MR. EDELMAN: Objection. Calls for
24    a legal interpretation.
25 A. I can't remember. I know we wouldn't

1     discuss one merchant's financial information
2     with another merchant. So maybe it applied
3     to that, too. I don't know. I'd have to
4     review it, but the reason we put the part
5     about confidentiality of data was, that was
6     a positive sales point that we made to
7     people we were trying to get to use us for
8     merchant processing.
9         MR. EDELMAN: I believe your three
10    and a half hours are up.
11        MR. GRAY: I believe, if the
12    witness is okay, I just have a couple more
13    minutes?
14        MR. SMITH: Sure. A couple more
15    minutes.
16 Q. Going back to Litle & Company's relationship
17    with FNBL, did FNBL ever forward any money
18    to a merchant or a third party without the
19    express instructions from Litle & Company to
20    do so?
21        MR. EDELMAN: Objection. Calls for
22    speculation. Vague and ambiguous.
23        MR. SMITH: Do you understand the
24    question?
25        THE WITNESS: Yeah.

1  A. I'm thinking about it. I can't imagine an
2     occasion when that would have happened.
3  Q. Typically then or in every occasion that you
4     can remember, any money that was forwarded
5     to anyone by FNBL that was processed by
6     Litle & Company was at the expressed
7     direction of Litle & Company?
8         MR. EDELMAN: Objection.
9  A. Yes. They would have no idea how to forward
10    money to anybody else or to anybody, for
11    that matter. They wouldn't have known how
12    to do that.
13 Q. Earlier, you mentioned that the separate
14    account to which the postage advance funds
15    were transferred from FNBL to Litle &
16    Company may have evolved over time?
17 A. Uh-huh.
18 Q. If that's the case, did it happen prior to
19    1995?
20 A. It would have, because I was gone after
21    1995.
22 Q. Roughly, how many customers did you have --
23    how many merchants did you have between 1985
24    and 1995?
25 A. Well, it was pretty stable. We built it up

Page 294

1  over the period of time and we had probably
2  about a thousand at the end, and we
3  obviously started with zero, so -- and we
4  lost a few along the way. Some went out
5  business. Some merged. Nothing
6  particular -- some we threw out because they
7  caused more problems than they were worth.
8  I mean, typical payment processor kind of
9  issues.
10 Q. Roughly, how much business did Litle &
11    Company do per year?
12 A. Measured how? There are three forms of
13    measurement that people have. One is how
14    many dollars were actually processed.
15    Another one is, what was the gross revenue,
16    which includes interchange. Another one was
17    net revenue, which doesn't include
18    interchange.
19 Q. How many dollars were actually processed?
20 A. Well, I really don't remember any of them,
21    but it was well in the billions. I
22    remember, one day, we processed half a
23    billion dollars.
24 Q. There were a couple of questions about a
25    Master Membership Agreement.

Page 295

1  A. Uh-huh.
2  Q. If you look at Exhibit 7 and 9, those are
3     the promissory notes for Exposures and for
4     Museum Publications.
5  A. Yeah.
6  Q. Each of those references a Master Membership
7     Agreement or Master Member Agreement?
8  A. Okay. Well, maybe that was in effect at
9     that time. I don't know.
10 Q. If it referenced those, then those did exist
11    for those two companies?
12 A. Yeah.
13        MR. SMITH: Objection.
14        MR. EDELMAN: Objection. Calls for
15    speculation. Vague and ambiguous.
16 A. The Member Agreement was a merger of the
17    Master Member Agreement and the Operating
18    Guide. I do remember that.
19 Q. And in Exhibit 8, which is your Interoffice
20    Memorandum, was that memorandum written
21    prior to any cash advances or postage
22    advances from Litle & Company?
23 A. Yes.
24 Q. So it's a preliminary outline; is that
25    correct?

Page 296

1  A. It's basically a communication to describe
2     what I thought was a good idea.
3  Q. And the promissory notes, Exhibits 7 and 9,
4     are those the actual agreements for the
5     postage advances to Exposures and Museum
6     Publications?
7  A. Yes.
8        MR. SMITH: Objection.
9  Q. Last question. You mentioned that you
10    processed the mop info-mercial
11    transactions. Can you think of any other
12    examples of info-mercial products?
13 A. Oh, there were all kinds ThighMaster, there
14    was the Chinese hammered wok, and the kind
15    of stuff we do for payment processors was
16    the factory in China used manual labor and
17    balpene hammers to make these woks, and then
18    the entrepreneur in China figured out how to
19    automate it, and they came through and there
20    were no imperfections at all, and they were
21    selling hand-hammered Chinese woks. "Now,
22    what do we do with all these woks?" I
23    remember getting in that conversation. They
24    actually took the woks and lined them up at
25    the end of the warehouse and took shotguns

