## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **ADVANCEME, INC.** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | **CAUSE NO. 6:05-CV-424 (LED)-(JDL)** |
| **RAPIDPAY, LLC, BUSINESS CAPITAL** | § | |
| **CORPORATION, FIRST FUNDS LLC,** | § | |
| **MERCHANT MONEY TREE, INC.,** | § | |
| **REACH FINANCIAL, LLC and** | § | |
| **FAST TRANSACT, INC. d/b/a** | § | |
| **SIMPLE CASH,** | § | |
| | § | |
| *Defendants.* | § | |

## DEFENDANTS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Defendants First Funds, LLC ("First Funds"), Merchant Money Tree, Inc. ("MMT"), and Reach Financial, LLC ("Reach Financial") (collectively "Defendants") hereby submit their proposed findings of fact and conclusions of law.[1]

---

[1] Any finding of fact that constitutes a conclusion of law, and any conclusion of law that constitutes a finding of fact, is hereby incorporated as such.

Dockets.Justia.com

## TABLE OF CONTENTS

**Page**

I.      BACKGROUND ...................................................................................................1

    A.      The Parties and Their Contentions.....................................................1
    B.      Jurisdiction .........................................................................................1
    C.      The Patent-in-Suit ..............................................................................1
        i.      Independent Claim 1 (Method)...............................................3
        ii.     Independent Claim 10 (System)..............................................5

II.     INVALIDITY:  CONCLUSIONS OF LAW ......................................................7

    A.      Anticipation:  35 U.S.C. § 102(a) and 35 U.S.C. § 102(b) ...............7
    B.      Obviousness:  35 U.S.C. § 103 .........................................................12
    C.      The LeCard Prior Art Method and System ........................................14
    D.      The Litle & Co. Prior Art Method and System.................................14
    E.      The Transmedia Prior Art Method ....................................................15
    F.      Prior Art Reserve Account Method ...................................................15

III.    INVALIDITY:  FINDINGS OF FACT .............................................................16

    A.      The LeCard Program...........................................................................16
    B.      The Litle & Co. Prior Art..................................................................30
    C.      The Transmedia Program ..................................................................50
    D.      Prior Art Reserve Account Method ...................................................57
    E.      Obviousness:  Findings Of Fact .......................................................63

IV.     INEQUITABLE CONDUCT..............................................................................64

    A.      Conclusions Of Law ..........................................................................64
    B.      Findings Of Fact ................................................................................67

V.      EXCEPTIONAL CASE AND ATTORNEYS' FEES........................................69

VI.     NON-INFRINGEMENT.....................................................................................71

    A.      Direct Infringement of Method Claims – Conclusions of Law ...........71
    B.      Direct Infringement of Method Claims – Findings of Fact ..................73
    C.      Direct Infringement of System claims – Findings of Fact and Conclusions of Law ...........................................................................79
    D.      Infringement Under the Doctrine of Equivalents...............................84
    E.      Indirect Infringement .........................................................................85
        i.      Inducement of Infringement ...................................................85
        ii.     Contributory Infringement .....................................................87

VII.    WILLFUL INFRINGEMENT ...........................................................................88

VIII.   INJUNCTIVE RELIEF.......................................................................................89

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A.B. Chance Co. v. RTE Corp.*,
    854 F.2d 1307 (Fed. Cir. 1988) ................................................................................... 69

*Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*,
    228 F.3d 1338 (Fed. Cir. 2000) ................................................................................... 87

*American Hoist & Derrick Co. v. Sowa & Sons*,
    725 F.2d 1350 (Fed. Cir. 1984) ..................................................................................... 7

*American Original Corp. v. Jenkins Food Corp.*,
    774 F.2d 459 (Fed. Cir. 1985) ..................................................................................... 87

*Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*,
    396 U.S. 57 (1969) ....................................................................................................... 13

*Applied Medical Resources Corp. v. United States Surgical Corp.*,
    448 F.3d 1324 (Fed. Cir. 2006) ................................................................................... 80

*Aquatex Indus. v. Techniche Solutions*,
    419 F.3d 1374 (Fed. Cir. 2005) ................................................................................... 84

*Baxter Int'l v. COBE Laboratories*,
    88 F.3d 1054 (Fed. Cir. 1996) ....................................................................................... 8

*BMC Resources, Inc. v. Paymentech, L.P.*,
    No. 3:03-CV-1927-M, 2006 U.S. Dist. LEXIS 37746 (N.D. Tex. May 24, 2006),
    *argued*, No. 06-1503 (Fed. Cir. April 9, 2007) ..................................................... 72, 73

*Brasseler, U.S.A. I, L.P v. Stryker Sales Corp.*,
    267 F.3d 1370 (Fed. Cir. 2001) ................................................................................... 65

*Charles E. Hill v. Amazon.com*,
    No. 2:02-CV-186, 2006 U.S. Dist. LEXIS 3389 (E.D. Tex. Jan. 19, 2006) (J. Ward) ...... 71, 72

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*,
    145 F.3d 1303 (Fed. Cir. 1998) .............................................................................. 84, 85

*Coffin v. Ogden*,
    85 U.S. 120 (1873) ......................................................................................................... 8

*Critikon, Inc. v. Becton Dickinson Vascular Access*,
    120 F.3d 1253 (Fed. Cir. 1997) ................................................................................... 66

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*,
    246 F.3d 1336 (Fed. Cir. 2001) ................................................................................... 87

*Cybor Corp. v. Fas Techs, Inc.*,
    138 F.3d 1448 (Fed. Cir. 1998) ................................................................................... 69

*Decca Ltd. v. United States,*
    544 F.2d 1070 (1976)................................................................................................ 82

*Deepsouth Packing Co. v. Laitram Corp.,*
    406 U.S. 518 (1972).......................................................................................... 81, 83

*Digital Control Inc. v. Charles Mach. Works,*
    437 F.3d 1309 (Fed. Cir. 2006) ....................................................................... 64, 65

*DSU Med. Corp. v. JMS Co.,*
    471 F.3d 1293 (Fed. Cir. 2006) .............................................................................. 85

*Duro-Last, Inc. v. Custom Seal, Inc.,*
    321 F.3d 1098 (Fed. Cir. 2003) .............................................................................. 64

*Dynacore Holdings Corp. v. U.S. Philips Corp.,*
    363 F.3d 1263 (Fed. Cir. 2004) ....................................................................... 85, 87

*eBay Inc. v. Mercexchange, L.L.C.,*
    126 S. Ct. 1837 (2006).................................................................................... 88, 89

*Ecolochem, Inc. v. S. Cal. Edison Co.,*
    227 F.3d 1361 (Fed. Cir. 2000) ................................................................................ 7

*Elec. Battery Co. v. Shimadzu,*
    307 U.S. 5 (1939)...................................................................................................... 9

*Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.,*
    279 F.3d 1022 (Fed. Cir. 2002) .............................................................................. 69

*Ferring B.V. v. Barr Labs., Inc.,*
    437 F.3d 1181 (Fed. Cir. 2006) .............................................................................. 65

*Finnegan Corp. v. Int'l Trade Comm'n,*
    180 F.3d 1354 (Fed. Cir. 1999) ....................................................................... 10, 12

*FMC Corp. v. Manitowoc Co.,*
    835 F.2d 1411 (Fed. Cir. 1987) .............................................................................. 67

*Gambro Lundia AB v. Baxter Healthcare Corporation,*
    110 F.3d 1573 (Fed. Cir. 1997) .............................................................................. 12

*GFI, Inc. v. Franklin Corp.,*
    265 F.3d 1268 (Fed. Cir. 2001) .............................................................................. 65

*Graham v. John Deere Co.,*
    383 U.S. 1 (1966)......................................................................................... 12, 13, 14

*Halliburton Co. v. Schlumberger Tech.,*
    925 F.2d 1435 (Fed. Cir. 1991) .............................................................................. 66

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.,*
    450 F.3d 1350 (Fed. Cir. 2006) .............................................................................. 79

*J & M Corp. v. Harley-Davidson, Inc.,*
    269 F.3d 1360 (Fed. Cir. 2001) .............................................................................. 80

*Joy Tech., Inc. v. Flakt, Inc.*,
  6 F.3d 770 (Fed. Cir. 1993) ........................................................................... 71

*Juicy Whip, Inc. v. Orange Bang, Inc.*,
  292 F.3d 728 (Fed. Cir. 2002) ....................................................................... 11

*Knorr v. Pearson*,
  671 F.2d 1368 (C.C.P.A. 1982) ..................................................................... 11

*Kridl v. McCormick*,
  105 F.3d 1446 (Fed. Cir. 1997) ................................................................ 10, 11

*KSR Int'l Co. v. Teleflex, Inc.*,
  127 S. Ct. 1727 (2007) ............................................................................ passim

*Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.*,
  322 F.3d 1335 (Fed. Cir. 2003) ............................................................... 10, 12

*Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*,
  82 U.S.P.Q.2d (BNA) 1687 (Fed. Cir. 2007) ....................................... 13, 63, 64

*Lockwood v. American Airlines*,
  107 F.3d 1565 (Fed. Cir. 1997) ....................................................................... 8

*Loral Fairchild Corp. v. Victor Co. of Japan Ltd.*,
  61 USPQ2d 1943 (E.D.N.Y. 2002) ................................................................. 65

*Mahurkar v. C.R. Bard, Inc.*,
  79 F.3d 1572 (Fed. Cir. 1996) .................................................................... 7, 10

*Matter of Carolin Paxson Advertising*,
  938 F.2d 595 (5th Cir. 1991) ..................................................................... 72, 81

*McKesson Information Solutions, Inc. v. Bridge Medical, Inc.*,
  No. 06-1517 (Fed. Cir. May 18, 2007) ........................................................... 65

*McNeil-PPC, Inc. v. L. Perrigo Co.*,
  337 F.3d 1362 (Fed. Cir. 2003) ..................................................................... 69

*Mendenhall v. Cedarapids, Inc.*,
  5 F.3d 1557 (Fed. Cir. 1993) ........................................................................... 7

*Merck & Co. v. Danbury Pharmacal, Inc.*,
  873 F.2d 1418 (Fed. Cir. 1989) ..................................................................... 66

*Minn. Mining and Mfg Co. v. Chemque, Inc.*,
  303 F.3d 1294 (Fed. Cir. 2002) ....................................................................... 9

*Molins PLC v. Textron, Inc.*,
  48 F.3d 1172 (Fed. Cir. 1995) ....................................................................... 66

*Motionless Keyboard Co. v. Microsoft Corp.*,
  No. 05-1497 (Fed. Cir. May 29, 2007) ........................................................... 10

*Nat'l Research Development Corp. v. Varian Associates, Inc.*,
  822 F. Supp. 1121 (D.N.J. 1993),
  *aff'd in relevant part*, 1994 U.S. App. LEXIS 1493 (Fed. Cir. 1994) (unpublished) ............... 9

*New Railhead Manufacturing v. Vermeer Manufacturing Co.*,
  298 F.3d 1290 (Fed. Cir. 2002) ................................................................................. 8

*NTP, Inc. v. Research in Motion, Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2005) ................................................................. 71, 81, 82

*O'Neill v. Dept. of HUD*,
  220 F.3d 1354 (Fed. Cir. 2000) .............................................................................. 72

*Paice LLC v. Toyota Motor Corp.*,
  No. 2:04-CV-211 (DF), 2006 U.S. Dist. LEXIS 61600 (E.D. Tex. 2006) ............................ 88

*Price v. Symsek*,
  988 F.2d 1187 (Fed. Cir. 1993) .............................................................................. 10

*Rotec Indus., Inc. v. Mitsubishi Corp.*,
  215 F.3d 1246 (Fed. Cir. 2000) .............................................................................. 83

*Sandt Tech. v. Resco Metal and Plastics Corp.*,
  264 F.3d 1344 (Fed. Cir. 2001) ........................................................................ 10, 11

*State Indus., Inc. v. A.O. Smith Corp.*,
  751 F.2d 1226 (Fed. Cir. 1985). ............................................................................. 88

*The Beachcombers, Int'l, Inc. v. Wildewood Creative Products, Inc.*,
  31 F.3d 1154 (Fed. Cir. 1994) ............................................................................... 11

*Thomson v. Quixote*,
  166 F.3d 1172 (Fed. Cir. 1999) .............................................................................. 11

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*,
  721 F.2d 1540 (Fed. Cir. 1983) ............................................................................... 9

*Woodland Trust v. Flowertree Nursery, Inc.*,
  148 F.3d 1368 (Fed. Cir. 1998) .............................................................................. 11

*z4 Techs. Inc., v. Microsoft Corp.*,
  434 F. Supp. 2d 437 (E.D. Tex. 2006) ....................................................................... 89

**Rules and Statutes**

28 U.S.C. § 1331 ...................................................................................................... 1

28 U.S.C. § 1338 ...................................................................................................... 1

28 U.S.C. § 1391(b) .................................................................................................. 1

28 U.S.C. § 1400(b) .................................................................................................. 1

35 U.S.C. § 102 .............................................................................................. 1, 7, 8, 9

35 U.S.C. § 102(a) ........................................................................................... passim

35 U.S.C. § 102(b) ........................................................................................... passim

35 U.S.C. § 103 .......................................................................................... 1, 12, 14, 15

35 U.S.C. § 103(a) ................................................................................................... 12

35 U.S.C. § 112 ........................................................................................................ 80

35 U.S.C. § 271 .......................................................................................................... 1

35 U.S.C. § 271(a) ............................................................................................... passim

35 U.S.C. § 271(b) ............................................................................................... 85, 86

35 U.S.C. § 271(c) .................................................................................................... 86

35 U.S.C. § 282 .......................................................................................................... 7

35 U.S.C. § 283 .......................................................................................................... 1

35 U.S.C. § 285 .................................................................................................... 1, 69

37 C.F.R. § 1.56 ....................................................................................................... 64

37 CFR § 1.56(b) ................................................................................................. 65, 66

**Other Authorities**

Manual of Patent Examining Procedure
   § 2001.06 (7th ed. 1998) ..................................................................................... 65

# I.    BACKGROUND

## A.    The Parties and Their Contentions

1.       This is a patent infringement case.  Plaintiff AdvanceMe, Inc. ("AdvanceMe") alleges that Defendants First Funds, LLC ("First Funds"), Merchant Money Tree, Inc. ("MMT"), and Reach Financial, LLC ("Reach") directly infringe and/or indirectly infringe by contributing to or inducing the infringement of certain claims of Patent No. 6,941,281 ("the '281 Patent"). AdvanceMe further contends that this infringement is willful.  AdvanceMe seeks a permanent injunction under 35 U.S.C. § 283, enjoining Defendants from infringing, contributing to, or inducing the infringement of the '281 Patent.  In addition, AdvanceMe seeks recovery of its attorneys' fees under 35 U.S.C. § 285.

2.       Defendants deny infringement and that they contribute to or induce infringement, either literally or under the doctrine of equivalents.  Defendants allege that the '281 Patent is invalid for failure to comply with 35 U.S.C. §§ 102 and 103.  Defendants further allege that the '281 Patent is unenforceable due to inequitable conduct.  Defendants are also seeking a declaration of non-infringement, invalidity, and unenforceability of the '281 Patent.  In addition, Defendants seek recovery of their attorneys' fees under 35 U.S.C. § 285.

## B.    Jurisdiction

3.       Jurisdiction in this case is based upon 28 U.S.C. §§ 1331 and 1338 in that the Plaintiff brings this action under the patent laws of the United States, including 35 U.S.C. § 271 *et seq*.  Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and 28 U.S.C. § 1400(b).  Jurisdiction is not disputed.

## C.    The Patent-in-Suit

4.       United States Patent No. 6,941,281 ("the '281 patent") relates to a method and system for automated payment of an obligation made by a merchant.  The '281 patent describes

that, prior to the invention, "the merchant 20 typically pays the outstanding loan back in periodic installments (e.g., equal monthly payments over five years)." ('281 patent, 5:12-14.) The '281 patent describes the invention as a modification of the existing merchant processor system, so that rather than the merchant making payment directly to the lender as in the prior art, "[t]he borrowing merchants use one or more already-familiar payment transaction processing systems to make the payments required by the lender or the loan collecting entity." ('281 patent, 2:48-51.)

5.    The patentee confirmed this description of the invention during prosecution: "The invention relates to modifying the existing merchant processor system that is now used by merchants to authorize and settle card payment transactions." (Applicant's June 7, 2000 Appeal Br., at p. 3.)

6.    The '281 specification describes that, in the prior art, merchants used VeriFone merchant-location equipment to accept a customer identifier (e.g., a credit card number) as payment from a customer and to electronically forward information related to the payment to a computerized merchant processor. ('281 patent, 6:18-59.) The '281 patent also describes that, in the prior art, computerized merchant processors used modems to acquire the information related to the payment from a merchant, and software executing known algorithms to authorize and settle the payment. ('281 Patent, 1:15-25, 3:31-4:37.)

7.    The '281 specification further describes that, in the prior art, the merchant processor would forward full payment (less processing fees) for that transaction to the merchant. ('281 Patent, 4:16-56.) A general description of prior art card transactions at the merchant and merchant processor is discussed with reference to Figures 1A and 1B of the '281 patent. ('281 patent, 3:10-5:3.)

8.    The claims of the '281 patent reflect the invention's modification of the existing merchant processor system by requiring that a "computerized merchant processor" forwards a "portion" (Claim 10) or "at least a portion" (Claim 1) of the payment to an entity to which a merchant owes an obligation.  In other words, the invention enables a merchant to automatically have its obligations repaid out of card receipts and, therefore, enables a capital provider to be repaid before the merchant gains access to payment amounts.

9.    The patent examiner noted this sole non-obvious feature in his Notice of Allowance for the claims of the '281 patent:  "[T]he non-obvious novelty of the invention is using the portion of the transaction payment as a remittance towards payment of an obligation owed by the merchant."  (March 17, 2005 Notice of Allowance, pp. 3-4.)

10.    The '281 patent contains two independent claims, claims 1 and 10—both of which are limited to this narrow, purportedly novel feature.

### i.    Independent Claim 1 (Method)

11.    Claim 1 of the '281 patent claims:

A method for automated payment, comprising:

at a merchant, accepting a customer identifier as payment from the customer and electronically forwarding information related to the payment to a computerized merchant processor;

at the computerized merchant processor, acquiring the information related to the payment from the merchant, authorizing and settling the payment, and *forwarding at least a portion of the payment to a computerized payment receiver as payment of at least a portion of an obligation made by the merchan*t; and

*at the computerized payment receiver, receiving the portion of the payment forwarded by the computerized merchant processor and applying that portion to the outstanding obligation made by the merchant to reduce such obligation.*

3

12.     The '281 patent—through various statements in the "Background Information" and "Description" sections of the specification—acknowledges that each of the steps of claim 1 was well known prior to the Application Date, except for the steps that are italicized above.

13.     The "Background Information" section of the '281 patent recites that it was known that "[c]ard transactions (e.g., credit, debit, charge, smart, etc.) generally involve at least merchants, merchant processors, issuers, and cardholders," and that such "transactions include authorization, clearing and settlement processes." ('281 patent, 1:17-20.)   Further, the '281 patent discloses that it was well known that such merchant processors may use "a system such as the VisaNet or Cirrus system to authorize, clear and settle the card payment." (*Id.* at 1:20-22.)

14.     In the "Description" section of the specification, the patentee also discusses standard card processing practices at the time of the application, and corresponding equipment in standard use to process card transactions, with reference to Figures 1A and 1B of the '281 patent. (*Id.* at 3:10-30.)   This discussion of the prior art is identical to the step of claim 1, which recites "at a merchant, accepting a customer identifier as payment from the customer."   The patentee's discussion of the prior art further describes the prior art card authorization and settlement steps, also with reference to Figures 1A and 1B of the '281 patent.   (*Id.* at 3:31-5:3.)   This prior art discussion is identical to the claim 1 steps of "electronically forwarding information related to the payment to a computerized merchant processor" and "at the computerized merchant processor, acquiring the information related to the payment from the merchant, authorizing and settling the payment."

15.     The patentee specifically characterizes this discussion of Figures 1A and 1B as relating to known prior art methods and equipment: "[h]aving described the environment in

which the invention operates with reference to FIGS. 1A and 1B, the automated loan repayment system and process according to the invention will now be described." (*Id.* at 5:4-8.)

