# EXHIBIT A

Page 1

```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
                         TYLER DIVISION
```

| | |
|---|---|
| ADVANCEME, INC., | ) |
| | ) |
| VS. | )   Case No.: |
| | ) 6:05CV-424-LED-JDL |
| RAPIDPAY, LLC, BUSINESS | )    Tyler, Texas |
| CAPITAL CORPORATION, FIRST | ) |
| FUNDS, LLC, MERCHANT MONEY | ) |
| TREE, INC., REACH | ) |
| FINANCIAL, LLC AND FAST | ) |
| TRANSIT, INC. d/b/a SIMPLE | )   July 17, 2007 |
| CASH | )   1:02 p.m. |

```
                    TRANSCRIPT OF TRIAL
           BEFORE THE HONORABLE LEONARD DAVIS
                UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

FOR THE PLAINTIFF:         MR. RONALD S. LEMIEUX
                           MR. MICHAEL N. EDELMAN
                           MR. VID BHAKAR
                           MR. ROBERT C. MATZ
                           MS. SHANEE Y. WILLIAMS
                           Paul, Hastings, Janofsky &
                           Walker, LLP
                           Five Palo Alto Square
                           Sixth Floor
                           Palo Alto, CA 94306-2155

                           MR. OTIS W. CARROLL
                           MS. DEBORAH RACE
                           Ireland, Carroll & Kelley, PC
                           6101 South Broadway, Suite 500
                           Tyler, TX 75703

APPEARANCES CONTINUED ON NEXT PAGE


COURT REPORTER:            MS. THERESE J. CASTERLINE,
                           CSR, RMR, CRR
                           Deputy Official Court Reporter


(Proceedings recorded by mechanical stenography,
transcript produced on CAT system.)

Page 46

1  it -- was innovative. Postage was his largest expense,
2  and in 1989, when he needed money, he turned to -- who?
3     A. Litle & Company.
4     Q. Yeah, but what -- in what capacity? It
5  says --
6     A. I'm sorry, turned to his credit card
7  processor.
8     Q. Credit card processor, a New Hampshire-based
9  company called Litle & Company. Litle agreed to
10 finance his postage by discounting his credit card
11 receivables.
12       Does that help you any in remembering who
13 was who in the two Litle & Companies?
14    A. No, these are Randy Bourne's words, not mine.
15       MR. CARROLL: Thank you.
16    A. This is his definition.
17       MR. CARROLL: No further questions.
18       THE COURT: All right. Redirect?
19       REDIRECT EXAMINATION
20 BY MR. BUSS:
21    Q. Mr. Bouchard, if I understood your testimony
22 when I was asking you questions, inside this processing
23 cloud here, there were actually three entities that
24 were doing some processing, correct?
25    A. In the case of Litle & Company, yes.

Page 47

1     Q. Right. And one of those was NPC?
2     A. Yes.
3     Q. And one of those was First National Bank of
4  Louisville?
5     A. First National Bank of Louisville.
6     Q. I'll just put FNBL.
7     A. Yes.
8     Q. And the other one was Litle & Company?
9     A. Yes.
10    Q. And each one of these had a separate
11 processing function, correct?
12    A. Correct.
13    Q. And each one of those charged for a fee for
14 the processing that they did?
15    A. Correct.
16    Q. Okay. Now, would you -- also Mr. Carroll
17 brought out the fact that this in this member
18 agreement, FNBL actually purchased the credit card
19 transactions from the merchants, correct?
20    A. Correct.
21    Q. So when net proceeds actually came back in,
22 they came back in to FNBL, correct?
23    A. Correct.
24    Q. Because FNBL purchased those transactions?
25    A. That's correct.

Page 48

1     Q. So those funds were owned by FNBL, correct?
2     A. Correct.
3     Q. And then it's only because of the merchant's
4  instructions to Litle that Litle can direct where those
5  funds go, correct?
6     A. That's correct.
7     Q. And in the instance of the postage advance,
8  the merchant would direct Litle to instruct FNBL to
9  send a portion to the Bank of Boston, correct?
10    A. Correct.
11    Q. And then the remainder would go back to the
12 merchant, correct?
13    A. Correct.
14    Q. And it was only because the merchant gave
15 Litle those instructions that Litle could then move the
16 funds, correct?
17    A. Correct. Again, under the MasterCard and Visa
18 rules, to be in compliance, when you get to that net
19 proceed calculation, that's the merchant's money. It
20 is only the merchant that can direct those funds.
21    Q. Okay. And so when those funds get into here,
22 to FNBL, they're not owned by Litle & Company?
23    A. No.
24    Q. So they're forwarded to Bank of Boston, Litle
25 & Company, and at that time, they're owned by Litle &

Page 49

1  Company, correct?
2     A. Correct.
3        MR. BUSS: Okay. Your Honor, before I
4  forget, can I move this into evidence?
5        THE COURT: If there's no objection. Has
6  it been marked?
7        MR. CARROLL: The board?
8        MR. BUSS: Yes.
9        MR. CARROLL: I think it's a
10 demonstrative, Your Honor. I object on that basis.
11       MR. BUSS: I think it --
12       MR. CARROLL: The one thing we know is
13 that Mr. Bouchard doesn't know who, you know, Litle &
14 Company is. So I think to that extent, it's fine as a
15 demonstrative, but I would object to it as an exhibit.
16       THE COURT: Overruled. It will be
17 admitted. Mark it with an exhibit number.
18       MR. BUSS: Do you want me to give it an
19 exhibit number?
20       THE COURT: Yeah.
21       (Exhibit Number 426 marked.)
22       MR. BUSS: 426.
23    Q. Before I leave this board, Mr. Bouchard, I
24 want to make one more point. Is NPC in any way related
25 to Litle & Company?

Page 50

1    A. No.
2    Q. Is FNBL in any way related to Litle & Company?
3    A. No.
4    Q. Mr. Bouchard -- Larry, one other thing I want
5  to move to with respect to Hanover Finance.
6        You said that once you got that letter,
7  you actually set it up, put the system into place so
8  that it would take place?
9    A. Correct.
10   Q. And then if I understand it, the only reason
11 you don't recall if it actually happened -- and I'm
12 talking about the forwarding of funds here -- is
13 because it's really one of the thousands of other
14 transactions that were processed in Litle's daily
15 operations; is that correct?
16   A. That's correct.
17   Q. Okay. Do you have any reason to -- to doubt
18 whether funds were actually forwarded? Were you ever
19 aware of a problem with --
20   A. The only -- no. The only reason that funds
21 would not have been forwarded -- if I could answer it
22 that way -- is if Museum Publications did not submit
23 any credit card transactions for processing, if they
24 submitted transactions for processing which resulted in
25 net proceeds, the system would have taken place and

Page 51

1  moved the funds in accordance with the agreement.
2    Q. Okay. One other note.
3        In -- did Litle have the ability to split
4  funds and direct those funds to a number of different
5  locations when Litle was operating back in 1992?
6    A. Yes.
7    Q. So Litle -- if the merchant had instructed
8  Litle, Litle could have forwarded those funds to two
9  different accounts?
10   A. Yeah, I -- the -- again, when you get to the
11 net proceeds, there was -- there was a limit, but I
12 believe it was -- to the best of my recollection, we
13 had the capability to automatically do somewheres in
14 the vicinity of five transfers per day per merchant,
15 five sets of instructions, if you will.
16   Q. Okay. When Litle & Company was bought out in
17 1995, did Litle & Company -- or did -- who were they
18 bought out by, again?
19   A. First USA.
20   Q. Okay. And did First USA continue with the
21 business of Litle & Company?
