# EXHIBIT B

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                        TYLER DIVISION

 3   ADVANCEME, INC.,              )
                                   )
 4   VS.                           )   Case No.:
                                   )6:05CV-424-LED-JDL
 5   RAPIDPAY, LLC, BUSINESS       )   Tyler, Texas
     CAPITAL CORPORATION, FIRST    )
 6   FUNDS, LLC, MERCHANT MONEY    )
     TREE, INC., REACH             )
 7   FINANCIAL, LLC AND FAST       )
     TRANSIT, INC. d/b/a SIMPLE    )   July 19, 2007
 8   CASH                          )   11:15 a.m.

 9                     TRANSCRIPT OF TRIAL
               BEFORE THE HONORABLE LEONARD DAVIS
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   FOR THE PLAINTIFF:      MR. RONALD S. LEMIEUX
                             MR. MICHAEL N. EDELMAN
13                           MR. VID BHAKAR
                             MR. ROBERT C. MATZ
14                           MS. SHANEE Y. WILLIAMS
                             Paul, Hastings, Janofsky &
15                           Walker, LLP
                             Five Palo Alto Square
16                           Sixth Floor
                             Palo Alto, CA 94306-2155
17
                             MR. OTIS W. CARROLL
18                           MS. DEBORAH RACE
                             Ireland, Carroll & Kelley, PC
19                           6101 South Broadway, Suite 500
                             Tyler, TX 75703
20
     APPEARANCES CONTINUED ON NEXT PAGE
21

22   COURT REPORTER:         MS. THERESE J. CASTERLINE,
                             CSR, RMR, CRR
23                           Deputy Official Court Reporter

24
     (Proceedings recorded by mechanical stenography,
25   transcript produced on CAT system.)
```

Page 30

1  are -- "including payment of postage advances."
2           And now, you're -- you're denying that
3  that's true, correct?
4     A. No, there's an error in what I said.
5     Q. Okay.
6     A. Because it -- because it doesn't follow --
7  what I said does not precisely follow what the
8  agreement was with them.
9     Q. I gotcha.
10          And so that testimony is wrong?
11    A. I can --
12    Q. Sir?
13    A. It's -- the testimony -- the testimony is
14 wrong in that I used some words that didn't match up
15 with the member agreement, so that -- in this case, I
16 used daily net proceeds incorrectly.
17    Q. The testimony is wrong because if it's right,
18 then you didn't forward the postage repayment, did you?
19    A. That's not why it's wrong.
20    Q. Well, look at your testimony. Your testimony
21 says, "forward the daily net proceeds less" -- "less,
22 minus" -- and you include in that minus the postage
23 advance, correct?
24    A. No. The way it actually works is --
25    Q. No, no. I understand your testimony in the

Page 31

1  trial. I'm talking about your sworn testimony in the
2  deposition, which you're now trying to change.
3     A. I'm not trying to change it. That's my
4  testimony. I just made a mistake, and if you would
5  like how it actually works, I will explain that.
6     Q. Okay. Now, how about this: Will you agree
7  that in connection with your postage advance financing,
8  that paying money to a third party was paying it to
9  Litle & Company?
10    A. Yes.
11    Q. And you testified to that. You said, paying
12 the money to a third party was paying it to us because
13 we advanced them the postage.
14          So you're standing by that testimony,
15 correct?
16    A. I'm standing by the other testimony, too,
17 except for the error in terminology.
18    Q. I gotcha.
19          And in that same transcript, you describe
20 the way the postage program worked by saying, "We'd" --
21 I guess that's Litle -- "collect a portion or keep a
22 portion of the proceeds that we would otherwise send
23 him until we recovered our initial postage amount."
24          Is that true?
25    A. Could you say that again?

Page 32

1     Q. Yeah. Better than that, I'll put it on the
2  machine.
3           There where I put it in -- in whatever you
4  call those -- carets, I guess, "We'd collect a portion
5  or we'd keep a portion of the records that we would
6  otherwise send him until we recovered our initial
7  postage amount."
