# EXHIBIT C

Dockets.Justia.com

Page 1

```
 1                   IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
 2                          TYLER DIVISION

 3     ADVANCEME, INC.,               )
                                      )
 4     VS.                            )         Case No.:
                                      ) 6:05CV-424-LED-JDL
 5     RAPIDPAY, LLC, BUSINESS        )      Tyler, Texas
       CAPITAL CORPORATION, FIRST )
 6     FUNDS, LLC, MERCHANT MONEY )
       TREE, INC., REACH             )
 7     FINANCIAL, LLC AND FAST       )
       TRANSIT, INC. d/b/a SIMPLE )  July 18, 2007
 8     CASH                          )      9:02 a.m.

 9                        TRANSCRIPT OF TRIAL
                   BEFORE THE HONORABLE LEONARD DAVIS
10                   UNITED STATES DISTRICT JUDGE

11     APPEARANCES:

12     FOR THE PLAINTIFF:      MR. RONALD S. LEMIEUX
                               MR. MICHAEL N. EDELMAN
13                             MR. VID BHAKAR
                               MR. ROBERT C. MATZ
14                             MS. SHANEE Y. WILLIAMS
                               Paul, Hastings, Janofsky &
15                             Walker, LLP
                               Five Palo Alto Square
16                             Sixth Floor
                               Palo Alto, CA 94306-2155
17
                               MR. OTIS W. CARROLL
18                             MS. DEBORAH RACE
                               Ireland, Carroll & Kelley, PC
19                             6101 South Broadway, Suite 500
                               Tyler, TX 75703
20
       APPEARANCES CONTINUED ON NEXT PAGE
21
22     COURT REPORTER:         MS. THERESE J. CASTERLINE,
                               CSR, RMR, CRR
23                             Deputy Official Court Reporter

24
       (Proceedings recorded by mechanical stenography,
25     transcript produced on CAT system.)
```

Page 82
1    THE WITNESS: No, I have not.
2         LAURENT BOUCHARD,
3  having been first duly sworn, testified as follows:
4         THE CLERK: Thank you.
5         THE WITNESS: Thank you.
6         DIRECT EXAMINATION
7  BY MR. BUSS:
8    Q. Mr. Bouchard, would you please state your name
9  for the record.
10   A. Yes. My legal name is Laurent, L-A-U-R-E-N-T,
11 Bouchard, B-O-U-C-H-A-R-D.
12        MR. BUSS: Your Honor, may I approach the
13 witness?
14        THE COURT: Yes, you may.
15   Q. Mr. Bouchard, I'm handing you what's been
16 marked as Plaintiff's Exhibit 50, which is your CV?
17   A. Yes.
18   Q. Mr. Bouchard, when did you first become
19 involved in the credit card processing industry?
20   A. In approximately 1971.
21   Q. Who did you work for at that time?
22   A. I worked for a regional bank in northern
23 Massachusetts called Essex Bank. That's E-S-S-E-X.
24   Q. How long did you work there?
25   A. Approximately seven years.

Page 83
1    Q. And what were your responsibilities there?
2    A. My responsibility there was to manage the
3  credit card issuing and merchant business that Essex
4  Bank had. It was a private credit card prior to the
5  evolution of MasterCard and Visa.
6    Q. Okay. What did you do after that?
7    A. After I left Essex Bank, I went to work for a
8  bank called Security National Bank, also in northern
9  Massachusetts, where I had the same functions.
10   Q. Okay. And then at some point, you joined
11 Litle & Company, correct?
12   A. Yes. In 1989, I went to work for Citizens
13 Fidelity Company, which was the -- one of the largest
14 processors in the United States at the time in
15 Louisville, Kentucky. I was vice president of
16 northeast sales for them.
17        They were acquired in, I believe, 1991 by
18 a bank in Sunrise, Florida. And I had the opportunity
19 at that time to work for a company in New Hampshire
20 called Litle & Company. And I went to work for Litle &
21 Company early in 1992.
22   Q. At the time you joined Litle & Company, what
23 was the business of Litle & Company?
24   A. Litle & Company was in the business of
25 processing credit card transactions for the -- what's

Page 84
1  generally known as the card-not-present industry,
2  primarily catalogs, Internet merchants.
3    Q. And you said card-not-present. Can you
4  explain what card-not-present is?
5    A. Card-not-present, it's an industry term used
6  to identify merchants who accept credit cards for
7  payment, but the consumer and the physical card is not
8  present at the merchant location.
9    Q. So it's like if I'm ordering something over
10 the telephone, then --
11   A. Right.
12   Q. -- and I give my credit card to that person?
13   A. If you're ordering over the telephone, you're
14 giving your credit card information. If you're
15 ordering it over the Internet, you are keying in your
16 credit card information. Or if you are filling out a
17 catalog order form, you may be writing your credit card
18 information on that catalog order form and mailing it
19 in.
20   Q. So your business was primarily
21 credit-card-not-present transactions. Were some of the
22 merchants that you processed for, did they also do
23 card-present transactions and where there is a -- what
24 we've termed as a POS device, point-of-sale device?
25   A. Yes, definitely there are many merchants in

Page 85
1  the card-not-present business who have retail
2  locations, and we processed merchants such as
3  Brookstones, which had a major catalog but also had
4  many retail locations. A lot of catalog merchants have
5  outlets where they sell product that hasn't sold from
6  the catalog.
7        So, yes, we did process transactions that
8  were originated in a card-swipe environment through
9  standard industry credit card processing terminals.
10   Q. Okay. Did Litle & Company enter into
11 agreements with the merchants that it processed their
12 transactions for?
13   A. Yes, there was member agreements signed by all
14 merchants.
15   Q. I'm handing you what's been marked Plaintiff's
16 Exhibit 51. If you would take a look at that.
17        Is that a copy of the member agreement
18 that you just spoke of?
19   A. Yes, it is. It's a standard member agreement,
20 process agreement, that Litle & Company entered into
21 between itself and the customer or the merchant.
22   Q. Okay. Now, Mr. Bouchard, I would like for you
23 to describe how a merchant's credit/debit and charge
24 cards were processed according to this member
25 agreement.

