# EXHIBIT F

Dockets.Justia.com

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ADVANCEME, INC.,          )
                          )
VS.                       )          Case No.:
                          )  6:05CV-424-LED-JDL
RAPIDPAY, LLC, BUSINESS   )     Tyler, Texas
CAPITAL CORPORATION, FIRST )
FUNDS, LLC, MERCHANT MONEY )
TREE, INC., REACH         )
FINANCIAL, LLC AND FAST   )
TRANSIT, INC. d/b/a SIMPLE )    July 17, 2007
CASH                      )         1:07 p.m.

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE LEONARD DAVIS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:        MR. RONALD S. LEMIEUX
                          MR. MICHAEL N. EDELMAN
                          MR. VID BHAKAR
                          MR. ROBERT C. MATZ
                          MS. SHANEE Y. WILLIAMS
                          Paul, Hastings, Janofsky &
                          Walker, LLP
                          Five Palo Alto Square
                          Sixth Floor
                          Palo Alto, CA 94306-2155

                          MR. OTIS W. CARROLL
                          MS. DEBORAH RACE
                          Ireland, Carroll & Kelley, PC
                          6101 South Broadway, Suite 500
                          Tyler, TX 75703

APPEARANCES CONTINUED ON NEXT PAGE

COURT REPORTER:           MS. THERESE J. CASTERLINE,
                          CSR, RMR, CRR
                          Deputy Official Court Reporter

(Proceedings recorded by mechanical stenography,
transcript produced on CAT system.)

Page 2

1  APPEARANCES CONTINUED
2  FOR THE DEFENDANTS:   MR. WILLEM G. SCHUURMAN
          MR. BRIAN BUSS
3          MR. GRAHAM E. SUTLIFF
          MR. JOSEPH D. GRAY
4          Vinson & Elkins, LLP
          2801 Via Fortuna, Suite 100
5          Austin, TX 78746
6          MR. DOUGLAS R. McSWANE, JR.
          Potter Minton, PC
7          110 North College
          500 Plaza Tower
8          Tyler, TX 75702
9          MR. JEFF SANDERS
          Roberts & Ritholz
10          183 Madison Avenue, Penthouse
          New York, NY 10016
11
12          * * * * * * * * *
13          P R O C E E D I N G S
14          THE BAILIFF: All rise.
15          THE COURT: Please be seated.
16          All right. Who will be our next witness?
17          MR. GRAY: Your Honor, the Defense would
18  like to call Lee Suckow.
19          THE COURT: Who?
20          MR. GRAY: Lee Suckow.
21          THE COURT: All right. This is by
22  agreement out of order?
23          MR. CARROLL: That's correct, Your Honor.
24          THE COURT: Has the witness been sworn?
25          MR. GRAY: No, Your Honor.

Page 3

1          LEE GERHARDT SUCKOW,
2  having been first duly sworn, testified as follows:
3          DIRECT EXAMINATION
4  BY MR. GRAY:
5     Q. Good afternoon, Mr. Suckow.
6     A. Good afternoon.
7     Q. Would you please state and your spell your
8  name for the record.
9     A. Lee Gerhardt Suckow, L-E-E, G-E-R-H-A-R-D-T,
10  S-U-C-K-O-W.
11     Q. Mr. Suckow, how are you currently employed?
12     A. I'm the chairman and chief executive of Clever
13  Ideas.
14     Q. What is the business of Clever Ideas?
15     A. We market and finance restaurants and we also
16  own restaurants.
17     Q. How long have you held that position?
18     A. I founded the company 30 years ago.
19     Q. And have you been employed by Clever Ideas for
20  the last 30 years?
21     A. Yes.
22     Q. Are you familiar with the LeCard program that
23  is offered by Clever Ideas?
24     A. Yes, I created it.
25     Q. Can you please briefly describe what the

Page 4

1  LeCard program was.
2     A. We advanced money or advertising to
3  restaurants, and they paid it back through Diners Club
4  receipts. To incent the Diners Club cardmembers to go
5  to the restaurant, they were given a 20 percent savings
6  off their total check.
7          So if you went to a restaurant and spent
8  $100 and, say, had $7 worth of tax and 18 percent tip,
9  total charge of 125, you would sign for 125 in the
10  restaurant, and then when you got your bill from Diners
11  Club, you would see the 125 charge at the restaurant,
12  and then right below, it would say LeCard savings, and
13  it would be 20 percent, so it would be a $25 savings.
14     Q. And how was Clever Ideas repaid for those cash
15  advances?
16     A. We would get the money, Diners would send the
17  money to our bank account, and then we would get the
18  proceeds after they took off the customer savings and
19  their fees. And then we would get a -- our share and
20  then return 20 percent of the gross transaction to the
21  restaurants for tax and tip.
22     Q. So was Clever Ideas ever repaid by the
23  merchant or from the merchant?
24     A. From the merchant.
25     Q. Was it always -- I'm sorry if that was a

Page 5

1  confusing question.
2          Was Clever Ideas always repaid directly
3  from Diners Club.
4     A. Yes.
5          THE COURT: Could you maybe clarify for
6  me with the witness -- I'm not exactly sure how Diners
7  Club works and LeCard works, whether it's a credit card
8  or just a discount card or exactly what. So sort of --
9          MR. GRAY: Yes, Your Honor.
10          THE COURT: -- start at that for me.
11          MR. GRAY: Okay. If I could get board
12  B 35 and slide 350.
13     Q. And, Mr. Suckow, this is a diagram that we
14  created based on your testimony that you've given in
15  this case.
16          And I guess to start at very beginning,
17  what is the LeCard card?
18     A. LeCard came out as a separate piece of plastic
19  in November of 1990. It was actually a Diners Club
20  card, but it had a different graphic of the LeCard
21  logo.
22          In 1991, it became embedded into the
23  regular Diners Club card, where just the LeCard logo
24  was on the back side of the card; and on the front side
25  of the card, it said LCUS rather than DCUS, indicating

Page 6

1  it was a special card, because they rolled it out to
2  cardmembers over a period of time.
3          Initially, people had to request it, but
4  then they eventually rolled it out to all cardmembers.
5          THE COURT:  Can you explain to me what
6  Diners Club --
7          THE WITNESS:  Diner's Club is --
8          THE COURT:  -- what your association with
9  it is.  You don't own Diners Club?
10         THE WITNESS:  Correct, Your Honor.
11         THE COURT:  Explain to me what Diners Club
12 is.
13         THE WITNESS:  Diners Club was a charge
14 card like American Express.  It was owned by Citibank,
15 Diners Club.  The -- it was the original credit card,
16 actually.  It was invented about 56 years ago, prior to
17 American Express, in New York.
18         THE COURT:  Diners Club was?
19         THE WITNESS:  The original charge card,
20 correct.
21         THE COURT:  All right.
22         THE WITNESS:  And how that card works is,
23 you would go to a restaurant, or any retailer -- at the
24 time when I started working with Diners, it was -- you
25 know, Diners had been in business since -- I believe

Page 7

1  it's like 1951/'52.  It was founded by Alfred
2  Bloomingdale and Taubman -- three or five guys actually
3  started this company.  And then it grew through the
4  years.
5          But it's no different than like an
6  American Express card that the cardmember gets the bill
7  and they have to pay it monthly as opposed to a
8  revolving charge card.
9          Diners Club is no longer a separate card;
10 it is now a MasterCard.  It's stilled called Diners
11 Club but it's accepted anyplace MasterCard and Visa
12 are, and that happened about two years ago.
13 Q.  Mr. Suckow, what is the business of Diners
14 Club?
15 A.  A travel and entertainment card.
16 Q.  Do they issue that card?
17 A.  Yes, they do.
18 Q.  And do they also process that card?
19 A.  Yes, they do.
20 Q.  And could you please walk me through VX 350
21 and what's on the board B 35 -- just walk me through
22 one single LeCard transaction at a restaurant.
23         THE COURT:  Well, now, help me to -- I
24 understand Diners Club now.  Explain to me what Clever
25 Ideas does that's different than Diners Club.

