# EXHIBIT G

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

```
ADVANCEME, INC.,              )
                              )
VS.                           )   Case No.:
                              ) 6:05CV-424-LED-JDL
RAPIDPAY, LLC, BUSINESS       )   Tyler, Texas
CAPITAL CORPORATION, FIRST    )
FUNDS, LLC, MERCHANT MONEY    )
TREE, INC., REACH             )
FINANCIAL, LLC AND FAST       )
TRANSIT, INC. d/b/a SIMPLE    )   July 17, 2007
CASH                          )   1:07 p.m.
```

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE LEONARD DAVIS
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:        MR. RONALD S. LEMIEUX
                          MR. MICHAEL N. EDELMAN
                          MR. VID BHAKAR
                          MR. ROBERT C. MATZ
                          MS. SHANEE Y. WILLIAMS
                          Paul, Hastings, Janofsky &
                          Walker, LLP
                          Five Palo Alto Square
                          Sixth Floor
                          Palo Alto, CA 94306-2155

                          MR. OTIS W. CARROLL
                          MS. DEBORAH RACE
                          Ireland, Carroll & Kelley, PC
                          6101 South Broadway, Suite 500
                          Tyler, TX 75703

APPEARANCES CONTINUED ON NEXT PAGE

COURT REPORTER:           MS. THERESE J. CASTERLINE,
                          CSR, RMR, CRR
                          Deputy Official Court Reporter

(Proceedings recorded by mechanical stenography, transcript produced on CAT system.)

Page 2

```
 1  APPEARANCES CONTINUED
 2  FOR THE DEFENDANTS:  MR. WILLEM G. SCHUURMAN
                         MR. BRIAN BUSS
 3                       MR. GRAHAM E. SUTLIFF
                         MR. JOSEPH D. GRAY
 4                       Vinson & Elkins, LLP
                         2801 Via Fortuna, Suite 100
 5                       Austin, TX 78746
 6                       MR. DOUGLAS R. McSWANE, JR.
                         Potter Minton, PC
 7                       110 North College
                         500 Plaza Tower
 8                       Tyler, TX 75702
 9                       MR. JEFF SANDERS
                         Roberts & Ritholz
10                       183 Madison Avenue, Penthouse
                         New York, NY 10016
11
12              * * * * * * * *
13              PROCEEDINGS
14           THE BAILIFF: All rise.
15           THE COURT: Please be seated.
16           All right. Who will be our next witness?
17           MR. GRAY: Your Honor, the Defense would
18  like to call Lee Suckow.
19           THE COURT: Who?
20           MR. GRAY: Lee Suckow.
21           THE COURT: All right. This is by
22  agreement out of order?
23           MR. CARROLL: That's correct, Your Honor.
24           THE COURT: Has the witness been sworn?
25           MR. GRAY: No, Your Honor.
```

Page 3

```
 1              LEE GERHARDT SUCKOW,
 2  having been first duly sworn, testified as follows:
 3              DIRECT EXAMINATION
 4  BY MR. GRAY:
 5     Q. Good afternoon, Mr. Suckow.
 6     A. Good afternoon.
 7     Q. Would you please state and your spell your
 8  name for the record.
 9     A. Lee Gerhardt Suckow, L-E-E, G-E-R-H-A-R-D-T,
10  S-U-C-K-O-W.
11     Q. Mr. Suckow, how are you currently employed?
12     A. I'm the chairman and chief executive of Clever
13  Ideas.
14     Q. What is the business of Clever Ideas?
15     A. We market and finance restaurants and we also
16  own restaurants.
17     Q. How long have you held that position?
18     A. I founded the company 30 years ago.
19     Q. And have you been employed by Clever Ideas for
20  the last 30 years?
21     A. Yes.
22     Q. Are you familiar with the LeCard program that
23  is offered by Clever Ideas?
24     A. Yes, I created it.
25     Q. Can you please briefly describe what the
```

Page 4

```
 1  LeCard program was.
 2     A. We advanced money or advertising to
 3  restaurants, and they paid it back through Diners Club
 4  receipts. To incent the Diners Club cardmembers to go
 5  to the restaurant, they were given a 20 percent savings
 6  off their total check.
 7           So if you went to a restaurant and spent
 8  $100 and, say, had $7 worth of tax and 18 percent tip,
 9  total charge of 125, you would sign for 125 in the
10  restaurant, and then when you got your bill from Diners
11  Club, you would see the 125 charge at the restaurant,
12  and then right below, it would say LeCard savings, and
13  it would be 20 percent, so it would be a $25 savings.
14     Q. And how was Clever Ideas repaid for those cash
15  advances?
16     A. We would get the money, Diners would send the
17  money to our bank account, and then we would get the
18  proceeds after they took off the customer savings and
19  their fees. And then we would get a -- our share and
20  then return 20 percent of the gross transaction to the
21  restaurants for tax and tip.
22     Q. So was Clever Ideas ever repaid by the
23  merchant or from the merchant?
24     A. From the merchant.
25     Q. Was it always -- I'm sorry if that was a
```

