# EXHIBIT H

Dockets.Justia.com

**McBrearty**

**Total Length of Defendant Clips: 00:29:25**
**Total Length of Plaintiff Clips: 00:16:09**
**Total Length of Combined Clips: 00:45:34**

DEFENSE: McBrearty_005.23-006.21   Length of Clip is: 00:01:53

| | | |
|---|---|---|
| 5: | 23 | Q. Mr. McBrearty, can you briefly explain to me |
| 5: | 24 | your background in the card processing industry? |
| 5: | 25 | A. Sure. I was -- came to work for Citibank -- I |
| 6:Page 6 | | |
| 6: | 1 | forget the year, but I was there 22 years, and I left |
| 6: | 2 | last August. So it was 22 years last July, I believe. |
| 6: | 3 | And I first worked for a Citibank company called |
| 6: | 4 | Citicorp Retail Services, and we provided cards to |
| 6: | 5 | largely department stores and a few others sorts of |
| 6: | 6 | merchants. |
| 6: | 7 | And in 1988, I went to work for Diners Club, |
| 6: | 8 | also a Citibank company, and I was with Diners Club |
| 6: | 9 | until the last -- early part of August of last year. |
| 6: | 10 | And Diners Club is both an issuer and an acquirer, so we |
| 6: | 11 | largely acquired all of our transactions. You know, |
| 6: | 12 | around the world it's a franchise business, but I worked |
| 6: | 13 | for Diners Club North America, and so I'm familiar with |
| 6: | 14 | that. |
| 6: | 15 | I was actually on the business side, but I'm |
| 6: | 16 | very familiar with how we processed charges and the |
| 6: | 17 | systems that were involved in that, because I used to |
| 6: | 18 | provide liaison to the technology group and be sort of |
| 6: | 19 | the director of technology projects that were done on |
| 6: | 20 | behalf of the group that I was in, which was called |
| 6: | 21 | "establishment sales." |

DEFENSE: McBrearty_010.07-010.10   Length of Clip is: 00:00:12

| | | |
|---|---|---|
| 10: | 7 | Q. And did Diners Club -- for those transaction |
| 10: | 8 | for which it was the merchant processor, did it charge |
| 10: | 9 | the merchant any processing fee? |
| 10: | 10 | A. Of course. That's how we made our money. |

DEFENSE: McBrearty_016.08-016.14   Length of Clip is: 00:00:21

| | | |
|---|---|---|
| 16: | 8 | Q. Now, did you have any involvement with LeCARD- |
| 16: | 9 | Clever Ideas? |
| 16: | 10 | A. I did, yes. |
| 16: | 11 | Q. And when did you first become involved with |
| 16: | 12 | LeCARD-Clever Ideas? |
| 16: | 13 | A. I'm not sure, but I would guess that it was |
| 16: | 14 | probably in about 1990 or '91. |

DEFENSE: McBrearty_017.07-018.24   Length of Clip is: 00:02:32

| | | |
|---|---|---|
| 17: | 7 | Q. The president of Clever Ideas at that time |
| 17: | 8 | was -- do you recall his name? |
| 17: | 9 | A. Lee Suckow. |
| 17: | 10 | Q. Lee Suckow. So you said, "That was the |
| 17: | 11 | genesis of the business we put together." Who's the we? |
| 17: | 12 | A. Well, you know, it started out Lee and I |

