IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ADVANCEME INC. | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| vs. | § | **CASE NO.  6:05 CV 424** |
| | § | **PATENT CASE** |
| RAPIDPAY, LLC, ET AL | § | |
| | § | |
| **Defendant** | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff AdvanceMe, Inc. ("AdvanceMe") filed suit against Defendants RapidPay, LLC,

Business Capital Corporation, First Funds, LLC, Merchant Money Tree, Inc. ("MMT"), Reach

Financial, LLC ("Reach") and Fast Transact, Inc. d/b/a Simple Cash alleging infringement of U.S.

Patent No. 6,941,281 ("the '281 patent"). Only Reach and MMT("Defendants") still remain in the

case. [1] The matter came for trial on the merits without a jury and was taken under submission.  The

Court has considered the testimony, exhibits, arguments of counsel, and supporting memoranda, and

now details its Findings of Fact and Conclusions of Law below pursuant to Federal Rule of Civil

Procedure 52(a).[2]

AdvanceMe alleges that Defendants directly infringe and/or indirectly infringe by

contributing to or inducing the infringement of certain claims of the '281 patent, that this

---

[1] AdvanceMe obtained a default judgment against RapidPay, LLC (Docket No. 142).  Business Capital Corporation
and Fast Transact were dismissed without prejudice (Docket Nos. 56 & 320).  First Funds was transferred to the
companion case, *AdvanceMe, Inc. v. Amerimerchant, LLC*, Civil Action No. 6:06cv082, as part of a sanction for
withholding documents from AdvanceMe  (Docket No. 311).

[2]  To the extent that any conclusion of law is deemed to be a finding of fact, it is adopted as such; and likewise, any
finding of fact that is deemed to be a conclusion of law is so adopted.

1

Dockets.Justia.com

infringement is willful, and that it is entitled to a permanent injunction under 35 U.S.C. § 283 and attorneys' fees under 35 U.S.C. § 285.

Defendants deny that they infringe the '281 patent and argue that the '281 patent is invalid for failure to comply with 35 U.S.C. §§ 102 and 103 and that the '281 patent is unenforceable due to inequitable conduct. Defendants also seek a declaration of non-infringement, invalidity, and unenforceability of the '281 patent. Additionally, Defendants seek recovery of their attorneys' fees under 35 U.S.C. § 285.

The matter was submitted to the Court on July 20, 2007 after a five-day bench trial.

## SUMMARY

The '281 patent is **INVALID** because it is **OBVIOUS** and **ANTICIPATED**. The patent-in-suit, simply put, is a computerized method for securing debt with future credit card receivables. While the patent inventor, Barbara Johnson, implemented an aggressive marketing and business development program that brought this financing method to widespread use, she did not invent a new business method. Rather, Johnson built on long-established prior art, packaged the idea in a new way, and marketed it aggressively.

There are multiple prior art references, not considered by the PTO when issuing the patent, that render the patent invalid, especially in light of the Supreme Court's recent ruling in *KSR Int'l Co. v. Teleflex, Inc*. In *KSR*, the Supreme Court opined "[w]hen a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability." 127 S. Ct. 1727, 1740 (2007). The Litle & Co prior art, the LeCard program, the Transmedia program, and the prior art Reserve Accounts were all available in the field

at the time of the purported invention. Johnson merely implemented a predictable variation of these existing methods in establishing her invention. While Johnson's work exhibits excellent entrepreneurship, it does not entitle AdvanceMe to a legal monopoly on this method of providing financing to small businesses. Rather AdvanceMe must continue to compete in the marketplace for its share of the market, which will benefit the economy and consumers as a whole.

Although this prior art was not considered by the PTO, there is insufficient evidence to conclude Johnson obtained the patent through inequitable conduct. The evidence is also insufficient to establish that this is an exceptional case and that the Defendants are entitled to attorneys' fees.

Accordingly, the Court **HOLDS** the patent is **INVALID**[3] and issues the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

## BACKGROUND

In January of 1984, Barbara Johnson opened a Gymboree franchise where parents and children participate in music, games, and activities. Johnson approached several banks for a business loan for her Gymboree franchise. The banks refused to loan her money because she was not willing to attach her home as collateral to the loan.

As time went by, the revenues generated by Johnson's Gymboree franchise became very predictable. Johnson knew what the credit card receipts for every September would be and knew that all of the expenses for advertising and printing occurred every July and August as she prepared for the fall school year. In light of the predictability of her business, it occurred to Johnson that the

---

[3] Although not necessary to the final disposition of the case, the Court has nevertheless conducted an infringement analysis and finds that both Reach and MMT infringe the '281 patent. The infringement analysis is included at the end of this opinion.

Gymboree credit card receipts might be something that a bank would consider of significant value. She realized that a bank might be willing to lend money on future receivables.

Johnson approached several banks and explained the predictability of the revenues generated by her Gymboree franchise. She asked the banks whether this predictability would be considered an asset of the business. The banks, however, answered no. When Johnson realized that predictability of credit card receivables was still not considered something on which a bank would be willing to lend, she began to think about who has control of the credit card receivables and who understands its value. She came to the realization that, since a computerized merchant processor[4] functions as a gatekeeper to the credit card processing system, it would be advantageous for the merchant processor to also control the process for loan repayment. This would reduce the lender's risk of non-payment and create an efficient system that was not dependant on the merchant taking any action. This realization led to her conception of the inventions asserted in the '281 patent.

In particular, the '281 patent describes a method whereby the merchant processor would be responsible for dividing up the revenue from card payments and splitting the revenue between the merchant and the lender or other capital provider. Requiring the merchant processor to divide up revenue and pay the appropriate parties resulted in a far more efficient system for payment to a lender or other capital provider and placed control of the process in the hands of a trusted third party.

**The '281 Patent**

The '281 patent is a continuation of U.S. Patent No. 6,826,544 ("the '544 patent"). The application for the '544 patent was filed on July 9, 1997. Therefore, the effective priority date for

---

[4] The parties agreed that computerized merchant processor is defined as "a computer-equipped entity or combination of entities that acquires or processes merchant transactions."

the '281 patent is July 9, 1997.

The '281 patent describes that, prior to the invention, "the merchant 20 typically pays the outstanding loan back in periodic installments (e.g., equal monthly payments over five years)." '281 patent, 5:12-14. The '281 patent describes the invention as a modification of the existing merchant processor system, so that rather than the merchant making payment directly to the lender, "[t]he borrowing merchants use one or more already-familiar payment transaction processing systems to make the payments required by the lender or the loan collecting entity." '281 patent, 2:48-51.

Johnson confirmed this description of the invention during prosecution: "The invention relates to modifying the existing merchant processor system that is now used by merchants to authorize and settle card payment transactions." Applicant's June 7, 2000 Appeal Br., at p. 3.

The '281 specification describes that, in the prior art, merchants used VeriFone merchant-location equipment to accept a customer identifier (e.g., a credit card number) as payment from a customer and to electronically forward information related to the payment to a computerized merchant processor. '281 patent, 6:18-59. The '281 patent also describes that, in the prior art, computerized merchant processors used modems to acquire the information related to the payment from a merchant, and software executing known algorithms to authorize and settle the payment. '281 patent, 1:15-25, 3:31-4:37.

The '281 specification further describes that, in the prior art, the merchant processor would forward full payment (less processing fees) for that transaction to the merchant. '281 patent, 4:16-56. A general description of prior art card transactions at the merchant and merchant processor is discussed with reference to Figures 1A and 1B of the '281 patent. '281 patent, 3:10-5:3.

The claims of the '281 patent reflect the invention's purported modification of the existing merchant processor system by requiring that a "computerized merchant processor" forwards a "portion" (Claim 10) or "at least a portion" (Claim 1) of the payment to a merchant's obligor. In other words, the invention purports to enable a merchant to automatically have its obligations repaid out of card receipts and, therefore, enables a capital provider to be repaid before the merchant gains access to payment amounts.

The patent examiner noted this sole non-obvious feature in his Notice of Allowance for the claims of the '281 patent: "[T]he non-obvious novelty of the invention is using the portion of the transaction payment as a remittance towards payment of an obligation owed by the merchant." March 17, 2005 Notice of Allowance, pp. 3-4.

The '281 patent contains two independent claims, claims 1 and 10.

**A. Independent Claim 1 (Method)**

Claim 1 of the '281 patent claims:

A method for automated payment, comprising:

at a merchant, accepting a customer identifier as payment from the customer and electronically forwarding information related to the payment to a computerized merchant processor;

at the computerized merchant processor, acquiring the information related to the payment from the merchant, authorizing and settling the payment, and *forwarding at least a portion of the payment to a computerized payment receiver as payment of at least a portion of an obligation made by the merchant*; and

*at the computerized payment receiver, receiving the portion of the payment forwarded by the computerized merchant processor and applying that portion to the outstanding obligation made by the merchant to reduce such obligation.*

Through various statements in the "Background Information" and "Description" sections of

the specification, the '281 patent acknowledges that each step was well known before the Application Date, except for the italicized steps.

The "Background Information" section recites that it was known that "[c]ard transactions (e.g., credit, debit, charge, smart, etc.) generally involve at least merchants, merchant processors, issuers, and cardholders," and that such "transactions include authorization, clearing and settlement processes." '281 patent, 1:17-20. Further, the '281 patent discloses that it was well known that such merchant processors may use "a system such as the VisaNet or Cirrus system to authorize, clear and settle the card payment." *Id.* at 1:20-22.