Page 297

1  and shot at them. Let's see. They were all
2  kinds of stuff. A lot of the exercise
3  stuff. The Ginsu knives. Everybody
4  remembers that one. We did about 95 percent
5  of all info-mercials, and that's the
6  late-night television stuff you see, and a
7  lot of health equipment. NordicTrack. We
8  did all the NordicTrack stuff.
9  Q. Could you explain what a ThighMaster is?
10 A. From personal experience or based on what I
11    know? What's her name, Somers? A
12    ThighMaster is a product -- an info-mercial
13    company gets a product that they think they
14    can sell, and then they develop the
15    advertising, the television commercials, and
16    they recruit the people to be on the
17    television commercial. Lots of times, they
18    have a celebrity. Chuck Norris is doing
19    Total Gym now, for example, and a lot of
20    times they have a celebrity, and what's her
21    name, Somers --
22 Q. Suzanne Somers?
23 A. -- did the ThighMaster and it was a pretty
24    successful product. BowFlex, people have
25    seen that. It goes on and on and on, and

75 (Pages 294 to 297)

1  usually, there are a few companies, like
2  Guthy Ranker -- we did all of Guthy Ranker's
3  stuff -- that finds people with products and
4  organizes the whole thing and figures out
5  how to do the advertising and has deals with
6  television stations, so they could get
7  highly discounted advertising, and they know
8  how to deal with all the metrics and which
9  television channels and which times are
10  going to be most efficient for selling some
11  kind of product.  The ThighMaster was just
12  one of those.
13  Q.  How many of info-mercial products use
14  fulfillment centers?
15  A.  Actually, most companies use third-party
16  fulfillment centers.  That was true in the
17  past and it's true now because the people
18  that do info-mercials are typically sort of
19  hot-shot merchandisers with a good idea and
20  generally not much business experience.
21        MR. EDELMAN:  All right, you guys
22  are way, way over.
23  Q.  Okay.  In each of those situations, was the
24  situation similar to the mop example you
25  testified about earlier?

1  A.  Yes.
2  Q.  In the sense that Litle & Company would
3  direct FNBL to pay a portion of the credit
4  card payments that would otherwise be due
5  the catalog company to the fulfillment
6  center?
7  A.  Only in those cases where we set up those
8  three-way agreements.  We didn't do that
9  with all of them.
10        MR. GRAY:  Thank you.
11        RECROSS-EXAMINATION
12  by Mr. Edelman:
13  Q.  I just have a brief few questions and then
14  we'll be done.  You were asked a question
15  about the application of the 20 percent
16  under the Exposures agreement to the bank
17  accounts, merchant accounts.  When was it in
18  the process that Litle & Company would
19  actually calculate what amount was going to
20  be applied to the outstanding advance to
21  Exposures?
22  A.  While we were setting up that cycle of
23  advance --
24  Q.  Right.
25  A.  -- we would determine the schedule, the

1  response curve and the Visa/MasterCard curve
2  for how many dollars would be coming in
3  after the catalog was mailed.  We determined
4  the percentage we would take out, and then
5  we had two methods of doing it, as I
6  remember.  We would either take out that
7  fixed amount for a period of time that was
8  calculated based on the projections, or we'd
9  take out the actual amount that came in and
10  calculate a percentage on it.  So we'd set
11  up the process before the money was even
12  advanced and then we, based on what the
13  process was, if in fact we took a percentage
14  of the amount out, we looked that day at
15  what the amount that came in was and took
16  the percentage that we agreed to ahead of
17  time.
18  Q.  Right, but when you were going through the
19  process of taking a percentage, you would do
20  that providing the instructions or
21  calculations to First National; correct?
22  A.  Instructions, yeah, based on the way we
23  refund money.
24  Q.  All right.  By the time the money came back
25  to you for that amount from First National,

1  you didn't segregate that amount of money at
2  that time; you just put it into an account
3  with all the other postage advance money?
4        MR. SMITH:  Objection.
5  A.  No.
6  Q.  So explain to me then how would you deal
7  with the money when it came back.
8  A.  We waited until the money came back, and
9  then we directed most of the money, the,
10  say, 75 or 80 percent to the merchant, paid
11  it out the way we normally would have paid
12  out a hundred percent, and at exactly the
13  same time, we paid out the amount that was
14  deducted from what the merchant got to
15  whoever the third party was, to our bank
16  account, whatever.  That was when the money
17  came back.
18  Q.  Right, but I'm talking about after the money
19  comes into First National.  First National
20  needs to know what to do with the money.
21  A.  Right.
22  Q.  Okay.  When you instruct First National and
23  say "Provide a payment to us, Litle &
24  Company, for the 20 percent" --
25  A.  Uh-huh.