### ii. Independent Claim 10 (System)

16. The '281 patent also acknowledges that nearly all of the elements of independent claim 10 were known prior to the Application Date. Claim 10, a system claim, recites:

> A system for automated payment of an obligation made by a merchant, comprising:

> at a merchant, means for accepting a customer identifier as payment from the customer and for electronically forwarding information related to the payment to a computerized merchant processor, wherein the merchant associated with the payment has an outstanding obligation to a third party; and

> at the computerized merchant processor, means for receiving the information related to the payment from the merchant, means for authorizing and settling the payment; and

> *means for forwarding a portion of the payment to the third party to reduce the obligation.*

17. Again, except for the italicized portion above, the '281 patent describes that each of the elements of claim 10 was well known prior to the Application Date.

18. In the "Summary of the Invention" section of the '281 patent, the patentee explains that merchants using the claimed system use known equipment to practice the claimed invention: "The borrowing merchants use one or more already-familiar payment transaction processing systems to make the payments required by the lender or the loan collecting entity." ('281 patent, 2:48-51.) In other words, the claimed system uses well known, existing equipment to process transactions and forward payment to the third party to reduce the obligation.

19. With respect to the first claim element (i.e., "at a merchant"), the '281 patent acknowledges that, prior to the Application date, known VeriFone merchant-location equipment accepted and electronically forwarded customer identifying card information to a merchant

5

processor.  ('281 patent, 2:13-17.)  This known prior art equipment corresponds to claim 10's element "at a merchant, means for accepting a customer identifier as payment from the customer and for electronically forwarding information related to the payment to a computerized merchant processor."

20.    With respect to the second element of claim 10 (i.e., "at the computerized merchant processor"), the '281 patent describes that the prior art merchant processors used the claimed "means for receiving the information related to the payment from the merchant" and "means for authorizing and settling the payment."  In its discussion of the prior art, the '281 patent discloses that the merchant terminal requests an authorization and sends card information "electronically, for example, transmission through the telephone system and/or some other network (e.g., the Internet and/or an intranet)."  ('281 patent, 3:31-36.)  In addition, the '281 patent discusses authorization and settlement as all taking place electronically through the use of computers executing appropriate software and networks.  (*Id.* at 3:42-49, 4:2-15.)

21.    Accordingly, similar to the narrow alleged novel feature of claim 1, claim 10's alleged novel feature is a "means for forwarding a portion of the payment to the third party to reduce the obligation."  Since the computer equipment at the computerized merchant processor is acknowledged to be in the prior art before the application date, the only alleged point of novelty in claim 10, according to the Court's claim construction and the patentee's description of the prior art, is using known computer systems to execute an algorithm that derives and forwards a selected portion of the payment to a third party to reduce the obligation.

## Invention Date

22.    The priority date of the '281 patent is July 9, 1997.  The date an application is filed is presumed to be the date of invention.  *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d

1361, 1371 (Fed. Cir. 2000). To establish a date of invention prior to the filing date, the inventor

(or patent holder) bears the burden of proving a date of invention that is earlier than the filing

date. *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576-77 (Fed. Cir. 1996). AdvanceMe has

failed to prove an invention date prior to the July 9, 1997 filing date of the parent patent

application; therefore, the invention date is July 9, 1997.

## II.    INVALIDITY: CONCLUSIONS OF LAW

23.    A patent is presumed to be valid, and a party attacking the validity must prove

invalidity by clear and convincing evidence. 35 U.S.C. § 282. However, as the Federal Circuit

has held:

> When new evidence touching validity of the patent not considered by the [PTO] is
> relied on, the tribunal considering it is not faced with having to disagree with the
> [PTO] or with deferring to its judgment or with taking its expertise into account.
> The evidence may, therefore, carry more weight and go further toward sustaining
> the attacker's unchanging burden.

*American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1360 (Fed. Cir. 1984); *see also*

*KSR Int'l Co. v. Teleflex, Inc.*, 127 S. Ct. 1727 (2007); *Mendenhall v. Cedarapids, Inc.,* 5 F.3d

1557, 1564 (Fed. Cir. 1993).

24.    None of the prior art upon which Defendants rely was considered by the PTO

during prosecution of the '281 patent.

### A.    Anticipation:  35 U.S.C. § 102(a) and 35 U.S.C. § 102(b)

25.    Section 102 of Title 35 of the United States Code provides that an applicant is not

entitled to a patent if:

> (a)    the invention was known or used by others in this country, or patented or
> described in a printed publication in this or a foreign country, before the invention
> thereof by the applicant for patent, or

(b)     the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . .

35 U.S.C. § 102 (2000).

Publicly Known

26.     Under 35 U.S.C. § 102(a), a patent is invalid if prior art satisfying all of the claim limitations was known or used by others in this country before the applicant's invention date. 35 U.S.C. § 102(a) (2000).  35 U.S.C. § 102(a) (2000); *Coffin v. Ogden*, 85 U.S. 120, 124-25 (1873) ("The prior knowledge and use by a single person is sufficient.  The number is immaterial.").

Public Use

27.     In addition, any public use in this country of a method or system satisfying all of the claim limitations, or any printed publication disclosing all of the claim limitations, that is more than one year prior to the U.S. filing date of a patent invalidates the claims of that patent under 35 U.S.C. § 102(b).

28.     For a method or system to be in "public use" within the meaning of 35 U.S.C. § 102(a) or (b), the method or system must be used in the ordinary course of business without active efforts to conceal its operation.  *New Railhead Manufacturing v. Vermeer Manufacturing Co.*, 298 F.3d 1290, 1298-1300 (Fed. Cir. 2002) (finding that performance of the claimed method of drilling in rock at a commercial jobsite under public land, hidden from view, constituted public use); *Lockwood v. American Airlines*, 107 F.3d 1565, 1570 (Fed. Cir. 1997) (finding that the defendant's use of the high-level aspects of its computer reservation system was a prior public use of a means-plus-function claim for a computer system); *Baxter Int'l v. COBE Laboratories*, 88 F.3d 1054 (Fed. Cir. 1996) (finding that a scientist's use of a machine

8

implementing the claimed method in a laboratory at the National Institute of Health, without the

public's awareness of the method employed by the machine, was a prior public use).

> [T]he public use doctrine requires an inquiry into whether the invention was used
> in its natural and intended way. . . . A prior use is public even if there is no effort
> to show the invention to the public at large, even if the invention is completely
> hidden from view, even if viewers of a machine incorporating the invention do
> not comprehend the invention.  There simply is no requirement that the prior user
> make an effort to make the invention publicly accessible, so long as he or she uses
> it in the ordinary course of business without efforts to conceal it."

*Nat'l Research Development Corp. v. Varian Associates, Inc.*, 822 F. Supp. 1121, 1133 (D.N.J.

1993) (citations omitted), *aff'd in relevant part*, 1994 U.S. App. LEXIS 1493 (Fed. Cir. 1994)

(unpublished) ("[U]se by only one member of the public, without that use informing other

members of the public as to the true nature of the invention, is sufficient under Supreme Court

jurisprudence to invalidate a patent under Section 102(b) for prior public use.").

29.    *See also Elec. Battery Co. v. Shimadzu*, 307 U.S. 5, 20 (1939) ("The ordinary use

of a machine or the practise [sic] of a process in a factory in the usual course of producing

articles for commercial purposes is a public use"); *Minn. Mining and Mfg Co. v. Chemque, Inc.*,

303 F.3d 1294, 1301 (Fed. Cir. 2002) ("Public use under 35 U.S.C. § 102(b) includes any use of

the claimed invention by a person other than the inventor who is under no limitation, restriction

or obligation of secrecy to the inventor.").

30.    Cases in which courts find that a prior use was not a "public use" within the

meaning of 35 U.S.C. § 102 have found <u>active concealment</u> of the method or system by the prior

user, typically by contractual agreements to maintain secrecy.  *See, e.g.*, *W.L. Gore & Assocs.,*

*Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983) (finding that company told all

employees that the prior art machine was confidential and required them to sign confidentiality

agreements, thus concealing the machine); *Motionless Keyboard Co. v. Microsoft Corp.*, No.

9

2005-1497 (Fed. Cir. May 29, 2007) (finding that the prior user was required to sign a non-disclosure agreement related to the prior art, thus concealing the prior art).

Corroboration

31.     Under 35 U.S.C. § 102(a) or (b), the party challenging a patent on the basis of prior knowledge or prior public use must come forth with sufficient corroborating evidence to support a finding of invalidity. *Finnegan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1367 (Fed. Cir. 1999).

32.     Corroboration may be in the form of <u>either documentary or testimonial evidence</u>, though <u>it is unnecessary when a party seeks to prove facts through the use of contemporaneous documents</u>. *Lacks v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1349 (Fed. Cir. 2003); *Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572 (Fed. Cir. 1996); *Price v. Symsek,* 988 F.2d 1187, 1195-96 (Fed. Cir. 1993). "[O]ral testimony of someone other than the alleged inventor may corroborate an inventor's testimony." *Sandt Tech. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1351 (Fed. Cir. 2001).

33.     "Each corroboration case must be decided on its own facts with a view to deciding whether the evidence as a whole is persuasive." *Sandt Tech. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001).

34.     "[A] tribunal must make a reasonable analysis of all of the pertinent evidence to determine whether the inventor's testimony is credible. The tribunal must also bear in mind the purpose of corroboration, which is to prevent fraud, by providing independent confirmation of the inventor's testimony." *Kridl v. McCormick*, 105 F.3d 1446, 1450 (Fed. Cir. 1997); *Finnigan Corp. v. Int'l Trade Commission* 180 F.3d 1354, 1369 (Fed. Cir. 1999); *see also Thomson v.*

*Quixote*, 166 F.3d 1172 (Fed. Cir. 1999); *The Beachcombers, Int'l, Inc. v. Wildewood Creative Products, Inc.*, 31 F.3d 1154 (Fed. Cir. 1994).

35.    In determining whether oral testimony is sufficiently corroborated, the Federal Circuit has considered the following criteria: (1) the relationship between the corroborating witness and the alleged prior user; (2) the time period between the event and trial; (3) the interest of the corroborating witness in the subject matter in suit; (4) contradiction or impeachment of the witness' testimony; (5) the extent and details of the corroborating testimony; (6) the witness' familiarity with the subject matter of the patented invention and the prior use; (7) probability that a prior use could occur considering the state of the art at the time; (8) impact of the invention on the industry, and the commercial value of its practice.  *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998).

36.    In situations where contemporaneous documentation and testimony that is "credible in light of the full record" is offered by the party challenging validity, courts have found that the testimony is corroborated.  *Sandt Tech. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001); *Kridl v. McCormick*, 105 F.3d 1446 (Fed. Cir. 1997); *Thomson v. Quixote*, 166 F.3d 1172 (Fed. Cir. 1999); *The Beachcombers, Int'l, Inc. v. Wildewood Creative Products, Inc.*, 31 F.3d 1154 (Fed. Cir. 1994); *Knorr v. Pearson*, 671 F.2d 1368 (C.C.P.A. 1982).

37.    Conversely, in situations where—unlike here—(1) the *defendant* is attempting to prove <u>its own prior public use</u> of a claimed invention, (2) <u>without *any* contemporaneous documentary support</u> revealing the alleged prior use, and (3) <u>with contradictory testimony in the record</u>, courts have found testimony to be insufficiently corroborated.  *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368 (Fed. Cir. 1998); *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728 (Fed. Cir. 2002); *Lacks Industries, Inc. v. McKechnie Vehicle Components USA,*

11

*Inc.*, 322 F.3d 1335 (Fed. Cir. 2003); *Finnigan Corp. v. Int'l Trade Commission*, 180 F.3d 1354 (Fed. Cir. 1999).

**B.    Obviousness:  35 U.S.C. § 103**

38.    The Patent Act provides no protection to obvious inventions.  Section 103(a) of Title 35 of the United States Code provides that:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103(a) (2007).

39.    The obviousness standard, as articulated in Section 103(a), requires that the invention must not have been obvious to one of ordinary skill in the relevant art in light of the teachings of the prior art.  *Graham v. John Deere Co.*, 383 U.S. 1 (1966).  A party challenging the nonobviousness of a patent must prove obviousness by clear and convincing evidence.  *Gambro Lundia AB v. Baxter Healthcare Corporation*, 110 F.3d 1573, 1576 (Fed. Cir. 1997).

40.    On April 30, 2007, the Supreme Court issued its ruling in *KSR Int'l Co. v. Teleflex, Inc.*, clarifying the obviousness standard under § 103 and abolishing the Federal Circuit's previous "rigid" teaching-suggestion-motivation test for nonobviousness.  The Supreme Court explained that a patent describing a combination of old elements with no change in their respective functions withdraws from the public domain, diminishes the resources available to the public, and, therefore, is considered unpatentable. *KSR*, 127 S. Ct. 1727 (2007), at 1739.

41.    The Supreme Court also explained that the combination of familiar elements with known methods is obvious when it provides no functionality except for yielding predictable results.  *Id.*  When, as here, a combination of prior art elements fails to yield a result different from what can be obtained by the sequential operation of old elements, the combination is

obvious.  *See id.*; *see also Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 60-62 (1969).

42.    Courts must look to interrelated teachings of multiple prior art references in determining whether an invention is obvious.  *KSR,* 127 S. Ct. 1727 (2007), at 1740.  The court should also consider the "common sense of those skilled in the art" to determine whether a combination is obvious in light of the prior art.  *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 82 U.S.P.Q.2d (BNA) 1687, 1690 (Fed. Cir. 2007).

43.    "In many fields it may be that there is little discussion of obvious techniques or combinations, and market demand, rather than scientific literature, may often drive design trends."  *KSR*, at 1741.  Therefore, granting patent monopoly to technological advances that would occur in the ordinary course without real innovation – like the '281 patent – retards progress and deprives prior inventions of their value.  *Id.*

44.    A finding of obviousness may be reinforced by "testimony from the sole inventor at trial that he did not have a technical background, could not have actually built the prototype himself, and relied on the assistance of an electrical engineer… to build a prototype of his invention."  *Leapfrog*, 82 U.S.P.Q.2d (BNA) 1687, 1692 (Fed. Cir. 2007).  Accordingly, inventions by inventors that are untrained or unskilled in the relevant art bolsters a conclusion that the invention is obvious.  *See id.*

45.    Four factors that aid the Court's obviousness inquiry were set forth by the Supreme Court's 1966 *Graham* decision:  (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the relevant art; and, if applicable, (4) objective or secondary considerations tending to prove

nonobviousness. These secondary considerations include evidence of commercial success, long-felt need, and failure of others to make the invention. *Graham*, 383 U.S. at 18.

### C.    The LeCard Prior Art Method and System

46.    The Court concludes that claims 1, 5-7, 9-10, 14-16, and 18-19 are invalid under 35 U.S.C. § 102(a) and (b) in light of the prior art LeCard program. As explained below, the Court finds that the LeCard program, as operated commercially beginning in 1992, expressly disclosed every element of claims 1, 5-7, 9-10, 14-16, and 18-19. The Court finds that the LeCard program was known and used by others before the invention by Barbara Johnson within the meaning of 35 U.S.C. § 102(a), and that the LeCard program was in public use more than one year prior to the U.S. filing date of the '281 patent within the meaning of 35 U.S.C. § 102(b).

47.    The Court also concludes, as explained below, that claims 2-4 and 11-13 are invalid as obvious under 35 U.S.C. § 103 in light of the LeCard program. Among other things, common sense of a person of skill in the art would lead to the use of numbers from other commonly available card types in the LeCard program.

### D.    The Litle & Co. Prior Art Method and System

48.    The Court concludes that claims 1-3, 5-7, 9-12, 14-16, and 18-19 are invalid under 35 U.S.C. § 102(a) and (b) in light of the Litle & Co. prior art. As explained below, the Court finds that each of the Litle & Co. merchant creditor arrangements (i.e., postage advance, Hanover Finance, and Bieler Marketing Associates), as operated commercially between 1990 and 1995, expressly disclosed every element of claims 1-3, 5-7, 9-12, 14-16, and 18-19. The Court finds that each of the Litle & Co. merchant creditor arrangements was known and used by others before the invention by Barbara Johnson within the meaning of 35 U.S.C. § 102(a), and that each was in public use more than one year prior to the U.S. filing date of the '281 patent within the meaning of 35 U.S.C. § 102(b).

49.     The Court also concludes that claims 4 and 13 are invalid as obvious under 35 U.S.C. § 103 in light of the Litle & Co. prior art.  Among other things, common sense of a person of skill in the art would lead to the use of numbers from smart cards in the Litle & Co. prior art.

### E.      The Transmedia Prior Art Method

50.     The Court concludes that claims 1, 6, 7, and 9 are invalid under 35 U.S.C. § 102(a) and (b) in light of the Transmedia prior art.  As explained below, the Court finds that the Transmedia program, as operated commercially by at least 1995, expressly disclosed every element of method claims 1, 6, 7, and 9.  The Court finds that the Transmedia program was known and used by others before the invention by Barbara Johnson within the meaning of 35 U.S.C. § 102(a), and that it was in public use more than one year prior to the U.S. filing date of the '281 patent within the meaning of 35 U.S.C. § 102(b).

51.     The Court also concludes that claims 2-5 are invalid as obvious under 35 U.S.C. § 103 in light of the Transmedia program.  Among other things, common sense of a person of skill in the art would lead to the use of numbers from other commonly available card types in the Transmedia prior art method.

### F.      Prior Art Reserve Account Method

52.     The Court concludes that claims 1-7 and 9 are invalid under 35 U.S.C. § 102(a) and (b) in light of prior art reserve accounts (including Litle & Co. reserve accounts).  As explained below, the Court finds that the well known method of funding prior art reserve accounts, as practiced commercially prior to July 9, 1996, expressly disclosed every element of method claims 1-7 and 9.  The Court finds that prior art reserve accounts were known and used by others before the invention by Barbara Johnson within the meaning of 35 U.S.C. § 102(a), and

that they were in public use more than one year prior to the U.S. filing date of the '281 patent within the meaning of 35 U.S.C. § 102(b).

## III.    INVALIDITY: FINDINGS OF FACT

53.    The Plaintiff has not asserted that any Defendant infringes dependent claims 8 or 17.

### A.    The LeCard Program[2]

54.    The evidence reveals the following facts regarding the LeCard program:

55.    At least five years before the July 9, 1997 priority date of the '281 patent, Citicorp Diners Club, Inc. ("Diners Club") offered a discount dining program to its cardholders known as the LeCard program.  (From testimony to be elicited at trial.)  In the LeCard program, Diners Club cardholders registered for the LeCard program with Diners Club and received a co-branded Diners Club/LeCard charge card (a "LeCard card").  (From testimony to be elicited at trial.)  If a cardholder presented a LeCard card as payment at a restaurant participating in the LeCard program, that cardholder received a 20% discount off that charge on its monthly statement from Diners Club.  (From testimony to be elicited at trial.)  By October 1992, electronic capture of LeCard transactions was available to all restaurant members provided they used Diners Club exclusively as the merchant processor for all LeCard transactions.  (From testimony to be elicited at trial.)

56.    In addition to the LeCard program's benefits to the cardholder, restaurants benefited from the program.  (From testimony to be elicited at trial.)  Restaurants participating in the LeCard program received a cash or advertising advance from Clever Ideas-LeCard, Inc.

---

[2] Defendants' evidence regarding the LeCard program will be a combination of contemporaneous documentation, deposition testimony from witnesses with personal knowledge of the LeCard program, and testimony to be elicited at trial.  Accordingly, in addition to the citations contained herein, Defendants will supplement their findings of fact post-trial to reflect the supporting trial testimony and exhibits.

("Clever Ideas"), which was repaid out of future LeCard transactions at that restaurant. (From testimony to be elicited at trial.) For each LeCard transaction, Diners Club processed the transaction (i.e., electronically acquired payment information from the merchant, authorized and settled the payment), then derived a portion of the payment amount by subtracting from the total LeCard charge, the Diners Club processing fees and the 20% cardholder discount, and forwarded that portion to Clever Ideas as payment of the restaurant's outstanding cash or advertising advance obligation. (From testimony to be elicited at trial.) Clever Ideas would then receive and apply the amount forwarded to reduce the restaurant's cash or advertising advance obligation. (From testimony to be elicited at trial.)