22   A. Yes.
23   Q. Did they continue processing transactions and
24 paying -- paying back creditors for -- for merchants'
25 debt?

Page 52

1    A. Yes.
2        MR. BUSS: No further questions, Your
3  Honor.
4        THE COURT: All right. Any recross?
5        MR. CARROLL: No, Your Honor.
6        THE COURT: You may stand down.
7        Who will be your next witness?
8        MR. GRAY: Your Honor, the Defendants
9  would like to call Mr. Tim Litle, founder of Litle &
10 Company.
11       THE COURT: How long do you anticipate his
12 testimony?
13       MR. GRAY: I would anticipate about 30
14 minutes on direct.
15       THE COURT: All right. I think we'll go
16 ahead and take about a 10-minute recess.
17       THE BAILIFF: All rise.
18       (Recess 2:09-2:24 p.m.)
19       THE BAILIFF: All rise.
20       THE COURT: Please be seated. All right.
21 You may call your next witness.
22       MR. GRAY: Mr. Litle.
23       THE COURT: Have you been sworn,
24 Mr. Litle?
25       THE WITNESS: Yes, I have.

Page 53

1        MR. McSWANE: Your Honor, just one matter.
2  Mr. Bouchard who just testified, may he be permanently
3  excused?
4        THE COURT: Any objection?
5        MR. CARROLL: No, Your Honor.
6        THE COURT: All right. Yes, he may.
7        DIRECT EXAMINATION
8  BY MR. GRAY:
9    Q. Good afternoon, Mr. Litle. Would you please
10 state and spell your name for the record.
11   A. It's Thomas Litle, L-I-T-L-E, one T.
12   Q. And, Mr. Litle, when did you first become
13 involved in the payment-processing industry?
14   A. In the payment-processing industry, in about
15 1981.
16   Q. What were you doing at that time?
17   A. My wife and I ran a mail order catalog. She
18 was the person that published the catalog or -- and
19 picked out the merchandise, and I was the guy that ran
20 the back room and -- related to everything that had
21 anything to do with after a person ordered something
22 from the catalog.
23   Q. What is the back room?
24   A. The back room is what the catalog industry
25 sometimes calls the operations.

Page 54

1    Q. Is it part of the same entity?
2    A. At the time -- at that time, no. We -- the
3  catalog itself was one entity and the fulfillment was
4  another entity, because we took on other catalogs from
5  other customers at the same time. I believe at the
6  time we had 14 customers, including our own catalog.
7    Q. So did that cause you to become involved in
8  the payment-processing industry?
9    A. Yes, it did. Actually, there were three
10 reasons I became involved in the payment-processing
11 industry. The first reason was at the time, mail order
12 catalogs were getting about 2 percent chargebacks from
13 the credit card processing environment, and that was
14 pretty costly, and it was unclear why, and -- why
15 the -- why we were getting such high chargebacks at
16 such high cost. We couldn't resolve them. The banking
17 system didn't help us at all.
18         And I got together on a regular basis with
19 other catalogers, and they came to me and said, you're
20 the techy; you fix it. So that was one reason.
21         Another reason was our salesperson from at
22 the time Chase, who was our payment-processing
23 salesperson, kept calling me the customer from hell
24 because I kept complaining about all the problems with
25 the credit card environment. And he said, if you're so

Page 55

1  smart, why don't you do it.
2         The third reason, which is maybe the most
3  important reason, was our fulfillment customers -- we
4  had -- as I say, we had 14 fulfillment customers, and
5  13 of them were not our catalog, and it took us a long
6  time to collect our payments.
7         So starting a credit card processing
8  business meant that we could propose to those catalogs
9  in 1982 that we would take our fees from the proceeds
10 of the Visa/MasterCard -- from the Visa/MasterCard
11 proceeds to pay for -- the fulfillment bills for two
12 things, really, as it turned out.
13        One was the fulfillment bills that we
14 would normally send to the catalogs, and the second one
15 was for the postage deposits that, in the fulfillment
16 business, the catalogs are obligated to fund in
17 advance.
18   Q. So was that the genesis of your first
19 payment-processing company?
20   A. Yeah. For those three reasons, I explored the
21 possibility of getting into the payment-processing
22 business, and I had -- I had a background in
23 technology, so that's what it took to do.
24   Q. What was that background in technology?
25   A. I was educational and experienced -- I'm a

Page 56

1  graduate of Cal Tech. I've been to the missile
2  program. I'm an electronic engineer. I -- I've
3  designed various thing. My whole -- my career has
4  pretty much been in the direct marketing community, and
5  I've done computer applications for the
6  direct-marketing community virtually my whole career,
7  and I worked as an engineer for -- for the first six
8  months of my career, and ever since I've worked for
9  companies that I've started myself that have primarily
10 been technology-oriented in the technology marketing
11 community.
12   Q. Have you ever won any direct marketing awards?
13   A. Yes, I have. I think the first one we won was
14 a direct marketing ECHO Award, and the Direct Marketing
15 Association gives out awards for the best promotional
16 programs. They're pretty well known. And as far as I
17 know, I'm the only person that ever got an award for
18 technology in the direct marketing industry, and so I
19 got a Gold ECHO Award.
20   Q. What was the technology you developed?
21   A. It had to do with that -- in that case, fraud
22 prevention, credit card fraud prevention, and that was
23 in the early part of our payment-processing activities.
24        I also won -- I was honored with a Hall of
25 Fame Award from the Direct Marketing Association, and I

Page 57

1  guess that's kind of distinguished because I'm one of
2  the few people that won that award that's still alive.
3         And then this fall, I'm getting the --
4  something called the Ed Mayer Award, which is more
5  significant to me, actually, than the Hall of Fame
6  Award, and that's for contributions to the direct
7  marketing industry in general and has a lot to do with
8  education of young people learning how to be direct
9  marketers, et cetera.
10        MR. GRAY: Would you move the mike back
11 just a little bit back from your mouth.
12        THE WITNESS: Can you still hear me?
13   Q. So how long -- what was the name of your first
14 payment-processing company?
15   A. Direct Marketing Guaranty Trust.
16   Q. Is that the DMGT?
17   A. Yes.
18   Q. And how long did -- or what ultimately
19 happened to DMGT?
20   A. Well, ultimately, I left it because at the
21 time I -- my partner and I were running it, and at the
22 time I was on the -- chairman of the ethics operating
23 committee for the DMA, and my partner, who had control
24 of the stock, wanted to sell the data we had on our
25 computers, and we'd been running that as a

Page 58

1  payment-processing company for two or three years and
2  we had a lot of data. At the time, it was highly
3  unethical to do that. Now it's illegal to do that,
4  according to Graham, Leach and Bliley.
5      Q. What kind of data?
6      A. Huh?
7      Q. What kind of data?
8      A. It was credit card data. It was mailing
9  address data. It was back-up data. And now Graham,
10 Leach and Bliley say it's legal. I wouldn't have any
11 part of it, so I left that company.
12     Q. What did you do at that time?
13     A. I started Litle & Company -- a company called
14 Litle & Company, which is not the same company as Litle
15 & Company now.
16          I started that in -- in early 1986, and
17 that was a payment-processing company. And that
18 company grew and prospered and did quite a bit better
19 than actually DMGT did, and I sold that in 1985. But I
20 didn't -- I really sold my stock, but I did not sell my
21 name.
22          And so that company had to rename itself,
23 and it renamed itself to Paymentech. Paymentech did
24 not buy Litle & Company; Paymentech is the other
25 Litle & Company.

Page 59

1      Q. And this is the Paymentech we've heard
2  testimony about today?