8           True or false?
9     A. True.
10          MR. CARROLL: Pass the witness.
11          MR. GRAY: Do you mind if I keep that
12 testimony up there?
13          THE COURT: Redirect?
14          REDIRECT EXAMINATION
15 BY MR. GRAY:
16    Q. Good morning, Mr. Litle.
17    A. Good morning.
18    Q. You were asked to explain --
19          MR. GRAY: Otis, could I get the
20 testimony?
21          MR. CARROLL: Is that the wrong one?
22          MR. GRAY: Yeah.
23          THE COURT: I'd ask defense counsel if you
24 could provide me a copy of the documents that he
25 testified to that corroborates the AdvanceMe -- I mean,

Page 33

1  the postage advance and the Hanover Financing.
2           MR. GRAY: Yes, Your Honor. Do we have
3  those available right now?
4           MR. SCHUURMAN: Your Honor, will after
5  lunch be okay? Do you want them right now?
6           THE COURT: Well, if you have them handy.
7  Whenever you can get them to me.
8     Q. Sorry about that, Mr. Litle.
9           I would like to first put up this piece of
10 testimony that you were just testifying to.
11          And it said, "We'd collect a portion" --
12 or in the carets -- "We'd collect a portion or we'd
13 keep a portion." And you were asked a question about
14 that.
15          Can you please read the next question and
16 answer for me.
17    A. "You said you would keep a portion of the
18 credit card receivables?"
19          And the answer is "Yes."
20    Q. And then the next question and answer, please.
21    A. "Would you instruct FNBL to forward that
22 portion to Litle & Company?"
23          The answer is "yes."
24    Q. So did FNBL forward a portion of the credit
25 card payment to Litle & Company, as you testified at

Page 34

1  your deposition?
2      A.  Yes.
3      Q.  Could you explain how that process worked.
4      A.  Yes.  The -- all of the funds that came from
5  the card-issuing banks were accumulated -- or collected
6  at First National Bank of Louisville, and they were --
7  they were collected -- or they were put in what I
8  believe is -- was an operating account at First of
9  Louisville, a single account, where all the funds for
10 all of our merchants were aggregate and also all of our
11 fees were aggravated -- aggregated in there, fees that
12 other parts of network took or collected were taken --
13 were deducted before they got in the operating account.
14         So we had no money, the merchants had no
15 money, and all the money existed at First National Bank
16 of Louisville.
17         Our instructions that we prepared every
18 day were to forward those fees to the right places --
19 or, excuse me, forward those funds to the right places.
20         Those funds were forwarded to merchants --
21 well, let's take an example of 10 merchants.  Assuming
22 we had 10 merchants -- and there were lots more than
23 that, of course -- but the minimum number of ACH's or
24 funds transferred for 10 merchants, assuming at least
25 one of those merchants had a reserve, was 12.

Page 35

1          The net proceed -- one of those funds
2  transfers would be to us for our fees.
3      Q.  I'm sorry, what type of fees?
4      A.  The per-transaction fees that we charged our
5  merchants.
6      Q.  Would those be processing fees?
7      A.  Yes.  One of those transfers would be to
8  transfer the funds into or out of a reserve account
9  normally kept at First National Bank of Louisville, and
10 the other 10 transfers would be made to each of the
11 merchants.
12     Q.  So how would postage advance change that?
13     A.  Postage advance meant that if one of those
14 merchants had -- was participating in our postage
15 advance program, there would be a 13th funds transfer
16 that would be money that was -- would be forwarded to
17 our First National Bank of Boston account.
18     Q.  So wouldn't that just mean, then, that Litle &
19 Company was moving money from the right pocket to the
20 left pocket?
21     A.  No, not really, because we weren't moving
22 money from our fees, our normal fees to the postage
23 account; we were -- we weren't -- no, we weren't doing
24 that.  And that analogy wasn't right.