22 (Pages 82 to 85)

Page 86

1          MR. BUSS:  And, Your Honor, may the
2  witness step down?  I think he would like to draw a
3  diagram on this board here.
4          THE COURT:  Yes, that would be fine.
5       A.  I don't profess to be an artist, so please
6  bear with me.  I want to make sure -- if I stand here,
7  is that all right?
8          MR. BUSS:  Is that all right?
9       A.  It's obvious, I guess, that the business
10  starts here with the merchant.  The merchant accepts
11  credit cards, as I said, either over the phone, over
12  the Internet, or if it's a retail facility, by a
13  customer walking in and presenting a credit card for
14  payment.
15          At that point, the merchant delivers that
16  credit card information to -- I'm going to try and make
17  this very simple -- what I like to call the processing
18  cloud.  And the reason I would say that it's a
19  processing cloud is because within this processing
20  environment, there are multiple functions that occur,
21  and I think -- at least my two days here in Tyler, I
22  heard in the courtroom some of those, such as
23  authorization, I think draft gap were used,
24  settlement -- all of those processing functions, in my
25  opinion, occur within this cloud.  It can be complex;

Page 87

1  it can be not complex.  But within the cloud and within
2  these functions, there can be multiple entities.  Each
3  entity can do one function; some entities can do
4  multiple functions.
5          The net result of all of this processing
6  that goes -- that takes place is at the end of the day,
7  there is a calculation that is the result of this
8  called net proceeds.  And in the simplest terms, these
9  net proceeds is the amount of funds due and, in fact,
10  owned by the merchant.
11          And I believe in the member agreement --
12  this member agreement from Litle -- there is a
13  definition of net proceeds.
14          MR. BUSS:  Let me call that up, Your
15  Honor.
16          MR. LEMIEUX:  Your Honor, I would like to
17  object and have this testimony struck.  This witness is
18  testifying in his opinion.  He's not designated as an
19  expert in this case.  He's not rendered an opinion in
20  this case.  He's provided no report, so I don't believe
21  he's entitled to render any kind of opinion evidence
22  here.
23          MR. BUSS:  I don't believe he's testifying
24  as to his opinion, Your Honor.  This is the way the
25  Litle system operated, according to the member

Page 88

1  agreement.
2          THE COURT:  What question specifically are
3  you objecting to?
4          MR. LEMIEUX:  Well, I'm just looking at
5  his testimony here, Your Honor.  And it specifically
6  states here in the transcript -- it says, in my
7  opinion, this is how it all works, and that's how he's
8  prefaced the testimony that he's provided here.
9          THE COURT:  All right.  Then if you've not
10  been designated as a witness, you cannot express any
11  opinion, just testify as to facts that you know.
12          THE WITNESS:  I'm sorry.  It was my use of
13  the word.
14       Q.  Is that how --
15       A.  This is the way they operated at Litle &
16  Company.  The end result is that all of the processing
17  of the transaction resulted in a calculation called net
18  proceeds, which was the amount of funds due and owned
19  by the merchant.
20          MR. BUSS:  Can we call up page 2 of
21  Plaintiff's Exhibit 51 of the net proceeds.
22          THE WITNESS:  May I refer to the document?
23       Q.  Sure.  Can you explain to me how you would
24  arrive at the net proceeds in -- when Litle & Company
25  would process its transactions for merchants?

Page 89

1       A.  Yes.  The net proceeds, as the definition
2  states, start with the gross proceeds.  The gross
3  proceeds are the total amount of the sales, less any
4  refund sales.  And there is a definition for gross
5  proceeds in this document.  It's slightly higher up on
6  the page.
7          So the gross proceeds are the total sales
8  the merchant did, less the total refunds that the
9  merchant issued to any consumers.  That's the gross
10  proceeds.  From the gross proceeds within the
11  processing, the fees -- what's called in this agreement
12  the Litle fees are subtracted from those.  The Litle
13  fees are the fees that the merchant has agreed to pay
14  Litle for the processing of these transactions.
15       Q.  Can I just stop you one second there.  The
16  agrees that -- the fees that they agree to pay Litle,
17  were other folks also charging fees in this processing
18  environment?
19       A.  Yes.  In this environment at Litle, there were
20  other entities that Litle was dependent on for certain
21  services that were charging Litle fees for those
22  services.  Yes.
23       Q.  And one of those was First National Bank of
24  Louisville, correct?
25       A.  Correct, one was First National Bank of

23 (Pages 86 to 89)

Page 90

1  Louisville.
2       Q. And one was --
3       A. One was --
4            THE COURT: Y'all need to slow down and
5  not talk over each other.
6            THE WITNESS: I'm sorry.
7       Q. And they -- and they've charged a fee; is that
8  correct?
9       A. That is correct.
10           THE COURT: Restate the names of those two
11  banks so the court reporter can get it down, if you
12  would, please.
13      Q. Go ahead.
14      A. First National Bank of Louisville and National
15  Processing Company.
16           THE COURT: All right.
17      Q. Okay. Continue on. Net proceeds?
18      A. The other -- the other potential amount that
19  would have been subtracted from the gross proceeds to
20  calculate out the net proceeds was -- is release
21  chargebacks, and the chargebacks is a mechanism within
22  the credit card environment where a consumer can
23  dispute a sale that appears on his personal credit card
24  statement. The issuing bank, a bank where the consumer
25  has his credit card, reverses that transaction off of