Page 8

1          THE WITNESS:  Clever Ideas was in the
2  business of basically turning cash into trade -- or
3  trade into cash.  In other words, if you'd go to a
4  restaurant and they wanted to advertise, and let's say
5  the ad was $20,000 cash, you'd make it $30,000 in
6  trade.  And by trade, that would be food and beverages.
7  And you'd say the way that trade will be utilized or
8  liquidated, we will put into a Diners Club directory
9  that we will offer 20 percent to the cardmembers so
10 that they will get a savings when dining at your
11 restaurant, so that will incent the people to come to
12 the restaurant.
13         Since Diners Club is a very small piece of
14 a restaurant's business, about 3 percent, it made a lot
15 of sense that you couldn't hurt a restaurant, and they
16 looked at it as they were giving away food and drink,
17 so if the ad -- which is basically about a 30 percent
18 cost.
19         So if you made a $20,000 cash ad $30,000,
20 they would say, gee, it's only costing me $10,000, but
21 they have to bring me $30,000 worth of customers'
22 business in my restaurant.  So they were happy to have
23 that because the Diners Club cardmember is usually the
24 highest spender in a restaurant, equal to or greater
25 than American Express.

Page 9

1          THE COURT:  Thank you.
2          THE WITNESS:  What --
3          THE COURT:  Go ahead.
4          THE WITNESS:  Clever Ideas, we brought
5  them the restaurants.
6          THE COURT:  You brought Diners Club the
7  restaurants?
8          THE WITNESS:  Correct.
9          THE COURT:  You would go out and market to
10 the restaurants and sign them up to participate?
11         THE WITNESS:  Correct.  We would give them
12 advertising and we first did it just with our own
13 advertising, published a travel magazine in Chicago.
14 And then when the program was launched in November of
15 '90 and it was successful, I went to a large competitor
16 of mine called Guest Informant -- it's a hard-copy book
17 you see in hotel rooms -- and I licensed the program to
18 that company and we rolled it out nationally, beginning
19 in New York, Los Angeles and Boston.  And so we went
20 and did the advertising there.
21         And it was a great program because people
22 would buy bigger ads.  In those ads, they put a Diners
23 Club logo in the book, so the publication benefited
24 from the incremental revenue from the additional
25 advertising.

3  (Pages 6 to 9)

Page 10

1    The guests saw more ads and went to those
2  restaurants, so the restaurant benefited from people
3  seeing the ads, so they had more business, and they
4  were able to pay for that business with their food,
5  because, once again, Diners is a very small percentage
6  of their business.
7    So if we increased their business by
8  50 percent, say, on a million dollar restaurant, Diners
9  being 3 percent is 30,000, we'd increase that business
10  to 45,000. It was very small. 15,000 on a million is
11  not that much. But most of the ads were seen by
12  people, 97 percent of which were paying with cards
13  other than Diners.
14    MR. GRAY:  And perhaps to help the Court,
15  could we please -- could I get VX 351.
16    Q. Okay. Mr. Suckow, this is a typed version of
17  an exhibit you prepared during your deposition.
18    Could you please explain the math behind
19  the transaction in the restaurant, the LeCard
20  transaction.
21    A. Sure. The $80 in food and drink would be a
22  typical charge at a restaurant. Say two people went in
23  and they spent $40 each on food and drink, there would
24  be -- say, in this case, in Chicago with a 10 percent
25  tax rate, you'd have $8 tax, and if somebody left a

Page 11

1  15 percent tip, you'd get the other $12. So the total
2  tax and tip is $20. This is what the customer, the
3  Diners Club cardmember, would sign for.
4    That total transaction was sent
5  electronically to Diners Club. And when they'd see the
6  transaction, they would automatically give a 20 percent
7  savings to the cardmember. They would -- so they would
8  deduct that fee. They would deduct the 6.4 percent
9  charge that they charged us for being in the program.
10  They charged us additional amounts to cover the
11  marketing expense. And then they would deposit into
12  our bank account $73.60.
13    Q. Could I stop you just right there.
14    Going back to the $6.40 charge, is that --
15  is that a fee for processing?
16    A. The processing fee -- there's two fees in
17  that. There's a 2.9 percent processing fee plus an
18  additional 3.5 percent fee that they use to cover the
19  cost of the directories, the mailing, the statement
20  stuffers, all the things they did to promote the LeCard
21  program.
22    Q. Okay.
23    A. So from the $73.60 that would be deposited
24  into the Clever Ideas bank account, we would then
25  electronically reimburse the restaurants for the

Page 12

1  tax-and-tip portion of the transaction, giving them the
2  money that they would need to pay their employees and
3  the government. We would eat the fee plus the customer
4  savings.
5    We would be netting the 53.60. And if we
6  had done a cash advance of $80, would equal -- we were
7  doing two-to-one advances at that time, it would repay
8  the 50 percent, or $40 to the bank, leaving us a gross
9  profit of $13.60 per transaction, per this 80, $100
10  transaction.
11    Q. Again, to clarify for the Court, out of this
12  $100 transaction, how much of that $100 was applied to
13  the restaurant's cash advance?
14    A. Of $100, $80 was applied to the cash advance.
15    Q. But after forwarding tax and tip, Clever Ideas
16  only had -- only received $53.60, correct?
17    A. Correct.
18    Q. Okay. So could you explain how you could
19  apply $80 to the outstanding cash advance?
20    A. Well, because we -- that's why we had a markup
21  of 2 to 1 on cash advance or advertising. How we took
22  the $20,000 ad and made it 30,000, we would mark it up,
23  because the restaurant, in their mind, they would look
24  at this transaction -- if they gave away $80 worth of
25  food and drink, their actual cost on that was $24, so