Page 5

```
 1  confusing question.
 2           Was Clever Ideas always repaid directly
 3  from Diners Club.
 4     A. Yes.
 5           THE COURT: Could you maybe clarify for
 6  me with the witness -- I'm not exactly sure how Diners
 7  Club works and LeCard works, whether it's a credit card
 8  or just a discount card or exactly what. So sort of --
 9           MR. GRAY: Yes, Your Honor.
10           THE COURT: -- start at that for me.
11           MR. GRAY: Okay. If I could get board
12  B 35 and slide 350.
13     Q. And, Mr. Suckow, this is a diagram that we
14  created based on your testimony that you've given in
15  this case.
16           And I guess to start at very beginning,
17  what is the LeCard card?
18     A. LeCard came out as a separate piece of plastic
19  in November of 1990. It was actually a Diners Club
20  card, but it had a different graphic of the LeCard
21  logo.
22           In 1991, it became embedded into the
23  regular Diners Club card, where just the LeCard logo
24  was on the back side of the card; and on the front side
25  of the card, it said LCUS rather than DCUS, indicating
```

Page 62

```
 1      Q. Suckow, I beg your pardon.
 2          Look at paragraph 3. That's your terms
 3   and conditions, right?
 4      A. Uh-huh.
 5      Q. Okay. And read for Judge Davis where it says,
 6   restaurant shall repay --
 7      A. That's number 3.
 8      Q. Right.
 9      A. You said number 4.
10      Q. I beg your pardon.
11          Read for Judge Davis how the restaurant
12   under your agreement can repay your cash advance.
13      A. Restaurant shall repay all such cash advances
14   and/or purchases to CLI by providing a dollar amount of
15   goods and services as reflected on the reverse side of
16   this agreement to Diners Club cardmembers, herein
17   called cardmember credits, and/or by a cash repayment
18   as reflected on the reverse side of this agreement.
19      Q. Okay.
20      A. The tax and gratuity which is included in the
21   charge shall be separately reimbursed by CLI to
22   restaurant and shall not be included in calculating
23   cardmember credits.
24      Q. So under your agreements, the merchant can
25   repay in cash? That's what that document says?
```

Page 63

```
 1      A. That would be correct.
 2          MR. CARROLL: No further questions.
 3          THE COURT: Redirect?
 4          MR. GRAY: No, Your Honor.
 5          THE COURT: All right. You may stand
 6   down. Thank you.
 7          All right. Let's see. Who will your next
 8   witness be?
 9          MR. GRAY: Mr. Edward Landon, Your Honor.
10          THE COURT: How long will he take?
11          MR. GRAY: I don't believe he'll take more
12   than 20 minutes on direct. He's essentially testifying
13   on what Mr. Suckow testified to.
14          THE COURT: All right. You may proceed.
15          MR. GRAY: Mr. Landon.
16          THE COURT: Has he been sworn?
17          MR. GRAY: He has not.
18          THE COURT: Please raise your right hand
19   to be sworn.
20              EDWARD W. LANDON,
21   having been first duly sworn, testified as follows:
22              DIRECT EXAMINATION
23   BY MR. GRAY:
24      Q. Good afternoon, Mr. Landon.
25      A. Good afternoon.
```

Page 64

```
 1      Q. Would you please spell your name for the
 2   record.
 3      A. Edward W. Landon, E-D-W-A-R-D, W.,
 4   L-A-N-D-O-N.
 5      Q. Mr. Landon, how are you currently employed?
 6      A. Vice president and chief financial officer of
 7   Clever Ideas.
 8      Q. And how long have you been at Clever Ideas?
 9      A. Nearly 13 years.
10      Q. Have you ever known a man by the name of Adam
11   Cetric?
12      A. I do.
13      Q. Who is Adam Secher?
14      A. Adam Secher is a former sales representative
15   of Clever Ideas.
16      Q. And when did he leave Clever Ideas?
17      A. Roughly 2000.
18      Q. And where did he -- where did he go after he
19   left Clever Ideas?
20      A. I believe he had had a short stint at
21   AdvanceMe.
22      Q. Are you familiar with the LeCard program that
23   was offered by Clever Ideas in the early 1990s?
24      A. I am.
25      Q. Would you please briefly describe what that
```