| | | |
|---|---|---|
| 17: | 13 | planned it all, and then -- you know, on our side then |
| 17: | 14 | there was our operations people and our systems people |
| 17: | 15 | and all of that, but we started it with, you know, I |
| 17: | 16 | suppose, just the two of us. |
| 17: | 17 | And, you know, it started as a very small |
| 17: | 18 | enterprise in Chicago with a list of 30 or so |
| 17: | 19 | restaurants, and everything was done by hand. You know, |
| 17: | 20 | we had to see if this business would work. And we |
| 17: | 21 | actually had to -- we had to issue a separate piece of |
| 17: | 22 | plastic, because we couldn't differentiate between the |
| 17: | 23 | kinds of transactions we had and all this. |
| 17: | 24 | And so we did that. We issued plastic to our |
| 17: | 25 | card members in Chicago, and we had a little list of |
| 18:Page 18 | | |
| 18: | 1 | restaurants. It was, you know, pretty little on a sheet |
| 18: | 2 | of paper, you know. Said, here, you can, you know -- |
| 18: | 3 | and you can -- when you dine in these restaurants, |
| 18: | 4 | you'll get a 20 percent credit, but instead of offering |
| 18: | 5 | your Diners Club card, present this LeCARD, which was |
| 18: | 6 | tied to their -- tied to their Diners Club account. So |
| 18: | 7 | it was -- could be done electronically. Eventually, it |
| 18: | 8 | could be done electronically. |
| 18: | 9 | We first started with making sure we did |
| 18: | 10 | everything with paper so that we could control it and |
| 18: | 11 | watch it and do all of that stuff. You know, when you |
| 18: | 12 | first start that business, you look at every transaction |
| 18: | 13 | every day and that kind of thing. Started it and -- to |
| 18: | 14 | see if it would work, and it did, so we built the |
| 18: | 15 | business from that. |
| 18: | 16 | Q. And did you remain involved with the LeCARD |
| 18: | 17 | side of the Diners Club business while you remained at |
| 18: | 18 | Diners Club? |
| 18: | 19 | A. Yeah. For about, I would think -- I was doing |
| 18: | 20 | different work, so probably until about 1998 or -- '97, |
| 18: | 21 | '98, or somewhere in there, I handed it off to -- and it |
| 18: | 22 | was -- the marketing side went to our marketing group, |
| 18: | 23 | and the operations side stayed in -- and I didn't have |
| 18: | 24 | anything to do with it after that point. |

DEFENSE: McBrearty_019.04-019.12*    Length of Clip is: 00:00:37

| | | |
|---|---|---|
| 19: | 4 | Q. (BY MR. SCHUURMAN) Mr. McBrearty, I'm handing |
| 19: | 5 | you what has been marked as Diners Club Exhibit 3, DC3. |
| 19: | 6 | And that's a collection of documents, and I'd like to go |
| 19: | 7 | through them at our leisure, but first of all, I'd like |
| 19: | 8 | to focus you on the first page. |
| 19: | 9 | And the first page has the heading on the top |
| 19: | 10 | left "LeCARD." It is dated October 29, 1992, and it is |
| 19: | 11 | signed by Lee Suckow, president. Do you see that? |
| 19: | 12 | A. Uh-huh, yes. |

SHOW 002

DEFENSE: McBrearty_021.08-022.23    Length of Clip is: 00:03:04

| | | |
|---|---|---|
| 21: | 8 | Q. Okay. And when you say, "processed |
| 21: | 9 | electronically like any other Diners Club card," what |
| 21: | 10 | does that mean? Does that mean that -- explain it to |
| 21: | 11 | me. What does that mean? |
| 21: | 12 | A. Well, the Diners Club card would -- when it |
| 21: | 13 | was -- when the Diners Club card with the LeCARD logo on |
| 21: | 14 | the back of it, which, by definition, was a Diners Club |
| 21: | 15 | personal card, as opposed to a corporate card -- when |
| 21: | 16 | that restaurant -- when that card was presented in the |
| 21: | 17 | restaurant, and that would be a restaurant that was |
| 21: | 18 | contractually participating in this program, that card |

```
21: 19      would be swiped like any other -- like any other Diners
21: 20      Club card or any other card, actually.
21: 21      And that transaction would first be authorized
21: 22      by our system, and then subsequently the transaction
21: 23      would be delivered to our merchant system. And that
21: 24      merchant system would divide -- well, I shouldn't say
21: 25      "divide." It's probably the wrong word. The
22:Page 22
22:  1      programming can be put in place, so our merchant system
22:  2      would take -- would process the transaction.
22:  3      And the LeCARD transactions were processed in
22:  4      a slightly different fashion than typical transactions.
22:  5      The system would take the transaction and it would
22:  6      calculate 20 percent, and that value would be sent
22:  7      electronically to our cardholder system. The full
22:  8      transaction itself would be -- the value of that would
22:  9      be sent to the cardholder system.
22: 10      Then the merchant fee would be taken, and this
22: 11      fee was somewhat larger than our typical merchant fee,
22: 12      but it was in the merchant fee category on our system.
22: 13      We would withhold that, and then we would make payment
22: 14      of the balance, the net, to LeCARD.
22: 15      Q. And how would that payment of the balance, the
22: 16      net, be paid to LeCARD?
22: 17      A. ACH.
22: 18      Q. So that's certainly electronic, isn't it?
22: 19      A. Uh-huh.
22: 20      Q. So for these Diners Club/LeCARD transactions,
22: 21      was Diners Club still the merchant processor for those
22: 22      transactions?
22: 23      A. Yes.
```