In the "Description" section, Johnson also discusses standard card processing practices at the time of the application and corresponding equipment in standard use to process card transactions, with reference to Figures 1A and 1B. *Id.* at 3:10-30. This discussion of the prior art is identical to the first step of claim 1, which recites "at a merchant, accepting a customer identifier as payment from the customer." Johnson's discussion of the prior art further describes the prior art card authorization and settlement steps, also with reference to Figures 1A and 1B. *Id.* at 3:31-5:3. This prior art discussion is identical to the claim 1 steps of "electronically forwarding information related to the payment to a computerized merchant processor" and "at the computerized merchant processor, acquiring the information related to the payment from the merchant, authorizing and settling the payment."

Johnson specifically characterizes this discussion of Figures 1A and 1B as relating to known prior art methods and equipment: "[h]aving described the environment in which the invention operates with reference to FIGS. 1A and 1B, the automated loan repayment system and process according to the invention will now be described." *Id.* at 5:4-8.

7

### B. Independent Claim 10 (System)

The '281 patent also acknowledges that nearly all of the elements of independent claim 10 were known beforethe Application Date.  Claim 10, a system claim, recites:

> A system for automated payment of an obligation made by a merchant, comprising:
>
> at a merchant, means for accepting a customer identifier as payment from the customer and for electronically forwarding information related to the payment to a computerized merchant processor, wherein the merchant associated with the payment has an outstanding obligation to a third party; and
>
> at the computerized merchant processor, means for receiving the information related to the payment from the merchant, means for authorizing and settling the payment; and
>
> *means for forwarding a portion of the payment to the third party to reduce the obligation*.

Except for the italicized portion above, the '281 patent describes that each of claim 10's elements were well known before the Application Date.

In the "Summary of the Invention" section, the patentee explains that merchants using the claimed system use known equipment to practice the claimed invention: "The borrowing merchants use one or more already-familiar payment transaction processing systems to make the payments required by the lender or the loan collecting entity."  '281 patent, 2:48-51.  In other words, the claimed system uses well known, existing equipment to process transactions and forward payment to the third party to reduce the obligation.

With respect to the first claim element (i.e., "at a merchant"), the '281 patent acknowledges that, before the Application date, known VeriFone merchant-location equipment accepted and electronically forwarded customer identifying card information to a merchant processor.  '281 patent, 2:13-17.  This known prior art equipment corresponds to claim 10's element "at a merchant, means

8

for accepting a customer identifier as payment from the customer and for electronically forwarding information related to the payment to a computerized merchant processor."

With respect to claim 10's second element (i.e., "at the computerized merchant processor"), the '281 patent describes that the prior art merchant processors used the claimed "means for receiving the information related to the payment from the merchant" and "means for authorizing and settling the payment." In its discussion of the prior art, the '281 patent discloses that the merchant terminal requests an authorization and sends card information "electronically, for example, transmission through the telephone system and/or some other network (e.g., the Internet and/or an intranet)." '281 patent, 3:31-36. In addition, the '281 patent discusses authorization and settlement as all taking place electronically through the use of computers executing appropriate software and networks. *Id.* at 3:42-49, 4:2-15.

Similar to claim 1, claim 10's purportedly novel feature is a "means for forwarding a portion of the payment to the third party to reduce the obligation." Since the computer equipment at the computerized merchant processor is acknowledged to be in the prior art before the application date, the only alleged point of novelty in claim 10, according to the Court's claim construction and Johnson's description of the prior art, is using known computer systems to execute an algorithm that derives and forwards a selected portion of the payment to a third party to reduce the obligation.

## APPLICABLE LAW

This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), as this is an action arising under the Patent Act, 35 U.S.C. §§ 271 *et seq*. Defendants have sold and offered for sale in this judicial district the programs that are alleged to infringe the '281 patent. Accordingly, the Court has personal jurisdiction over Defendants. Venue in this Court is proper pursuant to 28

U.S.C. § 1400.

**Infringement**

### A.  Direct Infringement

Under the Patent Act, direct infringement occurs when a party "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent . . . ."  35 U.S.C. § 271(a). Infringement analysis requires two steps:  (1) claim construction to determine the scope and meaning of the asserted claims, and (2) a comparison of the properly construed claims with the allegedly infringing method to determine whether the method practices every limitation of the claims.  *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454, 1467 (Fed. Cir. 1998) (*en banc*).

A defendant that is shown by a preponderance of the evidence to perform one or more claims of the patented method literally or under the doctrine of equivalents is liable for direct infringement. *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1572-73 (Fed. Cir. 1994).  Direct infringement of a method claim may be established by circumstantial evidence.  *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986).  "'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'"  *Id.*  (quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960)).

"It is not necessary for the acts that constitute infringement to be performed by one person or entity."  *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1344 (Fed. Cir.), *cert. denied*, --U.S.--, 127 S. Ct. 683 (2006).  This is especially true where the patent itself contemplates action by at least two actors.  *Applied Interact, LLC v. Vermont Teddy Bear Co.*, No. 04 Civ. 8713

HB, 2005 WL 2133416, at *5 (S.D.N.Y. Sept. 6, 2005).

Liability for direct infringement cannot be avoided by interposing an agent or independent contractor between the defendant and the infringing acts. *Free Standing Stuffer, Inc. v. Holly Dev. Co.*, 187 U.S.P.Q. 323, 335 (N.D. Ill. 1974) (citing *Crowell v. Baker Oil Tools*, Inc., 143 F.2d 1003 (9th Cir. 1944)). Even if a defendant does not perform all patented method steps, the defendant is still liable for direct infringement where it is demonstrated by a preponderance of the evidence that (1) the steps of the patented method are being performed, and (2) defendant has a sufficient connection to, or control over, the entity or entities performing part of the patented method. *Id.* (finding defendant liable for direct infringement where it instructed its advertising agency to perform or have performed certain steps of the patented process); *Cordis Corp. v. Medtronic AVE, Inc.*, 194 F. Supp. 2d 323, 349 n.19 (D. Del. 2002) (finding defendant liable for direct infringement where there was a close relationship between defendant and the doctors performing part of the patented process); *Shields v. Halliburton Co.*, 493 F.Supp. 1376, 1389 (W.D. La. 1980), *aff'd*, 667 F. 2d 1232 (5th Cir. 1982) (finding defendants liable for infringement based on the combined actions of two entities); *Metal Film Co. v. Melton Corp.*, 316 F. Supp. 96, 110 (S.D.N.Y. 1970) (finding defendant liable for direct infringement because it arranged for other entities to perform the first step of the patented method); *Marley Mouldings, Ltd. v. Mikron Indus., Inc.*, No. 02 C 2855, 2003 WL 1989640, at *2-3 (N.D. Ill. Apr. 30, 2002) (denying motion for summary judgment of noninfringement where two entities performed steps of patented process); *Charles E. Hill v. Amazon.com, Inc.*, No. Civ. A. 2:02-CV-186, 2006 WL 151911, at *2 (E.D. Tex. Jan. 19, 2006) (Ward, J.) (denying motion for summary judgment of noninfringement where two entities performed steps of patented process and were in the same vendor-customer relationship claimed in the invention).

A showing of "agency" or "working in concert" is not required in order to establish a sufficient connection between the defendant and the third party or parties performing the patent method's steps. *Charles E. Hill*, 2006 WL 151911, at *2. The sufficient connection can be shown through a contractual relationship between the defendant and the third party or parties performing the steps of the patented method. *Id.*

When evaluating whether a defendant has sufficient connection to, or control over, the entity or entities performing part of the patented method, courts look to the inventions claimed in the patent and the relationships described therein. *Id.* at *2. That the relationships described in the patent are the same relationships relied upon to establish sufficient connection to, or control over, the entity or entities performing part of the patented method is probative. *Id.* at *3.

A defendant can also literally infringe a patent under the doctrine of equivalents. "The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733 (2002).

Infringement is found under the doctrine of equivalents where every limitation of the asserted claim or its equivalent is found in the accused subject matter and where the equivalent differs from the claimed limitation only insubstantially. *Abraxis Bioscience, Inc. v. Mayne Pharma (USA), Inc.*, 467 F.3d 1370, 1379 (Fed. Cir. 2006); *see also Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950), *superceded on other grounds by statute*, 35 U.S.C. § 112. The analysis focuses on whether the element in the accused method "performs substantially the same function in substantially the same way to obtain the same result" as the claim limitation. *Graver Tank & Mfg.*, 339 U.S. at 608.

12

Equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. *Id.* at 609. "Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum." *Id.* An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was. *Id.*

An infringement analysis of a claim with limitations drafted pursuant to 35 U.S.C. § 112, ¶ 6 involves the same two steps - claims construction and a comparison of the accused device or method with the properly construed claims. *Caterpillar Inc. v. Deere & Co.*, 224 F.3d 1374, 1380 (Fed. Cir. 2000). Means-plus-function limitations recite a specified function to be performed rather than the structure, material, or acts for performing that function. Such limitations are "construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6. "'Literal infringement of a § 112, ¶ 6 limitation requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification.'" *Caterpillar Inc.*, 224 F.3d at 1380 (citation omitted).

**B. Inducement to Infringe**

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). Inducement of infringement can be found where there is an underlying instance of direct infringement and a requisite showing of intent. *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1377 (Fed. Cir. 2005). The requisite showing of intent is a "'showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements.'" *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1304 (Fed. Cir.