Page 302

1   Q.  -- when you get that 20 percent from First
2       National Bank, that money is then taken and
3       put into a general postage advance account;
4       it's not segregated for each particular
5       merchant; correct?
6   A.  That's right, except First National Bank, I
7       believe it wired that money directly to our
8       postage account.
9   Q.  Correct.
10  A.  They didn't wire it to some other account
11      and we transferred it.  They wired it to the
12      postage account.
13  Q.  You referenced the fact that companies had
14      asked Litle & Company to do the postage
15      advance and Litle & Company turned them
16      down?
17  A.  True.
18  Q.  Can you identify any of those companies?
19  A.  No.  I can identify them by nature.
20      Generally, they were down the shoot so far
21      that nobody would have touched them, or else
22      we had already used our limit of the capital
23      that we had during that time period.
24  Q.  You can't identify anybody by name?
25  A.  No.

Page 303

1           MR. EDELMAN:  Okay.  Thank you.
2           MR. SMITH:  We'll read and sign.
3   Someone is going to provide us with a copy,
4   with exhibits.  All right.
5           THE VIDEOGRAPHER:  The time is
6   5:47.  The deposition is concluded.  This is
7   the end of Cassette 4.  We are off the
8   record.
9           (The Deposition was closed at
10          5:47 p.m.)
11
12
13      _____
            THOMAS J. LITLE, IV
14
15
16  Subscribed and sworn to before me
17  this _____ day of _____, 2006.
18
19  _____  _____
20  (Notary Public)    My Commission Expires:
21
22
23
24
25

Page 304

1           DEPONENT'S ERRATA SHEET
2           AND SIGNATURE INSTRUCTIONS
3           The original of the Errata Sheet
4   has been delivered to Atty. Gray.
5           When the Errata Sheet has been
6   completed by the deponent and signed, a copy
7   thereof should be delivered to each party of
8   record and the ORIGINAL delivered to Atty.
9   Gray, to whom the original deposition
10  transcript was delivered.
11
12
13          INSTRUCTIONS TO DEPONENT
14
15          After reading this volume of
16  your deposition, indicate any corrections or
17  changes to your testimony and the reasons
18  therefore on the Errata Sheet supplied to
19  you and sign it.  DO NOT make marks or
20  notations on the transcript volume itself.
21
22  REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
23  COMPLETED AND SIGNED ERRATA SHEET WHEN
24  RECEIVED.
25

Page 305

1   ATTACH TO DEPOSITION OF:  T.J. LITLE, IV
    CASE:  ADVANCEME, INC.
2   vs.    RAPIDPAY, LLC, et als.
    and    ADVANCEME, INC.
3   vs.    AMERIMERCHANT, LLC
4
            ERRATA SHEET
5
    INSTRUCTIONS:  After reading the transcript
6   of your deposition, note any change or
    correction to your testimony and the reason
7   therefore on this sheet.  DO NOT make any
    marks or notations on the transcript volume
8   itself.  Sign and date this errata sheet
    (before a Notary Public, if required).
9   Refer to Page 304 of the transcript for
    errata sheet distribution instructions.
10  Page   Line
11
12  _____  _____  CHANGE: _____
                  REASON: _____
13  _____  _____  CHANGE: _____
                  REASON: _____
14  _____  _____  CHANGE: _____
                  REASON: _____
15  _____  _____  CHANGE: _____
                  REASON: _____
16  _____  _____  CHANGE: _____
                  REASON: _____
17  _____  _____  CHANGE: _____
                  REASON: _____
18  _____  _____  CHANGE: _____
                  REASON: _____
19  _____  _____  CHANGE: _____
                  REASON: _____
20
            I have read the foregoing
21  transcript of my testimony, and except for
    any corrections or changes noted above, I
22  hereby subscribe to the transcript as an
    accurate record of the statements made by
23  me.
24  _____     _____
25  THOMAS J. LITLE, IV       DATE

77 (Pages 302 to 305)

1  COMMONWEALTH OF MASSACHUSETTS

2  MIDDLESEX, SS.

3

4      I, Denise M. Rae, a Certified

5  Shorthand Reporter and Notary Public duly

6  commissioned and qualified within and for

7  the Commonwealth of Massachusetts, do hereby

8  certify:

9      That THOMAS J. LITLE, IV, the

10  witness whose deposition is hereinbefore set

11  forth, was duly sworn by me, and that such

12  deposition is a true record of the testimony

13  given by the witness to the best of my

14  skill, knowledge, and ability.

15      IN WITNESS WHEREOF, I have hereunto

16  set my hand and my affixed notarial seal

17  this 8th day of September, 2006.

18

19  _____

20          Denise M. Rae

21          Notary Public

22

23  My commission expires:

24  January 16, 2009

25