### Specific Findings of Fact

57. Clever Ideas provided cash and advertising advances to merchants participating in the LeCard program. (LC_00007-10.)

58. The merchants' obligation to repay Clever Ideas was created by the cash or advertising advance and, therefore, was an "obligation" within the meaning of the claims of the '281 patent: it was an amount owed by a merchant that was independent of any costs or fees arising out of the use of customer identifiers as payment. (LC_00007-10.)

59. LeCard card numbers were "customer identifiers" within the meaning of the claims of the '281 patent, because they were unique identifying account numbers. (From testimony to be elicited at trial.)

60. The Clever Ideas method and system for repayment were completely automated, and thus were a method and system of automated payment. (From testimony to be elicited at trial.)

***Claim 1***

17

<u>At the merchant</u>

61.     "*Accepting a customer identifier as payment from the customer.*"   Merchants in the LeCard program electronically accepted LeCard card numbers as payment from customers. (LC_00001-14; Suckow Tr. 16:9-17:6; 19:4-16; Landon Tr. 12:15-14:6, 47:16-22; Sorwell Tr. 13:15-17, 14:4-15:6, 46:18-24; from testimony to be elicited at trial.)

62.     "*Electronically forwarding information related to the payment to the computerized merchant processor.*"   After accepting the LeCard card numbers, merchants electronically forwarded information related to the LeCard card payment to Diners Club. (LC_00001-14; Suckow Tr. 22:13-23:8; Landon Tr. 16:5-17, 47:23-48:2; Sorwell Tr. 24:11-25:1, 46:18-47:3; McBrearty Tr. 9:23-25, 75:25-78:4; from testimony to be elicited at trial.)

<u>At the computerized merchant processor</u>

63.     "*Acquiring the information related to the payment from the merchant.*"   Diners Club received the information related to the payment from the merchant.  (LC_00001-14; McBrearty Tr. 21:8-22:23, 39:20-43:19, 75:25-78:4; Sorwell Tr. 24:11-25:1; Landon Tr. 48:3-49:4 ; from testimony to be elicited at trial.)

64.     "*Authorizing and settling[3] the payment.*"   Diners Club then authorized and settled the LeCard payments.  (LC_00001-14; McBrearty Tr. 21:8-22:23, 39:24-43:19, 77:21–78:4; Landon Tr. 21:14-22:1, 42:6-8; 47:23-49:4; Sorwell Tr. 17:7-20, 38:22-39:3; from testimony to be elicited at trial.)  As the card issuer and merchant processor, Diners Club itself approved the authorization request and conveyed this information back to the merchant.  (*See* '281 patent, 3:53-58; from testimony to be elicited at trial.)  The settlement involved Diners Club, as the

---

[3] According to the Court's claim construction, "settling the payment" means "the part of a transaction when an amount is transferred or credited to the merchant processor.

merchant processor, reflecting a credit for the transaction in its records as required by the agreed upon claim construction. (From testimony to be elicited at trial.)

65.    Accordingly, Diners Club was the "computerized merchant processor" within the meaning of the claims of the '281 Patent: it was a computer-equipped entity that acquired or processed merchant transactions. (LC_00001-14; McBrearty Tr. 22:20-23; Landon Tr. 19:13-24:23, 21:14-22:1, 42:6-8, 47:23-49:4; Sorwell Tr. 17:7-20, 23:12-29:6, 39:1-3; Secher Tr. 16:13-18; from testimony to be elicited at trial.)

66.    "*Forwarding at least a portion of the payment to a computerized payment receiver as payment of at least a portion of an obligation made by the merchant.*"  Once a particular merchant's transaction had been approved, Diners Club then deducted its processing fees from the settled payment, deducted the 20% cardholder discount and applied that as a credit to the cardholder's account, and then forwarded the remaining portion of the LeCard payment amount to Clever Ideas as payment of the merchant's cash or advertising advance obligation using either ACH or wire transfer. (LC_00001-14; McBrearty Tr. 22:3-19, 42:21-43:19, 78:23-80:5; Suckow 30:18-31:5, 33:17-34:5; Landon Tr. 11:7-12:14, 16:5-17:14, 48:11-24; Sorwell Tr. 9:11-11:6, 47:17-48:21; from testimony to be elicited at trial.)

67.    Clever Ideas was a "computerized payment receiver" within the meaning of claim 1 of the '281 patent, because it was an account or entity capable of receiving payments or credits electronically. (LC_00001-14; McBrearty Tr. 22:3-19, 42:21-43:19, 78:23-80:5; Suckow 30:18-31:5, 33:17-34:5; Landon Tr. 11:7-12:14, 16:5-17:14, 48:11-24; Sorwell Tr. 9:11-11:6, 47:17-48:21; from testimony to be elicited at trial.)

At the computerized payment receiver

68.    "*Receiving the portion of the payment forwarded by the computerized merchant processor*."  Clever Ideas received the portion of the payment forwarded by Diners Club. (LC_00001-14; Landon Tr. 11:7-12:14, 48:11-24; Sorwell Tr. 9:11-11:6, 47:17-48:15; from testimony to be elicited at trial.)

69.    "*Applying that portion to the outstanding obligation made by the merchant to reduce such obligation*."  Clever Ideas applied the full amount of the portion forwarded to it by Diners Club to reduce the restaurant's outstanding cash or advertising advance obligation to Clever Ideas.  (LC_0001-14; Suckow Tr. 32:4-33:14, 37:8-38:12, 74:12-79:24; Landon Tr. 11:7-12:14, 33:18-35:6, 49:17-21, 50:5-22; Sorwell Tr. 33:14-34:16, 35:16-37:9, 47:17-48:15; McBrearty Tr., 29:4-20. 53:2-56:14; from testimony to be elicited at trial.)  Clever Ideas thus "us[ed] the portion that was received from the merchant processor to reduce the obligation owed by the merchant" – as set forth in the Court's claim construction – and, therefore, "appl[ied] that portion to the outstanding obligation made by the merchant to reduce such obligation."

70.    Clever Ideas also applied an additional amount to reduce the obligation that equates to the difference between 80% of the total LeCard payment amount (the amount applied by Clever Ideas) and the amount forwarded by Diners Club (approximately 73.6% of the LeCard payment amount).  (LC_00001-14; Suckow Tr. 32:4-33:14, 37:8-38:12, 74:12-79:24; Landon Tr. 11:7-12:14, 33:18-35:6, 49:17-21, 50:5-22; Sorwell Tr. 33:14-34:16, 35:16-37:9, 47:17-48:15; McBrearty Tr., 29:4-20. 53:2-56:14; from testimony to be elicited at trial.)

71.    The merchant, computerized merchant processor (Diners Club), and computerized payment receiver (Clever Ideas) in the LeCard program practiced every element of claim 1.

*Claim 5*

72.    The LeCard card was a charge card, because it was a card that required full payment every billing cycle.   (LC_00001-5; Suckow Tr. 17:10-20; Sorwell Tr. 13:15-14:3; Landon Tr. 12:15-13:14; Shamos Infringement Expert Report, ¶ 77; Shamos Invalidity Report, ¶ 103; from testimony to be elicited at trial.)

*Claim 6*

73.    Merchants in the LeCard program accepted the LeCard card at their restaurant locations, i.e. "at a merchant location."  (LC_00001-14; Suckow Tr. 19:11-16; Landon Tr. 47:16-22; Sorwell Tr. 14:4-15:6, 46:18-24; from testimony to be elicited at trial.)

*Claim 7*

74.    Restaurants participating in the LeCard program after 1992 accepted the Diners Club/LeCard cards using an electronic draft capture, i.e. "electronically."   (LC_00001-12 ; Suckow Tr. 19:17-20:14; Landon Tr. 14:7-17, 47:16-22; Sorwell Tr. 14:4-15:6, 46:18-24; from testimony to be elicited at trial.)

*Claim 9*

75.    Diners Club forwarded payments to Clever Ideas on a periodic basis — i.e., on a daily or weekly basis.   (LC_00001-12; Suckow Tr. 34:20-35:4; McBrearty Tr. 10:20-11:5; Sorwell Tr. 49:1-5; from testimony to be elicited at trial.)

*Claim 10*

At a merchant

76.    "*Means for accepting a customer identifier as payment from the customer and for electronically forwarding information related to the payment to a computerized merchant processor*."  Merchants accepted LeCard card numbers and electronically forwarded information

21

related to the payment to Diners Club using ordinary merchant-location equipment, including VeriFone merchant-location equipment. (LC_00001-12; Suckow Tr. 14:13-15:11, 16:9-17:6; 19:4-16, 20:19-21:9, 22:13-23:8, 26:5-12; Landon Tr. 12:15-14:6, 16:5-17, 20:13-21:7, 47:16-48:2; Sorwell Tr. 13:15-15:17, 24:11-25:1, 46:18-47:3; McBrearty Tr. 9:23-25, 75:25-78:4; from testimony to be elicited at trial.)

77.    Standard VeriFone merchant-location equipment, as described in the '281 patent, contained a processor, memory, modem, and a keypad or magnetic card reader together with software executing an algorithm to accept customer identifiers and electronically forward information related to the payment to a computerized merchant processor. ('281 patent, 6:18-59; from testimony to be elicited at trial.)

<u>At the computerized merchant processor</u>

78.    "*Means for receiving the information related to the payment from the merchant.*" Diners Club received the information related to the payment from the merchant electronically via modems. (LC_00001-12; McBrearty Tr. 21:8-22:23, 39:20-43:19, 75:25-78:4; Sorwell Tr. 24:11-25:1; Landon Tr. 48:3-49:4; from testimony to be elicited at trial.)

79.    "*Means for authorizing and settling the payment.*" Diners Club used computers programmed to execute the standard algorithms identified in the Court's claim construction order to authorize and settle LeCard payments. (LC_00001-12, McBrearty Tr. 21:8-22:23, 39:24-43:19, 77:21–78:4; Landon Tr. 21:14-22:1, 42:6-8; 47:23-49:4; Sorwell Tr. 17:7-20, 38:22-39:3; from testimony to be elicited at trial.)

80.    "*Means for forwarding a portion of the payment to the third party to reduce the obligation.*" Diners Club derived the portion to be forwarded by subtracting the Diners Club processing fees and the 20% cardholder discount from the amount of the LeCard payment and

electronically forwarded the remaining portion of the payment to Clever Ideas using its computer system.  (LC_00001-14; McBrearty Tr. 10:20-11:5; 22:3-19, 42:21-43:19, 78:23-80:5; Suckow 30:18-31:5, 33:17-35:4; Landon Tr. 11:7-12:14, 16:5-17:14, 48:11-24; Sorwell Tr. 9:11-11:6, 47:17-48:21; 49:1-5; from testimony to be elicited at trial.)

81.    Diners Club thus forwarded a portion of the payment to Clever Ideas to reduce the merchant's obligation using the claimed means—i.e., the combination of a processor, memory, and modem together with software executing an algorithm for forwarding payment to the third party as described at '281 patent, 5:21-37.

82.    Clever Ideas and Diners Club were independent entities, sharing no common ownership or management.  (LC_00001-12; Suckow Tr. 13:3-12; Landon Tr. 18:17-23; from testimony to be elicited at trial.)    Accordingly, Clever Ideas was a "third party" within the meaning of claim 10 of the '281 patent:  Clever Ideas was neither the merchant nor the merchant processor.

*Claim 14*

83.    The LeCard card was a charge card, because it was a card that required full payment every billing cycle.  (LC_00001-6; Suckow Tr. 17:10-20; Sorwell Tr. 13:15-14:3; Landon Tr. 12:15-13:14; Shamos Infringement Expert Report, ¶ 77; Shamos Invalidity Report, ¶ 103; from testimony to be elicited at trial.)    Merchants accepted LeCard charge cards using ordinary merchant-location equipment, including VeriFone merchant-location equipment. (LC_00001-12; Suckow Tr. 14:13-15:11, 16:9-17:6; 19:4-16, 20:19-21:9, 22:13-23:8, 26:5-12; Landon Tr. 12:15-14:6, 16:5-17, 20:13-21:7, 47:16-48:2; Sorwell Tr. 13:15-15:17, 24:11-25:1, 46:18-47:3; McBrearty Tr. 9:23-25, 75:25-78:4; from testimony to be elicited at trial.)

*Claim 15*

84.    Merchants accepted LeCard card numbers at their merchant location using ordinary merchant-location equipment, including VeriFone merchant-location equipment. (LC_00001-12; Suckow Tr. 14:13-15:11, 16:9-17:6; 19:4-16, 20:19-21:9, 22:13-23:8, 26:5-12; Landon Tr. 12:15-14:6, 16:5-17, 20:13-21:7, 47:16-48:2; Sorwell Tr. 13:15-15:17, 24:11-25:1, 46:18-47:3; McBrearty Tr. 9:23-25, 75:25-78:4; from testimony to be elicited at trial.)

*Claim 16*

85.    Merchants electronically accepted LeCard card numbers at their merchant location using ordinary merchant-location equipment, including VeriFone merchant-location equipment.  (LC_00001-12; Suckow Tr. 14:13-15:11, 16:9-17:6; 19:4-16, 20:19-21:9, 22:13-23:8, 26:5-12; Landon Tr. 12:15-14:6, 16:5-17, 20:13-21:7, 47:16-48:2; Sorwell Tr. 13:15-15:17, 24:11-25:1, 46:18-47:3; McBrearty Tr. 9:23-25, 75:25-78:4; from testimony to be elicited at trial.)

*Claim 18*

86.    Diners Club subtracted the Diners Club processing fees and the 20% cardholder discount from the amount of the LeCard payment and periodically forwarded the remaining portion of the payment to Clever Ideas using its computer system, which included a processor, memory, modem, and software.  (LC_00001-14; McBrearty Tr. 10:20-11:5; 22:3-19, 42:21-43:19, 78:23-80:5; Suckow 30:18-31:5, 33:17-35:4; Landon Tr. 11:7-12:14, 16:5-17:14, 48:11-24; Sorwell Tr. 9:11-11:6, 47:17-48:21; 49:1-5; from testimony to be elicited at trial.)

*Claim 19*

87.    Any amount forwarded from Diners Club to Clever Ideas was a percentage of the obligation owed by the merchant.  Diners Club thus forwarded to Clever Ideas an amount that

was a percentage of the merchant's obligation to Clever Ideas using its computer system, which included a processor, memory, modem, and software.  (LC_00001-14; McBrearty Tr. 10:20-11:5; 22:3-19, 42:21-43:19, 78:23-80:5; Suckow 30:18-31:5, 33:17-35:4; Landon Tr. 11:7-12:14, 16:5-17:14, 48:11-24; Sorwell Tr. 9:11-11:6, 47:17-48:21; 49:1-5; from testimony to be elicited at trial.)

***Public Knowledge, Public use and Corroboration***

88.    The operation of the LeCard program was publicly known.  (LC_00001-18; Landon Tr. 45:18-24; Secher Tr., 8:8-21, 9:5-15, 13:7-17, 14:16-15:13, 35:4-36:6, 47:4-24, 49:6-18; Konop Tr., 34:8-35:1, 38:4-13, 40:2-41:6; Boudette Tr., 16:4-20:8, 33:12-34:16, 34:22-35:3, 49:13-24; Gepford Tr., 19:5-20:25; from testimony to be elicited at trial.)

89.    How dining discount programs functioned during this time period was generally known (McBrearty Tr. 67:1-13; from testimony to be elicited at trial), and the LeCard program was one of the largest and most prominent of such programs.  In 1992, there were approximately 180,000–200,000 LeCard cardholders, and this number increased to approximately 350,000 by 1995.  (LC_00001; Suckow Tr. 42:16-43:9; from testimony to be elicited at trial.)  There were over 1500 restaurants participating in the program by 1995, and those restaurants received approximately $25 - $30 million in cash advances from Clever Ideas.  (Suckow Tr. 43:10-44:7; from testimony to be elicited at trial.)

90.    Diners Club marketed the LeCard program to all of its existing members by sending them billing statement inserts, statement messages, and a directory of participating restaurants.  (LC_00001-18; McBrearty Tr. 62:4-14; Suckow Tr. 46:9-47:23; from testimony to be elicited at trial.)  Diners Club also described the program within materials designed to solicit

new customers. (McBrearty Tr. 62:25-63:4; from testimony to be elicited at trial.) None of this material was confidential. (From testimony to be elicited at trial.)

91.    Clever Ideas also marketed its cash advance program to prospective restaurants. (From testimony to be elicited at trial.) Clever Ideas would cold-call restaurants, send direct marketing mailings, advertise in industry publications, and discuss its cash advance program at industry trade shows. (Suckow Tr. 48:8-16, 54:19-55:15; Landon Tr. 26:2-21; Sorwell Tr. 42:3-7; Secher Tr., 8:8-21, 9:5-15, 13:7-17, 14:16-15:13, 35:4-36:6, 47:4-24, 49:6-18; from testimony to be elicited at trial.) Periodical articles were published that described, among other things, the 20% discount afforded LeCard cardholders at participating restaurants. (LC_00014; CH00040-41, 43-44, 46-47, 53-54, 56-57, 59-60, 67-68, 83; from testimony to be elicited at trial.) None of this material was confidential either. (From testimony to be elicited at trial.)

92.    Diners Club's and Clever Ideas' marketing efforts included explaining to existing and potential restaurants the benefits of the program, including Diners Club's 20% incentive to cardholders for dining at participating restaurants and Diners Club's automatically forwarding a portion of the LeCard payment to Clever Ideas as payment of the restaurant's outstanding cash or advertising advance obligation. (LC_00001-18; from testimony to be elicited at trial.)

93.    In October of 1992 Lee Suckow, President of Clever Ideas, sent a non-confidential letter to every merchant participating in the LeCard program announcing the ability to electronically capture transactions (by the use of card swipe machines) and explaining the relevant details of the program to these merchants. (LC_00001-5; from testimony to be elicited at trial.) Specifically, the October 1992 letter stated that Diners Club (the merchant processor) was now able to process transactions electronically captured by merchants. (LC_00001; from testimony to be elicited at trial.) ("Electronic Draft Capture of LeCARD transactions is now a

reality.")  Mr. Suckow's letter also details that Diners Club would be the merchant processor. (*Id.*; from testimony to be elicited at trial.)  ("Presently, Electronic Draft Capture of LeCard transaction is available only to those restaurants that are processing directly to Diners Club.") This letter also details that the restaurant could have payment sent directly from Diners Club to Clever Ideas.  (LC_00001-2; from testimony to be elicited at trial.)  ("Enclosed you will also find a document that enables you to have Diners Club send the LeCARD charges directly to us for your Account.")

94.     The non-confidential documentation *alone* discloses that:  (1) restaurants accepted LeCard cards as payment from cardholders and electronically forwarded information to Diners Club; (2) Diners Club processed LeCard payments (i.e., it acquired, authorized, and settled the payment); (3) Diners Club forwarded payment for the LeCard transactions, less the 20% discount afforded LeCard cardholders and some amount of processing fee, to Clever Ideas; and (4) Clever Ideas applied 80% of the LeCard payment amount to reduce the restaurant's outstanding cash or advertising advance obligation.  (From testimony to be elicited at trial.)  Thus, all relevant facts regarding the operation of the LeCard program were available to the public and are established by contemporaneous documentation.  (From testimony to be elicited at trial.)

95.     Neither Clever Ideas nor Diners Club took any steps to conceal relevant aspects of the LeCard program's operation and, indeed, it is difficult to imagine how the operation of such a program, involving mass marketing and the involvement of multiple entities, could have been actively concealed.  (From testimony to be elicited at trial.)  Neither Clever Ideas nor Diners Club ever required existing or potential merchants or cardholders to sign confidentiality agreements or non-disclosure agreements.  (From testimony to be elicited at trial.)  Nor did Clever Ideas or Diners Club ever require any of their employees to sign any type of

confidentiality agreement regarding the operation of the LeCard program.  (From testimony to be elicited at trial.)

96.     Together with the unequivocal testimony of every witness with knowledge of the LeCard program's operation, the contemporaneous documentation reveals that the LeCard program was used commercially, in the ordinary course of business without efforts to conceal its operation.  (From testimony to be elicited at trial.)

97.     Additionally, AdvanceMe knew about dining programs such as LeCard, Transmedia, and Dining a la Card, knew that they gave discounts to cardholders, and knew that they provided cash advances that were repaid out of card receipts.  (From testimony to be elicited at trial.)