3      A. Yes.
4      Q. Approximately how much did you sell Litle &
5  Company to what -- to the owner -- the current owners
6  of Paymentech for?
7      A. Well, the Inc. magazine says $80 million. It
8  was frankly much more than that.
9      Q. How much more?
10     A. $250 million more.
11         MR. GRAY: If I could get Plaintiff's
12 Exhibit 246.
13     Q. You just mentioned the Inc. magazine article.
14 Do you see this on your screen --
15     A. Yes, I do.
16     Q. -- the cover page of this magazine?
17         Is the issue you're referring to September
18 2006?
19     A. Yes.
20         MR. GRAY: And if I could please get
21 page 2 of this exhibit.
22     Q. And I see that in this article Litle & Company
23 is the number 1 business. What was this a ranking of?
24     A. This was the fastest-growing privately held
25 companies in the United States. After I sold the old

Page 60

1  Litle & Company and it became Paymentech, I had a
2  five-year noncompete. After that noncompete was up, I
3  started this company, and as I still had use of my
4  name, this new company is called Litle & Company.
5      Q. And is that your current employer today?
6      A. Yes.
7      Q. And is Litle & Company today also a payment
8  processor?
9      A. It is.
10     Q. Now, at -- I believe we heard testimony
11 earlier from Mr. Goldman that credit card processing
12 has become sort of a commodity. So how did you
13 distinguish yourself in that industry?
14     A. Well, we've always distinguished ourselves.
15 It's been a pattern, is -- first of all, we primarily
16 process card-not-present companies. And what we do is
17 the typical payment processing, but we also understand
18 how payment processing is essential to the marketing
19 scheme of companies, and we've always helped companies
20 deal with their marketing issues, and always understood
21 the payment-processing issues for card-not-present
22 companies very well because we understood
23 card-not-present companies themselves.
24          And so we've always helped a great deal
25 with our customers, and we've helped them in all kinds

Page 61

1  of ways. We also help our noncustomers, and very often
2  they become customers as a result.
3      Q. Can you please describe how you helped some of
4  your customers in their marketing efforts.
5      A. Well, some of them are -- some of them have
6  been pretty significant over the years, and, frankly,
7  I'm proud of them.
8           One of them was a little company called
9  Quantum Computer, and they had an idea, and they --
10 they had charged for their services on a monthly basis.
11 They charged credit card -- their subscribers on credit
12 cards and they had about 12 percent of their
13 subscribers were directly debited to checking accounts;
14 their checking accounts had ACH debits against them.
15 And we worked with those guys.
16          But they were giving away a free trial,
17 and they didn't have the customer service people to
18 answer the phones. So when people wanted to cancel,
19 they didn't cancel it; they got all kinds of chargeback
20 problems with Visa and MasterCard, and because they
21 were directly debiting people's checking accounts, they
22 got in a lot of trouble with the Feds.
23          And so we stepped in and we helped
24 organize a way for them to get out of it. Sometimes we
25 can be heavy-handed. And we went in and said, you have

Page 62

1  to hire 400 customer service people. And they did it,
2  and they didn't stop until there were 4,000 and they
3  would not be in business today without our
4  intervention.
5         But one of the things that happened in the
6  meantime was they got sued by Quantum Storage Products,
7  and they had to change their name, so they changed
8  their name to America Online.
9         Others are CDW in Chicago, which many
10 people know. CDW ran into a lot of problems with
11 Visa/MasterCard, and we helped -- we helped them get
12 out of it. We've helped a lot of marketing programs.
13 In fact, one of our customers was Signature Dining
14 Card -- or Signature Group.
15        And they got in a lot of trouble with
16 their credit card processing, and -- I won't go through
17 the whole story, but the Signature Dining Group's
18 marketing program offering people to be able to
19 register any free credit cards and do the dining
20 programs that we've heard about in this -- in this
21 courtroom, that -- that whole idea of registering any
22 three credit cards was our idea, and that's what we did
23 for our customers.
24    Q. Your idea, as in Litle & Company's idea, or
25 your personal idea?

Page 63

1     A. In that case, it was my personal idea.
2     Q. So when Mr. Falke testified the other day that
3  third party did the scrubbing transactions for Dining
4  Ala Card, was that third company Litle & Company?
5     A. Yes, it was.
6         There were other things that we did for
7  the direct-marketing industry or for the credit card
8  world. One of the things was, we were widely -- or
9  years ago, when I was in the subscription fulfillment
10 business, we basically did the model and the -- for the
11 carrier route presort system and developed it. It
12 involves how more than half of all mailing goes through
13 the post office.
14    Q. What year was that?
15    A. Well, we actually developed the system for the
16 Christian Science Publishing Society to get the
17 newspaper delivered on time. It was getting delivered
18 70 percent of the time, and after they used our system,
19 it got delivered 92 percent of the time on time.
20        And the Postal Service saw what we did,
21 and they also analyzed it and they discovered it saved
22 them 60 percent of their costs; in other words, it only
23 cost 40 percent as much to deliver the Christian
24 Science Monitor. And so they asked us if we could see
25 if we could expand it and do trials for other -- in

Page 64

1  other venues.
2         So we did it for catalogs and magazines
3  and other magazines. And then eventually it was
4  adopted as the way to deal with mailing all mail for
5  people -- for quantity mailers.
6     Q. When you sold the first Litle & Company in
7  1995, is your resume correct that Litle & Company was
8  processing $40 billion annually in credit card
9  receipts?
10    A. I think so. I don't remember exactly, but,
11 yes.
12        MR. GRAY: And that's Defendants'
13 Exhibit 98, is Mr. Litle's resume.
14    Q. What I would like to focus on for the rest of
15 your testimony is the first Litle & Company that
16 existed between 1985 and when you sold it in 1995.
17    A. All right.
18    Q. And you heard the testimony about the postage
19 advance program, so I would like to clarify a few
20 issues.
21    A. Okay.
22    Q. First, do you agree with Mr. -- what
23 Mr. Bouchard described as how the standard transaction
24 was processed by Litle & Company, NPC and FNBL?
25    A. Yes, I do.

Page 65

1     Q. Were there any other entities, other than
2  those three, that processed transactions in conjunction
3  with Litle & Company?
4     A. Yes, there were. There -- as we -- or as I've
5  heard before there, we've talked about all kinds of
6  diagrams, acquiring banks and issuing banks and
7  authorization people and all of these guys that are
8  involved, and I think Larry called it the cloud --
9  that's what the cloud is all about.
10        NPC, FNBL and Litle & Company were three
11 of the entities in that cloud. There was authorization
12 networks; there was issuing banks. All of that is in
13 the cloud. But, yes, NPC, FNBL and Litle & Company
14 were certainly in that cloud.
15    Q. When card issuers credited money to an account
16 somewhere in that cloud, where was that account held?
17    A. That account, by regulation, is held at the
18 acquiring bank. That's the acquiring bank's primary
19 function, is to deal with the -- with receiving the
20 money from the card-issuing banks.
21    Q. Was FNBL the acquiring bank?
22    A. Yes.
23    Q. Was there a separate account for every
24 merchant into which funds from the issuing banks would
25 be deposited?

Page 66

1   A. No. It was on a daily basis. FNBL received
2  its settlement from the clearinghouse, the Visa and
3  MasterCard -- the two clearinghouses that Visa and
4  MasterCard ran.
5   Q. Are you aware of any -- any way a card
6  transaction could be processed that did not involve
7  funds being credited from the card issuer directly to
8  the acquiring bank's bank account?