25     Q.  Did Litle & Company have any control over the

Page 36

1  funds at FNBL that was not expressly given to Litle &
2  Company by the merchant?
3      A.  No, we did not.  And FNBL owned the accounts.
4  What we did was gave any control, if you will -- we had
5  control in the sense that we provide instructions to
6  cause the funds transfer to go from FNBL to wherever
7  they went.  But we didn't have any legal control over
8  that account.  We didn't own it.  And we complied with
9  Visa and MasterCard rules to do that.
10     Q.  So is it correct to say that funds were
11 forwarded from a bank account at FNBL over which Litle
12 & Company had no legal control to a bank account over
13 which Litle & Company had absolute control?
14     A.  For --
15     Q.  For the postage advance?
16     A.  Yes, that's true.
17     Q.  And when you sold your -- when you sold Litle
18 & Company to Paymentech -- or to First USA -- sorry --
19 in 1995, Litle & Company was processing $40 billion in
20 transactions, right?
21     A.  I think so, around that, yeah.
22     Q.  Do you believe that the 50-plus pages of
23 documents from the early 1990s are sufficient to
24 corroborate the invention that Barbara Johnson
25 explained in one single phone call to a patent

Page 37

1  attorney?
2      A.  Yes, I do.
3      Q.  Have you ever forwarded money to a cash
4  advance company like Plaintiff's or Defendants'?  Or
5  has Litle & Company?
6      A.  Yes.
7      Q.  When was that?
8      A.  It was in the -- in that period of time, in
9  1990 -- in 1992.
10     Q.  And who was the cash advance company?
11     A.  Yes.
12     Q.  Who was?
13     A.  Who?
14     Q.  Who was the cash advance company to whom funds
15 were forwarded?
16     A.  Well, I know we did several.  One was a
17 company that financed inventories, primarily of
18 infomercial companies.  The infomercial companies would
19 sell stuff over the television.  They needed to pay for
20 their inventory.  There was a company that financed
21 their inventories.  I honestly don't remember what
22 their name was.
23         MR. LEMIEUX:  Your Honor, I'd object.
24 They're referring now again to the Bieler testimony.
25 It's prohibited from this trial.  They're just trying

Page 38

1  to back-door in by not using the name Bieler.
2     MR. GRAY: I don't believe that's what
3  he's testifying to.
4     Q. And, Mr. Litle, I apologize. I was asking a
5  cash advance company exactly like Plaintiff's or
6  Defendants', the new Litle & Company, have you done
7  that?
8     A. The new Litle & Company, no.
9     MR. LEMIEUX: The infomercial he's
10 referring to, Your Honor, is Bieler & Company. I move
11 to strike that testimony.
12    THE COURT: That objection is sustained.
13 Stricken.
14    THE WITNESS: That was not the company I
15 was talking about.
16    MR. GRAY: May I please get Defendants'
17 Exhibit 15.
18    THE WITNESS: Hm?
19    MR. GRAY: And, again, could I go to the
20 second page. This is a January 1990 interoffice memo
21 that we looked at yesterday.
22    Could you please pull up paragraph 4.
23    Q. And, again, this last sentence in this
24 paragraph, it says, this percentage of sale deposits --
25 which you testified yesterday were credit card

Page 39

1  transactions -- will be deducted from the amount of
2  money that would otherwise be transferred to the
3  member.
4     And I believe you testified that that
5  deduction -- that deducted amount would be forwarded
6  from FNBL to Litle & Company as repayment for the
7  postage advance; is that correct?
8     A. That's right. And Litle & Company was the
9  third party in that example.
10    Q. Do you believe that that -- that concept is
11 elegant in its simplicity, as Mr. Goldman testified
12 yesterday?
13    A. Yes, I do.
14    Q. I believe the other day you were in the
15 courtroom when Plaintiff's expert testified that
16 settlement of a transaction always requires payment to
17 the merchant. Do you remember that testimony?