Page 91

1  the consumer's account. It goes back to the processing
2  system, back to the processor, and the processor, in
3  accordance -- or Litle & Company, in accordance with
4  this definition, debits the merchant for that
5  charged-back item.
6            The next amount that would be -- could
7  have been deducted would be less any other amounts due
8  from member, which was the merchant, to Litle.
9            And lastly, any prepayments.
10      Q. Okay.
11      A. So the result of that calculation results in
12  the defined term net proceeds.
13      Q. Does the member agreement specify what Litle &
14  Company can do with those net proceeds?
15      A. Yes, it does.
16      Q. What can Litle & Company do with those net
17  proceeds pursuant to member agreement?
18      A. Pursuant to the member agreement, which is in
19  compliance of MasterCard and Visa relations -- as I
20  said, these net proceeds are now funds due and owing by
21  the merchant -- Litle & Company is obligated to
22  distribute those net proceeds in a manner so instructed
23  by the merchant. And I believe there was language in
24  this agreement -- it is on the next page.
25      Q. Okay. Are there instances in the Litle &

Page 92

1  Company -- 1990s when Litle & Company was operating --
2  where the merchant directed you to send funds somewhere
3  other than to the merchant?
4       A. Yes.
5       Q. Can you describe those instances.
6       A. Yes. Again, we are obligated to move the net
7  proceeds to the merchant as directed by the merchant.
8  From time to time --
9            THE COURT: What -- where is that language
10  you were referring to on --
11           THE WITNESS: I'm sorry, Your Honor. It's
12  on the next page. I don't know if I can read it.
13           MR. BUSS: We'll call it the 3c1 on  page
14  3, Exhibit 51. There, yeah.
15           THE WITNESS: It's 3d1.
16           THE COURT: So it's -- the agreement is to
17  transfer an amount equal to net proceeds to the
18  member's bank account as designated from time to time
19  by the member in writing?
20           THE WITNESS: Correct, right.
21           THE COURT: Okay.
22      Q. Can you describe, again, when -- in those
23  instances where Litle forwarded funds to somewhere
24  other than the merchant?
25      A. Yes. There were -- the system, as it was

Page 93

1  designed and developed, had the capability of creating
2  multiple transfers of net proceeds based on algorithms
3  that would be input into the system at the time the
4  merchant initiated doing business or anytime after the
5  initial initiation of business as designated by the
6  merchant when he chose to have his funds directed
7  elsewhere.
8            There were instances that I am familiar
9  with where merchants directed us to move funds, either
10  as a whole or a percentage or a fixed amount, to what I
11  would classify as third parties.
12           One of those arrangements was a standard
13  practice that we provided called postage financing.
14           THE COURT: I'm sorry, called what?
15           THE WITNESS: Postage financing.
16      A. The others that I am familiar with I would
17  classify as third-party creditors or third-party
18  service providers. One that I am aware of is a company
19  called Hanover Finance that did financing -- or
20  provided financing to merchants in this business.
21           Another one was a company called -- I
22  apologize. I'm not sure I remember the exact name of
23  the company. It was managed by a gentleman by the name
24  of Peter Bieler -- I think it was Bieler Martin &
25  Company, but I'm not sure that was the exact name of

Page 94

1  his company.
2           MR. LEMIEUX: Objection, Your Honor. The
3  witness just referred to testimony that the pretrial
4  hearing specifically excluded in this case.
5           THE COURT: Is that correct?
6           MR. BUSS: My understanding was that
7  Mr. Bieler himself would not testify, nor his documents
8  be introduced, but that other witnesses could speak to
9  their knowledge of who they dealt with at the third
10  parties. If that's not correct, we can strike that
11  testimony out.
12          THE COURT: Objection, sustained. The
13  testimony is stricken.
14      A. There were two that I was aware of, one is
15  postage financing; one was Hanover Financing, during
16  the four years I was at Litle & Company.
17      Q. Can you draw those on the diagram there where
18  they would be.
19      A. Sure. Again, the system had the capability of
20  doing multiple transfers, as directed by the merchant.
21  These transfers and the algorithms applied to the net
22  proceeds could be based on a percentage or a fixed
23  dollar amount, meaning a merchant could say, I want
24  10 percent of my net proceeds every day to go to
25  Hanover Finance or I want $100 every day to go to

Page 95

1  Hanover Finance, and I want the remainder to come to my
2  bank account or a bank account that I've designated.
3           So if those algorithms -- or if those
4  instructions are in place when the net proceeds were
5  calculated, a set of ACH instructions would have taken
6  place that would have said, send, based on the
7  merchant's instructions, X dollars to this bank
8  account, as directed by the merchant, which might be
9  owned by Hanover Finance, and send the other
10  calculation to this bank account, which is owned by the
11  merchant.
12      Q. And in that instance, the bank account where
13  Hanover Finance is located, that's not inside this
14  cloud, then?
15      A. No, this -- these entities are simply bank
16  accounts that have no correlation in reality to the
17  processing mechanism going on in this activity to
18  process the actual transactions.
19      Q. Okay. Can you draw on the other side here,
20  for instance, where -- describe the postage advance
21  situation where that would happen there.
22      A. The postage -- do you want me to describe what
23  a postage advance was or just the funding of it?
24      Q. Just the funding of it. We'll get into what
25  it was in a second.

Page 96

1      A. In the postage funding scenario, there was ACH
2  instructions that sent -- just like any of our normal
3  ACH instructions -- that sent the money to an account
4  owned by Litle, because Litle was the advancer of the
5  funds, to a bank account at Bank of Boston -- was the
6  bank -- where the receivables were established and
7  where the funds were sent to offset the receivable.
8      Q. And so the Bank of Boston was not in this
9  processing cloud, then, either?
10      A. No. The Bank of Boston was outside of the
11  cloud. It was a complete separation between the
12  processing that we were performing and this postage
13  financing arrangement.
14      Q. Okay. If you would, I think, take your seat,
15  and maybe we'll go through some of the documents that
16  describe the first postage advance program.
17          I hand you what's been marked as
18  Plaintiff's Exhibit 16 through -- yes, 16 through 19.
19  They're Defendants' exhibits, sorry.
20          Can you describe for me what those are?
21      A. They are various promissory notes and
22  agreements representing the agreement between Litle
23  and -- excuse me -- a merchant who has obtained a
24  postage finance or postage advance.
25          MR. BUSS: Can I get Exhibit 16 on the