Page 13

1  we paid them in advance $40 for $24 worth of food and
2  drink.
3    THE COURT:  What do you mean when you say
4  you paid them in advance?
5    THE WITNESS:  We would give them cash up
6  front. You'd go to a restaurant, you'd give them
7  $5,000 or $10,000 cash, and they would then say, you
8  have a balance of $20,000 that they will pay you in
9  Diners Club receipts.
10    I know it sounds very strange that someone
11  would do that.
12    THE COURT:  I'm not following you exactly.
13  Run me through that again.
14    THE WITNESS:  Okay. If you went to a
15  restaurant -- $10,000 cash --
16    THE COURT:  By "you," you mean you?
17    THE WITNESS:  Me, correct -- going to a
18  restaurant and giving a restaurant $10,000 cash --
19  they're not able to get bank financing and things like
20  that because it's -- they have a reputation of not
21  being creditworthy, so they have trouble getting
22  financing.
23    But you were buying meals in advance, is
24  really what you were doing. You were guaranteeing them
25  $20,000 worth of meals, because that's what they were

4 (Pages 10 to 13)

Page 14

1  going to repay you with, okay.
2      Now, the $20,000 in their minds --
3      THE COURT:  In other words, you'd give
4  them 10,000?
5      THE WITNESS:  Cash today.
6      THE COURT:  And they would agree to sell
7  $20,000 worth of food --
8      THE WITNESS:  Right.
9      THE COURT:  -- for LeCard members?
10     THE WITNESS:  Correct.  And that -- in
11 their minds, 30 percent of $20,000 is $6,000, so they
12 were $4,000 to the good anyway.
13     THE COURT:  Because their cost of goods
14 was 30,000 -- was 30 --
15     THE WITNESS:  Percent.
16     THE COURT:  -- 30 percent?
17     All right.  Thank you.
18     THE WITNESS:  You're welcome.
19 Q. Mr. Suckow, was anything ever confidential
20 about any -- any of these aspects you're testifying to?
21 A. The -- we didn't really break out the 6.4
22 being 2.9 and 3.5 to the restaurants.  That was -- that
23 wasn't confidential, but they just -- they didn't care,
24 because we ate the fee.
25     They normally -- if this was a non-LeCard

Page 15

1  transaction or a -- you know, the restaurant would have
2  been paid back, not $100, but $97.10, because $2.90
3  would have been kept by Diners.
4      Because what Diners actually does, or what
5  any credit card does, they actually buy that
6  transaction.  They fund it.  Even though the cardmember
7  does not get billed, the cardmember might not even get
8  billed from anywhere from three to 30 days, the
9  restaurant would be paid in -- somewhere between 24 to
10 72 hours after the transaction was submitted to Diners.
11 Q. In the LeCard program, were restaurants aware
12 that it was Clever Ideas that was paying the processing
13 fee rather than the merchant itself?
14 A. Absolutely.
15     MR. GRAY:  Could I please have Defendants'
16 Exhibit 6.
17     And could you please highlight the account
18 summary in the top right.
19 Q. Okay.  If you look at the account summary --
20 and this is on the first page of Defendants'
21 Exhibit 6 -- it shows a beginning balance of 20,000 and
22 change, and then the credit decreases 1548.96, and then
23 the resulting credit balance of 18,566.  Do you see
24 that?
25 A. Yes.

Page 16

1  Q. Does this document show that Clever Ideas is
2  applying those amounts received from Diners Club?
3  A. That would be correct.  That is 80 percent of
4  the total volume that they would have done in Diners.
5      MR. GRAY:  Okay.  And could I please --
6  could you please zoom in on the second page of the
7  bottom of the page on the left, summary transaction
8  date.
9  Q. And these -- these have the dates of 1996 on
10 them.
11     When did LeCard begin operations,
12 electronic operations?
13 A. Really, November.  We had started getting some
14 of the transactions in November of '91.
15 Q. And when -- when did it become widespread use?
16 A. It rolled out beginning in that time.  So I
17 would say we were totally electronic by November of --
18 or not even November -- probably by August of '92.
19     MR. GRAY:  Okay.  And if you could turn
20 to the second page of this same exhibit.
21 Q. This is what we were discussing just a second
22 ago about processing fees and whether the merchant was
23 aware that Clever Ideas paid those processing fees.
24     MR. GRAY:  Could you highlight the second
25 line on that page.

Page 17

1  Q. This statement, which is from Clever Ideas
2  LeCard to a restaurant -- is that correct?
3  A. Correct.
4  Q. It says at the end of the statement, total
5  year-to-date, you have saved approximately $850.16 in
6  Diners processing fees.
7      Does that reflect the fact that Clever
8  Ideas was paying those processing fees?
9  A. Yes.
10 Q. Now, was there any risk to Clever Ideas that a
11 merchant would not repay the cash advance through its
12 LeCard transactions?
13 A. Well, there were -- sure.  There were risks
14 that the restaurant could go out of business, that they
15 would decide to decline accepting the card.  But that
16 was -- there were -- we sold some accounts that they
17 didn't get the Diners Club business in.  It wasn't
18 their fault, but, literally, they were in locations or
19 a type of establishment that Diners Club members didn't
20 go to or they bought more advertising or did too large
21 of an advance, thinking they would do more business.
22 Q. If a customer presented a LeCard card at a
23 restaurant, was there any way the restaurant could
24 prevent the payment to Clever Ideas?
25 A. Only by refusing the card.

5 (Pages 14 to 17)

Page 18

1    Q. Once they accepted the card --
2    A. No.
3    Q. -- did the restaurant ever have control over
4 the funds?
5    A. No.
6        MR. GRAY: Could I please get Defendants'
7 Exhibit 2.
8        And would you please highlight the date in
9 the top left corner and the signature at the bottom.
10    Q. Mr. Suckow, is this your signature? Do you
11 recognize your signature?
12    A. Yes.
13    Q. And then at the top it's dated October 29th,
14 1992; is that correct?
15    A. Yes.
16    Q. And it's addressed to "Dear Participating
17 LeCard Restauranteur." Do you see that?
18    A. Uh-huh.
19    Q. Okay. I would like to walk through a couple
20 of paragraphs on this letter.
21        But first, what was -- do you recall this
22 letter?
23    A. Absolutely.
24    Q. And what was the purpose of this letter?
25    A. This was where we were talking about the

Page 19

1 electronic draft capture of the card.
2        MR. GRAY: Could you highlight right where
3 the pointer is, that paragraph.
4    Q. What is electronic draft capture that's
5 referred to in that paragraph?
6    A. Well, back in the -- prior to electronic draft
7 capture, you used to have manual imprints. I don't
8 know if any of you recall going to a restaurant or a
9 hotel, but you put your credit card out, and they had
10 what were called like a knuckle-buster, that they had a
11 machine that would go over and make an imprint on a
12 hard copy. And that is -- the system migrated from
13 being a manual process to an electronic process.
14    Q. So how would a restaurant accept a LeCard card
15 once electronic draft capture was instituted?
16    A. They would swipe it through their electronic
17 terminal, whether the Hypercom, Verifone, any kind of
18 machines they had.
19    Q. Would all of those terminals have accepted the
20 LeCard card as well as Visa/MasterCard?
21    A. If they were programmed to accept Diners, yes.
22    Q. Okay. And were the restaurants who
23 participated in the LeCard program required to be
24 programmed to accept Diners Club?
25    A. Yes.