Page 65

```
 1   program was.
 2      A. The LeCard program is a financing program for
 3   restaurants where the restaurants were marketed to
 4   Diners Club cardmembers. Diners Club cardmembers would
 5   earn a 20 percent savings while using their Diners Club
 6   card in the restaurant. The proceeds from the LeCard
 7   transactions would be utilized to repay cash advances
 8   made by Clever Ideas to restaurants.
 9      Q. And was this the way the LeCard program
10   operated between 1992 and 1996?
11      A. Correct.
12      Q. Okay. And how did the cardholders receive
13   their 20 percent discount?
14      A. That was credited to them by Diners Club.
15          MR. GRAY: Could I please get VX 350.
16      Q. This is the diagram we were just using that
17   has now been written on.
18          Would you please walk me through a LeCard
19   transaction at a restaurant and let me know if there's
20   anything about this diagram that is incorrect.
21      A. Okay. A Diners Club cardmember would go into
22   a restaurant that is participating on the LeCard
23   program. They would charge their entire meal, which
24   would include tax and gratuity. That transaction would
25   go through their credit card terminal. It would then
```

Page 66

1  be sent to Diners Club, at which point Diners Club
2  would identify that transaction as a LeCard
3  transaction.
4       They would issue a 20 percent, or $20 in
5  this example, savings to the cardmember. They would
6  forward net proceeds to Clever Ideas, which would be
7  7 -- $73.60 on this transaction, which would be net of
8  a 6.4, or $6.40, processing fee and the $20 cardmember
9  savings.
10      Clever Ideas would then book-keep the
11 transaction for the restaurant, show them on a
12 statement the transaction, apply the $80, which would
13 be the food and beverage portion of the transaction to
14 their balance with us, and reimburse the restaurant
15 20 percent, or $20, for tax and tip.
16    Q. And what was your position when you joined
17 Clever Ideas in 1994?
18    A. Initially, I was hired as their controller.
19    Q. And what were your responsibilities as a
20 controller?
21    A. Primary responsibilities as controller were
22 day-to-day cash management, financial reporting,
23 banking relationships, managing the accounting
24 function.
25    Q. Are you aware whether Clever Ideas marketed

Page 67

1  the LeCard program?
2     A. I am aware, yes.
3     Q. What did Clever Ideas do to market that
4  program?
5     A. We had a sales force that would directly
6  solicit restaurants. We participated in trade shows.
7  We worked with Guest Informant, which was their hotel
8  publication. Their sales force marketed the LeCard
9  program. We sent out oversized postcards to market the
10 LeCard program to restaurants. We worked
11 with/trained/communicated to Diners Club sales reps how
12 the LeCard program would make good sense for
13 restaurants, enabling those restaurants to accept the
14 Diners Club card.
15    Q. Other than the precise amount of processing
16 fees charged to Clever Ideas by Diners Club, was
17 anything about VX 350 in any way confidential or
18 concealed from the public?
19    A. No.
20    Q. Did employees of Clever Ideas -- were they
21 ever required to sign confidentiality agreements?
22    A. No.
23       MR. GRAY: If I could please get Defense
24 Exhibit 4.
25    Q. Again, this is a cash advance agreement we

Page 68

1  were looking at a while ago dated 1995, where Clever
2  Ideas advanced $3,000 in cash in exchange for the
3  restaurant's promise to repay $6,000 in food and
4  beverages. Do you see that?
5     A. Yes.
6     Q. Are you familiar with this agreement, or this
7  type of agreement?
8     A. This is an evolution of our general cash
9  advance agreement.
10    Q. So was this the standard cash agreement in use
11 in 1995?
12    A. That is correct.
13       MR. GRAY: If I could please get the
14 second page of this exhibit, the terms and conditions,
15 and could you please highlight the first paragraph.
16    Q. The first paragraph says, Clever Ideas is in
17 the business of providing cash advances and/or
18 purchasing products and services to restaurants who
19 have entered into member establishment agreements with
20 Citicorp Diners Club. Do you see that?
21    A. I do.
22    Q. Is that correct, that Clever Ideas provided
23 cash advances in the 1995 time frame?
24    A. Correct.
25    Q. And is it correct that the restaurants to whom

Page 69

1  those advances were provided were required to use
2  Diners Club as their processor?
3     A. Correct.
4        MR. GRAY: And if you could please
5  highlight the third paragraph.
6     Q. I believe the -- the Plaintiff was asking a
7  question about this term and condition a while ago.
8        Paragraph 3 states that restaurants shall
9  repay all such cash advances and/or purchases to Clever
10 Ideas by providing a dollar amount of goods or services
11 as reflected on the reverse side of this agreement to
12 Diners Club cardmembers and/or by cash repayment as
13 reflected on the reverse side of this agreement.
14       Do you see that sentence?
15    A. Yes.
16    Q. Roughly, what percentage of Clever Ideas' cash
17 advances were repaid by a cash repayment rather than
18 through Diners Club?
19    A. Generally, it would only be in restaurants
20 that had defaulted on the agreement that we had entered
21 into litigation with or ultimately sued. So for them
22 to repay us, they were then forced to pay our contract
23 in cash.
24    Q. Now, from the perspective of Clever Ideas, the
25 capital provider, was there -- would there have been