DEFENSE: McBrearty_025.09-025.13   Length of Clip is: 00:00:21

```
25:  9      Q. If you could continue on that Diners Club
25: 10      Exhibit 3, if we go to the fourth paragraph, it says,
25: 11      "Enclosed you will also find a document that enables you
25: 12      to have Diners Club send the LeCARD charges directly to
25: 13      us for your account." Do you see that?
```

DEFENSE: McBrearty_025.21-027.06*   Length of Clip is: 00:02:08

```
25: 21      Q. Okay. And if you could turn to the next page
25: 22      of Diners Club Exhibit 3, I believe that's the document
25: 23      that is being referred to there. And do you see that
25: 24      language --
25: 25      A. Yes.
26:Page 26
26:  1      Q. -- "Effective immediately please pay me for my
26:  2      Diners Club and Carte Blanche charges and pay LeCARD for
26:  3      only my LeCARD charges." Do you see that?
26:  4      A. Yeah.
26:  5      Q. Can you explain what that means, please?
26:  6      A. We would have a contractual relationship with
26:  7      the individual restaurants, and that describes that
26:  8      we're going to take the transactions in, we're going to
26:  9      keep a fee, and there's a -- there's a lot of things
26: 10      that they have to do with respect to authorization and
26: 11      that we would pay them. And that was the relationship.
26: 12      So we required that this document be in place,
26: 13      and we had a matter of record. And it was -- we needed
26: 14      it for our own protection. Certainly it was a Citibank
26: 15      audit issue. We needed to make sure that we had in
26: 16      place, so that -- this is an exception to what our
```

```
26: 17    contract would say. It isn't described as that, but I
26: 18    suppose, you know, in retrospect, you could probably say
26: 19    that it would have been smart to call it an exception.
26: 20    But in the event, the transactions that would
26: 21    be coming in from the restaurant, only a portion of
26: 22    those would be LeCARD. So the other ones would be --
26: 23    the other ones would be Diners Club corporate card
26: 24    transactions and Carte Blanche transactions. And those
26: 25    we continued to handle and pay like we always had. So
27:Page 27
27:  1    we paid the restaurant ACH.
27:  2    And this was saying, but if they're LeCARD
27:  3    transactions, we're not going to pay you, like it says
27:  4    in our contract. We're going to pay LeCARD.
27:  5    Q. Okay.
27:  6    A. And so that handled that situation.
```

SHOW 002-0002

DEFENSE: B_McBrearty_031.06-032.07*   Length of Clip is: 00:01:32

```
31:  6    Q. Okay. And then going on to the next page?
31:  7    A. This is what was referred to in the letter --
31:  8    in the letter to the restaurants as a letter of change.
31:  9    Q. Okay.
31: 10    A. And letter of change is a -- was a Diners Club
31: 11    terminology for a letter that was, again, generated by
31: 12    the mainframe to describe something that -- where the
31: 13    payment to the restaurant had a difference than what was
31: 14    submitted to Diners Club; some difference. It could be
31: 15    a chargeback. It could be something, but it explains
31: 16    what the change is --
31: 17    Q. Okay.
31: 18    A. -- between what they sent us and what we were
31: 19    paying them.
31: 20    Q. Okay. And what is this one? Explain what
31: 21    this is.
31: 22    A. Well, and this one would be pulling out -- in
31: 23    the total, it was described -- in the total of $600 that
31: 24    they submitted, $100 was a LeCARD charge. So that was
31: 25    going to be put over here, and it refers back to the
32:Page 32
32:  1    statement here that says, there's the other $500.
32:  2    So the $500 constitutes the -- which would be
32:  3    the regular Diners Club charges and the Carte Blanche
32:  4    charges. This is the $100. This is the LeCARD charge.
32:  5    This is telling the restaurant, why is this only 500?
32:  6    We sent -- the restaurant sent us 600. Here's 500.
32:  7    Here's the other 100 that goes, you know, to LeCARD.
```