13

2006) (en banc) (citation omitted).  Courts have construed this to mean actual or constructive knowledge of the patent.  *Instituform Techs., Inc. v. CAT Contracting, Inc*., 385 F.3d 1360, 1378 (Fed. Cir. 2004).

Where a defendant enters into agreements providing for performance of the patented method after the institution of the lawsuit (*i.e.,* with full knowledge of the patent), inducement of infringement can be found.  *Id.* at 1378.  Direct evidence of intent is not required; rather, circumstantial evidence may suffice.  *Fuji Photo*, 394 F.3d at 1378; *Water Techs. Corp. v. Calco, Ltd*., 850 F.2d 660, 668 (Fed. Cir. 1988).

"Evidence of active steps taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe . . . ."  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 915 (2005); *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004) (finding active inducement of infringement based on defendant's publications describing and promoting use of patented method).  E-mails encouraging use of the patented invention and providing support for the use of the patented invention is relevant to determine intent to induce infringement.  *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp*., 420 F.3d 1369, 1379-80 (Fed. Cir. 2005).

### C.  Contributory Infringement

One who "offers to sell or sells within the United States . . . a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a

14

contributory infringer." 35 U.S.C. § 271(c).

After a direct infringement has been shown, contributory infringement can be shown where (1) defendant supplied an important component of the infringing part of the method, (2) the component is not a staple article of commerce suitable for non-infringing use, and (3) defendant supplied the component with knowledge of the patent-in-suit and knowledge that the component was especially made or adapted for use in an infringing manner. *Lummus Indus., Inc. v. D.M. & E. Corp.*, 862 F.2d 267, 272 (Fed. Cir. 1988). Direct evidence of intent is not required; rather, circumstantial evidence may suffice. *Water Techs. Corp.*, 850 F.2d at 668.

### D. Willful Infringement

Willful infringement must be proven by clear and convincing evidence. *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1346 (Fed. Cir. 2001). The patentee must show that the accused infringer acted without a reasonable belief that its actions avoided infringement. *Id.* A showing of a good faith noninfringement or invalidity challenge is evidence supporting a lack of willfulness. *Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1352 (Fed. Cir. 2000). A finding of willful infringement requires knowledge of the patent, and activity begun without knowledge of the patent generally cannot form the basis for a finding of willfulness. *Am. Original Corp. v. Jenkins Food Corp.*, 774 F.2d 459, 464-65 (Fed. Cir. 1985).

### Invalidity

A patent is presumed to be valid, and a party attacking the validity must prove invalidity by clear and convincing evidence. 35 U.S.C. § 282.

**A. Anticipation:  35 U.S.C. § 102(a) and 35 U.S.C. § 102(b)**

An applicant is not entitled to a patent if:

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . .

35 U.S.C. § 102 (2000).

### *i.  Publicly Known*

Under 35 U.S.C. § 102(a), a patent is invalid if prior art satisfying all of the claim limitations was known or used by others in this country before the applicant's invention date.  35 U.S.C. § 102(a) (2000).  35 U.S.C. § 102(a) (2000); *Coffin v. Ogden*, 85 U.S. 120, 124-25 (1873) ("The prior knowledge and use by a single person is sufficient.  The number is immaterial.").

### *ii. Public Use*

In addition, any public use in this country of a method or system satisfying all of the claim limitations, or any printed publication disclosing all of the claim limitations, that is more than one year before a patent's U.S. filing date  invalidates the claims of that patent under 35 U.S.C. § 102(b).

For a method or system to be in "public use" within the meaning of 35 U.S.C. § 102(a) or (b), the method or system must be used in the ordinary course of business without active efforts to conceal its operation. *New Railhead Mfg. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1298-1300 (Fed. Cir. 2002) (finding that performance of the claimed method of drilling in rock at a commercial jobsite

16

under public land, hidden from view, constituted public use); *Lockwood v. Am. Airlines*, 107 F.3d 1565, 1570 (Fed. Cir. 1997) (finding that the defendant's use of the high-level aspects of its computer reservation system was a prior public use of a means-plus-function claim for a computer system); *Baxter Int'l v. COBE Labs*, 88 F.3d 1054 (Fed. Cir. 1996) (finding that a scientist's use of a machine implementing the claimed method in a laboratory at the National Institute of Health, without the public's awareness of the method employed by the machine, was a prior public use); *see also Elec. Battery Co. v. Shimadzu,* 307 U.S. 5, 20 (1939) ("The ordinary use of a machine or the practise [sic] of a process in a factory in the usual course of producing articles for commercial purposes is a public use"); *Minn. Mining & Mfg Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002) ("Public use under 35 U.S.C. § 102(b) includes any use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor.").

Cases in which courts find that a prior use was not a "public use" within the meaning of 35 U.S.C. § 102 have found active concealment of the method or system by the prior user, typically by contractual agreements to maintain secrecy. *See, e.g.*, *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983) (finding that company told all employees that the prior art machine was confidential and required them to sign confidentiality agreements, thus concealing the machine); *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376 (Fed. Cir. 2007) (finding that the prior art user was required to sign a non-disclosure agreement related to the prior art, thus concealing the prior art).

### *iii.  Corroboration*

Under 35 U.S.C. § 102(a) or (b), the party challenging a patent on the basis of prior

17

knowledge or prior public use must come forth with sufficient corroborating evidence to support a finding of invalidity. *Finnegan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1367 (Fed. Cir. 1999). Corroboration may be in the form of either documentary or testimonial evidence, though it is unnecessary when a party seeks to prove facts through the use of contemporaneous documents. *Lacks v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1349 (Fed. Cir. 2003); *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572 (Fed. Cir. 1996); *Price v. Symsek*, 988 F.2d 1187, 1195-96 (Fed. Cir. 1993). "[O]ral testimony of someone other than the alleged inventor may corroborate an inventor's testimony." *Sandt Tech. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1351 (Fed. Cir. 2001). "Each corroboration case must be decided on its own facts with a view to deciding whether the evidence as a whole is persuasive." *Id.* at 1350.

"[A] tribunal must make a reasonable analysis of all of the pertinent evidence to determine whether the inventor's testimony is credible. The tribunal must also bear in mind the purpose of corroboration, which is to prevent fraud, by providing independent confirmation of the inventor's testimony." *Kridl v. McCormick*, 105 F.3d 1446, 1450 (Fed. Cir. 1997); *Finnegan Corp,* 180 F.3d at 1369; *see also Thomson v. Quixote*, 166 F.3d 1172 (Fed. Cir. 1999); *The Beachcombers, Int'l, Inc. v. Wildewood Creative Prods, Inc.*, 31 F.3d 1154 (Fed. Cir. 1994).

In determining whether oral testimony is sufficiently corroborated, the Federal Circuit has considered the following criteria: (1) the relationship between the corroborating witness and the alleged prior user; (2) the time period between the event and trial; (3) the interest of the corroborating witness in the subject matter in suit; (4) contradiction or impeachment of the witness's testimony; (5) the extent and details of the corroborating testimony; (6) the witness's familiarity with the subject matter of the patented invention and the prior use; (7) probability that a prior use could

occur considering the state of the art at the time; (8) impact of the invention on the industry, and the commercial value of its practice. *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998).

In situations where contemporaneous documentation and testimony that is "credible in light of the full record" is offered by the party challenging validity, courts have found that the testimony is corroborated. *Sandt Tech.*, 264 F.3d at 1350; *Kridl*, 105 F.3d at 1446; *Thomson,* 166 F.3d at 1172; *The Beachcombers, Int'l, Inc.*, 31 F.3d at 1154; *Knorr v. Pearson*, 671 F.2d 1368 (C.C.P.A. 1982).

Conversely, where the *defendant* is attempting to prove its own prior public use of a claimed invention without any contemporaneous documentary support revealing the alleged prior use, and with contradictory testimony in the record, courts have found testimony to be insufficiently corroborated. *Woodland Trust v.*, 148 F.3d at 1368; *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728 (Fed. Cir. 2002); *Lacks Indus., Inc.*, 322 F.3d at 1335; *Finnegan Corp.,* 180 F.3d at 1354.

### B. Obviousness: 35 U.S.C. § 103

The Patent Act provides no protection to obvious inventions:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103(a) (2007). Thus, the invention must not have been obvious to one of ordinary skill in the relevant art in light of the teachings of the prior art. *Graham v. John Deere Co.*, 383 U.S. 1 (1966). A party challenging the nonobviousness of a patent must prove obviousness by clear and convincing evidence. *Gambro Lundia AB v. Baxter Healthcare Corp.,* 110 F.3d 1573, 1576 (Fed.

Cir. 1997).

Courts must look to interrelated teachings of multiple prior art references in determining whether an invention is obvious. *KSR*, 127 S. Ct. at 1740. A court should also consider the "common sense of those skilled in the art" to determine whether a combination is obvious in light of the prior art. *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 82 U.S.P.Q.2d (BNA) 1687, 1690 (Fed. Cir. 2007). The combination of familiar elements with known methods is obvious when it provides no functionality except for yielding predictable results. *KSR*, 127 S. Ct. at 1739. When a combination of prior art elements fails to yield a result different from what can be obtained by the sequential operation of old elements, the combination is obvious. *See id.*; *see also Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 60-62 (1969).

"In many fields it may be that there is little discussion of obvious techniques or combinations, and market demand, rather than scientific literature, may often drive design trends." *KSR*, at 1741. Therefore, granting patent monopoly to technological advances that would occur in the ordinary course without real innovation retards progress and deprives prior inventions of their value. *Id.* A finding of obviousness may be reinforced by "testimony from the sole inventor at trial that he did not have a technical background, could not have actually built the prototype himself, and relied on the assistance of an electrical engineer… to build a prototype of his invention." *Leapfrog*, 82 U.S.P.Q.2d at 1692.