98.     All relevant facts regarding the operation of the LeCard program are established by contemporaneous documentation, and confirmed by the consistent, detailed testimony of every witness with intimate personal knowledge of the LeCard program's operation, and the Court finds that the LeCard program expressly disclosed every element of claims 1, 5-7, 9-10, 14-16, and 18-19.  The Court also finds that because of the extensive commercial use of the LeCard method and system, and the lack of any measures by those involved to conceal the relevant details of operation of the program, all relevant facts regarding the operation of the LeCard program were publicly known before AdvanceMe's invention date, and that the LeCard program was publicly used more than one year before the July 9, 1997 priority date of the '281 patent.

## Obviousness

99.     *Claims 2-4.*  The Court finds that claims 2-4 are obvious in light of the LeCard program.  Card numbers from credit, debit, smart, and charge cards may all be input into a

computer or read from a magnetic strip by a card terminal. (Litle Dep. 11:9-13, 130:9-14, 139:7-140:21, 207:18-208:16; from testimony to be elicited at trial.) In fact, card numbers from each of these card types may be read by the *same* terminal. (Suckow Tr. 111:10-12; Sorwell Tr. 49:6-10; Landon Tr. 15:8-11; from testimony to be elicited at trial.)

100.    The Court's finding is supported by the '281 specification, which equates all of these types of card numbers and makes it clear that it would be obvious to one of skill in the art to interchange any of them. ( '281 patent, abstract:4-6, 1:17-22, 1:29-33, 1:56-61, 1:66-2:7, 2:31-34, 2:44-48, 3:10-24, 3:27-30; from testimony to be elicited at trial.) The Examiner at the United States Patent Office additionally noted that there was no non-obvious distinction between a debit, charge, smart, or credit card. (January 22, 2002 Office Action, p. 5.) Moreover, common sense of a person of ordinary skill in the art, as well as ordinary market forces, would lead to the use of various standard types of card numbers in the LeCard program. (From testimony to be elicited at trial.) In addition, Plaintiff's expert concedes that "a charge card purchase is no different from a credit card purchase if a computerized merchant processor is involved." (Shamos Infringement Report, ¶ 31.)

101.    *Claims 11-13.* The Court finds that claims 11-13 are obvious in light of the LeCard program. The Court has construed the means for accepting a credit card number, debit card number, and smart card number to be identical to the means for accepting a charge card number—the combination of a processor 312, memory 320, modem 322, and a keypad or magnetic card reader 316 together with software executing an algorithm as implemented by Verifone merchant-location equipment available as of the July 9, 1997 filing date and equivalents thereof.

102.    And as described above, there is no non-obvious distinction between accepting a card number from a charge card, as occurred in the LeCard program, and accepting a card number from a credit card, debit card or smart card.  The same merchant-location equipment, including VeriFone merchant-location equipment, that accepted LeCard charge cards was used to accept other customer identifiers, such as credit, debit, and smart card numbers.  (Suckow Tr. 111:10-12; Sorwell Tr. 49:6-10; Landon Tr. 15:8-11; from testimony to be elicited at trial.)  Moreover, common sense of a person of ordinary skill in the art, as well as ordinary market forces, would lead that person to use the existing equipment in the LeCard program to accept the various standard types of card numbers.

**B.    The Litle & Co. Prior Art[4]**

103.    The evidence reveals the following facts regarding the Litle & Co. prior art:

104.    From 1990-1993, Litle & Co. worked with National Processing Company ("NPC") and First National Bank of Louisville ("FNBL") to process card transactions. (LI_00017-29; from testimony to be elicited at trial.)  The responsibilities of each of these companies with respect to processing card transactions is explained in detail in the contemporaneous Member Agreement, dated June 1992.[5]  (LI_00017-29; from testimony to be elicited at trial.)

105.    The Litle & Co. prior art system and method was completely automated and involved payment by the merchant processor to various merchant creditors, including Bieler Marketing Associates, Hanover Finance, and Litle & Co.  (From testimony to be elicited at trial.)

---

[4] Defendants' evidence regarding the Litle & Co. prior art will be a combination of contemporaneous documentation, deposition testimony from witnesses with personal knowledge of the Litle & Co. prior art, and testimony to be elicited at trial.  Accordingly, in addition to the citations contained herein, Defendants will supplement their findings of fact post-trial to reflect the supporting trial testimony.

[5] Beginning in 1994, Litle & Co. worked in conjunction with First U.S.A. Merchant Services, Inc. ("First USA") to process card transactions.  The Member Agreement remained identical, but First USA assumed the responsibilities of both NPC and FNBL as described in the Member Agreement.  (from testimony to be elicited at trial.)

The processing of card payments (i.e., acquiring, authorizing, and settling) was identical regardless of who was ultimately paid by the merchant processor after settlement of the payment. (From testimony to be elicited at trial.)

106.   In other words, the only differences between the merchant processor's paying Bieler Marketing Associates, Hanover Finance, and Litle & Co. in the Litle & Co. prior art were (1) the entity to which payment was forwarded and (2) the type of merchant obligation being automatically repaid.   (From testimony to be elicited at trial.)   The steps occurring "at the merchant" (accepting a customer identifier as payment and electronically forwarding information related to the payment to the computerized merchant processor), and the "at the merchant processor" steps of acquiring, authorizing, and settling, were identical in each merchant creditor arrangement.[6]  (From testimony to be elicited at trial.)

107.   The merchant processor's forwarding a portion of the payment to the party to which the merchant owed an obligation in the Litle & Co. prior art was routine, and simply involved the step of inputting a bank account number of the entity to which payment was to be forwarded into the existing computer system and specifying what portion of the payment was to be forwarded.  (Bouchard Dep. 95:20-98:1; from testimony to be elicited at trial.)

Litle & Co. Postage Advance

108.   Beginning on or before June 22, 1990, Litle & Co. provided postage advances to merchants in exchange for the merchants' agreement allowing the merchant processor to forward "Daily Repayment Amounts" to Litle & Co. out of the merchant's "Net Proceeds" from card payments ("Postage Advance Program").  (LI_00004-8, 18, 33-38, 40-42, 55-57; from testimony to be elicited at trial.)

---

[6] While the steps that occurred at the merchant processor were identical, the entities that performed the various functions may have changed.  (From testimony to be elicited at trial.)

109.    The postage advance agreement—i.e., the "Promissory Note for Postage Advance"—was a schedule to the standard processing agreement ("Member Agreement") entered by and between a merchant, Litle & Co., NPC, and FNBL.  (From testimony to be elicited at trial.)  In the Postage Advance Program, Litle & Co., NPC, and FNBL performed their ordinary functions under the Member Agreement (including acquiring information related to the payment from the merchant and authorizing and settling the payment), with the exception of the forwarding step.  (From testimony to be elicited at trial.)  Rather than forwarding all of Net Proceeds to the merchant, the merchant processor forwarded a portion of the payment ("Daily Repayment Amounts") to Litle & Co. as repayment of the merchant's postage advance obligation.  (Promissory Notes for Exposures, Inc (June 22, 1990; June 19, 1991); Promissory Notes for Museum Publications of America (September 27, 1993; October 20, 1993; January 20, 1994; January 31, 1994); Bouchard Dep. 93:10-94:15; Litle Dep. 96:3-12; Bourne Decl. ¶ 17; Abbott Decl. ¶ 13; from testimony to be elicited at trial.)

110.    The merchant's obligation to Litle & Co. was created by a cash or advertising advance and, therefore, was an "obligation" within the meaning of the claims of the '281 patent: it was an amount owed by a merchant that was independent of any costs or fees arising out of the use of customer identifiers as payment.  (LI_00004-8, 33-38, 40-42, 55-57; Litle Dep. 75:2-9, 80:3-12, 86:3-25, 92:14-20, 283:24-284:18, 293:13-21;  Bouchard Dep. 92:10-93:8, 102:19-103:17, 106:15-107:16; Bourne Dep. 53:17-20; Abbott Dep. 42:7-12, 78:9-79:9; from testimony to be elicited at trial.)

<u>Hanover Finance</u>

111.    The merchant processor in the Litle & Co. prior art also entered arrangements with merchant creditors whereby FNBL (or, after 1994, First USA) automatically forwarded a

portion of card payments to the merchant creditor as repayment of the merchant's obligation. (LI_00030-31 ("Hanover Finance letter"); from testimony to be elicited at trial.)

112.    In the arrangement described in the 1994 Hanover Finance letter ("Hanover Finance Program"), Boston Publishing (a merchant that entered into the Member Agreement with the merchant processor) obtained a line of credit from a creditor (Hanover Finance) and authorized the merchant processor's automatic forwarding of a portion of its card payments directly to the creditor upon written instruction from Hanover Finance. (LI_00030-31; Bouchard Dep. 112:19-24; Litle Dep. 70:14-19; from testimony to be elicited at trial.)

113.    In the Hanover Finance Program, the merchant (Boston Publishing) granted the creditor (Hanover Finance) a security interest in the funds that the merchant would receive from "Card Sales from Litle & Co." (LI_00030-31; from testimony to be elicited at trial.) When Hanover Finance instructed Litle & Co. to begin forwarding payment pursuant to this arrangement, the merchant processor thereafter practiced the claimed method and system for automated payment of Boston Publishing's obligation to Hanover Finance. (From testimony to be elicited at trial.)

114.    Boston Publishing's obligation to Hanover Finance was created by Hanover Finance's providing a line of credit to the merchant and, therefore, was an "obligation" within the meaning of the claims of the '281 patent: it was an amount owed by a merchant that was independent of any costs or fess arising out of the use of customer identifiers as payment. (LI_00030-31; from testimony to be elicited at trial.)

<u>Bieler Marketing Associates</u>

115.    Just as in the Hanover Finance Program, the merchant processor in the Bieler Marketing Associates program entered into an arrangement with Bieler Marketing Associates, whereby FNBL (or, after 1994, First USA) automatically forwarded a portion of a merchant's

33

card payments to the merchant creditor (Bieler Marketing Associates) as repayment of the merchant's obligation. (BM0001-03; from testimony to be elicited at trial.) The Bieler Marketing Associates program operated in exactly the same manner as the Hanover Finance program except that the merchant's obligation arose out of purchasing infomercial broadcast time as opposed to a line of credit. (Id.)

### Claim 1

#### At the merchant

116. "*Accepting a customer identifier as payment from the customer.*" Merchants in the Litle & Co. prior art accepted credit card numbers, debit card numbers, and charge card numbers as payment from their customers. (LI_00018, 19; Litle Dep. 11:9-13, 35:13-15, 36:21-37:9, 130:9-19, 138:12-139:6, 205:20-207:5, 256:25-257:3130:9-19; Bouchard Dep. 16:21-17:6, 19:5-21; 24:22-25:4; Bourne Dep. 22:7-21, 23:20-24:7, 77:20-25, 78:5-12, 78:13-79:22, 80:2-6; Abbott Dep. 73:6-13, 74:9-75:11; from testimony to be elicited at trial.) These three types of cards are identified as "BANK CARDS" (credit cards and debit cards) and "T&E CARDS" (charge cards) in the Member Agreement. (LI_00018, 19; Litle Dep. 11:9-13, 35:13-15, 36:21-37:9, 130:9-19, 138:12-139:6, 205:20-207:5, 256:25-257:3130:9-19; Bouchard Dep. 16:21-17:6, 19:5-21; 24:22-25:4; Bourne Dep. 22:7-21, 23:20-24:7, 77:20-25, 78:5-12, 78:13-79:22, 80:2-6; Abbott Dep. 73:6-13, 74:9-75:11; from testimony to be elicited at trial.)

117. "*Electronically forwarding information related to the payment to the computerized merchant processor.*" After accepting a customer identifier as payment from the customer, merchants electronically forwarded information related to the payment to Litle & Co. (LI_00019, 25; Litle Dep. 131:9-132:19; Bouchard Dep. 28:13-29:10; from testimony to be elicited at trial.)

<u>At the computerized merchant processor</u>

118.    "*Acquiring the information related to the payment from the merchant*."  Litle & Co. received the information related to the payment from merchants.  (LI_00019, 25; Litle Dep. 55:13-56:6, 154:15-155:15, 156:2-20; Bouchard Dep. 26:20-27:15, 29:7-10, 30:23-31:6, 33:6-8, 169:7-16, 178:9-22; from testimony to be elicited at trial.)

119.    "*Authorizing [the payment]*."  Litle & Co. and NPC then obtained permission from the card issuer for using the card number for the transaction between the customer and the merchant, thus Litle & Co. and NPC authorized the payment within the meaning of claim 1 of the '281 patent.  (LI_00019, 25; Litle Dep. 51:6-54:20; Bouchard Dep. 29:18-30:17, 36:14-37:9, 38:8-39:12, 41:4-42:3, 46:10-16; from testimony to be elicited at trial.)  NPC charged Litle & Co. a processing fee for its services.  (Bouchard Dep. 80:24-82:14; from testimony to be elicited at trial.)  Litle & Co. maintained the NPC processing fees in a separate account, and paid those fees to NPC out of that account on a monthly basis.  (*Id.*)

120.    "*Settling the payment*."  The card issuer then transferred funds for the card payment to FNBL/ First USA.  Because the card issuer transferred or credited payment to FNBL/ First USA, FNBL/First USA settled the payment within the meaning of claim 1 of the '281 patent.[7]  (LI_00019, 25; Litle Dep. 51:6-54:20; Bouchard Dep. 29:18-30:17, 36:14-37:9, 38:8-39:12, 41:4-42:3, 46:10-16; from testimony to be elicited at trial.)

121.    The Court has construed "computerized merchant processor" to mean "a computer-equipped entity or combination of entities that acquires or processes merchant transactions."  Litle & Co., NPC, and FNBL each performed discrete roles in the processing of card transactions, including claim 1's claimed functions of acquiring information from the merchant (Litle & Co.), authorizing the payment (Litle & Co. and NPC), settling the payment

_____

[7] Settling the payment: the part of a transaction when an amount is transferred or credited to the merchant processor.

(FNBL), and forwarding payment (FNBL).  (LI_00017-29; from testimony to be elicited at trial.)

Moreover, all three entities were signatories to the standard processing agreement ("Member

Agreement") in the early 1990s.  (Id.)  Therefore, the *combination* of Litle & Co., NPC, and

FNBL[8] constituted the computerized merchant processor in the Litle & Co. prior art.  (Id.)

122.    For an ordinary card transaction, FNBL/First USA forwarded the card payment

amount less processing fees ("Net Proceeds") to the merchant.  (LI_00019, 25; from testimony to

be elicited at trial.)  However, in the situation where the merchant had an outstanding obligation

to a creditor, FNBL/First USA periodically forwarded a portion of the merchant's card payments

to that creditor.  (*Id.*; Promissory Notes for Exposures, Inc (June 22, 1990; June 19, 1991);

Promissory Notes for Museum Publications of America (September 27, 1993; October 20, 1993;

January 20, 1994; January 31, 1994); Bouchard Dep. 93:10-94:15; Litle Dep. 96:3-12; Bourne

Decl. ¶ 17; Abbott Decl. ¶ 13; LI_00030-31; Bouchard Dep. 112:19-24; Litle Dep. 70:14-19;

from testimony to be elicited at trial.)

123.    *"Forwarding at least a portion of the payment to a computerized payment*

*receiver as payment of at least a portion of an obligation made by the* merchant.*"*

124.    *Postage Advance Program.*  In the Litle & Co. postage advance program, rather

that forwarding Net Proceeds to the merchant, FNBL forwarded, by ACH, Daily Repayment

Amounts for postage advances to Litle & Co. as payment of at least a portion of the merchant's

postage advance obligation.  (LI_00004-8, 19, 25, 33-38, 40-42, 55-57; Litle Dep. 72:8-12, 80:3-

12, 86:1-25, 92:8-20, 95:7-96:2, 99:12-100:1, 283:9-12; Bouchard Dep. 58:9-12, 85:22-86:13,

91:8-92:9, 108:8-11, 111:20:112-2, 117:7-119:11, 130:1-131:2; Bourne Dep. 25:7-20, 38:19-25,

52:12-15, 53:25-54:6; Abbott Dep. 40:11-20, 42:13-16, 84:25-86:3, 87:13-88:13, 91:16-23; from

---

[8] As described above, after 1994, the functions previously performed by NPC and FNBL were performed by First
USA and the combination of Litle & Co. and First USA comprised the merchant processor in the Litle & Co. prior
art.

testimony to be elicited at trial.)  FNBL then forwarded any remaining portion of Net Proceeds to the merchant.  (*Id.*)

125.    Because Litle & Co. was an account or entity capable of receiving payments or credits electronically, and because Litle & Co. did receive payments electronically, Litle & Co. was a "computerized payment receiver" within the meaning of claim 1 of the '281 patent.  (From testimony to be elicited at trial.)

126.    *Hanover Finance Program.*  In the arrangement identified in the 1994 Hanover Finance letter, First USA (after performing the other processing functions described above) electronically forwarded the card payment amount, less processing fees and postage advance repayment amounts, directly to Hanover Finance as repayment of the merchant's obligation to Hanover Finance.  (LI_00030-31; Bouchard Dep. 130:1-20; from testimony to be elicited at trial.)  Therefore, the portion forwarded to Hanover Finance was the amount remaining after deduction of processing fees and postage advance repayment amounts.  (*Id.*)

127.    Because Hanover Finance was an account or entity capable of receiving payments or credits electronically, and in fact did receive payments electronically, it was a "computerized payment receiver" within the meaning of claim 1 of the '281 patent.  (From testimony to be elicited at trial.)

128.    *Bieler Marketing Associates.*  As described in the sample contract, Bieler Marketing Associates was to be paid directly by the "Credit Card Processing Company." (BM0011; from testimony to be elicited at trial.)  Thus, First USA (after performing the other processing functions described above) electronically forwarded a portion of the merchant's card payments to Bieler Marketing Associates as repayment of the merchant's obligation to Bieler Marketing Associates.  (*Id.*)

129.    Because Bieler Marketing Associates was an account or entity capable of receiving payments or credits electronically, and in fact did receive payments electronically, it was a "computerized payment receiver" within the meaning of claim 1 of the '281 patent.  (From testimony to be elicited at trial.)

At the computerized payment receiver

130.    "*Receiving the portion of the payment forwarded by the computerized merchant processor and applying that portion to the outstanding obligation made by the merchant to reduce such obligation.*"

131.    *Postage Advance Program.*  Litle & Co., via a bank account, received the amount forwarded by FNBL (Daily Repayment Amount) and applied that amount to reduce the postage advance obligation of the merchant.  (LI_00004-8, 19, 25, 33-38, 40-42, 55-57; Litle Dep. 101:10-102:16; Bouchard Dep. 94:16-95:14; from testimony to be elicited at trial.)

132.    FNBL's forwarding of a portion of the payment to Litle & Co. is the type of forwarding that would take place in the preferred embodiment's description of the situations in which (1) the merchant processor is the *same* entity as the lender or (2) the merchant processor is an entity affiliated in some way with the lender.  ('281 patent, 1:35-42; from testimony to be elicited at trial.)  In both situations, one member or division of the merchant processor forwards payment to another member or division of the merchant processor in accordance with the method of claim 1.  (*Id.*)

133.    The merchant, merchant processor, and computerized payment receiver in the Litle & Co. Postage Advance Program thus practiced every element of claim 1 of the '281 patent.  (From testimony to be elicited at trial.)

38

134.     *Hanover Finance Program.*     Upon receipt of the portion of the payment forwarded by First USA, Hanover Finance applied that amount to reduce Boston Publishing's obligation to Hanover Finance (as any merchant creditor necessarily does).  (LI_00030-31; from testimony to be elicited at trial.)

135.     The merchant, computerized merchant processor, and computerized payment receiver in the Litle & Co. Hanover Finance Program thus practiced every element of claim 1 of the '281 patent.  (From testimony to be elicited at trial.)

136.     *Bieler Marketing Associates.*   Bieler Marketing Associates received the portion of the payment forwarded by the merchant processor and applied that portion to the outstanding obligation made by the merchant to reduce the obligation.   (BM0011; from testimony to be elicited at trial.)

137.     The merchant, computerized merchant processor, and computerized payment receiver in the Litle & Co. Bieler Marketing Associates arrangement thus practiced every element of claim 1 of the '281 patent.  (From testimony to be elicited at trial.)