9   A. Not -- not in those days. Probably three or
10 four years before, you -- it was -- it wasn't done that
11 way, but for a variety of reasons, mostly for control,
12 because Visa and MasterCard had been burned by not
13 having an acquiring bank in the middle. They set it up
14 so that that's the only way that funds get from issuing
15 banks to merchants, is by way of the acquiring bank.
16  Q. And that acquiring bank, there's one single
17 account into which all funds from all card issuers are
18 deposited; is that your --
19  A. It may be more than one account, but it's not
20 many accounts. It's certainly not by merchant.
21  Q. In whose -- in whose name is that account?
22  A. In that case, FNBL. It's an FNBL -- an
23 FNBL-owned account, and it's a "for the benefit of
24 Litle kind of account," but it's -- no. In FNBL, they
25 may have had an account for us, but it wasn't by

Page 67

1  merchant. It would have been an account -- however
2  they called it -- an operating account for us.
3   Q. Did a merchant ever have access to that
4  account?
5   A. No.
6   Q. And today, in the payment-processing industry
7  today, does a merchant ever have access to the account
8  at the acquiring bank that receives funds from card
9  issuers?
10  A. No.
11  Q. So in this postage advance program we were
12 discussing, the funds would flow from the card issuer
13 to FNBL; is that correct?
14  A. That's right.
15  Q. And then, from there, when the funds are in
16 the account at FNBL, how would those funds be split and
17 where would they be forwarded to?
18  A. They would be split based on instructions that
19 Litle & Company gave them, and they would be forwarded
20 to various places. The minimum number of places it
21 would be forwarded to for -- let's say there were 10
22 merchants -- would be 12: 10 transfers to each of the
23 merchants, one transfer to us for our fees, and one
24 transfer into a reserve account that would also be at
25 FNBL, or at least the -- today, the way we operate, we

Page 68

1  use Wells Fargo for that -- it is also at Wells Fargo
2  and owned by Wells Fargo, so assuming at least one of
3  merchants had some changes in their reserves, so there
4  would be 12.
5       If there were -- okay. I'll -- I think
6  that's the end of that.
7   Q. Well, my question was, for the postage advance
8  situation.
9   A. Oh, if -- if a merchant had a postage advance,
10 for example, or any kind of advance, then the -- there
11 would be -- if one merchant had one, there would be one
12 additional forwarding, and that would forward -- that
13 transfer would be to whatever bank account the merchant
14 told us to forward the funds to.
15  Q. So in that situation, there would be 13?
16  A. That's right.
17  Q. 13 amounts forwarded; is that right?
18  A. That's true.
19  Q. And if -- in these postage advances, if you
20 look at --
21      MR. GRAY: If you'll please pull up
22 Defendants' Exhibit 16. And could you please pull up
23 the first paragraph.
24  Q. Mr. Carroll was mentioning earlier that this
25 mentions Litle & Company in two places. It says, in

Page 69

1  consideration of Litle & Company making advances for
2  the account of member to Postmaster, member agrees to
3  pay on demand the principal amount of advance plus
4  accrued interest. And then it says Litle & Company --
5  at 10 percent to Litle & Company.
6   A. Right.
7   Q. And then it also says -- hold on. Stop there.
8       So if you replace Litle & Company in that
9  paragraph with ABC Company, a company completely
10 unrelated to Litle & Company, and a merchant handed you
11 this same promissory note with ABC Company on it, how
12 does that process change that you just described?
13  A. It would simply be a different bank account
14 that the funds got transferred to. It's exactly the
15 same process.
16  Q. Do you have to make any changes to the system?
17  A. No.
18  Q. Do you have to get any additional
19 authorizations?
20  A. No.
21  Q. Do you have to run that by FNBL to see if they
22 are okay with that?
23  A. No.
24  Q. And now just to clear up was Mr. Bouchard was
25 unable to testify to, were there two separate Litle &

Page 70

1  Companies or was there one single Litle & Company?
2    A. There was one single Litle & Company.
3    Q. So would the Litle & Company processing be
4  related to the Litle & Company postage advancing?
5    A. It was basically a separate division or a
6  separate department within Litle & Company. There was
7  two -- it was two separate functions, and they were
8  treated as totally separate functions. Just exactly
9  like in a bank, the -- in a bank that issues credit
10 cards is an acquiring bank, there are two separate
11 departments in that bank, the issuing part of the bank
12 and the acquiring part of the bank.
13   Q. Is American Express an example of such a bank?
14   A. Yes. Well, it's not exactly a bank, but
15 American Express has the issuing side to their
16 business, and it's run in an entirely separate way than
17 the acquiring part of their business.
18        Citicorp has an issuing side of their
19 business and they have an acquiring side of their
20 business. In fact, Wells Fargo has an issuing side of
21 their business and they have an acquiring side of their
22 business.
23        Lots of banks, particularly banks that
24 issue credit -- well, JP Morgan Chase has a huge
25 card-issuing part of their business, and Paymentech is

Page 71

1  the acquiring part of their business. They're run as
2  separate organizations. They have separate issues.
3  They often have disputes between each other, because
4  when credit card transactions go bad, they have to
5  resolve them within the bank. It -- they have to be
6  two separate organizations. I know of no bank that has
7  such an organization.
8    Q. So within Litle & Company, how were those
9  divisions segregated?
10   A. Well, they were segregated. They had
11 different banking accounts; they had different P&L
12 statements; they had different balance sheets. But
13 Litle & Company itself, the balance sheets and the P&Ls
14 were consolidated at the -- after -- you know, after --
15 at the end of the year.
16   Q. Within the postage advance program, where was
17 the bank account to which postage advance repayments
18 were forwarded?
19   A. It was at Bank of Boston.
20   Q. And where were the repayments for -- for
21 processing fees forwarded? To which bank account?
22   A. Bank of Boston.
23   Q. Is that to the same account?
24   A. Could you ask me the question again; I'm
25 sorry.

Page 72

1    Q. The first question I asked was, where are the
2  postage advance repayments forwarded to, which bank
3  account?
4    A. To the Bank of Boston.
5    Q. And the second question was, to which bank
6  account are process -- were processing fees forwarded?
7    A. I believe it was another bank. It wasn't the
8  Bank of Boston. The reason we had the Bank of Boston
9  for the -- for the postage advance fees is because we
10 wanted to expand the business, and it was financed --
11 I -- it was our company money or my money that was
12 financing it or behind it. We did not have anybody
13 helping us finance that. We didn't have a bank to do
14 that. And we were trying to get Bank of Boston to do
15 that for us.
16        One of the problems -- one of the reasons
17 that we didn't expand the business a lot more is
18 because the seasonal nature of postage financing all
19 came at the same time, and if we had done 10 of these
20 things, it would have been $3 million of capital we had
21 to put in, and we didn't have it at the time.
22        And so we were looking to Bank of Boston
23 to help us with that, and we were -- it appeared as if
24 we'd be successful, except during that period of time,
25 most of the banks in New England seemed to go out of

Page 73

1  business. I know 40 percent of the banks of
2  New Hampshire went out of business on the same day. It
3  was a tough time in New England.
4        So that -- our -- our contacts at the bank
5  suddenly had other priorities, like looking for jobs,
6  most of them.
7    Q. Approximately how many cash -- or postage
8  advances did Litle & Company provide prior to its sale
9  in 1995?
10   A. Oh, I'm trying to remember some of them.
11 Exposures was the first postage advance. We did
12 Hartsong. We did Museum Collections. We did -- I'm
13 going to guess a dozen.