18    A. Yes.
19    Q. Is that an accurate statement?
20    A. I don't think so.
21    Q. Why not?
22    A. Or it's not an accurate statement.
23    Settlement -- the definition of
24 settlement -- certainly the way the definition of
25 settlement that I have used, and everybody else in the

Page 40

1  payment-processing industry that I know uses, is the
2  settlement is finished when all of the merchant's
3  directions for a -- for a set of money have been
4  carried out.
5     Q. And do those instructions instruct the payment
6  processor to forward those funds to accounts other than
7  the merchants'?
8     A. Sure.
9     Q. And that would be settlement?
10    MR. LEMIEUX: Objection, Your Honor, to
11 the extent he's trying to elicit testimony contrary to
12 the Plaintiff's expert. I don't believe that he's
13 allowed to do so. He's not a designated expert in this
14 case, so he's not really allowed to comment on the
15 expert's opinion by replacing it with his own opinion.
16    MR. GRAY: Your Honor, Plaintiff's expert
17 testified that in the payment-processing industry, it's
18 inconceivable to believe that settlement does not
19 involve payment to the merchant. Mr. Litle can testify
20 that based on his experience in the payment-processing
21 industry, that that's not correct.
22    THE COURT: All right. The objection's
23 overruled.
24    Q. Thank you, Mr. Litle.
25    A. There are also other instances where funds are

Page 41

1  transferred to the merchant in the settlement process,
2  and that's when there are more refunds than there are
3  deposits. The merchant would not get any funds at all.
4     Q. And would that batch, then, still be settled?
5     A. That would be considered settled because it
6  was finished, yes.
7     Q. You were asked a few questions about this
8  testimony. I'll put it on the Elmo here.
9     MR. GRAY: If you could switch it over.
10    Q. You said that there was something in here that
11 was incorrect, I believe. Could you please explain the
12 question that Mr. Carroll was asking you. You
13 attempted to explain this testimony. I wasn't -- I
14 didn't quite follow it, though.
15    A. Yeah. What happens is when FNBL gets -- would
16 get the money from the Visa/MasterCard networks, that
17 money included some of the things that were listed here
18 that were basically above what we call net proceeds in
19 that diagram we had yesterday.
20    It was really more the gross proceeds that
21 came in from -- when I said forward the daily net
22 proceeds, I should have said forward the daily gross
23 proceeds. And the daily gross proceeds -- some of
24 those funds -- some of those were those defined terms
25 that led to the net proceeds prior to the merchant

Page 42

1 having discretion over instructing how they should be
2 settled.
3          Once those items that were above the net
4 proceeds were -- were -- were transferred, then -- and
5 you get to the net proceeds, the net proceeds are what
6 the merchant had discretion over and could instruct us
7 to do, or the merchant could say, in the case of
8 Hanover Direct, we will allow you, under certain
9 circumstances, to stand in our shoes and give similar
10 instructions to -- to Litle & Company to send the net
11 proceeds as -- however they wanted to send them.
12     Q. How large of a player is Paymentech in the
13 payment-processing industry?
14     A. Well, if I -- Paymentech, if you divided it in
15 two, then it would be the largest and the second
16 largest payment processor. It's the largest by far,
17 and they do somewhere between 6 and $700 billion a
18 year.
19     Q. And that was Litle & Company that changed its
20 name to Paymentech; is that correct?
21     A. That's right. But along the way, they bought
22 other places. The original Litle & Company is probably
23 140, $150 billion of that.
24     Q. And is Mike Duffy the current CEO of
25 Paymentech?

Page 43

1     A. Yes, he is.
2     Q. And you, personally, called him; is that
3 correct.
4     A. I called him. I don't remember reaching him
5 on the phone. I do remember leaving him a message to
6 please help out with the situation.
7     Q. And what did you say in that message?
8     A. Just about that, Mike, there's a situation
9 here which you might want to know about, and it's a
10 company that's -- there's a patent that claims that
11 they have the rights to do what we did back in the
12 early '90s at the old Litle & Company, and -- and I'm
13 sure there's documents around that might help the case;
14 could you help these guys when they call -- or
15 thereabouts, or something like that.