Page 97

1  screen, please.
2      Q. You see there at the top it says,
3  Schedule E-1?
4      A. Correct.
5          THE COURT: Excuse me. Can you explain to
6  me what you're referring to when you're talking about
7  this postage advance or postage finance? What is that?
8          THE WITNESS: Well, in the normal course
9  of business, Your Honor, for a catalog, one of the
10  catalog's largest expense is the actual mailing of the
11  catalog, the postage involved in mailing the catalog.
12          The cataloger doesn't realize any revenue
13  or sales from the catalog, obviously, until the catalog
14  is out in the consumer's hands and the consumer can
15  purchase from the catalog.
16          So the cash flow for a cataloger typically
17  is extremely high, beginning somewheres around two
18  weeks after the catalog is mailed. And then over the
19  next two to three months, it drops off because people
20  don't keep catalogs around. Once they order, they
21  typically don't order again until there's another
22  catalog.
23          So I believe in -- I believe there was a
24  cataloger that initiated this by coming to Mr. Litle
25  and suggesting that one of the issues that he had as a

25 (Pages 94 to 97)

Page 98

1  cataloger, because of the nature of the fluctuation in
2  sales, was when he got to the end of the sales cycle of
3  a catalog, he had little cash left to fund the mailing
4  of a new catalog.
5      So postage financing was a means of
6  providing the merchant with funds to mail out the next
7  catalog and, therefore, initiate new sales.
8
9      THE COURT:  So you were sort of like
10 payroll deduction, putting it in a savings account for
11 the catalog?
12     THE WITNESS:  In reality, Your Honor, we
13 sent -- the financing on postage financing was paid
14 directly to the US Postmaster, because that provided us
15 the guarantee that it wasn't money that the merchant
16 was going to take and misuse; it was money given to the
17 post office to assure us that the catalogs would, in
18 fact, be mailed because the repayment for the postage
19 finance arrangements was based on the future sales
20 resulting from the catalog.
21     THE COURT:  So who had control of the --
22 of the postage account, the catalog company or Litle?
23     THE WITNESS:  I'm not sure, Your Honor,
24 what you mean by the postage account.  The funds were
25 sent from Litle to the specific postmaster where the

Page 99

1  catalog was going to be drop-shipped from, or shipped
2  from.
3      THE COURT:  Okay.  And this was at the
4  request of the catalog company?
5      THE WITNESS:  Yes.  Yes.
6      THE COURT:  And so they were, in essence,
7  prepaying postage to the US Postmaster for their next
8  catalog mailing?
9      THE WITNESS:  Correct.
10     THE COURT:  All right.
11  Q.  And that postage advance resulted in this
12 agreement, which was an agreement between Litle &
13 Company and the merchant, on behalf of which you
14 advanced those funds, correct?
15  A.  Correct.
16  Q.  How much was typically at the time for payment
17 to the postmaster that you would advance these funds
18 for the merchants?
19  A.  Typically, it was somewheres in the vicinity
20 between 100,000 and probably 200,000, 250,000,
21 depending on the size of the merchant and how many
22 catalogs they were mailing.
23  Q.  Okay.  And in this instance, you can tell
24 it's -- it was about 170,000; is that correct?
25  A.  That's correct.

Page 100

1   Q.  If you would look at the first full paragraph
2  there of that agreement.  And it says -- toward the
3  middle there, it says, member agrees -- the third line
4  towards the right -- member agrees that, (i), the
5  principal amount of the advance plus accrued interest
6  at 10 percent less prior payments shall be paid in full
7  on or before September 10th, 1990, and the daily
8  repayments shall be deducted from daily net proceeds.
9   A.  That's correct.
10  Q.  What's that referring to?
11  A.  That's referring to the repayment of the
12 postage.  There was a daily repayment amount.  However,
13 there was a final payment due -- or I should say, if
14 there wasn't a final payment due, it would be required
15 by the merchant to pay it no later than September 10th,
16 and the (ii), the daily repayment shall be deducted
17 from daily net proceeds, goes back to what I was
18 describing up there, that these funds did not -- were
19 not deducted in the calculation of net proceeds in the
20 cloud; they were transferred -- again, at the request
21 of the merchant by signing this document -- from the
22 net proceeds.
23     THE COURT:  Let me ask a question.  I'm
24 not sure I'm understanding.
25     Are you talking about this money that gets

Page 101

1  paid to the postmaster in Atlanta, Georgia, is that a
2  splitting of sales, or is this money advanced by Litle
3  to the postmaster to be repaid by a splitting of -- of
4  the -- of the sales proceeds?
5      THE WITNESS:  It is an amount of money,
6  Your Honor, advanced on behalf of the merchant to the
7  postmaster to be repaid from the splitting of future
8  sales.
9      THE COURT:  It would be repaid to whom?
10     THE WITNESS:  Repaid to Litle.
11     THE COURT:  Okay.  So, in other words,
12 Litle would send $10,000 to the postmaster for --
13 for -- to pay the postage on the catalog, but then you
14 would be repaid out of the proceeds of the credit card
15 sales?
16     THE WITNESS:  Correct.
17     THE COURT:  I understood you before to say
18 that it was an accumulation or a savings account where
19 the catalog company was prepaying postage, but actually
20 what you're saying is Litle was prepaying the postage,
21 and then the credit card company -- I mean, the
22 merchant was -- the catalog company was paying Litle
23 back.
24     THE WITNESS:  That's correct.  I'm sorry
25 for the confusion, Your Honor.

26 (Pages 98 to 101)

Page 102

1    Q. Can you run through how Litle would have been
2  repaid back.
3    A. Litle would have been repaid back -- or Litle
4  was repaid back by the collection from the net proceeds
5  on a daily basis based on either one of two mechanisms:
6  a fixed payment amount or a predetermined fixed payment
7  schedule.
8    Q. So if we look back at this diagram, the funds
9  would come in to this net proceeds, right?
10    A. Right.
11    Q. And then from the net proceeds this -- what's
12  referred to as a daily repayment would be repaid to
13  Litle from the Boston account?
14    A. Right.
15    Q. And then the remainder would be sent back to
16  the merchant's bank account, right?
17    A. Correct, to the merchant's bank account.
18    THE COURT: And would that money -- which
19  category of net proceeds would that deduction be based
20  on? Would that be considered Litle fees or repayments
21  or other charges or what?
22    THE WITNESS: That -- the deduction for
23  the re-collection of the postage finance would have
24  occurred or did occur after the net proceeds
25  calculation.