Page 20

1        MR. GRAY: And if you could highlight the
2 next paragraph, please.
3        And on the second line, it says processing
4 directly to Diners Club.
5    Q. That paragraph begins, presently electronic
6 draft capture of LeCard transactions is available only
7 to those restaurants that are processing directly to
8 Diners Club and are receiving payment from Diners Club.
9        What does it mean to process directly to
10 Diners Club?
11    A. That the settlement came directly from Diners
12 as opposed to a processor that would settle the
13 transaction, much as a MasterCard/Visa transaction is
14 settled. Direct settlement means that Diners is paying
15 the merchant directly versus bank license was --
16 independent sales organizations would go out and they'd
17 sell card acceptance, and they would say, we'd also
18 process the Diners, but then they would settle the
19 Diners with them.
20    Q. Did Clever Ideas ever process any Diners Club
21 transactions after electronic draft capture was
22 instituted?
23    A. No.
24    Q. Did Clever Ideas have the infrastructure to
25 process transactions?

Page 21

1    A. No.
2        MR. GRAY: Could you please highlight the
3 next paragraph.
4    Q. The next paragraph states, enclosed you will
5 also find a document that enables you to have Diners
6 Club send the LeCard charges directly to us for your
7 account.
8        Does that mean Diners Club would forward
9 it directly to Clever Ideas?
10    A. Yes.
11        MR. GRAY: And if you could turn to the
12 next page for the same exhibit, please, and highlight
13 through the signature line.
14    Q. Mr. Suckow, could you please review this
15 document and tell me if this is the document that's
16 referenced in the previous page.
17    A. Yes, it is.
18    Q. It is?
19        Why would -- why would such a document be
20 necessary for the merchant to sign?
21    A. Because Diners required it to authorize that
22 the payment be sent to a different place than to the
23 merchant's bank account.
24    Q. And why is that?
25    A. Well, because when they sign their merchant

Sunbelt Reporting & Litigation Services
Houston  Austin  Corpus Christi  Dallas/Fort Worth  East Texas

Page 22

1  agreement, it's -- they indicate on the merchant
2  agreement what account it's to be sent to. So this is
3  saying, send it someplace else. And Diners wouldn't
4  need authorization from the restaurant to be able to do
5  that, and that's what -- the authorization from the
6  restaurant to have the firm -- the funds diverted.
7      Q. So when you say the restaurant, when it signs
8  its agreement with Diners Club, is that a processing
9  agreement with Diners Club?
10     A. Yes, it's called the merchant -- a member
11  establishment agreement, I believe.
12         MR. GRAY: If I could please get
13  Defendants' Exhibit 4.
14     Q. Mr. Suckow, do you recognize this document?
15     A. Yes.
16     Q. And what is this?
17     A. This is a --
18         MR. GRAY: You have to scroll down.
19         THE WITNESS: Yeah, scroll dow.
20     A. No, it's a cash advance agreement. We're
21  advancing $3,000 to the restaurant, and they're
22  agreeing to pay us back in $6,000 worth of food and
23  drink.
24     Q. So does this mean that the restaurant would
25  get $3,000 cash today in exchange for a promise of

Page 23

1  $6,000 worth of LeCard transactions in the future?
2      A. Well, they would get the -- it depends. If it
3  was a -- this contract was signed on 7-20 of '95, and
4  so this must have been a renewal where we actually gave
5  the money -- refunded it on 7-- I believe -- I can't
6  tell for sure, but I think we funded it the same day,
7  which means that they would have gotten money the same
8  day, as opposed to people could sign an agreement and
9  we'd have to wait until they were set up, and then they
10 didn't get their funding until --
11     Q. So Clever Ideas gave $3,000, and in exchange,
12 the restaurant owed Clever Ideas $6,000; is that right?
13     A. Correct.
14     Q. And I believe you already said the date this
15 was signed. Would you point to me where that is again.
16     A. I'm just looking at the top. It said -- oh,
17 on or before 7-20. The date it was signed was actually
18 down in the right-hand corner -- it was signed 3- --
19 looks like it was signed on March 2nd of '95.
20     Q. All right. And if you look at the term --
21         MR. GRAY: I'm sorry, could you go back
22 to the full document.
23         The all-caps paragraph, please.
24     Q. That first sentence there says, the terms and
25 conditions printed on the reverse side of this

Page 24

1  agreement are an integral part of this agreement, and
2  restaurant and CLI agree to be bound thereby.
3         Is CLI Clever Ideas?
4      A. Yes.
5         MR. GRAY: And if you'll turn to the next
6  page of the exhibit.
7      Q. Are these the terms and conditions referred to
8  on the previous page?
9      A. Yes.
10        MR. GRAY: Would you please highlight the
11 first paragraph.
12     Q. As the first term, it says, CLI is in the
13 business of providing cash advances and/or purchasing
14 products and services to restaurants who have
15 engaged -- who have entered into member establishment
16 agreements with Citicorp Diners Club or their
17 respective franchisees.
18        And you explained that a second ago, but
19 what is a member establishment agreement with Citicorp
20 Diners Club?
21     A. That is the agreement for the merchant to sell
22 their Diners Club transaction, to accept Diners Club
23 and sell those transactions to Diners Club for payment
24 at whatever discount rate they negotiated.
25        MR. GRAY: And could you highlight the

Page 25

1  sixth paragraph, please.
2      Q. So the sixth paragraph says, restaurant shall
3  maintain status as a Diners Club member establishment
4  and shall agree to process directly to Diners Club and
5  be paid by Diners Club. Could you explain that
6  sentence.
7      A. In order for us to be able to collect on our
8  restaurant's obligation, we needed them to accept
9  Diners Club, and that was -- if they didn't accept
10 Diners Club, that was a breach, so that we would seek
11 any legal recourse to recover any funds that were owed,
12 whether they were cash advance or advertising that was
13 advanced.
14     Q. And why would the restaurant need to process
15 to Diners Club in order for Clever Ideas to repay them?
16     A. Because that was their agreed-upon method of
17 repayments.
18     Q. So does this sentence that says, the
19 restaurant shall maintain its status as a Diners Club
20 member establishment and agree to process directly to
21 Diners Club, does that mean that Diners Club was the
22 processor for those LeCard transactions?
23     A. They were the processor for all Diners Club
24 transactions.
25        MR. GRAY: And I -- could I please get

7  (Pages 22 to 25)

Page 26

1  Defendants' Exhibit 5.
2    Q. Mr. Suckow, this is another agreement, which
3  is dated April 28th, 1994.
4        Do you recognize the signature on the
5  left-hand side?
6    A. Yes.
7    Q. Who is that?
8    A. Eliot Becker, who was the sales rep.
9    Q. This looks very similar to the previous
10  agreement.
11        MR. GRAY: Can you go back to the full
12  page.
13    Q. It appears to be an advertising agreement?
14    A. That correct, a 1/6th page ad in Guest
15  Informant, Chicago edition.
16        MR. GRAY: Please highlight paragraphs 1
17  and 2.
18    Q. And instead of advancing cash, Clever Ideas
19  purchased advertising for this restaurant; is that
20  correct?
21    A. Correct.
22    Q. And in exchange for that advertising, the
23  restaurant owed Clever Ideas $4,200; is that right?
24    A. Correct.
25        MR. GRAY: Okay. Back to the full