Page 70

1  any difference between receiving payment from Diners
2  Club like Clever Ideas did, or receiving payment like
3  Clever Ideas did along with Diners Club forwarding
4  payment to the merchant?
5      A. You have to do that -- do that for me one more
6  time.
7      Q. Would Clever Ideas have cared one way or the
8  other if Diners Club forwarded any payment to the
9  merchant along with its payment to Clever Ideas?
10     A. No, as long as we got paid.
11     Q. When did the LeCard program end?
12     A. It ended in November of 2002.
13     Q. And why did it end?
14     A. Diners Club terminated the agreement.
15     Q. Why did Diners Club terminate the agreement?
16     A. Ultimately, it's because they converted their
17 cards from individual Diners Club cards to cobranded
18 MasterCards. And then, as it says in the agreement,
19 you have to process proprietarily with Diners Club.
20 When those cards were no longer a unique Diners Club
21 card but then became a MasterCard, they were then
22 processed by a bank-licensed processor we could no
23 longer get the cash.
24     Q. From Diners Club?
25     A. From Diners Club.

Page 71

1      Q. Mr. Landon, why are you here testifying today?
2      A. We were subpoenaed to be deposed. We were
3  deposed. It's -- technically, I'm here because
4  Mr. Suckow's here.
5      Q. And what do you mean by that?
6      A. Well, we're -- we've been doing this business
7  quite some time. I've been involved in it for 13
8  years. The -- the goal is to provide our testimony on
9  a truthful basis so that you guys can resolve your
10 issue.
11     Q. Okay. And on VX 350 -- again, this is -- this
12 was precisely how the LeCard program operated in 19 --
13 beginning in 1992; is that correct?
14     A. For LeCard transactions, that is correct.
15         MR. GRAY: Nothing further, Your Honor.
16         THE COURT: Okay. Cross-examination?
17         MR. CARROLL: No questions, Your Honor.
18         THE COURT: All right. You may stand
19 down.
20         All right. Who will be the next witness?
21         MR. MATZ: Your Honor, it would be the
22 video testimony of William Benedict.
23         THE COURT: And that's about an hour?
24         MR. MATZ: The same count that I gave this
25 morning, Your Honor.

Page 72

1          THE COURT: Okay. I think we'll take a
2  15-minute recess until 10 minutes until 3:00.
3          THE BAILIFF: All rise.
4          (Recess 2:35-2:57 p.m.)
5          THE BAILIFF: All rise.
6          THE COURT: Please be seated.
7          All right. There's been an inquiry of how
8  much time the parties have used. This would be
9  inclusive of the times that were given to me for the
10 video depositions, which I've already added in, and
11 including those times through completion of the video
12 depositions. The Plaintiffs have used six hours, 15
13 minutes, and the Defendants have used two hours, 55
14 minutes.
15         You may proceed with the next video.
16         MR. MATZ: Your Honor, the next video
17 deposition will be of William Benedict. It will be an
18 hour and five minutes long.
19         THE COURT: All right. Very well.
20         (Video playing.)
21     EXAMINATION BY MR. MATZ (VIDEO EXCERPT)
22     Q. Could you state your name and title.
23     A. William J. Benedict, Jr. I'm CEO of Reach.
24     Q. Does Reach Financial do business under any
25 other name other than Reach Financial?

Page 73

1      A. We do. We did a few transactions under the
2  name of Reach Finance, similar business.
3      Q. And when did you do business as Reach Finance?
4      A. In 2005 and 2006.
5      Q. And are you still doing business under the
6  name Reach Finance?
7      A. No.
8      Q. Now, Mr. Benedict, have you seen this document
9  before?
10     A. I have.
11     Q. And what is this document?
12     A. This is an irrevocable payment instructions
13 letter, which the -- a merchant that is -- that we
14 would be financing signs to give instructions to a
15 processor.
16     Q. And with respect to --
17     A. Generally, it directs the processor to follow
18 some instructions that we might give them.
19     Q. How does -- how does the money flow from a
20 merchant processor to Reach Financial?
21     A. Well, first of all, it doesn't flow from -- to
22 us from a merchant processor. We -- the merchant
23 processor in -- in -- in all cases -- shall I use an
24 example?
25     Q. Sure.