SHOW 002-0004

DEFENSE: McBrearty_032.08-032.10   Length of Clip is: 00:00:07

```
32:  8    Q. Okay. And then that's the page that has
32:  9    LC 0004 at the bottom right, right?
32: 10    A. Correct.
```

PLAINTFF: PL_McBrearty_032.18-033.03*   Length of Clip is: 00:00:52

```
32: 18    Q. What is this page that's got LC 0005?
32: 19    A. LC 00005.
32: 20    Q. Okay. Can you explain that to me, please?
32: 21    A. Yes. This -- this is a statement that LeCARD
32: 22    sent to the restaurant to describe what happens with the
32: 23    transaction that was referred to on LC 00004. And that
32: 24    is -- now, this is the reconciliation of that, since the
```

```
32:  25      hundred dollars is the gross transaction, that, you
33:Page 33
33:   1      know, the food and beverage part of it is $80. The tax
33:   2      and tip is 20. So they're paying the restaurant 20 and
33:   3      crediting the $80 against their advertising account.
```

SHOW 002-0005

PLAINTFF: PL_McBrearty_035.19-036.01   Length of Clip is: 00:00:23

```
35:  19      Q. Okay. And so as reflected on this particular
35:  20      document that you've got in front of you, this one that
35:  21      ends with the 5, LC 00005 --
35:  22      A. Yes.
35:  23      Q. -- that reflects that of the transaction
35:  24      amount of $100, $80 has been applied by LeCARD to reduce
35:  25      the merchant's advertising obligation; is that correct?
36:Page 36
36:   1      A. Yes.
```

PLAINTFF: PL_McBrearty_036.02-036.17   Length of Clip is: 00:01:25

```
36:   2      Q. Okay. And what was the arrangement between
36:   3      Diners Club and LeCARD as to the payment of the tax and
36:   4      tip to the restaurant? Or let me rephrase that. If you
36:   5      understand my question.
36:   6      A. Yes. But that -- that wasn't -- it wasn't our
36:   7      obligation. It was LeCARD's obligation. So I'm
36:   8      assuming that it was part of the contract that said that
36:   9      they agreed to do that. But it was always part of the
36:  10      arrangement that the restaurant received the tax and tip
36:  11      in real money, you know, because they had to pay the
36:  12      government and because they had to pay the wait staff.
36:  13      And so certainly, that was part of the LeCARD restaurant
36:  14      contract, but it wasn't our obligation to pay them.
36:  15      Q. And you didn't -- did Diners Club want to have
36:  16      any responsibility for that obligation or not?
36:  17      A. No.
```

DEFENSE: McBrearty_036.24-037.14**   Length of Clip is: 00:00:44

```
36:  24      Q. For these -- for this transaction example that
36:  25      we've just gone through, did Clever Ideas-LeCARD play
37:Page 37
37:   1      any role in processing this transaction, if you know
37:   2      what I mean? Or let me rephrase it. Who was the
37:   3      processor for this transaction?
37:   4      A. Diners Club was the processor.
37:   5      Q. Diners Club?
37:   6      A. Uh-huh.
37:   7      Q. So all -- so Diners Club, for this type --
37:   8      this transaction of a hundred dollars, would Diners Club
37:   9      have authorized the transaction?
37:  10      A. Yes.
37:  11      Q. And it would have -- would it have told the
37:  12      merchant electronically that it's okay to go ahead with
37:  13      the transaction?
37:  14      A. Yes.
```