Four factors that aid a court's obviousness inquiry are: (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordinary skill in the relevant art; and, if applicable, (4) objective or secondary considerations tending to prove nonobviousness. These secondary considerations include evidence of commercial success, long-felt

need, and failure of others to make the invention. *Graham*, 383 U.S. at 18.

### C. Inventorship

Section 102(f) provides that: "A person shall be entitled to a patent unless . . . (f) he did not

himself invent the subject matter sought to be patented . . . ." 35 U.S.C. § 102(f). The originality

requirement of Section 102(f) means that a person cannot obtain a patent on an invention if he

obtained a complete idea for the invention from another source. *Int'l Gambro Lundia AB*, 110 F.3d

at 1576. The inventors listed on the patent are presumed to be correct. *Canon Computer Sys. v.*

*Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998).

### Inequitable Conduct

A patent applicant is under a duty of candor in dealing with the PTO. 37 C.F.R. §§ 1.56 (a),

(b); *Bd. of Educ. v. Am. Bioscience, Inc.*, 333 F.3d 1330, 1344 (Fed. Cir. 2003) ("Rule 56 imposes

a duty to disclose information material to patentability."). A breach of that duty constitutes

"inequitable conduct." *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 807 (Fed. Cir. 2000).

Inequitable conduct must be established by clear and convincing evidence. *Sanofi-Synthelabo*

*v. Apotex, Inc.*, 470 F.3d 1368, 1380 (Fed. Cir. 2006). To hold a patent unenforceable due to

inequitable conduct, there must be clear and convincing evidence that the applicant (1) made an

affirmative misrepresentation of material fact, failed to disclose material information, or submitted

false material information, and (2) intended to deceive the PTO. *Eli Lilly & Co. v. Zenith Goldline*

*Pharms., Inc.*, 471 F.3d 1369, 1381-82 (Fed. Cir. 2006).

"[I]nformation is material to patentability when it is not cumulative to information already

of record or being made of record in the application and . . . [i]t refutes, or is inconsistent with, a

position the applicant takes in: . . . [a]sserting an argument of patentability."  37 C.F.R. §
1.56(b)(2)(ii).  "Gross negligence" will not suffice to establish inequitable conduct; intent to deceive
must be shown.  *Hoffman-La Roche Inc. v. Lemmon Co.*, 906 F.2d 684, 688 (Fed. Cir. 1990).

If a district court finds that the requirements of materiality and intent have been established
by clear and convincing evidence, it must then "balance the equities to determine whether the
patentee has committed inequitable conduct that warrants holding the patent unenforceable."
*Monsanto Co. v. Bayer Bioscience N.V.*, 363 F.3d 1235, 1239 (Fed. Cir. 2004).  Under the balancing
test, "'(t)he more material the omission or the misrepresentation, the lower the level of intent
required to establish inequitable conduct, and vice versa.'"  *Ruiz,* 234 F.3d at 670 (citation omitted).

**Attorneys' Fees**

The determination of whether a case is exceptional and, thus, eligible for an award of
attorneys' fees under § 285 is a two-step process.  First, the district court must determine whether
a case is exceptional.  After determining that a case is exceptional, the district court must determine
whether attorney fees are appropriate.  *Cybor Corp. v. Fas Techs, Inc.*, 138 F.3d 1448, 1460 (Fed.
Cir. 1998) (en banc).  Conduct that can form a basis for finding a case exceptional includes
inequitable conduct before the PTO, misconduct during litigation, vexatious or unjustified litigation,
and frivolous suit.  *McNeil-PPC, Inc. v. L. Perrigo Co.*, 337 F.3d 1362, 1371 (Fed. Cir. 2003); *Epcon
Gas Systems, Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1034 (Fed. Cir. 2002).

# ANALYSIS

## Invalidity

### A. Anticipation

None of the prior art upon which Defendants rely was considered by the PTO during prosecution of the '281 patent. Only the Litle & Co. prior art practiced every element of the claimed invention, thus anticipating the invention.

### *i. The LeCard Prior Art Method and System*

At least five years before the July 9, 1997 priority date of the '281 patent, Citicorp Diners Club, Inc. ("Diners Club") offered a discount dining program to its cardholders known as the LeCard program. In the LeCard program, Diners Club cardholders registered for the LeCard program with Diners Club and received a co-branded Diners Club/LeCard charge card (a "LeCard card"). If a cardholder presented a LeCard card as payment at a restaurant participating in the LeCard program, that cardholder received a 20% discount off that charge on its monthly statement from Diners Club. By October 1992, electronic capture of LeCard transactions was available to all restaurant members provided they used Diners Club exclusively as the merchant processor for all LeCard transactions; however, the LeCard Program did not accept any card other than the LeCard card.

Restaurants benefitted from the LeCard program by receiving a cash or advertising advance from Clever Ideas-LeCard, Inc. ("Clever Ideas"), which was repaid out of future LeCard transactions at that restaurant. For each LeCard transaction, Diners Club processed the transaction (i.e., electronically acquired payment information from the merchant, authorized and settled the payment), then derived a portion of the payment amount by subtracting from the total LeCard charge, the

Diners Club processing fees and the 20% cardholder discount, and forwarded that portion to Clever Ideas as payment of the restaurant's outstanding cash or advertising advance obligation. Clever Ideas would then receive and apply the amount forwarded to reduce the restaurant's cash or advertising advance obligation. As a result, the restaurant would pay down its obligation, but would not receive anything other than tax and tip from the transaction, leaving the merchant exposed to inadequate or unpredictable cash flow.

<u>Specific Findings of Fact</u>

Clever Ideas provided cash and advertising advances to merchants participating in the LeCard program. The merchants' obligation to repay Clever Ideas was created by the cash or advertising advance and, therefore, was an "obligation" within the meaning of the claims of the '281 patent: it was an amount owed by a merchant that was independent of any costs or fees arising out of the use of customer identifiers as payment. LeCard card numbers were "customer identifiers" within the meaning of the claims of the '281 patent because they were unique identifying account numbers.

The Clever Ideas method and system for repayment were completely automated, and thus were a method and system of automated payment.

***Claim 1***

<u>At the merchant</u>

"*Accepting a customer identifier as payment from the customer*." Merchants in the LeCard program electronically accepted LeCard card numbers as payment from customers.

"*Electronically forwarding information related to the payment to the computerized merchant processor*." After accepting the LeCard card numbers, merchants electronically forwarded

24

information related to the LeCard card payment to Diners Club.

At the computerized merchant processor

"*Acquiring the information related to the payment from the merchant*." Diners Club received the information related to the payment from the merchant.

"*Authorizing and settling[5] the payment*." Diners Club then authorized and settled the LeCard payments. As the card issuer and merchant processor, Diners Club itself approved the authorization request and conveyed this information back to the merchant. The settlement involved Diners Club, as the merchant processor, reflecting a credit for the transaction in its records as required by the agreed upon claim construction. Accordingly, Diners Club was the "computerized merchant processor" within the meaning of the claims of the '281 Patent: it was a computer-equipped entity that acquired or processed merchant transactions.

"*Forwarding at least a portion of the payment to a computerized payment receiver as payment of at least a portion of an obligation made by the merchant*."

According to the '281 patent, this element requires that the merchant processor forward one or more portions of what would normally go the merchant to the computerized payment receiver. '281 patent, at 5:21-25 ("[T]he invention involves a merchant processor 300 designed to pay a portion of what would normally go to the merchant 20 to the lender 60 as repayment of at least a portion of the merchant's outstanding loan amount, as indicated by an arrow 29."); 5:32-37; FIG. 2 (arrows 27 and 29) (showing split of total amount in portions between merchant and payment receiver).

---

[5] According to the Court's claim construction, "settling the payment" means "the part of a transaction when an amount is transferred or credited to the merchant processor.

In the Clever Ideas system, there is no splitting as described in the patent. Rather, Diners Club simply forwarded the entire transaction to Clever Ideas, without giving anything to the merchant. Although testimony showed that Diners Club did not forward to Clever Ideas amounts representing cardholder discounts or processing fees, these discounts or fees are irrelevant to the forwarding step. Rather, according to the '281 patent, the merchant processor is supposed to divide up the amount that would normally go to the merchant and forward a portion of that amount to the payment receiver "as payment." The cardholder discounts and processing fees would never have gone to the merchant in any event.

Accordingly, the LeCard prior art does not practice this element of Claim 1.

At the computerized payment receiver

"*Receiving the portion of the payment forwarded by the computerized merchant processor*." Clever Ideas received the portion of the payment forwarded by Diners Club.

"*Applying that portion to the outstanding obligation made by the merchant to reduce such obligation*." Clever Ideas applied the full amount of the portion forwarded to it by Diners Club to reduce the restaurant's outstanding cash or advertising advance obligation to Clever Ideas. Clever Ideas thus "us[ed] the portion that was received from the merchant processor to reduce the obligation owed by the merchant" - as set forth in the Court's claim construction - and, therefore, "appl[ied] that portion to the outstanding obligation made by the merchant to reduce such obligation."

*Claim 5*

The LeCard card was a charge card, because it was a card that required full payment every billing cycle.

26

*Claim 6*

Merchants in the LeCard program accepted the LeCard card at their restaurant locations, *i.e.* "at a merchant location."