### Claims 2, 3, and 5

138.     Merchants in all three merchant creditor arrangements in the Litle & Co. prior art (i.e., postage finance, Hanover Finance, and Bieler Marketing) accepted card numbers from credit cards, debit cards, and charge cards.  (LI_00018-19; Litle Dep. 11:9-13, 35:13-15, 36:21-37:9, 130:9-14, 138:12-139:6, 205:20-207:5, 256:25-257:3; Bouchard Dep. 19:5-21; 24:22-25:4; Bourne Decl. ¶ 6; Bourne Dep. 22:7-21, 23:20-24:7, 77:20-25, 78:5-12; Abbott Decl. ¶ 6; Abbott Dep. 73:6-13, 74:13-75:11; from testimony to be elicited at trial.)

*Claim 6*

139.    Merchants in all three merchant creditor arrangements in the Litle & Co. prior art accepted customer identifiers at their merchant location.  (LI_00018-19; Abbott Decl. ¶ 6; Abbott Dep. 74:9-75:7; Bourne Decl. ¶ 6; Bourne Dep. 22:7-23:6, 78:13-79:22, 80:2-6, Bouchard Dep. 24:1-21, 178:9-13; Litle Dep. 42:1-44:17, 141:15-142:12; from testimony to be elicited at trial.)

*Claim 7*

140.    Merchants in all three merchant creditor arrangements in the Litle & Co. prior art electronically accepted customer identifiers.  (LI_00018-19; Abbott Decl. ¶ 6; Abbott Dep. 74:9-75:7; Bourne Decl. ¶ 6; Bourne Dep. 22:7-23:6, 78:13-79:22, 80:2-6, Bouchard Dep. 24:1-21, 178:9-13; Litle Dep. 42:1-44:17, 141:15-142:12; from testimony to be elicited at trial.)

*Claim 9*

141.    FNBL/First USA periodically forwarded (e.g., daily) a portion of the payment to merchant creditors in all three merchant creditor arrangements in the Litle & Co. prior art. (LI_00004-8, 19, 25, 30-31, 33-38, 40-42, 55-57; Litle Dep. 90:1-12, 93:12-94:21, 96:3-98:1, 149:5-151:14; Bouchard Dep. 55:21-56:1, 86:7-87:11, 90:11-92:5; Bourne Dep. 84:21-85:6; Abbott Dep. 91:9-12; from testimony to be elicited at trial.)

*Claim 10*

At a merchant

142.    *"Means for accepting a customer identifier as payment from the customer and for electronically forwarding information related to the payment to a computerized merchant processor."*  Merchants in all three merchant creditor arrangements in the Litle & Co. prior art electronically accepted customer identifiers as payment from their customers and electronically

40

forwarded information relating to the payment to Litle & Co. using customary merchant-location equipment, including that offered by VeriFone. (LI_00018-19; Litle Dep. 11:9-13, 35:13-15, 36:21-37:9, 42:1-44:17, 47:7-19, 76:6-19, 115:8-25, 130:9-14, 138:12-139:6, 141:15-142:12, 152:19-154:25, 156:2-20, 205:20-207:5, 256:25-257:3; Bouchard Dep. 19:5-21; 24:1-29:10, 169:7-16, 178:9-22; Bourne Dep. 22:7-21, 23:20-24:7, 77:20-25, 78:5-79:22, 80:2-6; Abbott Dep. 73:6-13, 74:9-75:11; from testimony to be elicited at trial.)

        <u>At the computerized merchant processor</u>

       143. "*Means for receiving the information related to the payment from the merchant.*" Litle & Co. received the information related to the payment from merchants using modems in all three merchant creditor arrangements in the Litle & Co. prior art. (LI_00019, 25; Litle Dep. 47:19-48:22, 55:13-56:6, 155:1-156:20; Bouchard Dep. 26:20-27:15, 29:7-37:5, 42:4-11, 47:7-48:16, 137:7-138:3, 169:7-16, 178:9-22; Bourne Dep. 44:11-22; from testimony to be elicited at trial.)

       144. "*Means for authorizing [the payment].*" Litle & Co./NPC used computers configured to route an authorization request to a card issuer and receive approval of the authorization from the card issuer to authorize the transaction in all three merchant creditor arrangements in the Litle & Co. prior art, thus used claim 10's claimed standard means for authorizing the payment. (LI_00019, 25; Litle Dep. 47:19-48:22, 51:6-56:6, 155:1-156:20; Bouchard Dep. . 26:20-27:15, 29:7-37:9, 38:8-39:12, 41:4-42:11, 46:10-16, 47:7-48:16, 137:7-138:3, 169:7-16, 178:9-22; from testimony to be elicited at trial.)

       145. "*Means for settling the payment.*" Using computers executing the appropriate standard software, NPC submitted the amount of the customer's purchase to the card issuer, and FNBL received or was credited some amount by the card issuer in all three merchant creditor

arrangements in the Litle & Co. prior art.  These two entities together thus employed claim 10's claimed means for settling the payment.[9]  (LI_00019, 25; Litle Dep. 51:6-54:20; Bouchard Dep. 29:18-30:17, 36:14-37:9, 38:8-39:12, 41:4-42:3, 46:10-16; from testimony to be elicited at trial.)

146.    *"Means for forwarding a portion of the payment to the third party to reduce the obligation."*

147.    *Postage Advance Program.*    In deriving Daily Repayment Amounts and forwarding them to Litle & Co. using computers containing a processor, memory, modem, and software, FNBL forwarded a portion of the payment to Litle & Co. using the claimed "means for forwarding a portion of the payment to the third party" at the computerized merchant processor. (LI_00004-8, 19, 25, 33-38, 40-42, 55-57; Litle Dep. 56:7-56:16, 68:23-69:6, 69:19-24, 72:2-7, 79:5-14; Bouchard Dep. 40:5-19, 48:17-50:2, 51:22-52:5, 54:1-55:9, 61:2-15, 95:20-98:1; from testimony to be elicited at trial.)

148.    Litle & Co., as the lender (postage advance provider), was distinct from the combination of entities (i.e., the combination of Litle & Co., NPC, and FNBL) comprising the computerized merchant processor and was thus a "third party" within the meaning of claim 10 of the '281 patent.[10]  (LI_00004-8, 17-29, 33-38, 40-42, 55-57; Litle Dep. 80:1-12, 86:3-25, 92:8-20, 293:13-21; Bouchard Dep. 91:9-92:9, 106:8-108:11; Bourne Dep. 53:17-20; Abbott Dep. 42:9-12, 78:9-79:9; from testimony to be elicited at trial.)

149.    The merchant and merchant processor in the Litle & Co. Postage Advance Program thus used the claimed means to perform the claimed functions of claim 10 of the '281 patent.  (From testimony to be elicited at trial.)

---

[9] Starting in 1994, First USA performed these tasks.
[10] Third party:  payment receiver, i.e., a party that is neither the merchant nor the merchant processor.

150.    *Hanover Finance Program.*  Because First USA used computers with processors, memory, modem, and software executing an algorithm that derived the portion of the payment to be periodically forwarded (by subtracting processing fees and postage advance repayment amounts from the merchant's card transactions) and forwarded that portion to Hanover Finance, claim 10's claimed "means for forwarding a portion of the payment to the third party" was employed by the merchant processor in the Litle & Co. Hanover Finance program.  (LI_00019, 25, 30-31; Litle Dep. 56:7-56:16, 68:23-69:6, 69:19-24, 72:2-7, 79:5-14; Bouchard Dep. 40:5-19, 48:17-50:2, 51:22-52:5, 54:1-55:9, 61:2-15, 95:20-98:1; from testimony to be elicited at trial.)

151.    Because Hanover Finance was an entity other than the merchant or merchant processor in the Litle & Co. Hanover Finance program, Hanover Finance was a "third party" within the meaning of claim 10 of the '281 patent.  (LI_00030-31; Litle Dep. 69:25-70:9; Bouchard Dep. 114:1-23, 117:7-119:11; from testimony to be elicited at trial.)

152.    The merchant and merchant processor in the Litle & Co. Hanover Finance Program thus used the claimed means to perform the claimed functions of claim 10 of the '281 patent.  (From testimony to be elicited at trial.)

153.    *Bieler Marketing Associates.*  Because the merchant processor in the Bieler Marketing Associates arrangement used computers with processors, memory, modem, and software executing an algorithm that derived the portion of the payment to be forwarded, and forwarded that portion to Bieler Marketing Associates, claim 10's "means for forwarding a portion of the payment to the third party" was employed by the merchant processor in the Bieler Marketing Associates arrangement.  (LI_00019, 25; from testimony to be elicited at trial.)

154.    Because Bieler Marketing Associates was an entity other than the merchant or merchant processor in the Bieler Marketing Associates arrangement, Bieler Marketing

Associates was a "third party" within the meaning of claim 10 of the '281 patent. (BM0001, 11; from testimony to be elicited at trial.)

155.    The merchant and merchant processor in the Litle & Co. Bieler Marketing Associates arrangement thus used the claimed means to perform the claimed functions of claim 10 of the '281 patent. (From testimony to be elicited at trial.)

### Claims 11, 12, and 14

156.    Merchants in all three merchant creditor arrangements in the Litle & Co. prior art used standard merchant-location equipment, including VeriFone merchant-location equipment, to accept credit card numbers, debit card numbers, and charge card numbers from customers. (LI_00018-19; Litle Dep. 11:9-13, 35:13-15, 36:21-37:9, 42:1-44:17, 47:7-19, 76:6-19, 115:8-25, 130:9-14, 138:12-139:6, 141:15-142:12, 152:19-154:25, 156:2-20, 205:20-207:5, 256:25-257:3; Bouchard Dep. 19:5-21; 24:1-29:10, 169:7-16, 178:9-22; Bourne Dep. 22:7-21, 23:20-24:7, 77:20-25, 78:5-79:22, 80:2-6; Abbott Dep. 73:6-13, 74:9-75:11; from testimony to be elicited at trial.)

### Claim 15

157.    Merchants in all three merchant creditor arrangements in the Litle & Co. prior art used standard merchant-location equipment, including VeriFone merchant-location equipment, to accept customer identifiers at their merchant location. (LI_00018-19; Litle Dep. 11:9-13, 35:13-15, 36:21-37:9, 42:1-44:17, 47:7-19, 76:6-19, 115:8-25, 130:9-14, 138:12-139:6, 141:15-142:12, 152:19-154:25, 156:2-20, 205:20-207:5, 256:25-257:3; Bouchard Dep. 19:5-21; 24:1-29:10, 169:7-16, 178:9-22; Bourne Dep. 22:7-21, 23:20-24:7, 77:20-25, 78:5-79:22, 80:2-6; Abbott Dep. 73:6-13, 74:9-75:11; from testimony to be elicited at trial.)

44

*Claim 16*

158.    Merchants in all three merchant creditor arrangements in the Litle & Co. prior art used standard merchant-location equipment, including VeriFone merchant-location equipment, to electronically accept customer identifiers as payment from customers.  (LI_00018-19; Litle Dep. 11:9-13, 35:13-15, 36:21-37:9, 42:1-44:17, 47:7-19, 76:6-19, 115:8-25, 130:9-14, 138:12-139:6, 141:15-142:12, 152:19-154:25, 156:2-20, 205:20-207:5, 256:25-257:3; Bouchard Dep. 19:5-21; 24:1-29:10, 169:7-16, 178:9-22; Bourne Dep. 22:7-21, 23:20-24:7, 77:20-25, 78:5-79:22, 80:2-6; Abbott Dep. 73:6-13, 74:9-75:11; from testimony to be elicited at trial.)

*Claim 18*

159.    The merchant processor periodically (e.g., daily) forwarded a portion of the payment to Litle & Co., Hanover Finance, and Bieler Marketing Associates using computer systems executing the algorithm identified by the Court in each of the three merchant creditor arrangements in the Litle & Co. prior art.  (LI_00004-8, 19, 25, 30-31, 33-38, 40-42, 55-57; Litle Dep. 56:7-56:16, 68:23-69:6, 69:19-24, 72:2-7, 79:5-14; Bouchard Dep. 40:5-19, 48:17-50:2, 51:22-52:5, 54:1-55:9, 61:2-15, 95:20-98:1; from testimony to be elicited at trial.)

*Claim 19*

160.    The merchant processor forwarded an amount that was a percentage of the merchant's obligation to Litle & Co., Hanover Finance, and Bieler Marketing Associates using computer systems executing the algorithm identified by the Court in each of the three merchant creditor arrangements in the Litle & Co. prior art.  (LI_00004-8, 19, 25, 30-31, 33-38, 40-42, 55-57; Litle Dep. 56:7-56:16, 68:23-69:6, 69:19-24, 72:2-7, 79:5-14; Bouchard Dep. 40:5-19, 48:17-50:2, 51:22-52:5, 54:1-55:9, 61:2-15, 95:20-98:1; from testimony to be elicited at trial.)   Any

amount forwarded by FNBL was a percentage of the obligation owed by the merchant within the meaning of claim 19.

***Public Knowledge, Public Use and Corroboration***

161.    *Postage Advance Program.*  All relevant facts regarding the operation of the Litle & Co. Postage Advance program are established by contemporaneous, non-confidential documentation that was available to the public in the early 1990s.  (Litle Dep. 80:20-82:19, 83:11-85:22, 91:4-92:1, 288:19-290:15; Bouchard Dep. 58:13-59:16, 108:12-110:4, 126:1-127:19, 179:8-16; Bourne Dep. 31:13-32:11, 88:2-90:11; Abbott Dep. 32:15-33:3, 92:4-93:2; Manjeet Kripalani & Tatiana Pouschine, *People thought I was nuts*, Forbes Magazine, June 8, 1992, at 120 (LI_00003); from testimony to be elicited at trial.)

162.    All testimony of witnesses with personal knowledge of the operation of the Litle & Co. postage advance program confirms the documents' contents and is entirely consistent.  All testimony is thus fully corroborated by contemporaneous documentation and by other witness testimony.

163.    On June 8, 1992, *Forbes* published an article about Randall Bourne, founder of Exposures, Inc. (a merchant who entered into a processing agreement with Litle & Co., NPC, and FNBL).  (Manjeet Kripalani & Tatiana Pouschine, *People thought I was nuts*, Forbes Magazine, June 8, 1992, at 120 (LI_00003).)  The article states that "[W]hen he needed money, he turned to his credit card processor, a New Hampshire-based company called Litle & Co.  Litle agreed to finance his postage by discounting his credit card receivables.  It was such a good idea, other catalogers have followed suit."  (LI_00003.)

164.    The *Forbes* article thus describes that the merchant's credit card receivables were discounted by Litle & Co., which is precisely the method in claim 1.  A person of ordinary skill

in the art, with knowledge of the standard method of processing card transactions and with the knowledge that all credit card processors that process Visa and MasterCard transactions must use the processing services of a sponsoring bank to forward funds,[11] would understand this article to disclose that FNBL, Litle & Co.'s sponsoring bank, forwarded a portion of Exposures' card transactions to Litle & Co. as payment of Exposures' postage advance obligation to Litle & Co. (From testimony to be elicited at trial.)   The Court thus finds that the *Forbes* article alone anticipates claims 1 and 3.

165.    As Litle & Co.'s Postage Advance program was described in non-confidential contemporaneous documentation, publicized by *Forbes* magazine, and openly discussed with those in the processing industry in the early 1990s, the Litle & Co. postage advance program was publicly known and publicly used:  it was used in the ordinary course of business, without efforts to conceal its operation, from at least 1990-1993.  (LI_00004-8, 17-29, 33-38, 40-42, 55-57; from testimony to be elicited at trial.)

166.    The Court also finds that because of the extensive commercial use of the Litle & Co. Postage Advance method and system, and the lack of any measures by those involved to conceal the relevant details of operation of the program, all relevant facts regarding the operation of the Postage Advance program were publicly known before AdvanceMe's invention date, and that the Postage Advance program was publicly used more than one year before the July 9, 1997 priority date of the '281 patent.

167.    *Hanover Finance Program.*  All relevant facts regarding the operation of the Litle & Co. Hanover Finance program are established by contemporaneous, non-confidential documentation that was available to the public by at least 1994.  (LI_00030-31; Litle Dep. 80:20-

---

[11] Because Visa and MasterCard require that third party processing companies be associated with a sponsoring bank, the construction of "computerized merchant processor" expressly includes the situation where a *combination* of entities comprises the merchant processor.

82:19, 83:11-85:22, 91:4-92:1, 288:19-290:15; Bouchard Dep. 58:13-59:16, 108:12-110:4, 126:1-127:19, 179:8-16; Bourne Dep. 31:13-32:11, 88:2-90:11; Abbott Dep. 32:15-33:3, 92:4-93:2.)

168.    All testimony of witnesses with personal knowledge of the operation of the Litle & Co. Hanover Finance program confirms the documents' contents and is entirely consistent. (*Id.*)  All testimony is thus fully corroborated by contemporaneous documentation and by other witness testimony.

169.    As Litle & Co.'s Hanover Finance program was described in non-confidential contemporaneous documentation and openly discussed with those in the processing industry in the early 1990s, with no efforts to conceal its operation, the Litle & Co. Hanover Finance program was publicly known and publicly used:  it was used in the ordinary course of business, without efforts to conceal its operation, beginning at least as early as 1994.  (*Id.*)

170.    The Court also finds that because of the extensive commercial use of the Litle & Co. Hanover Finance method and system, and the lack of any measures by those involved to conceal the relevant details of operation of the program, all relevant facts regarding the operation of the Hanover Finance program were publicly known before AdvanceMe's invention date, and the Hanover Finance program was publicly used more than one year before the July 9, 1997 priority date of the '281 patent.

171.    *Bieler Marketing Associates*.  All relevant facts regarding the operation of the Litle & Co. Bieler Marketing Associates arrangement are established by contemporaneous, non-confidential documentation that was available to the public prior to the invention date of the '281 patent.  (From testimony to be elicited at trial.)

172.    All testimony of witnesses with personal knowledge of the operation of the Litle & Co. Bieler Marketing Associates arrangement confirms the documents' contents and is entirely consistent.   (From testimony to be elicited at trial.)   All testimony is thus fully corroborated by contemporaneous documentation and by other witness testimony.

173.    As Litle & Co.'s Bieler Marketing Associates arrangement was described in non-confidential contemporaneous documentation and openly discussed with those in the processing industry in the early 1990s, with no efforts to conceal its operation, the Litle & Co.  Bieler Marketing Associates arrangement was publicly known and publicly used:  it was used in the ordinary course of business, without efforts to conceal its operation.  (From testimony to be elicited at trial.)

174.    The Court also finds that because of the extensive commercial use of the Litle & Co. Bieler Marketing method and system, and the lack of any measures by those involved to conceal the relevant details of operation of the program, all relevant facts regarding the operation of the Bieler Marketing program were publicly known before AdvanceMe's invention date, and the Bieler Marketing program was publicly used more than one year before the July 9, 1997 priority date of the '281 patent.

*Obviousness*

175.    *Claims 4 and 13.*  The Court finds that claims 4 and 13 are obvious in light of the Litle & Co. prior art.  Card numbers from credit, debit, smart, and charge cards may all be input into a computer or read from a magnetic strip by a card terminal.  (Litle Dep. 11:9-13, 130:9-14, 139:7-140:21, 207:18-208:16; from testimony to be elicited at trial.)  In fact, card numbers from each of these card types may be read by the *same* terminal.  (Suckow Tr. 111:10-12; Sorwell Tr. 49:6-10; Landon Tr. 15:8-11; from testimony to be elicited at trial.)

176.    Moreover, the Court has construed the means for accepting a credit card number, debit card number, and charge card number to be identical to the means for accepting a smart card number—the combination of a processor 312, memory 320, modem 322, and a keypad or magnetic card reader 316 together with software executing an algorithm as implemented by Verifone merchant-location equipment available as of the July 9, 1997 filing date and equivalents thereof.