14   Q. And were those ongoing through the sale to
15 First USA in 1995?
16   A. Yes.
17   Q. And after First USA purchased Litle & Company
18 and those postage advances were -- I assume they
19 continued to be repaid in the same manner you
20 described?
21   A. I would assume the company was sold as a going
22 concern, and then -- so I think -- yeah, sure. One of
23 my requirements in the sale, which was an interesting
24 negotiation, was I -- I made it a requirement that I
25 wasn't required -- I didn't have to stay; the next day

19 (Pages 70 to 73)

Page 74

1  I could leave. I didn't work very well for other
2  people. As I said, I've always worked for companies I
3  started myself from six months out of school.
4      Q. So after the sale to First USA in 1995, in
5  order to continue being repaid in the manner you
6  described for these postage advances, were First USA
7  forced to alter its system in order to forward money to
8  Litle & Company as a third party?
9      A. No, it wasn't forced to alter its systems. I
10 don't know if it did or not. I suspect it probably
11 changed the bank accounts around, but I don't know that
12 for sure.
13     Q. Did it have to change any of its computer
14 systems?
15     A. No.
16     Q. Did it have to add any fields to its computer
17 programs?
18     A. No.
19     Q. Could you describe --
20     A. Oh, one thing it did have to do, it did have
21 to -- because I didn't sell my name -- it did have to
22 expunge the word "Litle" out of all their files and
23 everything in the computer -- in the computers. And as
24 far as I know, they haven't succeeded in doing that
25 yet, so -- but, no, nothing to do with postage

Page 75

1  financing. They didn't have to change anything.
2      Q. And Mr. Bouchard was describing how Litle &
3  Company was required to forward payment wherever the
4  merchant instructed it to forward payment. Do you
5  agree with that?
6      A. Yes.
7      Q. And when the merchant instructed Litle &
8  Company to forward payment -- or if the merchant didn't
9  instruct Litle & Company at all, would all the payment
10 of net proceeds be forwarded directly to the merchant's
11 account?
12     A. That's right.
13     Q. And would those payments be forwarded from
14 First National Bank of Louisville?
15     A. Yes.
16     Q. And if the merchant instructed Litle & Company
17 to split the payment and forward the payment partially
18 to the merchant and partially to Litle & Company, for
19 example, how would Litle & Company enter that into its
20 system?
21     A. Exactly the -- well, we were -- by
22 Visa/MasterCard regulation then -- still are -- were
23 required to do whatever the merchant says. So we had
24 the ability to take the net proceeds and wire those net
25 proceeds to I think Larry said as many as five places.

Page 76

1  I don't remember, but it was multiple places.
2         And we'd just enter in the algorithm by
3  which the payments were split and the bank account to
4  which the payments would go. And the merchant had one
5  account. Part -- it would -- the money would go -- or
6  if we were doing postage financing, we would say -- we
7  would put our bank account in there, and then the rest
8  would go to the merchant's account.
9         If we were doing something else -- we did
10 do other kinds of financing. If we did do other kinds
11 of financings, or if -- we supported other kinds of
12 financial institutions, we just put in the other
13 financial institution's bank account.
14        But the merchant would have to instruct us
15 to do that, and they would make a deal with the
16 financial institution, and the merchant won't tell us
17 what that deal was.
18     Q. So the computer system at Litle & Company
19 prior to 1995 was capable of forwarding all the net
20 proceeds directly back to the merchant; is that right?
21     A. Yes.
22     Q. And that was done; is that right?
23     A. All the net proceeds back to -- yeah, that was
24 the normal way of doing it without any other
25 agreements.

Page 77

1      Q. And the Litle & Company system prior to 1995
2  had the capability of forwarding a portion of the net
3  proceeds to the merchant and a portion of the proceeds
4  to some other bank account; is that right?
5      A. Yeah, to, I think, four other bank accounts.
6      Q. And did FNBL actually forward that payment in
7  two different directions?
8      A. Yes. When we entered the data in our system,
9  what that did was generate ACH instructions, which we
10 sent to First Bank of Louisville, and First Bank of
11 Louisville executed those instructions.
12        Actually, when we were doing the postage
13 financing and the Museum Collection financings that we
14 were talking about, that was all done through First
15 National Bank of Louisville.
16        Between then and the time we actually sold
17 the company, we had formed a relationship with First
18 USA. And so First USA took on the role that First
19 National Bank of Louisville did, but it was done
20 exactly the same way as when we were working with First
21 Bank of Louisville.
22     Q. And what year was that?
23     A. I think that was -- I'd say '93, maybe the
24 middle of '93.
25     Q. So in the middle of '93, First USA replaced

Page 78

1  NPC and FNBL within the cloud on Defendants' Exhibit --
2  what is that -- 426?
3    A. Yes, and we actually took on the role of NPC,
4  so -- and First USA took on the role of First National
5  Bank of Louisville.
6         MR. GRAY: Could I please get Defendants'
7  Exhibit 15.
8    Q. Mr. Litle, I would like for you to look at the
9  memo on the screen, which appears to be a memo to you
10 from John Shirey, dated January 24th, 1990?
11   A. Yes.
12   Q. Do you see that?
13   A. Yes.
14   Q. Would you please read that to yourself, and
15 I'll ask you to describe what this memo is about.
16        And it's two pages. We can flip the page.
17   A. Okay. I didn't finish the first page. I'm
18 familiar with it without having read the second half of
19 the first page, not reading the rest of the second
20 page, because I was worried that it would disappear.
21   Q. Would you please describe what this memo is
22 about.
23        MR. GRAY: And, Your Honor, may I approach
24 the witness.
25        THE COURT: You may.

Page 79

1         THE WITNESS: Thanks.
2    A. Yeah, John Shirey was at the time involved
3  with new products. Steve Tritman is a name from the
4  past.
5         But anyway, Alan Abbott, who was the CFO
6  of Exposures, and I had been talking about the
7  possibility of doing postage financing, and we were
8  developing the idea of postage financing. And this --
9  this explains what the idea was at that exact time.
10   Q. Who conceived of the idea of a postage
11 advance?
12   A. It's unclear. I think Alan Abbott and I were
13 talking about, and Alan sent a proposal at one point.
14 Maybe -- I guess this is preproposal.
15   Q. Who was Alan Abbott?
16   A. Alan was the CFO of Exposures.
17   Q. Is Exposures the merchant that's listed on the
18 postage advance agreement we looked at earlier, which
19 is Defendants' Exhibit 16?
20   A. I didn't look at it.
21   Q. If you could look in that stack, it should be
22 labeled.
23        MR. GRAY: The bottom left.
24   Q. Mr. Litle, if you'll look on the screen, this
25 is Defendants Exhibit 16.

Page 80

1    A. Yes, that's Alan Abbott. I guess he was the
2  vice president of marketing at the time. He was also
3  the CFO.
4         Interestingly enough, most of the
5  marketers in the direct-marketing industry have a
6  background of finance. It's not marketing as most
7  people think of it; it's analysis.
8    Q. And this agreement that's on the screen is
9  dated June 22nd, 1990?
10   A. Right.
11   Q. The memo is dated January 24th, 1990.
12   A. Uh-huh.
13   Q. Is the early part of 1990 when this postage
14 advance program was first implemented?
15   A. It appears that that's the correct date, yes.
16        MR. GRAY: If you could turn back to
17 Exhibit 15, page 2. Pull out the first paragraph,
18 please.
19   Q. Mr. Litle, the first paragraph states, we
20 should indicate what percentage of the Visa/MasterCard
21 sale deposits will be deducted from each payment to
22 member. Note that this is not net deposits. This
23 percentage of sale deposits will be deducted from the
24 amount of money that would otherwise be transferred to
25 member.