16     Q. And to your knowledge, did the CEO of the
17 biggest payment processor in the payment-processing
18 industry offer to provide these documents without a
19 subpoena?
20     A. Yes. Yes, he did. I mean, that's -- I assume
21 that's why the documents showed up and why he helped --
22 or he instructed somebody to help out.
23          MR. GRAY: Thank you. No further
24 questions, Your Honor.
25          THE COURT: Recross?

Page 44

1          MR. CARROLL: No, Your Honor.
2          THE COURT: All right. You may stand
3 down.
4          All right. Who will Defendants' next
5 witness be?
6          MR. GRAY: Your Honor, may Mr. Litle be
7 excused?
8          THE COURT: Any objection?
9          MR. CARROLL: No, Your Honor.
10         THE COURT: You may be excused, Mr. Litle.
11 Thank you.
12         Who will be your next witness?
13         MR. GRAY: Your Honor, we would like to
14 offer without playing Defendants' and Plaintiff's
15 deposition designations of two other witness that had
16 knowledge of the Litle & Company postage advance
17 program, if that's okay. And we -- both parties
18 understand that it will count against our time as well.
19         THE COURT: Who are those two witnesses?
20         MR. GRAY: The first is Alan Abbott, who
21 conceived of the postage advance program with
22 Mr. Litle. And the second is a man by the name of Jim
23 Alexander, who was a consultant that described the
24 postage advance program to catalog companies.
25         THE COURT: All right. And of those two

Page 45

1 witness, how much time is the Plaintiff's and how much
2 is the Defendants'?
3          MR. GRAY: Plaintiff's is 27 minutes, and
4 Defendants' is 26 minutes. And, Your Honor, the
5 exhibits for both of those -- any exhibits that are
6 referenced are also in what I'll hand the Court.
7          THE COURT: Ms. Ferguson, do you want
8 those marked as exhibits? Can you mark those as
9 exhibits?
10         MR. GRAY: They are marked as exhibits.
11         THE COURT: All right. What exhibit
12 numbers are they?
13         MR. GRAY: I'm sorry?
14         THE COURT: What exhibit numbers are they?
15         MR. GRAY: They are --
16         THE COURT: Talking about the summaries
17 and attachments -- not the summaries, but the
18 transcripts and the attachments.
19         MR. GRAY: Alan Abbott is Exhibit Number
20 427. And what we've done is, we marked the video
21 itself, the DVD, Exhibit Number 427-A.
22         THE COURT: Okay.
23         MR. GRAY: And the text transcript --
24 the -- on DVD is marked 427-D.
25         THE COURT: Okay.

12 (Pages 42 to 45)

Page 70

1  rest our case.
2           THE COURT: So we're looking at -- not
3  counting cross-examination five, six, seven more hours
4  of testimony; would that be a good estimate?
5           MR. GRAY: Yes, Your Honor, about five and
6  a half hours total.
7           THE COURT: Okay. And what about rebuttal
8  testimony? Do we anticipate witnesses on rebuttal?
9  And you may not know that yet, but to the extent you do
10 know, I'm trying to get an estimate.
11          MR. EDELMAN: Your Honor, we know we're
12 going to call Dr. Shamos in rebuttal. Beyond that, we
13 sort of have to see based on what comes out of the rest
14 of the case if there will be anybody else.
15          THE COURT: Very well. We're going to
16 break for lunch, and we will be in recess until 1:45.
17          THE BAILIFF: All rise.
18          (Recess 1:45-1:52 p.m.)
19
20
21
22
23
24
25

Page 71

1           CERTIFICATION
2
3      I HEREBY CERTIFY that the foregoing is a
4  true and correct transcript from the stenographic notes
5  of the proceedings in the above-entitled matter, to the
6  best of my ability.
7
8  _____    _____
   THERESE J. CASTERLINE, CSR, RMR, CRR    Date
9  Official Court Reporter
   State of Texas No.: 5001
10 Expiration Date: 12/31/07
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25