Page 103

1    THE COURT: So it would be an additional
2  step that would -- would -- would come out of the net
3  proceeds --
4    THE WITNESS: Correct.
5    THE COURT: -- as you defined it? All
6  right.
7    Q. So what would Litle do with the money once it
8  received its daily payment from the net proceeds?
9    A. It would offset the obligation of the merchant
10  by the amount of that daily payment.
11    MR. BUSS: Can we just go to the daily
12  payment amount here on this document. It's the fourth
13  line -- fifth line at the top.
14    Q. It says the daily repayment amount is
15  $4,311.47, correct?
16    A. Correct.
17    Q. Would you take a look at Exhibit 18 and tell
18  me what that is.
19    A. It's a demand promissory note for postage
20  advances.
21    Q. And would Litle have been repaid exactly
22  according to what you previously described?
23    A. Yes.
24    Q. So, again --
25    A. The same process.

Page 104

1    Q. -- Litle would advance funds to the postmaster
2  General on behalf of the merchant and get repaid out of
3  net proceeds by taking a daily repayment amount?
4    A. That's correct. In this advance, we advanced
5  168,000, and the repayment was a daily amount of
6  $4,412.50.
7    Q. And then after Litle was forwarded the daily
8  repayment, the remainder would have gone back to the
9  merchant, just like before?
10    A. Correct.
11    MR. BUSS: Okay. I would like to
12  introduce the next set of exhibits, which is
13  Defendants' Exhibits 21 through 23.
14    Q. Can you tell me what that collection of
15  exhibits is.
16    A. These are, again, promissory notes and
17  agreements for postage finance.
18    Q. Okay. The first set of agreements was with
19  the merchant Exposures, correct?
20    A. That is correct.
21    Q. And the second set of agreements is with the
22  merchant Museum Publications of America?
23    A. That is correct.
24    Q. And if you look at the member agreement that
25  you have, is Museum Publications of America, that's

Page 105

1  their member agreement as well?
2    A. Yes, it is.
3    Q. So would Litle have been repaid exactly as you
4  described before, according to these postage advance
5  agreements as well?
6    A. Yes.
7    Q. Were any of the aspects of the postage advance
8  program confidential?
9    A. The only aspects of the program -- I'm sorry,
10  can you ask the question again?
11    Q. Were any of the aspects of the program that
12  we've been talking about here confidential?
13    A. No.
14    Q. So the fact that Litle was giving postage
15  advances to merchants wasn't confidential?
16    A. No.
17    Q. The fact that there was this entity processing
18  the payments on behalf of the merchant wasn't
19  confidential?
20    A. Absolutely not.
21    Q. And the fact that Litle was being sent a
22  portion of the payments wasn't confidential, out of net
23  proceeds?
24    A. Correct, it was not confidential.
25    Q. And the fact that the rest of it was going

27 (Pages 102 to 105)

Page 106

1    back to the merchant wouldn't have been confidential?
2        A. No.
3        Q. Did you -- did Litle require that the
4    merchants that it signed contracts with enter into
5    confidentiality agreements?
6        A. I believe there's a confidentiality section in
7    the member agreement that pertains primarily to -- as
8    required by MasterCard and Visa confidential -- what
9    you would consider confidential credit card information
10    or personal information on the consumer.
11        Q. The net confidentiality provision wouldn't
12    have covered any of the high-level details of the
13    postage advance program, though, would it?
14        A. No, it would not.
15            MR. BUSS: I would like to introduce the
16    next exhibit, which is Plaintiff's Exhibit 13.
17            Can I get page 3 of this.
18        Q. Well, can you tell me what this is, first.
19        A. Well, this is the -- appears to be a reprint
20    of a magazine article from June of 1992, Forbes
21    Magazine.
22            MR. BUSS: You've got the wrong exhibit on
23    the screen there. Defendants' Exhibit 13.
24        Q. And, I'm sorry, you said this was what?
25        A. It appears to be a reprint of a magazine

Page 107

1    article from the June 8th, 1992 edition of Forbes.
2            MR. BUSS: Okay. Can we go to the third
3    page of this document, call up the first full
4    paragraph.
5        Q. It says, finding capital remained a problem,
6    but Bourne was innovative. Postage was his largest
7    expense, and in 1989, when he needed money, he turned
8    to his credit card processor, a New Hampshire-based
9    company called Litle & Company. Litle agreed to
10    finance his postage by discounting his credit card
11    receivables. It was such a good idea, other catalogers
12    have followed suit.
13            Who's Randy Bourne that's referred to
14    there?
15        A. Randy Bourne was -- I believe he was the
16    founder and president of this -- of a merchant -- of
17    this merchant Exposures.
18        Q. And Exposures is one of the first agreements
19    that we looked at --
20        A. Correct.
21        Q. -- the postage advance agreements?
22        A. Correct.
23        Q. So does this describe the postage advance
24    program?
25        A. It -- it describes the concept of the postage

Page 108

1    advance program, yes.
2        Q. When this was published, did you ever contact
3    Randy Bourne and tell him that he had disclosed any
4    confidential information of Litle & Company?
5        A. No.
6        Q. Now, I would like to discuss the other
7    arrangement where you talked about the Hanover Finance
8    arrangement, and I would like to introduce Plaintiff's
9    Exhibit 53.
10            Can you tell me what this is.
11        A. Yes, this is a letter from Boston Publishing,
12    from Robert George of Boston Publishing, the president,
13    to Michael Duffy, who was vice president of Litle &
14    Company at the time, describing an arrangement or a
15    financing arrangement that he had reached with Hanover
16    Finance Corporation in providing us with instructions
17    on how he wanted his net proceeds to be managed.
18        Q. Okay. And that's the second instance where
19    you talked about it here on the board, correct?
20        A. Correct.
21        Q. Can we take a look at page 2, paragraph 2, of
22    that agreement.
23            It says, Hanover Finance acknowledges that
24    its security interest in the rights of the borrower to
25    payment pursuant to this agreement is subject to your