Page 27

1  document, please.
2    Q. And, again, in the all-paths paragraph, the
3  terms and conditions printed on the reverse side of
4  this agreement are an integral part of the agreement;
5  is that correct?
6    A. Yes.
7        MR. GRAY: And the next page on this
8  exhibit, please.
9    Q. And, again, these -- the terms and conditions
10  were identical for both types of agreements; is that
11  correct?
12    A. Correct.
13        MR. GRAY: Again, could you please
14  highlight paragraph 6 again.
15    Q. And, again, this says, restaurant shall
16  maintain its status as a Diners Club member
17  establishment and shall agree to process directly to
18  Diners Club and be paid by Diners Club; is that right?
19    A. Correct.
20    Q. So in either situation, the cash advance or
21  advertising in advance, the restaurant was
22  contractually required to have Diners Club as the
23  processor; is that right?
24    A. Yes.
25        MR. GRAY: Could I please have Defendants'

Page 28

1  Exhibit 2 again.
2    Q. Now, we started going through this letter, and
3  we left off discussing the document that enables --
4  that the merchant signs that allows Diners Club to
5  forward payment to Clever Ideas. Do you remember that
6  document, the second page of this exhibit?
7    A. Yes.
8        MR. GRAY: And now if I could have the
9  first page. And then highlight the middle paragraph.
10  That one.
11    Q. And this paragraph states, the enclosed
12  examples from the Chicago Chop House indicate that $600
13  worth of Diners Club and Diners Club LeCard
14  transactions were permitted. Of the $600 total, 500
15  were regular Diners Club transactions, which were paid
16  in the normal manner.
17        What does "the normal manner" mean?
18    A. That it would be deposited into the merchant's
19  designated account.
20    Q. Okay. So for non-LeCard Diners Club
21  transactions --
22    A. Correct.
23    Q. -- those would be processed by Diners Club and
24  payment would be sent to the restaurant; is that right?
25    A. Yes.

Page 29

1    Q. And then the next sentence states, a LeCard
2  charge of $100 completes the $600 total, and a letter
3  of change was generated to indicate that this
4  transaction was forwarded to LeCard.
5        Does that sentence indicate that the
6  transaction was forwarded for processing by Clever
7  Ideas?
8    A. No. What it indicates is that it was sent to
9  us to reduce their balance.
10    Q. Okay. And now the letter of change, I
11  believe, is the fourth page of this exhibit.
12        MR. GRAY: If I could get that.
13    Q. Is this document what that letter refers to as
14  a letter of change?
15    A. Yes.
16        MR. GRAY: Could you please highlight all
17  the text of that page.
18    Q. Could you please explain to me what a letter
19  of change is.
20    A. A letter of change explains why when a
21  restaurant batched out and submitted their charges to
22  Diners Club, if there was any reason that the payment
23  was going to be different than what they thought, this
24  was a reason -- number 24 was a LeCard charge. You
25  could have that the cardholder had disputed a charge

8 (Pages 26 to 29)

Page 30

1    that would -- I don't remember what the number was for
2    that. That might have been, say, number 19.
3            Another one might have been, we had a
4    chargeback, you had a deficit, so we're not paying you.
5    That could have been reason number 6.
6            So any reason that there would be a
7    discrepancy between what they submitted and what Diners
8    paid, less their processing fee, was explained in a
9    letter of change, that you wouldn't, you know, always
10   get letters of change. If there was nothing -- there
11   was not a LeCard transaction; there was not a
12   chargeback; there was not deficiency owed, you would
13   just get the normal statement.
14   Q.   Was the form of the letter of change identical
15   for all of the various reasons you've just described?
16   A.   Correct. It was -- that -- this is just one
17   of the LeCard charges. You could have had a letter
18   like this with actually two different numbers or three
19   different numbers on it adjusting the statement.
20   Q.   So what is the purpose of the letter of
21   change?
22   A.   To make sure that the bookkeeper could
23   understand so people could reconcile their books. If
24   you send in $600 and somebody pays you back 500 minus
25   the discount fee, what happened to the other $100?

Page 31

1            This was explaining, in this case, the
2    other $100 was a LeCard transaction that was settled,
3    you know, to Clever Ideas.
4    Q.   And then Clever Ideas would then account to
5    the merchant for that amount; is that right?
6    A.   Yes.
7    Q.   And how would Clever Ideas account to the
8    merchant for that $100 transaction?
9    A.   I think -- it would show on their regular
10   statement. There's -- we would do statements for
11   transactions that we received from the first of the
12   month through the 15th of the month that would detail
13   each of the charges, and then there would be a second
14   statement from the 16th through the end of the month.
15   Q.   Now, is this the statement we referred to
16   earlier that had the -- the account summary in the top
17   right corner?
18   A.   Correct.
19           MR. GRAY: Could I please have Defendants'
20   Exhibit 6.
21   A.   Correct. It would show the date, the charge,
22   the amount of the charge.
23   Q.   Okay. This document on the screen now?
24   A.   Right.
25   Q.   Again, that's Defendants' Exhibit 6.

Page 32

1            MR. GRAY: If we could go back to
2    Defendants' Exhibit 2, page 4 again, and highlight the
3    text.
4    Q.   Okay. So this letter of change which you've
5    testified was a form agreement sent from Diners Club --
6    is that correct?
7    A.   Correct.
8    Q.   -- in the second paragraph, it says, this
9    summary included credits, slash, charges which could
10   not be processed.
11           Did that indicate that Diners Club did not
12   process that transaction?
13   A.   No, that indicates that it was not on the
14   statement; it could not be processed with this
15   statement.
16   Q.   And that Clever Ideas would account to the
17   restaurant for that amount; is that correct?
18   A.   Correct. It says, right here, this is a
19   LeCard card charge. Under Explanation, LeCard will
20   settle directly with you.
21   Q.   And what does "LeCard will settle directly
22   with you" mean?
23   A.   That we will credit their account for
24   whatever. They would not necessarily know whether it
25   was an advertising contract or a cash advance contract,

Page 33

1    whatever.
2    Q.   Now, does that indicate that Clever Ideas was
3    the merchant processor for the LeCard transactions?
4    A.   No, it would not -- it does not. It says, we
5    will settle.
6            MR. GRAY: Could I please get Defendants'
7    Exhibit 3.
8    Q.   And, again, your name is in the bottom
9    left-hand corner of this document, and it's dated
10   July 23rd, 1992. Do you see this?
11   A.   Uh-huh.
12   Q.   Do you recall this letter?
13           MR. GRAY: Go back to the full letter,
14   please.
15   A.   Yes. This was the letter where we -- if
16   you'll notice in the lower right-hand corner, the
17   graphic, that was what the initial card looked like
18   when it was a separate card. And what this letter is
19   saying, no longer is it going to be a separate card;
20   it's going to be just incorporated into the regular
21   Diners Club card with the logo on the back.
22   Q.   Was the LeCard card a charge card in both
23   instances?
24   A.   Yes.
25           MR. GRAY: Will you please highlight the