CLEAR

DEFENSE: McBrearty_038.07-039.19   Length of Clip is: 00:02:59

```
38:   7      Q. So when you say, "entirely untouched by human
38:   8      hands," can you go through that, because he's referred
38:   9      several times to generated by the Diners Club mainframe.
```

```
38: 10    What did the Diners Club mainframe encompass in general
38: 11    terms, what type of equipment?
38: 12    A. The actual mainframe is a Citibank mainframe.
38: 13    Resides in -- at The Lakes, Nevada, and lots of card
38: 14    products run on that mainframe, lots of Visa-
38: 15    MasterCards. A lot of Citibank products run there.
38: 16    And the Diners Club transactions ran on that
38: 17    mainframe, and there were -- I don't know how many
38: 18    boxes. That gets, you know, sort of beyond my -- but in
38: 19    any event, there were two systems. Actually more than
38: 20    that, but the two systems in this connection, one was
38: 21    the merchant system and the other was the cardholder
38: 22    system, card member system, if you will.
38: 23    And the card member system automatically does
38: 24    a lot of things. Once it -- people are put on there, it
38: 25    runs the credit side of the cardholders. It causes
39:Page 39
39:  1    cards to be issued. It causes bills to be sent. It
39:  2    causes the reconciliation when payments are made and all
39:  3    that, and it runs the cardholder side of the business,
39:  4    which in the industry is called "the issuing side of the
39:  5    business."
39:  6    The merchant system does the credit side of
39:  7    the relationship with merchants, so every merchant on
39:  8    there is represented with a contract. Each has its own
39:  9    circumstances with respect to pricing. Each one has its
39: 10    own circumstances with respect to payments, frequency,
39: 11    if you will, and method, and there were little nuances
39: 12    to all of that kind of thing.
39: 13    It -- each merchant -- each merchant location,
39: 14    actually, was represented with a unique merchant number,
39: 15    and things -- I guess that's sort of -- everything that
39: 16    we had to do with the merchant side of our business was
39: 17    automated and run on that system. So again, largely
39: 18    typical things could be untouched by human hands, if you
39: 19    will.
```

DEFENSE: McBrearty_043.06-043.19   Length of Clip is: 00:00:51

```
43:  6    Q. And you said that the payments are sent to the
43:  7    merchants. What about the LeCARD component of those
43:  8    transactions?
43:  9    A. It would be the same way. On our system,
43: 10    LeCARD was set up as a merchant, so they had a merchant
43: 11    number. And so anything that was owed to them, they'd
43: 12    be -- the system looked at LeCARD as a merchant and did
43: 13    the same -- paid them the same way. So it would
43: 14    generate every night a payment to them, and it would be
43: 15    sent and a statement would be sent to them.
43: 16    Q. So in the same way as to the merchant, the
43: 17    system would deduct the processing fee that LeCARD was
43: 18    charged and send the balance to LeCARD; is that correct?
43: 19    A. That's correct.
```

PLAINTFF: PL_McBrearty_050.01-051.03*   Length of Clip is: 00:01:22

```
50:  1    Q. Okay. And then the next -- on that page
50:  2    LC 00006, the next paragraph says, "Since the charges
50:  3    are captured electronically, the reimbursement for tax
50:  4    and tip will be 20 percent of the gross transaction."
50:  5    And then it goes on to say in the first twenty months,
50:  6    they found this to be accurate. And then they say if
50:  7    it's different -- and please read that all to yourself.
50:  8    They say if it's different, please let us know and we'll
```

DEFENSE: B_McBrearty_082.02-082.23   Length of Clip is: 00:01:33

| | | |
|---|---|---|
| 82: | 2 | Q. Okay. Last question, Mr. McBrearty, is this |
| 82: | 3 | information that you've given me today -- is any of that |
| 82: | 4 | information, to your knowledge, confidential or |
| 82: | 5 | restricted in any way? |
| 82: | 6 | A. I would say this, that the -- the information |
| 82: | 7 | specific to a restaurant is confidential by contract |
| 82: | 8 | between the restaurant and Diners Club because of the |
| 82: | 9 | confidentiality agreements inherent in all Citibank |
| 82: | 10 | contracts. So there's a confidentiality agreement |
| 82: | 11 | there. |
| 82: | 12 | I don't recall, might have -- probably isn't |
| 82: | 13 | in there, the LeCARD may have had a confidential -- |
| 82: | 14 | confidentiality agreement in their contract with the |
| 82: | 15 | restaurants, although I'm not sure about that. But -- |
| 82: | 16 | but the Diners Club contract would override, you know, |
| 82: | 17 | because we were part of it. |
| 82: | 18 | So things having to do with the amounts, their |
| 82: | 19 | account numbers, their discount rate, all those things |
| 82: | 20 | are confidential by contract, and even though those |
| 82: | 21 | contracts are all, at this stage of the game, dormant, |
| 82: | 22 | you know, their survivability would be -- you know, |
| 82: | 23 | would still be out there, so that's confidential. |