*Claim 7*

Restaurants participating in the LeCard program after 1992 accepted the Diners Club/LeCard cards using an electronic draft capture, i.e. "electronically."

*Claim 9*

Diners Club forwarded payments to Clever Ideas on a periodic basis - i.e., on a daily or weekly basis.

*Claim 10*

At a merchant

"*Means for accepting a customer identifier as payment from the customer and for electronically forwarding information related to the payment to a computerized merchant processor*." Merchants accepted LeCard card numbers and electronically forwarded information related to the payment to Diners Club using ordinary merchant-location equipment, including VeriFone merchant-location equipment.

Standard VeriFone merchant-location equipment, as described in the '281 patent, contained a processor, memory, modem, and a keypad or magnetic card reader together with software executing an algorithm to accept customer identifiers and electronically forward information related to the payment to a computerized merchant processor.

<u>At the computerized merchant processor</u>

"*Means for receiving the information related to the payment from the merchant*."  Diners Club received the information related to the payment from the merchant electronically via modems.

"*Means for authorizing and settling the payment*."  Diners Club used computers to authorize and settle LeCard payments.

"*Means for forwarding a portion of the payment to the third party to reduce the obligation*."

The Court has limited the forwarding element in Claim 10 to the algorithm set forth in the specification on column 5, lines 21-37.  The algorithm described by these lines includes a split of payment between the merchant and a third party, such that the merchant processor pays a portion of the outstanding obligation to the payment receiver (after deducting processing fees), and pays the rest to the merchant.

The Clever Ideas Prior Art did not perform this algorithm.  Under the Clever Ideas system, Diners Club did not perform any splitting of the payment between the merchant and the third party, and did not pay the merchant some amount less than what the merchant would receive in the standard processing arrangement.  Instead, Diners Club sent the entire transaction to Clever Ideas without any forwarding of payments to the merchant.  Accordingly, the LeCard prior art did not practice this element of claim 10.

### Claim 14

The LeCard card was a charge card because it was a card that required full payment every billing cycle.  Merchants accepted LeCard charge cards using ordinary merchant-location equipment, including VeriFone merchant-location equipment.

*Claim 15*

Merchants accepted LeCard card numbers at their merchant location using ordinary merchant-location equipment, including VeriFone merchant-location equipment.

*Claim 16*

Merchants electronically accepted LeCard card numbers at their merchant location using ordinary merchant-location equipment, including VeriFone merchant-location equipment.

*Claim 18*

Diners Club subtracted the Diners Club processing fees and the 20% cardholder discount from the amount of the LeCard payment and periodically forwarded the remaining portion of the payment to Clever Ideas using its computer system, which included a processor, memory, modem, and software.

*Claim 19*

Any amount forwarded from Diners Club to Clever Ideas was a percentage of the obligation owed by the merchant. Diners Club thus forwarded to Clever Ideas an amount that was a percentage of the merchant's obligation to Clever Ideas using its computer system, which included a processor, memory, modem, and software.

### *ii. The Litle & Co. Prior art Method and System*

The evidence reveals the following facts regarding the Litle & Co. prior art:

From 1990-1993, Litle & Co. worked with National Processing Company ("NPC") and First National Bank of Louisville ("FNBL") to process card transactions. The responsibilities of each of

these companies with respect to processing card transactions is explained in detail in the contemporaneous Member Agreement, dated June 1992.[6]

The Litle & Co. prior art system and method was completely automated and involved payment by the merchant processor to various merchant creditors, including Hanover Finance, and Litle & Co. The processing of card payments (i.e., acquiring, authorizing, and settling) was identical regardless of who was ultimately paid by the merchant processor after settlement of the payment. The only differences between the merchant processor's paying Hanover Finance and Litle & Co. in the Litle & Co. prior art were: (1) the entity to which payment was forwarded and (2) the type of merchant obligation being automatically repaid. The steps occurring "at the merchant" (accepting a customer identifier as payment and electronically forwarding information related to the payment to the computerized merchant processor) and the "at the merchant processor" steps of acquiring, authorizing, and settling, were identical in each merchant creditor arrangement.[7]

The merchant processor's forwarding a portion of the payment to the party to which the merchant owed an obligation in the Litle & Co. prior art was routine and simply involved the step of inputting a bank account number of the entity to which payment was to be forwarded into the existing computer system and specifying what portion of the payment was to be forwarded.

<u>Litle & Co. Postage Advance</u>

Beginning on or before June 22, 1990, Litle & Co. provided postage advances to merchants

---

[6] Beginning in 1994, Litle & Co. worked in conjunction with First U.S.A. Merchant Services, Inc. ("First USA") to process card transactions. The Member Agreement remained identical, but First USA assumed the responsibilities of both NPC and FNBL as described in the Member Agreement.

[7] While the steps that occurred at the merchant processor were identical, the entities that performed the various functions may have changed.

in exchange for the merchants' agreement allowing the merchant processor to forward "Daily Repayment Amounts" to Litle & Co. out of the merchant's "Net Proceeds" from card payments ("Postage Advance Program").

The postage advance agreement—i.e., the "Promissory Note for Postage Advance"—was a schedule to the standard processing agreement ("Member Agreement") entered by and between a merchant, Litle & Co., NPC, and FNBL.  In the Postage Advance Program, Litle & Co., NPC, and FNBL performed their ordinary functions under the Member Agreement (including acquiring information related to the payment from the merchant and authorizing and settling the payment), with the exception of the forwarding step.  Rather than forwarding all of Net Proceeds to the merchant, the merchant processor forwarded a portion of the payment ("Daily Repayment Amounts") to Litle & Co. as repayment of the merchant's postage advance obligation.

The merchant's obligation to Litle & Co. was created by a cash or advertising advance and, therefore, was an "obligation" within the meaning of the claims of the '281 patent:  it was an amount owed by a merchant that was independent of any costs or fees arising out of the use of customer identifiers as payment.

<u>Hanover Finance</u>

The merchant processor in the Litle & Co. prior art also entered arrangements with merchant creditors whereby FNBL (or, after 1994, First USA) automatically forwarded a portion of card payments to the merchant creditor as repayment of the merchant's obligation.

In the arrangement described in the 1994 Hanover Finance letter ("Hanover Finance Program"), Boston Publishing (a merchant that entered into the Member Agreement with the

31

merchant processor) obtained a line of credit from a creditor (Hanover Finance) and authorized the merchant processor's automatic forwarding of a portion of its card payments directly to the creditor upon written instruction from Hanover Finance.

In the Hanover Finance Program, the merchant (Boston Publishing) granted the creditor (Hanover Finance) a security interest in the funds that the merchant would receive from "Card Sales from Litle & Co." When Hanover Finance instructed Litle & Co. to begin forwarding payment pursuant to this arrangement, the merchant processor thereafter practiced the claimed method and system for automated payment of Boston Publishing's obligation to Hanover Finance.

Boston Publishing's obligation to Hanover Finance was created by Hanover Finance's providing a line of credit to the merchant and, therefore, was an "obligation" within the meaning of the claims of the '281 patent: it was an amount owed by a merchant that was independent of any costs or fess arising out of the use of customer identifiers as payment.

### *Claim 1*

<u>At the merchant</u>

"*Accepting a customer identifier as payment from the customer*." Merchants in the Litle & Co. prior art accepted credit card numbers, debit card numbers, and charge card numbers as payment from their customers. These three types of cards are identified as "BANK CARDS" (credit cards and debit cards) and "T&E CARDS" (charge cards) in the Member Agreement.

"*Electronically forwarding information related to the payment to the computerized merchant processor*." After accepting a customer identifier as payment from the customer, merchants electronically forwarded information related to the payment to Litle & Co.

At the computerized merchant processor

"*Acquiring the information related to the payment from the merchant*." Litle & Co. received the information related to the payment from merchants.

"*Authorizing [the payment]*." Litle & Co. and NPC then obtained permission from the card issuer for using the card number for the transaction between the customer and the merchant, thus Litle & Co. and NPC authorized the payment within the meaning of claim 1. NPC charged Litle & Co. a processing fee for its services. Litle & Co. maintained the NPC processing fees in a separate account and paid those fees to NPC out of that account on a monthly basis.

"*Settling the payment*." The card issuer then transferred funds for the card payment to FNBL/ First USA. Because the card issuer transferred or credited payment to FNBL/ First USA, FNBL/First USA settled the payment within the meaning of claim 1.[8]

The Court has construed "computerized merchant processor" to mean "a computer-equipped entity or combination of entities that acquires or processes merchant transactions." Litle & Co., NPC, and FNBL each performed discrete roles in the processing of card transactions, including claim 1's acquiring information from the merchant (Litle & Co.), authorizing the payment (Litle & Co. and NPC), settling the payment (FNBL), and forwarding payment (FNBL) functions. Moreover, all three entities were signatories to the standard processing agreement ("Member Agreement") in the early 1990s. Therefore, the *combination* of Litle & Co., NPC, and FNBL[9] constituted the computerized merchant processor in the Litle & Co. prior art.

---

[8] Settling the payment: the part of a transaction when an amount is transferred or credited to the merchant processor.

[9] As described above, after 1994, the functions previously performed by NPC and FNBL were performed by First USA, and the combination of Litle & Co. and First USA comprised the merchant processor in the Litle & Co. prior art.