177.    The Court's finding is supported by the '281 specification, which equates all of these types of card numbers and makes it clear that it would be obvious to one of skill in the art to interchange any of them.  ( '281 patent, abstract:4-6, 1:17-22, 1:29-33, 1:56-61, 1:66-2:7, 2:31-34, 2:44-48, 3:10-24, 3:27-30; from testimony to be elicited at trial.)  The Examiner at the United States Patent Office additionally noted that there was no non-obvious distinction between a debit, charge, smart, or credit card.   (January 22, 2002 Office Action, p. 5.)  Moreover, common sense of a person of ordinary skill in the art, and ordinary market forces, would lead to the use of numbers from all commonly available card types, including smart cards, in the Litle & Co. prior art.

C.    **The Transmedia Program**[12]

Generally

178.    Beginning in 1990, Transmedia Network, Inc. ("Transmedia") offered a dining discount program to its cardholders similar to the LeCard program.  (From testimony to be elicited at trial.)  In the Transmedia program, cardholders received a Transmedia card (which

---

[12] Defendants' evidence regarding the Transmedia program will be a combination of at least 101 pages of contemporaneous documentation, deposition excerpts from witnesses with personal knowledge of the Transmedia program, and testimony to be elicited at trial from Mel Chasen, founder of Transmedia.  In addition to the citations contained herein, Defendants will supplement their findings of fact post-trial to reflect the supporting trial testimony.

contained a unique identifying account number) that could be used to purchase food and beverages at participating restaurants.  (From testimony to be elicited at trial.)

179.    After a cardholder presented a Transmedia card as payment at a restaurant participating in the Transmedia program, that cardholder received a 25% discount off that charge on its monthly Visa, MasterCard, American Express, or Discover statement from its card issuer. (LC_00014, TR_00090; from testimony to be elicited at trial.)

180.    In addition to the Transmedia program's benefits to the cardholder, restaurants benefited from the program.  (LC_00014, TR_00090; from testimony to be elicited at trial.) Restaurants participating in the Transmedia program received a cash advance from Transmedia, which was automatically repaid to Transmedia out of future Transmedia card payments. (LC_00014, TR_00090; from testimony to be elicited at trial.)   In other words, restaurants received cash up front in exchange for allowing future restaurant patrons to purchase meals using a Transmedia card.

181.    Thus, in the Transmedia program: (1) cardholders received a 25% discount from Transmedia on meals at participating restaurants; (2) restaurants received a cash or advertising advance that was automatically repaid through Transmedia card payments; and (3) Transmedia was automatically repaid for its cash advances.   (LC_00014, TR_00090; from testimony to be elicited at trial.)

<u>Specific Findings of Fact</u>

182.    In the Transmedia program, Transmedia made a cash advance to a restaurant that was repaid through future Transmedia card payments accepted at that restaurant.  (LC_00014, TR_00090; from testimony to be elicited at trial.)   The restaurant's obligation to Transmedia arose from this cash advance and was thus an "obligation" within the meaning of claim 1: it was

an amount owed by a merchant that is independent of any costs or fees arising out of the use of customer identifiers as payment. (TR_00075-76; from testimony to be elicited at trial.)

183.    When a cardholder signed up for the Transmedia program, the cardholder provided a Visa, MasterCard, Discover, or American Express card number to Transmedia, which was the account to which the Transmedia cardholders' restaurant charges would ultimately be billed. (TR_3; 5; 66-67; 76; 82; 90; from testimony to be elicited at trial.)

*Claim 1*

At a merchant

184.    "*Accepting a customer identifier as payment from the customer.*"  Merchants in the Transmedia program accepted a Transmedia card number as payment from a cardholder. (TR_3; 5; 66-67; 76; 82; 90; from testimony to be elicited at trial.)

185.    The Transmedia card number was a "customer identifier" within the meaning of claim 1 because it was a unique identifying account number.

186.    "*Electronically forwarding information related to the payment to the computerized merchant processor.*"  Merchants in the Transmedia program electronically forwarded information related to the payment to Transmedia using point-of-sale terminals. (TR_3; 5; 66-67; 76; 82; 90; from testimony to be elicited at trial.)

At the computerized merchant processor

187.    Beginning at least by 1995 and continuing through July 9, 1997, Transmedia operated its own computerized merchant processing division that, in conjunction with its sponsoring bank, processed card payments. (TR_00003; 5; 66-67; 76; 82; 90; from testimony to be elicited at trial.)

52

188.    "*Acquiring the information related to the payment from the merchant*."
Transmedia received the information related to the payment from the merchant.    (From
testimony to be elicited at trial.)    After receiving the information related to the payment from the
merchant, Transmedia associated the card number from the Transmedia card with the
cardholders' Visa, MasterCard, Discover, or American Express card account.    (TR_00003; 5; 66-
67; 76; 82; 90; from testimony to be elicited at trial.)    The Transmedia card payment was
thereafter processed as an ordinary Visa, MasterCard, Discover, or American Express card
transaction.    (*Id.*)

189.    "*Authorizing [the payment].*"    Transmedia's merchant processing division then
authorized the transaction.    (TR_00003; 5; 66-67; 76; 82; 90; from testimony to be elicited at
trial.)

190.    "*Settling the payment.*"    The Visa, MasterCard, Discover, or American Express
card issuer transferred or credited an amount to Transmedia's sponsoring bank, thus
Transmedia's sponsoring bank settled the payment within the meaning of claim 1.    (TR_00003;
5; 66-67; 76; 82; 90; from testimony to be elicited at trial.)

191.    Accordingly, the combination of Transmedia and its sponsoring bank was the
"computerized merchant processor" within the meaning of claim 1 of the '281 patent: the
computer-equipped combination of entities that acquired or processed merchant transactions.

192.    "*Forwarding at least a portion of the payment to a computerized payment
receiver as payment of at least a portion of an obligation made by the merchant*."    Transmedia's
sponsoring bank then forwarded a portion of the payment (payment amount, less 25% cardholder
discount, and less processing fees) to Transmedia's cash advance division as repayment of the

restaurant's cash advance obligation.  (TR_00003; 5; 66-67; 76; 82; 90; from testimony to be elicited at trial.)

193.    Because Transmedia was an account or entity capable of receiving payments electronically, it was a "computerized payment receiver" within the meaning of claim 1 of the '281 patent.

At the computerized payment receiver

194.    "*Receiving the portion of the payment forwarded by the computerized merchant processor*."  Transmedia then received the portion of the payment forwarded.  (TR_00003; 5; 66-67; 76; 82; 90; from testimony to be elicited at trial.)

195.    "*Applying that portion to the outstanding obligation made by the merchant to reduce such obligation*."  Transmedia applied the portion of the payment forwarded by the computerized merchant processor to reduce the restaurant's cash advance obligation. (TR_00003; 5; 66-67; 76; 82; 90; from testimony to be elicited at trial.)  Transmedia applied the amount of the payment, less taxes and gratuities, to reduce the restaurant's outstanding cash advance obligation.  (TR_00003; 5; 66-67; 76; 82; 90; from testimony to be elicited at trial.)

196.    The amount forwarded to Transmedia's cash advance division (payment amount, less 25% cardholder discount, and less processing fees) was less than the amount applied by Transmedia to reduce the restaurant's outstanding cash advance obligation (payment amount, less taxes and gratuities).  (From testimony to be elicited at trial.)  Therefore, Transmedia "us[ed] the portion that was received from the merchant processor to reduce the obligation owed by the merchant" – as set forth in the Court's claim construction order – and "appl[ied] that portion to the outstanding obligation made by the merchant to reduce such obligation" as required by claim 1.

197.    The Transmedia program thus practiced every element of claim 1 of the '281 patent.

*Claim 6*

198.    Restaurants participating in the Transmedia program accepted Transmedia card numbers at their merchant location.  (TR_00003; 5; 66-67; 76; 82; 90; from testimony to be elicited at trial.)

*Claim 7*

199.    Restaurants participating in the Transmedia program electronically accepted Transmedia card numbers.  (TR_00003; 5; 66-67; 76; 82; 90; from testimony to be elicited at trial.)

*Claim 9*

200.    Transmedia's sponsoring bank (i.e., one of two entities comprising the merchant processor) periodically forwarded at least a portion of the payment to Transmedia.  (TR_00003; 5; 66-67; 76; 82; 90; from testimony to be elicited at trial.)

*Public Knowledge, Public Use and Corroboration*

201.    The Transmedia program was offered by a very well known public company and began operating in the United States in 1990.  (TR_5; from testimony to be elicited at trial.)  By 1994, Transmedia had 3,628 participating restaurants and 395,968 cardholders.  (TR_00003, 5; from testimony to be elicited at trial.)

202.    Transmedia marketed its dining program to restaurants all over the country, including by producing and distributing a directory of participating restaurants, cold-calling restaurants, sending direct marketing mailings, advertising in industry publications, and discussing the advances at industry trade shows.  (From testimony to be elicited at trial.)

55

Transmedia's marketing efforts included explaining to merchants and anyone interested how the cash advance would be repaid.  (From testimony to be elicited at trial.)

203.    All relevant facts regarding the operation of the Transmedia program are established by contemporaneous, non-confidential documentation that was available to the public by at least 1995.  (TR 00001-90; from testimony to be elicited at trial.)

204.    All testimony of witnesses with personal knowledge of the operation of the Transmedia program confirms the documents' contents and is entirely consistent.  All testimony is thus fully corroborated by contemporaneous documentation and by other witness testimony.

205.    As the Transmedia program was described in non-confidential contemporaneous documentation and openly discussed with merchants and those in the processing industry in the early 1990s, with no efforts to conceal its operation, the Transmedia program was publicly known, and was publicly used:  it was used in the ordinary course of business, without efforts to conceal its operation, years before the July 9, 1997 priority date of the '281 patent.

*Obviousness*

206.    *Claims 2-5*.  The Court finds that claims 2-5 are obvious in light of the Transmedia program.  Card numbers from credit, debit, smart, and charge cards—like Transmedia card numbers—may all be input into a computer or read from a magnetic strip by a card terminal.  (Litle Dep. 11:9-13, 130:9-14, 139:7-140:21, 207:18-208:16; from testimony to be elicited at trial.)

207.    The Court's finding is supported by the '281 specification, which equates all of these types of card numbers and makes it clear that it would be obvious to one of skill in the art to interchange any of them.  ('281 patent, abstract:4-6, 1:17-22, 1:29-33, 1:56-61, 1:66-2:7, 2:31-34, 2:44-48, 3:10-24, 3:27-30; from testimony to be elicited at trial.)  The Examiner at the United

States Patent Office additionally noted that there was no non-obvious distinction between a debit, charge, smart, or credit card.  (January 22, 2002 Office Action, p. 5.)  Moreover, common sense of a person of ordinary skill in the art would lead that person to use the various standard types of card numbers in the Transmedia program.

### D.    Prior Art Reserve Account Method[13]

208.    It is standard in the payment processing industry, and was standard for many years prior to 1997, for merchant processors to require high-risk merchants to set up "reserve accounts" to compensate for the risk associated with chargebacks.  (From testimony to be elicited at trial.)

209.    Chargebacks occur, for example, when a cardholder disputes a charge on his or her card statement.  (From testimony to be elicited at trial.)  In a chargeback situation, the merchant is liable for the amount of the chargeback.  (From testimony to be elicited at trial.)  However, if the merchant has insufficient funds in its bank account to pay the chargeback, the merchant processor is liable to Visa or MasterCard for the amount of the chargeback and is thus forced to incur a loss in the amount of the chargeback.  (From testimony to be elicited at trial.)

210.    A reserve account is a "buffer" account that is used in payment processing systems to ensure a merchant's ability to pay the amount of any chargebacks that occur.  (From testimony to be elicited at trial.)  In a chargeback situation, the merchant processor may debit the reserve account for the amount of the chargeback rather than incurring the expense itself.  Prior to July 9, 1997, reserve accounts were funded and maintained by the merchant processor's forwarding a portion of the merchant's daily card payments to the reserve account after

---

[13] Defendants' evidence regarding prior art reserve accounts consists of contemporaneous documents, deposition testimony of multiple fact witnesses, and testimony to be elicited at trial.  Defendants will supplement these findings of fact post-trial to include testimony given at trial.

processing (i.e., after acquiring, authorizing, and settling the payment). (From testimony to be elicited at trial.)

211.    A merchant's reserve account obligation arises out of a reserve agreement, which may be an independent agreement between a merchant processor and a merchant or a provision of the processing agreement between the merchant and merchant processor. (From testimony to be elicited at trial.) The merchant's obligation to maintain a reserve account may require the merchant to contribute a percentage of every transaction to the reserve account up to a specified amount (known as a "rolling reserve"), or require the merchant to maintain a specified balance in the reserve account. (From testimony to be elicited at trial.)

*Claim 1*

      <u>At a merchant</u>

212.    "*Accepting a customer identifier as payment from the customer.*" As the reserve account was funded from merchant card payment in the ordinary course of business, the merchant accepted customer identifiers as payment from its customers as they normally did in the ordinary course of business. (From testimony to be elicited at trial.)

213.    "*Electronically forwarding information related to the payment to the computerized merchant processor.*" Merchants then – as they did with all standard card payments – electronically forwarded information related to the payment to their merchant processor. (From testimony to be elicited at trial.)

      <u>At the computerized merchant processor</u>

214.    "*Acquiring the information related to the payment from the merchant, authorizing and settling the payment.*" The merchant processor then performed its usual functions of

acquiring information related to the payment from the merchant and authorizing and settling the payment.  (From testimony to be elicited at trial.)

215.   "*Forwarding at least a portion of the payment to a computerized payment receiver as payment of at least a portion of an obligation made by the merchant*."   Rather than forwarding the payment amount (less processing fees) to the merchant, as the '281 patent describes as the prior art processing method ('281 patent, 4:49-56), the merchant processor forwarded a portion of the payment (either a fixed amount or a percentage of the payment amount) to the reserve account as payment of the merchant's reserve account obligation.  (From testimony to be elicited at trial.)

216.   A merchant's reserve account – which was typically maintained at the third party processor's sponsoring bank – was a "computerized payment receiver" within the meaning of claim 1, because it was an account or entity capable of receiving payments or credits electronically.

At the computerized payment receiver

217.   "*Receiving the portion of the payment forwarded by the computerized merchant processor and applying that portion to the outstanding obligation made by the merchant to reduce such obligation.*"   The reserve account received the amount forwarded by the merchant processor, and that amount was applied to reduce the merchant's reserve account obligation. (From testimony to be elicited at trial.)

218.   If a merchant or merchant processor terminated the processing relationship, all money remaining in the reserve account after all chargebacks have been deducted was returned to the merchant.  (From testimony to be elicited at trial.)   A merchant's reserve account obligation is thus not a cost or fee.  (From testimony to be elicited at trial.)   Therefore, a

merchant's reserve account obligation is an "obligation" within the meaning of claim 1 of the '281 patent: it is an amount owed by the merchant that is independent of any cost or fee arising out of the use of customer identifiers as payment.

219. The method of funding prior art reserve accounts thus practiced every element of claim 1 of the '281 patent.

**Claims 2-7 and 9**

220. As the '281 patent acknowledges, merchants in the prior art accepted credit cards, debit cards, smart cards, and charge cards as payment from customers. (From testimony to be elicited at trial.) Similarly, the '281 patent acknowledges that prior art merchants electronically accepted customer identifiers at their merchant location. Therefore, the method of funding prior art reserve accounts practiced every element of claims 2-7 of the '281 patent.

221. As merchant processors forwarded payment for a merchant's card transactions on a periodic basis (typically on a daily basis), the merchant processor periodically forwarded at least a portion of the payment to the reserve account. (From testimony to be elicited at trial.) The method of funding prior art reserve accounts thus practiced every element of claim 9 of the '281 patent.

<u>Litle & Co. Reserve Accounts</u>

222. In the case of Litle & Co. prior art reserve accounts, the merchant's card transactions were processed as described above with respect to the Litle & Co. prior art (i.e., a merchant accepted customer identifiers as payment and electronically forwarded information related to the payment to Litle & Co.; Litle & Co. received that information and authorized the payment; then FNBL settled the payment), then FNBL forwarded a portion of the merchant's payments to a reserve account jointly owned by Litle & Co. and FNBL to protect each of them

against any chargebacks against the merchant.  (LI_00017-29; Bouchard, 69:10-79:12; from testimony to be elicited at trial.)

223.    The reserve account received the forwarded portion of the payments, and that amount was applied to reduce the merchant's reserve account obligation to the merchant processor.  (LI_00020, 26; Bouchard, 69:10-79:12; from testimony to be elicited at trial.)

224.    In the Litle & Co. prior art, the merchant's reserve account obligation arose from the Member Agreement, which specified the balance a merchant must maintain in the reserve account and/or the percentage of each payment that the merchant is obligated to deposit into the reserve account.  (LI_00020, 26; Bouchard, 69:10-79:12; from testimony to be elicited at trial.)

225.    If the processing relationship among Litle & Co., NPC, FNBL, and the merchant was terminated and the merchant's chargebacks were less than the amount of funds in the merchant's reserve account, all remaining amounts in the reserve account were returned to the merchant.  (LI_00017-29; Bouchard, 71:9-73:16; from testimony to be elicited at trial.)  The merchant's reserve account obligation was not a cost or fee.  (From testimony to be elicited at trial.)

226.    Therefore, a merchant's reserve account obligation to Litle & Co., NPC, and FNBL was an "obligation" within the meaning of claim 1 of the '281 patent:  it was an amount owed by the merchant that is independent of any cost or fee arising out of the use of customer identifiers as payment.  (From testimony to be elicited at trial.)

227.    The method of funding Litle & Co. prior art reserve accounts thus practiced every element of claim 1 of the '281 patent.  (From testimony to be elicited at trial.)

*Claims 2-7 and 9*

61

228.    Merchants in the Litle & Co. prior art accepted credit cards, smart cards, debit cards, and charge cards as payment from customers.  (LI_00018-19; from testimony to be elicited at trial.)    Similarly, as discussed above, merchants in the Litle & Co. prior art electronically accepted customer identifiers at their merchant location.  Therefore, the method of funding Litle & Co. prior art reserve accounts practiced every element of claims 2-7 of the '281 patent.  (LI_00018-19; from testimony to be elicited at trial.)

229.    As the merchant processor in the Litle & Co. prior art forwarded payment for a merchant's card transactions on a periodic basis (typically on a daily basis), the merchant processor periodically forwarded at least a portion of the payment to the reserve account. (LI_00017-29; from testimony to be elicited at trial.)  The method of funding Litle & Co. prior art reserve accounts thus practiced every element of claim 9 of the '281 patent.

230.    Merchant processors' practice of electronically forwarding a portion of a merchant's card payments to establish and/or maintain reserve accounts was widely used by merchant processors prior to the filing of the application for the '281 patent.  (from testimony to be elicited at trial.)  This process was also widely known by those familiar with the methods by which merchants, merchant processors, and card issuers processed card payments prior to July 9, 1997.  (From testimony to be elicited at trial.)

231.    All relevant facts regarding the operation of Reserve Accounts are established by contemporaneous, non-confidential documentation.  (From testimony to be elicited at trial.)

232.    All testimony of witnesses with personal knowledge of the operation of Reserve Accounts confirms the documents' contents and is entirely consistent.  All testimony is thus fully corroborated by contemporaneous documentation and by other witness testimony.

233.    As the existence of Reserve Accounts, and their funding mechanism, was described in non-confidential contemporaneous documentation and openly discussed with merchants and those in the processing industry in the early 1990s, with no efforts to conceal their method of operation, the use of Reserve Accounts was publicly known and was publicly used: it was used in the ordinary course of business, without efforts to conceal its operation, years before the July 9, 1997 priority date of the '281 patent.

E.    **Obviousness:  Findings Of Fact**

234.    In light of the Supreme Court's recent ruling in *KSR Int'l Co. v. Teleflex, Inc.*, No. 04-1350, (U.S. April 30, 2007), and the Federal Circuit's recent application of *KSR* in *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 82 U.S.P.Q.2d (BNA) 1687 (Fed. Cir. 2007), the Court finds that any claims in the '281 patent that are not anticipated by the prior art identified by Defendants are invalid as obvious.

235.    The '281 patent acknowledges that prior art methods and systems in the payment processing industry were identical to the claimed method and system, with the minor exceptions noted above.  The '281 patent describes a combination of old elements with no change in their respective functions; the claims of the '281 patent require a merchant processor to simply use existing equipment to forward a portion of the payment to a party to whom a merchant owes an obligation.  The evidence reveals that this "novel" step is performed by simply entering a different bank account number into an existing computer system at the merchant processor.  In other words, the '281 patent combines familiar elements with known methods to yield predictable results.  *KSR*, 127 S. Ct. 1727 (2007), at 1739.