Page 81

1         Do you see that?
2    A. Uh-huh.
3    Q. Would you please describe what that paragraph
4  is discussing.
5    A. This was when we were trying to figure out how
6  to collect the fees from the proceeds. We were
7  thinking at one time that we'd take the -- an amount of
8  money that was calculated based on their sales, not
9  their refunds, and then deduct that from net deposits,
10 but the calculation percentage would be on the actual
11 sales.
12        And that was -- and then -- and then we
13 had to think about what the fee was, like would it be
14 so much per day, or such-and-such a percent, or how
15 would all that work?
16        And we experimented with that. We did it
17 several different ways, is my memory, and, eventually,
18 we wanted to make it real simple. And so what we did
19 is, once a catalog is mailed, the sales from that
20 catalog is quite predictable -- or at least the sales
21 curve is quite predictable. Sometimes if a catalog
22 does 10 percent better than they would expect it to do,
23 the sales curve itself was always stable.
24        For example, three weeks after the catalog
25 was mailed, about 50 percent of the sales were in the

Page 82

1  house.
2          So we were working on trying to figure
3  out, based on the expected sales from the catalog, how
4  could we predict a way of making the loan repayment the
5  easiest and the most business -- and the most
6  consistent with the business requirements of the
7  catalog.
8          So that's what that -- this was one of
9  those attempts, I suspect, to figure out how we should
10 deduct the fees from that.
11     Q. So when the idea was originally conceived --
12 if you look at the last sentence of paragraph 4, it
13 says, this percentage of sale deposits will be
14 deducted.
15         Are sale deposits credit card receipts?
16     A. They're -- they're credit card receipts
17 excluding refunds, because, obviously, if you sell
18 $100,000, and you have $10,000 of refunds, the question
19 was -- this said we would base the amount on the
20 $100,000, not the $90,000 after refund.
21     Q. So you would take a percentage of the credit
22 card transaction, the sale deposits, and deduct those
23 from the amount of money that would otherwise be
24 transferred to the member? That was the original idea?
25     A. Yes, and that would -- and the amount that

Page 83

1  would otherwise be transferred to the member was what
2  we call net proceeds.
3      Q. Okay. So the percentage that would be
4  deducted from the amount of money that would otherwise
5  be transferred to the member, is that -- that would
6  otherwise be transferred to the merchant?
7      A. Yes.
8      Q. And the -- out of net proceeds; is that
9  correct?
10     A. That's right.
11     Q. Okay. So the way this idea would alter the --
12 the standard processing environment, it would take the
13 net proceeds, the amount that would otherwise go back
14 to the member; is that right?
15     A. That's right.
16     Q. And it would take a percentage of those and
17 transfer those to another bank account other than the
18 merchant's?
19     A. Yes, it could take a percentage. It could
20 take a fixed fee. It could take a fixed fee that
21 varied by day that was calculated on the basis of
22 the -- of what the catalog sales were projected to be.
23 They could take it on so-much-per-sale transaction.
24 That algorithm could take various forms.
25     Q. Did the -- did the Litle & Company system have

Page 84

1  to be altered to accommodate this new idea, or was the
2  infrastructure in place?
3      A. Most of the -- at the time, either most of the
4  infrastructure was in place or all of the
5  infrastructure was in place. I don't remember. We
6  might have had to change something.
7      Q. What would you have had to change?
8      A. We had the capability to be algorithm -- the
9  algorithms that we had. I mean, it wasn't much to --
10 that wouldn't have been a big project for us.
11     Q. And if you look at paragraph 5, it says, we
12 have to identify what the fee should be. My sense is
13 we do something like deduct 21 percent from the
14 Visa/MasterCard proceeds, of which we keep 1 percent
15 and 20 percent goes back to the member.
16         Do you see that?
17     A. Yes.
18     Q. Does that mean that 20 -- 20 percent would be
19 forwarded back to the member, or does that mean that
20 20 percent would be applied to the principal amount of
21 the advance?
22     A. I think that's a misprint. I think if -- I
23 think we would have deducted 21 percent of the
24 Visa/MasterCard proceeds, and 79 percent would have
25 gone back to the member.

Page 85

1      Q. Okay. And then the last sentence says, this
2  is basically a 5 percent fee on a loan whose average
3  duration is somewhere between 29 and 34 days.
4          Do you see that sentence?
5      A. Yes.
6      Q. Were those postage advances typically repaid
7  within 29 to 34 days?
8      A. It -- actually, I think it turned out to be
9  longer. But it wasn't -- you know, it wasn't -- it was
10 more like two months, probably.
11         MR. GRAY: Okay. And if I could please
12 get Defense Exhibit 20.
13     Q. Mr. Litle, this is another demand promissory
14 note signed by Museum Publications of America on
15 September 27th, 1993.
16         Do you see that?
17     A. Yes.
18         MR. GRAY: Okay. Now, I would like to go
19 back to the full document and pull out the top
20 paragraph, principal amounts held. There you go.
21     Q. Now, this appears to be the terms of the
22 postage advance. The principal amount of the advance
23 is $204,224.48; is that right?
24     A. That's right.
25     Q. And that is the amount that would be paid to

Page 86

1  the postmaster on behalf of the merchant?
2      A. Yes.
3      Q. And the next line says, management fee,
4  $90,190.52. Do you see that?
5      A. Yes.
6      Q. What is the management fee?
7      A. The management fee is the way we charge for
8  our service. We originally toyed with the idea of
9  trying to figure out a percentage of outstanding
10 balance and all that stuff, and we just came to the
11 conclusion we would charge a management fee, and then
12 they would owe us the total of the principal amount
13 plus the management fee.
14     Q. Okay. And then if you drop down to the
15 second-to-last line in this excerpt, it says, daily
16 repayment, see repayment schedule.
17     A. Yes.
18         MR. GRAY: If I could please get the third
19 page of this exhibit. It's entitled Repayment
20 Schedule. If you could please call that up.
21     A. Uh-huh.
22     Q. Could you explain what this repayment schedule
23 represents.
24     A. Yes, that would -- of their projected
25 volume -- we took their projected volume as a result of

Page 87

1  their sales from the catalog, and we mapped that to a
2  repayment schedule that I'm sure we had negotiated with
3  them and they agreed that that made sense, and that's
4  what -- that's what that payment schedule is.
5      Q. So would Litle & Company in the postage
6  advance program sometimes take a fixed amount as
7  repayment and sometimes take a percentage of the credit
8  card transactions?
9      A. Yes, we could take a straight percentage of
10 the credit card transactions, or if we took a fixed
11 payment, that didn't really match their cash flow as
12 well, and this looks like a combination of the two.
13     Q. So as the postage advances was repaid -- were
14 repaid, sometimes the amount of repayment, it would
15 fluctuate with the business of the -- of the catalog
16 company; is that correct?
17     A. Yeah. It generally fit the business needs of
18 the catalog company. Remember, we were a catalog
19 company. My wife and I ran a catalog for 10 years. So
20 we understood this very well. We experienced the pain
21 of having to pay postage at a time when our cash
22 balances were the lowest seasonally. That's when you
23 mailed your next catalog. And the postage -- the post
24 office doesn't take credit; you have to pay cash. So
25 we experienced the pain. We knew -- we knew very well

Page 88

1  how this worked from the Exposures point of view.
2      Q. Now, I would like to turn over to the Hanover
3  Finance program that Mr. Bouchard also discussed, which
4  seems to be intertwined with the postage advance
5  program, two of the agreements I referenced in that
6  last letter.