Page 109

1    rights to offset certain amounts or fees and other
2    amounts due to you under the agreement to the extent
3    provided therein and is further subject to the rights
4    of Litle & Company to payment under a demand promissory
5    note dated January 21st, 1994, the principal amount of
6    which is $179,220.28. And then it refers to a second
7    promissory note.
8            Are those the two promissory notes that
9    are in Defendants' Exhibits 22 and 23?
10        A. Yes, they are. That refers to the two
11    promissory notes for the postage finance advances.
12        Q. So those are two previous postage advance
13    agreements that Litle had with this same merchant?
14        A. Correct.
15        Q. How would Hanover Finance have been repaid
16    according to the terms of this agreement as well as the
17    terms of the member agreement?
18        A. In this scenario, again, we would have
19    calculated the net proceeds, and there would have been
20    three sets of instructions. One would have been the
21    repayment of the first promissory note. Whatever the
22    daily repayment schedule was would have created an ACH
23    to the Bank of Boston for that amount.
24            The second set of instructions would have
25    been to ACH the daily repayment off of the second

Sunbelt Reporting & Litigation Services
Houston  Austin  Corpus Christi  Dallas/Fort Worth  East Texas

Page 110

1  promissory note to the Bank of Boston, again, to -- to
2  reduce the obligation of Museum Publications for the
3  two postage finances.
4          And the third transfer would have been,
5  according to the terms of the agreement between Hanover
6  Finance and Boston Publishing, the transfer of funds to
7  Hanover Finance's account.
8      Q. Okay. So according to that, then, out of the
9  net proceeds, first, the -- there would have been a
10  daily amount gone to Litle & Company for the first
11  postage advance that we talked about?
12     A. Correct.
13     Q. Then there would have been a second amount
14  taken out and sent to Litle & Company for the second
15  postage advance?
16     A. Correct.
17     Q. And then there would have been a third amount
18  taken out, and that would have been the remainder going
19  to Hanover Finance?
20     A. Hanover Finance, correct.
21     Q. And in this instance, was there anything sent
22  back to the merchant?
23     A. I don't -- looking at these documents, I don't
24  believe so.
25     Q. Would it have been easy for you to send

Page 111

1  something back to the merchant if the merchant had
2  requested it?
3      A. Yes. It would have just been another
4  instruction. This is another transfer instruction.
5          THE COURT: And excuse me. I may have
6  missed this. But why were you sending money to Hanover
7  Finance? What was their role in this?
8          THE WITNESS: Hanover Finance was a
9  third-party finance company that was entering into an
10  arrangement with this merchant to provide working
11  capital for the merchant, and therefore the merchant
12  instructed us to send credit card proceeds to Hanover
13  Finance.
14          THE COURT: So for this customer, in
15  addition to the -- to the postage, you were also paying
16  his note that the -- for working capital?
17          THE WITNESS: Yes.
18     Q. Was Litle & Company's capability of forwarding
19  payments to third-party creditors like Hanover Finance
20  considered to be confidential by Litle?
21     A. No.
22     Q. Now I would like to go through this diagram
23  just a little bit more, and maybe you can describe some
24  of the equipment that used -- that was used at the
25  merchant in these processing entities. I'll run

Page 112

1  through that with you real quickly.
2      A. Sure.
3      Q. To start the process, a merchant would accept
4  a card from a customer, correct?
5      A. That's correct.
6      Q. What type of equipment would be used to accept
7  the card?
8      A. If it was at the merchant's retail location,
9  it would have been one of the myriad of point-of-sale
10  terminals available in the marketplace that would take
11  card swipes.
12          If it was an Internet merchant or a
13  catalog merchant, they would have either used software
14  that they developed themselves to key and capture the
15  credit card information, or they would have purchased
16  software from some of the many software agencies or
17  software companies that provide software that do that.
18     Q. Okay. And then once the card was -- number
19  was entered, what would happen to the information?
20     A. The information would be -- would have been
21  transmitted to the cloud, to us at Litle & Company.
22     Q. And would it have been transmitted
23  electronically?
24     A. Yes.
25     Q. Using modems?

Page 113

1      A. In some cases using modems in the
2  point-of-sale environment. Retail -- I guess it's a
3  safe assumption that the terminal itself has a modem
4  built into it.
5          In -- in larger merchants that had direct
6  connections to us at Litle, they wouldn't have
7  specifically used a modem. They would have used a
8  device called a router. And that's because when you
9  have a point-to-point connection, you don't need to
10  dial. It's similar to having a string between two
11  cans. It goes to the other can; you don't need to dial
12  up.
13     Q. Okay. And then what equipment would have been
14  used to receive the information on the other end in the
15  processing cloud?
16     A. Again, Litle would have -- would have had a
17  comparable router, if it was that type of scenario, or
18  comparable modem to receive the information. It would
19  have been imported into Litle's data-processing
20  hardware, which in those days was Stratus computers.
21     Q. And what would happen next after Litle
22  received the information?
23     A. In the typical environment or the standard
24  environment, the transactions are formatted in a
25  standard industry format. They would have been sent

29 (Pages 110 to 113)