9 (Pages 30 to 33)

Page 34

1  third paragraph, the long paragraph.
2      Q. This paragraph states, to be able to
3  electronically draft capture your LeCard transactions,
4  you will need to process directly to Diners Club and
5  not through a licensed bank or other third-party
6  processor.
7          What does that sentence mean? I
8  apologize. I know you explained this earlier, but just
9  to clarify.
10     A. Okay. Enable -- to enable Diners to get the
11 20 percent savings to the cardmember and send the fees
12 to us, they needed to see the transaction settle the --
13 by processing it themselves as opposed to using a
14 bank-licensed processor. The bank-licensed processor
15 would not know which transactions were LeCard
16 transactions.
17     Q. Okay. And then the next sentence states, if
18 you are presently not processing to Diners Club, you
19 can direct your processor to make the switch for you or
20 you may contact your local Diners Club representative.
21         Again, does that indicate that restaurants
22 were required to process to Diners Club in order to
23 accept LeCard transactions?
24     A. Yes.
25     Q. And then in the next paragraph, the last

Page 35

1  sentence says, all LeCard transactions will be noted in
2  a letter of change that will be sent along with your
3  batch summaries.
4          Is that referencing again the letter of
5  change we discussed a few minutes ago?
6      A. Correct.
7      Q. Did Clever Ideas market the LeCard program?
8      A. Yes.
9      Q. How did it do that?
10     A. We did initially with our own sales reps
11 and -- well, we started in Chicago to our different
12 merchants. Then the next big rollout was with the
13 Guest Informant sales reps, and that was about -- about
14 50 different sales reps that I trained throughout the
15 country. I think there was at the peak probably about
16 65 sales reps that would go and pitch their
17 advertising, explain how they could pay for it in trade
18 by accepting the Diners Club LeCard program.
19     Q. Did Clever Ideas explain how that cash advance
20 or advertising advance would be repaid?
21     A. Yes.
22     Q. Were any of the details you discussed
23 confidential?
24     A. No.
25     Q. Did the merchant -- were the restaurants ever

Page 36

1  required to sign any sort of nondisclosure agreement?
2      A. No.
3      Q. And these letters that we looked at, both
4  letters dated 1992, were those letters actually sent to
5  restaurants in 1992?
6      A. Yes.
7      Q. Approximately how many restaurants were
8  participating in the LeCard program, say, by 1995?
9      A. 1995 was about 1500 restaurants.
10     Q. And approximately how many LeCard cardholders
11 were there in 1995?
12     A. In '95, there were probably between 300,
13 350,000 personal cardmembers, and they were rolling out
14 the corporate card, of which there was about another
15 300,000, but I can't tell you the total number of
16 corporate cards at that time. It would happen on a
17 monthly basis over the --
18     Q. Was that all in the United States?
19     A. Yes.
20     Q. Approximately how much revenue did Clever
21 Ideas receive from the LeCard program in 1995, if you
22 remember?
23     A. Revenuewise, it was about 15 million.
24     Q. Were any articles ever written about the
25 LeCard program?

Page 37

1      A. Yes.
2      Q. What types of articles?
3      A. There were articles in a trade publication
4  called the Nielsen Report that talked about things that
5  were going on. There were articles in travel magazines
6  like Travel & Leisure or -- various publications that
7  would talk about ways to save money when traveling or
8  dining out; specials, they would talk about us and, at
9  the time, a company called Transmedia, and then Dining
10 Ala Card has programs.
11         Some of them talked about the neat idea of
12 how restaurants were getting financing. That was
13 really a big part of the aspect of articles and --
14 because we were doing both cash advance and
15 advertising, so we would be included in those articles.
16 Sometimes the articles were just about us.
17     Q. Was it a new development that restaurants were
18 receiving financing from companies like these dining
19 programs?
20     A. No, it -- in '95, it had been -- Transmedia
21 started in 1985, and they were the largest one in the
22 industry. Then Dining Ala Card started in -- I believe
23 around October of '91, and they spent over a million
24 dollars advertising just in the Chicago market when
25 they introduced that program.

10 (Pages 34 to 37)

Page 38

1     Q. Were restaurants aware that the cardholders
2  were going to receive a 20 percent discount for dining
3  at their restaurant?
4     A. Yes.
5     Q. How were they aware of that?
6     A. We had quarterly directories, and we would
7  include a directory when we mailed their statements to
8  them, because that was one of the sales features we
9  would do on making sales calls and solicitations, say,
10 you're going to be in this directory, which is going to
11 increase your business, which is one of the reasons
12 they thought it was a great program.
13    MR. GRAY: Could I please get Plaintiff's
14 Exhibit 327. And turn to page 2. And then if you
15 could highlight about two-thirds of the way down --
16 more than that -- farther down than that. Okay.
17    And if you look, it says on the right
18 side, Diners Club cardholders -- there's a dash --
19 eight lines up -- there you go -- down two lines.
20    Q. Now, this article says, Diners Club
21 cardholders who register for the free LeCard program
22 will get 20 percent off at 700 restaurants in 12
23 cities, including Chicago, Los Angeles and New York
24 City.
25    Do you see that?

Page 39

1     A. Yes.
2     Q. Is this the type of article that would be
3  published to inform the cardholders that -- or to
4  advertise the LeCard program?
5     A. Well, this was something that we didn't
6  control. This was -- you put press releases. They
7  just did an article. The things that we controlled
8  were Diners Club mailings to their cardmembers and
9  statement stuffers and, you know, their monthly
10 newsletter.
11    But this would be a general publication
12 that somebody -- this is not paid. This was general --
13 you know, like a press release or somebody just doing
14 research on a good deal. This was CNN.
15    MR. GRAY: Would you go back to the first
16 page, please.
17    Q. So this is from cnnmoney.com; is that right --
18    A. Yes.
19    Q. -- entitled Travel Clubs Can Cut your Vacation
20 Costs in Half?
21    And what is the date on that -- dated
22 February 1st, 1993?
23    And so this would be after electronic
24 draft capture began; is that correct?
25    A. Yes.