PLAINTFF: PL_McBrearty_082.24-083.05   Length of Clip is: 00:00:26

| | | |
|---|---|---|
| 82: | 24 | And I guess the specific business arrangements |
| 82: | 25 | between Diners Club and LeCARD would be confidential, |
| 83:Page 83 | | |
| 83: | 1 | because that contract would have confidentiality clauses |
| 83: | 2 | in it. So the things that would be published and |
| 83: | 3 | letters that would be sent and that kind of thing would |
| 83: | 4 | not be, but the specific arrangements of -- business |
| 83: | 5 | arrangements between the two companies would be. |

PLAINTFF: PL_McBrearty_083.06-083.09   Length of Clip is: 00:00:14

| | | |
|---|---|---|
| 83: | 6 | And I would suggest that the Citibank way is |
| 83: | 7 | to put 50 years of survivability on those. You know, I |
| 83: | 8 | mean, so when in doubt, it's confidential. That's the |
| 83: | 9 | way we approach business, generally. |

PLAINTFF: PL_McBrearty_084.17-084.24   Length of Clip is: 00:00:17

| | | |
|---|---|---|
| 84: | 17 | Q. You mentioned earlier that there was a |
| 84: | 18 | contract between Diners Club and Clever Ideas or LeCARD; |
| 84: | 19 | is that correct? |
| 84: | 20 | A. Correct. |
| 84: | 21 | Q. Have we discussed that contract today? Let |
| 84: | 22 | me, actually, restate that. Have we seen that contract |
| 84: | 23 | today? |
| 84: | 24 | A. No. |

PLAINTFF: PL_McBrearty_086.24-087.13   Length of Clip is: 00:00:39

| | | |
|---|---|---|
| 86: | 24 | Q. What was the business that you were |
| 86: | 25 | contracting to do -- |
| 87:Page 87 | | |
| 87: | 1 | A. Oh. |
| 87: | 2 | Q. -- that Diners Club was contracting to do with |

DEFENSE: B_McBrearty_103.24-105.16*    Length of Clip is: 00:02:58

| | | |
|---|---|---|
| 103: | 24 | Q. Okay. And when -- at the time that this |
| 103: | 25 | statement was generated, if Diners club received a |
| 104:Page 104 | | |
| 104: | 1 | LeCARD transaction, they would send the entire |
| 104: | 2 | transaction to LeCARD; is that correct? |
| 104: | 3 | A. I don't think so. Let me -- no. That |
| 104: | 4 | wouldn't -- that's not a correct statement. So it's -- |
| 104: | 5 | Q. How do you explain what would happen? |
| 104: | 6 | A. So I would say this: You have to go back and |
| 104: | 7 | you have to look at these -- these two pieces in its -- |
| 104: | 8 | so Nos. 3 and No. 4 go together. And this, a restaurant |
| 104: | 9 | was sending in charges directly to Diners Club, and |
| 104: | 10 | those charges were regular Diners Club charges, Carte |
| 104: | 11 | Blanche charges, and LeCARD charges, the three types. |
| 104: | 12 | And that combination was $600. That's indicated, |
| 104: | 13 | because it says here in one of these statements that |
| 104: | 14 | that's what this example is, but -- without finding |
| 104: | 15 | them, that this is -- they sent in $600 worth of |
| 104: | 16 | charges. |
| 104: | 17 | And what our system did was take that in and |
| 104: | 18 | say, here's $600. We owe the restaurant 500. That |
| 104: | 19 | would be for the Diners Club and Carte Blanche charges. |
| 104: | 20 | So we're going to pay them $500, and the system would |
| 104: | 21 | pay them and generate this statement. But, of course, |
| 104: | 22 | it doesn't balance with what they sent us, which was |
| 104: | 23 | $600, so it -- there's a letter of change comes out that |
| 104: | 24 | goes with the statement. |
| 104: | 25 | And the letter of change is what's just -- the |
| 105:Page 105 | | |
| 105: | 1 | reason it's called "change" is, what's changed from what |
| 105: | 2 | you sent us to what we paid you. And there can be a lot |
| 105: | 3 | of reasons that that might be the case, refunds and |
| 105: | 4 | chargebacks and all. There's a long list of things. |
| 105: | 5 | And one of those things is that there was a |
| 105: | 6 | LeCARD transaction, which is what this is, the |
| 105: | 7 | hundred-dollar one. And this is telling the merchant, |
| 105: | 8 | You sent us -- they know they sent us 600. Here's your |
| 105: | 9 | 500. You got paid. And here's the reason that we paid |
| 105: | 10 | this, because you had a LeCARD transaction, and that's |
| 105: | 11 | -- we sent the money to LeCARD. And it says in there |
| 105: | 12 | the reason, LeCARD will settle directly with you. |
| 105: | 13 | And that's that other math, which is the next |
| 105: | 14 | page, which is, we tell them that LeCARD is going to |
| 105: | 15 | settle with them. Then LeCARD actually does, and they |
| 105: | 16 | send them this document. So that's the continuum. |