For an ordinary card transaction, FNBL/First USA forwarded the card payment amount less processing fees ("Net Proceeds") to the merchant. However, in the situation where the merchant had an outstanding obligation to a creditor, FNBL/First USA periodically forwarded a portion of the merchant's card payments to that creditor.

"*Forwarding at least a portion of the payment to a computerized payment receiver as payment of at least a portion of an obligation made by the merchant.*"

*Postage Advance Program.* In the Litle & Co. postage advance program, rather than forwarding Net Proceeds to the merchant, FNBL forwarded, by ACH, Daily Repayment Amounts for postage advances to Litle & Co. as payment of at least a portion of the merchant's postage advance obligation. FNBL then forwarded any remaining portion of Net Proceeds to the merchant.

Because Litle & Co. was an account or entity capable of receiving payments or credits electronically, and because Litle & Co. did receive payments electronically, Litle & Co. was a "computerized payment receiver" within the meaning of claim 1.

*Hanover Finance Program.* In the arrangement identified in the 1994 Hanover Finance letter, First USA (after performing the other processing functions described above) electronically forwarded the card payment amount, less processing fees and postage advance repayment amounts, directly to Hanover Finance as repayment of the merchant's obligation to Hanover Finance. Therefore, the portion forwarded to Hanover Finance was the amount remaining after deduction of processing fees and postage advance repayment amounts.

Because Hanover Finance was an account or entity capable of receiving payments or credits electronically, and in fact did receive payments electronically, it was a "computerized payment

34

receiver" within the meaning of claim 1.

<u>At the computerized payment receiver</u>

"*Receiving the portion of the payment forwarded by the computerized merchant processor and applying that portion to the outstanding obligation made by the merchant to reduce such obligation.*"

*Postage Advance Program.* Litle & Co., via a bank account, received the amount forwarded by FNBL (Daily Repayment Amount) and applied that amount to reduce the merchant's postage advance obligation.

FNBL's forwarding of a portion of the payment to Litle & Co. is the type of forwarding that would take place in the preferred embodiment's description of the situations in which (1) the merchant processor is the same entity as the lender or (2) the merchant processor is an entity affiliated in some way with the lender. In both situations, one member or division of the merchant processor forwards payment to another member or division of the merchant processor in accordance with the method of claim 1. The merchant, merchant processor, and computerized payment receiver in the Litle & Co. Postage Advance Program thus practiced every element of claim 1.

*Hanover Finance Program.* Upon receipt of the portion of the payment forwarded by First USA, Hanover Finance applied that amount to reduce Boston Publishing's obligation to Hanover Finance (as any merchant creditor necessarily does). The merchant, computerized merchant processor, and computerized payment receiver in the Litle & Co. Hanover Finance Program thus practiced every element of claim 1.

***Claims 2, 3, and 5***

Merchants in all merchant creditor arrangements in the Litle & Co. prior art (i.e., postage finance and Hanover Finance) accepted card numbers from credit cards, debit cards, and charge cards.

***Claim 6***

Merchants in all merchant creditor arrangements in the Litle & Co. prior art accepted customer identifiers at their merchant location.

***Claim 7***

Merchants in all merchant creditor arrangements in the Litle & Co. prior art electronically accepted customer identifiers.

***Claim 9***

FNBL/First USA periodically forwarded (e.g., daily) a portion of the payment to merchant creditors in all merchant creditor arrangements in the Litle & Co. prior art.

***Claim 10***

<u>At a merchant</u>

"*Means for accepting a customer identifier as payment from the customer and for electronically forwarding information related to the payment to a computerized merchant processor.*"  Merchants in all merchant creditor arrangements in the Litle & Co. prior art electronically accepted customer identifiers as payment from their customers and electronically forwarded information relating to the payment to Litle & Co. using customary merchant-location

36

equipment, including that offered by VeriFone.

<u>At the computerized merchant processor</u>

"*Means for receiving the information related to the payment from the merchant*." Litle & Co. received the information related to the payment from merchants using modems in all merchant creditor arrangements in the Litle & Co. prior art.

"*Means for authorizing [the payment]*." Litle & Co./NPC used computers configured to route an authorization request to a card issuer and receive the card issue's approval to authorize the transaction in all merchant creditor arrangements in the Litle & Co. prior art, thus using claim 10's claimed standard means for authorizing the payment.

"*Means for settling the payment*." Using computers executing the appropriate standard software, NPC submitted the amount of the customer's purchase to the card issuer, and FNBL received or was credited some amount by the card issuer in all merchant creditor arrangements in the Litle & Co. prior art. These two entities together thus employed claim 10's claimed means for settling the payment.[10]

"*Means for forwarding a portion of the payment to the third party to reduce the obligation*."
*Postage Advance Program*. In deriving Daily Repayment Amounts and forwarding them to Litle & Co. using computers containing a processor, memory, modem, and software, FNBL forwarded a portion of the payment to Litle & Co. using the claimed "means for forwarding a portion of the payment to the third party" at the computerized merchant processor.

Litle & Co., as the lender (postage advance provider), was distinct from the combination of

---

[10]  Starting in 1994, First USA performed these tasks.

entities (i.e., the combination of Litle & Co., NPC, and FNBL) comprising the computerized merchant processor and was thus a "third party" within the meaning of claim 10.[11] The merchant and merchant processor in the Litle & Co. Postage Advance Program thus used the claimed means to perform the claimed functions of claim 10.

*Hanover Finance Program*.  Because First USA used computers with processors, memory, modem, and software executing an algorithm that derived the portion of the payment to be periodically forwarded (by subtracting processing fees and postage advance repayment amounts from the merchant's card transactions) and forwarded that portion to Hanover Finance, claim 10's claimed "means for forwarding a portion of the payment to the third party" was employed by the merchant processor in the Litle & Co. Hanover Finance program.

Because Hanover Finance was an entity other than the merchant or merchant processor in the Litle & Co. Hanover Finance program, Hanover Finance was a "third party" within the meaning of claim 10. The merchant and merchant processor in the Litle & Co. Hanover Finance Program thus used the claimed means to perform the claimed functions of claim 10.

### Claims 11, 12, and 14

Merchants in all merchant creditor arrangements in the Litle & Co. prior art used standard merchant-location equipment, including VeriFone merchant-location equipment, to accept credit card numbers, debit card numbers, and charge card numbers from customers.

### Claim 15

Merchants in all merchant creditor arrangements in the Litle & Co. prior art used standard

---

[11]  Third party:  payment receiver, i.e., a party that is neither the merchant nor the merchant processor.

merchant-location equipment, including VeriFone merchant-location equipment, to accept customer identifiers at their merchant location.

### Claim 16

Merchants in all merchant creditor arrangements in the Litle & Co. prior art used standard merchant-location equipment, including VeriFone merchant-location equipment, to electronically accept customer identifiers as payment from customers.

### Claim 18

The merchant processor periodically (e.g., daily) forwarded a portion of the payment to Litle & Co. and Hanover Finance using computer systems executing the algorithm identified by the Court in each of the three merchant creditor arrangements in the Litle & Co. prior art.

### Claim 19

The merchant processor forwarded an amount that was a percentage of the merchant's obligation to Litle & Co. and Hanover Finance using computer systems executing the algorithm identified by the Court in each of the merchant creditor arrangements in the Litle & Co. prior art. Any amount forwarded by FNBL was a percentage of the obligation owed by the merchant within the meaning of claim 19.

### Public Knowledge, Public Use and Corroboration

*Postage Advance Program*.  All relevant facts regarding the operation of the Litle & Co. Postage Advance program are established by contemporaneous, non-confidential documentation that was available to the public in the early 1990s. All testimony of witnesses with personal knowledge of the operation of the Litle & Co. postage advance program confirms the documents' contents and

is entirely consistent. All testimony is thus fully corroborated by contemporaneous documentation and by other witness testimony.

On June 8, 1992, *Forbes* published an article about Randall Bourne, founder of Exposures, Inc. Manjeet Kripalani & Tatiana Pouschine, *People thought I was nuts*, Forbes Magazine, June 8, 1992, at 120. The article states, "[W]hen he needed money, he turned to his credit card processor, a New Hampshire-based company called Litle & Co. Litle agreed to finance his postage by discounting his credit card receivables. It was such a good idea, other catalogers have followed suit." *Id*.

The *Forbes* article thus describes that the merchant's credit card receivables were discounted by Litle & Co., which is precisely the method in claim 1. A person of ordinary skill in the art, knowing the standard method of processing card transactions and that all credit card processors processing Visa and MasterCard transactions must use the processing services of a sponsoring bank to forward funds,[12] would understand this article to disclose that FNBL, Litle & Co.'s sponsoring bank, forwarded a portion of Exposures' card transactions to Litle & Co. as payment of Exposures' postage advance obligation to Litle & Co.

As Litle & Co.'s Postage Advance program was described in non-confidential contemporaneous documentation, publicized by *Forbes* magazine, and openly discussed with those in the processing industry in the early 1990s, the Litle & Co. postage advance program was publicly known and publicly used: it was used in the ordinary course of business, without efforts to conceal its operation, from at least 1990-1993.

---

[12]  Because Visa and MasterCard require that third party processing companies be associated with a sponsoring bank, the construction of "computerized merchant processor" expressly includes the situation where a combination of entities comprises the merchant processor.

Accordingly, because the Litle & Co. Postage Advance method and system was extensively used commercially, and those involved took no measures to conceal the relevant details of operation of the program, all relevant facts regarding the operation of the Postage Advance program were publicly known before AdvanceMe's invention date, and the Postage Advance program was publicly used more than one year before July 9, 1997, the '281 patent's priority date.