236.    Moreover, the Court finds that granting monopoly power to the claimed inventions in the '281 patent would grant monopoly power to a technological advance that would

63

occur in the ordinary course without real innovation, thus retarding progress and depriving prior inventions of their value.  *Id*.

237.    The Court additionally finds that the invention described in the '281 patent was not uniquely challenging.  Barbara Johnson, the alleged inventor, is untrained and unskilled in the relevant art.  Like the Federal Circuit in *Leapfrog*, the Court finds that Mrs. Johnson's lack of skill in the art of payment processing bolsters its finding that the claimed invention is obvious in light of the prior art.

## IV.    INEQUITABLE CONDUCT

### A.    Conclusions Of Law

238.    "Applicants for patents have a duty to prosecute patent applications in the PTO with candor, good faith, and honesty."  *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1109 (Fed. Cir. 2003) (*citing  Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995)).  The duty of candor and good faith in dealing with the Patent Office applies to inventors, attorneys, and every other person who is substantively involved in the preparation or the prosecution of the application and who is associated with the inventor or the assignee.  37 C.F.R. § 1.56.

239.    "A patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the PTO during prosecution."  *Digital Control Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1313 (Fed. Cir. 2006).

240.    To establish inequitable conduct, a defendant must prove, by clear and convincing evidence, a "threshold level" of both materiality and intent.  *See Digital Control Inc. v. Charles Machine Works*, 437 F.3d 1309, 1313 (Fed. Cir. 2006).  Once these threshold levels are shown, "the court must . . . determine whether the questioned conduct amounts to inequitable conduct by

balancing the levels of materiality and intent, 'with a greater showing of one factor allowing a lesser showing of the other.'" *Id.* Thus, where the applicant's misconduct is highly material to allowance of the claims, a minimal showing of intent is required, and vice-versa. *See GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1273 (Fed. Cir. 2001); *Ferring B.V. v. Barr Labs., Inc.*, 437 F.3d 1181, 1191-92 (Fed. Cir. 2006).

241.    Material information must be disclosed regardless of the source. MPEP § 2001.06 ("Such individuals may be or become aware of material information from various sources such as, for example, co-workers, trade shows, communications from or with competitors, potential infringers, or other third parties …"); *McKesson Information Solutions, Inc. v. Bridge Medical, Inc.*, No. 06-1517 (Fed. Cir. May 18, 2007).

242.    Furthermore, "[i]nventors represented by counsel are presumed to know the law." *Brasseler, U.S.A. I, L.P v. Stryker Sales Corp.*, 267 F.3d 1370, 1385 (Fed. Cir. 2001). Consequently, a showing of intent cannot be avoided by an applicant's alleged "innocent" failure to disclose material information to his or her patent counsel. *Id.* at 1378.

<u>Materiality</u>

243.    Information is material to patentability if it is not cumulative and establishes either by itself, or in combination with other information, a prima facie case of unpatentability of a claim.  37 CFR § 1.56(b).

244.    "An applicant may not ... withhold what he considers cumulative information where a reasonable examiner might likely arrive at an opposite determination. The applicant must disclose the information to the examiner who will then determine whether it is cumulative." *Loral Fairchild Corp. v. Victor Co. of Japan Ltd.*, 61 USPQ2d 1943, 1947 (E.D.N.Y. 2002).

245.    "A prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability."  37 CFR § 1.56(b).

Intent

246.    "The more material the omission, the less culpable the intent required, and vice versa."  *Halliburton Co. v. Schlumberger Tech.*, 925 F.2d 1435, 1439-40 (Fed. Cir. 1991).

247.    "Direct evidence of intent or proof of deliberately scheming is rarely available in instances of inequitable conduct, but intent may be inferred from the surrounding circumstances."  *Critikon, Inc. v. Becton Dickinson Vascular Access*, 120 F.3d 1253, 1256 (Fed. Cir. 1997).

248.    Intent may be inferred where (1) a patent applicant knew, or should have known, that withheld information would be material to the [Patent Office's] consideration of the patent application or (2) there is a high level of materiality coupled with a failure to offer a good faith explanation of the non-disclosure.  *Merck & Co. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1422 (Fed. Cir. 1989); *Critikon*, 120 F.3d at 1256 ("A relatively high degree of intent may be inferred under the facts of this case.  Critikon was aware of the McDonald Patent.  It was aware that the 'retaining means' was a point of novelty the examiner relied upon during the course of prosecution.  It knew or should have known that the 'retaining means' disclosed in the McDonald patent was relevant to a point of novelty in the Lemieux proceedings.  And, despite this, it did not disclose the patent or provide a good faith explanation for not disclosing the patent.").

66

249.    A patentee may attempt to prevent the drawing of an inference of intent to mislead by establishing a "subjective good faith belief" that the prior art reference was not material.  *See FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1416 (Fed. Cir. 1987).  However, such an attempt is incredible when the prior art withheld is highly material.  *Id*. ("A mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice in such circumstances.").

### B.    Findings Of Fact[14]

250.    At least three people substantively involved in the prosecution of the '281 patent withheld four highly material prior art references from the PTO with the intent to deceive, including the LeCard program, the Transmedia program, the Dining a la Card program, and prior art reserve accounts.  These AdvanceMe employees' failure to disclose any of these highly material prior art references—despite full knowledge that they are more material than any reference that was before the patent examiner and that they each disclose the point of novelty upon which the examiner relied in issuing the '281 patent—reveals the lengths to which AdvanceMe was willing to go to deceive the patent office and obtain a patent for a business method and system that had been routine in the industry for years.

251.    In issuing the '281 patent, the examiner agreed with AdvanceMe's argument that the prior art before the examiner did not disclose a merchant processor's forwarding a the portion of the transaction payment for the benefit of the merchant, as opposed to forwarding for the benefit of the customer.  March 17, 2005 Notice of Allowance, pp. 3-4.  Internal documents of AdvanceMe and testimony of numerous witnesses establish that at least Les Falke, Tom Burnside, and Glenn Goldman knew that the LeCard program, the Transmedia program, and

---

[14] Defendants' evidence of inequitable conduct consists of internal documents of AdvanceMe, the production history of the '281 patent, live testimony, and deposition testimony at trial.  Defendants will supplement these findings of fact post-trial to reflect the supporting trial testimony and exhibits.

reserve accounts disclose this allegedly novel feature and thus provide the "missing link" between the disclosed prior art and the claims of the '281 patent. Likewise, the evidence reveals that Les Falke, Tom Burnside, and Glenn Goldman knew that merchant obligations to Dining a la Card were repaid out of card receipts and were thus highly material to patentability.

252.    As described above, each of the LeCard program, the Transmedia program, and prior art reserve accounts anticipates claims of the '281 patent as well as supplies what AdvanceMe argued, and the examiner accepted, was the prior art's "missing link." Each of these three highly material prior art references, therefore, independently establishes a prima facie case of unpatentability. Similarly, Dining a la Card, in conjunction with the prior art before the examiner, independently establishes a prima facie case of unpatentability.

253.    Each of these highly material prior art references was well known within AdvanceMe, and the details of their operation were frequently discussed between Les Falke, Tom Burnside, Glenn Goldman, and numerous other senior level AdvanceMe employees. Regardless of their knowledge that the LeCard program, the Transmedia Program, the Dining a la Card program, and prior art reserve accounts were highly material to the patentability of the claims of the '281 patent, Les Falke, Tom Burnside, and Glenn Goldman withheld all such information from the PTO. Testimony of numerous witnesses likewise establishes that it was common sentiment within AdvanceMe that the alleged invention was unpatentable in light of this prior art. Yet, those in charge of prosecution withheld all of this prior art from the patent office.

254.    Due to the high materiality of each prior art reference, the extensive knowledge of LeCard, Transmedia, Dining a la Card, and reserve accounts by Les Falke, Tom Burnside, and Glenn Goldman, and each person's failure to offer a good faith explanation for failing to disclose

any of these references to the patent office, the Court finds that Les Falke, Tom Burnside, and Glenn Goldman withheld each reference with the intent to deceive and, therefore, engaged in inequitable conduct during prosecution of the '281 patent. All claims of the '281 patent are, therefore, unenforceable.

## V.    EXCEPTIONAL CASE AND ATTORNEYS' FEES

255.    The determination of whether a case is exceptional and, thus, eligible for an award of attorneys' fees under § 285 is a two-step process. First, the district court must determine whether a case is exceptional. After determining that a case is exceptional, the district court must determine whether attorney fees are appropriate." *Cybor Corp. v. Fas Techs, Inc.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998) (en banc).

256.    Among the types of conduct that can form a basis for finding a case exceptional are inequitable conduct before the PTO, misconduct during litigation, vexatious or unjustified litigation, and frivolous suit. *McNeil-PPC, Inc. v. L. Perrigo Co.*, 337 F.3d 1362, 1371 (Fed. Cir. 2003) (citations omitted). "Inequitable conduct is a separate defense to patent infringement and, either alone or in conjunction with trial conduct, may constitute the basis for an award of attorney fees under 35 U.S.C. § 285." *A.B. Chance Co. v. RTE Corp.*, 854 F.2d 1307, 1312-13 (Fed. Cir. 1988).

257.    "Litigation misconduct and unprofessional behavior are relevant to the award of attorney fees, and may suffice, by themselves, to make a case exceptional." *Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1034 (Fed. Cir. 2002).

258.    In bringing this action, AdvanceMe knew that it was attempting to assert an invalid patent procured through inequitable conduct. As described above, each of Les Falke, Tom Burnside, and Glenn Goldman withheld highly material prior art from the patent office with the intent to deceive, including the LeCard program, the Transmedia program, the Dining a la

Card program, and reserve accounts.  With full knowledge of inequitable conduct, AdvanceMe nevertheless asserted the '281 patent against the Defendants and pursued the case through trial.

259.    Also as described above, every claim of the '281 patent is invalid in light of the following four prior art references:  the LeCard program, the Litle & Co. prior art, the Transmedia program, and reserve accounts.  Despite Defendants' development of clear evidence of invalidity in light of each of these prior art references early in this case, Plaintiff and its counsel continued to pursue the litigation and grossly misrepresented the record in opposing Defendants' partial summary judgment motions (Docket Nos. 215 and 232).

260.    AdvanceMe failed to produce even a single internal document revealing its extensive knowledge of highly material prior art until the Court granted Defendants' motion to compel on December 21, 2006.  Defendants were forced to subpoena and take the depositions of numerous third parties in an effort to discover facts and documents that were concealed by AdvanceMe and its current employees.  Indeed, the most relevant documents in this litigation— documents revealing AdvanceMe's extensive knowledge of the withheld prior art and AdvanceMe's thorough analyses of its competitors, including the dining programs—were produced *only* by third parties, and never by AdvanceMe.

261.    Counsel for AdvanceMe, with full knowledge of the invalidity and unenforceability of the claims of the '281 patent at least since Defendants developed clear and convincing evidence of both, has continued to pursue this litigation.  Additionally, counsel for AdvanceMe has employed extensive dilatory and prejudicial tactics throughout this litigation.  For example, when Defendants subpoenaed the deposition of third party John Konop (former Vice President of Sales at AdvanceMe), AdvanceMe delayed—and attempted to prevent altogether—his deposition.  AdvanceMe filed motions both in the Eastern District of Texas and

70

in the Northern District of Georgia attempting to prevent Mr. Konop's deposition, and both were denied.  Chief Judge Camp, of the Northern District of Georgia, in denying Plaintiff's motion for a protective order regarding the deposition of third party John Konop, characterized Plaintiff's counsel's attempts to entirely prevent or perpetually delay the deposition as "crude attempts to manipulate the witness and the scheduling."  (February 8, 2007 Hearing Tr. 40:9-20.)

## VI.    NON-INFRINGEMENT[15]

### A.    Direct Infringement of Method Claims – Conclusions of Law

262.    "It is well established that a patent for a method or process is not infringed unless all steps or stages of the claimed process are utilized."  *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005) (citations omitted).  For a method claim, liability can occur only under the "use" prong of 35 U.S.C. § 271(a).  *Id.* at 1319 ("Congress has consistently expressed the view that it understands infringement of method claims under section 271(a) to be limited to use.").

263.    Generally, to be liable as a direct infringer, one must perform all of the steps of a claimed method.  *Joy Tech., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993).  However, in the Eastern District of Texas, "the plaintiff may prevail if it shows that the defendants exert sufficient control or have a sufficient connection to" the entities actually performing the claimed method steps.  *Charles E. Hill v. Amazon.com*, No. 2:02-CV-186, 2006 U.S. Dist. LEXIS 3389, *16 (E.D. Tex. Jan. 19, 2006) (J. Ward).

264.    District courts have applied varying standards in analyzing direct infringement of method claims when the accused infringer does not perform all of the steps of a claimed method.  On April 5, 2007, the Federal Circuit heard oral argument on the issue of divided infringement of

---

[15] Because, as explained above, all claims are invalid and unenforceable, the Court need not address issues of non-infringement.

method claims in *BMC Resources, Inc. v. Paymentech, L.P.*, No. 3:03-CV-1927-M, 2006 U.S. Dist. LEXIS 37746 (N.D. Tex. May 24, 2006), *argued*, No. 06-1503 (Fed. Cir. April 9, 2007), although has not yet issued an opinion.[16]

265.    In *Hill*, Judge Ward found that:

> [S]ome connection between the parties is required to make out a case of direct infringement of a method claim when one party does not perform all of the steps of the method.  Not just any connection, however, is sufficient.  In the absence of an agency or contractual relationship, the case law appears to require a showing that the defendant and the third party are connected at least to the extent that the defendant must actually direct the third party to perform the remaining steps of the method.

*Charles E. Hill v. Amazon.com*, 2006 U.S. Dist. LEXIS 3389, **17-18 (E.D. Tex. 2006) (J. Ward).

266.    Agency "is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."  *O'Neill v. Dept. of HUD*, 220 F.3d 1354, 1360 (Fed. Cir. 2000). An agency relationship is defined by "the right of control" of the principal over its agent; the "alleged principal must have the right to control both the means and the details of the process by which the alleged agent is to accomplish his task."  *Matter of Carolin Paxson Advertising*, 938 F.2d 595 (5th Cir. 1991).

267.    In *BMC Resources*, a patent infringement case related to the processing of debit card transactions, the Honorable Judge Lynn of the Northern District of Texas reviewed the relevant case law, including Judge Ward's *Hill* decision.  Judge Lynn agreed with Judge Ward that a plaintiff "must prove that the party accused of infringement directs or controls the actions

---

[16] Defendants, therefore, request that the Court allow them to amend their findings of fact and conclusions of law, if necessary, to address any new standard of divided infringement of method claims upon the Federal Circuit's ruling in *BMC Resources*.

of the other entity or entities performing the steps of the process patent." *BMC Resources, Inc.*, 2006 U.S. Dist. LEXIS 37746 at *22.

268.    The district court in *BMC Resources* affirmed the Magistrate Judge's finding that having *any* sort of contractual relationship is insufficient to prove the requisite direction or control: "No court has ever found direct infringement based on the type of arms-length business transactions present here.  Rather, the cases appear to require an agency relationship or evidence that the accused infringer directs or controls the infringing activities of the other parties." *BMC Resources, Inc. v. Paymentech, L.P.*, 2006 U.S. Dist. LEXIS 4961, **17-18 (N.D. Tex. Feb. 9, 2006).

269.    Therefore, a defendant who does not perform all steps of a method claim may be liable for direct infringement only if: (1) it employs an agent or agents to perform the remaining steps; (2) it has a contract with the third party dictating the performance of the method steps; or (3) it "actually directs" the third party's performance of the remaining steps of the method.

**B.      Direct Infringement of Method Claims – Findings of Fact**

*Claims 1-9*

270.    Claim 1 of the '281 patent recites:

A method for automated payment, comprising:

at a merchant, accepting a customer identifier as payment from the customer and electronically forwarding information related to the payment to a computerized merchant processor;

at the computerized merchant processor, acquiring the information related to the payment from the merchant, authorizing and settling the payment, and forwarding at least a portion of the payment to a computerized payment receiver as payment of at least a portion of an obligation made by the merchant; and

at the computerized payment receiver, receiving the portion of the payment forwarded by the computerized merchant processor and applying that portion to the outstanding obligation made by the merchant to reduce such obligation.[17]

271.    As discussed above, a defendant who does not perform all steps of method claim 1 of the '281 patent may be liable for direct infringement only if: (1) it employs an agent or agents to perform the remaining steps; (2) it has a contract with the third party dictating the performance of the method steps; or (3) it "actually directs" the third party's performance of the remaining steps of the method.

### Merchant Money Tree

272.    Defendant Merchant Money Tree has no contracts with any merchant directing that merchant to electronically forward information related to payments it receives to a merchant processor.  (From testimony to be elicited at trial.)

273.    Defendant Merchant Money Tree has no contracts with any merchant processors. (From testimony to be elicited at trial.)  Defendant Merchant Money Tree thus has no contract dictating the performance of any of the method steps of claim 1 that occur "at a computerized merchant processor."  (From testimony to be elicited at trial.)

274.    No merchant or merchant processor is an agent of defendant Merchant Money Tree.   (From testimony to be elicited at trial.)

275.    Because defendant Merchant Money Tree has no agency relationship with any merchant or merchant processor; and no contracts with any merchant dictating that the merchant electronically forward information related to payments it receives to a merchant processor; and no contracts with any merchant processor dictating that the merchant processor (1) acquire any information related to any payment from a merchant, (2) authorize or settle any payments, or (3)

---

[17] The analysis below focuses on claim 1 because if claim 1 is not infringed, then as a matter of law, no claim that depends from claim 1, i.e., claims 2-9, are infringed.

forward any portion of payments to Merchant Money Tree as payment of an obligation owed by a merchant, it must direct a merchant processor and merchant to perform each of the aforementioned steps of claim 1 in order to be found to infringe that claim. (From testimony to be elicited at trial.)

276.    Because Merchant Money Tree does not direct any merchant to electronically forward any information related to the payment it receives for goods or services to a computerized merchant processor, it does not infringe claim 1 of the '281 patent. (From testimony to be elicited at trial.)

277.    Because Merchant Money Tree does not direct any computerized merchant processor to acquire any information related to any payment from any merchants, it does not infringe claim 1 of the '281 patent. (From testimony to be elicited at trial.)

278.    Because Merchant Money Tree does not direct any computerized merchant processor to authorize or settle any payments, it does not infringe claim 1 of the '281 patent. (From testimony to be elicited at trial.)

279.    Because Merchant Money Tree does not direct any computerized merchant processor to forward any portion of any payment to Merchant Money Tree as payment of an obligation owed by a merchant, it does not infringe claim 1 of the '281 patent. (From testimony to be elicited at trial.)

**Reach Financial**

280.    Defendant Reach Financial has no contracts with any merchant directing that merchant to electronically forward information related to payments it receives to a computerized merchant processor. (From testimony to be elicited at trial.)

281.    Defendant Reach Financial has no contracts with any merchant processor directing that merchant processor to acquire any information related to any payment from a merchant.  (From testimony to be elicited at trial.)

282.    Defendant Reach Financial has no contracts with any merchant processor directing that merchant processor to authorize or settle any payments.  (From testimony to be elicited at trial.)

283.    Defendant Reach Financial has no contracts with any merchant processor directing that merchant processor to forward any portion of payments to Reach Financial as payment of an obligation owed by a merchant to Reach Financial.  (From testimony to be elicited at trial.)

284.    In fact, Reach Financial never receives any funds as payment of an obligation of a merchant from any merchant processor.  (From testimony to be elicited at trial.)  Instead, every merchant processor associated with Reach Financial's cash advance program forwards the entirety of the transaction amount (less processing fees) to the merchant's bank account.  (From testimony to be elicited at trial.)  Subsequently, Reach Financial receives funds directly from the merchant's account.  (From testimony to be elicited at trial.)

285.    No merchant or merchant processor is an agent of defendant Reach Financial. (From testimony to be elicited at trial.)