7          MR. GRAY: Could I get Exhibit 53, please.
8  Could you please call up the top left.
9      Q. It says -- this is a letter to -- it's
10 addressed to Michael Duffy?
11     A. Yes.
12     Q. Who is Michael Duffy?
13     A. He was my vice president of sales and
14 administration -- or finance and administration at the
15 time.
16         MR. GRAY: Call up the first paragraph,
17 please.
18     Q. The letter begins, as you know, for some time
19 we now have been -- for some time now, we have been
20 working to arrange a line of credit to assist us in
21 financing inventory. I am pleased to report that we
22 have now established a $3 million line. The lender is
23 Hanover Finance Corporation, a subsidiary of Hanover
24 Direct.
25         Do you see that?

Page 89

1      A. Yes.
2      Q. Are you familiar with lines of credit?
3      A. Sure.
4      Q. How do lines of credit operate?
5      A. It's -- a company has access to a certain
6  amount of cash. If it needs it, it takes it. As it
7  doesn't need it, it pays it back.
8      Q. So can a line of credit be used as an
9  operating account for a business?
10     A. Yes.
11     Q. So in this Hanover Finance situation, did
12 Boston Publishing operate its business off of that line
13 of credit and have Litle & Company forward payment to
14 Hanover Finance to pay that line of credit down?
15     A. That's how this was set up, yes.
16         MR. GRAY: If you could turn to the second
17 page of this exhibit, please. And call up the first
18 paragraph.
19     Q. The first paragraph says, upon written
20 instruction from Hanover Finance, designated in writing
21 by Hanover Finance, without further action by Boston
22 Publishing, you will make all payments of net proceeds
23 or any other credits, reserves, deposits, et cetera,
24 hereafter due to Boston Publishing under the member
25 agreement in respect to card sales directly by wire

Page 90

1  transfer to such account or accounts as Hanover may
2  designate in writing.
3      Do you see that?
4  A. Yes, I do.
5  Q. And could you please explain what that means.
6  A. Yeah, that was consistent with what we would
7  do, because it was up to the merchant to tell us what
8  to do, and this was the merchant telling us that they
9  were putting Hanover in a position to -- to act in
10 their behalf. And so I do -- I do remember this.
11     And what that would mean is Hanover could
12 call us and direct money to go, and they didn't
13 necessarily have to direct all of it. But they had --
14 they had the ability to direct where all of the money
15 went, and they could say, send all of it to Hanover
16 House, some of it to Hanover House, and some of it to
17 Museum Collections. They basically stood in the shoes
18 of Museum Collections.
19 Q. Now, is the reference to member agreement in
20 there, is that a reference to a member agreement that
21 is marked Plaintiff's Exhibit 51?
22 A. Yes.
23 Q. The document that says Member Agreement.
24 A. Yes.
25     MR. GRAY And could you please call up the

Page 91

1  second paragraph on page 2 of Exhibit 13.
2      I'm sorry, 15.
3  Q. And, again, we've already been over this, but
4  it says that Hanover Financing acknowledges that its
5  interest in the -- security interests in the rights of
6  the borrower, the payment are subject to the rights of
7  Litle & Company under two promissory notes.
8  A. Yes.
9  Q. Do you see that?
10     And these promissory notes are the Museum
11 Publications promissory notes --
12     MR. GRAY: I need the numbers.
13 Q. Defendants' Exhibit 22. That's dated January
14 of '94. Do you see that?
15 A. Yes.
16 Q. And then it says it's also subject to a demand
17 promissory note dated January 28th, 1994.
18     MR. GRAY: And could I please get
19 Defendants' Exhibit 23.
20 Q. Are those two promissory notes the promissory
21 notes referenced in this -- this letter?
22 A. I -- yes. I assume so, yeah.
23 Q. Okay. So this letter references three other
24 documents that you've seen today; is that right?
25 A. Yes.

Page 92

1  Q. Okay. So these four documents together
2  describe the operation of this Hanover Finance
3  situation; is that right?
4  A. Yes.
5  Q. Okay. Could you please tell me on
6  Mr. Bouchard's diagram there how payment would have
7  been forwarded in the Hanover Finance situation -- or
8  was forwarded, I'm sorry.
9  A. Sure. We would have calculated the net
10 proceeds on a daily basis, and we've talked about, as
11 Larry calls it, the cloud, where all these players are,
12 and we -- we would calculate the net proceeds, and then
13 we would produce from that our -- our daily ACH
14 instructions or -- or our daily transfer instructions,
15 because our daily transfer instructions would then go
16 to First National Bank of Louisville, and they follow
17 those instructions.
18     Most of them were ACH's. Some of them
19 were wires. But then FNBL would take those
20 instructions and forward the money to whatever bank
21 accounts our instruction -- and whatever amounts our
22 bank -- our instructions told them to.
23 Q. When you instructed -- or when Litle & Company
24 instructed FNBL to forward payment to the -- the
25 Boston -- what is it -- Bank of Boston bank account,

Page 93

1  was that just Litle & Company forward -- moving funds
2  from one of its own accounts to another of its own
3  accounts?
4  A. No, it was moving from First National Bank of
5  Louisville's operating account to a Litle & Company --
6  or the -- the Litle & Company account at Bank of
7  Boston.
8  Q. Did Litle & Company have any ownership at all
9  in the operating account at FNBL?
10 A. No.
11 Q. Did Litle & Company have any control over that
12 operating account?
13 A. We did in the sense that we could issue
14 instructions of where the wires from that -- funds
15 transferred from that account should go. But, no, we
16 didn't have any legal control. In fact, quite the
17 opposite. It's a requirement of Visa and MasterCard
18 that we don't.
19 Q. Please explain that. Who does Visa/MasterCard
20 require to have control?
21 A. First National Bank of Louisville. That's the
22 bank -- that's the -- that's the function of the
23 acquiring bank. It's one possible function, but
24 it's -- it's why it's an acquiring bank.
25     What happened was -- it wasn't set up that

24 (Pages 90 to 93)

Page 94

1  way, as I said, several years before. And there was a
2  company called Charger that misused the funds. They
3  got the funds from the banking system and used them as
4  their own working capital, eventually went out of
5  business, and stuck Visa and MasterCard for -- for some
6  liabilities to merchants that they didn't pay.
7       Visa and MasterCard didn't really want to
8  deal with anybody other than the member banks of Visa
9  and MasterCard. And so they -- they made it -- they
10 changed the rules so it was absolutely essential that
11 all funding to merchants came from -- it could be the
12 acquiring bank, which had to be a member bank of
13 Visa/MasterCard.
14    Q. And I believe you testified to this earlier,
15 but a merchant has no access to those funds at the
16 acquiring bank; is that correct?
17    A. No. The funds at the acquiring bank are all
18 of the merchants for -- that Litle & Company would be
19 processing. So the First National Bank of Louisville
20 didn't know how to distinguish whose funds were whose.
21    Q. And, again, all payments from card issuers
22 were always deposited into the acquiring bank's
23 account; is that correct?
24    A. It was true then and it's true now.
25    Q. Okay. So could you briefly run through one

Page 95

1  more time exactly how the payment of net proceeds was
2  split in the Hanover Finance situation.
3     A. Okay. The -- the first thing that would
4  happen is net proceeds would be calculated, and net
5  proceeds are calculated as a result of all of the
6  things that happened in the -- in what Larry's called
7  the cloud.
8       Then from -- after the net proceeds was
9  calculated, then we applied the algorithms or whatever
10 we'd agreed -- or the -- the ways we agreed with the
11 merchants to distribute those net proceeds.