Page 114

1  out initially to obtain an authorization. That's the
2  scenario that validates whether the credit card is good
3  and whether the credit card -- or the consumer has
4  sufficient funds available on the credit card to make
5  the purchase.
6          That information would be routed back to
7  the merchant, the results of the authorization, and
8  then the merchant would typically at some point later
9  in the day send a batch file of all the transactions
10  that he wanted to be paid for.
11          And those would come typically over the
12  same connectivity in the same system. They would be,
13  again, put in standard industry file formats. They
14  would be forwarded to MasterCard and Visa to obtain --
15  so that the transaction can flow through to the
16  cardholder and Litle & Company can be paid from
17  MasterCard and Visa, or the processing card can be paid
18  from MasterCard and Visa. And in conjunction with
19  that, the processing that created the net proceeds
20  would have taken place.
21      Q. What type of equipment was used in this
22  authorization and batching-out or settlement process?
23      A. In both processes -- again, internally at
24  Litle, we used Stratus computers, but like everybody
25  else in the industry, the connectivity between the

Page 115

1  processor and MasterCard and Visa is standard industry
2  hardware and software that is provided by MasterCard
3  and Visa.
4          I apologize. I don't know the technical
5  brand names they use. MasterCard employs a -- a MIP,
6  which is a MasterCard interface port, and it's -- I
7  believe it's some sort of server or PC device. Again,
8  it's standard within the industry.
9          And Visa deploys a VAP, which is a Visa
10  access point, which, again, is a piece of proprietary
11  hardware -- I'm not sure how it's proprietary, but the
12  software is proprietary. It's delivered by Visa. It's
13  brought to the site. They install it. And the Litle &
14  Company computers will have been connected to it.
15      Q. You said all this equipment was well known in
16  the industry as standard equipment, right?
17      A. Yes. Yes.
18      Q. What about the forwarding of payments to the
19  various creditors and merchants? What type of
20  equipment was used to do that?
21      A. I think it was -- well, again, it was -- it
22  was driven off of the Stratus computer. We created a
23  standard industry NACH file, which is a National
24  Automated Clearinghouse, the ACH file. It's a standard
25  industry format; it's not proprietary.

Page 116

1          It includes, obviously, the bank transit
2  routing number, which identifies which bank the
3  merchant has its account in; it includes the merchant's
4  bank account; and it typically includes a -- a label,
5  if you will, that's -- that identifies what the
6  payment's for, who the payment's from or who the ACH is
7  from.
8          And it has other data in it, such as
9  transaction codes to identify whether it's a debit or a
10  credit ACH. But, again, it's a standard, nonmodifiable
11  industry format.
12      Q. So was all of this processing -- processing
13  that we're talking about, was all that done
14  automatically?
15      A. Yes.
16      Q. Using computers and other electronic
17  equipment?
18      A. Yes.
19      Q. And all the payments were made electronically?
20      A. Correct.
21      Q. Payments to the merchants?
22      A. Correct.
23      Q. Payments to the third parties were made
24  electronically?
25      A. Correct.

Page 117

1      Q. Just a few more questions, and then we'll
2  conclude.
3          Going back to when Litle was bought by
4  Paymentech in 1995, is that -- well, let me -- I guess
5  we didn't establish that before.
6          Litle was sold at some point, correct?
7      A. That's correct.
8      Q. And who were they sold to?
9      A. First USA, slash, became Paymentech.
10      Q. Paymentech. When did that occur?
11      A. I believe it occurred in the fall of 1995.
12      Q. And what was one of the first things that
13  happened after Paymentech purchased Litle & Company?
14      A. One of the first -- I guess one of the first
15  events that impacted me, as I stayed on with First
16  USA/Paymentech, I was contacted by a gentleman by the
17  name of Phil Taken, who was one of the legal counsels
18  from Dallas Paymentech, and he wanted to get together
19  with me to discuss all of the products and services
20  that Litle had so that Paymentech could make a
21  determination as to whether any of the products and
22  services that they had acquired in the acquisition
23  might warrant the investigation of obtaining a patent
24  on -- for the obvious reason, I assume, of providing
25  greater value for the purchase as well as providing

30 (Pages 114 to 117)

Page 118

1    some leverage over the -- over the competition.
2        Q. What were the results of that?
3        A. The results of the investigation and
4    discussions on the products and services was that Taken
5    and, I believe, other folks as Paymentech in Dallas,
6    made the determination that none of the products and
7    services that Litle & Company offered as it relates to
8    the credit card process were sufficiently unique in the
9    industry to warrant any patent investigation.
10            MR. LEMIEUX: Objection, Your Honor. I
11   move to strike the witness' testimony as pure hearsay.
12            THE COURT: Sustained.
13       Q. Mr. Bouchard, if a member -- or, excuse me, a
14   merchant were to come to you today and ask you to send
15   a portion of its receipts to a capital provider, how
16   would you go about doing that today?
17       A. In the -- in my current employment, I would do
18   it in the same exact manner that we did it at Litle &
19   Company in 1992.
20       Q. Okay. And that would have -- would it have
21   been any different with respect to how you did that
22   with respect to the postage advance program?
23       A. None.
24       Q. Would there be any difference between that and
25   how you did it with respect to the Hanover repayment?

Page 119

1        A. None.
2        Q. So I just want to recap, then, before 1996,
3    there were instances where, at the merchant's
4    instructions, Litle & Company would forward out of the
5    daily net proceeds a certain fixed amount or a
6    percentage to a postage advance account, correct?
7        A. Correct.
8        Q. And then the remainder to the merchant,
9    correct?
10       A. Correct.
11       Q. And then Litle used those funds to offset the
12   postage advance that it forwarded to the merchant,
13   correct?
14       A. That's correct.
15       Q. And then there's -- in the other scenario, the
16   Hanover Finance situation we're talking about, Litle
17   would pay first -- first take off its fee, then pay a
18   portion to postage advance, correct?
19       A. That's correct. It would pay -- we would,
20   again, take the proceeds, ACH the repayments for the
21   postage advances, and the remainder of the net proceeds
22   we would ACH to Hanover Finance for repayment to
23   Hanover Finance on behalf of the merchant.
24       Q. Okay. And were all these arrangements common
25   and nothing was confidential about them?