Page 40

1     Q. Have you ever met Tom Burnside of AdvanceMe?
2     A. Yes.
3     Q. When was that?
4     A. Probably maybe the first time 2000/2001.
5  We -- we used to do trade shows for the restaurant
6  industry, like the -- we did the National Restaurant
7  Association trade show in Chicago, but we also did
8  Los Angeles and New York and San Francisco and Texas.
9     And so they would be at the trade shows,
10 as we would, and -- and -- so we've -- we were -- we
11 talked. I mean, it was a competitor, but I talked to
12 him.
13    Q. Do you remember what you talked about with Tom
14 Burnside at the trade show meeting in 2000 or 2001?
15    A. Well, a couple of things. One, they were very
16 envious of our Diners Club program and wanted to know
17 if, you know, we would consider selling it, and we said
18 no.
19    But he also was fascinated by the fact
20 that we also were doing -- in addition to the Diners
21 Club LeCard program, we were doing an ACH program where
22 we just debited restaurants' bank accounts, because not
23 everyone did -- as I mentioned, Diners spotting was
24 only 3 percent. So some of the restaurants, it just
25 wasn't enough volume to give a significant amount of

Page 41

1  cash to.
2     And I remember him being real concerned
3  about being behind the money, in other words, going to
4  a bank account from his -- I don't know if it was he or
5  Konop or whatever that -- was with --
6     Q. I'm sorry, did you say Konop?
7     A. Konop.
8     Q. Was that another gentleman who was with him at
9  that meeting?
10    A. Right. He used to work at Dining Ala Card,
11 and they would -- they would debit the restaurant's
12 bank account after the fact and get the money. And a
13 lot of times they go into the accounts and the money
14 wouldn't be there, and you get rejects. And if you do
15 that, your bank hits you with a $25 fee for an NSF, and
16 charges and stuff like that. And they were
17 concerned --
18    Q. What is NSF?
19    A. Nonsufficient funds or -- so they were
20 fascinated that we could do this business and not be
21 afraid of it.
22    Q. And you said something about being behind the
23 money. What does that mean?
24    A. Well, in a Diners Club transaction, the
25 restaurant -- the money did not -- it no longer went

Page 42

1  into their bank account; it went into our bank account,
2  and then we -- you know, we sent -- we were in front of
3  the money, as opposed to in ACH, you're just -- a
4  restaurant is agreeing to let you debit their bank
5  account, like a health club payment or auto insurance,
6  where you just go into a bank account, do it on a daily
7  basis, and if the funds are insufficient, if it's off
8  by a dollar -- if you debit the account for $200 and
9  there's 199, it rejects it; it doesn't give you 199.
10    Q. So you discussed with Tom Burnside in 2000 the
11  difference between the LeCard program's getting ahead
12  of the money versus the ACH program's being behind the
13  money; is that correct?
14    A. Correct.
15    Q. Did he seem surprised that the LeCard
16  program -- in the LeCard program you were getting ahead
17  of the money?
18    A. No, he knew about that. See, we had to send a
19  cease-and-desist when -- Dining Ala Card started, I
20  mentioned, in like October of '92, and they put down
21  that you could do all these credit cards, and they had
22  listed Diners Club card, and we had an exclusive
23  agreement with Diners Club. They couldn't work with
24  anybody else nor could we work with another credit
25  card.

Page 43

1        So they had to send a cease-and-desist
2  letter to Dining Ala Card that they could not do this
3  because we had a program.
4    Q. Have you ever been contacted by the Paul
5  Hastings law firm in relation to this lawsuit?
6    A. Yes.
7    Q. When was that?
8    A. I don't know for sure, but I do have a copy of
9  a letter that they sent to engage me --
10    Q. To -- I'm sorry, what was --
11    A. -- in my briefcase.
12    Q. What was the subject matter of the
13  conversation?
14    A. They wanted to engage me as an expert witness
15  for this case.
16        MR. GRAY: If I could get Plaintiff's 279,
17  please.
18    Q. Mr. Suckow, is this the letter that you just
19  referred to?
20    A. Yes. So it was July of '06.
21    Q. July of 2006?
22        And what -- who did you discuss this with
23  from Paul Hastings, if you recall?
24    A. Well, Robert Matz and there was another
25  gentleman on the phone.

Page 44

1        Is there another carbon on this? Can you
2  show me the --
3    Q. Is that -- on the second page at the bottom,
4  there are a few carbon copies.
5        Was it any one of those four there?
6    A. Not that I recall.
7    Q. Okay. So then when they -- when they
8  discussed with you whether you would be an expert for
9  them in this case, what -- did they indicate why they
10  thought you would be a good expert for this case?
11    A. That I had been around a long time and knew
12  the business, and they thought that -- that I would be
13  a good witness. But they had asked me if I had been
14  contacted by the other side and -- or engaged by the
15  other side, and I said no.
16    Q. And why did you choose not to accept that
17  engagement?
18    A. Well, after having a little fun with these
19  guys -- I put in there -- I told them -- I said, if you
20  want to engage me, I'm not going to work for your
21  lawyers' wages; I make a lot more money per hour than
22  that. But I wanted to see if they'd send me the
23  letter, because it seemed very strange that, why would
24  you want to engage me, who definitely was doing what
25  they claimed to be getting a patent for? It seemed

Page 45

1  very strange.
2        So I contacted my attorney, and I asked
3  him about it, and he said, this is what they do to just
4  buy your silence.
5        So I told them that -- you know, when the
6  letter came, I didn't respond to the letter. And I got
7  a follow-up phone call, and they wanted to know why.
8  And I said, because you insulted me by submitting it
9  for 400 an hour when I told you it was like $1200 an
10  hour or something like that.
11    Q. And just to summarize, then, if we could look
12  back at board 335 and slide 350, just to make sure we
13  understand what is going on with the flow of funds,
14  could you walk us through the one transaction and let
15  us know where the funds go again.
16    A. Certainly. Let's just say there's a
17  Applebee's restaurant that I noticed across from the
18  hotel, and you went into that restaurant last night,
19  and they were participating in the program, and you
20  charged your meal on Diners Club, and the bill came to
21  $100. I would have charged that -- last night was
22  Monday night.
23        Diners Club would have seen that
24  transaction, known that it was a LeCard transaction.
25  They would have deducted $20 to cover the savings to

Page 46

1  the cardmember. They would have deducted another $6.40
2  processing fee. And then they would have sent the
3  $73.60 to my bank account. If that transaction
4  happened and they batched out last night, Monday night,
5  those funds would have been put into -- or would be put
6  into my bank account by Thursday.
7        For the cardmember, depending on when
8  their statement is generated, they would see their
9  charge for $100, and then right below it, they would
10 see a LeCard savings of $20 savings and what they would
11 pay Diners Club would be $80.
12       Since yesterday was the 16th, that
13 transaction would not be paid to the restaurant; that
14 would be in the second-month statement. So the 16th
15 through the 31st of July statement, they would see that
16 charge, and they would be reimbursed the $20 for the
17 tax and tip.
18    Q. So when Diners Club forwarded $73.60, is it
19 correct that Clever Ideas would apply $80?
20    A. We would credit $80 to their cash advance
21 balance. So if we had given them 10,000 or 20,000, and
22 it was the first transaction, that balance would be now
23 $9,920.
24    Q. Okay. And earlier you said that the LeCard
25 program was a way of getting ahead of the money; is