SHOW 002-0004

DEFENSE: McBrearty_105.17-107.01    Length of Clip is: 00:01:43

| | | |
|---|---|---|
| 105: | 17 | Q. Okay. So I think you answered my question. |
| 105: | 18 | Maybe I just didn't word it right, but -- |
| 105: | 19 | A. No, I know it's complicated. It's hard not to |
| 105: | 20 | go through all the steps and pick -- it's hard to pick |
| 105: | 21 | out one little piece of it, you know. |
| 105: | 22 | Q. Okay. So let me make sure I understand, then, |
| 105: | 23 | what you just testified to. So in this context, in this |
| 105: | 24 | transaction, there was a total amount of $600? |
| 105: | 25 | A. Right. |
| 106:Page 106 | | |
| 106: | 1 | Q. 100 of that included a LeCARD transaction? |
| 106: | 2 | A. Right. |
| 106: | 3 | Q. Diners Club received the transactions from the |

```
106:  4     restaurant --
106:  5     A. Uh-huh.
106:  6     Q. -- correct? And upon recognizing that a
106:  7     hundred dollars of the 600 was a LeCARD transaction,
106:  8     Diners Club forwarded that information to LeCARD? Is
106:  9     that -- is that how that worked?
106: 10     A. Yes. Let me give you -- well, we got the
106: 11     hundred-dollar transaction in, and we did several things
106: 12     with it.
106: 13     Q. Okay.
106: 14     A. We took our fee. We calculated the 20 percent
106: 15     credit and sent that over to the merchant -- I mean, to
106: 16     the card member system, along with the original
106: 17     transaction.
106: 18     Q. Okay.
106: 19     A. So two transactions went to the card member
106: 20     system for billing to the card member, and then we would
106: 21     send the net amount to LeCARD. So we weren't sending
106: 22     LeCARD the hundred dollars. We were sending them the
106: 23     net.
106: 24     Q. Okay. And that's the net minus Diners Club's
106: 25     processing fees, and anything else?
107:Page 107
107:  1     A. And the credit to the card member.
```

PLAINTFF: PL_McBrearty_107.02-107.05**    Length of Clip is: 00:00:08

```
107:  2     Q. The credit to the card member. Did Diners
107:  3     Club forward the amount of tax and tip from transactions
107:  4     to restaurants, or was that LeCARD?
107:  5     A. LeCARD.
```
CLEAR

DEFENSE: McBrearty_107.12-107.14    Length of Clip is: 00:00:05

```
107: 12     Q. Have you had any communications regarding this
107: 13     litigation other than at the deposition today?
107: 14     A. No.
```

PLAINTFF: PL_McBrearty_109.15-110.01    Length of Clip is: 00:00:49

```
109: 15     Q. (BY MS. WILLIAMS) Separate, separate from
109: 16     that contract, did you have any other confidentiality
109: 17     obligations to Diners Club?
109: 18     A. Do I have confidentiality clauses --
109: 19     obligations to Diners Club? Yes, I suppose I do. Sure
109: 20     I do.
109: 21     Q. And is that as part of an employment agreement
109: 22     that you had with Diners Club or Citicorp?
109: 23     A. Yes. I am obligated for the rest of my
109: 24     natural life not to disclose any confidential
109: 25     information that I had with Citibank in my Citibank
110:Page 110
110:  1     life, you know, I guess.
```

PLAINTFF: PL_McBrearty_119.09-119.19    Length of Clip is: 00:00:39

```
119:  9     Q. And it doesn't do -- in other words, it
119: 10     doesn't somehow become part of the processing
119: 11     environment?
119: 12     A. No. The processing ends at Diners. Diners
119: 13     Club has done the processing, and we make a payment --
119: 14     we made a payment to LeCARD, and then they further split
```