*Hanover Finance Program.*  All relevant facts regarding the operation of the Litle & Co. Hanover Finance program are established by contemporaneous, non-confidential documentation that was available to the public by at least 1994.  All testimony of witnesses with personal knowledge of the operation of the Litle & Co. Hanover Finance program confirms the documents' contents and is entirely consistent.  All testimony is thus fully corroborated by contemporaneous documentation and by other witness testimony.

As Litle & Co.'s Hanover Finance program was described in non-confidential contemporaneous documentation and openly discussed with those in the processing industry in the early 1990s, with no efforts to conceal its operation, the Litle & Co. Hanover Finance program was publicly known and publicly used:  it was used in the ordinary course of business, without efforts to conceal its operation, beginning at least as early as 1994.

Accordingly, because the Litle & Co. Hanover Finance method and system was extensively used commercially, and those involved took no measures to conceal the relevant details of operation of the program, all relevant facts regarding the operation of the Hanover Finance program were publicly known before AdvanceMe's invention date, and the Hanover Finance program was publicly used more than one year before July 9, 1997, the '281 patent's priority date.

41

### iii. The Transmedia Prior art Method

Beginning in 1990, Transmedia Network, Inc. ("Transmedia") offered a dining discount program to its cardholders similar to the LeCard program except that Transmedia customer's bills were ultimately charged to a major credit card.   In the Transmedia program, cardholders received a Transmedia card (which contained a unique identifying account number) that could be used to purchase food and beverages at participating restaurants.  After a cardholder presented a Transmedia card as payment at a restaurant participating in the Transmedia program, that cardholder received a 25% discount off that charge on its monthly Visa, MasterCard, American Express, or Discover statement from its card issuer.

In addition to the Transmedia program's benefits to the cardholder, restaurants benefitted from the program by receiving a cash advance from Transmedia, which was automatically repaid to Transmedia out of future Transmedia card payments. Transmedia had arrangements with Visa, MasterCard, and Discover so that the full amount of these bills would be remitted to Transmedia while the cardmember's credit card account would be debited for the bill's total and credited for 25% of the bill's food and beverage portion (as the 25% discount for dining at the participating restaurant).  Transmedia kept the full amount of the payment that it received from Visa, MasterCard, or Discover, less tax and gratuities, and applied it against the Rights to Receive owned by Transmedia in order to reduce its food and beverage credit balance with the restaurant. The tax and gratuities were reimbursed to the restaurant.  No other party received any portion of the payment from Transmedia.

Specific Findings of Fact

In the Transmedia program, Transmedia made a cash advance to a restaurant that was repaid

42

through future Transmedia card payments accepted at that restaurant. The restaurant's obligation to Transmedia arose from this cash advance and was thus an "obligation" within the meaning of claim 1: it was an amount owed by a merchant that is independent of any costs or fees arising out of the use of customer identifiers as payment.

When a cardholder signed up for the Transmedia program, the cardholder provided a Visa, MasterCard, Discover, or American Express card number to Transmedia, which was the account to which the Transmedia cardholders' restaurant charges would ultimately be billed.

### *Claim 1*

#### At a merchant

"*Accepting a customer identifier as payment from the customer*." Merchants in the Transmedia program accepted a Transmedia card number as payment from a cardholder. The Transmedia card number was a "customer identifier" within the meaning of claim 1 because it was a unique identifying account number.

"*Electronically forwarding information related to the payment to the computerized merchant processor*." Merchants in the Transmedia program electronically forwarded information related to the payment to Transmedia using point-of-sale terminals.

#### At the computerized merchant processor

Beginning at least by 1995 and continuing through July 9, 1997, Transmedia operated its own computerized merchant processing division that, in conjunction with its sponsoring bank, processed card payments.

"*Acquiring the information related to the payment from the merchant*." Transmedia received

43

the information related to the payment from the merchant.  After receiving the information related to the payment from the merchant, Transmedia associated the card number from the Transmedia card with the cardholders' Visa, MasterCard, Discover, or American Express card account.   The Transmedia card payment was thereafter processed as an ordinary Visa, MasterCard, Discover, or American Express card transaction.

"*Authorizing [the payment]*."  Transmedia's merchant processing division then authorized the transaction.

"*Settling the payment*."  The Visa, MasterCard, Discover, or American Express card issuer transferred or credited an amount to Transmedia's sponsoring bank, thus Transmedia's sponsoring bank settled the payment within the meaning of claim 1.

Accordingly, the combination of Transmedia and its sponsoring bank was the "computerized merchant processor" within the meaning of claim 1 of the '281 patent: the computer-equipped combination of entities that acquired or processed merchant transactions.

"*Forwarding at least a portion of the payment to a computerized payment receiver as payment of at least a portion of an obligation made by the merchant*."  According to the '281 patent, this element requires that the merchant processor forward one or more portions of what would normally go the merchant to the computerized payment receiver.  '281 patent, at 5:21-25 ("[T]he invention involves a merchant processor 300 designed to pay a portion of what would normally go to the merchant 20 to the lender 60 as repayment of at least a portion of the merchant's outstanding loan amount, as indicated by an arrow 29."); 5:32-37; FIG. 2 (arrows 27 and 29) (showing split of total amount in portions between merchant and payment receiver).

44

There is no splitting in the Transmedia prior art as described in the patent. Rather, the merchant processor forwarded the entire transaction (less tax and tips) to Transmedia without giving anything to the merchant. As with LeCard, although testimony showed that Transmedia did not receive amounts representing cardholder discounts or processing fees, these discounts or fees are irrelevant to the forwarding step. Rather, according to the '281 patent, the merchant processor is supposed to divide up the amount that would normally go to the merchant and forward a portion of that amount to the payment receiver "as payment." The cardholder discounts and processing fees would never have gone to the merchant in any event.

Accordingly, the Transmedia prior art does not practice this element of Claim 1.

At the computerized payment receiver

"*Receiving the portion of the payment forwarded by the computerized merchant processor*." Transmedia then received the portion of the payment forwarded.

"*Applying that portion to the outstanding obligation made by the merchant to reduce such obligation*." Transmedia applied the payment forwarded by the computerized merchant processor to reduce the restaurant's cash advance obligation. Therefore, Transmedia "us[ed] the portion that was received from the merchant processor to reduce the obligation owed by the merchant" - as set forth in the Court's claim construction order - and "appl[ied] that portion to the outstanding obligation made by the merchant to reduce such obligation" as required by claim 1.

*Claim 6*

Restaurants participating in the Transmedia program accepted Transmedia card numbers at their merchant location.

45

*Claim 7*

Restaurants participating in the Transmedia program electronically accepted Transmedia card numbers.

*Claim 9*

Transmedia's sponsoring bank (i.e., one of two entities comprising the merchant processor) periodically forwarded at least a portion of the payment to Transmedia.

### iv. Prior art Reserve Account Method

It is standard in the payment processing industry, and was standard for many years prior to 1997, for merchant processors to require high-risk merchants to set up "reserve accounts" to compensate for the risk associated with chargebacks. Chargebacks occur, for example, when a cardholder disputes a charge on his or her card statement. In a chargeback situation, the merchant is liable for the amount of the chargeback. However, if the merchant has insufficient funds in its bank account to pay the chargeback, the merchant processor is liable to Visa or MasterCard for the amount of the chargeback and is thus forced to incur a loss in the amount of the chargeback.

A reserve account is a "buffer" account that is used in payment processing systems to ensure a merchant's ability to pay the amount of any chargebacks that occur. In a chargeback situation, the merchant processor may debit the reserve account for the amount of the chargeback rather than incurring the expense itself. Prior to July 9, 1997, reserve accounts were funded and maintained by the merchant processor's forwarding a portion of the merchant's daily card payments to the reserve account after processing (i.e., after acquiring, authorizing, and settling the payment).

A merchant's reserve account obligation arises out of a reserve agreement, which may be an

independent agreement between a merchant processor and a merchant or a provision of the processing agreement between the merchant and merchant processor. The merchant's obligation to maintain a reserve account may require the merchant to contribute a percentage of every transaction to the reserve account up to a specified amount (known as a "rolling reserve"), or require the merchant to maintain a specified balance in the reserve account.

### Claim 1

<u>At a merchant</u>

"*Accepting a customer identifier as payment from the customer.*"  As the reserve account was funded from merchant card payment in the ordinary course of business, the merchant accepted customer identifiers as payment from its customers as they normally did in the ordinary course of business.

"*Electronically forwarding information related to the payment to the computerized merchant processor.*"  Merchants then - as they did with all standard card payments - electronically forwarded information related to the payment to their merchant processor.

<u>At the computerized merchant processor</u>

"*Acquiring the information related to the payment from the merchant, authorizing and settling the payment.*"  The merchant processor then performed its usual functions of acquiring information related to the payment from the merchant and authorizing and settling the payment.

"*Forwarding at least a portion of the payment to a computerized payment receiver as payment of at least a portion of an obligation made by the merchant.*"  A chargeback is not the type of obligation contemplated in the '281 patent.  The Court construed obligation to mean "an amount

owed by a merchant that is independent of any costs or fees arising out of the use of customer identifiers as payment." As is evident by the '281 patent, this is usually an obligation incurred in exchange for an advance to the merchant. A chargeback is a fee as a result of a dispute or non-payment of a credit card bill. The merchant has received no advance from the third party. Accordingly, the forwarded portion of payment is not payment of "an obligation" as the claim requires.