286.    Because defendant Reach Financial has no agency relationship with any merchant or merchant processor; and no contracts with any merchant dictating that the merchant electronically forward information related to payments to a merchant processor; and no contracts with any merchant processor dictating that the merchant processor (1) acquire any information related to any payment from a merchant, (2) authorize or settle any payments, or (3) forward any

portion of payments to Reach Financial as payment of an obligation owed by a merchant to Reach Financial, it must actually direct a merchant processor and merchant to perform each of the aforementioned steps of claim 1 in order to be found to infringe that claim. (From testimony to be elicited at trial.)

287.    Because Reach Financial does not direct any merchant to electronically forward any information related to the payment it receives for goods or services to a computerized merchant processor, it does not infringe claim 1 of the '281 patent. (From testimony to be elicited at trial.)

288.    Because Reach Financial does not direct any computerized merchant processor to acquire any information related to any payment from any merchants, it does not infringe claim 1 of the '281 patent. (From testimony to be elicited at trial.)

289.    Because Reach Financial does not direct any computerized merchant processor to authorize or settle any payments, it does not infringe claim 1 of the '281 patent. (From testimony to be elicited at trial.)

290.    Because Reach Financial does not direct any computerized merchant processor to forward any portion of any payment to Reach Financial as payment of an obligation owed by a merchant to Reach Financial, it does not infringe claim 1 of the '281 patent. (From testimony to be elicited at trial.)

**First Funds**

291.    Defendant First Funds has no contracts with any merchant directing that merchant to electronically forward information related to payments to a computerized merchant processor. (From testimony to be elicited at trial.)

292.    Defendant First Funds has no contracts with any merchant processor directing that merchant processor to acquire any information related to any payment from a merchant.  (From testimony to be elicited at trial.)

293.    Defendant First Funds has no contracts with any merchant processor directing that merchant processor to authorize or settle any payments.  (From testimony to be elicited at trial.)

294.    Defendant First Funds has no contracts with any sponsoring bank directing that entity to forward any portion of payments to First Funds as payment of an obligation owed by a merchant to First Funds.  (From testimony to be elicited at trial.)

295.    No merchant or merchant processor is an agent of defendant First Funds.  (From testimony to be elicited at trial.)

296.    Because defendant First Funds has no agency relationship with any merchant or merchant processor, and no contracts with any merchant dictating that the merchant electronically forward information related to payments to a computerized merchant processor, and has no contracts with any merchant processor dictating that the merchant processor (1) acquire any information related to any payment from a merchant, (2) authorize or settle any payments, or (3) forward any portion of payments from credit, debit, charge or smart cards that it may process to First Funds as payment of an obligation owed by a merchant to First Funds, it must actually direct a merchant processor and merchant to perform each of the aforementioned steps of claim 1 in order to be found to infringe that claim.  (From testimony to be elicited at trial.)

297.    Because First Funds does not direct any merchant to electronically forward any information related to the payment to a computerized merchant processor, it does not infringe claim 1 of the '281 patent.  (From testimony to be elicited at trial.)

78

298.    Because First Funds does not direct any computerized merchant processor to acquire any information related to any payment from any merchants, it does not infringe claim 1 of the '281 patent.  (From testimony to be elicited at trial.)

299.    Because First Funds does not direct any computerized merchant processor to authorize or settle any payments, it does not infringe claim 1 of the '281 patent.  (From testimony to be elicited at trial.)

300.    Because First Funds does not direct any sponsoring bank to forward any portion of any payment to First Funds as payment of an obligation owed by a merchant to First Funds, it does not infringe claim 1 of the '281 patent.  (From testimony to be elicited at trial.)

### C.    Direct Infringement of System claims – Findings of Fact and Conclusions of Law

301.    "Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States, or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a).

302.    In order to establish infringement (for making, using, offering to sell, or selling), Plaintiff must show by a preponderance of the evidence that every element and limitation of the claims is literally present in the accused instrumentalities.  *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1357-58 (Fed. Cir. 2006).

303.    Claim 10 of the '281 patent describes a system comprising five components including: (1) a "means for accepting customer identifiers and electronically forwarding information;" (2) a "means for receiving information;" (3) a "means for authorizing [the

payment];" (4) a "means for settling the payment;" and (5) a "means for forwarding a least a portion of the payment to a third party."[18]

304.    Under 35 U.S.C. § 112 ¶6, a claim written in means-plus-function form literally covers the structure linked to the claimed function and other structures that (1) perform the identical function (2) using structurally equivalent means.  *Applied Medical Resources Corp. v. United States Surgical Corp.*, 448 F.3d 1324, 1333 (Fed. Cir. 2006) ("Literal infringement of a means-plus-function claim limitation requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification.").  A means clause does not extend to all means for carrying out the defined function.  *J & M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360 (Fed. Cir. 2001) ("The literal scope of a properly construed means-plus-function limitation does not extend to all means for performing a certain function. Rather, the scope of such claim language is sharply limited to the structure disclosed in the specification and its equivalents.")

305.    The Court finds that Plaintiff has not shown that every limitation of system claim 10 is present in any of the systems used in conjunction with Defendants' cash advance programs and, therefore, finds that no Defendant is liable for infringement of any of the system claims, 10-19, of the '281 patent under the making, using, offering to sell, or selling prongs of § 271(a).

306.    Additionally, the Court finds that defendant Reach Financial does not infringe claim 10 because no merchant processor ever forwards any amount of money, using the algorithm set forth in the Court's claim construction for the "means for forwarding a portion of the payment to the third party," to Reach Financial to satisfy an obligation owed by any merchant to Reach Financial.  (From testimony to be elicited at trial.)  Instead, each merchant

---

[18] The analysis below focuses on claim 10 because if claim 10 is not infringed, no claims that depend from claim 10, i.e., claims 11-19, are infringed.

processor forwards the entire amount (less processing fees) back to the merchant's account, and Reach Financial is subsequently repaid directly from the merchant's bank account. (From testimony to be elicited at trial.)

## Making

307.    Creation of a claimed system occurs when all of the components of the system are combined together into an operable system. *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972) (*citing Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 344 (1961) ("For if anything is settled in patent law, it is that the combination patent covers only the total of the elements in the claim and that no element, separately viewed, is within the grant.")).

308.    The Court finds that the claimed system is not made by any Defendant or its agent. (From testimony to be elicited at trial.) Defendants do not make any component of any system that would satisfy any of the means clauses of claim 10 of the '281 patent. (From testimony to be elicited at trial.) In addition, Defendants have no agency relationship with any merchant or merchant processor, and therefore do not have the right to control the means or the details of the process or equipment that would satisfy any of the means clauses of claim 10 of the '281 patent. (From testimony to be elicited at trial.) Because the Court finds that no parties act as any of Defendants' agents in making the claimed system, no Defendant directly infringes any of claims 10-19 of the '281 patent under the "making" prong of 35 U.S.C. 271(a). *See Matter of Carolin Paxson Advertising*, 938 F.2d 595 (5th Cir. 1991).

## Using

309.    "Because a process is nothing more than the sequence of actions of which it is comprised, the use of a process necessarily involves doing or performing each of the steps recited. This is unlike use of a system as a whole, in which the components are used

collectively, not individually." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005).

310.    "The use of a claimed system under section 271(a) is the place at which the system as a whole is put into service, i.e., the place where control of the system is exercised and beneficial use of the system obtained." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005) (finding that RIM's customers controlled the transmission of the originated information and also benefited from such an exchange of information, thus were the users of the system); *see also Decca Ltd. v. United States,* 544 F.2d 1070 (1976).

311.    Claim 10 is the only independent system claim in the '281 patent and requires that means be employed (1) at the merchant and (2) at the computerized merchant processor.  Claim 10 does not require that any means be employed by the third party to whom the obligation is owed.  Nor does the '281 patent suggest that the third party has any control over the system. (From testimony to be elicited at trial.)  Moreover, the preamble for claim 10 defines the claimed system as "[a] system for automated payment of an obligation made by a merchant."

312.    The Court finds that the system as a whole is put into service, and the place where control of the system is exercised and beneficial use of the system obtained, is not at any of the Defendants.  No Defendant controls the customers' presentation of a customer identifier as payment, nor does any Defendant control whether, when, or how a merchant accepts any particular customer identifier.  (From testimony to be elicited at trial.)  In addition, no defendant controls or dictates the use of any part of any system at merchants or merchant processors. (From testimony to be elicited at trial.)

313.    Therefore, the Court finds that no Defendant "uses" the system within the meaning of 35 U.S.C. § 271(a).

314.    The Court additionally finds that Plaintiff's argument that merchants use the claimed system as Defendants' agents is not persuasive.  Defendants have no preference, much less control, over the equipment used by the merchants or merchant processors—and, therefore, cannot be said to control the means and details of a merchant's use of any system.  (From testimony to be elicited at trial.)  In fact, the cash advance agreements between the Defendants and merchants specifically state that there is no agency relationship established by this contract.  (From testimony to be elicited at trial.)

315.    Likewise, no merchant processor can be considered an agent of any of the defendants.  (From testimony to be elicited at trial.)  Defendants have no preference or control over the equipment used by the merchant processors, and likewise have no control over whether any merchant processor decides whether or not to process any transactions for any particular merchant at all.  (From testimony to be elicited at trial.)

316.    Because the system as a whole is put into service, and the place where control of the system is exercised and beneficial use of the system obtained, is not at any of the Defendants or at any agents of the defendants, the Court finds that no Defendant has infringed any of Claims 10-19 of the '281 patent under the "use" prong of Section 271(a).

Selling or Offering to Sell

317.    Under § 271(a), a party cannot be liable for infringement by selling or offering to sell less than a complete invention.  *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1252-53 (Fed. Cir. 2000).

318.    The claimed system of claims 10-19 consists of the combination of components into an operable assembly.  *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972) (*citing Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 344 (1961) ("For if anything is settled in patent law, it is that the combination patent covers only the total of the

elements in the claim and that no element, separately viewed, is within the grant.")).  Therefore, the system that must be sold or offered for sale under § 271(a) consists of the completed operable assembly of Claims 10-19.

319.    No Defendant has ever sold or offered to sell the system claimed in claim 10 of the '281 Patent.  (From testimony to be elicited at trial.)  Rather, Defendants simply offer a cash advance to cash-strapped merchants.  (From testimony to be elicited at trial.)  Defendants play no role in the manufacture or determination of the system that may be used to repay that cash advance.  (From testimony to be elicited at trial.)

320.    Moreover, there is no evidence suggesting that *any* party has ever sold or offered to sell the claimed system.  (From testimony to be elicited at trial.)  Claim 10 of the '281 patent requires specific means to be employed by merchants and computerized merchant processors, and the Court finds that Plaintiff has failed to show that any party sells a completed, operable assembly comprising the system of claim 10.  (From testimony to be elicited at trial.)

321.    The Court thus finds that no Defendant has infringed any claim of the '281 patent under the "sell or offer to sell" prong of Section 271(a).

## D.    Infringement Under the Doctrine of Equivalents

322.    Infringement under the doctrine of equivalents can occur if the equivalent of a missing limitation is found in the accused instrumentality.  *Aquatex Indus. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005).  "The analysis focuses on whether the element in the accused device 'performs substantially the same function in substantially the same way to obtain the same result' as the claim limitation."  *Id.* (*citing Graver Mfg. Co. v. Linde Co.*, 339 U.S. 605, 608 (1950)).

323.    For means-plus-function claims, the doctrine of equivalents only applies to after arising technologies.  *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d

1303, 1311 (Fed. Cir. 1998). Therefore, any structure that existed at the time the patent was filed that operates in a substantially different way from the claimed structures is not an equivalent for means-plus-function term purposes or under the doctrine of equivalents. *Id.*

324.    Plaintiff has not identified any element in any claim of the '281 patent that it alleges is present under the doctrine of equivalents in any of the Defendants' accused instrumentalities, and has identified no evidence to support a finding of equivalence. (From testimony to be elicited at trial.) Therefore, the Court finds that no defendant infringes any claim of the '281 patent under the doctrine of equivalents.

### E.    Indirect Infringement

325.    Liability for indirect infringement requires that there be an act of direct infringement. *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement . . . .").

### i.    Inducement of Infringement

326.    "To establish liability under section 271(b), a patent holder must prove that once the defendants knew of the patent, they 'actively and <u>knowingly</u> aid[ed] and abett[ed] another's direct infringement.'" *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc for cited portion) (emphasis in original). "However, 'knowledge of the acts alleged to constitute infringement' is not enough." *Id.* (citing *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003)). "The 'mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven.'" *Id.* (citing *Manville Sales Corp. v. Paramount Sys.,* 917 F.2d 544, 554 (Fed. Cir. 1990)).

327.    Therefore, liability for inducement of infringement under 35 U.S.C. § 271(b) requires proof of three elements: (i) an act of direct infringement by a party other than a Defendant; (ii) an intentional act by a Defendant that induces the act of direct infringement; and (iii) specific intent by that Defendant that its intentional act would result in direct infringement. *Id.* ("The defendant must have intended to cause the acts that constitute the direct infringement and must have known or should have known than[sic] its action would cause the direct infringement.").

328.    As discussed above with respect to the method claims, there is no direct infringement of any of the method claims, 1-9, of the '281 patent by any of the Defendants. There is also no evidence to suggest that any defendant has infringed any of the system claims, 10-19, of the '281 patent.  Because there is likewise no direct infringement of any of claims 1-19 of the '281 patent by any other party, there can be no liability for inducement of infringement.

329.    Furthermore, there is no evidence suggesting that Plaintiff can satisfy the specific intent requirement of § 271(b).  In order to satisfy this requirement, the Plaintiff must show that the Defendants intended that *infringement* occur—and not simply intended to cause the acts that constitute infringement.  Plaintiff has presented no evidence that any Defendant intended to induce infringement or that any Defendants has actively and knowingly aided and abetted another party's infringement of any claim of the '281 patent.

330.    In addition, the evidence demonstrates that the Defendants have no role in the selection of equipment used by any merchant or computerized merchant processor.  (From testimony to be elicited at trial.)  Similarly, there is no evidence that any Defendant has ever promoted the use of the infringing system over the use of a noninfringing system.  Therefore, there can be no specific intent to infringe any of system claims 10-19 of the '281 patent.

### ii.    Contributory Infringement

331.    35 U.S.C. § 271(c) states that:

(c) Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

332.    Liability for contributory infringement under 35 U.S.C. § 271(c) for selling or offering to sell a component requires that: (1) the component must be for use in practicing a patent process; (2) the component must constitute a material part of the patented invention; (3) the alleged contributory infringer must have knowledge that the component "is especially made or especially adapted for use in infringing" claims of the patent; (4) the component must not be suitable for substantial noninfringing use; and (5) there must be some act of direct infringement. *See Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004).

333.    As discussed above with respect to the method claims, there is no direct infringement by any Defendant of any of the method claims, 1-9, of the '281 patent. There is also no evidence to suggest that any Defendant has infringed any of the system claims, 10-19, of the '281 patent. Because there is likewise no direct infringement of any of claims 1-19 of the '281 patent, there can be no liability for contributory infringement by any of the Defendants.

334.    Neither Defendant Merchant Money Tree, Inc. nor Defendant Reach Financial, LLC has ever sold or offered to sell any component of the claimed system or any component for use in practicing the claimed method and, therefore, cannot be held liable for contributory infringement of any claim of the '281 patent.

335.    First Funds LLC has sold a total of 20 point-of-sale terminals since its inception, although has sold no other component of the claimed system or for use in practicing the claimed

method.  Point-of-sale terminals do not constitute a material part of the patented invention, are not especially made or especially adapted for use in infringing claims of the patent, and are suitable for substantial noninfringing use.  Therefore, First Funds cannot be held liable for contributory infringement of any claim of the '281 patent.

## VII.    WILLFUL INFRINGEMENT[19]

336.    Willful infringement must be proven by clear and convincing evidence.  *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1346 (Fed. Cir. 2001).  The patentee must show that the accused infringer acted without a reasonable belief that its actions avoided infringement.  *Id*.

337.    A showing of a good faith noninfringement or invalidity challenge is evidence supporting a lack of willfulness.  *Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1352 (Fed. Cir. 2000).

338.    A finding of willful infringement requires knowledge of the patent, and activity begun without knowledge of the patent generally cannot form the basis for a finding of willfulness.  *American Original Corp. v. Jenkins Food Corp.*, 774 F.2d 459, 464-65 (Fed. Cir. 1985).  "A 'patent pending' notice gives one no knowledge whatsoever.  It is not even a guarantee that an application has been filed.  Filing an application is no guarantee that any patent will issue and a very substantial percentage of applications never result in patents."  *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985).

339.    Because this Court finds that the '281 patent is invalid and not infringed, this Court need not address the issue of willfulness.  There can be no willful infringement without first finding infringement.  In addition, there is no evidence that any Defendant acted without a

---

[19] Because, as explained above, all claims are invalid and unenforceable, the Court need not address infringement or willful infringement.

reasonable belief that its actions avoided infringement.  Plaintiff has presented no evidence that clearly and convincingly shows that any Defendant was aware of the '281 patent prior to filing suit, and all Defendants began their activities without knowledge of the patent generally.  In addition, all Defendants had both a good faith non-infringement challenge and a good faith invalidity challenge.  The Court thus finds that no Defendant has willfully infringed the '281 patent.

## VIII.   INJUNCTIVE RELIEF[20]

340.    A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant a permanent injunction. "A plaintiff must demonstrate: (1) that it has suffered irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. Mercexchange, L.L.C.*, 126 S. Ct. 1837, 1839 (2006).  The decision to grant or deny injunctive relief rests within the equitable discretion of the courts, but such discretion must be exercised consistent with traditional principles of equity. *Id.* at 1841.

341.    "No presumption of irreparable harm shall automatically follow from a finding of infringement." *Paice LLC v. Toyota Motor Corp.*, No. 2:04-CV-211 (DF), 2006 U.S. Dist. LEXIS 61600, *12 (E.D. Tex. 2006).  This Court has held that an injunction may only issue in accordance with the traditional principles of equity, but that does not imply a rebuttable presumption of irreparable harm. *z4 Techs. Inc., v. Microsoft Corp.*, 434 F. Supp. 2d 437, 440 (E.D. Tex. 2006). Rather, a plaintiff seeking a permanent injunction has the burden of proving

---

[20] Because, as explained above, all claims are invalid and unenforceable, the Court need not address infringement or whether Plaintiff is entitled to injunctive relief.

irreparable harm.  *Id.* "Applying a presumption of irreparable harm in the context of an injunction is contrary to traditional equitable principles." *Id.*

342.    The statutory right to exclude does not alone justify a general rule in favor of permanent injunctive relief. *See eBay*, 126 S. Ct. at 1840. Furthermore, "a violation of the right to exclude does not inevitably lead to the conclusion that the patent holder cannot be adequately compensated by remedies at law such as monetary damages without first applying the principles of equity." *z4 Techs.*, at 441.

June 12, 2007                              Respectfully submitted,

By :    /s/ Joseph D. Gray
William G. Schuurman (TX State Bar No. 17855200)
bschuurman@velaw.com
Brian K. Buss (TX State Bar No. 00798089)
bbuss@velaw.com
Joseph D. Gray (TX State Bar No. 24045970)
jgray@velaw.com
R. Floyd Walker (TX State Bar No. 24044751)
fwalker@velaw.com
Graham E. Sutliff (TX State Bar No. 24046935)
gsutliff@velaw.com
VINSON & ELKINS L.L.P.
2801 Via Fortuna, Suite 100
Austin, Texas 78746
Telephone: 512.542.8400
Facsimile: 512.236.3476

Hilary L. Preston
hpreston@velaw.com
VINSON & ELKINS L.L.P.
666 Fifth Avenue – 26th Floor
New York, NY 10103
Telephone: 212.237.0000
Facsimile: 212.237.0100

Douglas R. McSwane, Jr. (TX State Bar No. 13861300)
J. Matt Rowan (TX State Bar No. 24033137)
POTTER MINTON
A Professional Corporation
110 N. College
500 Plaza Tower
Tyler, Texas 75702
Telephone: 903.597.8311
Facsimile: 903.593.0846
E-mail: dougmcswane@potterminton.com

*Counsel for Defendants First Funds LLC, Merchant
Money Tree, Inc., and Reach Financial, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service and are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on this the 12th day of June, 2007  Any other counsel of record will be served by first class mail on this same date.

/s/ Joseph D. Gray
Joseph D. Gray

91