12    Q. And how would you calculate those or apply
13 those?
14    A. According to the merchant's instructions, and
15 that was generally because we filled in some parameters
16 in the system, and we filled those parameters in
17 typically once.
18       What it says is, here's how you calculate
19 it, and you keep paying until this amount is reached,
20 and then you stop paying.
21       So anyway -- so according to those
22 parameters, the net proceeds would be distributed in --
23 in most cases distributed directly to the merchant. In
24 the cases where there were other parameters or other
25 requirements, it would calculate that and distribute it

Page 96

1  to one, two, three or four other bank accounts other
2  than the merchants according to those parameters.
3       Those -- after those calculations were
4  made, all done untouched by human hands and
5  computerized, the -- the daily -- those would be
6  entered as part of the daily funds transfer instruction
7  list, and the funds transfer instruction list was a
8  file that said -- said, okay, FNBL, you take this
9  amount of money and send it to this account via wire;
10 this amount of money, send it to this account via ACH,
11 et cetera, and just went down the list until we
12 distributed all the net proceeds from all of our
13 merchants for that day, and then FNBL executed the
14 funds transfers.
15    Q. So just to make sure I understand, there was
16 one instruction that said, send processing fees to
17 Litle; is that right?
18    A. Yes. One of those instructions was to send --
19 so we would get one wire every day for our accumulated
20 processing fees that went to -- that were -- that were
21 in the FNBL account, yes.
22    Q. And then a separate instruction would say,
23 send this amount out of net proceeds to Litle &
24 Company's Bank of Boston account?
25    A. Yes, and that -- that was a separate

Page 97

1  instruction.
2     Q. And that was the postage advance repayment; is
3  that right?
4     A. Postage --
5     Q. Postage advance repayment.
6     A. Yeah. There would be one of those transfers
7  for each merchant that was involved and active in the
8  postage advance program.
9     Q. And a third instruction would say, forward X
10 percentage to Hanover Finance; is that right?
11    A. Yes.
12    Q. Okay. And then a fourth instruction was,
13 forward the remainder to the merchant? Was that -- did
14 Litle & Company ever --
15    A. It could be -- a fourth instruction could be,
16 pay my printer some amount. A fifth instruction might
17 be to send all the rest to the merchant.
18    Q. Did Litle & Company's computer system
19 distinguish between Litle & Company accounts and other
20 entities' accounts?
21    A. No.
22       MR. GRAY: May I please get --
23    Q. Before I go there, was anything confidential
24 about what we've been discussing today?
25    A. No. We were proud of it, actually.

Page 98

1    Q. I'm sorry?
2    A. We were proud of it. We didn't advertise it,
3 but we certainly told people about it. We knew the
4 catalog industry well, and it was a well-known program.
5    Q. Why didn't Litle & Company provide more
6 than -- more patent -- more postage advances than 20 or
7 30?
8    A. Well, at the time, as Larry said, it was
9 fundamentally my money, and I didn't -- and we were
10 trying to get a line of credit so that we could expand
11 the business. But the banking system was such that
12 they weren't lending any money to anybody in those
13 days.
14         MR. GRAY: Could I get Defense Exhibit 15,
15 please.
16    Q. Again, this is the memo we discussed earlier.
17         MR. GRAY: If I could get the second page
18 again, and call up the fourth paragraph.
19    Q. So, again, the last sentence of this paragraph
20 says, this percentage of sale deposits will be deducted
21 from the amount of money that would otherwise be
22 transferred to the member.
23         So the postage program was Litle &
24 Company's implementation of this concept discussed in
25 this memo; is that right?

Page 99

1    A. Yes.
2    Q. And then in conjunction with the postage
3 advance program, merchants sometimes had other
4 creditors which they wanted to be repaid out of card
5 transactions as well?
6    A. Yeah. And there were other programs that
7 weren't postage advance but they were other kinds of
8 creditors, yes.
9    Q. Approximately how many merchants instructed
10 Litle & Company to forward payments to accounts other
11 than their own prior to 1995?
12    A. Prior to 1995? I don't know. I'm guessing
13 20, 30, maybe.
14    Q. When you came up with the postage advance idea
15 in conjunction with Alan Abbott, did you guys think
16 that the payment method was unique at all?
17    A. No.
18    Q. Why not?
19    A. Because from my earliest exposure to the
20 credit card environment, when stuff was still paper,
21 merchants would take their paper to the local bank --
22 well, let me back up a second.
23         My first exposure ever to the credit card
24 system was probably in the late '60s when I was asked
25 to play a consulting role -- I don't remember the

Page 100

1 details -- but to a group that was helping figure out
2 how to form MasterCard. BankAmericard --
3 BankAmericard, done by Bank of America, was franchised
4 in every metropolitan city to one bank.
5         All the other banks wanted to get in on a
6 good thing, and that's where MasterCard came from, and
7 they were trying to figure out how to get -- how to get
8 going. And they were talking about the advantages and
9 how to -- how to get banks to join this new association
10 and what to do.
11         And one of the things they were talking
12 about is when they had -- when the local merchants took
13 paper slips to their local banks -- they were paper;
14 they weren't contemplating all the electronic stuff --
15 that the income stream from their credit cards would be
16 good collateral for the loans they gave their merchant,
17 and they -- that was, I remember, talked about as a
18 feature.
19         Now, I don't really remember what happened
20 to that, but I do remember that was the first time I --
21 it occurred to me that credit card proceeds would be
22 good collateral for loans. And it was in a different
23 time and a different environment.
24         But I looked at this as the same thing as
25 I had been exposed to in the late '60s.

Page 101

1    Q. So is it your understanding that splitting
2 this stream of payments to the merchant was not
3 invented in 1997?
4    A. Was not what?
5    Q. Was not invented in 1997.
6    A. No, I certainly didn't.
7    Q. And you mentioned that there were
8 approximately 20 to 30 merchants that instructed
9 Litle & Company to split the payment stream prior to
10 1995. About how much money did they receive in cash
11 advances?
12    A. Oh, I don't know. Probably $5 million. I'm
13 guessing. I don't really remember.
14    Q. And you were in the courtroom earlier when
15 Mr. Goldman described the repayment method of
16 AdvanceMe; is that right?
17    A. Yes.
18    Q. If Mr. Goldman had come to you and described
19 that repayment method in 1992 at Litle & Company, what
20 would Litle & Company have had to do to implement that
21 system?
22    A. Nothing. Nothing different, just enter the
23 parameters.
24         MR. GRAY: Nothing further, Your Honor.
25         THE COURT: Pass the witness? All right.

Page 102

1    Very well. We're -- as I explained
2 yesterday, we're going to recess this afternoon at
3 3:30. We'll reconvene tomorrow immediately after --
4 following the suppression hearing that starts at 9:30.
5 I don't know how long that will take. I would say
6 anywhere from an hour to two to three hours.
7    So will counsel just be on standby, ready
8 to start back as soon as we get through with that.
9    By way of time, Plaintiffs have expended
10 eight hours and 10 minutes, and Defendants have
11 expended five hours and 45 minutes.
12    We'll be in recess until tomorrow morning.
13    THE BAILIFF: All rise.
14    (Proceedings adjourned at 3:31 p.m.)

Page 103

1    CERTIFICATION
3    I HEREBY CERTIFY that the foregoing is a
4 true and correct transcript from the stenographic notes
5 of the proceedings in the above-entitled matter, to the
6 best of my ability.

THERESE J. CASTERLINE, CSR, RMR, CRR      Date
9 Official Court Reporter
State of Texas No.: 5001
10 Expiration Date: 12/31/07