Page 120

1        A. Correct. Nothing was confidential.
2        Q. Can you explain what a reserve account is?
3        A. Yes. In the normal course of business, during
4    the credit underwriting as to whether a processor or an
5    acquirer will accept a merchant and allow a merchant to
6    enter into an agreement, there are times when basically
7    a merchant's type of business, based on the product,
8    based on the financial well-being of the merchant, a
9    processor may opt to require the merchant to put up a
10   financial reserve or collect a financial reserve over a
11   period of time as some mitigation against a risk of
12   processing the merchant.
13           It's pretty standard in the industry. One
14   of the -- as maybe a better example as to why you would
15   do that, when I was at NPC, NPC was -- at one point
16   before 9/11, we were the largest processor of airline
17   transactions.
18           Because airline transactions -- because of
19   the nature of the business that you buy a ticket today
20   but you don't use that ticket, potentially, until next
21   week, next month or next year, we, as the processor,
22   had a huge risk of these prepaid tickets.
23           We had paid US Air; we had paid American
24   Airlines for the ticket, but the consumer hadn't used
25   the ticket. If anything occurred, such as the airline

Page 121

1    went bankrupt, we would be liable for all these
2    tickets, because if the consumer can't fly, he can then
3    initiate a chargeback.
4            Again, that's a credit to the consumer.
5    It comes back to us as the merchant processor. And if
6    the merchant isn't there or the merchant doesn't have
7    the financial capability to cover those return items,
8    I -- I, as the processor, have -- have to absorb that
9    liability and I have the loss.
10           So to protect myself against that loss, I
11   typically would collect, in that type of arrangement, a
12   reserve on a daily basis and hold that aside as
13   protection against that potential loss.
14           The reserve typically is handled in --
15   there's three ways a reserve can typically be handled.
16   One is a fixed amount. You determine what your risk is
17   going to be, and you would tell the merchant, if you
18   want to do business with me, I need you to have X
19   number of dollars in your reserve so you can give me
20   that money, and then we'll enter the agreement. That's
21   not necessarily -- that's one way. That's not the
22   typical way.
23           The typical way is that you enter into an
24   agreement with a merchant where you want to have X
25   number of dollars on reserve, and you collect that out

31 (Pages 118 to 121)

Page 122

1  of the net proceeds -- or actually it's done -- again,
2  this is done in the cloud, but it's done before the net
3  proceeds -- that you agree with that merchant that you
4  would take, say, 10 percent of the sales every day and
5  apply it to this reserve.
6          So when you're doing your calculation, the
7  last calculation you get to before you say, this the
8  net proceeds; this is what we owe the merchant, is you
9  take that 10 percent and you move that via another ACH
10  transfer to a separate account.
11          And it is the merchant's funds.  The
12  merchant doesn't have access to it by contract until we
13  would release it to them, but it is the merchant's
14  funds.
15      Q.  So then it would be another split of proceeds;
16  is that correct?
17      A.  Correctly, it would -- correct, it's another
18  split.
19      Q.  And one part would go to the reserve account
20  and the remainder would go to the credit account?
21      A.  Yes.
22      Q.  Were these well known by the 1990s?
23      A.  Yes.  In the industry, yes.
24      Q.  By the 1980s?
25      A.  Yes.

Page 123

1      Q.  Were these same types of reserves implemented
2  by Litle in the 1990s, in the early 1990s?
3      A.  Yes, because of the nature of the
4  card-not-present business, other than those merchants
5  that provide prepaid products like the airlines, Litle
6  was probably the -- they were probably the largest
7  acquirer of reserve funds because of the nature of
8  card-not-present business and because of the propensity
9  of fraud in that business because the cardholder isn't
10  present, and especially in the early days there was
11  very -- there was very limited ability to identify --
12  that the merchant could identify that you were who you
13  said you were when you were calling up and placing the
14  order.  So there were more chargebacks in the retail
15  world, and, therefore, there was more -- a greater
16  requirement to have reserves on the merchants.
17      Q.  If you would look at the member agreement,
18  Schedule D, does that set forth the reserve amount with
19  a particular merchant?
20      A.  Schedule D, yes, it does.  And as it states in
21  the case of Museum Publications, the minimum net
22  chargeback reserve was $75,000.
23      Q.  And how did Litle do the reserve account in
24  this instance?
25      A.  In this instance?  In this instance, we -- we

Page 124

1  would have collected a percentage of the sales on a
2  daily basis, and in the case of Litle and in the case
3  of merchants like this, we did what was called -- what
4  we would call a rolling reserve, where we collected a
5  percentage of the sales every month or every day.
6          And then on a six-month interval -- I
7  don't want to make this too complicated -- but for the
8  sales in January, we would have collected 10 percent of
9  all the sales in January.
10          In July, we would have done a calculation
11  that said, I collected 10 percent of the sales in
12  January, which equals X.  Did I get the chargebacks in
13  for January?  Did I get the chargebacks in resulting
14  from those January sales?  I would reduce the reserve
15  by the amount of those chargebacks; and what was left
16  in that January bucket, I would then release back to
17  Museum Publications.
18      Q.  That was the merchant?
19      A.  The merchant, right.
20          So basically, I held the funds for six
21  months, because that in -- in the card-not-present
22  world, that is the extended period of time that Visa or
23  MasterCard allow you, as the cardholder, to dispute a
24  charge.
25          MR. BUSS:  Okay.  No further questions

Page 125

1  Your Honor.
2          THE COURT:  All right.  I believe we'll
3  take our noon break, and we'll be in recess until
4  1 o'clock.
5          THE BAILIFF:  All rise.
6          (Recess 12:08 p.m.)

32 (Pages 122 to 125)

Page 126

```
1                 CERTIFICATION
2
3         I HEREBY CERTIFY that the foregoing is a
4   true and correct transcript from the stenographic notes
5   of the proceedings in the above-entitled matter, to the
6   best of my ability.
7
8   _____          _____
    THERESE J. CASTERLINE, CSR, RMR, CRR         Date
9   Official Court Reporter
    State of Texas No.:  5001
10  Expiration Date:  12/31/07
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

33 (Page 126)

Sunbelt Reporting & Litigation Services
Houston  Austin  Corpus Christi  Dallas/Fort Worth  East Texas