Page 47

1  that correct?
2     A. Correct.
3     Q. And that's as opposed to being behind the
4  money?
5     A. Right. If we were ACH'ing and we had agreed
6  that we would debit Applebee's bank account for $100 a
7  day, it is not dependent upon a card coming in. It's
8  an agreed payback that they -- whatever we advance,
9  they said, okay, we can take $100-a-day payment, we
10 would simply debit their bank account for $100 on every
11 banking day, or basically 250 banking days a year.
12       THE COURT: Let me ask, the $20 tax
13 and tip, is that sent back to Applebee's by you, or is
14 it sent back by Diners Club?
15       THE WITNESS: It's sent back by us
16 electronically, just ACH it into their bank account
17 twice a month.
18       THE COURT: Is there any money that flows
19 back from Diners Club to Applebee's?
20       THE WITNESS: Not on a LeCard transaction.
21       THE COURT: Thank you.
22       MR. GRAY: And along those lines, could we
23 please get -- I'm sorry -- it's Exhibit Number --
24 Defense Exhibit 2. And page 4, please.
25    Q. And this is the $600 in examples we were

Page 48

1  discussing earlier. Of those $600, it says $100
2  consisted of LeCard transactions; is that correct?
3     A. Correct.
4     Q. So of all the restaurants Diners Club
5  transactions, $500 of those were paid directly back to
6  the restaurant; is that correct?
7     A. That would be correct.
8     Q. Okay. And then of the $100 LeCard
9  transaction, 73.60 would be forwarded to Clever Ideas;
10 is that right?
11    A. That's correct.
12       MR. GRAY: Your Honor, at this time I have
13 no further questions.
14       THE COURT: Cross-examination?
15       MR. CARROLL: If the Court please, Your
16 Honor, may I approach the witness?
17       THE COURT: Yes, you may.
18            CROSS-EXAMINATION
19 BY MR. CARROLL:
20    Q. Mr. Suckow, you and I don't know each other.
21 I'll tell you, my name is Otis Carroll, and I'm one of
22 the lawyers for the folks that couldn't afford you.
23       Do you really get 1200 bucks an hour?
24    A. Yes, sir, I do.
25    Q. How often do you consult?

Page 49

1     A. Once every five years.
2     Q. Are you charging these guys what you wanted
3  from us?
4     A. No.
5     Q. Are you charging them anything?
6     A. No.
7     Q. So you came down here for free?
8     A. Right.
9     Q. And one of the reasons you came down here for
10 free is because this fellow over here with the broken
11 finger, Mr. Goldin, who's a defendant in another one of
12 these cases stirred you up about this case, didn't he?
13    A. That would be incorrect.
14    Q. Okay. He sent you the patent and talked to
15 you about what he thought it meant, but you've never
16 even read the patent, have you?
17    A. That would be incorrect.
18    Q. Well, you hadn't as of the time you gave your
19 deposition, had you?
20    A. He never sent me the patent.
21    Q. Well, didn't you testify in the deposition
22 that you got the patent but you didn't bother to read
23 it?
24    A. I might have, but I don't ever recall getting
25 it.

13 (Pages 46 to 49)

Page 58

1     A. Probably four or five times.
2     Q. Okay. There have been a lot of other folks
3  out in the gallery here who have an interest in the
4  case, including a guy who's going to testify, I guess,
5  tomorrow, Mr. Litle.
6          Have you talked to Mr. Litle about this
7  lawsuit?
8     A. No, I just was introduced to him for the first
9  time today. I knew of him from years ago.
10    Q. Okay. And everything you're doing in this
11 case for the Defendants you're doing for free? They're
12 not even reimbursing your expenses; is that your
13 testimony?
14    A. I would expect to be reimbursed for my
15 airfare.
16    Q. Okay. But we get the $1200 bill and they get
17 the free testimony, correct?
18    A. Correct.
19       MR. CARROLL: Thank you.
20       THE COURT: Redirect?
21          REDIRECT EXAMINATION
22 BY MR. GRAY:
23    Q. Mr. Suckow, why are you testifying today?
24    A. It's the way I was raised: It's the right
25 thing to do, tell the truth, not be bought.

Page 59

1     Q. And you -- Mr. Carroll mentioned something
2  about having 10 different conversations with the
3  Defendants' counsel before your deposition. Do you
4  remember that question? That was Mr. Carroll.
5     A. Okay. Yes. I remember him saying that, yes.
6     Q. And do you remember telling me when we met at
7  the deposition that you thought we represented the
8  Plaintiffs?
9     A. Yes.
10    Q. So those conversations could have been with
11 Plaintiff's counsel or with Defendants' counsel; you
12 didn't know --
13    A. That's correct.
14    Q. -- who represented whom in this lawsuit; is
15 that correct?
16    A. No, that's correct, because I couldn't
17 understand why I needed to be deposed for like seven
18 hours and not be paid for that, for $40.
19    Q. Now, as -- as a capital provider, is there any
20 difference between this method of repayment and this
21 method of repayment?
22    A. No.
23    Q. Is there any difference in the risk assumed by
24 the capital provider between this method of repayment
25 and this method of repayment? Sorry, this method of

Page 60

1  repayment and the one that I've just changed it to?
2     A. Well, I guess $3 less.
3     Q. Is there any difference in risk between the
4  first method and the second method on this board?
5     A. No.
6     Q. What's the advantage of having a method like
7  this versus ACH'ing the merchant's account, if there is
8  any?
9        THE COURT: Excuse me. Mr. Gray, when
10 you're asking about risk, risk to whom are you --
11       MR. GRAY: Risk to the capital provider,
12 Your Honor.
13       THE COURT: All right.
14    Q. Is there any difference in risk to the capital
15 provider between the method that was first on this
16 board and the method I've just changed this to?
17    A. No.
18    Q. You mentioned that you spoke to Jim
19 Delasandro; is that correct?
20    A. Yes.
21    Q. And who is Jim Delasandro?
22    A. Jim Delasandro used to be a vice president of
23 AdvanceMe, who had contacted me about possibly coming
24 to work for me. So I've talked to him probably for the
25 -- over the last four or five years.

Page 61

1     Q. So it was a former vice president of AdvanceMe
2  that described to you what AdvanceMe claims to have
3  invented; is that correct?
4     A. Correct.
5        MR. GRAY: No further questions.
6        MR. CARROLL: Just a couple real quick,
7  Your Honor.
8          RECROSS-EXAMINATION
9  BY MR. CARROLL:
10    Q. Did I understand what you told Mr. Gray
11 correctly that under the Clever Ideas program, the only
12 way the restaurant borrower or merchant, I guess is a
13 better way to say it, could repay Clever Ideas was from
14 the credit card transactions?
15    A. According to the agreement.
16    Q. Okay. Let's look at that agreement.
17       MR. CARROLL: May I approach, Your Honor?
18       THE COURT: Yes, you may.
19       MR. CARROLL: Show 215, please.
20    Q. Okay. And this is -- can you lift out
21 paragraph 4 Roman -- I mean, Arabic 4. Wait a minute.
22 That's not right, Arabic 3.
23       Now, Mr. Suckrow (sic), if you don't
24 mind --
25    A. Suckow.

16  (Pages 58 to 61)