### At the computerized payment receiver

"*Receiving the portion of the payment forwarded by the computerized merchant processor and applying that portion to the outstanding obligation made by the merchant to reduce such obligation*." The reserve account received the amount forwarded by the merchant processor, but as discussed above, the amount is not applied to an "obligation" as contemplated by the patent.

### *Claims 2-7 and 9*

As the '281 patent acknowledges, merchants in the prior art accepted credit cards, debit cards, smart cards, and charge cards as payment from customers. Similarly, the '281 patent acknowledges that prior art merchants electronically accepted customer identifiers at their merchant location. Therefore, the method of funding prior art reserve accounts practiced every element of claims 2-7 of the '281 patent.

As merchant processors forwarded payment for a merchant's card transactions on a periodic basis (typically on a daily basis), the merchant processor periodically forwarded at least a portion of the payment to the reserve account. The method of funding prior art reserve accounts thus practiced every element of claim 9 of the '281 patent.

**B. Obviousness**

Although the Court holds only that the Litle & Co. prior art anticipates the '281 patent, the totality of the prior art, discussed in detail above, renders the patent obvious. While the Clever Ideas and Transmedia prior art fail to forward some of the money back to the merchant thus enabling the merchant to have predicable cash flow, the common sense of a person of ordinary skill would logically lead to this extension of forwarding money back to the merchant. Further, the Litle & Co. and reserve account methods both allow the merchant to receive at least a portion of the transactions.

The LeCard program only accepted Diners Club credit cards, however, other prior art (e.g. Litle & Co.) uses common credit cards such as Visa and Mastercard. In addition, the common sense of a person of ordinary skill would lead to the use of other cards such as smart cards.

The reserve account methods did not have an obligation as the Court construed that term, but Clever Ideas, Transmedia and Litle &Co. all gave advances in exchange for future receivables thus satisfying the obligation requirement.

When considered together, one of skill in the art could easily view the prior art and make the common sense leap to the '281 claims. *See Leapfrog Enters.*, 485 F.3d at 1161 ("the common sense of those skilled in the art demonstrates why some combinations would have been obvious").

The secondary considerations do not overcome this conclusion. Johnson's commercial success in practicing the claimed methods is evidence of her excellent entrepreneurship in meeting the long-felt need of certain market segments that the other prior art methods had not yet reached. It does not overcome the other evidence of obviousness.

The '281 patent acknowledges that prior art methods and systems in the payment processing

industry were identical or nearly identical to the claimed method and system. The '281 patent describes a combination of old elements with no change in their respective functions; the claims of the '281 patent require a merchant processor to simply use existing equipment to forward a portion of the payment to a merchant's obligor. The evidence reveals that this step is performed by simply entering a different bank account number into an existing computer system at the merchant processor. In other words, the '281 patent combines familiar elements with known methods to yield predictable results. *See KSR*, 127 S. Ct. at 1739. Granting a patent monopoly to this technological advance that would have occurred in the ordinary course without real innovation retards progress and deprives prior inventions of their value. Accordingly, in light of the prior art, the '281 patent is obvious.

### C. Inventorship

Barbara Johnson is the sole inventor named on the '281 patent; thus, she is presumed to be the sole inventor of the '281 patent. Defendants can only overcome this presumption by presenting clear and convincing evidence that Johnson was not the inventor. Defendants have not established that Johnson obtained or derived the ideas for the inventions from another source. Defendants have also not established that any individual other than Johnson contributed to the conception of the patented inventions. Since Defendants have not established by clear and convincing evidence that Johnson was not the inventor of the '281 patent, Defendants' defense under Section 102(f) is without merit.

**Inequitable Conduct**

Defendants have failed to establish by clear and convincing evidence that anyone involved in the prosecution of the '281 patent acted with intent to deceive the PTO. There is no evidence that

any such person even considered the possibility of submitting the prior art to the PTO, much less decided to deceive the PTO by withholding it. Since Defendants have failed to establish by clear and convincing evidence that any material prior art was withheld with an intent to deceive the PTO, Defendants' inequitable conduct defense is without merit.

**Infringement**

**A. Direct Infringement**

On December 21, 2006, Magistrate Judge John D. Love issued his Memorandum Opinion and Order regarding claim construction in this case (Docket No. 182). On January 29, 2007, this Court overruled Defendants' objections to Magistrate Judge Love's Memorandum Opinion and Order regarding claim construction (Docket No. 202). Since the claims of the '281 patent have already been properly construed to determine the scope of the asserted claims, all that remains to be done to determine infringement is to compare these properly construed claims with the allegedly infringing programs and systems.

Both Reach and MMT directly infringe the asserted claims of the '281 patent. Under Reach and MMT's programs, all of the elements of the patent claims are performed either by Reach or MMT, the merchants that enter into contracts with Reach or MMT, the merchant processors that enter into contracts with Reach or MMT, or agents or instrumentalities of these entities.

The claims generally require a merchant, who accepts a customer identifier (such as a credit card) to electronically forward the payment to a merchant processor. The merchant processor then authorizes and settles payment and forwards at least some of the payment to a payment receiver as payment of part of an obligation. The payment receiver then applies the payment to the merchant's

outstanding obligation.

MMT and Reach's programs satisfy each of these claims either literally or under the doctrine of equivalents.  For example, the forwarding step in the second element of Claim 1 is literally performed under both a split funding method recited in the Reach Financial documentation and under the back-to-back ACH variation as described in certain testimony of Reach Financial witnesses.  The back-to-back ACH variation performs the same forwarding step, but employs an additional intervening step.  However, an accused method does not avoid literally infringing a method claim having the transitional phrase "comprising" simply because it employs additional steps.  *Suntiger, Inc. v. Scientific Research Funding Group*, 189 F.3d 1327, 1336 (Fed. Cir. 1999)  (citation omitted). To the extent the back-to-back ACH variation does not constitute literal performance of the forwarding step, it constitutes an equivalent step under the doctrine of equivalents.

### B. Inducement to Infringe

MMT and Reach also induce infringement. Defendants knew or should have known that their actions would induce actual infringement.  MMT and Reach had actual notice of the patent at least as early as the filing of this lawsuit.  Defendants entered into agreements with merchant processors to perform the patented method with full knowledge of the '281 patent after this lawsuit was filed. This is strong evidence of intent to induce infringement.

Defendants have taken active steps to encourage infringement through entering into contracts requiring performance of the patented method and by repeatedly providing payment instructions to merchant processors to forward portions of payments according to the patented method.

## C. Contributory Infringement

MMT and Reach supplied important and necessary components of the patented method and system by providing capital to merchants under their programs which were only paid through forwarding of portions of payments by merchant processors, and by providing payment instructions to merchant processors that required performance of claim elements of the patented method. By so doing, Defendants contributed to direct performance of the claim elements by merchants and merchant processors.

The components provided by Defendants are not a staple article of commerce suitable for non-infringing use. Defendants' providing of capital, which is paid only through forwarding from merchant processors, and the payment instructions to merchant processors, could only be utilized for the purpose of performing the patented inventions.

At least since the inception of this lawsuit, Defendants supplied the capital and payment instructions with knowledge of the '281 patent. At least since the inception of this lawsuit, Defendants supplied the capital and payment instructions with knowledge that they were especially made or adapted for use in infringing the '281 patent. Since Defendants have contributed to the direct infringement by the merchants and merchant processors of the '281 patent, they are liable as contributory infringers under 28 U.S.C. § 271(c).

## D. Willful Infringement

There is no evidence that any Defendant acted without a reasonable belief that its actions avoided infringement of a valid patent. AdvanceMe has presented insufficient evidence that clearly and convincingly shows that any Defendant was aware of the '281 patent before filing suit, and

53

Defendants began their activities without knowledge of the patent generally. In addition, Defendants had both a good faith non-infringement challenge and a good faith invalidity challenge. Thus, the Court finds that neither Defendant willfully infringed the '281 patent.

**Exceptional Case and Attorneys' Fees**

Neither side has established that this is an exceptional case that warrants attorneys' fees. Accordingly, the Court concludes that attorneys' fees under Section 285 are not warranted.

## CONCLUSION

For the reasons stated above, the Court finds the '281 patent is **INVALID** as anticipated and obvious. Accordingly, AdvanceMe **TAKES NOTHING** from Reach and MMT, and Reach and MMT are entitled to their costs as the prevailing parties.[13] The Court will issue a final judgment in accordance with these findings of fact and conclusions of law.

**So ORDERED and SIGNED this 14th day of August, 2007.**



**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

---

[13] The Court encourages the parties to review its recent opinions in *Halliburton Energy Services, Inc. v. M-I, LLC*, __ F.R.D. ___ (E.D. Tex. June 20, 2007) (Davis, J.) (currently available at 2007 WL 1765642) and *Maurice Mitchell Innovations, L.P. v. Intel Corp.*, __ F. Supp. 2d ___ (E.D. Tex. June 20, 2007) (Davis, J.) (currently available at 2007 WL 1765641) regarding bills of costs. If, after reviewing the law as stated in those orders, there is any area of disagreement related to Defendants' Bills of Costs, the parties should meet, confer, and be prepared to compromise making every effort to submit an "agreed" bill of costs to the Court. If the parties still have a legitimate dispute on which they cannot agree, they shall file a joint "disagreed" bill of costs indicating their areas of disagreement, and the Court will set a hearing on same at which time lead trial counsel will be ordered to appear and explain why they have not been able to resolve their differences.